UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

DIALOGO, LLC and
DIRECT MERCHANTS S.A., INC.,

        Plaintiffs,

v.

LILLIAN SANTIAGO BAUZÁ,
EL DIALOGO, LLC, and FRANCISCO
JAVIER SOLÉ,

        Defendants.

CIVIL ACTION NO. 05-30076-MAP

**AFFIDAVIT OF GERRY PIKE**

I, Gerry Pike, do hereby on oath depose and state as follows:

1. My name is Gerry Pike, and I am the Managing Director of Direct Merchants S.A., Inc. ("DMSA"), which is a New Jersey corporation with a principal place of business in Newfoundland, Pennsylvania. I am over 18 years old and competent to testify in this action.

2. The information set forth in this affidavit is based upon my personal knowledge, upon the books and records of DMSA, which is a regularly-conducted business and which maintains its records as a regular practice of its business, or the public records of the Commonwealth of Massachusetts.

3. In May and early June of 2004, Lillian Santiago Bauzá approached me to discuss the possibility of engaging in a venture with DMSA.

4. The purpose of the venture was to develop a Spanish language and bilingual print and media business.

5.  In early June 2004, Ms. Santiago Bauzá wanted a contract to set forth the obligations of the parties. In an e-mail sent to me in early June, Ms. Santiago Bauzá stated:

> I need to come to some understanding with you before we enter this new adventure in both our professional and business lives. I really need a tangible contract that we can start building from.

I have attached a copy of this e-mail as Exhibit 1 to this affidavit.

6.  Ms. Santiago Bauzá continued, "I am moving on with the plan I presented to you. I am working very hard to have a <u>new</u> Dialogo by July 1st." Ex. 1 (emphasis added).

7.  In response to Ms. Santiago Bauzá's e-mail, on June 9, 2004, I sent her a reply, stating:

> It has been but 7 business days since our 05/27/04 CT meeting and your e-mail of 06/08. Let's review where we are re: DMSA's commitment and what we have done to date:
>
> *   We have committed to partner with you without reservation.
> *   We outlined to you an exit strategy for your situation with Manuel [her former business partner].

I have attached a copy of my e-mail dated June 9, 2004 as Exhibit 2.

8.  In that June 9 e-mail, I also stated:

> Our attorneys have completed all the drafts to create the new Dialogo LLD [sic]. However, per our 06/02 conversation, you need to resolve the partnership situation with Manuel in order for us to execute it.

Ex. 2.

9.  Later, on June 9, 2004, I e-mailed to Ms. Santiago Bauzá a copy of the corporate documents for the formation of the new company, Dialogo, LLC ("Dialogo, LLC" or "the Company") between DMSA and Ms. Santiago Bauzá. Ex. 3. These documents were executed by DMSA and included a Venture Agreement, an Operating Agreement and Members

Agreement (Dialogo, LLC) for the new company, as well as two consents in lieu of meetings, one to be signed by the Members of the new company and one by the Directors. Id.

10. On June 9, Ms. Santiago Bauzá executed these documents on her own behalf and returned them to me by facsimile.

11. As contemplated in the Venture Agreement, and as set forth in the Operating Agreement and Members Agreement (Dialogo, LLC) ("the Operating Agreement"), DMSA and Ms. Santiago Bauzá entered into the Operating Agreement to form a limited liability company called Dialogo, LLC. Under the Operating Agreement, DMSA agreed to make a capital contribution up to $50,000 and Ms. Santiago Bauzá made a capital contribution of $1.00. Ex. 4, at 30. The membership interests of the Company, accordingly, are as follows: DMSA - 51%, Ms. Santiago Bauzá - 49%. Id.

12. Under the Venture Agreement, Ms. Santiago Bauzá and DMSA formed a joint venture and that agreed that, among other things:

- They would create a limited liability company called Dialogo LLC for the joint venture and that Ms. Banzá had a 49% membership interest and DMSA had a 51% membership interest;
- The Company will be managed by a board of directors, consisting of two representatives from DMSA and one designated by Ms. Santiago Bauzá;
- DMSA and LSB [Lillian Santiago Bauzá] shall through the Company jointly pursue the Spanish language and bilingual print and media business;
- Ms. Santiago Bauzá shall devote her efforts exclusively to the Company, and she shall not provide "such services, directly or indirectly for itself [sic] or any other entity or person to the extent it relates to the Business."
- They will keep confidential the proprietary information of the Company.

Ex. 5, at 1-2.

13. Under the Operating Agreement, the Company was "formed for the object and purpose of developing Spanish language newspaper(s) and media." Ex. 4, at 6.

3

14. Under Section 12.7 of the Operating Agreement, Ms. Santiago Bauzá agreed to act exclusively on behalf of the Company. She agreed that:

> LSB shall employ its [sic] diligent efforts for the Company and LSB shall not provide such services, directly or indirectly for itself [sic] or any other entity or person to extent that it relates to the business.

