UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

_____

DIÁLOGO, LLC and
DIRECT MERCHANTS S.A., INC.,

                        Plaintiffs,

v.

LILLIAN SANTIAGO BAUZÁ,
EL DIÁLOGO, LLC, and
FRANCISCO JAVIER SOLÉ,

                        Defendants.
_____

CIVIL ACTION NO. 05-30076-MAP

**AMENDED COMPLAINT and REQUEST FOR INJUNCTIVE RELIEF**

Plaintiffs Diálogo, LLC and Direct Merchants S.A., Inc. (collectively,

"Plaintiffs"), by and through their attorneys, state the following as their Amended

Complaint in this action:

## INTRODUCTION

1.      This is an action brought under the Lanham Act, 15 U.S.C. § 1125(a), and

pendant state law claims against Defendants Lillian Santiago Bauzá, El Diálogo, LLC,

and Francisco Javier Solé for the Defendants' unauthorized appropriation and use of

Plaintiff Diálogo, LLC's mark "El Diálogo" and its assets, equipment, employees and

goodwill.

## PARTIES

2.      Plaintiff Diálogo, LLC ("Diálogo, LLC or "the Company") is a Maine

limited liability company with its principal place of business in Holyoke, Massachusetts.

3.      Plaintiff Direct Merchants S.A., Inc. ("DMSA") is a New Jersey corporation with its principal place of business in Newfoundland, Pennsylvania.

4.      Defendant Lillian Santiago Bauzá ("Santiago Bauzá") is a person residing in Holyoke, Massachusetts.

5.      Defendant El Diálogo, LLC ("Newco") is a Massachusetts limited liability company with its principal place of business in Holyoke, Massachusetts.

6.      Defendant Francisco Javier Solé ("Solé") is a person residing in Southwick, Massachusetts.

## JURISDICTION and VENUE

7.      The Court's subject matter jurisdiction is based upon 28 U.S.C. § 1331 and § 1337 and supplemental jurisdiction under 28 U.S.C. § 1367.

8.      Venue is proper in this district pursuant to 28 U.S.C. § 1391(b)(1) because all Defendants reside in this district.

## FACTS

9.      In May and early June of 2004, Lillian Santiago Bauzá approached Gerry Pike, Managing Director of DMSA, to discuss the possibility of engaging in a venture with DMSA.  At that time, she explained that her first venture called Diálogo Bilingue, Inc. with Manuel Frau-Ramos had failed.

10.     The purpose of the new venture was to develop a Spanish language and bilingual print and media business.

11.     In early June 2004, Ms. Santiago Bauzá wanted a contract to set forth the obligations of the parties.  In an e-mail sent in early June, Ms. Santiago Bauzá stated:

> I need to come to some understanding with you before we
> enter this new adventure in both our professional and

> business lives.  I really need a tangible contract that we can
> start building from.

Ms. Santiago Bauzá continued, "I am moving on with the plan I presented to you.  I am working very hard to have a new Diálogo by July 1st."

12.    In response to Ms. Santiago Bauzá's e-mail, on June 9, 2004, Gerry Pike, on behalf of DMSA, sent her a reply, stating:

> It has been but 7 business days since our 05/27/04
> CT meeting and your e-mail of 06/08.  Let's review
> where we are re: DMSA's commitment and what we
> have done to date:
>
> *      We have committed to partner with you
>        without reservation.
>
> *      We outlined to you an exit strategy for your
>        situation with Manuel [her former business
>        partner].

In that June 9 e-mail, Mr. Pike also stated:

> Our attorneys have completed all the drafts to create
> the new Diálogo LLD [sic].  However, per our
> 06/02 conversation, you need to resolve the
> partnership situation with Manuel in order for us to
> execute it.

13.    Later on June 9, 2004, Gerry Pike of DMSA sent to Ms. Santiago Bauzá, in response to her request, a joint venture agreement and the organizational documents for the formation of the new company, Diálogo, LLC, to document the joint venture between Ms. Santiago Bauzá and DMSA.  These documents were executed by DMSA and included a Venture Agreement and an Operating Agreement and Members Agreement (Diálogo, LLC) for the new company.

14.    On June 9, Ms. Santiago Bauzá executed these documents on her own behalf and returned them to DMSA by facsimile.

15.    As contemplated in the Venture Agreement, and as set forth in the Operating Agreement and Members Agreement (Diálogo, LLC) ("the Operating Agreement"), DMSA and Ms. Santiago Bauzá entered into the Operating Agreement to form a limited liability company called Diálogo, LLC.  Under the Operating Agreement, DMSA and Ms. Santiago Bauzá agreed that the value of DMSA's initial capital contribution was $50,000 and the value of  Ms. Santiago Bauzá's initial capital contribution was $1.00.  As set forth in the Operating Agreement, the membership interests of the Company are as follows:  DMSA - 51%, Ms. Santiago Bauzá - 49%.  A true and correct copy of the Operating Agreement is attached to the Complaint as Exhibit 1.

16.    Under the Venture Agreement, Ms. Santiago Bauzá and DMSA formed a joint venture and agreed that, among other things:

- They would create a limited liability company called Diálogo LLC for the joint venture and that Ms. Santiago Bauzá had a 49% membership interest and DMSA had a 51% membership interest;

- The Company will be managed by a board of directors, consisting of two representatives from DMSA and one designated by Ms. Santiago Bauzá;

- DMSA and LSB [Lillian Santiago Bauzá] shall through the Company jointly pursue the Spanish language and bilingual print and media business;

- Ms. Santiago Bauzá shall devote her efforts exclusively to the Company, and she shall not provide "such services, directly or indirectly for itself [sic] or any other entity or person to the extent it relates to the Business;"

- They will keep confidential the proprietary information of the Company.

A true and correct copy of the Venture Agreement is attached to the

Complaint as Exhibit 2.

17.     Under the Operating Agreement, the Company was "formed for the object and purpose of developing Spanish language newspaper(s) and media." Ex. 1, at 6.

18.     Under Section 12.7 of the Operating Agreement, Ms. Santiago Bauzá agreed to act exclusively on behalf of the Company.  She agreed that:

> LSB shall employ its [sic] diligent efforts for the Company and LSB shall not provide such services, directly or indirectly for itself [sic] or any other entity or person to extent that it relates to the business.

Ex. 1, at 22. Ms. Santiago Bauzá also agreed that she "may not resign from the Company prior to the dissolution and winding up of the Company."  Ex. 1, at 10.

19.     Ms. Santiago Bauzá also agreed that the proprietary information of the Company was to be kept confidential.  Section 12.8 of the Operating Agreement provides, in relevant part:

> DMSA and LSB acknowledge and agree that all efforts and actions undertaken by them for the Company in connection with the business of the Company are to be kept confidential.  Neither DMSA nor LSB will disclose to any person or entity, directly or indirectly, any Proprietary Information (as hereinafter referred) relating to the Company's business without the prior written consent of the LLC.  For the purposes of this Agreement, "Proprietary Information" means all advertiser and subscription lists, advertiser and subscription prospects, marketing information and data, product information, strategic or technical information, financial information, supplier information, billing rates and advertiser provided information, documents and data.

Ex. 1, at 22.

20. Under the Operating Agreement, the dissolution and winding up of the Company's affairs requires "the written consent of all Members." Ex. 1, at 24.

21. Shortly after Ms. Santiago Bauzá agreed to the terms of the Operating Agreement and the Venture Agreement, she wrote an e-mail to Gerry Pike of DMSA to provide an update of the Company. She stated:

> Just an update of what I've been doing in the last two weeks. I informed Manuel that I was going to close the Diálogo [B]ilingual Corporation. Open a bank account under Diálogo LLC, I need the ID # of the venture for the bank and clients. Attached please find copy of the new media kit, new name logo and other form just for your information and [advice] if you wish.
>
> All new business are [sic] under Diálogo LLC contract.

(Emphasis added).

22. After she entered into the Operating Agreement and Joint Venture Agreement (in which she agreed that she would act exclusively on behalf of the Company), Ms. Santiago Bauzá, at the request of DMSA, purchased the domain name "eldialogo.com," in which she listed the account holder as "El Diálogo, LLC."

23. In June, 2004, the Company established an office at Suite 405, 250 Open Square in Holyoke, where another DMSA joint venture was located.

24. On or about July 1, 2004, the Company published and distributed the first issue of its bilingual newspaper, **El Diálogo**. It published numerous issues after that, on a bi-weekly basis, from July, 2004 until February, 2005.

25. Before July 1, 2004, neither Ms. Santiago Bauzá nor Diálogo Bilingue, Inc. had published a newspaper entitled **El Diálogo**.

26.    In August, 2004, the Company engaged the services of Ana Morales, a free lancer, for, among other things, the creation of a website for the newspaper, **El Diálogo**.  The website, www.eldialogo.com, became operational on or about October 15, 2004.

27.    During this period, the Company operated as set forth in the Venture Agreement and Operating Agreement.  For example, DMSA advanced funds to the Company to pay past various expenses, to the extent that the Company's cash flow was not sufficient to cover such expenses, and Ms. Santiago Bauzá, as the venture partner in charge of operations, handled the day-to-day matters (but was required to get DMSA's approval for expenditures).

28.    In December 2004, Ms. Santiago Bauzá presented Mr. Pike with financial statements (prepared by her own accountant) reflecting the financial performance of the Company from July 1, 2004 to December 13, 2004.  These documents demonstrated that, during this period, the Company had a total net income of over $21,000 and that the Company had a profit for every complete month in this period.

29.    Based on such strong initial financial performance (of almost $50,000 on an annualized basis), Mr. Pike and Ms. Santiago Bauzá discussed obtaining a bank line of credit for the Company.

30.    On or about January 6, 2005, because of the Company's initial success, it hired Francisco Javier Solé as the Director of Advertising Sales for the Company pursuant to an employment agreement.  Under that agreement, Mr. Solé agreed, among other things, that he would not directly or indirectly compete with the business of the Company and would keep confidential the Company's proprietary information.  A true

and correct copy of Mr. Solé's employment agreement and confidentiality/non-compete

agreement is attached to the Complaint as Exhibit 3.

31.     In early February, Ms. Santiago Bauzá sent Gerry Pike of DMSA an e-

mail indicating the continuing positive momentum of the business and stated:

> Gerry, the newspaper is on an incredible moment to
> grow, since Francisco arrived we had implemented
> many systems that are going to help us get the
> accounts we need . . . .

32.     In mid-February, the Managing Director of DMSA (Gerry Pike) was

nearly completely incapacitated and could not monitor the developments at the Company.

33.     On or about this same time and unknown to DMSA, Ms. Santiago Bauzá,

in direct contravention to her obligations under Operating Agreement and Joint Venture

Agreement, was preparing to take the assets of the Company, create her own limited

liability company, and open up under a new and deceptively similar name ("El Diálogo,

LLC") without DMSA.

34.     At some point, Ms. Santiago Bauzá drafted a letter dated February 17,

2004 (that she did not send to DMSA until more than a week later) to inform DMSA that

she was unilaterally closing down the business of the Company (which she had no

authority to do).  A true and correct copy of this letter is attached to the Complaint as

Exhibit 4.

35.     This letter, however, was not mailed until February 25, 2005.

36.     DMSA was unaware that Ms. Santiago Bauzá was not operating the joint

venture business of the Company as she had agreed to do under the joint venture

documents.

37.    In February 2005, without the knowledge or consent of DMSA, Ms. Santiago Bauzá physically moved the employees, assets, and equipment of the Company out of its location at  Suite 405, 250 Open Square Way in Holyoke to a new location located in the same building at Suite 120, 4 Open Square in Holyoke.  On information and belief, Mr. Solé discontinued his work for the Company and went to work for Ms. Santiago Bauzá's new business.

38.    On each of March 1, 2005 and March 15, 2005, Ms. Santiago Bauzá published an edition of  a newspaper styled and titled "**El Diálogo**," using the assets of the Company to do so.

39.    On March 15, 2005, Ms. Santiago Bauzá established a new Massachusetts limited liability company called El Diálogo, LLC (hereinafter "Newco").  The principal office of Newco is Suite 120, 4 Open Square in Holyoke.

40.    The Certification of Organization of Newco states that, "[t]he specific nature of the business of the Limited Liability Company is to operate, run, and publish a newspaper and conduct any other lawful business, trade, purpose or activity, which the members may determine to be beneficial to the company."

41.    As reflected in the March 15, 2005 false, imitation, edition of **El Diálogo**, the newspaper is virtually unchanged from the previous editions of **El Diálogo**.  Upon information and belief, Newco has distributed the false, imitation **El Diálogo** according to the distribution plan that Ms. Santiago Bauzá took from Diálogo, LLC.

