# UNITED STATES DISTRICT COURT
## DISTRICT OF MASSACHUSETTS

_____
                                                )
DIALOGO, LLC and                                )
DIRECT MERCHANTS S.A., INC.,                    )          CIVIL ACTION NO. 05-30076-MAP
                                                )
            Plaintiffs,                         )
                                                )
v.                                              )
                                                )
LILLIAN SANTIAGO BAUZÁ,                         )
EL DIALOGO, LLC, and FRANCISCO                  )
JAVIER SOLÉ,                                    )
                                                )
            Defendants.                         )
_____)
                                                )
LILLIAN SANTIAGO BAUZÁ,                         )
EL DIALOGO, LLC, and                            )
FRANCISCO JAVIER SOLÉ,                          )
                                                )
            Counterclaim Plaintiffs,            )
                                                )
v.                                              )
                                                )
DIALOGO, LLC  and                               )
DIRECT MERCHANTS S.A., INC.,                    )
                                                )
            Counterclaim Defendants.            )
_____)

## PLAINTIFFS' MEMORANDUM IN OPPOSITION TO DEFENDANTS' MOTION TO DISQUALIFY VERRILL DANA, LLP AS COUNSEL FOR DIALOGO, LLC

Plaintiffs Dialogo, LLC ("Dialogo, LLC" or "the Company") and Direct Merchants S.A.,

Inc. ("DMSA") (collectively, "Plaintiffs") submit this memorandum in opposition to Lillian

Santiago Bauzá's ("Santiago Bauzá's") Motion to Disqualify Verrill Dana as Attorneys for

Dialogo, LLC.  (Dkt. No. 17)  Plaintiffs also submit the Affidavit of Mark K. Googins, Esq.,

attached as <u>Exhibit A</u>, and portions of the deposition transcript of Lillian Santiago Bauzá dated

May 9, 2005, attached as <u>Exhibit B</u>.

## <u>BACKGROUND</u>

Dialogo, LLC is a Maine limited liability company which was formed in June of 2004 for

the object and purpose of developing Spanish language newspaper(s) and media. Second

Amended Complaint ("Am. Compl. II") ¶¶ 2, 14, 17; Answer of Defendants Lillian Santiago

Bauzá and El Dialogo, LLC ("Answer") ¶¶ 2, 14, 17. Dialogo, LLC has two members: Plaintiff,

DMSA, which holds a 51% membership interest in Dialogo, LLC, and Santiago who owns a

49% membership interest in the LLC. Am. Complaint II ¶ 16 and Ex. 2; Answer ¶ 16.

Since 1999 Verrill Dana LLP ("Verrill Dana") has represented Direct Merchants S.A.,

Inc. ("DMSA"), a New Jersey corporation owned by Beatriz Eileen Mallory Renovales Carcador

Aponte Reyes Lucchetti ("Mallory") and operated by Mallory and Gerry Pike, whose title is

Managing Director. Googins Aff. ¶ 2. Mr. Pike has been Verrill Dana's primary contact since

the commencement of its representation of DMSA. <u>Id.</u> Mark Googins has been the primary

attorney at Verrill Dana having contact with DMSA. <u>See</u> <u>id.</u>

In June of 2004, DMSA and Santiago entered into (1) a Joint Venture Agreement

between DMSA and Santiago to form Dialogo, LLC and (2) an Operating Agreement between

Santiago and DMSA for a to be formed Maine limited liability company to be called Dialogo,

LLC. Am. Compl. II ¶¶ 13, 14, 15 and Exs. 1, 2; Answer ¶¶ 13, 14, 15. Under the Venture

Agreement, Santiago Bauzá and DMSA formed a joint venture and agreed that, among other

things:

·    They would create a limited liability company called Dialogo LLC for the joint
     venture and that Santiago Bauzá had a 49% membership interest and DMSA had
     a 51% membership interest;

·    The Company will be managed by a board of directors, consisting of two representatives from DMSA and one designated by Santiago Bauzá;

·    DMSA and Santiago Bauzá shall through the Company jointly pursue the Spanish language and bilingual print and media business; and

·    Santiago Bauzá shall devote her efforts exclusively to the Company, and she shall not provide "such services, directly or indirectly for itself [sic] or any other entity or person to the extent it relates to the Business."

Am. Compl. II ¶ 16 and Ex. 2; Answer ¶ 16.

In her motion to disqualify Verrill Dana from representing the Company, Santiago Bauzá states:

> Verrill and Dana represented DMSA in negotiations with Ms. Santiago prior to the formation of Dialogo, LLC, drafted the Operating Agreement and Members Agreement on DMSA's behalf . . . .

Motion to Disqualify at 2. Contrary to these allegations, Verrill Dana did not negotiate with Santiago Bauzá prior to the formation of Dialogo, LLC, did not draft the Operating Agreement or the Venture Agreement on DMSA's behalf. Googins Aff. ¶ 3. In fact, to date, no Verrill Dana attorney has ever spoken to or otherwise corresponded directly with Santiago. Id. The Operating Agreement and Members Agreement drafts were modified by Gerry Pike from previously prepared draft documents. Id.

Gerry Pike requested that Verrill Dana create a limited liability company to be called "Dialogo, LLC." Googins Aff. ¶ 4. Verrill Dana then filed with the Maine Secretary of State Articles of Organization for the Company. Googins Aff. ¶ 4.

Santiago Bauzá notified Gerry Pike by certified letter dated February 17, 2005 (and sent on or about February 25, 2005) that she was closing the business of the Company "effective immediately." Am. Compl. II ¶ 34 and Ex. 4; Answer ¶ 34; Googins Aff. ¶ 6.

