**UNITED STATES DISTRICT COURT**
**DISTRICT OF MASSACHUSETTS**

| | |
|---|---|
| DIALOGO, LLC and <br> DIRECT MERCHANTS S.A., INC., <br><br> Plaintiffs, <br><br> v. <br><br> LILLIAN SANTIAGO BAUZÁ, <br> EL DIALOGO, LLC, and <br> FRANCISCO JAVIER SOLÉ, <br><br> Defendants. <br><br> LILLIAN SANTIAGO BAUZÁ, <br> EL DIALOGO, LLC, and <br> FRANCISCO JAVIER SOLÉ, <br><br> Counterclaim-Plaintiffs, <br><br> v. <br><br> DIALOGO, LLC and <br> DIRECT MERCHANTS S.A., INC., <br><br> Counterclaim-Defendants. | CIVIL ACTION NO. 05-cv-30076-MAP |

**PLAINTIFFS' MEMORANDUM IN SUPPORT OF MOTION**
**FOR PRELIMINARY INJUNCTION**

Pursuant to Federal Rule of Civil Procedure 65, Plaintiffs Dialogo, LLC ("the Company" or "Dialogo, LLC") and Direct Merchants S.A., Inc. ("DMSA") (collectively, "Plaintiffs") move for entry of a preliminary injunction against Defendants Lillian Santiago Bauzá and El Dialogo, LLC (collectively, "Defendants").

1

## INTRODUCTION

This is an action brought under the Lanham Act, 15 U.S.C. § 1125(a), and pendent state law claims against Defendants Lillian Santiago Bauzá, El Dialogo, LLC, and Francisco Javier Solé for the Defendants' unauthorized appropriation and use of Plaintiff Dialogo, LLC's mark "El Dialogo" and its assets, equipment, employees and goodwill.

In June, 2004, Plaintiff DMSA and Defendant Lillian Santiago Bauzá entered into two agreements to create the company, Dialogo, LLC. From July 1, 2004 until February 2005, the Company (with Santiago Bauzá serving as the publisher) published El Dialogo and distributed that newspaper in Western Massachusetts. Without notice, in February, 2005, Santiago Bauzá drafted a letter to DMSA stating that she was unilaterally closing down the Company.

Defendant Santiago Bauzá then took virtually all of the assets and property of the Company, including trade secrets, proprietary information, goodwill, equipment, and employees, moved them to new office space and published a false, imitation newspaper titled "El Dialogo." Defendant Santiago Bauzá subsequently established a new company, El Dialogo, LLC, to publish this newspaper. As set forth below, Defendants' actions have caused (and continue to cause) Plaintiffs to suffer irreparable harm.

## BACKGROUND

In May and early June of 2004, Lillian Santiago Bauzá ("Santiago Bauzá") approached Gerry Pike, Managing Director of DMSA ("Pike"), to discuss the possibility of engaging in a venture with DMSA. Second Affidavit of Gerry Pike ("Second Pike Aff.") ¶ 3. The purpose of the venture was to develop a Spanish language and bilingual print and media business. Id. at ¶ 4.

In early June 2004, Santiago Bauzá wanted a contract to set forth the obligations of the parties. In an e-mail sent in early June, Santiago Bauzá stated:

> I need to come to some understanding with you before we enter
> this new adventure in both our professional and business lives. I
> really need a tangible contract that we can start building from.

Santiago Bauzá continued, "I am moving on with the plan I presented to you. I am working very hard to have a new Dialogo by July 1st." Second Pike Aff. ¶¶ 5, 6, 7 and Ex. 1.

Later, on June 9, 2004, Pike sent to Santiago Bauzá a copy of the organizational documents for the formation of the new company, Dialogo, LLC between DMSA and Santiago Bauzá. These documents included a Venture Agreement and an Operating Agreement and Members Agreement (Dialogo, LLC) for the new company. Second Pike Aff. ¶ 12. On June 9, Santiago Bauzá executed these documents on her own behalf and returned them to DMSA by facsimile. Id. at ¶ 13.