Ex. 4, at 22. Ms. Santiago Bauzá also agreed that she "may not resign from the Company prior to the dissolution and winding up of the Company." Ex. 4, at 10.

15. Ms. Santiago Bauzá also agreed that the proprietary information of the Company was to be kept confidential. Section 12.8 of the Operating Agreement provides, in relevant part:

> DMSA and LSB acknowledge and agree that all efforts and actions undertaken by them for the Company in connection with the business of the Company are to be kept confidential. Neither DMSA nor LSB will disclose to any person or entity, directly or indirectly, any Proprietary Information (as hereinafter referred) relating to the Company's business without the prior written consent of the LLC. For the purposes of this Agreement, "Proprietary Information" means all advertiser and subscription lists, advertiser and subscription prospects, marketing information and data, product information, strategic or technical information, financial information, supplier information, billing rates and advertiser provided information, documents and data.

Ex. 4, at 22.

16. Under the Operating Agreement, the dissolution and winding up of the Company's affairs requires "the written consent of all Members." Ex. 4, at 24.

17. Shortly after Ms. Santiago Bauzá agreed to the terms of the Operating Agreement and the Venture Agreement, she wrote me an e-mail to provide an update of the Company. She stated:

> Just an update of what I've been doing in the last two weeks. I informed Manuel that I was going to close the Dialogo [B]ilingual Corporation. Open a bank account under Dialogo LLC, I need the ID # of the venture for the bank and clients. Attached please find

4

> copy of the new media kit, new name logo and other form just for your information and [advice] if you wish.
>
> <u>All new business are [sic] under Dialogo LLC contract</u>.

Ex. 6 (emphasis added).

18. In June, 2004, the Company established an office at Suite 405, 250 Open Square in Holyoke, where another DMSA joint venture was located.

19. On or about July 1, 2004, the Company published and distributed the first issue of its bilingual newspaper, El Diálogo. It published a number of issues after that, on a bi-weekly basis, from July 1, 2004 to February, 2005. From July, 2004 through February, 2005, the Company developed the trademark and trade name "El Diálogo." Through its development and use of the mark/name of "El Diálogo," the Company created substantial goodwill in this asset.

20. In August, 2004, the Company engaged the services of Ana Morales, a free lancer, for, among other things, the creation of a website for the newspaper, El Diálogo. The website, www.eldialogo.com, became operational on or about October 15, 2004.

21. During this period, the Company operated as set forth in the Venture Agreement and Operating Agreement. For example, DMSA provided all of the capital for the Company, to the extent that the Company's cash flow was not sufficient to provide it, and Ms. Santiago Bauzá, as the venture partner in charge of operations, handled the day-to-day matters (but was required to get DMSA's approval for expenditures). During this period I had a number of conversations and e-mails with Ms. Santiago Bauzá as one would expect from joint venture partners.

22. On or about January 6, 2005, because of the Company's initial success, it hired Francisco Javier Solé as the Director of Advertising Sales for the Company pursuant to an employment agreement. Ex. 7. Pursuant to the terms of the agreement, Mr. Solé agreed, among

other things, that he would not directly or indirectly compete with the business of the Company and would keep confidential the proprietary information of the Company. Ex. 7, at 3-4.

23. In early February, Ms. Santiago Bauzá sent me an e-mail indicating the continuing positive momentum of the business and stated:

> Gerry, the newspaper is on an incredible movement to grow, since Francisco arrived we had implemented many systems that are going to help us get the accounts we need . . . .

Ex. 8.

24. My wife Beatriz and I were treated for fever and pneumonia on or about February 13, 2005, which required hospital care and total bed rest. For the weeks of February 13 and 20, I was nearly completely incapacitated. Most of the week of February 27, I had limited capability.

25. On February 20, I received a February 18 telephone message from Mr. Solé asking me to call me. In response, I wrote him and Ms. Santiago Bauzá an e-mail in which I stated:

> Beatriz and myself have been on our backs for a week, hospitalized on Wednesday and now under an intensive and accelerated program of antibiotics to prevent a spreading pneumonia and check a body temperature that at times hovered close to 103 degrees.

Ex. 9.

26. On or about this same time . . . and unknown to me at the time, Ms. Santiago Bauzá was preparing to take the assets of the Company and open up under a new and deceptively similar name without DMSA.