42.    Upon information and belief, even though certain advertising customers of Diálogo, LLC were under long-term contracts, Ms. Santiago Bauzá is receiving the money from those customers and using it to fund Newco's operations.

43. On or about March 21, 2005, Newco, through Ms. Santiago Bauzá as president, applied to register the trademark "**El Diálogo**" in Massachusetts. In the application, Santiago Bauzá stated that the date of first use of mark was July 1, 2004.

44. In the application, Ms. Santiago Bauzá failed to state that the July 1, 2004 use of the mark "**El Diálogo**" was by Diálogo, LLC or that on July 1, 2004, the applicant Newco did not exist. Ms. Santiago Bauzá failed to identify any other predecessor entity even though the Massachusetts registration form expressly required such information.

45. Under the penalties of perjury, Ms. Santiago Bauzá stated in the application that the "foregoing statements are true and that [she] verily believes that said applicant [Newco] is the owner of the mark . . . and that no other person has the right in the Commonwealth of Massachusetts to use such mark."

## LEGAL CLAIMS

### COUNT I
(Violation of the Lanham Act, 15 U.S.C. § 1125(a))

46. Plaintiffs reallege and incorporate by reference the allegations of paragraphs 1 through 45 of the Amended Complaint as if fully set forth herein.

47. Beginning in June 2004, Plaintiff Diálogo, LLC and its majority owner DMSA have used the mark and name "**El Diálogo**" as the title of a bilingual Spanish-English newspaper focusing on the Latino people, politics, culture and civic life of Western Massachusetts. The newspaper is widely read by business, media and community leaders, as well as a cross-section of the Latino community, and others interested in Latino culture and events. Print circulation is approximately 10,000 copies, and since October 2004 the newspaper is available on-line as well.

48.     Plaintiff Diálogo, LLC and its majority owner DMSA have published the "**El Diálogo**" newspaper on a biweekly basis, in print from July 1, 2004 and on-line from approximately October 15, 2004.

49.     Through publication of "**El Diálogo**" in print and in on-line form, Plaintiffs Diálogo, LLC and its majority owner DMSA have developed substantial goodwill in the mark and name "**El Diálogo**" as an indicator of source for their publications.

50.     Defendants Santiago Bauzá and Solé, through their former affiliation with Plaintiffs and otherwise, are fully aware and informed that the mark and name "**El Diálogo**" has been used and developed by Plaintiffs for a bilingual Spanish-English newspaper focusing on the Latino people, politics, culture and civic life of Western Massachusetts.

51.     Defendant Newco, operating by and through Defendant Santiago Bauzá and under her authority, is also fully aware and informed that the mark and name "**El Diálogo**" has been used and developed by Plaintiffs for a bilingual Spanish-English newspaper focusing on the Latino people, politics, culture and civic life of Western Massachusetts.

52.     Since February 17, 2005 or earlier, Defendant Santiago Bauzá has been using the mark and name "**El Diálogo**" as the title of a bilingual Spanish-English newspaper focusing on the Latino people, politics, culture and civic life of Western Massachusetts.

53.     Since February 17, 2005 or earlier, Defendant Solé has been using the mark and name "**El Diálogo**" as the title of a bilingual Spanish-English newspaper

focusing on the Latino people, politics, culture and civic life of Western Massachusetts.

54.     Since its incorporation on or about March 15, 2005, or earlier, Defendant
Newco has been using the mark and name "**El Diálogo**" as the title of a bilingual
Spanish-English newspaper focusing on the Latino people, politics, culture and civic life
of Western Massachusetts.

55.     Upon information and belief, Defendants' plan is to use the identical title,
trade dress, coverage, subject matter, target audience, advertisers and vendors of the
newspaper used and developed by Plaintiffs.

56.     On March 1, 2005 and on March 15, 2005, Defendants published a
newspaper (in both print and on-line form) named and styled, "**El Diálogo**", using the
assets of Diálogo, LLC which they have appropriated, and insofar as possible identical in
title, trade dress, coverage, subject matter, target audience, advertisers and vendors to the
"**El Diálogo**" newspaper used and developed by Plaintiffs.

57.     Upon information and belief, and absent this Court's intervention,
Defendants' plan is to continue biweekly publication of their false "**El Diálogo**."

58.     Defendants' use of the mark and name "**El Diálogo**" as a title, and their
use of the identical or nearly identical title, trade dress, coverage, subject matter, target
audience, advertisers and vendors, is likely to cause, and has already caused, confusion,
mistake, and deception of the public as to the source of their newspaper.  Customers and
potential customers are likely to believe that Defendants' newspaper is Plaintiffs'
newspaper, or a new spin-off from Plaintiffs' newspaper, or that it emanates from, or is
sponsored or approved by, Plaintiffs.  Any dissatisfaction with Defendants' newspaper
will reflect upon and irreparably damage the valuable reputation and goodwill of

Plaintiffs, embodied in the "**El Diálogo**" mark and name.

59.    The actions of Defendants constitute the use in commerce of a false designation of origin in violation of Section 43 (a) of the Lanham Act, 15 U.S.C. § 1125 (a).  Because Defendants have been fully informed and aware of Plaintiffs' rights in the mark and name "**El Diálogo**", Defendants' actions are in willful violation of Plaintiffs' rights.

COUNT II

(Violations of Massachusetts General Laws, Chapter 93A, § 11)

60.    Plaintiffs reallege and incorporate by reference the allegations of paragraphs 1 through 59 of the Amended Complaint as if fully set forth herein.

61.    Plaintiffs and Defendants are persons engaged in trade or commerce in Massachusetts.

62.    Defendants' use of the title "**El Diálogo**" for their newspaper, and their use of the identical or nearly identical title, trade dress, coverage, subject matter, target audience, advertisers and vendors as Plaintiffs' newspaper, in a publication and in on-line form directed to Massachusetts, constitutes an unfair method of competition and unfair or deceptive acts or practices in the conduct of trade or commerce, in violation of Mass. G. L. c. 93A, § 11.

63.    The aforesaid conduct of Defendants has damaged and is damaging Plaintiffs.

COUNT III

(Common Law Trademark Infringement and Unfair Competition)

64.    Plaintiffs reallege and incorporate by reference the allegations of paragraphs 1 through 59 of the Amended Complaint as if fully set forth herein.

65. The aforesaid conduct of Defendants has damaged and is damaging Plaintiffs, in violation of the common law of trademark infringement and unfair competition.

## COUNT IV
(Breach of Contract -- Santiago Bauzá)

66. Plaintiffs reallege and incorporate by reference the allegations of paragraphs 1 through 59 of the Amended Complaint as if fully set forth herein.

67. Under the Operating Agreement and the Venture Agreement, Defendant Santiago Bauzá and Plaintiffs DMSA and Diálogo, LLC entered into binding contracts.

68. Plaintiffs fully performed their obligations under these agreements, including all conditions precedent.

69. By her actions and conduct, Defendant Santiago Bauzá breached the terms of the Operating Agreement and the Venture Agreement.

70. As a result of Ms. Santiago Bauzá'a breach of these agreements, Plaintiffs have (and continue to) suffer damages.

## COUNT V
(Breach of Contract -- Solé)

71. Plaintiffs reallege and incorporate by reference the allegations of paragraphs 1 through 45 of the Amended Complaint as if fully set forth herein.

72. Under an employment agreement and  a confidentiality/non-compete agreement,  Defendant Solé and Plaintiff Diálogo, LLC entered into binding contracts.

73. Plaintiff fully performed its obligations under these agreements, including all conditions precedent.

74.    By his actions and conduct, including but not limited to, his work for and/or employment with Newco, Defendant Solé breached the terms of the employment agreement and confidentiality/non-compete agreement.

75.    As a result of Mr. Solé's breach of these agreements, Plaintiff has (and continues to) suffer damages.

COUNT VI
(Misappropriation of Trade Secrets -- Damages)

76.    Plaintiffs reallege and incorporate by reference the allegations of paragraphs 1 through 45 of the Amended Complaint as if fully set forth herein.

77.    The Company's information provided to Defendants Santiago Bauzá and Solé, including proprietary information, constitutes one or more "trade secrets" as defined in Mass. Gen. Laws c. 266, § 30(4), in that it is anything tangible or intangible or electronically kept or stored, which constitutes, represents, evidences or records a secret scientific, technical, merchandising, production or management information, design, process, procedure, formula, invention or improvement.

78.    Defendants Santiago Bauzá and Solé have violated Mass. Gen. Laws c. 93, § 42 with respect to one or more of the Company's trade secrets, in that they have embezzled, stolen or unlawfully carried away, concealed, or copied, or by fraud or deception obtained, one or more of the Company's trade secrets, with the intent to convert same to their own use.

79.    Defendants' misappropriation of the Company's trade secrets has caused serious and substantial loss and damage to the Company, which is continuing.

80.    Defendants are liable in tort for all damages resulting from their misappropriation of the Company's trade secrets.

81.    The Court should exercise its discretion under Mass. Gen.  Laws c. 266, §

42 to increase Defendants' damages up to double the amount found.

<u>COUNT VII</u>
(Misappropriation of Trade Secrets -- Injunctive Relief)

82.    Plaintiffs reallege and incorporate by reference the allegations of

paragraphs 1 through 45 of the Amended Complaint as if fully set forth herein.

83.    Plaintiff Diálogo, LLC is an aggrieved person within the meaning of

Mass. Gen. Laws c. 93, § 42A.

84.    Plaintiff Diálogo, LLC is entitled to an injunction restraining and

enjoining Defendants Santiago Bauzá, Solé, El Diálogo, LLC and its officers, directors,

employees, agents, attorneys, affiliates, predecessors and successors in interest, assigns,

and all other persons or entities in active concert or participation with Defendants, from

retaining, taking, receiving, concealing, assigning, transferring, leasing, pledging,

copying or otherwise using or disposing of proprietary information or trade secret

provided by Diálogo, LLC to Defendants.

<u>COUNT VIII</u>
(Conversion)

85.    Plaintiffs reallege and incorporate by reference the allegations of

paragraphs 1 through 45 of the Amended Complaint as if fully set forth herein.

86.    Without authorization, Defendants have taken the property, assets,

equipment, employees, goodwill, and confidential information of Diálogo, LLC and

transferred such assets to El Diálogo, LLC.

87.    As a result of Defendants' actions, Diálogo, LLC has been damaged.

<u>COUNT IX</u>
(Breach of Fiduciary Duties)

88.     Plaintiffs reallege and incorporate by reference the allegations of paragraphs 1 through 45 of the Amended Complaint as if fully set forth herein.

89.     Under the Operating Agreement and Maine law, Defendant Santiago Bauzá has breached her fiduciary duties to the Company and DMSA.

90.     Defendant Santiago Bauzá's conduct is and has been willful, fraudulent and/or in bad faith so that malice may be implied.

91.     As a result of Santiago Bauzá's conduct, the Company and DMSA have been (and continue to be) damaged.

<u>COUNT X</u>
(Tortious Interference with Contractual Relations -- Santiago Bauzá)

92.     Plaintiffs reallege and incorporate by reference the allegations of paragraphs 1 through 45 of the Amended Complaint as if fully set forth herein.

93.     There exists a contractual relationship between Diálogo, LLC and Solé.

94.     Defendants Santiago Bauzá and El Diálogo, LLC improperly interfered with Diálogo, LLC's rights under these agreements through the means of fraud and/or intimidation.

95.     Defendants' conduct was intentional and deliberate.

96.     As a proximate result of Santiago Bauzá's and El Diálogo, LLC's interference, the Company has been damaged.

<u>COUNT XI</u>
(Tortious Interference with Contractual Relations -- Solé)

97.     Plaintiffs reallege and incorporate by reference the allegations of paragraphs 1 through 45 of the Amended Complaint as if fully set forth herein.

98.     There exists a contractual relationship between the Company, DMSA and Santiago Bauzá through the terms of the Operating Agreement and the Venture Agreement.

99.     Upon information and belief, Defendant Solé improperly interfered with the Company's rights under these agreement through the means of fraud and/or intimidation.

100.    Solé's conduct was intentional and deliberate.

101.    As a proximate result of  Solé's interference, the Company and DMSA have been damaged.

## COUNT XII
### (Unjust Enrichment)

102.    Plaintiffs reallege and incorporate by reference the allegations of paragraphs 1 through 45 of the Complaint as if fully set forth herein.

103.    Plaintiffs have conferred benefits on Defendants Santiago Bauzá and Solé.

104.    Defendants Santiago Bauzá and Solé accepted the benefits provided to them by Plaintiffs.

105.    Defendants Santiago Bauzá's and Solé's acceptance of such benefits without payment for the value of such benefits would be inequitable.