On March 30, 2004, Verrill Dana filed a complaint and request for injunctive relief on behalf of its clients Dialogo, LLC and DMSA.  Googins Aff. ¶ 7.  Verrill Dana never provided legal services for, or on behalf of, Santiago Bauzá, El Dialogo, LLC or Francisco Javier Solé.  Id. at ¶ 9.

## ARGUMENT

I.     Defendant Has Failed to Meet its Burden of Proof Seeking to Disqualify Verrill Dana, LLP from Representing the Company.

A party seeking to disqualify counsel has the burden of proof.[1]  In order to satisfy its burden, the moving party is required to meet a very high standard of proof.  See, e.g., Evans v. Artek Sys. Corp., 715 F.2d 788, 791 (2d Cir. 1983); Nuri v. PRC, Inc., 5 F. Supp. 2d 1299, 1304 (M.D. Ala. 1998); Sommer v. Aronow, 1998 U.S. Dist. LEXIS 2093, at *3, 1998 WL 85748, at *1 (S.D.N.Y. 1998); Plant Genetic Sys. v. Ciba Seeds, 933 F. Supp. 514, 517 (M.D.N.C. 1996); Tessier v. Plastic Surgery Specialists, 731 F. Supp. 724, 729 (E.D. Va. 1990); In re Kelton Motors Inc., 109 B.R. 641, 650 (Bankr. D. Vt. 1989).  Cf. Gov'g of Indian v. Cook Indus., 569 F.2d 737, 739 (2d Cir. 1978); Keatley v. Gee Communs., 55 Val Cir. 128, 130 (2001).  In fact, courts often will not disqualify a party's chosen counsel unless the moving party succeeds in carrying the "heavy and difficult burden" in demonstrating the continued representation by challenged counsel would constitute a conflict of interest and that disqualification is warranted.[2]

---

[1] See, e.g., QST Envtl. v. OHM Remd'n Servs. Corp., 2000 U.S. Dist. LEXIS 16393, at *2 (D.N.H. 2000); Ives v. Guilford Mills, 3 F. Supp. 2d 191, 202 (N.D.N.Y. 1998); Cruz v. County of Dupage, 1997 U.S. Dist. LEXIS 9220, at *12 (N.D. Ill. 1997); Leonard v. Univ. of Del., 1997 U.S. Dist. LEXIS 4196 (D. Del. 1997); Guerrero v. Bluebeard's Castle Hotel, 982 F. Supp. 343, 347 (D.V.I. 1997)l 982 F. Supp. 343, 347 (D.V.I. 1997); Pastor v. Trans World Air., 951 F. Supp. 27, 31 (E.D.N.Y. 1996); Griffen v. Reorg'd Sch. Dist. No. 2, 945 F. Supp 1251, 1253 (E.D. Mo. 1996); Seitel Geophysical v. Greenhill Petrol. Corp., 1995 U.S. Dist. LEXIS 17595, at *6 (E.D. La. 1995); Hilton v. Barnett Banks, 1994 U.S. Dist. LEXIS 19444, at *4 (M.D. Fla. 1994); Ciba-Geigy Corp. v. Alza Corp., 795 F. Supp. 711, 714 (D.N.J. 1992); Dawson v. Orkin Exterm'g Co., 736 F. Supp. 1049, 1054 (D. Colo. 1990); IMC Global, Inc. v. Moffett, 1998 Del. Ch. LEXIS 22, at *8 (1998); Barragree v. Tri-County Elec. Coop., 263 Kan. 446, 455, 950 P.2d 1351 (1997).

[2] See, e.g., Foley v. Int'l Bhd. of Elec. Workers, 1998 U.S. Dist. LEXIS 16742, at *11 (E.D. Pa. 1998); Cordy v. Sherwin-Williams Co., 156 F.R.D. 574, 583 (D.N.J. 1994); see, also, Olson v. Snap Prods., 183 F.R.D. 539, 542 (D.

To meet its burden of proof, the moving party cannot merely make conclusory claims. Since an order of disqualification should not be based upon conjecture or supposition about what might have happened -- or might occur in the future -- disqualification is not mandated in a situation where the alleged grounds are based upon hearsay or other inadmissible evidence.[3]

The rationale for imposing such an exacting and high standard on the party moving for disqualification are numerous.  First, disqualification is prejudicial in its own right.  It has long been recognized that the right to counsel of one's choosing is a fundamental one that is entitled to substantial deference.  Richardson-Merrell v. Koller, 105 S.Ct. 2757, 2767 (1985).  Second, courts have considered not only the hardship imposed when a client whose counsel has been disqualified, but also on the needs of efficient judicial administration.  Bd. of Educ. v. Nyquist, 590 F.2d 1241, 1246 (2nd Cir. 1979).  Courts have an institutional interest in managing their dockets.  Third, courts have justified the high burden placed on the moving party because disqualification motions are not always motivated by high-minded concerns about ethical violations.  To the contrary, such motions often are interposed in bad faith for tactical reasons unrelated to purported concerns about maintaining the profession's ethical purity.  As Judge Caffrey explained:

---

Minn. 1998); Abney v. Wal-Mart, 984 F. Supp. 526, 528 (E.D. Tex. 1997); World Plan Exec. Counsel - United States v. Zurich Ins., 810 F. Supp. 1042, 1047 (S.D. Iowa 1992); Lanigan v. RTC, 1992 U.S. Dist. LEXIS 17957, 1992 WL 350688, at *1 (N.D. Ill. 1992); Stratagem Dev. Corp. v. Heron Int'l, 756 F. Supp. 789, 792 (S.D.N.Y. 1991); Culverhouse v. Cooke Ctr. for Learning and Dev., 177 Misc.2d 365, 370, 675 N.Y.S.2d 776 (1998).  Cf. Milliken v. Grigson, 986 F. Supp. 426, 429 (S.D. Tex. 1997).