As contemplated in the Venture Agreement, and as set forth in the Operating Agreement and Members Agreement (Dialogo, LLC) ("the Operating Agreement"), DMSA and Santiago Bauzá entered into the Operating Agreement to form a limited liability company called Dialogo, LLC. Second Pike Aff. ¶ 14. As set forth in the Operating Agreement, the membership interests of the Company are as follows: DMSA - 51%, Santiago Bauzá - 49%. Id.

Under the Venture and Operating Agreements, Santiago Bauzá and DMSA formed a joint venture and agreed that, among other things:

- They would create a limited liability company called Dialogo LLC for the joint venture and that Santiago Bauzá had a 49% membership interest and DMSA had a 51% membership interest;

- The Company will be managed by a board of directors, consisting of two representatives from DMSA and one designated by Santiago Bauzá;

- DMSA and LSB [Lillian Santiago Bauzá] shall through the Company jointly pursue the Spanish language and bilingual print and media business;

3

- Santiago Bauzá shall devote her efforts exclusively to the Company, and she shall not provide "such services, directly or indirectly for itself [sic] or any other entity or person to the extent it relates to the Business;"

- They will keep confidential the proprietary information of the Company.

Second Pike Aff. ¶¶ 15-20, Exs. 4 and 5. Shortly after Santiago Bauzá agreed to the terms of the Operating and Venture Agreements, she wrote an e-mail to Pike to provide an update of the Company. In this e-mail, she plainly stated, "All new business are [sic] under Dialogo LLC contract." Second Pike Aff. ¶ 24 and Ex. 6.

On or about July 1, 2004, the Company published and distributed the first issue of its bilingual newspaper, **El Diálogo**. Second Pike Aff. ¶ 27. It published numerous issues after that, on a bi-weekly basis, from July, 2004 until February, 2005. Id. From July, 2004 through February, 2005, the Company developed the trademark and trade name "El Diálogo." Through its development and use of the mark/name of "El Diálogo," the Company created substantial goodwill in this asset. Id.

During this period, the Company operated as set forth in the Venture Agreement and Operating Agreement. Second Pike Aff. ¶ 29. In August, 2004, the Company engaged the services of Ana Morales, a free lancer, for, among other things, the creation of a website for the newspaper, **El Diálogo**. The website, www.eldialogo.com, became operational on or about October 15, 2004. Id. at ¶ 28.

In early February, Santiago Bauzá sent Pike an e-mail indicating the continuing positive momentum of the business and stated:

> Gerry, the newspaper is on an incredible moment to grow, since Francisco arrived we had implemented many systems that are going to help us get the accounts we need . . . .

4

Id. at ¶ 32 and Ex. 8.

In mid-February, Pike, the Managing Director of DMSA, was nearly completely incapacitated and could not monitor the developments at the Company; he so informed Santiago Bauzá.  Second Pike Aff. ¶ 35.  Meanwhile, unknown to Pike, Santiago Bauzá was preparing to take the assets of the Company and open up under a new and deceptively similar name ("El Dialogo, LLC") without DMSA.  Id. at ¶ 41.  She drafted a letter dated February 17, 2004 (that she did not send to DMSA until more than a week later) to inform DMSA that she was unilaterally closing down the business of the Company (which she had no authority to do).  Id. at ¶ 36, 37, 38, 39 and Ex. 10.

In February 2005, Santiago Bauzá physically moved the employees, assets, and equipment of the Company out of its location at Suite 405, 250 Open Square Way in Holyoke to a new location located in the same building at Suite 120, 4 Open Square in Holyoke.  Second Pike Aff. ¶ 41.

On each of March 1, 2005 and March 15, 2005, Santiago Bauzá published an edition of a newspaper styled and titled "**El Diálogo**."  Second Pike Aff. ¶ 32.  As reflected in the March 15, 2005 false, imitation, edition of **El Diálogo,** the newspaper is virtually unchanged from the previous editions of **El Diálogo**.  Id. at ¶ 43.