27. At some point, Ms. Santiago Bauzá drafted a letter dated February 17, 2004 (that she did not send to me until more than a week later) to inform me that she was unilaterally closing down the business of the Company (which she had no authority to do). It stated as follows:

6

> Since our last meeting and telephone conversation I have reconsidered my position in Diálogo LLC. Since the beginning I have had to endure your lack of commitment to this organization and your promised financial contributions to the business. Your inconsistent communication on the decision making process and lack of financial support to the venture has caused a material deteriorations [sic], to the point where we do not have staff support, nor are we able to continue without the business going into debt. Therefore, as operating manager, I have no other alternative but to close the business effective immediately.
>
> The landlord has been made aware of the situation; he is allowing you to leave the computer, software and other office furniture at that space until the end of the month. You should take whatever steps are necessary to remove those items at your earliest. All business paperwork, e.g. bank statements, check book and list of account payables will be sent to you shortly.
>
> If you have questions and or concerns you can address those to my attorney, Arnold Greenhut at 413-785-1504.

Ex. 10.

28. This letter, however, was not mailed until February 25, 2005. I have attached a copy of the February 25, 2005 postmarked envelope as Exhibit 11.

29. The letter was sent to me by certified mail, which required that I go to the post office to sign for it and pick it up. Ex. 11. Although the letter could be expected to have arrived between February 28 and March 3, assuming normal post office delivery times, I was not able to pick it up until March 5, 2005 due to my illness.

30. I was not aware that Ms. Santiago Bauzá was not operating the joint venture business of the Company as she had agreed to do under the joint venture documents. I was particularly surprised by her allegations of "lack of commitment" by DMSA, since DMSA had provided all of the funding for the Company and Ms. Santiago Bauzá had previously indicated that the Company was progressing well. See Ex. 8.

7

31. In February 2005, without my knowledge, and without the consent of DMSA, I understand that Ms. Santiago Bauzá physically moved the employees, assets, and equipment of the Company out of its location at Suite 405, 250 Open Square Way in Holyoke to a new location which I understand is located in the same building at Suite 120, 4 Open Square in Holyoke.

32. On each of March 1, 2005 and March 15, 2005, Ms. Santiago Bauzá published an edition of El Diálogo, apparently with the assets of the Company. Newco's and Ms. Santiago Bauzá's use of "El Diálogo" is likely to cause confusion to the readers and damage the goodwill of the Company.

33. On March 15, 2005, Ms. Santiago Bauzá established a new Massachusetts limited liability company called El Dialogo, LLC (hereinafter "Newco" for clarity). The principal office of this new company is listed as Suite 120, 4 Open Square in Holyoke. Ex. 12.

34. The Certification of Organization of Newco states that, "[t]he specific nature of the business of the Limited Liability Company is to operate, run, and publish a newspaper and conduct any other lawful business, trade, purpose or activity, which the members may determine to be beneficial to the company." Ex. 12.

35. The Certificate of Organization of Newco also states that Ms. Santiago Bauzá (aka "Lillian Santiago") is the sole member authorized to execute documents to be filed with the Secretary for the Commonwealth of Massachusetts. Ex. 12.

36.     As reflected in the March 15, 2005 edition of El Diálogo, Exhibit 13, the newspaper is virtually unchanged from the previous editions of El Diálogo. See Exhibit 14. Upon information and belief, Newco has distributed the imitation El Diálogo according to the distribution plan taken by Ms. Bauzá from Diálogo, LLC.

37.     Upon information and belief, even though the advertising customers of Diálogo, LLC were under a two-year contract, Ms. Bauzá is receiving the money from those customers and using it to fund Newco's operations.

38.     Ms. Bauzá's misappropriation of Diálogo, LLC's assets and publication of a new unauthorized version of El Diálogo are causing irreparable harm to Diálogo, LLC, threatening the company's very existence. The longer that Ms. Bauzá continues to use the misappropriated assets, the harder it will be for Diálogo, LLC, to resume its operations. Ms. Bauzá is currently establishing relationships on behalf of Newco between customers, vendors, and employees that had previously worked with Diálogo, LLC. It will be impossible to re-establish those relationships with Diálogo, LLC if Ms. Bauzá continues to interfere with them.

39.     DMSA's reasonable financial expectations for Diálogo, LLC, were that it would be self-sufficient by now and would have greatly increased in value. If Ms. Bauzá's misappropriation is allowed to persist, it will be impossible to achieve those goals.

Dated: March 29, 2005

_____
Gerry Pike

COMMONWEALTH OF PENNSYLVANIA
Wayne, ss.                                                                      March 29, 2005

Personally appeared the above-named Gerry Pike and made oath that the foregoing statements are true and based upon his own personal knowledge.

Before me,

_____
Notary Public/Attorney at Law
Print Name: Bridget A. Cavage
My Commission Expires:

P:\sbrewster\Dialogo\Affidavit Gerry Pike.doc

> Notarial Seal
> Bridget A. Cavage, Notary Public
> Dreher Twp., Wayne County
> My Commission Expires Oct. 3, 2005
>
> Member, Pennsylvania Association of Notaries

10

UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

CLERK'S NOTICE

This document can not be scanned due to its size, or the way in which it was bound.

The original is available for viewing in the Clerk's Office.