## COUNT XIII
### (Constructive Trust)

106.    Plaintiffs reallege and incorporate by reference the allegations of paragraphs 1 through 45 of the Amended Complaint as if fully set forth herein.

107.    Defendants have made wrongful use of the assets, proprietary information, trade secrets, goodwill, and equipment of the Company for their own purposes and gain

18

and to the detriment of the Company.

108.    Defendants should be adjudged to hold the Company's assets, proprietary information, trade secrets, goodwill and equipment of the Company in constructive trust, and should be required to disgorge to the Company any and all profits and benefits which have inured or will inure to the benefit of El Diálogo, LLC or Santiago Bauzá and/or El Diálogo, LLC's officers, directors, employees, agents, attorneys, affiliates, predecessors and successors in interest, assigns, and all other persons or entities in active concert or participation with Defendants.

<u>COUNT XIV</u>
(Declaratory Judgment)

109.    Plaintiffs reallege and incorporate by reference the allegations of paragraphs 1 through 108 of the Amended Complaint as if fully set forth herein.

110.    There exists an actual controversy over the use and ownership of the mark "**El Diálogo**."

111.    Plaintiff Diálogo, LLC first used the mark "**El Diálogo**" in the Commonwealth of Massachusetts with the publication of the July 1, 2004 edition of the newspaper entitled "**El Diálogo."**

112.    At the time, Defendant El Diálogo, LLC did not exist.

113.    Defendant El Diálogo, LLC's application filed on or about March 21, 2005 to register the trademark "**El Diálogo**" was false, misleading and/or fraudulent.

114.    This application for registration of the trademark "**El Diálogo**" by Defendant El Diálogo, LLC failed to meet the filing requirements of Mass. Gen. Laws c. 110B, § 2, including, without limitation, those in subsections 2 (c) and (d), but for the false, misleading and/or fraudulent statements made in the application, including, without

limitation, those concerning the date of first use, ownership, and exclusive right to use.

115.    It should be adjudged and declared: that Plaintiff Diálogo, LLC is the
entity that first used the mark "**El Diálogo**," that Plaintiff Diálogo, LLC is the rightful
owner of the mark "**El Diálogo**," that Defendant El Diálogo, LLC is not the owner of the
mark "**El Diálogo**," that Defendant El Diálogo, LLC made material false, misleading
and/or fraudulent statements in applying for Massachusetts trademark registration of the
mark "**El Diálogo**," that any forthcoming such registration to Defendant El Diálogo, LLC
was granted improperly, and/or that any forthcoming such registration to Defendant El
Diálogo, LLC was obtained fraudulently.

COUNT XV
(Violation of Mass. Gen. Laws c. 110B, § 10)

116.    Plaintiffs reallege and incorporate by reference the allegations of
paragraphs 1 through 115 of the Amended Complaint as if fully set forth herein.

117.    Defendants Santiago Bauzá and El Diálogo, LLC made false or fraudulent
statements in one or more applications to register the trademark "**El Diálogo**" in violation
of Mass. Gen. Laws c. 110B, § 10.

118.    As a proximate result, Plaintiffs have suffered damages.

**PRAYER FOR RELIEF**

WHEREFORE, Plaintiffs Diálogo, LLC and DMSA respectfully pray:

1.    That Defendants be preliminarily and permanently enjoined from using
the title "**El Diálogo**" and any confusingly similar variation thereof, in connection with
any publication including but not limited to print and on-line publications;

2.    That Defendants be ordered to file with this Court and to serve upon
Plaintiffs and their counsel, within thirty days of service of the permanent injunction

20

requested herein, a report in writing, under oath, setting forth in detail the manner and form in which Defendants have complied therewith;

3.      That Defendants Lillian Santiago Bauzá and her alter ego, El Diálogo LLC its officers, directors, employees, agents, attorneys, affiliates, predecessors and successors in interest, assigns, and all other persons or entities in active concert or participation with Defendants be preliminarily and permanently enjoined from disclosing to any person or entity, directly or indirectly, any proprietary information relating to the business of Diálogo, LLC (including all advertiser and subscription lists, advertiser and subscription prospects, marketing information and data, product information, strategic or technical information, financial information, supplier information, billing rates and advertiser provided information, documents and data) without the prior written consent of Diálogo, LLC by its majority owner, DMSA and from retaining, taking, receiving, concealing, assigning, transferring, leasing, pledging, copying or otherwise using or disposing of proprietary information or trade secret provided by Diálogo, LLC to Defendants;

4.      That Defendants Lillian Santiago Bauzá and her alter ego, El Diálogo LLC be ordered to file with this Court and to serve upon Plaintiffs and their counsel, within thirty days of service of the permanent injunction requested herein, a report in writing, under oath, setting forth in detail any and all proprietary information previously disclosed by either of both of them;

5.      That Defendant Francisco Javier Solé be preliminarily and permanently enjoined from disclosing to any person or entity, directly or indirectly, any proprietary information relating to the business of Diálogo, LLC (including (a) advertising clients

and business, marketing and advertising plans and studies; (b) proprietary consumer

research; (c) methods of operation and distribution; (d) statistical data and analysis; (e)

know-how; (f) trade secrets; (g) product and/or service concepts, designs and

specifications; (h) production processes and procedures; (i) existing and proposed

agreements; (j) business records; (k) financial statements and data; (l) employee

information; and, (m) any notes, analyses, studies, or compilations, summaries, or other

information derived or generated from or reflecting ongoing operations of Diálogo and its

clients) without the prior written consent of Diálogo, LLC by its majority owner, DMSA;

     6.     That Defendants be preliminarily and permanently enjoined from

operating and/or working for any Spanish language newspapers or media in Western

Massachusetts/Northern Connecticut  (other than their obligations to Diálogo, LLC and

the majority owner DMSA), including, but not limited to, publishing **El Diálogo** for the

company El Diálogo, LLC or any other company (except Diálogo, LLC);

     7.     That Defendants be preliminarily and permanently enjoined from using,

employing, or possessing the property, assets, equipment and goodwill of Diálogo, LLC

and that Defendants be ordered to return all such property of Diálogo, LLC to the

Company;

     8.     That it be adjudged and declared: that Plaintiff Diálogo, LLC is the entity

that first used the mark "**El Diálogo**," that Plaintiff Diálogo, LLC is the rightful owner of

the mark "**El Diálogo**," that Defendant El Diálogo, LLC is not the owner of the mark "**El**

**Diálogo**," that Defendant El Diálogo, LLC made material false, misleading and/or

fraudulent statements in applying for Massachusetts trademark registration of the mark

"**El Diálogo**," that any forthcoming such registration to Defendant El Diálogo, LLC was

granted improperly, and/or that any forthcoming such registration to Defendant El Diálogo, LLC was obtained fraudulently, and/or that any registration resulting from such application be cancelled.

9.     That Defendants be adjudged to hold the Company's assets, proprietary information, trade secrets, goodwill and equipment of the Company in constructive trust, and should be required to disgorge to the Company any and all profits and benefits which have inured or will inure to the benefit of El Diálogo, LLC or Santiago Bauzá and/or El Diálogo, LLC's officers, directors, employees, agents, attorneys, affiliates, predecessors and successors in interest, assigns, and all other persons or entities in active concert or participation with Defendants.

10.     That Defendants be ordered, jointly and severally, to pay to Plaintiffs such damages as Plaintiffs have incurred by the conduct complained of herein, said damages to be trebled in light of the willful nature of Defendants' conduct;

11.     That Plaintiffs recover their costs, as well as reasonable attorneys' fees and other expenses; and

12.     That this Court grant such other and further relief as is just.

DIÁLOGO, LLC and
DIRECT MERCHANTS S.A., INC.

By its attorneys,


Dated:   April 22, 2005                    /s/ Seth W. Brewster_____
                                           George Field (BBO No. 164520)
                                           Seth W. Brewster (BBO No. 551248)
                                           Attorneys for Plaintiffs
                                           Verrill Dana, LLP
                                           One Boston Place
                                           Suite 2330
                                           Boston, MA  02108
                                           (617) 367-0929
                                           gfield@verrilldana.com
                                           sbrewster@verrilldana.com


## CERTIFICATE OF SERVICE

I hereby certify that on April 22, 2005, I electronically filed Plaintiffs' Amended Complaint and Request for Injunctive Relief with the Clerk of Court using the CM/ECF system which will send notification of such filing to the following:  Keith A. Minoff, Esq., and I hereby certify that there are no non-registered participants.

/s/ Seth W. Brewster_____

P:\sbrewster\Dialogo\Amended Complaint.doc

# OPERATING AGREEMENT
# AND MEMBERS AGREEMENT
## DIALOGO, LLC

This Operating Agreement and Members Agreement ("Agreement") of Dialogo, LLC (the "Company") is made as of June __, 2004, among Lillian Santiago Bauzá, a resident of Massachusetts ("LSB"), and Direct Merchants S.A., Inc., a New Jersey Corporation ("DMSA"), as members of the Company, and the persons or entities who become members of the Company in accordance with the provisions hereof and whose names are set forth as Members on Schedule A hereto.

WHEREAS, LSB and DMSA desire to form a limited liability company pursuant to the Maine Limited Liability Company, as amended from time to time (the "Maine Act"), by filing Articles of Organization with the office of the Secretary of State of the State of Maine and entering into this Agreement.

NOW, THEREFORE, in consideration of the agreements and obligations set forth herein and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged and intending to be legally bound, the Members hereby agree as follows:

## ARTICLE I

## DEFINED TERMS

Section 1.1    Definitions.  Unless the context otherwise requires, the terms defined in this Article I shall, for the purposes of this Agreement, have the meanings herein specified.

"Additional Members" has the meaning set forth in Section 13.1 hereof.

"Affiliate" means with respect to a specified Person, any Person that directly or indirectly controls, is controlled by, or is under common control with, the specified Person.  As used in this definition, the term "control" means the possession, directly or indirectly, of the power to direct or cause the direction of the management and policies of a Person, whether through ownership of voting securities, by contract or otherwise.

"Agreement" means this Operating Agreement and Members Agreement of the Company, as amended, modified, supplemented or restated from time to time.

"Articles" means the Articles of Organization of the Company and any and all amendments thereto and restatements thereof filed on behalf of the Company with the office of the Secretary of State of the State of Maine pursuant to the Maine Act.

"Board" means the Board of Directors of the Company.

"Capital Account" means, with respect to any Member, the account maintained for such Member in accordance with the provisions of Section 4.4 hereof.

"Capital Contribution" means, with respect to any Member, the aggregate amount of money and the fair market value of any property (other than money) contributed to the Company pursuant to Section 4.1 hereof with respect to such Member's Interest.

"Code" means the Internal Revenue Code of 1986, as amended from time to time, or any corresponding federal tax statute enacted after the date of this Agreement. A reference to a specific section of the Code refers not only to such specific section but also to any corresponding provision of any federal tax statute enacted after the date of this Agreement, as such specific section or corresponding provision is in effect on the date of application of the provisions of this Agreement containing such reference.

"Company" means Dialogo, LLC, the limited liability company formed and continued under and pursuant to the Maine Act and this Agreement.

"Covered Person" means a Member, a Director, an Officer, a Manager, any Affiliate of a Member, a Director, an Officer or a Manager, any officers, directors, Members, partners, employees, representatives or agents of a Member, a Director, an Officer or a Manager, or their respective Affiliates, or any employee or agent of the Company or its Affiliates.

"Director" means a director of the Company.

"Fiscal Year" means (i) the period commencing upon the formation of the Company and ending on December 31, 2004, (ii) any subsequent twelve (12) month period commencing on January 1 and ending on December 31, or (iii) any portion of the period described in Clause (ii) of this sentence for which the Company is required to allocate Profits, Losses and other items of Company income, gain, loss or deduction pursuant to Article VIII hereof.

"Interest" means a Member's limited liability company interest in the Company which represents any Member Votes held by a member and such Member's interest of the profits and losses of the Company and a Member's right to receive distributions of the Company's assets in accordance with the provisions of this Agreement and the Maine Act.

"Laws" means:

(i)    all constitutions, treaties, laws, statutes, codes, ordinances, orders, decrees, rules, regulations and municipal by-laws, whether domestic, foreign or international;

(ii)   all judgments, orders, writs, injunctions, decisions, rulings, decrees and awards of any governmental body;

-2-

(iii)     all policies, practices and guidelines of any governmental body; and

(iv)     any amendment, modification, re-enactment, restatement or extension of the foregoing, in each case binding on or affecting the party or Person referred to in the context in which such word is used; and "Law" shall mean any one of them.

"Maine Act" means the Maine Limited Liability Company Act, 31 M.R.S.A. Chapter 13, as amended from time to time.