[3] Concerned Parents v. Hous. Auth. of St. Petersburg, 934 F. Supp. 406, 409 n.2 (M.D. Fla. 1996); Ganobsek v. Performing Arts Ctr. Auth., 2000 U.S. Dist. LEXIS 6807, at *8-9 (S.D. Fla. 2000) (a disqualification motion cannot be based on speculation); Sommer, 1998 U.S. Dist. LEXIS 2093, *7 ("[m]uch more than defendants mere speculation and conclusory allegations are required"); Neumann v. Wright, 1993 U.S. Dist. LEXIS 13549, at *6 (N.D. Ill. 1993); In re Peck, 112 B.R. 485, 492 (Bankr. D. Conn. 1990); Castro v. L.A. County Bd. of Sups., 232 Cal. App. 3d 1432, 1442, 284 Cal. Rptr.154 (1991).  Cf. A.J. by L.B. v. Kierst, 56 F.3d 849, 859 8th Cir. 1995); In re Possession & Control of Comm'r of Banks, 2001 Ill. App. LEXIS 2508 ("appellants have not met the burden required to demonstrate a conflict of interest in any concrete form.  Their allegations are hypothetical and speculative at best"); Lease Am. Corp. v. Stewart, 19 Kan. App. 2d 740, 876 P.2d 184, 193 (1994).

> [C]ourts have been reluctant to disqualify attorneys because of the severe consequences of a disqualification. This reluctance stems from the fact that disqualification has an immediate adverse effect on the client by separating him from the counsel of his choice.  Also, many times such motions are made for tactical, not substantive, reasons and will most likely cause delay in the litigation.  Thus, when deciding on a motion for disqualification, a court should proceed with caution.

Moss v. TACC Int'l Corp., 776 F. Supp. 622, 624 (D. Mass. 1991) (citations omitted).  For all these reasons, courts have imposed an extraordinary burden on a party moving to disqualify counsel.

In this case, Defendant Santiago Bauzá clearly has failed to meet her burden . . . or even to introduce any admissible evidence.  First, no affidavit, declaration, or other form of admissible evidence been submitted supporting her motion to disqualify; for this reason alone, her motion should be denied.  Moreover, the allegations underlying her disqualification motion are flatly incorrect.  The only factual assertion is set forth in one sentence on page 2 of the Motion, where she baldly asserts:

> Verrill and Dana represented DMSA in negotiations with Ms. Santiago prior to the formation of Dialogo, LLC, drafted the Operating Agreement and Members Agreement on DMSA's behalf and filed Articles of Organization for the LLC with the State of Maine.

Motion to Disqualify at 2.  As the Affidavit of Mark K. Googins, Esq. makes clear, these allegations are false.  Verrill Dana did not represent DMSA in negotiations with Santiago Bauzá prior to the formation of Dialogo, LLC.  Googins Aff. ¶ 3.  Verrill Dana did not draft the Operating Agreement or the Venture Agreement on DMSA's behalf.  Id.  To the contrary, regarding the relationship between DMSA and Santiago Bauzá, Verrill Dana became involved only after the Operating Agreement and Venture Agreements were executed.  Id. at ¶¶ 3-4.  At

Mr. Pike's request, Verrill Dana then filed the Articles of Organization for the LLC with the State of Maine.  Id. at ¶ 4.  During this period, Santiago Bauzá has her own counsel.  Santiago Dep. 107, ll. 18-20.  No Verrill Dana attorney has ever represented Santiago Bauzá or El Dialogo, LLC and has never spoken to or otherwise corresponded directly with Santiago Bauzá.  Googins Aff. ¶ 3.

At her own deposition, Ms. Santiago Bauzá explicitly stated that on or about June 9, Arnold Greenhut was her attorney (relating to Dialogo Bilingue), Santiago Dep. 107, ll. 18-20, that one of the newspaper workers suggested that Ms. Santiago Bauzá consult an attorney about the Operating Agreement, id. at 258, ll. 8-21, that she "unfortunately" never consulted with her attorney, id. at 108, ll. 305, that she never talked with Mark Googins or anyone from Verrill Dana, id. at 108, ll. 12-14, and that she "never had access to his [DMSA's] lawyers."  Id. at 192, ll. 9-12.

It is important to recognize that Santiago Bauzá understood the difference.  Relating to her previous close corporation, Dialogo Bilingue, Inc., Santiago Bauzá testified that Arnold Greenhut, Esq. represented all members of that entity in the formation of the company.  Santiago Dep. 124, ll. 6-9.  After a dispute arose with the other Dialogo Bilingue members, Attorney Greenhut continued to represent Santiago Bauzá.  Id. at 125, ll. 1-8.  In the Company, however, Santiago Bauzá continually referred to Verrill Dana as "his" as in DMSA's (not "our") attorneys.  Id. at pp. 103, ll. 10-11, 192, ll. 1-3, 7-9, 11-12.  There can be no doubt that Santiago Bauzá never believed that Verrill Dana represented her interests.

II.    There Is No Ethical Violation in Verrill Dana's Representation of the Company and DMSA.

The interests of DMSA and the Company are identical.  The Second Amended Complaint clearly makes identical allegations on behalf of both entities.  This is not surprising given DMSA

has a majority membership interest in Dialogo, LLC.  Verrill Dana can represent both entities since their interest are identical.  Therefore, there can be no violation of the Massachusetts Code of Responsibility, SJC Rule 3:07, Canon 5, DR 5-105(c), the only ethical rule Santiago Bauzá alleges Verrill Dana violated.