On March 15, 2005, Santiago Bauzá established a new Massachusetts limited liability company called El Dialogo, LLC (hereinafter "Newco").  Second Pike Aff. ¶ 42.  The Certification of Organization of Newco states that, "[t]he specific nature of the business of the Limited Liability Company is to operate, run, and publish a newspaper and conduct any other lawful business, trade, purpose or activity, which the members may determine to be beneficial to the company."  Affidavit of Gerry Pike dated March 29, 2005 and filed herein, at ¶ 34.  Of

5

course, this business is virtually identical to the business of the Company.  See Second Pike Aff.
¶ 4 and Ex. 4, at 6.

## ARGUMENT

The familiar requirements for obtaining preliminary injunctive relief are: (i) a likelihood of success on the merits; (ii) irreparable injury to Plaintiff absent injunctive relief; (iii) which injury outweighs any harm to Defendant resulting from an injunction; and (iv) no harm to the public interest.  *See, e.g., I.P. Lund Trading v. Kohier Co.*, 163 F.3d 27, 33 (1st Cir. 1998); *Keds Corp. v. Renee International Trading Corp.*, 888 F.2d 215, 220 (1st Cir. 1989); *Concrete Machinery Co., Inc. v. Classic Lawn Ornaments, Inc.*, 843 F.2d 600, 611 (1st Cir. 1988).

I.  PLAINTIFFS ARE LIKELY TO SUCCEED ON THE MERITS.

    A.  Defendant Santiago Bauzá breached her contracts and fiduciary duties to Diálogo, LLC, and misappropriated proprietary information and trade secrets from Diálogo, LLC.

The Operating Agreement obligated Santiago Bauzá to take all actions "for the Company in connection with the business of the Company" and to keep all company information "confidential."    Second Pike Aff., Ex. 4, at 22.  The contract also prevents her from competing with the Company: "LSB shall not provide such services, directly or indirectly for itself [sic] or any other entity or person to the extend it relates to the business."  Id.  The contract also prevents her from disclosing "to any person or entity, directly or indirectly, any Proprietary Information (as hereinafter referred) relating to the Company's business without the prior written consent of the LLC."  Id.  The Operating Agreement defines "Proprietary Information" as "all advertiser and subscription lists, advertiser and subscription prospects, marketing information and data, product information, strategic or technical information, financial information, supplier information, billing rates and advertiser provided information, documents and data."  *Id.*  When

6

Santiago Bauzá took all of Diálogo, LLC's business records, property, contracts and customers to her new business, and used all that property to create a competing business, she clearly violated these provisions.

This taking was also a theft of Diálogo, LLC's trade secrets. A trade secret is defined in Mass. G.L c. 266, Sec. 30, as "anything tangible or intangible or electronically kept or stored, which constitutes, represents, evidences or records a secret scientific, technical, merchandising, production or management information, design, process, procedure, formula, invention or improvement." The information taken by Santiago Bauzá is at least "management information" and "merchandising information." Second Pike Aff., ¶ 41. "Further, confidential information, even if not truly a trade secret, and even if there is no ascertainable damage, is entitled to protection by injunction." *Transkaryotic Therapies, Inc. v. Bain & Co., Inc.*, 14 Mass.L.Rptr. 397, 2002 WL 799694 *3 (Mass. Super. 2002); *see also Warner-Lambert Company v. Execuquest Corporation,* 427 Mass. 46, 50 (1998).

Santiago Bauzá's conduct also constituted a breach of her fiduciary duty to Diálogo, LLC and her partner, DMSA. "Stockholders in close corporations must discharge their management and stockholder responsibilities in conformity with this strict good faith standard. They may not act out of avarice, expediency or self-interest in derogation of their duty of loyalty to the other stockholders and to the corporation." *Donahue v. Rodd Electrotype Co. of New England, Inc.* 367 Mass. 578, 593 (1975).