"Majority Vote" means the written approval of, or the affirmative vote by, Members holding a majority of the Member Votes.

"Majority" means a majority of the Member Votes.

"Manager" means any Person designated by the Members as a manager of the Company within the meaning of the Maine Act and shall include the Directors of the Company.

"Member" means each of LSB and DMSA and includes any Person admitted as an Additional Member or a substitute Member pursuant to the provisions of this Agreement, in such Person's capacity as a member of the Company, and "Members" means two (2) or more of such Persons when acting in their capacities as members of the Company. For purposes of the Maine Act, the Members shall constitute one (1) class or group of members.

"Member Votes" means the votes allocated to each Person as reflected in Schedule A as may be amended.

"Net Cash Flow" means, for each Fiscal Year or other period of the Company, the gross cash receipts of the Company from all sources, but excluding any amounts, such as gross receipts taxes, that are held by the Company as a collection agent or in trust for others or that are otherwise not unconditionally available to the Company, less all amounts paid by or for the account of the Company during the same Fiscal Year or other period (including, without limitation, payments of principal and interest on any Company indebtedness and expenses reimbursed to the Members under Section 5.2 hereof), and less any amounts determined by the Members to be necessary to provide a reasonable reserve for working-capital needs or any other contingencies of the Company. Net Cash Flow shall be determined in accordance with the cash receipts and disbursements method of accounting and otherwise in accordance with generally accepted accounting principles, consistently applied. Net Cash Flow shall

not be reduced by depreciation, amortization, cost recovery deductions, depletion, similar allowances or other non-cash items, but shall be increased by any reduction of reserves previously established.

"Officer" means an officer of the Company.

"Percentage Interest" means the interest of a Member, expressed as a portion of one hundred percent, as shown on Schedule A hereto, which reflects the Member's ownership interest in the Company, as determined by the unanimous written consent of the Members as adjusted from time to time.

"Person" includes any individual, Company, association, partnership (general or limited), joint venture, trust, estate, limited liability company, or other legal entity or organization.

"Profits" and "Losses" means, for each Fiscal Year, an amount equal to the Company's taxable income or loss for such Fiscal Year, determined in accordance with § 703(a) of the Code.

"Secretary" means the Person appointed by the Board as the secretary of the Company, who shall perform the duties described in Section 7.4 of this Agreement.

"Tax Matters Partner" has the meaning set forth in Section 11.1 hereof.

"Treasury Regulations" means the income tax regulations, including temporary regulations, promulgated under the Code, as such regulations may be amended from time to time (including corresponding provisions of succeeding regulations).

Section 1.2     Headings.  The headings and subheadings in this Agreement are included for convenience and identification only and are in no way intended to describe, interpret, define or limit the scope, extent or intent of this Agreement or any provision hereof.

## ARTICLE II

## FORMATION AND TERM

Section 2.1     Formation.

(i)     The Members hereby form the Company as a limited liability company under and pursuant to the provisions of the Maine Act and agree that the rights, duties, and liabilities of the Members shall be as provided in the Maine Act, except as otherwise provided herein.

(ii)    Upon the execution of this Agreement or a counterpart of this Agreement, LSB and DMSA shall be admitted as Members.

(iii)    The name and mailing address of each Member, the agreed value of the amount contributed to the capital of the Company and the Percentage Interest of each Member shall be listed on Schedule A attached hereto. The Secretary shall be required to update Schedule A from time to time as necessary to accurately reflect the information therein. Any amendment or revision to Schedule A made in accordance with this Agreement shall not be deemed an amendment to this Agreement. Any reference in this Agreement to Schedule A shall be deemed to be a reference to Schedule A as amended and in effect from time to time.

(iv)    Gerry Pike, as an authorized person within the meaning of the Maine Act, shall execute, deliver, and file the Articles.

Section 2.2    Name. The name of the Company formed hereby is Dialogo, LLC. The business of the Company may be conducted upon compliance with all applicable Laws under any other name designated by the Board.

Section 2.3    Term. The term of the Company shall commence on the date the Articles are filed in the office of the Secretary of State of the State of Maine and shall continue in perpetuity, unless the Company is dissolved in accordance with the provisions of this Agreement. The existence of the Company as a separate legal entity shall continue until cancellation of the Articles in the manner required by the Maine Act.

Section 2.4    Registered Agent and Office. The Company's registered agent and office in the State of Maine shall be Mark Googins, Verrill & Dana, One Portland Square, Portland, Maine 04112. At any time, the Members may designate another registered agent and/or registered office.

Section 2.5    Principal Place of Business. The principal place of business of the Company shall be at 252 Open Square Way, Suite 405, Holyoke, MA. 01040. At any time, the Board may change the location of the Company's principal place of business to another location.

Section 2.6    Qualification in Other Jurisdictions. The Board shall cause the Company to be qualified, formed, or registered under assumed or fictitious name statutes or similar Laws in any jurisdiction in which the Company transacts business. The Secretary, as an authorized person within the meaning of the Maine Act, shall execute, deliver and file any certificates (and any amendments and/or restatements thereof) necessary for the Company to qualify to do business in a jurisdiction in which the Company may wish to conduct business.

# ARTICLE III

## PURPOSE AND POWERS OF THE COMPANY

Section 3.1    Purpose.  The Company is formed for the object and purpose of developing Spanish language newspaper(s) and media, and to engage in any lawful act or activity for which limited liability companies may be formed under the Maine Act and engaging in any and all activities necessary, convenient, desirable or incidental to the foregoing, including, without limitation, (i) to acquire, hold and dispose of the investments, including investments in Affiliates, (ii) to lend money to, borrow money from, act as surety, guarantor or endorser for, provide collateral for, and transact other business with third parties including, Members and Affiliates of the Company, and (iii) acquiring, holding, managing, operating and disposing of interests in real and personal property.

Section 3.2    Powers of the Company.

(i)    The Company shall have the power and authority to take any and all actions necessary, appropriate, proper, advisable, incidental or convenient to or for the furtherance of the purpose set forth in Section 3.1, including, but not limited to, the power:

(a)    to conduct its business, carry on its operations and have and exercise the powers granted to a limited liability company by the Maine Act in any state, territory, district or possession of the United States, or in any foreign country, that may be necessary, convenient, or incidental to the accomplishment of the purpose of the Company;

(b)    to enter into, perform and carry out contracts of any kind, including, without limitation, contracts with the Directors, the Officers, any Manager, any Member, any Affiliate thereof, or any agent or Affiliate of the Company necessary to, in connection with, convenient to, or incidental to the accomplishment of the purpose of the Company;

(c)    to lend money to, borrow money from, act as surety, guarantor or endorser for, provide collateral for, and transact other business with third parties including Members and Affiliates of the Company;

(d)    to purchase, take, receive, subscribe for, or otherwise acquire, own, hold, vote, use, employ, sell, mortgage, lend, pledge, or otherwise dispose of, and otherwise use and deal in and with, Interests or other interests in or obligations of

-6-

domestic or foreign Company's, associations, general or limited partnerships (including, without limitation, the power to be admitted as a partner thereof and to exercise the rights and perform the duties created thereby), trusts, limited liability companies (including, without limitation, the power to be admitted as a member or appointed as a manager thereof and to exercise the rights and perform the duties created thereof), or individuals or direct or indirect obligations of the United States or of any government, state, territory, governmental district, or municipality or of any instrumentality of any of them;

(e)     to lend money for its proper purpose, to invest and reinvest its funds, to take and hold real and personal property for the payment of funds so loaned or invested;

(f)     to sue and be sued, complain and defend, and participate in administrative or other proceedings, in its name;

(g)     to appoint employees and agents of the Company, and define their duties and fix their compensation;

(h)     to indemnify any Person in accordance with the Maine Act and to obtain any and all types of insurance;

(i)     to cease its activities and cancel its Articles;

(j)     to negotiate, enter into, renegotiate, extend, renew, terminate, modify, amend, waive, execute, acknowledge, or take any other action with respect to any lease, contract or security agreement in respect of any assets of the Company;

(k)     to borrow money and issue evidences of indebtedness, and to secure the same by a mortgage, pledge, or other lien on the assets of the Company;

(l)     to pay, collect, compromise, litigate, arbitrate, or otherwise adjust or settle any and all other claims or demands of or against the Company or to hold such proceeds against the payment of contingent liabilities; and

(m)     to make, execute, acknowledge, and file any and all documents or instruments necessary, convenient, or incidental to the accomplishment of the purpose of the Company.

(ii)    The Company may merge with, or consolidate into, another limited liability company or other business entity upon the approval of all of the Members.

## ARTICLE IV

## CAPITAL CONTRIBUTIONS, INTERESTS, CAPITAL ACCOUNTS AND ADVANCES

Section 4.1    Capital Contributions.

(i)    Each Member has contributed or is deemed to have contributed to the capital of the Company the amount set forth opposite the Member's name on Schedule A attached hereto. The agreed value of the Capital Contributions made or deemed to have been made by each Member shall be set forth on Schedule A.

(ii)    No Member shall be required to make any additional capital contribution to the Company. However, a Member may make additional capital contributions to the Company with the written consent of all of the Members.

Section 4.2    Member's Interest.  A Member's Interest shall for all purposes be personal property.  A Member has no interest in specific Company property.

Section 4.3    Status of Capital Contributions.

(i)    Except as otherwise provided in this Agreement, the amount of a Member's Capital Contributions may be returned to it, in whole or in part, at any time, but only with the consent of all of the Members. Any such returns of Capital Contributions shall be made to all Members in proportion to their Percentage Interests. Notwithstanding the foregoing, no return of a Member's Capital Contributions shall be made hereunder if such distribution would violate applicable law. Under circumstances requiring a return of any Capital Contribution, no Member shall have the right to demand or receive property other than cash, except as may be specifically provided in this Agreement or as may be specifically agreed to by all of the Members.

(ii)    No Member shall receive any interest, salary, or drawing with respect to its Capital Contributions or its Capital Account or for services rendered on behalf of the Company or otherwise in its capacity as a Member, except:

> (a) the respective invoices of each of DMSA, in connection with services rendered or goods provided through or on behalf of the Company for a client of the Company, shall be paid by the Company as it receives payment form such customer;

-8-

(b) the Members shall be paid profits in accordance with their respective Membership Interests; and

(c) as expressly provided by a unanimous resolution of the Board.

(iii)    Except as otherwise provided herein and by applicable law, the Members shall be liable only to make their capital contributions pursuant to Section 4.1 hereof, and no Member shall be required to lend any funds to the Company or, after a Member's Capital Contributions have been fully paid pursuant to Section 4.1 hereof, to make any additional capital contributions to the Company. No Member shall have any personal liability for the repayment of any Capital Contribution of any other Member.

Section 4.4    Capital Accounts.

(i)    An individual Capital Account shall be established and maintained for each Member.

(ii)    The Capital Account of each Member shall be maintained in accordance with the provisions of Regulation section 1.704-1 (b) (2) (iv)

Section 4.5    Advances.  If any Member shall advance any funds to the Company in excess of its Capital Contributions, the amount of such advance shall neither increase its Capital Account nor entitle it to any increase in its Interest of the distributions of the Company. The amount of any such advance shall be a debt obligation of the Company to such Member and shall be subject to such terms and conditions acceptable to the Company and each Member. Any such advance shall be payable and collectible only out of Company assets, and the other Members shall not be personally obligated to repay any part thereof. No Person who makes any nonrecourse loan to the Company shall have or acquire, as a result of making such loan, any direct or indirect interest in the profits, capital, or property of the Company, other than as a creditor.

# ARTICLE V

# MEMBERS

Section 5.1    Powers of Members. The Members shall have the power to exercise any and all rights or powers granted to the Members pursuant to the express terms of this Agreement. The Members shall also have the power to authorize the Board, by Majority Vote, to possess and exercise any right or power not already vested in the Board pursuant to Article VI or any other provision of this Agreement. In addition to the foregoing, the Members have the power to exercise any and all other rights or powers of the Company and to do all lawful acts and things as are not by the Maine Act or this Agreement directed or required to be exercised or done by the Board. Except as provided herein, individually, the Members shall have no power to bind the Company.

Section 5.2    Reimbursements. The Company shall reimburse the Members, for all ordinary and necessary out-of-pocket expenses incurred by the Members on behalf of the Company. Such reimbursement shall be treated as an expense of the Company that shall be deducted in computing the Net Cash Flow and shall not be deemed to constitute a distributive Interest of Profits or a distribution or return of capital to any Member.

Section 5.3    Partition. Each Member waives any and all rights that it may have to maintain an action for partition of the Company's property.

Section 5.4    Resignation. A Member may not resign from the Company prior to the dissolution and winding up of the Company.

Section 5.5    Meetings of Members.