Santiago Bauzá further alleges that "Verrill and Dana cannot adequately represent the interests of Dialogo LLC, while at the same time representing the interests of DMSA, a 51% owner, against Ms. Santiago Bauzá, a 49% owner in this action."  Motion to Disqualify at 2. Santiago Bauzá continues explaining that DMSA and Santiago "differ markedly as to what course of action is in the best interests of the LLC."[4]  Id. at 2.

Implicit, though unstated, in Santiago's Motion to Disqualify, is the assumption that Verrill Dana's representation of the Company is deemed to constitute representation of both members of the Company.  This assumption is simply wrong.  Generally, disqualification cases hold that a close corporation's lawyer does not represent the shareholders.  Courts, therefore, have refused to disqualify the lawyer for being adverse to a shareholder.[5]  The rationale behind the caselaw is that the lawyer does not, by virtue of representing an organization, represent its

---

[4] Considering the facts of this matter, this argument is breathtaking:  a minority shareholder who removes corporate assets from the Company and then states such shareholder "differs markedly" from the controlling shareholder or the best interests of the Company.  This argument is similar to a Wal-Mart shareholder caught for shoplifting seeking to disqualify corporate counsel because such shareholder "differs markedly" on the "best interests" of Wal-Mart.

[5] See Nadherny v. Roseland Property Co., 2002 U.S. Dist. LEXIS 20760, 2002 WL 31426748 (D. Mass. Oct. 29, 2002); McKinney v. McMeans, 147 F. Supp. 2d 898 (W.D. Tenn. 2001); Correspondent Services Corp. v. J.V.W. Investment, Ltd., 2000 U.S. Dist. LEXIS 11881, 2000 WL 1174980 (S.D.N.Y. Aug. 16, 2000); In re Tetzlaff, 31 Bankr. 560 (E.D. Wis. 1983); Bobbit v. Victorian House, Inc., 545 F. Supp. 1124 (N.D. Ill. 1982); Wayland v. Shore Lobster & Shrimp Corp., 537 F. Supp. 1220 (S.D.N.Y. 1982); Mayer-Wittmann Joint Ventures, Inc. v. Gunther International, Ltd., 1994 Conn. Super. LEXIS 1507, 1994 WL 271795 (1994); McCarthy v. John T. Henderson, Inc., 246 N.J. Super. 225, 587 A.2d 280 (Ct. App. 1991); Carlson v. Fredrikson & Byron, P.A., 475 N.W.2d 882 (Minn. App. 1991) (dictum); Terre Du Lac Prop. Owners' Association, Inc. v. Shrum, 661 S.W.2d 45 (Mo. App. 1983); Seifert v. Dumatic Industries Inc., 413 Pa. 395, 197 A.2d 454 (1964); and Meehan v. Hopps, 144 Cal. App. 2d 284, 301 P.2d 10 (1956); Carlson v. Fredrikson & Byron, P.A., 475 N.W.2d 882 (Minn. App. 1991).

individual officers, shareholders, directors or employees.  In those few cases where courts have disqualified a close corporation's lawyer because the lawyer was adverse to a shareholder, there were additional, special circumstances present.  For example, the shareholder was a former client or may have disclosed confidences to the lawyer during the lawyer's representation of the corporation.  Santiago Bauzá plainly admitted that she never had access to Verrill Dana. Santiago Dep. 192, ll. 9-12.  It is difficult to imagine how an attorney-client relationship can arise between a person and an attorney to whom the person does not have access.  If Santiago's legal position were correct, counsel for a close corporation could never be adverse to any shareholder under any circumstance.  This is not the law.

The cases cited by Santiago Bauzá do not support her position.  She initially cites McCann v. Davis, Malm & D'Agostine, 423 Mass. 558, 559, 669 N.E.2d 1077, 1078 (1996), where plaintiff established that the defendant law firm's conduct was negligent because it represented both the buyer and the seller of corporate stock.  Obviously, the law firm was representing different interests and the court correctly found that the law firm's conduct violated the Massachusetts Code of Professional Responsibility, S.J.C. 3:07, c. 5, DR 5-105(c).  Here, Verrill Dana represents the majority shareholder and the close corporation who have identical interests.

Santiago Bauzá also cites the bankruptcy case of In re Freedom Solar Center, Inc. v. Frasier, 776 F.2d 14 (1st Cir. 1985), where the First Circuit ruled that debtor's counsel could not also represent the debtor's sole shareholder who was attempting to purchase some of the debtor's assets.  Again, Santiago Bauzá's reliance on the case law is misplaced.  In Frasier, the bankruptcy court found two adverse interests between the debtor and its sole shareholder.  First, one of the attorney's clients had an interest in delaying the turnover of the assets to use his

possession of them as a negotiating chip while the other client of the attorney had an interest in cooperating with the trustee to achieve the swiftest resolution possible.  Second, one of the attorney's clients had an interest in purchasing the assets for the lowest possible price while the attorney's other client was interested in selling the assets for the highest possible price.  This case simply does not apply here.