Defendants are attempting to justify their conduct by claiming that DMSA breached the agreement by not providing sufficient capital, which supposedly forced Santiago Bauzá to take all the Company's assets with her to start a new company to save the business. This defense should be rejected for two reasons. First, the documents show that DMSA *did* provide adequate

capital. By stipulation in the Operating Agreement, the expertise and strategic planning and research that DMSA brought to the venture was *deemed* to constitute a capital investment of $50,000. Second Pike Aff. ¶ 10, 16, 23 and Ex. 4, at 8. The Agreement says:

> Each Member has contributed or *is deemed to have contributed* to the Capital of the Company in the amount set forth opposite the Member's name on Schedule A. The *agreed value* of the Capital Contributions made or *deemed to have been made* by each Member shall be set forth on Schedule A [which shows a $50,000 contribution from DMSA].

Id. In addition to that contribution agreed to be worth $50,000, DMSA provided ongoing capital of at least $47,000. Second Pike Aff., ¶ 29. In fact, Defendants are unable to articulate a *single* specific instance where Santiago Bauza made a request for funds from DMSA that was refused.[1]

Second, even if there were a breach, the Operating Agreement prohibits a Member from simply taking all the Company's assets to start a competing business. All transfers of Company assets not in the ordinary course of business must be approved by the Board of Directors. Second Pike Aff., Ex. 4 at § 6.8 (i). A Member may not take back his or her Capital Contribution without written consent of all Members. Id. at § 4.3 (i). A Member may not resign from the Company until the Company has been dissolved by the consent of all Members or by court order under article XV. (Id. at Art. XV) Upon dissolution, all creditors of the Company must be paid before Members may seek to take Company assets for themselves. (Id.) In short, the Operating Agreement does not allow a Member to engage in a self-help remedy of taking all the Company's assets as for use in a competing business owned exclusively by the supposedly aggrieved Member. Such conduct -- conceded by Defendants -- is plainly in breach of the express terms of Santiago Bauza's agreements with DMSA.

---

[1] Although Santiago Bauzá did complain in an e-mail in November, 2004, about not receiving money for salaries, Pike quickly responded and cleared up the misunderstanding.

B.     Defendants are infringing Diálogo, LLC's common-law trademarks.

A trademark is any designation used "by a manufacturer or merchant to identify his goods and distinguish them for those manufactured or sold by others." 15 U.S.C.A. § 1127. Ownership of trademark rights arises upon use, not upon registration. 2 J. Thomas McCarthy, *McCarthy on Trademarks* § 16:4 (4th ed. 2003). A "use" in the trademark sense means a sale of goods or services in commerce under the mark. *Id.* § 16:11. "No rights accrue to one who merely selects a trademark without actual use of it in the advertising or sale of goods." *Id.* Thus, the first person to *sell* products and services under a designation owns the trademark rights, even if someone else thinks of using the designation first or even registers the designation.

Defendants admit that the designation "El Diálogo" was first used on the July 1, 2004 issue of the newspaper of the same name, which issue was published by the Plaintiff, Diálogo, LLC. All of the papers previously published by Defendant Santiago Bauzá's former company were called "Diálogo Bilingue". Therefore, it is clear that Diálogo LLC, the undisputed first user of the designation, is the owner of the exclusive trademark rights to "El Diálogo". Because neither Santiago Bauzá nor her former company Diálogo Bilingue ever had the trademark rights and Santiago Bauzá never had any legal authority (and, in fact, never even attempted) to transfer formally and legally the rights to El Dialogo, LLC, her new company,[2] that new company *cannot* legally use the mark.