    (i)    The annual meeting of the Members for the election of Directors and the transaction of other business shall be held, in each year, at such place as shall be designated by the Board and stated in the notice of the meeting. Special meetings of Members for any purpose or purposes may be held at such time and place, and shall be stated in the notice of the meeting or in a duly executed waiver of notice thereof.

    (ii)    At the annual meeting of the Members, LSB shall elect one of the Directors and DMSA shall elect two of the Directors on the Company's Board of Directors.

    (iii)    Written notice of the annual meeting stating the place, date and hour of the meeting shall be given to each Member entitled to vote at such meeting not less than 10 nor more than 60 days before the date of the meeting.

(iv)    Special meetings of the Members, for any purpose or purposes, may be called by the President and shall be called by the President or Secretary at the request in writing of a majority of the Board. Such request shall state the purpose or purposes of the proposed meeting.

(v)    Written notice of a special meeting stating the place, date, and hour of the meeting and the purpose or purposes for which the meeting is called, shall be given not less than 10 nor more than 60 days before the date of the meeting, to each Member entitled to vote at such meeting.

(vi)    Business transacted at any special meeting of Members shall be limited to the purposes stated in the notice, unless otherwise agreed to by all of the Members.

(vii)    A Majority present in person or by proxy, shall constitute a quorum at all meetings of the Members for the transaction of business except as otherwise provided by this Agreement. If, however, such quorum shall not be present or represented at any meeting of the Members, the Members entitled to vote thereat, present in person or represented by proxy, shall have power to adjourn the meeting from time to time, without notice other than announcement at the meeting, until a quorum shall be present or represented. At such adjourned meeting at which a quorum shall be present or represented any business may be transacted which might have been transacted at the meeting as originally notified. If the adjournment is for more than 30 days, or if after the adjournment a new record date is fixed for the adjourned meeting, a notice of the adjourned meeting shall be given to each Member of record entitled to vote at the meeting.

(viii)    When a quorum is present at any meeting, a Majority Vote shall decide any question brought before such meeting, unless the question is one upon which by express provision of this Agreement, a different vote is required in which case such express provision shall govern and control the decision of such question.

(ix)    Unless otherwise provided in this Agreement, each Member shall at every meeting of the Members be entitled to vote in person or by proxy, but no proxy shall be voted on after three years from its date, unless the proxy provides for a longer period.

(x)    Members may participate in a meeting of the Members by means of conference telephone or similar communications equipment, provided all persons participating in the meeting can hear each other, and such participation in a meeting shall constitute presence in person at the meeting. If all the participants are participating by conference telephone or similar

-11-

communications equipment, the meeting shall be deemed to be held at the principal place of business of the Company.

(xi)    Unless otherwise provided in this Agreement, any action required to be taken at any annual or special meeting of the Members of the Company or any action which may be taken at any annual or special meeting of such Members, may be taken without a meeting, without prior notice and without a vote, if a consent in writing, setting forth the action so taken, shall be signed by a Majority. Prompt notice of taking of the action without a meeting by less than unanimous consent shall be given to those Members who have not consented in writing.

## ARTICLE VI

## MANAGEMENT

Section 6.1    Board of Directors. Subject to Section 5.1 of this Agreement, the business and affairs of the Company shall be managed by or under the direction of a Board of three Directors. A person elected as a Director is by such election designated a Manager by the Members for purposes of the Act. The Directors shall be elected at the annual meeting of the Members, except as provided in this Article, and each Director elected shall hold office until a successor is elected and qualified or until such Director's earlier death, resignation, or removal. Directors need not be Members. Vacancies shall be filled by the vote of LSB, if the vacancy is the LSB-elected Director, and by DMSA if the vacancy is a DMSA-elected director, and the Directors so chosen shall hold office until the next annual election and until their successors are duly elected and shall qualify, unless sooner displaced.

Section 6.2    Meetings of the Board of Directors. The Board of Directors of the Company may hold meetings, both regular and special, within or outside the State of Maine. The first meeting of each newly elected Board of Directors shall be held immediately after the annual meeting of Members and at the same place, and no notice of such meeting shall be necessary to the newly elected Directors in order legally to constitute the meeting, provided a quorum shall be present. In the event such meeting is not held at that time and place, the meeting may be held at such time and place as shall be specified in a notice given as hereinafter provided for special meetings of the Board of Directors, or as shall be specified in a written waiver signed by all of the Directors. Regular meetings of the Board may be held without notice at such time and at such place as shall from time to time be determined by the Board. Special meetings of the Board may be called by the President on three (3) days' notice to each Director, either personally, by telephone, by mail, by telegram or by any other means of communication; special meetings shall be called by the President in like manner and on like notice on the written request of one or more of the Directors.

Section 6.3    Quorum and Acts of the Board.  At all meetings of the Board a majority of the Directors shall constitute a quorum for the transaction of business and, except as otherwise provided in Section 6.9 of this Agreement or any other provision of this Agreement, the act of a majority of the Directors present at any meeting at which there is a quorum shall be the act of the Board.  If any Directors' vote shall result in a tie-vote, then the matter voted on by the Board shall be presented to the Members for vote, and the resulting vote by the Members shall decide such matters.  If a quorum shall not be present at any meeting of the Board, the Directors present thereat may adjourn the meeting from time to time, without notice other than announcement at the meeting, until a quorum shall be present.  Any action required or permitted to be taken at any meeting of the Board or of any committee thereof may be taken without a meeting, if all members of the Board or committee, as the case may be, consent thereto in writing, and the writing or writings are filed with the minutes of proceedings of the Board or committee.

Section 6.4    Electronic Communications.  Members of the Board, or any committee designated by the Board, may participate in a meeting of the Board, or any committee, by means of conference telephone or similar communications equipment by means of which all persons participating in the meeting can hear each other, and such participation in a meeting shall constitute presence in person at the meeting.  If all the participants are participating by conference telephone or similar communications equipment, the meeting shall be deemed to be held at the principal place of business of the Company.

Section 6.5    Committees of Directors.  The Board may, by resolution passed by a majority of the whole Board, designate one or more committees, each committee to consist of one or more of the Directors of the Company.  The Board may designate one or more Directors as alternate members of any committee, who may replace any absent or disqualified member at any meeting of the committee.

In the absence or disqualification of a member of a committee, the member or members thereof present at any meeting and not disqualified from voting, whether or not such members constitute a quorum, may unanimously appoint another member of the Board to act at the meeting in the place of any such absent or disqualified member.

Any such committee, to the extent provided in the resolution of the Board, shall have and may exercise all the powers and authority of the Board in the management of the business and affairs of the Company, but no such committee shall have the power or authority to take any of the actions described in Section 6.9 of this Agreement unless authorized in writing by each Director.  Such committee or committees shall have such name or names as may be determined from time to time by resolution adopted by the Board. Each committee shall keep regular minutes of its meetings and report the same to the Board when required.  Section 6.6 Compensation of Directors.  The Board shall have the authority to fix the compensation of Directors.  The Directors may be paid their expenses, if any, of attendance at

-13-

such meeting of the Board and may be paid a fixed sum for attendance at each meeting of the Board or a stated salary as Director. No such payment shall preclude any Director from serving the Company in any other capacity and receiving compensation therefor. Members of special or standing committees may be allowed like compensation for attending committee meetings.

Section 6.6    Removal of Directors. Unless otherwise restricted by Law, any Director may be removed, with or without cause, by the Member that was entitled to elect such director. Any vacancy caused by any such removal may be filled by action of the Member entitled to elect such director.

Section 6.7    Directors as Agents. The Directors, to the extent of their powers set forth in this Agreement, are agents of the Company for the purpose of the Company's business, and the actions of the Directors taken in accordance with such powers shall bind the Company.

Section 6.8    Actions Requiring Unanimous Approval of the Board. Notwithstanding any other provision of this Agreement to the contrary, none of the Board, any Director, or any Officer shall take any of the following actions on behalf of the Company unless authorized to do so unanimously by the Board:

(i)    the sale, exchange, or other disposition of any of the assets of the Company except for sales in the ordinary course of business;

(ii)    the commencement of a voluntary proceeding seeking reorganization or other relief with respect to the Company under any bankruptcy or other similar law or seeking the appointment of a trustee, receiver, custodian, or other similar official of the Company or any substantial part of its property, or the making by the Company of a general assignment for the benefit of creditors;

(iii)    the declaration or making of any distributions to Members other than to reimburse DMSA for initial capital contributions.

(iv)    the entering into by the Company of any joint venture, partnership, subcontracting, license, sub-license, manufacturing, marketing, distribution, or other similar arrangement with any Person;

(v)    the entering into by the Company of any agreement, facility, commitment, guaranty, instrument, or other undertaking providing for, or relating to, the incurrence of any indebtedness by the Company;

(vi)    the formation or organization of any subsidiary of the Company and the appointment of directors of (or persons with comparable authority with respect to) any such subsidiary;

(vii)    the issuance, sale, acquisition, or repurchase by the Company of any Interest or other equity interest (or option, warrant, conversion or similar right with respect to any equity interest) in or of the Company;

(viii)    the commitment to any material capital expenditure by the Company in any Fiscal Year of the Company;

(ix)    the adoption of a business plan and annual operating budget for the Company (or any updates to each thereof).

(x)    the entering into, amendment or termination of employment contracts with Officers of the Company or other contracts with Directors, Officers, Managers, or Members or their respective Affiliates;

(xi)    the appointment or change of the independent auditors or deposit banks of the Company;

(xii)    the acquisition or lease by the Company of any real property, or any sale, lease, or sublease of, or similar arrangement affecting, any real property owned or leased by the Company;

(xiii)    the entering into, amendment, modification, renewal (or election not to renew), waiver, or termination by the Company of any financing document; and

(xiv)    the incurrence or assumption of any material liability or obligation, whether contractually or otherwise, by the Company.

# ARTICLE VII

## OFFICERS

Section 7.1    <u>Officers</u>.  The Officers of the Company shall be elected by the Board and shall consist of at least a President, a Secretary, and a Treasurer.  The Board of Directors may also choose one or more Vice Presidents, and one or more Assistant Secretaries and Assistant Treasurers.  Any number of offices may be held by the same person.  The Board at its first meeting after each annual meeting of Members shall choose a President, a Secretary, and a Treasurer.  The Board at its first meeting may appoint such other Officers and agents as it shall deem necessary who shall hold their offices for such terms and shall exercise such powers and perform such duties as shall be determined from time to time by the Board.  The salaries of all Officers and agents of the Company shall be fixed by or in the manner prescribed by the Board.  The Officers of the Company shall hold office until their successors are chosen and qualify.  Any Officer elected or appointed by the Board of Directors may be removed at any time by the affirmative vote of a majority of the Board.  Any vacancy occurring in any office of the Company shall be filled by the Board.

Section 7.2    <u>The President</u>.  The President shall be the chief executive officer of the Company, shall preside at all meetings of the Members and the Board, shall have general and active management of the business of the Company and shall see that all orders and resolutions of the Board are carried into effect.  The President shall execute bonds, mortgages, and other contracts, except where required or permitted by Law to be otherwise signed and executed and except where signing and execution thereof shall be expressly delegated by the Board to some other Officer or agent of the Company or except as otherwise permitted in Section 7.3 hereof.

Section 7.3    <u>The Vice President</u>.  In the absence of the President or in the event of the President's inability to act, the Vice President, if any, (or in the event there be more than one Vice President, the Vice Presidents in the order designated by the Directors, or in the absence of any designation, then in the order of their election) shall perform the duties of the President, and when so acting, shall have all the powers of and be subject to all the restrictions upon the President.  The Vice Presidents, if any, shall perform such other duties and have such other powers as the Board may from time to time prescribe.

Section 7.4    <u>The Secretary and Assistant Secretary</u>.  The Secretary shall be responsible for filing legal documents and maintaining records for the Company.  The Secretary shall attend all meetings of the Board and all meetings of the Members and record all the proceedings of the meetings of the Company and of the Board in a book to be kept for that purpose and shall perform like duties for the standing committees when required.  The Secretary shall give, or cause to be given, notice of all meetings of the Members and special meetings of the Board, and shall perform such other duties as may

be prescribed by the Board or President, under whose supervision the Secretary shall be. The Assistant Secretary, or if there be more than one, the Assistant Secretaries in the order determined by the Board (or if there be no such determination, then in order of their election) shall, in the absence of the Secretary or in the event of the Secretary's inability to act, perform the duties and exercise the powers of the Secretary and shall perform such other duties and have such other powers as the Board may from time to time prescribe.