Finally, Santiago cites Schaeffer v. Cohen, Rosenthal, Price, Merkin, Jennings & Bird, P.C., 405 Mass. 506 (1989).  Santiago states that "the SJC held that a law firm representing the conflicting interests of Paragon, a closely-held corporation, and Gross, a 50% shareholder, violated its fiduciary duties to Schaeffer, the other 50% shareholder."  Motion to Disqualify at 3.  To the contrary, the SJC reached no such conclusion.  Instead, the Court avoided making any ruling the plaintiff lacked standing:

> Indeed, there is logic in the proposition that, even though counsel for a closely held corporation does not by virtue of that relationship alone have an attorney-client relationship with the individual shareholders, counsel nevertheless owes each shareholder a fiduciary duty.  . . .  However, it is not necessary for us to resolve the question whether such a duty is owed in order to decide this case.  Even if we were to recognize such a duty, we agreed with the judge that the plaintiff's claim that the defendants improperly received funds from the corporation for representing Gross's personal interests (jury questions [1] - [3]) is a claim of harm to the corporation.  The same is true of the claim that the defendants assisted Gross in diverting funds from the corporation for his personal use (jury questions [4] - [6]).  Therefore, the plaintiff's interests in recovering those funds are properly asserted only through a derivative action brought on behalf of the corporation.  . . .  Since the plaintiff ceased to be a stockholder of Paragon when she transferred her interest to Gross, she lacks standing to assert such a claim.

Id. at 513 (citations omitted).  Nevertheless, in Schaeffer, the principal distinction is that there was a derivative claim (on behalf of the corporation Paragon) against the other 50 percent

shareholder.  In such a circumstance, there is an obvious conflict between the corporate interests

and the interests of the 50 percent shareholder.  There is no such conflict in this case.

### CONCLUSION

For the reasons stated above, the Court should deny the Motion to Disqualify Verrill

Dana as attorneys for Dialogo, LLC.

DIÁLOGO, LLC and
DIRECT MERCHANTS S.A., INC.

By their attorneys,

Dated: May 13, 2005                    /s/ Seth W. Brewster_____
George Field (BBO No. 164520)
Seth W. Brewster (BBO No. 551248)
Attorneys for Plaintiffs
Verrill Dana, LLP
One Boston Place
Suite 2330
Boston, MA  02108
(617) 367-0929
gfield@verrilldana.com
sbrewster@verrilldana.com

### CERTIFICATE OF SERVICE

I hereby certify that on May 13, 2005, I electronically filed Plaintiffs' Memorandum in
Opposition to Defendants' Motion to Disqualify Verrill Dana, LLP as Counsel for Dialogo, LLC
with the Clerk of Court using the CM/ECF system which will send notification of such filing to
the following:  Keith A. Minoff, Esq. and Arnold Greenhut, Esq., and I hereby certify that there
are no non-registered participants.

/s/ Seth W. Brewster_____

P:\wknowles\direct Merchants\memo opp defs motion disqualify revised.doc


EXHIBIT
A

# UNITED STATES DISTRICT COURT
## DISTRICT OF MASSACHUSETTS

DIALOGO, LLC and )
DIRECT MERCHANTS S.A., INC., )
)                    CIVIL ACTION NO. 05-30076-MAP
Plaintiffs, )
)
v. )
)
LILLIAN SANTIAGO BAUZÁ, )
EL DIALOGO, LLC, and )
FRANCISCO JAVIER SOLÉ, )
)
Defendants. )
)
LILLIAN SANTIAGO BAUZÁ, )
EL DIALOGO, LLC, and )
FRANCISCO JAVIER SOLÉ, )
)
Counterclaim-Plaintiffs, )
)
v. )
)
DIALOGO, LLC and )
DIRECT MERCHANTS S.A., INC., )
)
Counterclaim-Defendants. )

## AFFIDAVIT OF MARK K. GOOGINS, ESQ.

Mark K. Googins, Esq., being duly sworn, deposes and states as follows:

1.      My name is Mark K. Googins, Esq. and I am a partner at the law firm of Verrill Dana, LLP where I have practiced since 1984. My practice is concentrated on commercial transactions. I am a member in good standing of the Maine and New York bars. I make this affidavit on personal knowledge.

2.    Since 1999 I have represented Direct Merchants S.A., Inc. ("DMSA"), a New Jersey corporation owned by Beatriz Eileen Mallory Renovales Carcador Aponte Reyes Lucchetti ("Mallory") and operated by Mallory and Gerry Pike, whose title is Managing Director. Mr. Pike has been my primary contact since the commencement of my representation of DMSA. My representation of DMSA has involved a variety of commercial transactions.

3.    In her motion to disqualify Verrill Dana, LLP as attorney for Dialogo, LLC, Ms. Santiago Bauzá states:

> Verrill & Dana represented DMSA in negotiations with Ms. Santiago prior to the formation of Dialogo, LLC, drafted the operating agreement and members agreement on DMSA's behalf . . . .

Motion to Disqualify at 2. Contrary to these allegations, Verrill Dana, LLP did not negotiate with Ms. Santiago Bauzá prior to the formation of Dialogo, LLC, and did not draft the Diálogo LLC Operating Agreement or the Venture Agreement on DMSA's behalf (although the draft forms that were used were draft forms that Verrill Dana, LLP had prepared previously for DMSA). In fact, to date, I have never spoken to or otherwise corresponded directly with Ms. Santiago Bauzá. Further, I do not believe any attorney at Verrill Dana, LLP has directly spoken to or otherwise corresponded with Ms. Santiago Bauzá other than in the context of the current litigation. The Operating Agreement and Venture Agreement drafts were modified personally by Gerry Pike for the LLC.

4.    At the request of Gerry Pike, Verrill Dana, LLP filed with the Secretary of State of Maine the Articles of Organization for Dialogo, LLC. I am the Registered Agent for Dialogo, LLC.

5.      In early January of 2005, Mr. Pike contacted me for assistance in negotiating an employment contract between Dialogo, LLC and Francisco Javier Solé. I referred the matter to Timothy O'Brien, Esq., a lawyer with Verrill Dana LLP who does labor and employment work.