Section 43(a) of the Lanham Act creates a federal cause of action for infringement of an unregistered trademark. *Two Pesos v. Taco Cabana, Inc.*, 505 U.S. 763, 780-81 (1992) (Stevens, J., concurring). The likelihood of confusion test for infringement is the same for registered and

---

[2] Trademark rights can be transferred in whole by assignment or in part by license. 2 J. Thomas McCarthy, *McCarthy on Trademarks* § 18.1

9

unregistered marks. *New West Corp. v. NYM Co. of California, Inc.*, 595 F.2d 1194, 1199-1201 (9th Cir. 1979); 4 J. Thomas McCarthy, *McCarthy on Trademarks* § 27:18 (4th ed. 2003).

Diálogo, LLC must therefore only prove three elements to prevail on its trademark infringement claim: (1) that it "uses and thereby 'owns', a mark"; (2) that Defendants are "using the same or a similar mark"; and (3) that such "use is likely to confuse the public, thereby harming the plaintiff." *Anheuser-Busch, Inc. v. Caught-On-Bleu, Inc.*, 288 F. Supp. 2d 105, 113-14 (D.N.H. 2003).

As previously mentioned, the Plaintiff Diálogo, LLC, as the undisputed first user, owns the trademark rights. Defendants are using the identical name, "El Diálogo", and the identical format, layout, and appearance for their new newspaper. Advertisers and readers cannot distinguish the new paper from the genuine El Diálogo, which is exactly what Defendants intend. As a consequence of such confusion, Defendants are able to harm Dialogo, LLC by misappropriating all of the readers, advertisers, and revenue stream of its publications. Their use of the designation therefore infringes Diálogo, LLC's trademark rights.

C.     Defendants are violating Massachusetts G.L. c. 93A.

Santiago Bauzá's taking of all the Diálogo, LLC assets to the new company exclusively owned by her in knowing violation of her contractual obligations and fiduciary duty is the type of conduct prohibited by Massachusetts G.L. c. 93A. In *Anthony's Pier Four, Inc. v. HBC Associates*, 411 Mass. 451, 488 (1991), the Supreme Judicial Court reversed a Superior Court decision to deny 93A damages, holding that: "conduct in disregard of known contractual arrangements and intended to secure benefits for the breaching party constitutes an unfair act or practice for c. 93A purposes." *Id.* at 474 (citing three previous decisions).

At least one Massachusetts Superior Court has applied this principle to facts very similar to ours, finding that an executive of a closely held corporation violated chapter 93A by taking corporate assets without proper permission and using those assets in a new competing company owned by him. *Henderson v. Axiam, Inc.*, 1999WL 33587312 at *57-58 (Mass. Super. June 22, 1999). And so it is here that Defendant Santiago Bauzá's disregard for her known contractual obligations and fiduciary duties to increase the value of her personal asset (her new company) violates chapter 93A. The *Henderson* court also acknowledged that "[u]nder c. 93A, § 11, a plaintiff may obtain an injunction if he has not suffered any loss of property or money 'if it can be shown that the aforementioned unfair method of unfair competition, act or practice may have the effect of causing such loss of property.'" *Id.* at 58. Thus, the 93A violations alone justify granting the requested injunctive relief because, as described in the accompanying Second Affidavit of Gerry Pike, Defendants' conduct is sure to cause economic loss and irreparable harm to Plaintiffs.

II. MONEY DAMAGES ARE NOT AN ADEQUATE REMEDY FOR DEFENDANTS' CONDUCT.

As previously mentioned, § 11 of chapter 93A expressly authorizes injunctive relief to prevent future harm from occurring, which should eliminate the need to show irreparable harm. *UV Industries, Inc. v. Posner*, 466 F. Supp. 1251, 1255-56 (D. Me. 1979) ("Where . . . a statute provides for injunctive relief upon the showing of a violation, the party seeking such relief need not make a showing of irreparable harm in the normal equity sense."). The Lanham Act violations similarly warrant an injunction without the need for showing irreparable harm. *See Keds Corp. v. Renee International Trading Corp.*, 888 F.2d 215, 220 (1st Cir. 1989) (primary significance of infringement finding in issuing injunctive relief); *see also Trak, Inc. v. Benner Ski, K.G.*, 475 F. Supp. 1076, 1078 (D. Mass. 1979) (irreparable harm flows from infringement