Section 7.5     The Treasurer and Assistant Treasurer. The Treasurer shall have the custody of the Company funds and securities and shall keep full and accurate accounts of receipts and disbursements in books belonging to the Company and shall deposit all moneys and other valuable effects in the name and to the credit of the Company in such depositories as may be designated by the Board. The Treasurer shall disburse the funds of the Company as may be ordered by the Board, taking proper vouchers for such disbursements, and shall render to the President and the Board, at its regular meetings, or when the Board so requires, an account of all of the Treasurer's transactions and of the financial condition of the Company. The Assistant Treasurer, or if there shall be more than one, the Assistant Treasurers in the order determined by the Board (or if there be no such determination, then in the order of their election), shall, in the absence of the Treasurer or in the event of the Treasurer's inability to act, perform the duties and exercise the powers of the Treasurer and shall perform such other duties and have such other powers as the Board may from time to time prescribe.

Section 7.6     Officers as Agents. The Officers, to the extent of their powers set forth in this Agreement or otherwise vested in them by action of the Board, are agents of the Company for the purpose of the Company's business, and the actions of the Officers taken in accordance with such powers shall bind the Company.

Section 7.7     Duties of Board and Officers. Except to the extent provided herein, each Director and Officer shall have the fiduciary duty of loyalty and care similar to those of directors and officers of business corporations organized under the Maine Business Corporation Act.

## ARTICLE VIII

## ALLOCATIONS

Section 8.1     Profits and Losses.

(i)     Subject to the allocation rules of Section 8.2 hereof, Profits for any Fiscal Year shall be allocated among the Members in proportion to the Percentage Interests.

(ii)     Subject to the allocation rules of Section 8.2 hereof, Losses for any Fiscal Year shall be allocated among the Members in proportion to the Percentage Interests.

-17-

Section 8.2     Allocation Rules.

(i)     For purposes of determining the Profits, Losses or any other items allocable to any period, Profits, Losses and any such other items shall be determined on a daily, monthly or other basis, as determined by the Members using any method that is permissible under § 706 of the Code and the Treasury Regulations thereunder.

(ii)     Except as otherwise provided in this Agreement, all items of Company income, gain, loss, deduction and any other allocations not otherwise provided for shall be shared among the Members in the same proportions as they shared Interest Profits and Losses for the Fiscal Year in question.

(iii)     The Members are aware of the income tax consequences of the allocations made by this Article VIII and hereby agree to be bound by the provisions of this Article VIII in reporting their Interests of Company income and loss for income tax purposes.

(iv)     The Members intend that the allocation provisions set forth in this Agreement are intended to comply with Section 704(b) of the Code and the Treasury Regulations issued thereunder and the provisions are to be interpreted in a manner consistent with those Treasury Regulations.

Section 8.3     Tax Allocations; Section 704(c) of the Code.  In accordance with Section 704(c) of the Code and the Treasury Regulations thereunder, income, gain, loss and deduction with respect to any property contributed to the capital of the Company shall, solely for income tax purposes, be allocated among the Members so as to take account of any variation between the adjusted basis of such property to the Company for federal income tax purposes and its initial fair market value.

## ARTICLE IX

## DISTRIBUTIONS

Section 9.1     Net Cash Flow.  Except as otherwise provided in Article XV hereof (relating to the dissolution of the Company), any distribution of the Net Cash Flow during any Fiscal Year shall be made to the Members in proportion to the Percentage Interests.

Section 9.2     Distribution Rules.  All distributions pursuant to Section 9.1 hereof shall be at such times and in such amounts as shall be determined by the Board.

Section 9.3    Limitations on Distribution. Notwithstanding any provision to the contrary contained in this Agreement, the Company, and the Board on behalf of the Company, shall not make a distribution to any Member on account of its interest in the Company if such distribution would violate applicable Law.

Section 9.4    Amounts Withheld. All amounts withheld pursuant to the Code or any provision of any state, local or foreign tax law as to any payment, distribution or allocation to the Company or the Members shall be treated, for all purposes under this Agreement, as amounts paid or distributed, as the case may be, to the Members as to which such amount was withheld pursuant to this 9.4. The Company is authorized to withhold from payments and distributions, or with respect to allocations to the Members, and to pay over to any federal, state and local government or any foreign government, any amounts required to be so withheld pursuant to the Code or any provisions of any other federal, state or local law or any foreign law, and shall allocate any such amounts to the Members with respect to which such amount was withheld.

## ARTICLE X

## BOOKS AND RECORDS

Section 10.1    Books, Records and Financial Statements.

(i)    At all times during the continuance of the Company, the Company shall maintain, at its principal place of business, separate books of account for the Company that shall show a true and accurate record of all costs and expenses incurred, all charges made, all credits made and received and all income derived in connection with the operation of the Company business in accordance with generally accepted accounting principles consistently applied, and, to the extent inconsistent therewith, in accordance with this Agreement. Such books of account, together with a copy of this Agreement and of the Certificate, shall at all times be maintained at the principal place of business of the Company and shall be open to inspection and examination at reasonable times by each Member and its duly authorized representative for any purpose reasonably related to such Member's interest in the Company.

(ii)    The Company, and the Board on behalf of the Company, shall prepare and maintain, or cause to be prepared and maintained, the books of account of the Company. The Company, and the Board on behalf of the Company, shall prepare and file, or cause to be prepared and filed, all applicable federal and state tax returns.

Section 10.2    Accounting Method. For both financial and tax reporting purposes and for purposes of determining Profits and Losses, the books and records of the Company shall be kept on the accrual method of accounting applied in a consistent manner in accordance with generally accepted

accounting principles and shall reflect all Company transactions and be appropriate and adequate for the Company's business.

# ARTICLE XI

## TAX MATTERS

Section 11.1    Tax Matters Partner.

(i)    DMSA is hereby designated as "Tax Matters Partner" of the Company for purposes of § 6231(a)(7) of the Code.

(ii)    The Tax Matters Partner shall, within ten (10) days of the receipt of any notice from the Internal Revenue Service in any administrative proceeding at the Company level relating to the determination of any Company item of income, gain, loss, deduction or credit, mail or otherwise deliver a copy of such notice to each Member.

Section 11.2    Taxation as Partnership.  The Company shall be treated as a partnership for U.S. federal income tax purposes.

# ARTICLE XII

## LIABILITY, EXCULPATION, INDEMNIFICATION

Section 12.1    Liability.  Except as otherwise provided by the Maine Act, the debts, obligations, and liabilities of the Company, whether arising in contract, tort or otherwise, shall be solely the debts, obligations, and liabilities of the Company, and no Member or Manager shall be obligated personally for any such debt, obligation, or liability of the Company solely by reason of being a Member or Manager.

Section 12.2    Exculpation.

(i)    No Covered Person shall be liable to the Company or any other Covered Person for any loss, damage, or claim incurred by reason of any act or omission performed or omitted by such Covered Person in good faith on behalf of the Company and in a manner reasonably believed to be within the scope of authority conferred on such Covered Person by this Agreement, except that a Covered Person shall be liable for any such loss, damage or claim incurred by reason of such Covered Person's gross negligence or willful misconduct.

-20-

(ii)    A Covered Person shall be fully protected in relying in good faith upon the records of the Company and upon such information, opinions, reports or statements presented to the Company by any Person as to matters the Covered Person reasonably believes are within such other Person's professional or expert competence and who has been selected with reasonable care by or on behalf of the Company, including information, opinions, reports or statements as to the value and amount of the assets, liabilities, Profits, Losses, or Net Cash Flow or any other facts pertinent to the existence and amount of assets from which distributions to Members might properly be paid.

Section 12.3    Fiduciary Duty.  To the extent that, at law or in equity, a Covered Person has duties (including fiduciary duties) and liabilities relating thereto to the Company or to any other Covered Person, a Covered Person acting under this Agreement shall not be liable to the Company or to any Member for its good faith reliance on the provisions of this Agreement.  The provisions of this Agreement, to the extent that they restrict the duties and liabilities of a Covered Person otherwise existing at law or in equity, are agreed by the parties hereto to replace such other duties and liabilities of such Covered Person.

Section 12.4    Indemnification.  To the fullest extent permitted by applicable law, a Covered Person shall be entitled to indemnification from the Company for any loss, damage or claim incurred by such Covered Person by reason of any act or omission performed or omitted by such Covered Person in good faith on behalf of the Company and in a manner reasonably believed to be within the scope of authority conferred on such Covered Person by this Agreement, except that no Covered Person shall be entitled to be indemnified in respect of any loss, damage or claim incurred by such Covered Person by reason of gross negligence or willful misconduct with respect to such acts or omissions; provided, however, that any indemnity under this Section 12.4 shall be provided out of and to the extent of Company assets only, and no Covered Person shall have any personal liability with respect to such indemnity.

Section 12.5    Expenses.  To the fullest extent permitted by applicable law, expenses (including legal fees) incurred by a Covered Person in defending any claim, demand, action, suit, or proceeding shall, from time to time, be advanced by the Company prior to the final disposition of such claim, demand, action, suit or proceeding upon receipt by the Company of an undertaking by or on behalf of the Covered Person to repay such amount if it shall be determined that the Covered Person is not entitled to be indemnified as authorized in Section 12.4 hereof.

Section 12.6    Insurance.  The Company may purchase and maintain insurance, to the extent and in such amounts as the Board shall, in its sole discretion, deem reasonable, on behalf of Covered Persons and such other Persons as the Board shall determine, against any liability that may be asserted against or expenses that may be incurred by any such Person in connection with the activities of the Company or such indemnities, regardless of whether the Company would have the power to indemnify such Person against such liability under the provisions of this Agreement.  The Company may enter into

-21-

indemnity contracts with Covered Persons and such other Persons as the Board shall determine and adopt written procedures pursuant to which arrangements are made for the advancement of expenses and the funding of obligations under Section 12.5 hereof and containing such other procedures regarding indemnification as are appropriate.

Section 12.7    DMSA's Outside Businesses; LSB's Exclusivity.  DMSA or an Affiliate thereof may engage in or possess an interest in other business ventures of any nature or description, independently or with others, similar or dissimilar to the business of the Company, and the Company and the Members shall have no rights by virtue of this Agreement in and to such independent ventures or the income or profits derived therefrom, and the pursuit of any such venture, shall not be deemed wrongful or improper.  Neither DMSA, nor an Affiliate thereof shall be obligated to present any particular investment opportunity to the Company even if such opportunity is of a character that, if presented to the Company, could be taken by the Company, and DMSA or its Affiliate thereof shall have the right to take for its own account (individually or as a partner or fiduciary) or to recommend to others any such particular investment opportunity.  Without diminishing DMSA's rights under the foregoing language, DMSA does agree that it intends to use diligent efforts to direct appropriate business to the Company in furtherance of the Company's goals. However, LSB shall employ its diligent efforts for the Company and LSB shall not provide such services, directly or indirectly for itself or any other entity or person to the extent it relates to the business. DMSA is hereby expressly relieved of its fiduciary duties as a Director to the extent such duties would prevent or impede DMSA from undertaking, soliciting or profiting from any business venture or investment opportunity, whether or not such venture or opportunity is similar or dissimilar to the business of the Company.

Section 12.8    DMSA and LSB acknowledge and agree that all efforts and actions undertaken by them for the Company in connection with the business of the company are to be kept confidential. Neither DMSA nor LSB will disclose to any person or entity, directly or indirectly, any Proprietary Information (as hereinafter defined) relating to the Company's business without the prior written consent of the LLC.  For purposes of this Agreement, "Proprietary Information" means all advertiser and subscription lists, advertiser and subscription prospects, marketing information and data, product information, strategic or technical information, financial information, supplier information, billing rates and advertiser provided information, documents and data.

# ARTICLE XIII

## ADDITIONAL MEMBERS

Section 13.1    Admission.  By approval of all of the Members, the Company is authorized to admit any Person as an additional member of the Company (each, an "Additional Member" and collectively, the "Additional Members").  Each such Person shall be admitted as an Additional Member at the time such Person (i) executes this Agreement or a counterpart of this Agreement and (ii) is named as a Member on Schedule A hereto.  The legal fees and expenses associated with such admission shall be borne by the Company.

Section 13.2    Allocations.  Additional Members shall not be entitled to any retroactive allocation of the Company's income, gains, losses, deductions, credits, or other items; provided that, subject to the restrictions of § 706(d) of the Code, Additional Members shall be entitled to their respective Interest of the Company's income, gains, losses, deductions, credits, and other items arising under contracts entered into before the effective date of the admission of any Additional Members to the extent that such income, gains, losses, deductions, credits, and other items arise after such effective date.  To the extent consistent with § 706(d) of the Code and Treasury Regulations promulgated thereunder, the Company's books may be closed at the time Additional Members are admitted (as though the Company's tax year had ended) or the Company may credit to the Additional Members pro rata allocations of the Company's income, gains, losses, deductions, credits and items for that portion of the Company's Fiscal Year after the effective date of the admission of the Additional Members.