6.      On or about March 5, 2005, Ms. Santiago Bauzá notified Mr. Pike by certified letter dated February 17, 2005 that "as operational manager," she was closing Dialogo, LLC "effective immediately." In that letter, she directed questions to "my attorney, Arnold Greenhut."

7.      On March 30, 2004, at the direction of Mr. Pike, Verrill Dana, LLP filed a complaint and request for injunctive relief on behalf of Dialogo, LLC and DMSA with this Court.

8.      On March 31, 2005, Attorney Arnold Greenhut called me to discuss the lawsuit. He said that he would be out of town and would need an extension of time in order to prepare an answer for Ms. Santiago Bauzá. I told him that I could not respond to that request but reminded him that we were seeking expedited relief.

9.      To my knowledge, this affidavit describes all of the legal work that Verrill Dana, LLP has done for Dialogo, LLC. I have never provided legal services, and to my knowledge no other attorney at Verrill Dana, LLP has ever provided legal services, to Ms. Santiago Bauzá, El Dialogo, LLC (a Massachusetts limited liability company that I understand was formed by her), or Francisco Javier Solé.

Dated: May 13, 2005

                              /s/ Mark K. Googins
                              Mark K. Googins, Esq.

3

STATE OF MAINE                                    May 13, 2005
Cumberland, ss.

      Personally appeared the above-named Mark K. Googins, Esq. and made oath that the foregoing statements made by him are true.

      Before me,

                    /s/ Paula A. Leighton                   
                    Notary Public/Attorney-at-Law

                    My commission expires:  9/5/10

## CERTIFICATE OF SERVICE

      I hereby certify that on May 13, 2005, I electronically filed the Affidavit of Mark K. Googins, Esq. with the Clerk of Court using the CM/ECF system which will send notification of such filing to the following:  Keith A. Minoff, Esq. and Arnold Greenhut, and I hereby certify that there are no non-registered participants.

                    /s/ Seth W. Brewster          

P:\wknowles\direct Merchants\googins aff.doc

4

EXHIBIT

B

PENGAD 800-631-6989

Santiago.txt

1

1           UNITED STATES DISTRICT COURT

2          FOR THE DISTRICT OF MASSACHUSETTS

3

4

5      * * * * * * * * * * * * * * * *

6    DIALOGO LLC and                    *

7    DIRECT MERCHANTS SA, INC.,      *

8              Plaintiffs *

9    vs.                    * No. 05-30076-MAP

10   LILLIAN SANTIAGO BAUZA,       *

11   EL DIALOGO LLC and             *

12   FRANCISCO JAVIER SOLE,        *

13              Defendants *

14   * * * * * * * * * * * * * * * *

15          ROUGH DRAFT COPY OF

16          VIDEO DEPOSITION OF:

17          LILLIAN SANTIAGO BAUZA

18      BULKLEY, RICHARDSON & GELINAS

19      1500 Main Street, Suite 2600

20       Springfield, Massachusetts

21          May 9, 2005

22

23         Tacy A. Malandrinos

24           Court Reporter

2

1    APPEARANCES:

2    Representing the Plaintiff:

3    VERRILL DANA LLP

4    One Portland Square

Santiago.txt

```
 5   Portland, Maine 04112-0586
 6   BY:  SETH W. BREWSTER, ESQ.
 7   (207) 774-4000
 8   fax (207) 774-7499
 9   sbrewster@verrilldana.com
10
11   Representing Lillian Santiago Bruza:
12   ROBINSON DONOVAN P.C.
13   1500 Main Street, Suite 1600
14   Springfield, MA 01115-5609
15   BY: KEITH A. MINOFF, ESQ.
16   (413) 732-2301
17
18   IN ATTENDANCE:
19   Gerry Pike
20
21
22
23
24
```

                                                    3

```
 1                    INDEX
 2   WITNESS:              LILLIAN SANTIAGO BAUZA
 3   EXAMINATION BY                    PAGE
 4   Mr. Brewster
 5
 6   EXHIBITS                         PAGE
 7   Exhibit 1,
 8   Exhibit 2,
 9   Exhibit 3,
10   Exhibit 4,
```

Santiago.txt

```
11   Exhibit 5,

12   Exhibit 6,

13   Exhibit 7,

14

15

16

17

18

19

20

21

22

23

24
```

4

```
1   EXHIBITS

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16
```

Santiago.txt

106

```
 1              Section 17.8 which states, "this
 2    agreement constituted the entire agreement among
 3    the parties here to pertaining to the subject
 4    matter hereof and supersedes all prior
 5    agreements and understandings pertaining there
 6    to"?
 7         A.     Yes.
 8         Q.     So therefore anything Mr. Pike had
 9    /said to you before was to be superseded by this
10    document.  Did you understand that?
11         A.     Yes.
12         Q.     With respect to Dialogo LLC, did
13    you deal with anyone other than Mr. Pike up to
14    this time and that's June 9, 2004?
15         A.     Say that again.
16         Q.     With respect to Dialogo LLC, did
17    you deal with any other person other than Gerry
18    Pike with respect to this venture?
19              MR. MINOFF:  From DMSA as opposed
20         to her own people?
21              MR. BREWSTER:  That's correct.
22         Q.     (By Mr. Brewster)  With respect to
23    DMSA, did you have conversations with Carmen
24    about the business points of this deal?
```

107

```
 1         A.     No.
 2         Q.     Did you have, did you have any
 3    conversations with anyone other than Gerry Pike
 4    about the business portions of this deal?
```

Page 86

Santiago.txt

5       A.      Only with him, yes.

6       Q.      Did you ever consult your attorney

7    Arnold Greenhut with respect to this?

8               MR. MINOFF:  Just warning her

9           anything she may have said to Attorney

10          Greenhut or he may have said to her is

11          privileged.