11

finding).  Irreparable harm is therefore *presumed* upon a showing of likelihood of success on the merits.  *GoTo.Com, Inc. v. Walt Disney Co.,* 202 F.3d 1199, 1205 n. 4 (9th Cir. 2000) (citation omitted) ("In a trademark infringement claim, 'irreparable injury may be presumed from a showing of likelihood of success on the merits.'"); *American Bd. of Psych. and Neur., Inc. v. Johnson-Powell*, 129 F.3d 1, 4 (1st Cir. 1997) (stating in dicta "trademark infringements may be presumed without more to cause irreparable harm").

The First Circuit has also held that loss of "incalculable revenues" and "harm to [a plaintiff's] goodwill" qualify as irreparable harm.  *Ross-Simons of Warwick, Inc. v. Baccarat, Inc.*, 102 F.3d 12, 19 (1st Cir. 1996) (affirming decision to grant preliminary injunction forcing Baccarat to honor its contractual obligations to supply crystal to Ross-Simons).  The First Circuit has also "recognized that the loss of a unique or fleeting business opportunity can constitute irreparable injury."  *Starlight Sugar, Inc. v. Soto* 114 F.3d 330, 332 (1st Cir. 1997); *see also Hyde Park Partners v. Connolly,* 839 F.2d 837, 853 (1st Cir.1988) (injunction may be appropriate where timing, in tender offer context, is crucial); *see also Baccarat,* 102 F.3d at 18-19 ("[A] plaintiff need not demonstrate that the denial of injunctive relief will be fatal to its business.... If [it] suffers a substantial injury *that is not accurately measurable* or adequately compensable by money damages, irreparable harm is a natural sequel.") (citations omitted) (emphasis added).  Defendants' conduct creates such harms by misappropriating existing revenues and incalculably hindering Diálogo, LLC's potential to generate new and growing revenues, and, in fact, by jeopardizing the very existence of Diálogo, LLC, and threatening to ruin forever Diálogo, LLC's unique and fleeting opportunity to publish a successful Spanish language newspaper called El Diálogo.

III.     THE BALANCE OF HARMS FAVORS PLAINTIFFS.

The injunction would only require Defendants to stop using property that is not theirs, to return that property to its rightful owner and to stop using a name and format for their paper that is confusingly similar to those owned by the Plaintiffs.

IV.     THE PUBLIC INTEREST FAVORS PREVENTING PUBLIC CONFUSION AND ENSURING THAT THE GENUINE EL DIÁLOGO IS PUBLISHED.

The public interest here involves honoring the contract rights and intellectual property rights of Diálogo, LLC, and preventing the public from being confused by a competing publisher publishing a counterfeit version of El Diálogo.  Both factors militate in favor of the injunctive relief requested by Plaintiffs.

## CONCLUSION

For the foregoing reasons, the Court should grant the motion for preliminary injunction.

        DIALOGO, LLC and
        DIRECT MERCHANTS S.A., INC.

        By its attorneys,

Dated:   May 13, 2005        /s/ Seth W. Brewster
        George Field (BBO No. 164520)
        Seth W. Brewster (BBO No. 551248)
        Attorneys for Plaintiffs
        Verrill Dana, LLP
        One Boston Place
        Suite 2330
        Boston, MA  02108
        (617) 367-0929
        gfield@verrilldana.com
        sbrewster@verrilldana.com

## **CERTIFICATE OF SERVICE**

      I hereby certify that on May 13, 2005, I electronically filed Plaintiffs' Memorandum in Support of Motion for Preliminary Injunction with the Clerk of Court using the CM/ECF system which will send notification of such filing to the following: Keith A. Minoff, Esq. and Arnold Greenhut, Esq., and I hereby certify that there are no non-registered participants.

                                                   /s/ Seth W. Brewster

P:\sbrewster\Dialogo\DMSA-memsuppmotpreliminj.GPF.doc