# ARTICLE XIV

## ASSIGNMENT AND PLEDGE OF INTERESTS

Section 14.1    Assignability of Interests.  No Member may assign the whole or any part of its Interests, without complying with the terms of this Agreement.

Section 14.2    Recognition of Assignment by Company.  No assignment or pledge of any Interest, or any part thereof, that is in violation of this Article XIV shall be valid or effective, and neither the Company nor the Members shall recognize the same for the purpose of making distributions pursuant to this Agreement.  Neither the Company nor the Members shall incur any liability as a result of refusing to make any such distributions to the assignee of any such invalid assignment.

Section 14.3    Pledge.  No Member may pledge or otherwise encumber the whole or any part of its Interests, without prior written consent of all Members.

# ARTICLE XV

# DISSOLUTION, LIQUIDATION AND TERMINATION

Section 15.1    <u>No Dissolution</u>. The Company shall not be dissolved by the admission of Additional Members or substitute Members in accordance with the terms of this Agreement.

Section 15.2    <u>Events Causing Dissolution</u>. The Company shall be dissolved and its affairs shall be wound up upon the occurrence of any of the following events:

(i)    the written consent of all Members;

(ii)    the death, retirement, resignation, expulsion, bankruptcy, or dissolution of a Member or the occurrence of any other event under the Maine Act that terminates the continued membership of a Member in the Company unless, within ninety (90) days after the occurrence of such an event, all of the remaining Members agree in writing to continue the business of the Company; or

(iii)    the entry of a decree of judicial dissolution of the Company.

Section 15.3    <u>Liquidation</u>. Upon dissolution of the Company, the Board shall carry out the winding up of the Company and shall immediately commence to wind up the Company's affairs; provided, however, that a reasonable time shall be allowed for the orderly liquidation of the assets of the Company and the satisfaction of liabilities to creditors so as to enable the Members to minimize the normal losses attendant upon a liquidation. The Members shall continue to distribute Interest Profits and Losses during liquidation in the same proportions, as specified in Article VIII hereof, as before liquidation. The proceeds of liquidation shall be distributed in the following order and priority:

(i)    to creditors of the Company, including Members who are creditors, to the extent otherwise permitted by law, in satisfaction of the liabilities of the Company (whether by payment or the making of reasonable provision for payment thereof); and

(ii)    to the Members in accordance with their Capital Account balances, after giving effect to all contributions, distributions and allocations for all periods.

Section 15.4    <u>Termination</u>. The Company shall terminate when all of the assets of the Company, after payment of or due provision for all debts, liabilities, and obligations of the Company, shall have been distributed to the Members in the manner provided for in this Article XV and the Articles shall have been canceled in the manner required by the Maine Act.

Section 15.5    <u>Claims of the Members</u>. The Members and former Members shall look solely to the Company's assets for the return of their Capital Contributions, and if the assets of the Company remaining after payment of or due provision for all debts, liabilities, and obligations of the Company are insufficient to return such Capital Contributions, the Members and former Members shall have no recourse against the Company or any other Member.

**ARTICLE XVI**

**<u>TRANSFER RESTRICTIONS</u>**

Section 16.1    <u>Transfer Procedures</u>. Each transfer of Interests of the Company shall be made on Schedule A of this Agreement. The person in whose name Interests stand on Schedule A of this Agreement shall be deemed the owner thereof for all purposes as regards the Company, and the Company shall not be bound to recognize any equitable or other claim to or interest in such Interests on the part of any other person, whether or not it shall have express or other notice thereof, except as otherwise provided by law.

Section 16.2    <u>Restrictions on Transfer</u>. No Member shall have the right to transfer Interests of the Company except in compliance with the restrictions on transfer set forth below. For purposes of this section, the term "transfer" means any transfer, whether outright or as security, <u>inter vivos</u> or testamentary, with or without consideration, voluntary or involuntary, by division of marital property or otherwise, of all or any part of any right, title, or interest (including without limitation voting rights and rights to dividends or liquidation proceeds) in or to any Interests, other than a transfer of voting rights by delivery of a revocable proxy. The provisions of this Article shall be applicable to any transfer of Interests of the Company notwithstanding any prior transfer made in compliance with this Article or any prior transfer made pursuant to any waiver of the Company's rights hereunder. Such Interests or any beneficial interest therein held by any person subsequent to such transfers shall be subject in every respect to these restrictions. If a transferring Member fails to comply with the transfer procedures and restrictions contained in this Agreement, then so long as such failure continues (i) the Interests in question will be deemed not to be voted and (ii) no dividend or distribution declared on such Interests shall be paid by the Company.

Section 16.3    <u>Party to this Agreement</u>. No sale, assignment, pledge, or gift, or other transfer of Interests shall be valid or enforceable unless the proposed transferee (i) is already a party to this Agreement, as then in effect, or (ii) has delivered to the Company a written undertaking to become a party to this Agreement, as may be amended from time to time.

Section 16.4    <u>Waiver</u>. Upon any proposed transfer of Interests pursuant to Sections 16.9, 16.10, and 16.11 of this Agreement, the parties agree that the Company and the other Members shall

-25-

be deemed to have waived the applicability of any other right of first refusal it may otherwise have.

Section 16.5    Securities Opinion. No Member may transfer, and no person may acquire, beneficial or record ownership of any Interests of the Company unless the transferee or transferor provides the Company an opinion of counsel, in form and substance satisfactory to the Board or the President, that such transfer will not violate the securities registration requirements of any applicable securities laws and will not cause the loss of any securities exemption on which the Company is relying with respect to prior sales or transfers of securities. The Company shall not be required to bear the expense of any such opinion of counsel. The Board or the President may waive this requirement for good cause.

Section 16.6    Right of First Refusal. Except as otherwise provided in this subsection, any sale or other transfer of Interests of the Company for value shall be made only pursuant to a bona fide written agreement with the proposed transferee and shall be subject to the right of first refusal set forth below. As a condition to any such sale or other transfer, the transferring Member shall deliver to the Company and all other Members of the Company written notice of the proposed transfer, which notice shall (i) contain a true and complete copy of the agreement by which the transferee proposes to acquire the Interests and (ii) set forth with particularity (to the extent not specified in such agreement) the identity and address of the proposed transferee, the Percentage Interests and number of LLC Votes to be transferred, the price, the terms of payment, all conditions to the transferee's obligation to acquire the Interests, and the date on which such proposed transfer is to be consummated. Such notice shall be deemed to constitute an offer by the transferring Member to sell all (but not less than all) of the specified Interests to the Company, its designees, and the other Members on terms equivalent to those offered by the proposed transferee. The Company, its designees (as determined by the Board), and the other Members may accept such offer by delivering written notice of acceptance to the transferring Member within sixty (60) days after the date on which a valid notice of transfer was received by the Company. If the aggregate Interests offered to be purchased exceeds the number to be transferred, the available Interests shall be allocated first to the Company to the full extent of its offer to purchase, then to the Members (allocated among them on a pro rata basis as determined by the Board), and finally (to the extent that the aggregate Interests offered to be purchased by the Company and the other Members is less than the total number to be transferred) to designees of the Company. During the pendency of such offer, the transferring Member shall promptly provide such further information concerning the proposed transfer as the Company may reasonably request in writing. Closing of the purchase of the Interests by the Company, its designees, or other Members shall take place within ninety (90) days after the date on which a valid notice of transfer was received by the Company. If acceptance and closing by the Company, its designees, and other Members have not occurred within the periods set forth above, the transferring Member shall have the right for sixty (60) days thereafter to transfer all (but not less than all) of the Interests to the original proposed transferee for the consideration specified in the original notice of transfer, subject to other terms and conditions of this Agreement. The right of first refusal provided in this subsection shall not be applicable to any transfer of Interests directly to the Company.

Section 16.7   <u>Other Rules Regarding Transfer, Etc.</u>  The Board may, from time to time, adopt by resolution such additional rules and regulations as it deems expedient, not inconsistent with this Agreement concerning the issue and transfer of Interests of the Company.

Section 16.8   <u>Waivers of Restrictions on Transfer.</u>  Notwithstanding anything to the contrary, the Board may waive the applicability of any transfer restrictions contained in this Agreement or any resolution of the Board, if and to the extent that the Board deems a waiver for the particular transaction to be in the best interests of the Company.  No such waiver shall be effective unless duly adopted by resolution of the Board.

# ARTICLE XVII

# MISCELLANEOUS

Section 17.1   <u>Notices.</u>  All notices provided for in this Agreement shall be in writing, duly signed by the party giving such notice, and shall be delivered, mailed via an overnight courier service, telecopied or mailed by registered or certified mail, as follows:

(i)       if given to the Company at the address specified in Section 2.5 of this Agreement;

(ii)      if given to a Director, at such Director's mailing address as provided to the Company; or

(iii)     if given to any Member at the address set forth opposite its name on Schedule A attached hereto, or at such other address as such Member may hereafter designate by written notice to the Company.

All such notices shall be deemed to have been given when received.

Section 17.2   <u>Failure to Pursue Remedies.</u>  The failure of any party to seek redress for violation of, or to insist upon the strict performance of, any provision of this Agreement shall not prevent a subsequent act, which would have originally constituted a violation, from having the effect of an original violation.

Section 17.3   <u>Cumulative Remedies.</u>  The rights and remedies provided by this Agreement are cumulative and the use of any one right or remedy by any party shall not preclude or waive its right to

use any or all other remedies. Said rights and remedies are given in addition to any other rights the parties may have by Law or otherwise.

Section 17.4    Binding Effect. This Agreement shall be binding upon and inure to the benefit of all of the parties and, to the extent permitted by this Agreement, their successors, legal representatives and assigns.

Section 17.5    Interpretation. Throughout this Agreement, nouns, pronouns and verbs shall be construed as masculine, feminine, neuter, singular or plural, whichever shall be applicable. All references herein to "Articles," "Sections" and "Paragraphs" shall refer to corresponding provisions of this Agreement.

Section 17.6    Severability. The invalidity or unenforceability of any particular provision of this Agreement shall not affect the other provisions hereof, and this Agreement shall be construed in all respects as if such invalid or unenforceable provision were omitted.

Section 17.7    Counterparts. This Agreement may be executed in any number of counterparts with the same effect as if all parties hereto had signed the same document. All counterparts shall be construed together and shall constitute one instrument.

Section 17.8    Integration. This Agreement constitutes the entire agreement among the parties hereto pertaining to the subject matter hereof and supersedes all prior agreements and understandings pertaining thereto.

Section 17.9    Governing Law. This Agreement and the rights of the parties hereunder shall be interpreted in accordance with the laws of the State of Maine, and all rights and remedies shall be governed by such laws without regard to principles of conflict of laws.

Section 17.10    Amendments. Any amendment to this Agreement shall be adopted and be effective as an amendment hereto if it received the affirmative vote of all of the Members, provided that such amendment be in writing and executed by all of the Members.

Section 17.11    No Implied Rights or Remedies. Nothing expressed or implied shall be construed to confer upon any Person, except the Members and Managers, any rights or remedies under or by reason of this Agreement.

-28-

FROM :DMSA Inc.

01/09/2005 05:28 TEL 4135339487

Case 3:05-cv-30076-MAP    Document 17-2    Filed 04/22/2005    Page 29 of 30

Mar. 21 2005 12:25PM P5

DIALOGO:BILINGUE

FROM :DMSA Inc.                    FAX NO. :5705765143          Jun. 09 2004 02:42PM P4

IN WITNESS WHEREOF, the parties hereto have executed this Agreement as of the date first above stated.

Dialogo, LLC

By:_____
Name:_____
Title:_____

By:_____
Name: Lillian Santiago Bauza
Title: Principal

DIRECT MERCHANTS S.A., INC.