12              THE WITNESS:  Not at the moment of

13          signing this agreement, no.

14      Q.      (By Mr. Brewster)  So therefore as

15   of June 9, 2004 Arnold Greenhut was your

16   attorney, is that right?

17      A.      Not on the Dialogo LLC.

18      Q.      But he was your attorney vis-a-vis

19   Dialogo Bilingue, is that right?

20      A.      Yes.

21      Q.      And he was your attorney with

22   respect to other matters other than Dialogo

23   Bilingue?

24      A.      No.

                                              108

1       Q.      Okay.  Just Dialogo Bilingue?

2       A.      Yes.

3       Q.      And you didn't review this document

4    with Mr. Greenhut?

5       A.      Unfortunately, no.

6       Q.      Did you ever talk to any other

7    lawyer with respect to this document?

8       A.      No.

9       Q.      Did you talk to any lawyer

10   representing Mr. Pike?

Santiago.txt

```
11    A.    No.

12    Q.    You never talked to Mark Gugens or

13 anyone from Verrill Dana.

14    A.    No.

15    Q.    And again, it was only Mr. Pike

16 with whom you discussed the operating agreement

17 and venture agreement?

18    A.    Yes.

19    Q.    I'm going to have you turn to

20 Bates stamp page 2014.

21    A.    2014.  Yes.

22    Q.    Now do you see that section

23 entitled Section 4.1 capital contributions?

24    A.    Yes.
```

109

```
1     Q.    Where it says "each member has

2 contributed or is deemed to have contributed to

3 the capital of the company the amount set forth

4 opposite the member's name on Schedule A

5 attached hereto."  Do you see that?

6     A.    Yes.

7     Q.    "The agreed value of the capital

8 contributions made or deemed to have been made

9 by each member shall be set forth on Schedule

10 A."  Do you see that?

11    A.    Yes.

12    Q.    So therefore as of June 9, 2004

13 either those capital contributions were already

14 made or were deemed to be made, is that correct?

15    A.    Yes.

16    Q.    And that was your understanding of
```

Page 88

Santiago.txt

23    to me you shouldn't be signing that.  I don't

24    think this is right.  You should consult a

258

1    lawyer.

2         Q.    Just so I understand.  When you are

3    talking about, you are talking about the venture

4    agreement?

5         A.    Yes.

6         Q.    And the operating agreement?

7         A.    Yes.

8         Q.    So with respect to the venture

9    agreement and the operating agreement you say

10   Gabriela saw those documents?

11        A.    Yes.

12        Q.    And she had advised you that you

13   should talk to a lawyer?

14        A.    Yes.

15        Q.    And this is the period of time,

16   again June 9, from approximately 3:00 in the

17   afternoon to 5:30 in the afternoon when they

18   were executed and returned, she saw them,

19   advising you you should consult with a lawyer,

20   is that right?

21        A.    Yes.

22        Q.    And did you take her advice?

23        A.    No.  Obviously.

24        Q.    And what was her view -- strike

259

1    that.

2              On what basis did she review the

3    operating agreement and the venture agreement?

Page 209

Santiago.txt

5    this document.

6        Q.    It's not in the email exchange

7    that's going back and forth, is that right?

8        A.    Not in this document, no.

9        Q.    And with respect to it, you said to

10   Gerry that you prefer that he use his own draft

11   contract as well as his own confidentiality

12   agreement, is that right?

13       A.    No.  He came out with that.

14       Q.    I'm going to refer you to the

15   second paragraph of Exhibit 42.  It says,

16   "Gerry, I prefer that you use the draft contract

17   and confidentiality agreement of your choice.

18   Then send to me for final review and approval."

19       A.    .  That's correct.

20       Q.    So therefore even though you

21   drafted a version, it was your preference that

22   Mr. Pike use his own choosing draft

23   confidentiality agreement and employment

24   agreement?

                                              192

1        A.    Mr. Pike already had decided that

2    he was going to use the one that his lawyers

3    drafted.

4        Q.    So and Mr. Pike is the one who

5    dealt with the draft of those agreements, is

6    that right?

7        A.    Yes, with those drafts of those

8    agreements.  His lawyers according to him.

9        Q.    And you never talked to the lawyers

10   about that, did you?

                        Page 155

Santiago.txt

11        A.        No.  I never had access to his

12    lawyers.

13        Q.        I'm going to show you what has been

14    marked as Exhibit 43.  Exhibit 43 is an email

15    from Mr. Pike to you dated January 5, 2005.  The

16    subject line is contract, and it has an imbedded

17    email from you to Mr. Pike.  Do you see that?

18        A.        Yes.

19        Q.        Exhibit 43, is that a true and

20    correct copy of your email exchange on or about

21    January 5, 2004?

22        A.        Yes.

23        Q.        And now on the bottom part of

24    Exhibit 43 reflects essentially your concerns

                                                    193

1    about the financial management of the business?

2    Is that fair?

3        A.        Yes.

4        Q.        In fact, you said in the very first

5    paragraph, you know "the value on recruiting Mr.

6    Sole and the need this newspaper has to contract

7    someone that knows about sales.  I need the

8    contract today and I'm going to contract this

9    man and I'm going to bill you for the $3000 I

10    need to do so."

11        A.        Yes.

12        Q.        So at this time, that is January 5,

13    2005 you were prepared to enter into an

14    agreement with Sole and the business in order to

15    bring him on as the head of sales?

16        A.        If Mr. Pike agree with the $3000.

Santiago.txt

7   been marked as Exhibit 24 in this case.  Exhibit

8   24 is a letter from Attorney Sean Cleary.  It's

9   dated June 17, 2004.  It was sent by facsimile

10  and regular mail to both you and your husband,

11  is that right?