By:_____
Name: Gene Pike
Title: Managing Director

F:\SC\DMSA\oper.agr.doc

-29-

# SCHEDULE A

## MEMBERS

| Name | Mailing Address | Capital Contributions | Percentage Interest | Votes | Member |
|------|-----------------|----------------------|--------------------|-------|--------|
| **LSB** | 101 Cabot Street<br>Holyoke, MA 01040 | $00,001.00 | 49.0% | | 49 |
| **DMSA** | One Enterprise Drive<br>Newfoundland, PA 18445-0089 | $50,000.00 | 51.0% | | 51 |
| | | | 100% | | 100 |

P:\SC\DMSA\oper.agr.doc

-30-

# VENTURE AGREEMENT

1.  The undersigned parties agree to form a Maine limited liability company ("LLC"), to be called Dialogo, with membership interests owned initially as follows: 49% by Lillian Santiago Bauzá ("LSB"), a Massachusetts resident, and 51% by Direct Merchants S.A., Inc ("DMSA"), a New Jersey Corporation, for the purpose of jointly developing Spanish language and bilingual print and media business ("the Business").  The LLC will be managed by a board of directors, consisting of two representatives from DMSA and one from LSB. Lillian Santiago Bauzá will carry the title of Publisher. She will be responsible for editorial content and for managing the day-to-day operations of the venture, including recruiting and hiring employees and contractors and, along with DMSA management, developing the long-term strategy of the joint venture. DMSA acknowledges that LSB will not contribute any cash to initiate the LLC.  LSB acknowledges all expenditures must be done with the concurrence of DMSA.  DMSA shall contribute the initial capital to launch the LLC in an amount that DMSA deems appropriate (including through travel, promotional costs, legal fees, accounting fees, billing fees and the labor of management and staff of DMSA).  The owners will sign an agreement giving each other a right of first refusal on any proposed transfer of membership interests in the LLC and requiring approval by the Board of Directors issuing any additional membership interests.  All profits that the board decides to distribute, both ordinary and capital, will be distributed to the members in proportion to their membership interest.  The board shall distribute each year at least enough cash to owners to cover the owners' U.S. tax liability for LLC profits in such year if any.

2.  DMSA and LSB agree that they shall through the LLC jointly pursue the Business. LSB acknowledges and agrees, however, that DMSA is an on-going enterprise, and its principals individually and through other enterprises, have a variety of business interests that are not and will not be part of the LLC's business, whether similar to the LLC's Business or not.  LSB further acknowledges and agrees that neither DMSA nor its principals shall have any obligation to assign existing, or originate new business, advertising contracts, marketing contracts, or any other contracts for the benefit of the LLC, or to assign existing or originate new advertising opportunities or clients for the benefit of the LLC, and that DMSA and its principals may retain existing and originate new media opportunities, advertising contracts and clients for its own benefit, whether directly or indirectly.  Without diminishing DMSA's rights under the foregoing language, DMSA does agree that it intends to use diligent efforts to direct appropriate business to the Company in furtherance of the Company's goals.  However, LSB shall employ diligent efforts to originate new media and advertising contracts and clients for the LLC and neither LSB nor its principals shall provide such services, directly or indirectly for itself or any other entity or person to the extent it relates to the Business.

3.  The LLC will initially rely on the staffs of DMSA and Dialogo .

4.  Amounts paid to the LLC by clients shall be distributed as follows: first to reimburse any out of pocket costs; second to DMSA to repay the initial capital to launch the LLC; third to owners to cover the owners' U. S. tax liability for LLC profits in such year, if any; finally any remaining amounts to be distributed by the Board at its discretion to the members in proportion to their respective membership interests. No member shall incur costs or expenses on behalf of the LLC, or commit the LLC to any costs or expenses, except in accordance with the approved budget. It is not currently expected that the LLC will borrow, but that may occur in the future if approved by the Board of Directors.

5.  DMSA and LSB acknowledge and agree that all efforts and actions undertaken by them for the LLC in connection with the Business are to be kept confidential. Neither DMSA nor LSB will disclose to any person or entity, directly or indirectly, any Proprietary Information (as hereinafter defined) relating to the LLC's Business without the prior written consent of the LLC. For purposes of this Agreement, "Proprietary Information" means all advertising and subscription client lists, advertising and subscription client prospects, marketing information and data, product information, strategic or technical information, financial information, supplier information, billing rates and client provided information, documents and data.

6.  In furtherance of this Agreement, DMSA and LSB shall execute and deliver the following documents, all of which shall be consistent with this Agreement and otherwise shall contain standard terms and conditions. articles of organization of LLC:

*   operating agreement of LLC;

IN WITNESS WHEREOF, the parties to this Agreement have executed this Agreement in one or more counterpart(s) as of the date first written below.

LSB                                         DMSA

By:                                         By:
Name:  Lillian Santiago Bauza              Name: Gerry Pike
Title:  Principal                          Title: Managing Director
Date    June __, 2004                       Date: June __, 2004

# El Diálogo

January 06, 2005

Francisco Javier Solé
28 Woodside Circle
Southwick, MA 01077

Dear Javier:

I am pleased to extend an offer of employment to you as our new Director Of Advertising Sales.
The details of our offer are described below.

**Title:**  Director Of Advertising Sales, Diálogo, LLC

**Responsibilities:**

- Achieve an individual advertising sales quota of twenty thousand dollars per month
- Planning and implementation of formal advertising sales division, account management functions and structure, and incremental building of a sales account team.
- Hiring, managing, mentoring and development of all sales representative personnel.
- Management and retention of existing advertising relationships.
- Organic growth of revenue from existing advertising account relationships.
- Development and management of new client relationships
- Increasing responsibility for managing day-to-day sales activity of Diálogo.
- Ad hoc support of Diálogo management in the growth and development of Diálogo.

**Compensation:**

Your compensation is a sum of the following elements:

- Base Salary.
  You will earn a base salary of $2,000 per month, ten percent of which is a draw.
- Commissioned Sales.
  You will receive a commission on advertising sales as enumerated below.

| | | |
|---|---|---|
| $ 1.00 to $100,000.00 | 25% |
| $100,001.00 to $200,000.00 | 20% |
| $200,001.00 to $300,000.00 | 15% |
| $300,001.00 to $400,000.00 | 10% |
| $400,001.00 to $500,000.00 | 5% |

This commission structure will roll over and repeat with every increment of five hundred thousand dollars ($500,000) of sales (e.g. $500,001 to $600,000 will be commissionable at 25%, $600,001 to $700,000 at 20%, etc.). Sales made with special prices that are not at a regular rate will be paid under a 20% commission and are exempt from this standard payment schedule.

- **Bonus Structure.**
  In addition to your individual commission structure, you will receive a commission override of five percent (5%) of sales commissions paid to sales representatives under your supervision.

- **Paid Benefits:**
  o  Two weeks vacation
  o  Paid Holidays:
     New Year's Day, Memorial Day, Independence Day, Labor Day, Thanksgiving Day, Christmas Day.
  o  Four (4) paid personal / sick days.

- **Reimbursement.**
  You will be reimbursed up to $100.00 per month for transportation / representation costs.

There will be a formal performance review after your initial first three (3) months of employment and every six (6) months thereafter.  Your signature below indicates your acceptance of this offer.  Once I receive it by return fax to (212) 415-3564, we will set a start date and forward confidentiality and non-compete agreements..

We look forward to having you on the Diálogo team!


Lillian Santiago Bauzá
Publisher
Diálogo, LLC



Agreed to and accepted:


By:    _____
       Francisco Javier Salé

Date:  _____

## Confidentiality and Non-compete Agreement
### between
### Diálogo, LLC, and Francisco Javier Solé

In employing Francisco Javier Solé ("**Employee**"), Diálogo, LLC, ("**Diálogo**"), will be making available original and proprietary concepts as well as certain confidential information relating to the business, operations, products, services and affairs of the company and its clients. This letter of agreement ("Agreement") is intended to set forth the terms of the required confidential treatment to be given this information.

1.      Definition of "Proprietary Information".   For purposes of this Agreement, the term "Proprietary Information" includes:  (a) advertising clients and business, marketing and advertising plans and studies;  (b) proprietary consumer research;  (c) methods of operation and distribution; (d) statistical data and analyses;  (e) know-how;  (f) trade secrets;  (g) product and/or service concepts, designs and specifications;  (h) production processes and procedures;  (i) existing and proposed agreements;  (j) business records;  (k) financial statements and data;  (l) employee information; and, (m) any notes, analyses, studies, or compilations, summaries, or other information derived or generated from or reflecting ongoing operations of **Diálogo** and its clients.

2.      Property Rights in Proprietary Information.   The undersigned agree that the Proprietary Information is the property of **Diálogo**, and that **Employee** will not use or disclose the Proprietary Information in any way, except in accordance with this Agreement or with the prior written consent of **Diálogo**, which may be given or withheld by **Diálogo** in its sole and absolute discretion.

3.      Use of Proprietary Information. **Employee** agrees to use the Proprietary Information only for the purposes of and in the context of the employment services to be provided to **Diálogo**.

4.      Disclosure of Proprietary Information. **Employee** agrees to keep the Proprietary Information strictly confidential, and will not directly or indirectly disclose any Proprietary Information to any person, except as otherwise provided in this Agreement. **Employee** may disclose Proprietary Information to persons external to the company if those persons are essential to the development of concepts, products and/or services to be created as part of the employment engagement. However, if **Employee** discloses any Proprietary Information to those persons, **Employee** will:  (a) inform them of the confidential nature of the Proprietary Information;  (b) direct them to keep all Proprietary Information strictly confidential and use it only for the purpose of assisting in evaluation of the above-mentioned concepts, products and/or services; and;  (c) be responsible for their failure to keep the Proprietary Information confidential.

If **Employee** or any person to whom **Employee** discloses any Proprietary Information is legally compelled to disclose any Proprietary Information (whether by deposition, interrogatory, request for production documents, subpoena, civil investigative demand, or any similar legal process), **Employee** will immediately notify **Diálogo** in writing, so that **Diálogo** can seek a protective order or other appropriate legal remedy. If **Diálogo** is unable to obtain a protective order or other legal remedy, **Employee** agrees to disclose only that portion of the Proprietary Information that the company is advised (by a written opinion of legal counsel satisfactory to **Diálogo** in its reasonable good faith discretion) is legally required to be disclosed, and to use their best efforts to assure that the Proprietary Information that **Employee** is required to disclose will remain confidential.

5.      The obligations above limiting disclosure and use will not apply to: information (i) generally in the public domain, (ii) already lawfully disclosed to or known by the Receiving Party prior to disclosure, (iii) lawfully received by a party without breach of this agreement or, (iv) required to be disclosed under United States laws or regulations or court order.

6.    Return of Proprietary Information. **Employee** agrees that upon termination of employment, **Employee** will return all originals or copies of any Proprietary Information then in his possession to **Diálogo**, and will cause all persons to whom they have disclosed any Proprietary Information to return all originals or copies of any Proprietary Information then in their possession to **Diálogo**.

7    No Representations or Warrants. **Employee** acknowledges that **Diálogo** has made no express or implied warranties of any kind as to the completeness or accuracy of the Proprietary Information.

8.    Non-competition. For good consideration and as an inducement for **Diálogo** to employ **Employee, Employee** agrees not to directly or indirectly compete with the business of the Company and its successors and assigns during the period of employment and for a period of twenty four months following termination of employment and notwithstanding the cause or reason for termination

9.    Definition of Non-compete. The term "not compete" as used herein shall mean that the **Employee** shall not own, manage, operate, consult or to be employee in a business substantially similar to or competitive with the present business of the Company or such other business activity in which the Company may substantially engage within the Western Massachusetts / Northern Connecticut geographical region during the term of employment and for a period of twenty four months following the expiration or termination of this agreement.

10.    Damages For Violation Of Non-compete. **Employee** agrees to pay liquidated damages of an amount to be determined by **Diálogo** if any violation of this paragraph is proved or admitted.

11.    Term of Agreement. This Agreement will be effective upon execution by both parties, will continue in full force indefinitely, so long as any Proprietary Information has not become generally available to or known by the public, and will not be terminated by termination of employment.

This Agreement is accepted by both parties, as indicated by the signatures below.

**Agreed to and accepted:**

By: _____          By: _____
        Francisco Javier Solé                          Lillian Santiago Bauzá

Title: _____          Title: _____
        Employee                                          Publisher, Diálogo, LLC

Date: _____                      Date: _____

FJS NDA  01-14-05

2

FROM :DMSA Inc.                FAX NO. :5706765143              Mar. 21 2005 12:25PM  P7

February 17, 2005

Gerry Pike
DMSA, Inc.
P.O. Box H
New Foundland, PA 18445

Dear Gerry:

Since our last meeting and telephone conversation I have reconsidered my position in Diálogo LLC. Since the beginning I have had to endure your lack of commitment to this organization and your promised financial contributions to the business. Your inconsistent communication on the decision making process and lack of financial support to the venture has caused a material deteriorations, to the point where we do not have staff support, nor are we able to continue without the business going into debt. Therefore, as operating manager, I have no other alternative but to close the business effective immediately.

The landlord has been made aware of the situation; he is allowing you to leave the computer, software and other office furniture at that space until the end of the month. You should take whatever steps are necessary to remove those items at your earliest. All business paperwork, e.g. bank statements, check book and list of account payables will be sent to you shortly.

If you have questions and or concerns you can address those to my attorney, Arnold Greenhut at 413-785-1504.

Cordially,

Lillian Santiago