12      A.    Yes.

13      Q.    And you received it on or about

14  June 17, 2004?

15      A.    Yes.

16      Q.    And what is then presented to you

17  is Exhibit 24 is a fair and accurate

18  representation of the letter that you received

19  on or about June 17?

20      A.    Yes.

21      Q.    And Mr. Frau and his wife had hired

22  an attorney, is that right?

23      A.    Yes.

24      Q.    Had you dealt with Mr. Cleary

                                          124

1   before?

2       A.    No.

3       Q.    This is the first time that you

4   ever dealt with Mr. Cleary, is that right?

5       A.    Yes.

6       Q.    With respect to the formation of

7   the business, Mr. Frau, did he have a lawyer?

8       A.    No.  We all have same lawyer.

9       Q.    Mr. Greenhut.

10      A.    Yes.

11      Q.    And what he is saying to you, this

12  is after you had sent the email that you had

                    Page 100

Santiago.txt

13    decided to close the business, Mr. Cleary is

14    saying that there is a problem with Dialogo

15    Bilingue.  Is that fair?

16          A.    Yes.

17          Q.    And he is essentially saying that

18    we are fifty percent shareholders of Dialogo

19    Bilingue, is that right?

20          A.    Yes.

21          Q.    And that you have responsibility

22    either to buy us out or to proceed by the

23    corporate form, is that right?

24          A.    Yes.

                                            125

1          Q.    When you received this letter of

2    June 17, 2004, what did you do?

3          A.    I did nothing.  I was already under

4    counsel and my attorney --

5          Q.    Mr. Greenhut?

6          A.    Mr. Greenhut.  And they were asking

7    for $10,000 that the company didn't have, it

8    just did not have.

9                They could easily have bought me

10    out also.  They could have easily continued the

11    newspaper theirselves.  They chose not to.

12          Q.    So therefore when you got this

13    letter you went to Mr. Greenhut, or you sent

14    this letter to Mr. Greenhut and you talked to

15    him about it, is that right.

16          A.    No.  No.  No.  This letter came to

17    Mr. Greenhut.

18          Q.    Well --

                   Page 101

Santiago.txt

19          A.      Came to Mr. Greenhut.  It came to

20   us.  I already had Mr. Greenhut.

21          Q.      I can only go, Miss Santiago, by

22   what it said on the letter, and it says it was

23   faxed to you.

24          A.      I know it was faxed to me, but it

                                              126

1   was also faxed to --

2          Q.      Okay.  And what happened after you

3   received this letter?

4          A.      The lawyers communicated with each

5   other.

6          Q.      Mr. Greenhut communicated with Mr.

7   Cleary, is that right?

8          A.      Yes.

9          Q.      With respect to, with respect to

10   the communication Mr. Greenhut was representing

11   you and your husband with respect to this

12   matter, is that right?

13          A.      Yes.

14          Q.      He wasn't representing the Fraus,

15   is that right?

16          A.      No.

17          Q.      Tell me what the current status is

18   after this June 17, 2004 correspondence.  Where

19   is this matter now?

20          A.      It is in the process of them

21   signing -- what do you calling that.

22                  MR. MINOFF:  I can't help you.

23                  THE WITNESS:  I don't know.

24   Because I don't know.

                    Page 102

Santiago.txt

 7    Or to assign existing or originate new

 8    advertising opportunities or clients for the

 9    benefit of the LLC.  And that DMSA and its

10    principals may retain and originate new media

11    opportunities, advertising contracts and clients

12    for its own benefit whether directly or

13    indirectly."

14              Do you see that?

15        A.    Yes.

16        Q.    And that accurately reflected your

17    understanding that DMSA was not obligated to

18    give its advertising contracts or marketing

19    contracts to the benefit of the LLC, is that

20    right?

21        A.    Yes.

22        Q.    Now with respect to, why didn't you

23    negotiate that same exclusion for yourself?

24        A.    Exclusion in which sense.  Can you

                                              103


 1    explain to me.

 2        Q.    Sure.

 3              With respect to Dialogo Bilingue,

 4    the advertising contracts, the sales contracts,

 5    the contact that you had vis-a-vis Dialogo

 6    Bilingue, why didn't you say in this document

 7    that those documents belong, those contracts

 8    belong to me?

 9              MR. MINOFF:  Objection to the form.

10              THE WITNESS:  This document was

11        created by Mr. Pike and his lawyers.  I

12        have no say in this contract whether I

                    Page 83

Santiago.txt

```
13        accepted it or not.
14             I was of the understanding and I'm
15        still am under the understanding that I
16        had a business.  It was business.  I had
17        a tangible business.  I had advertisers.
18        I have business that were fulfilling.  I
19        didn't feel that I had to establish that.
20        The only thing that I object at that
21        point was that I was bringing zero to the
22        venture, because I was bringing a business
23        to the venture.  I was bringing a business
24        to the venture.
```

                                                  104

```
1         Q.    (By Mr. Brewster)  So therefore
2     your contribution was the business, is that
3     right?
4         A.    Yes.  That was my business.
5         Q.    And the business you were putting
6     into the venture?
7         A.    And the business, yes.
8         Q.    Because you had to dedicate your
9     entire work life to Dialogo LLC, is that right?
10        A.    That's what it requested from me
11    here.
12        Q.    And you were going to do that?
13        A.    Well, Mr. Pike request me to be in
14    front of the business totally, full-time.
15    That's what I did.
16        Q.    Which is with respect for you to do
17    this business, Dialogo LLC, that required that
18    all of the contacts, advertising list, customer
```
                        Page 84