## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MASSACHUSETTS

_____

DIÁLOGO, LLC and
DIRECT MERCHANTS S.A., INC.,

       Plaintiffs,

v.

LILLIAN SANTIAGO BAUZÁ,
EL DIÁLOGO, LLC, and
FRANCISCO JAVIER SOLÉ,

       Defendants.
_____

LILLIAN SANTIAGO BAUZÁ,
EL DIALOGO, LLC, and
FRANCISCO JAVIER SOLÉ,

       Counterclaim-Plaintiffs,

v.

DIALOGO, LLC  and
DIRECT MERCHANTS S.A., INC.,

       Counterclaim-Defendants.
_____

CIVIL ACTION NO. 05-30076-MAP

## PROPOSED FINDINGS OF FACT IN SUPPORT OF PLAINTIFFS' PRELIMINARY INJUNCTION MOTION

Pursuant to Rule 65 of the Federal Rules of Civil Procedure and the Court's

Scheduling Order dated April 8, 2005, Plaintiffs Diálogo, LLC and Direct Merchants

S.A., Inc. (collectively, "Plaintiffs"), by and through their attorneys, set forth their

Proposed Findings of Fact in Support of Plaintiffs' Motion to Preliminary Injunction.

## PARTIES

1.      Plaintiff Diálogo, LLC ("Diálogo, LLC or "the Company") is a Maine limited liability company with its principal place of business in Holyoke, Massachusetts. Second Amended Complaint ("Am. Compl. II") (Dkt. No. 15) ¶ 2; Answer of Defendants, Lillian Santiago Bauzá and El Diálogo, LLC to Second Amended Complaint ("Answer") (Dkt. No. 16) ¶ 2.

2.      Plaintiff Direct Merchants S.A., Inc. ("DMSA") is a New Jersey corporation with its principal place of business in Newfoundland, Pennsylvania.  Second Affidavit of Gerry Pike ("Pike Aff. II") ¶ 1.

3.      Defendant Lillian Santiago Bauzá ("Santiago Bauzá") is a person residing in Holyoke, Massachusetts. Am. Compl. II ¶ 4; Answer ¶ 4.

4.      Defendant El Diálogo, LLC ("Newco") is a Massachusetts limited liability company with its principal place of business in Holyoke, Massachusetts.  Am. Compl. II ¶ 5; Answer ¶ 5.

5.      Defendant Francisco Javier Solé ("Solé") is a person residing in Southwick, Massachusetts.  Am. Compl. II ¶ 6; Answer ¶6.

## FACTS

6.      Defendant Santiago Bauzá has a bachelors degree in psychology and public administration from Inter-American University of Puerto Rico and a master degree in education and counseling from Cambridge College in Boston, Massachusetts. Deposition of Lillian Santiago Bauzá dated May 9, 2005 ("Santiago Dep.") 10.  In her professional experience, she has managed four nonprofit corporations, id. at 14, and presently is a City Councilor for the City of  Holyoke.  Id. at 14-15.

7.      In 2003, Santiago Bauzá, her husband Hector Bauzá, and two other partners, Manuel Frau-Ramos and Ingrid Estrany-Frau, started a Massachusetts corporation called Dialogo Bilingue, Inc.  Santiago Dep., Ex. 1.  Under its articles of organization, the company was a "bilingual/multicultural newspaper with a mission to inform the Latino/a on diverse topic to encourage community involvement."  Id.

8.      The four directors of Dialogo Bilingue, Inc. were Hector Bauzá, Lillian Santiago Bauzá, Dr. Manuel J. Frau and Ingrid Estrany-Frau.  Santiago Dep. 18 and Ex. 2.  Each of these directors were and are 25 percent owners of Dialogo Bilingue, Inc.  Id. at 18-19.  Ms. Santiago Bauzá served as clerk of the corporation and as clerk, her duties included filing the tax returns of the corporation, submitting the annual report of the corporation to Commonwealth of Massachusetts, and filing the articles of organization with the Commonwealth of Massachusetts.  Id. at 19-20 and Ex. 2.

9.      Attorney Arnold Greenhut was both the attorney of Dialogo Bilingue, Inc. and Ms. Santiago Bauzá's own attorney.  Santiago Dep. 17.

10.     The Dialogo Bilingue articles of organization were filed with the Massachusetts Secretary of State on September 17, 2004.  Santiago Dep., Ex. 1.

11.     In April 2003, on behalf of Dialogo Bilingue, Manuel Frau-Ramos secured the web domain name of "dialogobilingue.com."  Santiago Dep. 23-24 and Ex. 5.  Ms. Santiago Bauzá was clear that this was action on behalf of the entire partnership.  Id. at 24-25.  Dialogo Bilingue, Inc. did not secure the name "El Dialogo."  Id. at 24.

12.     In the community, the corporation of Dialogo Bilingue, Inc. was known as "Dialogo Bilingue."  Santiago Dep. 37.

13.    From the Dialogo Bilingue's financial statements, the company had a positive net income.  For example, its balance sheet as of May 31, 2004 reflected total net income as $14,142.72, Santiago Dep., Ex. 10, and the monthly May 2004 net income of $3,935.  Id. at 40.

14.    The corporation Dialogo Bilingue published a newspaper known as "Dialogo Bilingue."  Santiago Dep. 46-47 and Ex. 12.  The first edition of "Dialogo Bilingue" was on June 1, 2003 and the last edition of "Dialogo Bilingue" was on June 1, 2004.  Santiago Dep. 47-48.

15.    In May 2004, Lillian Santiago Bauzá discussed with Gerry Pike, Managing Director of DMSA, the business of Dialogo Bilingue, Inc.  She told him that she was breaking her involvement with her other partners and she was deciding whether to continue the newspaper herself or whether to close it down.  Santiago Dep. 54.

16.    At her deposition, Ms. Santiago Bauzá testified that Dialogo Bilingue partnership was breaking down because it allegedly was not making any money and that Ms. Santiago Bauzá wanted to have a graphic design person to bring the newspaper to the "next level."  Santiago Dep. 55-56.

17.    In discussions about DMSA's investment, Ms. Santiago Bauzá testified that Gerry Pike and she "vaguely discussed" money, and he would start by investing in "software which is $1,000.  He said that he will pay me a $2,000 salary and he would pay Gabriela the salary.  So that was the extent at that moment."[1]  Santiago Dep. 58.

---

[1] In her deposition, Ms. Santiago Bauzá was specifically asked if Mr. Pike stated how much money he would put in, and she responded that they had a vague discussion.  Santiago Dep. 58.  After the next break and speaking with counsel, the witness immediately changed her testimony and stated that "Mr. Pike said that he would invest, set a capital account for the business of the amount of $50,000."  Santiago Dep. 68-69.  Her counsel plainly admitted that during deposition breaks, he regularly "talk[s] to [his] clients about the testimony."  Santiago Dep. 70.  Courts have ruled regularly that this is improper conduct.  Plainsted v.

4

18.     The purpose of the new venture was to develop a Spanish language and bilingual print and media business.  Pike Aff. II ¶ 4.

19.     Santiago Bauzá offered her partners $3,000 for their Dialogo Bilingue stock, but they rejected her offer.  Santiago Dep. 65.  Accordingly, she "started something new."  Id.

20.     Through a new corporation (Dialogo, LLC), Ms. Santiago Bauzá launched a new newspaper, with a "new look, new way of doing that newspaper."  Santiago Dep. 60, 64.

21.     As Ms. Santiago Bauzá testified, in June 2004, she "was in the process of changing . . . of getting into another venture [Dialogo, LLC]."  Santiago Dep. 81.  In June 2004, the corporation of Dialogo Bilingue, Inc. and the publication "Dialogo Bilingue" were being discontinued.  Id. at 82-83.

22.     On June 8, 2004, Ms. Santiago Bauzá wanted a contract to set forth the obligations of the parties.  In an e-mail sent in early June, Ms. Santiago Bauzá stated:

> I need to come to some understanding with you before we
> enter this new adventure in both our professional and
> business lives.  I really need a tangible contract that we can
> start building from.

Santiago Dep. 86 and Ex. 17.  As she explained in her deposition, she needed the Venture Agreement and the Operating Agreement.  Id. at 86.  Ms. Santiago Bauzá continued, "I am moving on with the plan I presented to you.  I am working very hard to have a new Diálogo by July 1st."  Id. at 87 and Ex. 17.  She explained that she wanted to launch "El Dialogo."  Id.  And she wanted "the legal documents upon which the new venture could be built."  Id.

---

Geisinger Medical Center, 210 F.R.D. 527, 535 (M.D. Pa. 2002); Morales v. Zondo, Inc., 204 F.R.D. 50, 53

23.    In response to Ms. Santiago Bauzá's e-mail, on June 9, 2004, Gerry Pike,

on behalf of DMSA, sent her a reply, stating:

> It has been but 7 business days since our 05/27/04
> CT meeting and your e-mail of 06/08.  Let's review
> where we are re: DMSA's commitment and what we
> have done to date:
>
> *    We have committed to partner with you
>      without reservation.
>
> *    We outlined to you an exit strategy for your
>      situation with Manuel [her former business
>      partner].

Pike Aff. II ¶ 8 and Ex. 2; Santiago Dep. 88-89.  In that June 9 e-mail, Mr. Pike also

stated:

> However, per our 06/02 conversation, you need to
> resolve the partnership situation with Manuel in
> order for us to execute it.

Id.

24.    Furthermore, before the execution of the Operating and Venture

Agreements, Ms. Santiago Bauzá understood that Carmen (representing DMSA) was

"going to play a central role in the expenditures of Dialogo, LLC."  Santiago Dep. 94.

25.    Later on June 9, 2004, Gerry Pike of DMSA sent to Ms. Santiago Bauzá,

in response to her request, a joint venture agreement and the organizational documents

for the formation of the new company, Diálogo, LLC, to document the joint venture

between Ms. Santiago Bauzá and DMSA.  These documents were executed by DMSA

and included a Venture Agreement and an Operating and Members Agreement (Diálogo,

LLC) for the new company.  Am. Compl. II ¶ 13; Answer ¶ 13.

---

(S.D.N.Y. 2001); <u>Hill v. Clifton Precision</u>, 150 F.R.D. 525, 528-529 (E.D. Pa. 1993).

26.     On June 9, Ms. Santiago Bauzá executed these documents on her own behalf and returned them to DMSA by facsimile.  Am. Compl. II ¶ 14; Answer ¶ 14, Santiago Dep. 96, 105.

27.     At the time of execution of the Venture and Operating Agreements, Ms. Santiago Bauzá was represented by Attorney Arnold Greenhut, Santiago Dep. 107, 125, but she testified that "unfortunately" she did not have Attorney Greenhut review either of these agreements.  Id. at 108.

28.     At the time, Gabriela Romero, who worked in the office of Dialogo Bilingue, Inc., advised Ms. Santiago Bauzá to consult with her attorney about these agreements.  Santiago Dep. 258.

29.     As contemplated in the Venture Agreement, and as set forth in the Operating and Members Agreement (Diálogo, LLC) ("the Operating Agreement"), DMSA and Ms. Santiago Bauzá entered into the Operating Agreement to form a limited liability company called Diálogo, LLC.  Am. Comp. II ¶ 15 and Ex. 1; Answer ¶ 15. Under the Operating Agreement, DMSA and Ms. Santiago Bauzá agreed that the value of DMSA's initial capital contribution was (or was deemed to be) $50,000 and the value of Ms. Santiago Bauzá's initial capital contribution was (or was deemed to be) $1.00.  Id., Ex. 1, at 8, 30.  As set forth in the Operating Agreement, the membership interests of the Company are as follows:  DMSA - 51%, Ms. Santiago Bauzá - 49%.  Id., Ex. 1, at 30.

30.     Under the Venture Agreement, Ms. Santiago Bauzá and DMSA formed a joint venture and agreed that, among other things:

- They would create a limited liability company called Diálogo LLC for the joint venture and that Ms. Santiago Bauzá had a 49% membership interest and DMSA had a 51% membership interest;

- The Company will be managed by a board of directors, consisting of two representatives from DMSA and one designated by Ms. Santiago Bauzá;

- DMSA and LSB [Lillian Santiago Bauzá] shall through the Company jointly pursue the Spanish language and bilingual print and media business;

- Ms. Santiago Bauzá shall devote her efforts exclusively to the Company, and she shall not provide "such services, directly or indirectly for itself [sic] or any other entity or person to the extent it relates to the Business;"

- They will keep confidential the proprietary information of the Company.

Am. Compl. II ¶ 16 and Ex. 2; Answer ¶ 16; Santiago Dep. 96 and Ex. 17.

31.     With respect to initial capital contributions, the Venture Agreement provided that "DMSA shall contribute the initial capital to launch the LLC in an amount that DMSA deems appropriate (including through travel, promotional costs, legal fees, accounting fees, billing fees and the labor of management and staff of DMSA)." Am. Compl. II ¶ 16 and Ex. 2; Answer ¶ 16; Santiago Dep. 98.  There is no term in the Venture Agreement providing that DMSA shall provide initial capital in the amount of $50,000 cash to launch the LLC.  See id.

32.     The Venture Agreement also provided that "LSB [Lillian Santiago Bauzá] acknowledges all expenditures must be done with the concurrence of DMSA."  Am. Compl. II ¶ 16 and Ex. 2; Answer ¶ 16; Santiago Dep. 97-98.

33.     As Ms. Santiago Bauzá testified at her deposition, the Venture Agreement "accurately reflect[ed] [her] understanding and discussions with Mr. Pike about what this venture was all about," Santiago Dep. 96-97, and "accurately reflected what [her] obligations were and what DMSA obligations [were]." Id. at 97.

34.     Under the Operating Agreement, the Company was "formed for the object and purpose of developing Spanish language newspaper(s) and media."  Am. Compl. II ¶ 17 and Ex. 1; Answer ¶ 17.

35.     Under Section 12.7 of the Operating Agreement, Ms. Santiago Bauzá agreed to act exclusively on behalf of the Company.  She agreed that:

> LSB shall employ its [sic] diligent efforts for the Company and LSB shall not provide such services, directly or indirectly for itself [sic] or any other entity or person to extent that it relates to the business.

Am. Compl. II ¶ 18 and Ex. 1, at 22; Answer ¶ 18.  Ms. Santiago Bauzá also agreed that she "may not resign from the Company prior to the dissolution and winding up of the Company."  Am. Compl. II ¶ 18 and Ex. 1, at 10; Answer ¶ 18.

36.     Also in Section 12.7 of the Operating Agreement, the parties agreed that:

> DMSA or an Affiliate thereof may engage in or possess an interest in other business ventures of any nature of description, independently or with others, similar or dissimilar to the business of the Company . . .

Am. Compl. II ¶ 19 and Ex. 1, at 22; Answer ¶ 19.  Under this section of the Operating Agreement, DMSA was not obligated to act exclusively for the Company.

37.     Ms. Santiago Bauzá also agreed that the proprietary information of the Company was to be kept confidential.  Section 12.8 of the Operating Agreement provides, in relevant part:

> DMSA and LSB acknowledge and agree that all efforts and actions undertaken by them for the Company in connection with the business of the Company are to be kept confidential.  Neither DMSA nor LSB will disclose to any person or entity, directly or indirectly, any Proprietary Information (as hereinafter defined) relating to the Company's

> business without the prior written consent of the LLC. For the purposes of this Agreement, "Proprietary Information" means all advertiser and subscription lists, advertiser and subscription prospects, marketing information and data, product information, strategic or technical information, financial information, supplier information, billing rates and advertiser provided information, documents and data.

Am. Compl. II ¶ 19 and Ex. 1, at 22; Answer ¶ 19.

38.    Under the Operating Agreement, the dissolution and winding up of the Company's affairs requires "the written consent of all Members." Am. Compl. II ¶ 20 and Ex. 1, at 24; Answer ¶ 20.

39.    Section 4.1 of the Operating Agreement explains the members' initial capital contributions to the Company. Section 4.1(a) provides:

> Each Member has contributed or is deemed to have contributed to the capital of the Company the amount set forth opposite the Member's name on Schedule A attached hereto. The agreed value of the Capital Contributions made or deemed to have been made by each Member shall be set forth on Schedule A.

Pike Aff. II ¶ 22 and Ex. 4, at 8 (emphasis added). Schedule A provides that the agreed value of DMSA's capital contribution was $50,000 and of Ms. Santiago Bauzá's capital contribution was $1.00. Id. at ¶ 22 and Ex. 4, at 30.

40.    DMSA's initial capital contribution, which the parties agreed had a value of $50,000, was comprised of its marketing and strategy studies. Pike Aff. II ¶ 23.

41.    Ms. Santiago Bauzá understood that as of June 9, 2004, the capital contributions of DMSA were already made or were deemed to have been made. Santiago Dep. 109.

42.     Ms. Santiago Bauzá understood that under the Venture Agreement and Operating Agreement, she agreed that "[her] conduct would be dedicated exclusively to the venture," Santiago Dep. 100, and she would not work on any other venture, including Dialogo Bilingue, Inc.  Id. at 100.

43.     All her efforts were "to be dedicated to Dialogo, LLC, the Maine corporation."  Santiago Dep. 101.

44.     As Ms. Santiago Bauzá testified at her deposition, she "brought a business to the venture."  Santiago Dep. 103.  Since she had to dedicate her work life to Dialogo, LLC, Santiago Dep. 104, her contribution to the Company was "all of the contacts, advertising list[s], customer list[s] that she had with respect to Dialogo Bilingue was part of [her] contribution."  Santiago Dep. 104.

45.     Furthermore, Ms. Santiago Bauzá also understood that anything that Mr. Pike had said to her previously was superceded by the terms of the Operating Agreement dated June 9, 2004.  Santiago Dep. 106; Am. Compl. II ¶ 15 and Ex. 1, at 28; Answer ¶ 15.

46.     Ms. Santiago Bauzá never consulted her attorney Arnold Greenhut about the Venture Agreement and Operating Agreement, and she never talked to any lawyer representing Mr. Pike, including Mark Googins or Verrill Dana, LLP.  Santiago Dep. 107-108.

47.     Ms. Santiago Bauzá understood that her legal obligations are governed by the Operating Agreement.  Santiago Dep. 112.

48.     In an e-mail dated June 15, 2004 to one of her partners in Dialogo Bilingue, Inc., Ms. Santiago Bauzá stated:  "I have decided to close Dialogo Bilingue

corporation." Santiago Dep. 113. According to Ms. Santiago Bauzá, this corporation

was not going to conduct business any longer. Id. at 113-114.

49.     On June 10, 2004, the day after she executed the Venture Agreement and

Operating Agreement, Ms. Santiago Bauzá secured the domain name registration

"eldialogo.com". Santiago Dep. 114-115. At the time, she was operating exclusively on

behalf of Dialogo, LLC. Id. at 115. On the registration form, it provided that the account

holder was "El Dialogo, LLC," but as Ms. Santiago Bauzá admitted, the Massachusetts

company El Dialogo, LLC was not even in her consciousness at that time." Santiago

Dep. 116.

50.     Shortly after Ms. Santiago Bauzá agreed to the terms of the Operating

Agreement and the Venture Agreement, she wrote an e-mail to Gerry Pike of DMSA to

provide an update of the Company. Am. Compl. II ¶ 21; Answer ¶ 21. She stated:

> Just an update of what I've been doing in the last two
> weeks. I informed Manuel that I was going to close
> the Diálogo [B]ilingual Corporation. Open a bank
> account under Diálogo LLC, I need the ID # of the
> venture for the bank and clients. Attached please
> find copy of the new media kit, new name logo and
> other form just for your information and [advice] if
> you wish.
>
> All new business are [sic] under Diálogo LLC
> contract.

Id. (emphasis supplied).

51.     In June, 2004, the Company established an office at Suite 405, 250 Open

Square in Holyoke, where another DMSA joint venture was located. Pike Aff. II ¶ 26.

52.     On or about July 1, 2004, the Company published and distributed the first

issue of its bilingual newspaper, **El Diálogo**. It published numerous issues after that, on a

bi-weekly basis, from July, 2004 until February, 2005.  Pike Aff. II ¶ 27; Santiago Dep.

118, 131.

53.     Before July 1, 2004, neither Ms. Santiago Bauzá nor Diálogo Bilingue,

Inc. had published a newspaper entitled **El Diálogo**.  See Santiago Dep. 131; Pike Aff. II

¶ 27.

54.     In August, 2004, the Company engaged the services of Ana Morales, a

free lancer, for, among other things, the creation of a website for the newspaper, **El

Diálogo**.  Pike Aff. II ¶ 28.  The website, www.eldialogo.com, became operational on or

about October 15, 2004.  Id.

55.     During this period, the Company operated as set forth in the Venture

Agreement and Operating Agreement.  Pike Aff. II ¶ 29.  For example, DMSA provided

capital for the Company in an amount that DMSA deems appropriate, Pike Aff. II, Ex. 5,

and Ms. Santiago Bauzá, as the venture partner in charge of operations, handled the day-

to-day matters (but was required to get DMSA's approval for expenditures).  Id.  During

this period, Gerry Pike had a number of conversations and e-mails with Ms. Santiago

Bauzá as one would expect from owners of a business.  Id.

56.     In December 2004, Ms. Santiago Bauzá presented Mr. Pike with financial

statements (prepared by the accountant Tracy Learned) reflecting the financial

performance of the Company from July 1, 2004 to December 13, 2004.  Pike Aff. II ¶ 30

and Ex. 7; Santiago Dep. 164-165.  These documents demonstrated that, during this

period, the Company had a total net income of over $21,000 and that the Company had a

profit for every complete month in this period.  Id.

57.     Ms. Santiago Bauzá initially testified that she reviewed these financial statements before she gave them to Mr. Pike and she understood that the statements were accurate.  Santiago Dep. 165.

58.     Ms. Santiago Bauzá had exclusive control over the finances of the Company and the financial reporting of the business.  Santiago Dep. 169.

59.     As Ms. Santiago Bauzá admitted, the only written documentation of DMSA's alleged obligation to invest $50,000 cash into the Company was the Operating Agreement.  Santiago Dep. 143-144, 146.

60.     Specifically, these financial statements showed the monthly net income as follows:

|  | Net Income |
|---|---|
| July 2004 | $   777.38 |
| August 2004 | 9,147.92 |
| September 2004 | 2,748.71 |
| October 2004 | 5,542.98 |
| November 2004 | 4,924.34 |

Pike Aff. II ¶ 31 and Ex. 7.

61.     On the Company's financial statement for the period July 1, 2004 through December 31, 2004, Dialogo, LLC had a net income of $36,000.  Santiago Dep. 173-174 and Ex. 37.

62.     In early February, Ms. Santiago Bauzá sent Gerry Pike of DMSA an e-mail indicating the continuing positive momentum of the business and stated:

> Gerry, the newspaper is on an incredible moment to grow, since Francisco arrived we had implemented many systems that are going to help us get the accounts we need . . . .

Pike Aff. II ¶ 32 and Ex. 8.  Ms. Santiago Bauzá noted the positive trend in the business.

14

Santiago Dep. 215.

63.     From June 2004 through February 2005, Ms. Santiago Bauzá never

informed DMSA that she thought DMSA was failing to abide by any of its obligations

under the Venture Agreement or Operating Agreement.  During this period, Ms. Santiago

Bauzá never asserted, as she now apparently claims, that DMSA was obligated to invest

$50,000 in the Company.   Pike Aff. II ¶ 33.  Through March, 2005, however, DMSA had

made over $40,000 in such out-of-pocket payments and also contributed over $5,000 in

management services.  Pike Aff. II ¶ 29.

64.     In mid-February, the Managing Director of DMSA (Gerry Pike) was

nearly completely incapacitated and could not monitor the developments at the Company.

Pike Aff. II ¶ 34.  On February 20, Mr. Pike wrote Francisco Javier Solé, an employee of

the Company, and Ms. Santiago Bauzá an e-mail in which he stated:

> Beatriz [Mallory] and myself have been on our backs for a
> week, hospitalized on Wednesday and now under an
> intensive and accelerated program of antibiotics to prevent a
> spreading pneumonia and check a body temperature that at
> times hovered close to 103 degrees.

Pike Aff. II ¶ 35 and Ex. 9.  At her deposition, Ms. Santiago Bauzá acknowledged that

she saw this e-mail on February 20, 2005.  Santiago Dep. 249.  She also admitted that on

February 20, she was aware that Mr. Pike had been to the hospital.  Id.  Compare

Affidavit of Lillian Santiago Bauzá dated April 6, 2005 (Dkt. No. 9) ¶ 48 ("I was

unaware of any illness on the part of Mr. Pike").

65.     At some point, Ms. Santiago Bauzá drafted a letter dated February 17,

2004 (that she did not mail until more than a week later) to inform Mr. Pike that she was

unilaterally closing down the business of the Company (which she had no authority to

do).  The entire text of this letter, including several false accusations, is reproduced below:

> Since our last meeting and telephone conversation I have reconsidered my position in Diálogo LLC.  Since the beginning I have had to endure your lack of commitment to this organization and your promised financial contributions to the business.  Your inconsistent communication on the decision making process and lack of financial support to the venture has caused a material deteriorations [sic], to the point where we do not have staff support, nor are we able to continue without the business going into debt.  Therefore, as operating manager, I have no other alternative but to close the business effective immediately.
>
> The landlord has been made aware of the situation; he is allowing you to leave the computer, software and other office furniture at that space until the end of the month.  You should take whatever steps are necessary to remove those items at your earliest.  All business paperwork, e.g. bank statements, check book and list of account payables will be sent to you shortly.
>
> If you have questions and or concerns you can address those to my attorney, Arnold Greenhut at 413-785-1504.

Am. Compl. II ¶ 34 and Ex. 4; Answer ¶ 34; Pike Aff. II ¶ 36 and Ex. 10.

      66.     This letter, however, was not mailed until February 25, 2005.  Pike Aff. II ¶ 37.  Mr. Pike did not receive the letter, which was sent by certified mail, until March 5.  Id. at ¶ 38.

      67.     Until receipt of this letter on March 5, Ms. Santiago Bauzá never notified Mr. Pike of her unauthorized decision to unilaterally close the business of the Company by telephone, e-mail, fax, or regular U.S. mail.  Pike Aff. II ¶ 39.

      68.     As of May 13, 2005, almost three months after the letter dated February 17, Ms. Santiago Bauzá still has not sent the business paperwork of the Company to

DMSA as she promised to do "shortly" in her letter dated February 17, 2005.  Pike Aff. II ¶ 40.  Upon information and belief, Ms. Santiago Bauzá continues to use the Company's bank accounts.  Id.; Santiago Dep. 295-296.

69.    In February 2005, without the knowledge and consent of DMSA, Ms. Santiago Bauzá physically moved the business, assets, and equipment of the Company out of its location at  Suite 405, 250 Open Square Way in Holyoke to a new location in the same building at Suite 120, 4 Open Square in Holyoke.  Pike Aff. II ¶ 41.  This is directly contradictory of the statement in her letter of February 17, 2005 that she was leaving those items where they were so that DMSA could come and pick them up.  Id.  The Company's assets at that time included the following valuable, confidential "Proprietary Information" which Ms. Santiago Bauzá had agreed to maintain confidential, and not disclose to others without prior written consent: advertiser and subscription lists, advertiser and subscription prospects, marketing information and data, product information, strategic or technical information, financial information, supplier information, billing rates and advertiser provided information, documents and data.  No consent was ever given to the disclosure or use of this property of the Company.  Id.

70.    On March 15, 2005, Ms. Santiago Bauzá established a new Massachusetts limited liability company called El Dialogo, LLC (hereinafter "Newco" for clarity).  Pike Aff. II ¶ 42; Santiago Dep. 269-272.  The principal office of this new company is listed as Suite 120, 4 Open Square in Holyoke.  Id.

71.    On each of March 1, 2005 and March 15, 2005, April 1, 2005, and April 15, 2005, Ms. Santiago Bauzá published an edition of El Diálogo, apparently with the assets of the Company.  Pike Aff. II ¶ 43.  Newco's and Ms. Santiago Bauzá's use of "El

Diálogo" is likely to cause confusion to the readers and damage the goodwill of the Company.  Id.

72.     On or about April 21, 2005, the Commonwealth of Massachusetts approved Dialogo, LLC's application for registration of the trademark ("El Diálogo") and issued a certification of registration to Plaintiff Dialogo, LLC for that trademark.  Pike Aff. II ¶ 44 and Ex. 12.

73.     Plaintiff Dialogo, LLC is registered as a foreign limited liability company doing business in the Commonwealth of Massachusetts.  Pike Aff. II ¶ 45 and Ex. 13.

74.     As reflected in the March 15, 2005 edition of El Diálogo, the newspaper is virtually unchanged from the previous editions of El Diálogo.  Pike Aff. II ¶ 46.

75.     Ms. Santiago Bauzá's misappropriation of Diálogo, LLC's assets and publication of a new unauthorized version of El Diálogo are causing irreparable harm to Diálogo, LLC, threatening the Company's very existence.  Pike Aff. II ¶ 47.  The longer that Ms. Santiago Bauzá continues to use the misappropriated assets, the harder it will be for Diálogo, LLC to resume its operations.  Id.  Ms. Santiago Bauzá is currently establishing relationships on behalf of Newco between customers, vendors, and employees that had previously worked with Diálogo, LLC.  Id.  It will be impossible to re-establish those relationships with Diálogo, LLC if Ms. Santiago Bauzá continues to interfere with them.  Id.

76.     DMSA's reasonable financial expectations for Diálogo, LLC were that it would be self-sufficient by now and would have greatly increased in value.  Pike Aff. II ¶ 48.

77.     As reflected in the March 15, 2005 false, imitation, edition of **El Diálogo**, the newspaper is virtually unchanged from the previous editions of **El Diálogo**.  Am. Compl. II ¶ 41; Answer ¶ 41; Pike Aff. II ¶ 46.

78.     On or about March 21, 2005, Newco, through Ms. Santiago Bauzá as president, applied to register the trademark "**El Diálogo**" in Massachusetts.  Am. Compl. II ¶ 43; Answer ¶ 43.  In the application, Santiago Bauzá stated that the date of first use of mark was July 1, 2004.  Id.

79.     In the application, Ms. Santiago Bauzá failed to state that the July 1, 2004 use of the mark "**El Diálogo**" was by Diálogo, LLC or that on July 1, 2004, the applicant Newco did not exist.  Santiago Dep. 282-283.  Ms. Santiago Bauzá failed to identify any other predecessor entity even though the Massachusetts registration form expressly required such information.  Id.

80.     Under the penalties of perjury, Ms. Santiago Bauzá stated in the application that the "foregoing statements are true and that [she] verily believes that said applicant [Newco] is the owner of the mark . . . and that no other person has the right in the Commonwealth of Massachusetts to use such mark."  Santiago Dep. 278-279 and Ex. 70.

DIÁLOGO, LLC and
DIRECT MERCHANTS S.A., INC.

By its attorneys,


Dated:  May 13, 2005                  /s/ Seth W. Brewster
                                      George Field (BBO No. 164520)
                                      Seth W. Brewster (BBO No. 551248)
                                      Attorneys for Plaintiffs
                                      Verrill Dana, LLP
                                      One Boston Place
                                      Suite 2330
                                      Boston, MA  02108
                                      (617) 367-0929
                                      gfield@verrilldana.com
                                      sbrewster@verrilldana.com


## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on May 13, 2005, I electronically filed Plaintiffs' Proposed Findings of Fact in Support of Plaintiffs' Preliminary Injunction Motion with the Clerk of Court using the CM/ECF system which will send notification of such filing to the following:  Keith A. Minoff, Esq. and Arnold Greenhut, Esq., and I hereby certify that there are no non-registered participants.

                                      /s/ Seth W. Brewster




P:\sbrewster\Dialogo\Proposed Findings of Fact.doc

# ATTACHMENT A

# Santiago Bauzá Transcript

# pp. 1 - 47

Santiago.txt

1

```
 1              UNITED STATES DISTRICT COURT

 2           FOR THE DISTRICT OF MASSACHUSETTS

 3

 4

 5      * * * * * * * * * * * * * * *

 6   DIALOGO LLC and              *

 7   DIRECT MERCHANTS SA, INC.,   *

 8                  Plaintiffs *

 9   vs.                          * No. 05-30076-MAP

10   LILLIAN SANTIAGO BAUZA,      *

11   EL DIALOGO LLC and           *

12   FRANCISCO JAVIER SOLE,       *

13                  Defendants *

14      * * * * * * * * * * * * * * *

15              ROUGH DRAFT COPY OF

16            VIDEO DEPOSITION OF:

17           LILLIAN SANTIAGO BAUZA

18        BULKLEY, RICHARDSON & GELINAS

19         1500 Main Street, Suite 2600

20           Springfield, Massachusetts

21               May 9, 2005

22

23            Tacy A. Malandrinos

24              Court Reporter
```

2

```
 1   APPEARANCES:

 2   Representing the Plaintiff:

 3   VERRILL DANA LLP

 4   One Portland Square
```

Santiago.txt

```
 5   Portland, Maine 04112-0586

 6   BY:  SETH W. BREWSTER, ESQ.

 7   (207) 774-4000

 8   fax (207) 774-7499

 9   sbrewster@verrilldana.com

10

11   Representing Lillian Santiago Bruza:

12   ROBINSON DONOVAN P.C.

13   1500 Main Street, Suite 1600

14   Springfield, MA 01115-5609

15   BY: KEITH A. MINOFF, ESQ.

16   (413) 732-2301

17

18   IN ATTENDANCE:

19   Gerry Pike

20

21

22

23

24
```

                                                    3

```
 1                      INDEX

 2   WITNESS:              LILLIAN SANTIAGO BAUZA

 3   EXAMINATION BY                    PAGE

 4   Mr. Brewster

 5

 6   EXHIBITS                          PAGE

 7   Exhibit 1,

 8   Exhibit 2,

 9   Exhibit 3,

10   Exhibit 4,
```

Page 2

Santiago.txt

16    you understood what I was asking you.  If you
17    don't, I invite you to speak up and say you
18    don't understand the question.
19              I don't want to make this
20    experience for you an unpleasant one, but I am
21    going to assume that if you answer my questions
22    that you do understand it.
23              Do you understand that instruction?
24       A.     Yes.

                                                    10

 1       Q.     If you need to take a break,
 2    whether to stretch your legs, whether you need
 3    to use the restroom or whatever, please tell me
 4    so.  Again I don't want to keep you here where
 5    it's very uncomfortable or unpleasant for you.
 6              Do you understand that?
 7       A.     Yes, I do.
 8       Q.     Is there any reason that the
 9    testimony you give today is not going to be the
10    truth?  Any medical reason or otherwise?
11       A.     No, sir.
12       Q.     Can you please give a brief history
13    of your educational background.
14       A.     Well, I graduated from high school,
15    Gabriela Mistral in Puerto Rico.  Then I took a
16    Bachelors degree which I ended in 1978 from
17    Interamerican University of Puerto Rico.  I did
18    my Masters degree, graduating in 1992 from
19    Cambridge College in Boston, Massachusetts.
20       Q.     Your Bachelors degree was in
21    psychology and public administration?
                        Page 8

Santiago.txt

22      A.      That's correct.

23      Q.      Your Masters degree was in what?

24      A.      In educational counselling.

                                                11

1       Q.      And that was in 1992, is that

2   right, in Cambridge, Massachusetts?

3       A.      Yes.

4       Q.      Are you married?

5       A.      Yes.

6       Q.      For how long?

7       A.      Two years.

8       Q.      To whom are you married?

9       A.      Hector Bauza.

10      Q.      Do you have children?

11      A.      Of my own.  I have two adult

12  children.

13      Q.      Have you been previously married?

14      A.      Yes.

15      Q.      Can you give a brief history of

16  your employment background before your work for

17  Dialogo LLC?

18      A.      I was working with River Valley at

19  the Holyoke Medical Center as director of the

20  employee assistant program.

21      Q.      For how long?

22      A.      For two years.

23      Q.      And what was the reason for

24  leaving that job?

                                                12

1       A.      To become a full-time manager at

Santiago.txt

8      Q.     What years were you in Tampa,

9    Florida?

10     A.     Four.

11     Q.     From when to when?

12     A.     1999 to 2002.

13     Q.     In 2002 then you moved up to this

14   area, is that correct?

15     A.     That is correct.

16     Q.     Before 1999 did you live in western

17    Massachusetts?

18     A.     Yes.

19     Q.     When did you move to western

20   Massachusetts?

21     A.     I moved --

22     Q.     From Puerto Rico?

23     A.     I didn't move from Puerto Rico.  I

24   moved from Connecticut.  And that was in 1985.

                                          14


1      Q.     In the past you managed two

2    nonprofits?

3      A.     I managed four nonprofits.

4      Q.     What are the names of those

5    nonprofits?

6.     A.     I work with the department of,

7    State department of health, public health.  I'm

8    sorry, as the assistant director of the

9    prevention program.  I also work as director of

10   out patient services for gunda(phonetic) mental

11   health, Daco and River Valley.

12     Q.     Before Dialogo Bilingue did you

13   have any other history in publishing a

Page 11

Santiago.txt

14  newspaper?

15      A.      No.

16      Q.      Dialogo Bilingue was your first

17  background or first endeavor in publishing a

18  newspaper.

19      A.      Yes.

20      Q.      You are currently a City councilor

21  for the City of Holyoke, is that right?

22      A.      Yes.

23      Q.      How long have your been   a City

24  councilor.

                                            15


1       A.      This is my first term.

2       Q.      When were you elected?

3       A.      I was elected in November of 2003.

4       Q.      Is it a two year term?

5       A.      Yes.

6       Q.      And you are up for reelection in

7   November of 2005?

8       A.      That's correct.

9       Q.      Can you tell please describe for

10  me how Dialogo Bilingue came about.

11      A.      Dialogo Bilingue came about on an

12  evening I was doing a presentation.  Back in

13  2003 bilingual education was on the verge of

14  being disappear here in Massachusetts.  I was

15  one of the group of people who was an advocate

16  for Bilingual education since the 1970s.

17          I felt it was important to voice

18  out our concerns of elimination of Bilingual

19  education.  I was doing, I was a key note

Santiago.txt

20  speaker at the library in Holyoke to a group of

21  parents, educators and community members.  And

22  after that the following day when I look at the

23  newspaper I felt that what happened in that

24  meeting was not expressly recorded fairly.

16

1           And I felt that a publication that

2  really talked about the issues that effect the

3  Latino community was important to have.  So

4  that's how Dialogo Bilingue came up.

5      Q.     With respect to the ownership of

6  Dialogo Bilingue, how did you get in contact

7  with Manuel Frau Ramos?

8      A.     I didn't get in contact with Manuel

9  Frau.  Manuel Frau is a friend and back then he

10  always wanted to have a newspaper.  We walked

11  out of that meeting together talking about the

12  possibility of putting together a publication.

13  We didn't talk about a newspaper.  The newspaper

14  we talked about the following day when we

15  realized we were really losing the battle of

16  bilingual education.

17           We sat down and we start talking

18  about the possibility of putting together a

19  newspaper.  And the next step was my husband

20  Hector and Manuel his wife and I sit down and we

21  start thinking about it.

22      Q.     What was the date of that meeting?

23      A.     I do not recall.  It was back in

24  2003, but sometime February, March but I can not

17

Santiago.txt

1  tell you.

2        Q.    I'm going to show you what has

3  been previously marked as Exhibit 1.

4              Exhibit 1 is a Articles of

5  Incorporation Organization for Dialogo Bilingue,

6  Inc.

7              With respect to the lawyer for

8  Dialogo Bilingue was Arnold Greenhut, is that

9  right?

10       A.    That is correct.

11       Q.    Is Mr. Greenhut also your personal

12 lawyer?

13       A.    Yes.  Yes and no.

14       Q.    You used Mr. Greenhut for your

15 personal matters in the past, is that correct

16       A.    If business is personal then, yes,

17 because I don't have any personal matter that

18 I --

19       Q.    With respect to, and with respect

20 to Dialogo LLC Mr. Greenhut represented you with

21 respect to Dialogo LLC?

22       A.    No.

23       Q.    With respect to Dialogo what is

24 marked as Exhibit 1, the purpose of the

                                        18

1  enterprise as set forth here was bilingual

2  multi-cultural newspaper?  Is that correct?

3        A.    Dialogo Bilingue?

4              You said Dialogo LLC.

5              Dialogo Bilingue?

6        Q.    Yes.
                    Page 14

Santiago.txt

```
 7      A.     Yes.  Dialogo Bilingue was formed
 8   as a bilingual newspaper, yes.
 9      Q.     I'm going to show you what's been
10   marked as Exhibit 2.  The four directors of
11   Dialogo Bilingue were Hector Bauza, you, Manuel
12   Frau and his wife Ingrid, is that correct?
13      A.     Yes.
14      Q.     They were also each twenty-five
15   percent owners of Dialogo Bilingue, is that
16   right?
17      A.     Yes.
18      Q.     And with respect to now each one of
19   those parties currently owns twenty-five percent
20   interest in Dialogo Bilingue?
21      A.     Yes.
22      Q.     There hasn't been any transfer of
23   any ownership with respect to that, is that
24   right?
```

                                            19

```
 1      A.     It's in the process for a while.
 2   It's been in a process.
 3      Q.     However as it currently stands with
 4   Dialogo Bilingue each of those parties currently
 5   holds a twenty-five percent interest in the
 6   company, is that right?
 7      A.     Yes.
 8      Q.     Is Dialogo Bilingue still an active
 9   business?
10      A.     Yes.
11      Q.     With respect to the, I refer you to
12   the next to last page of what has been marked as
```
                         Page 15

Santiago.txt

13    Exhibit 2, you were the clerk of Dialogo

14    Bilingue, is that right?

15         A.    Yes.

16         Q.    And the responsibilities of the

17    being clerk of the company were what?  What was

18    your understanding of those responsibilities?

19         A.    Officially I can not tell you what

20    the responsibilities of the clerk.

21               I know unofficially I was basically

22    running the newspaper.  I was in the daily

23    running of the newspaper, although I was holding

24    a full-time job.

                                              20

1          Q.    The clerk was also responsible for

2     having the minutes of the meetings, is that

3     correct?

4          A.    Yes.

5          Q.    And the clerk was also responsible

6     for filing the Articles of Organization with the

7     Commonwealth of Massachusetts, is that right?

8          A.    Yes.

9          Q.    The clerk of the corporation was

10    also responsible for filing the tax returns of

11    the corporation, is that right?

12         A.    Yes.

13         Q.    Including the Federal tax returns

14    for 2003 and 2004, is that right?

15         A.    Yes.

16         Q.    The clerk of the corporation which

17    you also held was responsible for submitting the

18    annual report of the corporation to the

Santiago.txt

19   Commonwealth, is that right?

20        A.    Yes.

21        Q.    I'm going to have you refer to the

22   first page.  That's your signature, is that

23   right?

24        A.    Yes.

                                            21


1         Q.    And that's a true and accurate copy

2    of your signature, is that right?

3         A.    Yes.

4         Q.    In fact, all this document that is

5    Exhibit 2 this is a true and accurate copy of

6    what it purports to be and that is the

7    organizational and other corporate documents of

8    Dialogo Bilingue.

9         A.    Yes.

10        Q.    I'm going to show you what has

11   been marked as Exhibit 3.  Exhibit 3 is a

12   document entitled Bylaws of Dialogo Bilingue.

13   These were the bylaws that the shareholders

14   adopted in September 2003, is that right?

15        A.    Yes.

16        Q.    With respect to the office, 101

17   Cabot Street in Holyoke, was that your personal

18   residence at that time?

19        A.    Yes.

20        Q.    That was your personal residence

21   with your husband Hector?

22        A.    Yes.

23        Q.    And in fact, what has been marked

24   as Exhibit 3 is in fact the bylaws which operate

                    Page 17

Santiago.txt

22

1    the organization of Dialogo Bilingue?

2         A.    Yes.

3         Q.    I'm going to show you what's been

4    marked as Exhibit 4.  Exhibit 4 is a document

5    entitled Application for Employer Identification

6    Number for Dialogo Bilingue, Inc.  Do you see

7    that?

8         A.    Yes.

9         Q.    And the signature down at the

10   bottom, Hector Bauza, that's your husband, is

11   that right?

12        A.    Yes.

13        Q.    Is that in fact his signature, is

14   that right?

15        A.    Yes.

16        Q.    And your familiar with his

17   signature, is that right?

18        A.    Yes.

19        Q.    On the next page of this document

20   which has been marked as Exhibit 4, that's your

21   signature on this document, is that right?

22        A.    Yes.

23        Q.    And also those are the signatures

24   of both Hector, Manuel and Ingrid, is that

23

1    right?

2         A.    That's correct.

3         Q.    And you are familiar with those

4    signatures?

Page 18

Santiago.txt

5          A.      Yes.

6          Q.      An the purpose of this document was

7    again to get a Federal employer tax

8    identification so Dialogo Bilingue could do

9    business with various vendors suppliers, is that

10   correct?

11         A.      That's correct.

12         Q.      In fact, many suppliers, vendors

13   needed a Federal employer tax ID number in order

14   to do business with you, is that right?

15         A.      That's correct.

16         Q.      I'm going to show you what has

17   been marked as Exhibit 5 in this case.  This is

18   an email that is dated April 17, 2003.  It's to

19   Manuel Frau Ramos.  Again, that was your partner

20   in the Dialogo Bilingue venture, is that right?

21         A.      That's correct.

22         Q.      And this was essentially his

23   registration of Dialogo Bilingue dot com, is

24   that right?

                                              24

1          A.      That's correct.

2          Q.      And the web name for the company

3    was Dialogo Bilingue dot com, is that right?

4          A.      That's correct.

5          Q.      It was not El Dialogo?

6          A.      No.

7          Q.      Did you talk to Mr. Frau before he

8    went about and did this?

9          A.      Of course.  It was a decision of

10   all of us.

                        Page 19

Santiago.txt

11      Q.      And you did that because it was

12   part of the nature of the partnership, is that

13   right?

14      A.      No, not necessarily.  We did it

15   because it was something that was important for

16   the newspaper.  If you want to be competitive

17   you need to be on the web and so forth.

18      Q.      So you need to be on the web and

19   you wanted to have a web address, Dialogo

20   Bilingue dot com, is that right?

21      A.      That's correct.

22      Q.      So based upon the essentially the

23   partnership at that time, it was a decision of

24   the partnership to get the web address Dialogo

                                        25

1    Bilingue dot com?

2       A.      Yes.

3       Q.      And again, the organization of the

4    corporation was not formally done until

5    September of 2003, is that right?

6       A.      That's correct.

7       Q.      Even though the venture itself

8    started approximately March or April of 2003?

9       A.      The actual, if we are talking about

10   two separate dates.  The actual newspaper was

11   out on June of 2003.  The discussion about

12   putting together a newspaper began some February

13   or March, yes.

14      Q.      Miss Santiago, I'm going to show

15   you has been marked as Exhibit 6 in this case.

16   This is the annual report of the corporation

                        Page 20

Santiago.txt
17    Dialogo Bilingue.  It's dated March 15, 2004.

18    That's your signature on that document, is that

19    right?

20         A.    Yes.

21         Q.    And you filed that with the

22    Commonwealth of Massachusetts on or about March

23    15 of 2004?

24         A.    Yes.

                                              26

1          Q.    And that was in compliance of your

2     responsibilities as clerk of the corporation of

3     Dialogo Bilingue, is that right?

4          A.    Yes.

5          Q.    And that is as clerk of the

6     corporation it was also part of your

7     responsibilities in the operation of the

8     company, is that right?

9          A.    That's correct.

10         Q.    So if you were in control of the

11    operation of the company, you would file annual

12    reports with the Commonwealth of Massachusetts,

13    for example?

14         A.    That's correct.

15         Q.    And what has been marked as

16    Exhibit 6 is a true and accurate copy of the

17    document that was filed with the Commonwealth of

18    Massachusetts?

19         A.    Yes.

20         Q.    Miss Santiago, I'm going to show

21    you what has been marked as Exhibit 7 in case.

22    Exhibit 7 is the U.S. income tax return for

                            Page 21

Santiago.txt

20      A.      I give the invoices to the

21   accountant.  She registers all the invoices.

22   And she wrote the checks, and then she brings

23   the checks to me and I will sign them.  And we

24   of course we review them.

                                          37

1        Q.      And with respect to accounting for

2    the income of Dialogo Bilingue, please describe

3    for me how the income of Dialogo Bilingue was

4    recorded.

5        A.      I give the newspaper to the

6    accountant with the amounts that need to be

7    billed to the client, and she will prepare the

8    invoice and send it.

9        Q.      So the accountant generated the

10   invoices, sent the invoices to the clients, the

11   customers, the customers would remit their

12   payment to your accountant, who would then --

13       A.      No.  Not to the accountant.  They

14   would make the payments to the business.

15       Q.      So they would make the payment to

16   the business.  Once the payment -- usually

17   payment by check, is that right?

18       A.      Yes.

19       Q.      Once the check was received by the

20   business, how would it then be recorded in the

21   financial accounting system?

22       A.      I bring it to the bank.  I deposit

23   it.  I make a copy of the check and I put it in

24   a bin and she will come up and pick it up and

                                          38

Santiago.txt

7    this reflects a true and accurate picture of the

8    finances of the Dialogo Bilingue?

9         A.    It depends.  I'm going to say yes.

10        Q.    You have no reason to believe that

11   this document, Exhibit 10, is not a true, fair

12   and correct representation of the financial

13   status of Dialogo Bilingue as of May 31, 2004?

14        A.    No.

15        Q.    And again, this document was

16   generated by Tracy Learned, and it was given to

17   you to give you an idea of the financial picture

18   of Dialogo Bilingue as of May 31, 2004?

19   Is that right?

20        A.    Yes.

21        Q.    So therefore, I'm going to have you

22   turn to -- well, it may be half way through.

23   There is a document called Profit and Loss May

24   2004.  Do you see that?

                                                40

1              where it says for May 2004 the net

2    income of Dialogo Bilingue was $3935.  Do you

3    see that?

4         A.    Yes, I see that.

5         Q.    So therefore, for May 2004 is a

6    fair representation that the net income of the

7    business was in fact almost $4000?

8         A.    If it says there.

9         Q.    There is no reason to believe this

10   is not fair, is that right?

11        A.    Yes, you are right.

12        Q.    And again, it was Attorney

                    Page 32

Santiago.txt

13    Greenhut who was responsible for the

14    organization of Dialogo Bilingue, is that right?

15        A.     Yes.

16        Q.     So he was the one who helped you

17    with the Articles of Incorporation as well as

18    helped you as the clerk of the organization with

19    filing that with the Commonwealth of

20    Massachusetts?

21        A.     I would rephrase that to help us

22    because he meet with us.  With Manuel, with

23    Ingrid, with my husband and I.

24        Q.     At this time Hector's job with the

                                                    41

1    paper was both doing sales, is that right?

2        A.     Yes.

3        Q.     As well as distributing the

4    newspaper to various locations around Western

5    Massachusetts?

6        A.     My husband distributing the

7    newspaper?

8        Q.     Yes.

9        A.     Once in a while my husband and

10    Manuel distribute the newspaper, especially at

11    the beginning because we had to do everything.

12        Q.     I'm going to have you turn to the

13    third page of this document which has been

14    marked as Exhibit 10.  You see there are a

15    number of entries from 12/19 2003 all the way

16    down to, I guess on page four, March 25, 2004,

17    where there are various payments to Hector for

18    newspaper distribution?

                    Page 33

Santiago.txt

11     A.     Just recently we -- I was looking

12  at these details and I was like wait a minute.

13  We are showing profit here that we never had.

14     Q.     Were these documents given to your

15  partners?

16     A.     Yes.  We all discuss it.

17            We never, none of us kind of

18  realized, you know, that we were making that

19  mistake.

20     Q.     With respect to, with respect to

21  none of you realized that the income was

22  essentially doubled?

23     A.     Uh-huh.  To be honest.

24     Q.     So therefore, just so I understand

                                            46

1   your testimony, you are saying that even though

2   the company was, you are saying was operating a

3   loss, you didn't realize that your financial

4   statement reflected a $14,000 net profit?

5      A.     To be honest with you, I used this

6   as, this is the bank statement so I really went

7   by the bank statement.

8      Q.     So what you are saying is Exhibit

9   10 was an accurate document.  Exhibit 11 is not

10  an accurate document, is that right?

11     A.     Absolutely.

12            MR. BREWSTER:  Off the record for

13     a moment.

14            VIDEOGRAPHER:  The time is now 11

15     a.m. and we are off the record.

16

                        Page 37

Santiago.txt

17            (A break was taken)

18

19            VIDEOGRAPHER:  The time is now

20      11:02 a.m. and we are back on the record.

21      Q.    (By Mr. Brewster)  Miss Santiago,

22  I'm going to show you what has been temporarily

23  marked as Exhibit 12 in this case.  This is a

24  copy of the Dialogo Bilingue newspaper for the

                                              47

1   period of June 1 to June 15, 2004.

2            The document that I have shown you

3   which has been temporarily marked as Exhibit 12,

4   is that a true and accurate copy of that version

5   of the Dialogo Bilingue newspaper, is that

6   right?

7       A.    Yes.

8       Q.    And with respect to that newspaper

9   I'm going to have you refer to the second page

10  of the newspaper or actually the third page of

11  the newspaper.  That reflects the staff of the

12  Dialogo Bilingue at the time, that is

13  approximately June 1, 2004.

14      A.    Contributors, yes.

15      Q.    And at that time the Dialogo

16  Bilingue newspaper, this has been marked as

17  Volume two, number one, is that right?

18      A.    Yes.

19      Q.    So essentially the first volume

20  one, number one was the June 1, 2003 edition, is

21  that correct?

22      A.    Yes.

                    Page 38

Santiago.txt

23      Q.    So this is the first edition in the
24   second year, is that correct?

                                          48

1       A.    Yes.
2       Q.    Now I note that there is not a
3    Dialogo Bilingue for June 15 to June 30, is that
4    correct?
5       A.    That's correct.
6       Q.    So therefore what has been
7    temporarily marked as Exhibit 12 was the very
8    last edition of Dialogo Bilingue, is that right?
9       A.    That's correct.
10      Q.    How did you first meet Gerry Pike?
11      A.    I met Gerry Pike at my house on 101
12   Cabot Street.  He came with my husband.
13      A.    When was that?
14      A.    December, sometime in December of
15   2003.
16      Q.    What was the purpose of that visit?
17      A.    He was doing business with my
18   husband so he came.  That was the first time
19   that he approach me to have a participation in
20   the newspaper.
21      Q.    So this was in December of 2003, is
22   that right?
23      A.    Yes.
24      Q.    And he was essentially there doing

                                          49

1    business with your husband on another venture,
2    is that correct?
3       A.    Yes.
                        Page 39

Santiago.txt

22    which account it was.  And Gerry was going to

23    tag along with his wife, and he said that would

24    be a good opportunity for us to meet and discuss

                                                    53

1    the newspaper.

2        Q.      So Gerry had suggested that you

3    meet in Connecticut to discuss the newspaper?

4        A.      With my husband, yes.

5        Q.      So he had said, just so I

6    understand, he had said through Hector please

7    bring Lillian along because we would like to

8    talk?

9        A.      I don't know what he said to Hector

10   because I can not recall.  But Hector told me we

11   are going to be in this meeting and Gerry is

12   going to be there.  How he said it to Hector I

13   can not tell you.

14       Q.      But it was --

15       A.      But my understanding was that Mr.

16   Pike wanted to meet with me, yes.

17       Q.      And your understanding was based

18   upon what your husband Hector had said?

19       A.      Yes.

20       Q.      Tell me where was that meeting?

21       A.      It was in a hotel where they were

22   staying.

23       Q.      Do you remember where?

24       A.      It was in the hotel in Connecticut.

                                                    54

1        Q.      In Hartford?

                        Page 43

Santiago.txt

2      A.     No.  North Haven.

3      Q.     Can you tell me what was talked

4  about in that meeting?

5      A.     It was talked about the newspaper.

6      Q.     And in particular, what was

7  mentioned about the newspaper?

8      A.     Mr. Pike asked me, you know, what

9  was my intention with the newspaper, if I was

10  going to continue the newspaper what were we

11  going to do, what was the situation, and I

12  explained the situation.

13      Q.     What was the situation at that

14  time?

15      A.     That I was breaking my relationship

16  with Manuel and I would have to decide whether I

17  would continue the newspaper by myself or would

18  I totally close the newspaper.

19      Q.     So at that time, that's May of

20  2004, you either were going to go it alone or

21  close it down?

22      A.     Yes.

23      Q.     Is that right?

24             That's what you told Mr. Pike?

55

1      A.     Yeah, that's what I explain to him.

2  That was the situation I was in.

3      Q.     In response what did Mr. Pike say?

4      A.     Mr. Pike said that the newspaper

5  had a lot of potential, that he was willing to

6  invest.

7      Q.     What was he willing to invest.

Page 44

Santiago.txt

8         A.        He said that he was willing to

9    invest money for the newspaper to continue.

10        Q.        To go on?

11        A.        to go on.

12        Q.        With respect to -- strike that.

13                   Why was your relationship breaking

14   up with Manuel?

15        A.        There were many reasons.  One was

16   that the newspaper really wasn't generating any

17   money.  None of us were getting paid.  You know,

18   just Manuel had responsibility.  He has a home.

19   He has a family.

20                   And the other area was that I

21   really wanted to bring on board Gabriela Romero

22   which I felt was graphic design that will help

23   us bring the newspaper to the next level, look

24   more newspaper and he was in disagreement with

                                                        56

1    that.  He didn't want to bring anyone else on

2    board.

3         Q.        So a combination of, at that stage

4    is it your testimony that the newspaper wasn't

5    generating money as well as you wanted to bring

6    additional staff on in order to take the

7    newspaper up another level, is that right?

8         A.        Uh-huh.

9         Q.        So what happened between you and

10   Manuel with respect to the newspaper?

11        A.        Nothing really happened between.

12   He decided to resign.  That was it.

13        Q.        But at this stage he still owns

                              Page 45

Santiago.txt

14    fifty percent or he and Ingrid still own fifty

15    percent of the newspaper, is that right?

16        A.    Yes.

17        Q.    So what did you and Mr. Pike

18    discuss vis-a-vis his investment in the

19    newspaper?  What kind of investment was he

20    willing to make?

21        A.    Monetary.

22        Q.    What else happened in this meeting

23    in the hotel in Connecticut in May of 2004?

24    Have we discussed fully that conversation?

                                              57

1         A.    Well, he mentioned he said very

2     firmly that he was willing to invest money into

3     the newspaper.  He asked me for a report of the

4     stage, you know, the status of the newspaper

5     financially and otherwise.  And he promised me

6     $2000 a month to run the newspaper and he

7     promised to pay Gabriela $1000 a month.

8               I should say not $1000 a month.

9     We talk about between 375 per week, and then

10    later on I negotiated $1000 for her.

11        Q.    At the time the revenues of the

12    newspaper were not handling these expenses, is

13    that right?

14        A.    Not at all.

15        Q.    What else was discussed in that

16    meeting?

17        A.    That was basically it.

18        Q.    Is there anything else that Mr.

19    Pike said to you in that meeting that you

                    Page 46

Santiago.txt

20    haven't testified about?

21         A.    No.

22         Q.    Any representations that he had

23    made in that meeting that you haven't testified

24    about?

                                                    58

1          A.    No.

2          Q.    Did he testify how much money he

3     would put in?

4          A.    We vaguely discussed the amount of

5     money.  He asked me how much money I would need,

6     and I said I cannot tell you that until I can

7     put it in writing and look at what the expenses

8     are and all of that and then I can send you.

9          Q.    So therefore there was no number

10    that was mentioned in that meeting about the

11    amount of money he would invest, is that

12    correct?

13         A.    No.  He said he would start by

14    investing in software which is $1000.  He said

15    that he will pay me a $2000 salary, and he said

16    that he would pay Gabriela the salary.  So that

17    was the extent at that moment.

18         Q.    In exchange for his investment, did

19    you discuss that DMSA would have majority equity

20    control of the business?

21         A.    Yes.

22         Q.    So one of the items that you talked

23    about in that May 2004 meeting was that DMSA

24    would have control with respect to majority

                                                    59

# ATTACHMENT A

# Santiago Bauzá Transcript

# pp. 48 - 87

Santiago.txt

1    control of the corporation, is that right?

2        A.      It would have fifty-one percent of

3    participation.

4        Q.      And you would have the remaining

5    forty-nine percent, is that right?

6        A.      Yes.

7        Q.      Is there anything else that was

8    discussed in that meeting of May 2004?

9        A.      With regard to the business?

10       Q.      That's correct.

11       A.      No.  I don't recall.

12       Q.      After that meeting what happened

13   next with respect to Mr. Pike and the so called

14   investment of DMSA?

15       A.      I proceeded to look at my options

16   with what exactly Manuel wanted to do.  He

17   definitely didn't want any participation.  And

18   so I started to work on creating, you know, my

19   new newspaper.  And I sent Mr. Pike a memo with,

20   you know, what the expenses and especially the

21   distribution and cost of printing and all of

22   that.  And later on he send me, he faxed me the

23   agreement, the venture agreement and the rest of

24   the papers.

                                             60

1        Q.      So the thinking was that you were

2    going to create a new newspaper.  Dialogo

3    Bilingue was no longer?

4        A.      No.  That was not the thinking.

5        Q.      Is that what with respect to when

6    you mentioned the word new newspaper, what did

                        Page 48

Santiago.txt

7   you mean by that?

8       A.      That the way it looks different.

9   You know, new look, new way of doing that

10  newspaper.  Not a new identity.  Not a new

11  business.

12      Q.      If it was going to be a

13  continuation of Dialogo Bilingue, why didn't you

14  continue as Dialogo Bilingue?

15      A.      Because I never liked the Dialogo

16  Bilingue name.

17      Q.      Why didn't you continue under the

18  corporate form of Dialogo Bilingue?

19      A.      I don't know.

20      Q.      So with respect to the newspaper,

21  is that as you sit here right now, you don't

22  know why you moved from the corporate form of

23  Dialogo Bilingue, which was a Massachusetts

24  corporation, is that right?

                                            61


1       A.      Yes.

2       Q.      To a corporation Dialogo LLC which

3   was a Maine corporation, is that right?

4       A.      Well, Gerry wanted to do, or Mr.

5   Pike wanted to do the venture.  The venture, he

6   call it Dialogo LLC and it was going to be

7   registered in Maine.  He never talked about

8   investing in Dialogo Bilingue.  He talked about

9   this new venture and that's what he called the.

10  New venture?

11      Q.      So Gerry was not interested in

12  investing in Dialogo Bilingue, is that right?

                        Page 49

Santiago.txt

64

1    we go all new.  I'm ready, right?

2         A.    Yes.

3         Q.    Now with respect to this, you in

4    fact did launch a new newspaper, is that right?

5         A.    Yes.

6         Q.    And that was Dialogo LLC, is that

7    right?

8         A.    No.  It was Dialogo.

9         Q.    And but it was under a new

10   corporation, is that right?

11        A.    It was a new corporation.

12        Q.    And with respect to Manuel, did you

13   then talk to him about buying him out for $3000?

14        A.    Yes.

15        Q.    Did you put an offer that you would

16   like to buy him out for $3000?

17        A.    Yes. We talked about it.

18        Q.    And what was his response?

19        A.    He didn't want to be in the

20   newspaper.  He gave me a letter before that. I

21   was offering him some money because I kind of

22   felt, that he ended up with nothing really

23   because the newspaper wasn't making any money

24   and so really he ended up with nothing.

65

1         Q.    My question is is that you offered

2    him $3000 for his and Ingrid's share of the

3    corporation, is that right?

4         A.    Yes.

Page 52

Santiago.txt

5      Q.      Approximately when did you make

6   that offer?

7      A.      Way before.  Before I even talked

8   to Mr. Pike.

9      Q.      So would that be May of 2004?

10     A.      Around that.  Early May.

11     Q.      And his response was what when you

12  offered him $3000?

13     A.      He sent me an email saying that as

14  of June 1 or whatever he is no longer part of

15  the newspaper and that was it.

16     Q.      So he rejected your offer and so

17  therefore you started with something new?

18     A.      Yes.

19     Q.      And with respect to the business

20  plan, did you create this business plan just for

21  Mr. Pike or was that business plan provided for

22  or generated for somebody else?

23     A.      That business plan was created for

24  my own information not.

                                                66

1              So it's a way of really, you know,

2   stating what your business is all about and that

3   was something that I created.  And it was a

4   working document I should say.

5      Q.      When was this document, which has

6   been marked as Exhibit 14, when was it created?

7   Was it created in 2003?  Was it created in 2004?

8      A.      No.  2003.

9      Q.      I'm going have you look at the

10  third page of what has been marked as Exhibit

                      Page 53

Santiago.txt

1    And basically she, the process was that
2    everybody that writes in the newspaper submit
3    the articles directly to Manuel.  And he just
4    informing her that I was in charge, to send the
5    articles to me, not to him because I was charge.
6         Q.    With respect to Manuel after that
7    June 7 email, what happened next with respect to
8    him?
9         A.    I sent him the information.  He
10   decided to get Counsel and we did what we needed
11   to do.
12        Q.    With respect to Counsel, what does
13   that mean, you did what you needed to do?
14        A.    Well, he sent a letter to my
15   attorney stating that he, that he felt that the
16   value of his investment was $10,000, and so I
17   didn't have $10,000 to pay him.  The newspaper
18   was not generating $10,000.  The newspaper
19   wasn't generating anything.
20        Q.    When you say your attorney, that's
21   Arnold Greenhut, is that right?
22        A.    Yes.
23        Q.    So he sent a letter to Attorney
24   Greenhut, or his counsel sent a letter to Mr.

                                              81

1    Greenhut saying in essence that he wanted
2    $10,000 for his investment, is that right?
3         A.    Yes.
4         Q.    And you said there is no way you
5    were going to give him $10,000 because Dialogo
6    Bilingue is not making any money any more, is
                     Page 65

Santiago.txt

7    that right?

8        A.      Never made any money.

9        Q.      But in terms of as a going forward

10   venture, Dialogo Bilingue was not going to make

11   money in the future?

12       A.      Can you explain?

13       Q.      Well, with respect to as of June

14   10, June 12 of 2004, that the corporation

15   Dialogo Bilingue was not going to have

16   significant revenue going forward?

17       A.      It has the potential but I was in

18   the process of changing, yes, of getting into

19   another venture.

20       Q.      Dialogo LLC?

21       A.      Absolutely.

22       Q.      So Dialogo LLC was the operation

23   that was going to generate revenue, not Dialogo

24   Bilingue?

                                              82

1        A.      If Mr. Pike would comply with the

2    $50,000 that he promised, yes.

3        Q.      Is that your understanding of the

4    way the operating agreement and the venture

5    agreement work?

6        A.      Yes.

7                MR. MINOFF:  Objection to the form

8        of the question.

9        Q.      (By Mr. Brewster)  Is that Mr. Pike

10   was obligated to invest $50,000 cash into the

11   business, and if he didn't then the business

12   never existed?
                        Page 66

Santiago.txt

13              MR. MINOFF:  Objection to the form.

14      Q.     (By Mr. Brewster)  Is that your

15 understanding?

16      A.     My understanding was that Mr. Pike

17 was going to invest $50,000 cash capital account

18 into the business in order for the business to

19 continue.

20      Q.     Well, before July 1, 2004 there

21 was never a newspaper called El Dialogo, right?

22      A.     Because there was a newspaper

23 called Dialogo Bilingue.

24      Q.     However Dialogo Bilingue was being

                                              83

1 discontinued?

2      A.     The name was discontinued.  Not the

3 publication.

4      Q.     And the corporation was

5 discontinued?

6      A.     The corporation was discontinued.

7      Q.     Because you started with a new

8 corporation?

9      A.     Because I started a new venture.

10      Q.     I'm going to show you what has

11 been marked as Exhibit 16.  These are three

12 pages, an invoice from Dialogo Bilingue.  It's

13 dated June 10, 2004.  It has been issued to

14 Maria Acuna Real Estate, is that right?

15      A.     Yes.

16      Q.     And this is a customer of Dialogo

17 Bilingue, is that right?

18      A.     Yes.

                    Page 67

Santiago.txt

19          Q.      And this is an invoice for an ad

20    that ran in the June 1, 2004 edition, is that

21    right?

22          A.      Yes.

23          Q.      And it was invoiced on June 10,

24    2004?

                                                    84

1          A.      Yes.

2          Q.      And on the third page that is

3    essentially a copy of the ad, is that right?

4          A.      Yes.

5          Q.      The return address says 383 Dwight

6    Street.  What is that address?

7          A.      That is Open Square.

8          Q.      383 Dwight street is Open Square?

9          A.      It's Open Square.  Open Square is a

10    block up to -- It's Lyman Street on one side and

11    Dwight Street on the other side and the

12    registered address with the City is 383 Dwight

13    Street.  They recently, a year and so Mr. Aubin

14    registered for Open Square and he had been

15    making those Open Square way.

16          Q.      With respect to what has been

17    marked as Exhibit 16, on or about June 22, 2004

18    the real estate company remitted their payment

19    of $275, is that right?

20          A.      Yes.

21          Q.      And that was deposited in the bank

22    account for Dialogo Bilingue?

23          A.      Yes.

24          Q.      But Tracy Learned was responsible

Santiago.txt

85

1    for that, is that right?

2        A.    I did the deposits.  I was the one

3    that did the deposits.

4        Q.    Miss Santiago, I'm going to show

5    you what has been marked as Exhibit 17 in this

6    case.  Exhibit 17 is two different emails.  I'm

7    going to have you first turn to the second page

8    of what is marked as Exhibit 17.

9             That starts at the top as Lillian

10   Santiago at Comcast dot net.  Do you see that?

11       A.    Uh-huh.

12       Q.    That was your email address on or

13   about June 9?

14       A.    Yes.  That is my home email.

15       Q.    With respect to the second page of

16   what has been marked as Exhibit 17.  You wrote

17   that, is that right?

18       A.    Yes.

19       Q.    It starts off "Gerry, how are you

20   doing.  I am sorry to come across too assertive,

21   however I need to come to some understanding

22   with you before we enter this new adventure in

23   both our professional and business lives."

24            Do you see that?

86

1        A.    Yes.

2        Q.    What did you mean by that?

3        A.    What did I mean by that?

4        Q.    Yes.

Page 69

Santiago.txt

```
 5      A.      I meant our relationship in the
 6   business, professional and business.  We don't
 7   have a personal relationship.
 8      Q.      Essentially I'm going down to the
 9   next line.  "I really need a tangible contract
10   that we can start building from."
11              Do you see that?
12      A.      Yes.
13      Q.      That means that you needed the
14   venture agreement and the operating agreement,
15   is that right?
16      A.      Yes.
17      Q.      And you wanted for him to send that
18   to you as soon as possible, is that right?
19      A.      Yes.
20      Q.      And that's because at that time you
21   realized that Dialogo Bilingue was, that you
22   were not going to be able to resolve your
23   differences with Manuel, is that right?
24      A.      No.
```

                                                    87

```
 1              In order for me to start a new
 2   venture I needed something in paper.
 3   Everything was verbal up to that point.
 4      Q.      You really wanted an agreement that
 5   you could start building the business on, is
 6   that right?
 7      A.      Yes.
 8      Q.      I refer you to the last paragraph
 9   of this email, which is the second page of
10   Exhibit 17.  Where it says "I am moving on with
```

Page 70

Santiago.txt
11    the plan I presented to you.  I am working very

12    hard to have a new Dialogo by July 1."

13              Is that right?

14        A.    Yes.

15        Q.    And that meant to essentially

16    launch El Dialogo, is that right?

17        A.    Yes.

18        Q.    And essentially what you wanted to

19    do was again get the legal documents upon which

20    this new venture could be built?

21        A.    Yes.

22        Q.    Also with the rest of it, you were

23    just laying out for Mr. Pike what was going on

24    with the business and what the business needed

                                               88

1    at that time?

2        A.    Yes.

3        Q.    I am going to refer you to the

4    first page of what has been marked as Exhibit

5    17.  This is Mr. Pike's response to you.  It's

6    dated June 9, 2004.  You got this email on or

7    about June 9, 2004?

8        A.    Yes.

9        Q.    And this essentially is his

10    response that you got at this time with respect

11    to your concerns that you had stated on your

12    earlier email, is that right?

13        A.    Yes.

14        Q.    And with respect to what Mr. Pike

15    says here when he says, "it has been but seven

16    days since our May 27, 2004 Connecticut

                    Page 71

Santiago.txt

17    meeting."  Do you see that?

18        A.    Yes.

19        Q.    So therefore the meeting you had

20    with him in New Haven or North Haven was May 27,

21    2004, is that right?

22        A.    Yes.  That's what it says there.

23        Q.    Again as he referenced in that

24    paragraph is that the previous email that you

                                                89

1    had sent him was the June 8 email, is that

2    right?

3        A.    Yes.

4        Q.    And with respect to what he says in

5    those bullet points on Exhibit 17, are those

6    bullet points things that he had actually done

7    by that time?

8        A.    No.  We talked about, you know,

9    become partners.  I really did not understand

10    the line of strategy to exit with Manuel because

11    he was never involved with that.  Yes, he work

12    on, he provided us the software after I called

13    several times.

14            At that time I did not have, I

15    didn't know that he had leased a Dell desk top

16    for Anna.  I received the computer maybe a month

17    after, you know, when agreements were done.

18            Yes, we talked, we had already

19    discussed a proposal agreement for Gabriela's

20    salary.  And we put forward the proposition to

21    you must be salary and accept he had already

22    talked about me receiving money and I believe I

Page 72

Santiago.txt
23    said that before.

24              We had agreed to continue with the

                                                    90

1    accountant.  And the business plan, yes.

2         Q.    That is accurate, that we have

3    reviewed and discussed with you your business

4    plan document as soon as we received it?

5         A.    No.   That is accurate.  We did not

6    discuss the business plan.  That's what I was

7    looking for.  I wanted him to call me and we

8    could sit down and have this kind of discussion

9    and or come over.  It was very difficult to

10    reach Mr. Pike.

11        Q.    With respect to very difficult to

12    reach him, by telephone?

13        A.    Yes.  By telephone and sometimes by

14    email.  It was difficult to be able to connect

15    with him.

16        Q.    With respect to your ability to

17    reach Mr. Pike, would you call him or email him.

18        A.    Both.

19        Q.    With respect to his email at least.

20    your June 8 email was responded to on June 9.

21    Is that fair?

22        A.    I don't know because mine doesn't

23    have the number.

24        Q.    Again we go back to the very first

                                                    91

1    paragraph.  It says if you look on the first

2    paragraph seven business days since our May 27

3    '04 Connecticut meeting and your email of June 8

                         Page 73

Santiago.txt

16  that.

17      Q.      Do you have a policy about keeping

18  emails or periodically deleting documents off

19  your computer?

20      A.      I keep for the most part documents.

21  Emails are something that, you know, you delete.

22  It's a normal thing to do.  I provided with the

23  documents that I had.  I can't provide you of

24  what I don't have.

                                            94

1       Q.      With respect to the last paragraph

2   on the first page of what has been marked as

3   Exhibit 17 where it says Mr. Pike says to you,

4   "Re: Carmen.  Carmen is not just great.  She is

5   essential.   More than two thirds of all new

6   businesses fail.  We must carefully manage money

7   to be successful  It is just that simple."

8               "Carmen makes no Dialogo decisions.

9   She is merely a conduit for payments as with

10  your decision to purchase the software for

11  Gabriela."  Do you see that?

12      A.      Yes.

13      Q.      Do you understand that Mr. Pike's

14  view with respect to having Carmen control the

15  financial wherewithal of Dialogo LLC?

16      A.      Yes, that was the understanding.

17      Q.      That was the understanding before

18  you entered into the venture agreement and the

19  operating agreement?

20      A.      That's correct.

21      Q.      And Carmen was going to play a

Santiago.txt

22    central role in the expenditures of Dialogo LLC?

23         A.    That's correct.

24         Q.    I'm going to show you what has

                                                    95

1     been marked as Exhibit 18 in this case.  This is

2     an email that's dated June 9, 2004 from Mr. Pike

3     to you.  You got this document on or about June

4     9, 2004?

5          A.    Ninth.  Yes.

6          Q.    And as he states in this email, he

7     says "per our conversation please find attached

8     the following documents.  Re: the formation of

9     Dialogo LLC."  Do you see that?

10         A.    Yes.

11         Q.    And attached to this email of June

12    9, 2004 was the venture agreement, the operating

13    agreement and member agreement and then two

14    consents of directors, is that right?

15         A.    Yes.

16         Q.    Then the document that you had

17    received showed that Gerry had already signed

18    the venture agreement, the operating agreement

19    as well as the consents, is that right?

20         A.    I do not remember if --

21         Q.    You don't remember whether he had

22    signed it or not?

23         A.    He sent it by Email so they were

24    not signed.  I printed them.

                                                    96

1          Q.    So you printed them out at that

                        Page 77

Santiago.txt

2    time.  And it appears that you received this at

3    approximately 3:00 in the afternoon?

4         A.    Is that what it says.

5         Q.    I am showing you what has been

6    marked as Exhibit 19 in this case.

7                Exhibit 19 is a true and accurate

8    copy of the venture agreement that you received

9    on or about June 9, 2004?

10        A.    Yes.

11        Q.    And I refer you to the second page

12   of that document.  That's your signature?

13        A.    Yes.

14        Q.    So you signed the venture agreement

15   on June 9, 2004 and sent it back to Mr. Pike, is

16   that right?

17        A.    Yes.

18        Q.    And it appears that you sent it

19   back approximately 5:28 in the evening?

20        A.    Yes.

21        Q.    And now when you received the

22   venture agreement did this document accurately

23   reflect your understanding and discussions with

24   Mr. Pike about what the venture was all about?

                                              97

1         A.    Yes.

2         Q.    And also accurately reflected what

3    your obligations were and what DMSA obligations?

4         A.    Yes.

5         Q.    First it accurately reflected that

6    DMSA was going to have a fifty-one percent

7    ownership in the venture and you would have

                    Page 78

Santiago.txt
8   forty-nine percent, is that right?

9       A.      Not in this document.

10      Q.      I'm going to refer you to that

11  first paragraph, paragraph one.

12      A.      Yes.

13      Q.      And it also accurately reflected

14  that the LLC, that is Dialogo LLC, would be

15  managed by a Board of Directors consisting of

16  two representative from DMSA and one that you

17  would designate, is that right?

18      A.      Yes.

19      Q.      And that you would carry the title

20  of publisher?

21      A.      Yes.

22      Q.      And now you as we go down it say

23  "LSB acknowledges all expenditures must be done

24  with the concurrence of DMSA."  Do you see that?

                                            98

1       A.      Yes.

2       Q.      In this document you are LSB, is

3   that right?

4       A.      Yes.

5       Q.      The next line.  "DMSA shall

6   contribute the initial capital to launch the LLC

7   in an amount that DMSA deems appropriate."

8       A.      Yes.

9       Q.      And that doesn't say that they are

10  going to contribute $50,000, does it?

11      A.      In the other document it says this.

12      Q.      But with respect to the venture

13  agreement, the venture agreement says that they

                    Page 79

Santiago.txt

14   will contribute the initial capital in an amount

15   that DMSA deems to be appropriate?

16        A.     I received this document together.

17   I know what he have said and I know what all the

18   documents said.  And in the other document that

19   I sign as well it states the fact that he has

20   fifty-one percent and I have forty-nine percent

21   and that he will, I contribute zero which I

22   objected  in my conversation with him, and he

23   had the capital of $50,000 and that's what I

24   read.

                                              99


1         Q.     With respect to the venture

2    agreement, Miss Santiago, where it says that, it

3    says that "the capital would include travel,

4    promotional costs, legal fees, accounting fees,

5    billing fees and labor of management and staff

6    at DMSA."  Do you see that?

7         A.     Yes.

8         Q.     Did you also understand through

9    this agreement that the capital that DMSA would

10   invest included all of these expenses?

11        A.     Yes.

12        Q.     I'm going to refer you to down to

13   the second paragraph of the venture agreement,

14   where it says that "both DMSA and LSB agree

15   they shall jointly through the LLC pursue the

16   business"?

17        A.     Yes.

18        Q.     In this paragraph you agree that

19   DMSA would engage in other ventures, is that

Santiago.txt

20    right?

21         A.    Yes.

22         Q.    However it says "LSB shall employ

23    diligent efforts to originate new media and

24    advertising contacts and clients for the LLC,

                                                    100

1    and neither LSB nor its principals shall provide

2    such services directly or indirectly for itself

3    or any other entity or person to the extent it

4    relates to the business."

5              Do you see that?

6         A.    Yes.

7         Q.    So you agreed that your conduct

8    would be dedicated exclusively to the venture,

9    is that right?

10         A.    Yes.

11         Q.    And at that time, that is June 9,

12    2004, that was your understanding that you were

13    going to devote your exclusive efforts to the

14    venture, is that right?

15         A.    That's correct.

16         Q.    You wouldn't be working on any

17    other venture, is that right?

18         A.    Yes.

19         Q.    You wouldn't be working on Dialogo

20    Bilingue?

21         A.    I wasn't working on Dialogo

22    Bilingue.

23         Q.    But you would not?

24         A.    I would not.

                                                    101

                    Page 81

Santiago.txt

1      Q.     And you wouldn't work on another

2   venture called El Dialogo LLC?

3      A.     That wasn't in my mind back then.

4      Q.     So back then all your efforts were

5   going to be dedicated to Dialogo LLC, the main

6   corporation?

7      A.     That's correct.

8           MR. BREWSTER:  Why don't we take

9        break right now only because we are

10       running out of tape.

11          VIDEOGRAPHER:  The time is now

12       12:20 p.m.  This is the end of cassette

13       number one and we are off the record.

14

15          (A break was taken)

16

17          VIDEOGRAPHER:  The time is now

18       12:23 p.m.  this is the beginning of

19       cassette number two in the deposition of

20       Lillian Santiago Bauza.  We are back on

21       the record.

22      Q.     (By Mr. Brewster)  Miss Santiago,

23   I'm going to again refer you back to Exhibit 19,

24   in particular in the second paragraph of the

                                        102

1   first page where it says, "LSB further

2   acknowledges and agrees that neither DMSA nor

3   its principals shall have any obligation to

4   assign existing or originate new business,

5   advertising contracts, marketing contracts or

6   any other contracts for the benefit of the LLC.

                Page 82

Santiago.txt

7    Or to assign existing or originate new
8    advertising opportunities or clients for the
9    benefit of the LLC.  And that DMSA and its
10   principals may retain and originate new media
11   opportunities, advertising contracts and clients
12   for its own benefit whether directly or
13   indirectly."
14              Do you see that?
15       A.    Yes.
16       Q.    And that accurately reflected your
17   understanding that DMSA was not obligated to
18   give its advertising contracts or marketing
19   contracts to the benefit of the LLC, is that
20   right?
21       A.    Yes.
22       Q.    Now with respect to, why didn't you
23   negotiate that same exclusion for yourself?
24       A.    Exclusion in which sense.  Can you

                                          103

1    explain to me.
2        Q.    Sure.
3              With respect to Dialogo Bilingue,
4    the advertising contracts, the sales contracts,
5    the contact that you had vis-a-vis Dialogo
6    Bilingue, why didn't you say in this document
7    that those documents belong, those contracts
8    belong to me?
9              MR. MINOFF:  Objection to the form.
10             THE WITNESS:  This document was
11          created by Mr. Pike and his lawyers.  I
12          have no say in this contract whether I
                      Page 83

Santiago.txt

13    accepted it or not.
14         I was of the understanding and I'm
15    still am under the understanding that I
16    had a business.  It was business.  I had
17    a tangible business.  I had advertisers.
18    I have business that were fulfilling.  I
19    didn't feel that I had to establish that.
20    The only thing that I object at that
21    point was that I was bringing zero to the
22    venture, because I was bringing a business
23    to the venture.  I was bringing a business
24    to the venture.

                                        104

1         Q.    (By Mr. Brewster)  So therefore
2    your contribution was the business, is that
3    right?
4         A.    Yes.  That was my business.
5         Q.    And the business you were putting
6    into the venture?
7         A.    And the business, yes.
8         Q.    Because you had to dedicate your
9    entire work life to Dialogo LLC, is that right?
10         A.    That's what it requested from me
11    here.
12         Q.    And you were going to do that?
13         A.    Well, Mr. Pike request me to be in
14    front of the business totally, full-time.
15    That's what I did.
16         Q.    Which is with respect for you to do
17    this business, Dialogo LLC, that required that
18    all of the contacts, advertising list, customer
                        Page 84

Santiago.txt

19    list that you had with respect to Dialogo

20    Bilingue was part of your contribution?

21        A.    Yes.

22        Q.    Miss Santiago, I'm going to show

23    you what also has been marked as Exhibit 20 in

24    this case.  Exhibit 20 is the operating

                                              105


1    agreement.  It's Dated June 2004.  I'm going to

2    have you turn to the end of this document.  You

3    have the signature page.  One before that.

4    That's your signature?

5        A.    Yes.

6        Q.    And you signed this document on

7    June 9, 2004?

8        A.    Yes.

9        Q.    And you signed it and you faxed

10    back the signature page to Mr. Pike, is that

11    right?

12        A.    Yes.

13        Q.    And this document as well as the

14    venture agreement reflected your understanding

15    of how Dialogo LLC was going to be run, is that

16    right?

17        A.    Yes.

18        Q.    Including contributions of capital

19    as well as any other nature of the business, is

20    that right?

21        A.    Yes.

22        Q.    In fact, I'm going to refer you to

23    if you look down at the Bates stamp number in

24    the bottom right-hand corner.  It's 2034.

                        Page 85

Santiago.txt

106

1           Section 17.8 which states, "this
2    agreement constituted the entire agreement among
3    the parties here to pertaining to the subject
4    matter hereof and supersedes all prior
5    agreements and understandings pertaining there
6    to"?
7           A.    Yes.
8           Q.    So therefore anything Mr. Pike had
9    /said to you before was to be superseded by this
10   document.  Did you understand that?
11          A.    Yes.
12          Q.    With respect to Dialogo LLC, did
13   you deal with anyone other than Mr. Pike up to
14   this time and that's June 9, 2004?
15          A.    Say that again.
16          Q.    With respect to Dialogo LLC, did
17   you deal with any other person other than Gerry
18   Pike with respect to this venture?
19          MR. MINOFF:  From DMSA as opposed
20      to her own people?
21          MR. BREWSTER:  That's correct.
22          Q.    (By Mr. Brewster)  With respect to
23   DMSA, did you have conversations with Carmen
24   about the business points of this deal?

107

1           A.    No.
2           Q.    Did you have, did you have any
3    conversations with anyone other than Gerry Pike
4    about the business portions of this deal?

Page 86

Santiago.txt
```
 5     A.     Only with him, yes.
 6     Q.     Did you ever consult your attorney
 7  Arnold Greenhut with respect to this?
 8           MR. MINOFF:  Just warning her
 9           anything she may have said to Attorney
10           Greenhut or he may have said to her is
11           privileged.
12           THE WITNESS:  Not at the moment of
13           signing this agreement, no.
14     Q.     (By Mr. Brewster)  So therefore as
15  of June 9, 2004 Arnold Greenhut was your
16  attorney, is that right?
17     A.     Not on the Dialogo LLC.
18     Q.     But he was your attorney vis-a-vis
19  Dialogo Bilingue, is that right?
20     A.     Yes.
21     Q.     And he was your attorney with
22  respect to other matters other than Dialogo
23  Bilingue?
24     A.     No.
```
108
```
 1     Q.     Okay.  Just Dialogo Bilingue?
 2     A.     Yes.
 3     Q.     And you didn't review this document
 4  with Mr. Greenhut?
 5     A.     Unfortunately, no.
 6     Q.     Did you ever talk to any other
 7  lawyer with respect to this document?
 8     A.     No.
 9     Q.     Did you talk to any lawyer
10  representing Mr. Pike?
```
Page 87

# ATTACHMENT A

# Santiago Bauzá Transcript

# pp. 88 - 174

Santiago.txt

11      A.      No.

12      Q.      You never talked to Mark Gugens or

13  anyone from Verrill Dana.

14      A.      No.

15      Q.      And again, it was only Mr. Pike

16  with whom you discussed the operating agreement

17  and venture agreement?

18      A.      Yes.

19      Q.      I'm going to have you turn to

20  Bates stamp page 2014.

21      A.      2014.  Yes.

22      Q.      Now do you see that section

23  entitled Section 4.1 capital contributions?

24      A.      Yes.

109

1       Q.      Where it says "each member has

2   contributed or is deemed to have contributed to

3   the capital of the company the amount set forth

4   opposite the member's name on Schedule A

5   attached hereto."  Do you see that?

6       A.      Yes.

7       Q.      "The agreed value of the capital

8   contributions made or deemed to have been made

9   by each member shall be set forth on Schedule

10  A."  Do you see that?

11      A.      Yes.

12      Q.      So therefore as of June 9, 2004

13  either those capital contributions were already

14  made or were deemed to be made, is that correct?

15      A.      Yes.

16      Q.      And that was your understanding of

Page 88

Santiago.txt

17   of June 9?

18        A.      Yes.

19        Q.      And therefore on Schedule A, which

20   is the vary last page of this document, which

21   states that "DMSA's capital contribution was

22   $50,000." Is that right?

23        A.      Yes.

24        Q.      And yours was one dollar, is that

                                                    110

1    right?

2         A.      Yes.

3         Q.      And you agreed that that capital

4    contribution had either been made or had deemed

5    to have been made, is that right?

6         A.      My understanding was that it was

7    going to be made.

8         Q.      However section 4.1 of the

9    agreement does not say some future date, does it?

10        A.      I understand that.  But you are

11   asking me what did I understand.  I understand

12   based on my conversations with Mr. Pike and

13   based on the merits of this agreement, and the

14   conversations that we had, when we were about to

15   sign this agreement we were talking over the

16   phone as I was printing this, is that he was

17   going to invest $50,000 in this business.

18   Otherwise I didn't have no reason why to get in

19   business with Mr. Pike.

20        Q.      With respect to section 4.1 of the

21   agreement it states that the contributions had

22   already been made or was deemed to have been

                        Page 89

Santiago.txt

23    made.  Isn't that true?

24         A.     Deemed to be made.  Not already

                                                    111

1    have been made.

2         Q.     Well, it does say each member has

3    already contributed, isn't that right?

4         A.     I understand what you say, sir.

5         Q.     Now with respect to the conduct of

6    the LLC, that is Dialogo LLC, it was being run

7    by a board of directors, is that right, who had

8    the ultimate authority?

9         A.     According to the papers, yes.

10         Q.     And so therefore the board of

11    directors would decide various critical

12    decisions of the business, is that correct?

13         A.     According to the papers, yes.

14         Q.     Well, when you say according to the

15    papers, isn't that what governs the conduct of

16    the parties?

17         A.     I understand, but it didn't happen

18    that way.

19         Q.     My question is is that with respect

20    to the legal obligations of the parties is

21    governed by both the venture agreement and the

22    operating agreement, isn't it?

23              MR. MINOFF:  Objection to form.

24         Q.     (By Mr. Brewster)  Your

                                                    112

1    understanding is your legal obligations are

2    governed by the operating agreement, is that

3    right?
                          Page 90

Santiago.txt

4        A.      Yes.

5        Q.      And in order for the, and I am

6   referring you to Bates stamp number 2020 of the

7   document that's been marked as Exhibit 20,

8   sections, that section 6.8.  Actions requiring

9   unanimous approval of the board.  If the

10  board -- strike that.

11              If the business were to discontinue

12  doing business, it's your understanding that the

13  board of directors would have to make that

14  decision, is that right?

15       A.      Yes.

16       Q.      If the business were to sell its

17  assets or declare bankruptcy, that's a decision

18  that must be made by the board of directors, is

19  that right?

20       A.      Yes.

21       Q.      I'm going to show you what has

22  been marked as Exhibit 21 in this case.  This is

23  an email that's dated June 15, 2004.  It's from

24  you to Mr. Frau on the subject that says Dialogo

                                                   113


1   Bilingue.

2              This is an email that you sent to

3   Mr. Frau on or about June 15 of 2004?

4        A.      Yes.

5        Q.      In the very first line you say, "I

6   had decided do close Dialogo Bilingue

7   corporation," is that right?

8        A.      Yes.

9        Q.      And then you say that you were

                    Page 91

Santiago.txt

10    paying every bill of Dialogo Bilingue to make
11    sure that no one gets stuck with the bills.
12          A.    That's correct.
13          Q.    And at this point you are not going
14    to buy his share, is that right?
15          A.    I could not.
16          Q.    Was this your last communication
17    with Mr. Frau?
18          A.    Yes.  I believe so.  I do not know
19    for sure, but I believe that this was.
20          Q.    And with respect to this document
21    this is the truth, that Dialogo Bilingue was
22    being closed down, is that right?
23          A.    Yes, the corporation.
24          Q.    The corporation.  It was not going

                                                    114

1    to conduct business any more?
2          A.    Yes.
3          Q.    Now you didn't go about the process
4    of a dissolution of the corporation, did you?
5          A.    We discuss it, the four of us in
6    our conversation from the beginning, and it's in
7    the process.  It's in the process.
8          Q.    I'm going to show you what has
9    been marked as Exhibit 22 in this case.
10    This is a document that was produced to us in
11    the document production.  It's dated June 10,
12    2004.  It is the registration of El Dialogo, dot
13    com, is that right?
14          A.    Yes.
15          Q.    And this is something that you did
                          Page 92

Santiago.txt

16    as of June 10, 2004, is that right?

17         A.    Yes.

18         Q.    And you registered the domain name

19    of El Dialogo dot com?

20         A.    Yes.

21         Q.    That's because the previous

22    registration of Dialogo Bilingue dot com was no

23    longer useful, was that right?

24         A.    Yes.

                                              115

1          Q.    At this time you realized that the

2     newspaper was going to be named El Dialogo and

3     you wanted to have a web site for the domain

4     name of El Dialogo dot com.

5          A.    At that point I decided I wanted to

6     change the name to El Dialogo, and I felt we

7     needed a new web site.

8          Q.    And you did this on June 10, 2004,

9     is that right?

10         A.    Yes.

11         Q.    And that was a day after you had

12    entered into the venture agreement and the

13    operating agreement, is that right?

14         A.    Yes.

15         Q.    And therefore at that time you were

16    operating exclusively on behalf of Dialogo LLC,

17    is that right?

18         A.    According to the papers, yes.

19         Q.    So therefore when you had secured

20    the domain name of El Dialogo dot com, you had

21    done that on behalf of Dialogo LLC, is that

                    Page 93

                                    Santiago.txt
2          Q.      So therefore with respect to that,

3     the day after you had entered into an agreement

4     with the company, that you were going to act

5     exclusively on behalf of the company, you then

6     secured the companys domain name.  Is that your

7     testimony?

8              MR. MINOFF:  Objection to the form

9          of the question.  You can answer.

10             THE WITNESS:  The newspaper name.

11         The newspaper's name.  I didn't register a

12         domain.  Dialogo LLC.  I registered the

13         newspaper name, El Dialogo, which I

14         considered is my name.  It's the name that

15         I formed.  It's a name that I work with.

16         Q.      (By Mr. Brewster)  With respect to

17     that, where in the venture agreement or the

18     operating agreement did it say that you were

19     owned the name El Dialogo and was allowing

20     Dialogo LLC simply to use that name?

21             MR. MINOFF:  Objection to the form

22         of the question.

23             THE WITNESS:  Nowhere.

24             But it doesn't say the contrary

                                                        118


1          either.

2          Q.      (By Mr. Brewster)  With respect to

3     both the venture agreement and the operating

4     agreement there is nowhere in there that

5     indicate you are merely leasing the name El

6     Dialogo to the company, is that right?

7          A.      No.

                          Page 95

Santiago.txt

8      Q.      In fact, the very first time El

9   Dialogo was ever used was the July 4, 2004

10   edition, is that correct?

11      A.      Yes.

12      Q.      In fact, there wasn't an edition of

13   June 15 published of Dialogo Bilingue, is that

14   right?

15      A.      No.

16      Q.      Because at that stage you were

17   converting over to the new newspaper, is that

18   right?

19      A.      Yes.

20      Q.      I'm going to show you what has

21   been marked as Exhibit 23 in this case.  Exhibit

22   23 is an email that's dated June 17, 2004 from

23   Mr. Pike to you and it imbeds an earlier email

24   that you sent to him.  Do you see that?

                                    119

1      A.      Yes.

2      Q.      Now the purpose of the underline

3   email, Miss Santiago, was to give Mr. Pike an

4   update of Dialogo, is that correct?

5      A.      Yes.

6      Q.      And therefore on or about June 17,

7   2004 you wrote that message that's imbedded in

8   Exhibit 23?

9      A.      Yes.

10      Q.      And it says "just an update of what

11   I've been doing in the last two weeks."

12              Do you see that?

13      A.      Yes.

Page 96

Santiago.txt

22    right?

23         A.    Not necessarily.

24         Q.    Turn to the second page of what has

                                                    116

1     been marked as Exhibit 22 where you see it says

2     account holder, El Dialogo LLC.  Do you see

3     that?

4          A.    Yes.

5          Q.    And now at that time the

6     corporation that you formed in March of 2005, El

7     Dialogo, LLC had not been formed, is that right?

8          A.    No.

9          Q.    In fact, that wasn't even in your

10    consciousness at that time, is that right?

11         A.    Yes.

12         Q.    So therefore as of June 10, 2004

13    when you had registered the domain name El

14    Dialogo dot com, that was on behalf of Dialogo

15    LLC, the main corporation, isn't that right.

16              MR. MINOFF:  Objection to the form.

17              MR. BREWSTER:  You can answer.

18              THE WITNESS:  No.  I did it on

19         behalf of Dialogo LLC, no.

20         Q.    (By Mr. Brewster)  Then since the

21    account holder says El Dialogo LLC, on whose

22    behalf were you getting the El Dialogo dot com

23    domain name?

24         A.    Under mine.  I paid under my own

                                                    117

1     personal card.  It was mine.

                     Page 94

Santiago.txt

13    decided to close the business, Mr. Cleary is

14    saying that there is a problem with Dialogo

15    Bilingue.  Is that fair?

16         A.    Yes.

17         Q.    And he is essentially saying that

18    we are fifty percent shareholders of Dialogo

19    Bilingue, is that right?

20         A.    Yes.

21         Q.    And that you have responsibility

22    either to buy us out or to proceed by the

23    corporate form, is that right?

24         A.    Yes.

                                              125

1          Q.    When you received this letter of

2     June 17, 2004, what did you do?

3          A.    I did nothing.  I was already under

4     counsel and my attorney --

5          Q.    Mr. Greenhut?

6          A.    Mr. Greenhut.  And they were asking

7     for $10,000 that the company didn't have, it

8     just did not have.

9                They could easily have bought me

10    out also.  They could have easily continued the

11    newspaper theirselves.  They chose not to.

12         Q.    So therefore when you got this

13    letter you went to Mr. Greenhut, or you sent

14    this letter to Mr. Greenhut and you talked to

15    him about it, is that right.

16         A.    No.  No.  No.  This letter came to

17    Mr. Greenhut.

18         Q.    Well --

                   Page 101

Santiago.txt

```
19        A.     Came to Mr. Greenhut.  It came to

20   us.  I already had Mr. Greenhut.

21        Q.     I can only go, Miss Santiago, by

22   what it said on the letter, and it says it was

23   faxed to you.

24        A.     I know it was faxed to me, but it
```
126
```
1    was also faxed to --

2         Q.     Okay.  And what happened after you

3    received this letter?

4         A.     The lawyers communicated with each

5    other.

6         Q.     Mr. Greenhut communicated with Mr.

7    Cleary, is that right?

8         A.     Yes.

9         Q.     With respect to, with respect to

10   the communication Mr. Greenhut was representing

11   you and your husband with respect to this

12   matter, is that right?

13        A.     Yes.

14        Q.     He wasn't representing the Fraus,

15   is that right?

16        A.     No.

17        Q.     Tell me what the current status is

18   after this June 17, 2004 correspondence.  Where

19   is this matter now?

20        A.     It is in the process of them

21   signing -- what do you calling that.

22             MR. MINOFF:  I can't help you.

23             THE WITNESS:  I don't know.

24   Because I don't know.
```
Page 102

Santiago.txt
23    to me you shouldn't be signing that.  I don't
24    think this is right.  You should consult a

258

1    lawyer.
2         Q.    Just so I understand.  When you are
3    talking about, you are talking about the venture
4    agreement?
5         A.    Yes.
6         Q.    And the operating agreement?
7         A.    Yes.
8         Q.    So with respect to the venture
9    agreement and the operating agreement you say
10    Gabriela saw those documents?
11        A.    Yes.
12        Q.    And she had advised you that you
13    should talk to a lawyer?
14        A.    Yes.
15        Q.    And this is the period of time,
16    again June 9, from approximately 3:00 in the
17    afternoon to 5:30 in the afternoon when they
18    were executed and returned, she saw them,
19    advising you you should consult with a lawyer,
20    is that right?
21        A.    Yes.
22        Q.    And did you take her advice?
23        A.    No.  Obviously.
24        Q.    And what was her view -- strike

259

1    that.
2              On what basis did she review the
3    operating agreement and the venture agreement?
                        Page 209

```
                              Santiago.txt
17              VIDEOGRAPHER:   The time is now

18       12:59 p.m. and we are off the record.

19

20              (A break was taken)

21

22              VIDEOGRAPHER: The time is 12:59

23       p.m. and we are back on the record.

24       Q.     (By Mr. Brewster)  Miss Santiago,

                                                        131


 1    I'm going to show you what has been marked as

 2    Exhibit 27 in this case.  This is a copy of the

 3    newspaper El Dialogo for July 1, 2004?

 4         A.     Yes.

 5         Q.     Is that right?

 6         A.     Yes.

 7         Q.     And this is a document that was

 8    distributed on or about July 1, 2004?

 9         A.     Yes.

10         Q.     This was the very first edition of

11    the newspaper entitled El Dialogo, is that

12    right?

13         A.     Yes.

14         Q.     In fact the newspaper says in the

15    top left that is was volume one, number one.  Is

16    that right?

17         A.     Yes.

18         Q.     So therefore you had discontinued

19    the numbering of Dialogo Bilingue and started a

20    new numbering system for El Dialogo, is that

21    right?

22         A.     Yes.
```

Santiago.txt

23        Q.      With respect to the people that

24    worked for the newspaper at that time, those

                                                    132


1    people are accurately set forth on I believe the

2    second or third page of Exhibit 27?

3         A.      Yes.

4                 MR. BREWSTER:  And why don't we

5         take a break.

6                 VIDEOGRAPHER:  The time is now 1:00

7         p.m. and we are off the record.

8

9                 (A lunch break was taken)

10

11                VIDEOGRAPHER:  The time is now 1:42

12        p.m. and we are back on the record.

13        Q.      (By Mr. Brewster)  Miss Santiago,

14    I'm going to show you what has been marked as

15    Exhibit 28 in this case.  Exhibit 28 is an email

16    that is dated July 26, 2004.  It's from you to

17    Mr. Pike.  It has an earlier email in which you

18    were providing an El Dialogo update.  Do you

19    see?

20        A.      Uh-huh.  Yes. Sorry.

21        Q.      And with respect to this, as of

22    July 22, 2004 you had provided and sort of

23    updated the current status of Dialogo LLC

24    including the first two editions of the paper,

                                                    133


1    is that right?

2         A.      Yes.

3         Q.      With respect to these new

                    Page 107

Santiago.txt

20      A.      To learn more about the business,

21   to -- It's like I'm a therapist so I go to

22   training to learn more about the business.  And

23   I understood it was my responsibility to

24   continue learning about the business and to see

                                              142

1    how it runs.  But nothing to partner or anything

2    like that, you know.  I didn't have that in

3    mind.

4       Q.      Okay.  So therefore the purpose of

5    going to Florida was to learn more about the

6    publishing business, is that right?

7       A.      Yes.  To learn how they work with

8    the sales, what are the percentage, how to, you

9    know, to learn more about the business.

10      Q.      With respect to Exhibit 31, there

11   is nowhere in there that indicates that you are

12   saying to Mr. Pike that he was not satisfying

13   his obligations under the venture agreement or

14   operating agreement, is that right?

15      A.      No.  It says what it says.

16      Q.      Showing you what has been marked

17   as Exhibit 32.

18              Now at this time in approximately

19   August of 2004 what is your business

20   relationship with Mr. Pike?

21      A.      Can you repeat that?

22      Q.      In August of 2004 what is your

23   business relationship with Mr. Pike?  Is it a

24   good relationship?  Is it a bad relationship?

                                              143

Santiago.txt

1    Is it going well?  Is it not going well?

2         A.     It was a tense relationship.

3         Q.     It was tense in August of 2004?

4         A.     Yes.

5         Q.     Why was it tense?

6         A.     Because he wasn't responding to my

7    needs.  He wasn't communicating.  I would call

8    him. I would have conversation with him and he

9    would ignore my questions.  His input was very

10   minimal, and it was a tense relationship.

11        Q.     When you say his input was very

12   minimal, his input to into editorial comments?

13        A.     No.  The understanding was Mr. Pike

14   doesn't know anything about newspaper editing or

15   anything like that.  That's very clear.

16               My understanding of it was was he

17   was going to be an investor and he was going to

18   give me $50,000 so I can put this newspaper on

19   the map.  That's all.  And by August it was very

20   clear that was not his intention.

21        Q.     With respect to again any written

22   documentation, is there any written

23   documentation that went from you to Mr. Pike

24   reflecting his obligation to invest $50,000 into

                                              144

1    the business?

2         A.     I was understanding from that

3    operation agreement that that was his intention.

4         Q.     But what I'm saying is after the

5    operating agreement was entered into, was there

6    any email letter that goes from you to Mr. Pike
                   Page 116

Santiago.txt

```
 7   reflects that he is in breach or he is not
 8   living up to his obligation to invest $50,000?
 9        A.    We have plenty of conversations
10   over the phone.
11             MR. MINOFF:  Can she look through
12        perhaps to refresh her recollection some
13        of the correspondence that's been produced
14        to you because just for the record, I know
15        we are on video but for the paper record,
16        all she has in front of her is the
17        Exhibits.
18        Q.    (By Mr. Brewster)  I'm going to
19   just ask you as you sit here right now, do you
20   have can you name any letter or email that goes
21   from you to Mr. Pike after June 9 of 2004
22   stating that he has not satisfied his obligation
23   to invest $50,000 in the business?
24        A.    I sent him emails about the fact
```

                                          145

```
 1   that he was not responding to the financial
 2   obligation.  I don't have copies of those
 3   emails, some of them but I did plenty of time.
 4   And when he came here, I talked to him directly
 5   about that, yes.
 6        Q.    This is what I'm trying to get at.
 7             I'm really trying to get at those
 8   documents that reflect his failure to invest the
 9   $50,000 in the business and that you, by letter
10   or email, holding him to that obligation?
11        A.    By letter or email?
12             MR. MINOFF:  Can I show her this?
```
                    Page 117

Santiago.txt

13      Or can I show her the stack of emails and

14      letters that we produced to you in this

15      case going between Mr. Pike --

16              MR. BREWSTER:  No.  I'm asking

17      her --

18              MR. MINOFF:  You want to know if

19      she remembers without looking?

20              MR. BREWSTER:  That's correct.

21              MR. MINOFF:  I think she has

22      answered that.

23              MR. BREWSTER:  I'm not sure she

24      has.

                                            146

1               THE WITNESS:  Yes, I had.

2       Q.      (By Mr. Brewster)  With respect --

3  Let me ask you the question one more time.

4  It's very specific.

5               It goes to one, Mr. Pike's

6  investment of $50,000.  You stated that you

7  believe that he was obligated to invest $50,000

8  in capital up front in the business.  And I'm

9  asking you whether as you sit here, can you

10  recall any email or letter that reflects that

11  Mr. Pike --

12      A.      No, I cannot recall.

13      Q.      -- Mr. Pike has failed to invest

14  his $50,000?

15      A.      I cannot recall.

16      Q.      With respect to Exhibit 32,

17  Exhibit 32 is an email from Mr. Pike to you.

18  It's dated August 17, 2004.  And this email

                    Page 118

Santiago.txt

19    reflects -- first your imbedded email says that

20    you need an ID number for Dialogo LLC.  Is that

21    right?

22         A.    Yes.

23         Q.    And you actually say, "we can't use

24    the ID number for the last corporation of

                                              147

1    Dialogo Bilingue."  Is that right?

2         A.    Yes.

3         Q.    So therefore these accounts were

4    essentially accounts of the new business, is

5    that right?

6         A.    Yes.

7         Q.    And with respect to this, you

8    didn't mention anywhere in this email of August

9    17 of Mr. Pike's failure to invest the money in

10    the business, did you?

11         A.    Say that again.

12         Q.    On August 17 in this particular

13    email you did not state that he had failed to

14    invest any money in the business in this

15    particular communication, did you?

16         A.    No.

17         Q.    At this time is Dialogo LLC

18    failing to pay its bills?  That's August of

19    2004?

20         A.    It's paying bills late.

21         Q.    But they are paying their bills, is

22    that right?

23         A.    They are paying the bills.

24         Q.    So the obligations as of August

                        Page 119

Santiago.txt

20      A.      Excuse me?

21      Q.      You needed Mr. Pike's assent to

22  hire a new employee, is that right?  You needed

23  Mr. Pike's agreement before you were going to

24  hire a new employee?

                                        163

1       A.      A new consultant, yes.

2       Q.      So your understanding of Mr. Sole

3   was as a new consultant or employee?

4       A.      Consultant.

5       Q.      At a certain point in December you

6   met and had dinner with Mr. Pike, didn't you?

7       A.      Yes.

8       Q.      And this was sometime immediately

9   before or maybe a week or so before Christmas,

10  is that right?

11      A.      Yes.  My husband was present also.

12      Q.      I'm sorry?

13      A.      My husband was at that dinner also.

14      Q.      Where was that dinner?

15      A.      Yankee Pedlar.

16      Q.      Yankee Pedlar.  Okay.  That's in

17  Amherst?

18      A.      No.  That's in Holyoke.

19  Northampton Street.

20      Q.      And it was you and Hector and Mr.

21  Pike, is that right?

22      A.      Yes.

23      Q.      Now at that dinner you gave Mr.

24  Pike a copy of financial statements of Dialogo

                                        164

Page 132

Santiago.txt

1    LLC?

2         A.    Yes.

3         Q.    Which reflected the financial

4    statement and financial condition of the company

5    from --

6         A.    I should --

7              MR. MINOFF:  Let him finish the

8         question.

9              THE WITNESS:  No.  No.  It was not

10        at the dinner that I gave him the papers.

11        I gave him before at the office.

12        Q.    (By Mr. Brewster)  Okay.

13   Immediately before dinner you gave him a copy of

14   the financial statements?

15        A.    Yes.

16        Q.    So maybe an hour or so before

17   dinner?

18        A.     Approximately.

19        Q.    And these were the financial

20   statements of the business from July 1, 2004 to

21   December 13, 2004, is that right?

22        A.    Yes.

23        Q.    And how were those documents

24   prepared?

                                        165

1         A.    It was prepared by the bookkeeper.

2    The same person.  Tracy Learned.

3         Q.    And you had asked her to print out

4    a copy of the general ledger and P and L, profit

5    and loss statement of the business up to

6    December 13, is that right?

                    Page 133

Santiago.txt

```
 7        A.      Yes.
 8        Q.      Did you review those documents
 9  before you gave it to Mr. Pike?
10        A.      Briefly.  I just agree briefly.
11        Q.      Was it your understanding that
12  those documents were accurate?
13        A.      To the best of my knowledge, yes.
14        Q.      You didn't have any reason to
15  believe that they weren't accurate, did you?
16        A.      Afterward I found they were not
17  accurate.
18        Q.      After you gave the documents to Mr.
19  Pike?
20        A.      Yes.
21        Q.      How did you discover the documents
22  were not accurate?
23        A.      Because when I was looking at the
24  revenue I said I haven't made, you know, I'm
```

166

```
 1  very clear of what I have made and what the
 2  revenue is in the company, especially because I
 3  do the Excel separate.  And I account for every
 4  single ad that comes in.  So I run my Excel.
 5  And when I compare my Excel to that, I say wait
 6  a minute.  These are duplicates.  So that's when
 7  I realize when I go back to Dialogo Bilingue and
 8  all that that this is wrong, the way is wrong.
 9        Q.      When did you discover that the
10  financial statements of Dialogo LLC and Dialogo
11  Bilingue were inaccurate?
12        A.      Sometime in January.  This past
```
                         Page 134

Santiago.txt

169

1       A.      Yes.

2       Q.      And including exclusive control

3   over the financial reporting part of the

4   business, is that right?

5       A.      Yes.

6       Q.      And exclusive control over the

7   finances of the business, is that right?

8       A.      Yes.

9       Q.      And exclusive control of the

10  dissemination of information about the financial

11  condition of the business?

12      A.      Yes.

13      Q.      And with respect to, I'm going to

14  show you what has been marked as Exhibit 36 in

15  this case.  Exhibit 36 is this is a copy of

16  those financial statements that you gave -- I'm

17  going to ask you not to write on the Exhibit.

18      A.      I'm sorry.

19      Q.      Is that, with respect to Exhibit

20  36, we can explain it.  I'm just going to ask

21  you not to write on it because --

22          MR. MINOFF:  Do you want to switch

23      with this one?  It's still clean.

24      Q.      (By Mr. Brewster)  With respect to

170

1   Exhibit 36, this is a the document that you gave

2   to Mr. Pike in December of 2004, is that right?

3       A.      Yes.

4       Q.      And this is the document that was

Page 137

Santiago.txt

17    A.     That's correct.

18    Q.     What is the right number?

19    A.     The right number is the twenty-six

20  I believe.  I could be wrong too but.

21           MR. BREWSTER:  Why won't we take a

22      short break.

23           VIDEOGRAPHER:  The time is now 2:31

24      p.m. and we are off the record.

                                         173


1

2           (A break was taken)

3

4           VIDEOGRAPHER:  Back on the record.

5      The time is now 2:38 p.m. and we are back

6      on the record.

7    Q.     (By Mr. Brewster)  Miss Santiago,

8  I'm showing a document to you which has been

9  marked Exhibit 38.  This is again financial

10  statements of Dialogo LLC.  They are printed off

11  on January 24, 2005.  They are the financials of

12  the company from July through December 2004.

13           With respect to this document again

14  this document reflects the same errors that was

15  reflected in Exhibit 37 as well as Exhibit 36,

16  is that right?

17    A.     The profit loss detail it seems

18  like it.

19    Q.     If you look to page eight of the

20  document which reflects a net income of the

21  business of $36,000 on page eight?

22    A.     From July to December.

                    Page 140

Santiago.txt
23          MR. MINOFF:   Is there a question
24      about that?

174

1          MR. BREWSTER:   Yes.
2      Q.    (By Mr. Brewster)   And my question
3   is is that net income is inaccurate, is that
4   your testimony?
5      A.    To be honest, I do not know.
6      Q.    So as you sit here right now, you
7   are not sure whether or not the business did
8   have a $36,000 net income as of July through
9   December of 2004?
10      A.    It's seem accurate.
11      A.    It seems.
12      Q.    It seems accurate?
13      A.    It seems but.
14      Q.    So again, just so I can get it, is
15   that for that time period that six month time
16   period from July 1, 2004 to December 31, 2004,
17   the company showed a $36,000 net income?
18      A.    According to this paper, yes.
19      Q.    Well, again, is that you were
20   essentially the president or CEO of the company,
21   is that right?
22      A.    I was not president or CEO of the
23   company.
24      Q.    But you were essentially in

175

1   control --
2      A.    I was the managing person there.
3      Q.    And as you sit here right now, you
Page 141

Santiago.txt
```
17      A.      No.  He didn't want to sign the
18  non-compete.  That was the issue.  Mr. Pike did
19  not want to go forward if he did not sign he
20  non-compete.  And Sole didn't want to go forward
21  because he felt that he had a bad experience
22  before with another employer, and he didn't want
23  to sign that.  And I'm just asking Gerry not to
24  make a big deal out of that.  That's what I
```
                                                    215

```
 1  know.  This is what I am talking about.  I said
 2  I don't see why you feel that way.
 3      Q.      With respect to this as you said in
 4  the last paragraph, "I do not want this to
 5  become an issue and want to continue in this
 6  positive trend"?
 7      A.      Yes.
 8      Q.      So it was essentially as you see
 9  things in February 3, 2005 the company was on a
10  positive trend?
11      A.      The relationship between Sole and
12  Dialogo LLC I said it as a positive step.  The
13  company was in a lot of trouble, and I was
14  desperately asking Gerry to help me at least
15  with this.  He had failed with all the rest.
16      Q.      Let's take a look at that only
17  because in a few paragraphs earlier you said the
18  newspaper is in an incredible moment to grow.
19      A.      That's right.
20      Q.      That's the newspaper as a whole and
21  the business as a whole.  That's what you are
22  referring to?
```
                        Page 174

# ATTACHMENT A

# Santiago Bauzá Transcript

# pp. 175 - 226

Santiago.txt

23       A.      In bringing Mr. Sole in.    In

24    bringing Mr. Sole in it was a great opportunity

216

1    for us to grow.

2        Q.      I show you what has been marked as

3    Exhibit 49 in the case.  Exhibit 49 is an email

4    from Mr. Pike to you dated February 3, 2005.

5    Again this is continues the dialogue, the Is

6    email conversation that you had with Mr. Pike

7    about Mr. Sole's employment with the company, is

8    that right?

9        A.      Yes.

10       Q.      And about the necessity of working

11   out any differences or issues with respect to

12   his employment, is that right?

13       A.      Yes.

14       Q.      And this document, Exhibit 49, is a

15   true and correct copy of your email exchange

16   with Mr. Pike as of February 3, 2005?

17       A.      Yes.

18       Q.      And again with respect to this

19   documents, as of February 2 or 3 of 2005 you are

20   not telling Mr. Pike that he has no longer, has

21   not satisfied his obligations under the

22   operating agreement, is that right?

23       A.      Yes.

24       Q.      I'm going to show you what has been

217

1    marked as Exhibit 50 in the case.  Exhibit 50 is

2    an email from Mr. Pike to Mr. Sole and you.

3    It's dated February 8, 2005.  This is a document

Page 175

Santiago.txt

1    terms were $250 a month, is that right?

2       A.    Yes.

3       Q.    And how large is this space?

4       A.    It's a small space.  It really is

5    not that big.  It says --

6             MR. MINOFF:  Six hundred square

7        feet.

8             THE WITNESS:  Six hundred.

9       Q.    (By Mr. Brewster)  How large was

10   your other space?

11      A.    That space wasn't mine.  That space

12   is my husband.

13      Q.    My question is is how much space

14   did you have in your other space at Open Square?

15      A.    I had, well, the office I think was

16   twelve hundred square feet, but I only had like

17   an alley of the extent of the office.

18      Q.    So therefore this space is

19   approximately half the size of the other space?

20      A.    Yes.

21      Q.    And the rent on the old space was

22   roughly $1250 or $1230 per month?

23      A.    $615.

24      Q.    $615 for --

                                           249


1       A.    For my part.

2       Q.    For your part?

3             And it was another $615 for

4    Eventos?

5       A.    I don't know what they pay.

6       Q.    I'm going to show you what has

                    Page 201

Santiago.txt

7   been marked as Exhibit 60 in this case.  Exhibit

8   60 is an email from Mr. Pike to Mr. Sole and

9   you.  It's dated Sunday, February 20, 2005.

10  Do you see that?

11      A.    Yes.

12      Q.    Did you see this email as of

13  February 20, 2005?

14      A.    Yes.

15      Q.    So as of this email, that is

16  February 20, you knew that Mr. Pike had been

17  hospitalized and had health issues at the time?

18      A.    That's what he says there, yes.

19      Q.    And he was pretty much out of

20  commission during this period of time, is that

21  right?

22      A.    I don't know.

23      Q.    But you saw this email about

24  February 20, is that right?

                                            250

1       A.    Yes.

2       Q.    And at that time you still hadn't

3   sent the letter to him, is that right?

4       A.    The reason I didn't send the letter

5   to his is I didn't know Mr. Pike's address.  I

6   didn't know Mr. Pike's address.  I had to call

7   Carmen to get her address.  I didn't know where

8   to send him.  Most of our information come back

9   and forth from, you know, via email, and it took

10  me a few days to get his address. That was the

11  reason.

12      Q.    why didn't you send it by email?
                    Page 202

Santiago.txt
20          The performance of his duties was

21   for the company Dialogo LLC.  It wasn't for

22   DMSA, is that right?

23          A.    Yes.

24          Q.    And meaning DMSA was not hiring him

                                                    268


1    to do this work.  It was the paper that was

2    hiring him to do this work?

3          A.    Yes.

4          Q.    And with respect to when he states

5    here "the company owes me $3000 and after

6    repeated attempts to collect my fees from Mr.

7    Gerry Pike he seems unwilling to pay me."

8                Do you know what he is referring

9    to there?

10         A.    No.  I can say to you that he

11   called Mr. Pike several times to collect and he

12   wasn't too successful.

13         Q.    Now Mr. Sole was also aware that

14   with respect to the company that Dialogo LLC was

15   being closed down, is that right, and El Dialogo

16   LLC was being started?

17               MR. MINOFF:  Objection to the form

18   of the question.

19               THE WITNESS:  He didn't know that

20   El Dialogo LLC was started.  I didn't consult

21   that with anyone.  I just did that on my own.  I

22   didn't consult that with him.  Why should I?  He

23   was leaving.

24         Q.    (By Mr. Brewster)  I thought you

                                                    269

                     Page 217

Santiago.txt

1  just testified that you had stated that Gabriela

2  Romero had suggested that you do this?

3       A.    The seven months that I was there.

4       Q.    Yes.  And so therefore she was

5  aware that, based on your testimony, that you

6  were moving out of Dialogo LLC and into El

7  Dialogo LLC?

8       A.    Yes.

9       Q.    And therefore my question is

10  whether Mr. Sole also knew that you were moving

11  out of Dialogo LLC and into el Dialogo LLC?

12       A.    He knew I was going to move.  I

13  didn't talk details with him.

14       Q.    He knew you were going to move?

15       A.    That I was going to move.

16       Q.    And that you were moving into new

17  space and starting under a new corporate form.

18       A.    That I was moving into the new

19  space.  I don't know how much he knew about the

20  new corporate thing.

21       Q.    I want to show you what's been

22  marked as Exhibit 65.  I want to show you what's

23  been marked as Exhibit 66.

24            Now Exhibit 65 and Exhibit 66 are

                                        270

1  documents with respect to the creation of the

2  new entity, El Dialogo LLC, is that right?

3       A.    Yes.

4       Q.    With respects to Exhibit 65, that's

5  your signature on the second page, is that

6  right?

                    Page 218

Santiago.txt

```
 7        A.      Yes.

 8        Q.      And that indicates that you are

 9  creating an entity, El Dialogo LLC, and it's

10  address is 4 Open Square, suite 120 in Holyoke?

11        A.      Yes.

12        Q.      Now with respect to this business

13  you signed this document on March 30, 2005?

14        A.      Yes.

15        Q.      And Mr. Greenhut helped you with

16  respect to the preparation of this document?

17        A.      Yes.

18        Q.      Before you wrote the letter dated

19  February 17, 2005 to Mr. Pike, did you consult

20  with Mr. Greenhut?

21        A.      Yes.  I went to my lawyer, yes.

22        Q.      So after before you sent that or

23  before you drafted it you went to Mr. Greenhut

24  to consult with him with respect to that?
```
                                              271

```
 1        A.      Yes.

 2        Q.      Did you show him the operating

 3  agreement and the venture agreement?

 4        A.      He had seen that seven months

 5  prior.  He had seen it.

 6        Q.      So he previously examined the

 7  operating agreement and the venture agreement?

 8        A.      Yes.

 9        Q.      And he previously seen it when you

10  had consulted with him?

11        A.      Yes.

12        Q.      And you had consulted with him
```
                      Page 219

Santiago.txt

13    before you entered and signed the document, is

14    that right?

15        A.    No.

16        Q.    After you signed the documents?

17        A.    Yes.

18        Q.    And you showed it to him for the

19    purposes of this is the new entity that I'm in,

20    is that right?

21        A.    I was also feeling very

22    uncomfortable with --

23            MR. MINOFF:  Objection.  We are

24        getting into the attorney client

                                              272

1        privilege.

2        Q.    (By Mr. Brewster)  Now with respect

3    to Exhibit 66.  This is the operating agreement

4    of El Dialogo LLC, is that right?

5            I'm going to have you look at the

6    last page of this document.  That's your

7    signature?

8        A.    Yes.

9        Q.    With respect to these two

10    documents you indicate her as Lillian Santiago

11    and not Lillian Santiago Bauza.  Is there a

12    reason for that?

13        A.    No.  There was no reason.  I

14    usually don't use Bauza.

15            If you know about culture, we in

16    Puerto Rico don't use, I don't make an addendum

17    of my husband's last name.  We women don't use

18    the last name of our husband.  I have a father.

                    Page 220

Santiago.txt

19    I use always use Santiago.  That's a cultural

20    thing.  So when I sign, you know, I usually, I

21    can use Santiago.  I can use Bauza.  There is no

22    particular reason for this.

23         Q.    Again the operating agreement and

24    venture agreement were signed as Lillian

                                                    273


1    Santiago Bauza?

2         A.    Yes.

3         Q.    With respect to this, you are the

4    only member of El Dialogo LLC?

5         A.    Yes.

6         Q.    Hector Bauza is not a member, is

7    that right?

8         A.    No.

9         Q.    And again, you worked with Mr.

10    Greenhut with respect to this operating

11    agreement, is that right?

12        A.    Yes.

13        Q.    And you executed it on March 3,

14    2005?

15        A.    That's what it says, yes.

16        Q.    I'm going to show you what has

17    been marked as Exhibit 67.  Exhibit 67 is the

18    check book register of El Dialogo LLC, is that

19    right?

20        A.    Yes.

21        Q.    And this is again the check book

22    register of the new entity, is that right?

23        A.    Yes.

24        Q.    And this reflects a check to Mr.

                        Page 221

Santiago.txt

10    of --

11         Q.     And with respect to that, Mr. Soto,

12    who is Mr. Soto?

13         A.     He is a person who works there at

14    the Secretary of State office here in

15    Springfield.

16         Q.     Where is that address?

17         A.     That's here in Dwight Street.

18         Q.     The Secretary of State's office?

19         A.     Yes.  The branch of Springfield.

20    They have a, right on the corner of Lyman and

21    Dwight.

22         Q.     So he is, Mr. Soto is an employee

23    of the Commonwealth of Massachusetts here in

24    Springfield?

                                            282


1          A.     Yes.

2          Q.     With respect to there application

3    I'm going to have you refer to the second page

4    of Exhibit 70, paragraph nine, where it says

5    "date of first use of mark by applicant or

6    predecessor.  If first use of mark was in

7    Massachusetts use the same date in both A and

8    B."

9                 There you indicated that the first

10   use of this mark, El Dialogo, was July 1, 2004?

11         A.     Yes.

12         Q.     And you wrote that?

13         A.     Yes.

14         Q.     Now in paragraph ten the

15   application asks you "if either of the above

                         Page 228

Santiago.txt

16    first uses was by a predecessor of the

17    applicant, state which use or uses were by a

18    predecessor and identify that predecessor."

19              Do you see that?

20    A.    Yes.

21    Q.    And you didn't identify any

22    predecessor, did you?

23    A.    No.

24    Q.    The first use of this mark was by

283

1    Dialogo LLC, isn't that right?

2    A.    Yes.  And done by me, yes.

3    Q.    But it was under the corporate

4    umbrella of Dialogo LLC?

5    A.    That's debatable.  That's my name.

6    That's the name that I brought.  That's my name.

7    That's what I named the newspaper.  The

8    organization is Dialogo LLC, but the name of the

9    newspaper is El Dialogo and that's my name.  I

10   created that name back in 2003.

11              Manuel wanted Dialogo Bilingue, but

12   I always wanted El Dialogo.  And that was my

13   name that I put there.

14   Q.    With respect to that Dialogo --

15   strike that.

16              Well, if that were the case, you

17   didn't indicate that the first use of this mark

18   was by you, did you?

19   A.    You are absolutely correct, I

20   didn't.

21   Q.    You didn't say that Lillian

Page 229

Santiago.txt

22    Santiago Bauza was the first on to use that
23    mark?
24         A.    I didn't say it.

                                              284

1              MR. MINOFF:  How are we doing?
2              MR. BREWSTER: Pretty good.  I just
3         want to take a couple of minutes because I
4         have run out of exhibit stickers.
5              VIDEOGRAPHER:  The time is now 5:07
6         p.m. and we are off the record.
7
8              (A break was taken)
9
10             VIDEOGRAPHER:  Back on record.
11        The time is now 5:10 p.m. and we are back
12             on the record.
13        Q.    (By Mr. Brewster)  Miss Santiago,
14    I'm going to now show you what I have marked as
15    Exhibit 71 which is an invoice Verizon and it's
16    dated March 16, 2005.  Do you see that?
17        A.    Yes.
18        Q.    And now this invoice was issued to
19    Dialogo Bilingue.  Do you see that?
20        A.    Yes.
21        Q.    However there are seemingly new
22    charges on this as of March 16, 2005?
23        A.    Yes.
24        Q.    And was this in fact an obligation

                                              285

1    of Dialogo LLC or El Dialogo?

                    Page 230

Santiago.txt

17        A.      This and my word that she is going

18   to get it back.

19        Q.      I'm going to show you what has

20   been marked as Exhibit 69.  Exhibit 69 is a

21   invoice dated March 11, 2005 from Mr. Sole to El

22   Dialogo at 4 Open Square, in which it says

23   marketing services $2000.

24              We previously talked about the

                                                    278

1    check to Mr. Sole that was given to him on March

2    11.  Is this the Sole -- strike that.

3              Is this the invoice that he

4    presented to you at that time?

5         A.      Yes.

6         Q.      Does this represent his services of

7    Dialogo LLC or El Dialogo LLC?

8         A.      He never work for El Dialogo LLC.

9    This represent January 16 or 17 to February 28.

10   It was $3000, but he, you know, this is all I

11   could pay him.

12        Q.      Are you --

13              MR. MINOFF:  I think she may have

14        misspoke just now.  You said he never

15        worked for Dialogo LLC or El Dialogo LLC?

16              THE WITNESS:  El Dialogo LLC.  He

17        never work for my new company.

18        Q.      (By Mr. Brewster)  I'm going to

19   show you what's been marked as Exhibit 70 in the

20   case.  Exhibit 70 is a document from the

21   Commonwealth of Massachusetts.  It states El

22   Dialogo in the right-hand corner.  This contains

                        Page 225

Santiago.txt
23    the application for registration of a trade
24    mark.

                                                279

1              I'm going to have you turn to the
2    second page of this document.  That's your
3    signature on this document, is that right?
4         A.    Yes.
5         Q.    And this was your application that
6    you submitted to the Commonwealth of
7    Massachusetts with respect to the registration
8    of the trade mark El Dialogo?
9         A.    Yes.
10        Q.    And you submitted that to the
11   Commonwealth of Massachusetts or about March 11,
12   2005?
13        A.    Yes.
14        Q.    Did you do this with the assistance
15   of your Counsel, Mr. Greenhut?
16        A.    No, not really.
17        Q.    You were aware that one of the
18   things that you needed to do was register the
19   trade mark El Dialogo, is that right?
20        A.    Yes.
21        Q.    When did you become aware that you
22   should register the trade mark El Dialogo?
23        A.    I always feel that I wanted to
24   register the El Dialogo because it's the name

                                                280

1    that I put together.  I research it.  I research
2    several states and I decided that it's time to
3    do it.
                        Page 226

# ATTACHMENT B

# Santiago Bauzá Deposition Exhibits

# Exhibits 1, 2, 5 and 10

D

# The Commonwealth of Massachusetts

SEP 1 8 2003

**William Francis Galvin**
Secretary of the Commonwealth
One Ashburton Place, Boston, Massachusetts 02108-1512

## ARTICLES OF ORGANIZATION
(General Laws, Chapter 156B)

**COPY**

### ARTICLE I
The exact name of the corporation is:

Dialogo bilingue , Inc.

### ARTICLE II
The purpose of the corporation is to engage in the following business activities:

The purpose of the corporation is to transact any and all lawful business for which corporations may be incorporated under the Massachusetts General Corporation Act. Dialogo bilingue is a bilingual/multicultural newspaper with a mission to inform the Latino/a on diverse topic to encourage community involvement. The newspaper is also a vehicle for businesses to promote their product (s). Dialogo bilingue, may do writings of all types, including printing, publishing, distributing, etc., and take advantage of any and all opportunities, ventures and spin-offs that are legally available.

SECRETARY OF STATE
RECEIVED
03 SEP 17 PM 2: 04
CORPORATIONS DIVISION

EXHIBIT

**COPY**

## ARTICLE III

State the total number of shares and par value, if any, of each class of stock which the corporation is authorized to issue.

| WITHOUT PAR VALUE | | WITH PAR VALUE | | |
|---|---|---|---|---|
| TYPE | NUMBER OF SHARES | TYPE | NUMBER OF SHARES | PAR VALUE |
| Common: | 100 | Common: | | |
| | | | | |
| Preferred: | | Preferred: | | |
| | | | | |

## ARTICLE IV

If more than one class of stock is authorized, state a distinguishing designation for each class. Prior to the issuance of any shares of a class, if shares of another class are outstanding, the corporation must provide a description of the preferences, voting powers, qualifications, and special or relative rights or privileges of that class and of each other class of which shares are outstanding and of each series then established within any class.

NONE

## ARTICLE V

The restrictions, if any, imposed by the Articles of Organization upon the transfer of shares of stock of any class are:

SEE ATTACHED

## ARTICLE VI

**Other lawful provisions, if any, for the conduct and regulation of the business and affairs of the corporation, for its voluntary dissolution, or for limiting, defining, or regulating the powers of the corporation, or of its directors or stockholders, or of any class of stockholders:

1. The directors may make, amend or repeal the by-laws in whole or in part except with respect to any provision thereof which by law or by the by-laws requires action of the stockholders. 2. Meetings of the stockholders may be held anywhere in the United States. 3. The corporation may be a partner in any business enterprise that it would have power to conduct itself; 4. The directors may from time to time fix their compensation.

**If there are no provisions state "None".
*Note: The preceding six (6) articles are considered to be permanent and may ONLY be changed by filing appropriate Articles of Amendment.*



# ARTICLE V

Each share of common stock of the corporation is subject to the requirements and restrictions upon the transfer of such shares as hereinafter set forth, which shall be binding upon each shareholder and his or her heirs, assigns, executors, administrators or other legal representatives.

Any stockholder, before transferring any of his or her share of common stock by sale or otherwise, shall first give written notice thereof to the corporation through the Board of Directors, stating the nature of the proposed transfer, the name of the proposed transferee and the consideration to be received, if any, and shall at the same time offer in writing to sell such shares to the corporation at the book value thereof as hereinafter defined or, in the case of a sale, at the price which he or she has been offered if lower than the book value. Book value shall be the book value at the end of the corporate fiscal year next prior to the time of said offer and shall be determined by the accountant then servicing the corporation, using the customary accounting methods of the corporation.

The corporation shall have thirty days from the receipt of such offer to accept it or reject it and if such offer is not accepted within said thirty days, it shall be deemed to be rejected. If such offer shall be accepted as above, then the shares so offered shall be sold and transferred to the corporation or its nominee and the selling stockholder shall be paid the price determined in the manner set forth herein.

If at the end of said thirty days the directors shall not have exercised their right to purchase, then the stockholder owning the most shares of the common stock of the corporation, other than the transferring stockholder, shall have the same right as the corporation for an additional thirty days to purchase the stock of such transferring stockholder upon the same terms and conditions, including price, as contained in these restrictions in favor of the corporation.

If at the end of said sixty day period neither the directors of the corporation nor the largest stockholder, other then the transferring stockholder, shall have exercised their right to purchase then the owner may transfer the stock in the manner and to the person described in the written notice of the stockholder to the Board of Directors.

THE COMMONWEALTH OF MASSACHUSETTS

## ARTICLES OF ORGANIZATION
### (General Laws, Chapter 156B)



I hereby certify that, upon examination of these Articles of Organization, duly submitted to me, it appears that the provisions of the General Laws relative to the organization of corporations have been complied with, and I hereby approve said articles; and the filing fee in the amount of $ _____ having been paid, said articles are deemed to have been filed with me this _____ day of _____ 20 _____ .


*Effective date:* _____


### WILLIAM FRANCIS GALVIN
*Secretary of the Commonwealth*


**FILING FEE:** One tenth of one percent of the total authorized capital stock, but not less than $275.00. For the purpose of filing, shares of stock with a par value less than $1.00, or no par stock, shall be deemed to have a par value of $1.00 per share.


### TO BE FILLED IN BY CORPORATION
### Contact information:

ARNOLD GREENHUT, ESQ.
_____

244 BRIDGE STREET
_____

SPRINGFIELD,MA 01103
_____

Telephone: 1-413-785-1504
_____

Email: _____

A copy this filing will be available on-line at www.state.ma.us/sec/cor once the document is filed.



# MINUTES OF ORGANIZATIONAL MEETING OF THE

## BOARD OF DIRECTORS OF

### DIALOGO BILINGUE

#### HELD: September 3, 2003

The first meeting of the Board of Directors of the Corporation was held on the above date at the office of Attorney Arnold Greenhut, at 244 Bridge Street, Springfield, MA 01103, at a call of a majority of the Board.

The Directors were present, being:

        HECTOR A. BAUZA
        LILLIAN SANTIAGO-BAUZA
        DR. MANUEL J. FRAU
        INGRID ESTRANY-FRAU

The meeting was called to order and was elected President and Hector A. Bauza was elected Secretary of the meeting.

The President stated that the purpose of the meeting was to take all steps necessary to complete the organization of the Corporation to enable the Corporation to commence business. The President proposed the adoption of resolutions to effectuate these purposes. After full consideration the annexed resolutions were adopted.

For the purposes of the records, it was reported that the Certificate of Incorporation is to be filed in the Secretary of State's Office immediately following the meeting.

There being no further business presented, the meeting was adjourned.

DATED:

9-3-03

_____
LILLIAN SANTIAGO-BAUZA, Clerk





# MINUTES OF FIRST MEETING OF SHAREHOLDERS OF

## DIALOGO BILINGUE

### HELD: September 3, 2003

A meeting of the Shareholders of the Corporation was held on the above date at 11 a.m. at 244 Bridge Street, Springfield, Massachusetts 01103.

The following persons, constituting a quorum, was present in person or by proxy:

HECTOR A. BAUZA
LILLIAN SANTIAGO-BAUZA
DR. MANUEL J. FRAU
INGRID ESTRANY-FRAU

The President presided as chairman of the meeting and the secretary recorded the minutes of the meeting.

The President reported on the organization of the Corporation, noting that the Board had adopted by-laws, elected officers and determined to undertake certain activities.

Upon motion duly made and seconded, the Shareholders unanimously ratified and approved all actions taken by the Board and incorporators.

The next order of business to be considered was the election of Directors. The President stated that the Corporation's by-laws provided for the Director. The following were thereupon nominated and unanimously elected as Director to hold office until the next annual meeting of Shareholders and until the successor shall have been elected and qualified:

HECTOR A. BAUZA
LILLIAN SANTIAGO-BAUZA
DR. MANUEL J. FRAU
INGRID ESTRAY-FRAU

There being no further business presented, the meeting was adjourned.

LILLIAN SANTIAGO-BAUZA, Clerk

The UNDERSIGNED, being the majority Shareholders of the Corporation, acknowledge that they attended the foregoing meeting without protest of absence of notice and that the foregoing minutes accurately reflect the actions taken at that meeting.

DATED: 9/3/03

HECTOR A. BAUZA, Shareholder

DATED: 9/3/03

LILLIAN SANTIAGO-BAUZA, Shareholder

DATED: 9/3/03

DR. MANUEL J. FRAU, Shareholder

DATED: 9/3/03

INGRID ESTRANY-FRAU, Shareholder

# CONSENT TO ACTION
## OF THE BOARD OF DIRECTORS OF

### DIALOGO BILINGUE

The Board of Directors have determined that in order to attract investment in the Corporation, the Corporation shall be organized and managed so that it is a "Small Business Corporation" as defined in IRC Sec. 1244 (c)(1), as amended, and so that the shares issued by the Corporation are "Section 1244 Stock" as defined in IRC Sec. 1244 (c)(1), as amended. Compliance with this section will enable shareholders to treat the loss on the sale or exchange of their shares as an "ordinary loss" on their personal income tax returns.

RESOLVED, that the proper officers of the Corporation are authorized to sell and issue common shares in an aggregate amount of money and other property (as a contribution to capital and as paid in surplus), which together with the aggregate amount of common shares outstanding at the time of issuance, does not exceed $1,000,000.00 and

RESOLVED, that the sale and issuance of shares shall be conducted in compliance with IRC Sec. 1244, so that the corporation and its shareholders may obtain the benefits of IRC Sec. 1244, and further

RESOLVED, that the proper officers of the Corporation are directed to maintain such accounting records as are necessary so that any shareholder that experiences a loss on the transfer of common shares of the corporation may determine whether they qualify for "ordinary loss" deduction treatment on their personal income tax returns.

DATED: 9/03/03

_____
HECTOR A. BAUZA

DATED:

_____
LILLIAN SANTIAGO-BAUZA

DATED: 9/3/03

_____
DR. MANUEL J. FRAU

DATED: 9/3/03

_____
INGRID ESTRAY-FRAU

COPY

DIALOGO BILINGUE

## ACTION BY CONSENT INCORPORATORS

The undersigned, intending to act as incorporators and to form a corporation under the Business Corporation Law of the Commonwealth of Massachusetts, hereby consent to the following action and adopt the following votes, in lieu of the first meeting of incorporators:

VOTED:

That the by-laws attached to and made a part of this Consent be and the same hereby are adopted as the by-laws of DIALOGO BILINGUE

VOTED:

That the post office address of the initial principal office of DIALOGO BILINGUE and until changed in accordance with the by-laws, be and it hereby is designated as 101 Cabot Street, Suite 601, Holyoke, Massachusetts 01040.

VOTED:

That the number of Directors, until changed in accordance with the by-laws, be and it hereby is fixed at four (4) and that the following Director and officers be and they hereby are elected, each to hold office in accordance with the by-laws.

|  |  |
|---|---|
| DIRECTOR: | HECTOR A. BAUZA |
| DIRECTOR: | LILLIAN SANTIAGO-BAUZA |
| DIRECTOR: | DR. MANUEL J. FRAU |
| DIRECTOR: | INGRID ESTRANY-FRAU |
| PRESIDENT: | HECTOR A. BAUZA |
| TREASURER: | HECTOR A. BAUZA |
| CLERK: | LILLIAN SANTIAGO-BAUZA |

VOTED:

     That the ARTICLES OF ORGANIZATION attached to and made part of this Consent be executed by the incorporators and submitted to the Secretary of the Commonwealth of Massachusetts for his approval and filing; and that the proper fee be paid in respect hereto.

                           HECTOR A. BAUZA, Incorporator

EUDORA Web Mail

powered by: LYCOS

mfrau@eudoramail.com    LOG OUT    (Not you? click here)

· **Mail Home**

   **MailBox Folders**

   ------------

Compose

Address Book

Options

System Status

## MailBox: Read Mail

REPLY  REPLY ALL  FORWARD  DELETE  –Move to Folder–  ⬍

[ _____ ] [ _____ ]

**Date:** Thu, 17 Apr 2003 16:47:41 -0400
**From:** "RegisterSite.com Support" <support@registersite.com>
        [ _____ ] [ _____ ]
**Subject:** Account for dialogo successfully created!
**To:** "Manuel Frau-Ramos" <mfrau@eudoramail.com>

Text Size: S M L XL

Dear Manuel,

Thank you for creating an account at RegisterSite.com.
We look forward to meeting your domain name services needs.

Your username is: dialogo

You can manage your account and begin registering domain names by logging
in to your control panel at _____. If
you have any problems or questions, feel free to contact our support
team
at _____. We're available 24 hours a day to answer all
your questions.

Sincerely,
RegisterSite.com Support
_____
"High on Service, High on Quality"
------------------------------
*A service of Nitin Networks*

REPLY  REPLY ALL  FORWARD  DELETE  –Move to Folder–  ⬍   Previous  Next

AT&T Wireless

**» Lycos Worldwide** ▌ _____

About Terra Lycos  Help  Jobs  _____  _____

_____  _____  _____

_____  _____



**RegisterSite.com**
Nitin Networks
2 Tamarack Circle
Fishkill, NY 12524
Email: support@registersite.com

**Billed To:**
Manuel Frau-Ramos
Manuel Frau-Ramos
PO Box 572
Amherst, MA 01004-0572

**Date:** 2003-04-17 04:53:02 PM
**Ref. No.:** VEMA25977927
**Username:** dialogo

| Item Description | # Yrs. | Total |
|---|---|---|
| dialogobilingue.com<br>- Premium Plan ($35/yr) | 2 | $70 |
| Subtotal: | | $70 |
| Total: | | $70 |

*Thank you for choosing*
*RegisterSite.com!*

DIALOGO
HOLYOKE 03

Diálogo bilingue

EXHIBIT
10
PENGAD 800-631-6989

5/31/2004

Register: Peoples Bank

From 06/01/2003 through 05/31/2004

Sorted by: Date, Type, Number/Ref

| Date | Number | Payee | Account | Memo | Payment | C | Deposit | Balance |
|------|--------|-------|---------|------|---------|---|---------|---------|
| 06/13/2003 | | deposit | Fee Income | Deposit | | | 100.00 | 100.00 |
| 06/17/2003 | | deposit | Fee Income | Deposit | | | 560.00 | 660.00 |
| 06/20/2003 | | deposit | Fee Income | Deposit | | | 80.00 | 740.00 |
| 06/26/2003 | | deposit | Fee Income | Deposit | | | 560.00 | 1,300.00 |
| 06/26/2003 | | deposit | Fee Income | Deposit | | | 125.00 | 1,425.00 |
| 07/07/2003 | | deposit | Fee Income | Deposit | | | 450.00 | 1,875.00 |
| 07/09/2003 | 102 | Saltus Press | Printing and Reproduct... | | 1,681.00 | | | 194.00 |
| 07/17/2003 | | deposit | Fee Income | Deposit | | | 205.00 | 399.00 |
| 07/24/2003 | | deposit | Fee Income | Deposit | | | 120.00 | 519.00 |
| 07/28/2003 | | Armstrong Photograp... | Photography | | 195.00 | | | 324.00 |
| 07/31/2003 | | service charge | Bank Service Charges | | 10.00 | | | 314.00 |
| 08/07/2003 | | deposit | Fee Income | Deposit | | | 248.00 | 562.00 |
| 08/07/2003 | | insufficient funds cha... | Bank Service Charges | | 20.00 | | | 542.00 |
| 08/11/2003 | | deposit | Fee Income | Deposit | | | 560.00 | 1,102.00 |
| 08/12/2003 | | deposit | Fee Income | Deposit | | | 660.00 | 1,762.00 |
| 08/18/2003 | 141 | Saltus Press | Printing and Reproduct... | | 1,720.40 | | | 41.60 |
| 08/19/2003 | | deposit | Fee Income | Deposit | | | 125.00 | 166.60 |
| 08/21/2003 | | deposit | Fee Income | Deposit | | | 599.00 | 765.60 |
| 08/30/2003 | | service charge | Bank Service Charges | | 10.00 | | | 755.60 |
| 09/05/2003 | 104 | Arnold Greenhut | Professional Fees:Lega... | | 600.00 | | | 155.60 |
| 09/11/2003 | | insufficient funds cha... | Bank Service Charges | | 20.00 | | | 135.60 |
| 09/11/2003 | 105 | Saltus Press | Printing and Reproduct... | | 2,012.85 | | | -1,877.25 |
| 09/15/2003 | | deposit | Fee Income | Deposit | | | 560.00 | -1,317.25 |
| 09/17/2003 | | deposit | Fee Income | Deposit | | | 801.00 | -516.25 |
| 09/18/2003 | | deposit | Fee Income | Deposit | | | 640.00 | 123.75 |
| 09/18/2003 | 143 | ? | Miscellaneous | | 100.00 | | | 23.75 |
| 09/19/2003 | | deposit | Fee Income | Deposit | | | 812.00 | 835.75 |
| 09/23/2003 | | deposit | Fee Income | Deposit | | | 175.00 | 1,010.75 |
| 09/26/2003 | | deposit | Fee Income | Deposit | | | 830.00 | 1,840.75 |
| 09/26/2003 | 106 | Ed Cohen | Photography | | 150.00 | | | 1,690.75 |
| 09/30/2003 | | service charge | Bank Service Charges | | 10.00 | | | 1,680.75 |
| 09/30/2003 | 108 | Jose Jr. | Miscellaneous | | 100.00 | | | 1,580.75 |
| 10/01/2003 | | deposit | Fee Income | Deposit | | | 1,000.00 | 2,580.75 |
| 10/01/2003 | 107 | Gladys Cruz | newspaper distribution | | 100.00 | | | 2,480.75 |
| 10/01/2003 | 221 | City of Holyoke | Licenses and Permits | | 100.00 | | | 2,380.75 |
| 10/02/2003 | | deposit | Fee Income | Deposit | | | 755.00 | 3,135.75 |
| 10/02/2003 | 110 | Star Press | Printing and Reproduct... | | 1,963.00 | | | 1,172.75 |
| 10/03/2003 | | deposit | Fee Income | Deposit | | | 205.00 | 1,377.75 |
| 10/03/2003 | 111 | Jacqueline Yos | newspaper distribution | | 100.00 | | | 1,277.75 |
| 10/03/2003 | 112 | Hector Bauza | newspaper distribution | | 300.00 | | | 977.75 |

Diálogo bilingue

Register: Peoples Bank

From 06/01/2003 through 05/31/2004

Sorted by: Date, Type, Number/Ref

| Date | Number | Payee | Account | Memo | Payment | C | Deposit | Balance |
|---|---|---|---|---|---|---|---|---|
| 10/14/2003 | | deposit | Fee Income | Deposit | | | 185.00 | 1,162.75 |
| 10/16/2003 | 113 | Fernandez Family Re... | Travel & Ent:Meals | catering for con... | 595.00 | | | 567.75 |
| 10/18/2003 | 114 | Hector Bauza | newspaper distribution | | 400.00 | | | 167.75 |
| 10/18/2003 | 115 | Star Press | Printing and Reproduct... | | 1,611.00 | | | -1,443.25 |
| 10/20/2003 | | deposit | Fee Income | Deposit | | | 401.00 | -1,042.25 |
| 10/23/2003 | | deposit | Fee Income | Deposit | | | 1,175.00 | 132.75 |
| 10/24/2003 | | deposit | Fee Income | Deposit | | | 586.00 | 718.75 |
| 10/25/2003 | 116 | Hector Bauza | newspaper distribution | | 300.00 | | | 418.75 |
| 10/29/2003 | | deposit | Fee Income | Deposit | | | 80.00 | 498.75 |
| 10/29/2003 | 109 | J Rios | Miscellaneous | moving | 50.00 | | | 448.75 |
| 10/31/2003 | | service charge | Bank Service Charges | | 10.00 | | | 438.75 |
| 10/31/2003 | 144 | Jose Jr. | Commissions | "Luigue Store" | 150.00 | | | 288.75 |
| 11/03/2003 | | deposit | Fee Income | Deposit | | | 1,120.00 | 1,408.75 |
| 11/05/2003 | 117 | Hector Bauza | newspaper distribution | | 500.00 | | | 908.75 |
| 11/05/2003 | 118 | Jose Jr. | Commissions | | 250.00 | | | 658.75 |
| 11/05/2003 | 145 | Gayla | Articles for newspaper | | 200.00 | | | 458.75 |
| 11/17/2003 | | deposit | Fee Income | Deposit | | | 1,200.00 | 1,658.75 |
| 11/19/2003 | | deposit | Fee Income | Deposit | | | 640.00 | 2,298.75 |
| 11/19/2003 | 119 | FAME | Miscellaneous | | 110.00 | | | 2,188.75 |
| 11/19/2003 | 146 | Aubin Property | Rent | | 500.00 | | | 1,688.75 |
| 11/19/2003 | 147 | Star Press | Printing and Reproduct... | | 1,611.00 | | | 77.75 |
| 11/21/2003 | | deposit | Fee Income | Deposit | | | 640.00 | 717.75 |
| 11/24/2003 | 120 | Jose Jr. | Commissions | | 200.00 | | | 517.75 |
| 11/26/2003 | | deposit | Fee Income | Deposit | | | 275.00 | 792.75 |
| 11/26/2003 | 121 | Jose Jr. | Commissions | "Office Supply" | 250.00 | | | 542.75 |
| 11/28/2003 | | service charge | Bank Service Charges | | 10.00 | | | 532.75 |
| 12/01/2003 | 122 | Isis Rivera | Donation | | 50.00 | | | 482.75 |
| 12/01/2003 | 123 | Hector Bauza | newspaper distribution | | 400.00 | | | 82.75 |
| 12/03/2003 | 124 | Peter Quirk | Professional Fees:Cons... | Web page | 100.00 | | | -17.25 |
| 12/03/2003 | 125 | Marie | newspaper distribution | Chicopee | 50.00 | | | -67.25 |
| 12/03/2003 | 126 | Alex Maldonado | Miscellaneous | moving | 50.00 | | | -117.25 |
| 12/03/2003 | 127 | Jose Jr. | Commissions | | 500.00 | | | -617.25 |
| 12/05/2003 | | deposit | Fee Income | Deposit | | | 610.00 | -7.25 |
| 12/05/2003 | | deposit | Fee Income | Deposit | | | 1,250.00 | 1,242.75 |
| 12/05/2003 | | deposit | Fee Income | Deposit | | | 910.00 | 2,152.75 |
| 12/08/2003 | 128 | Star Press | Printing and Reproduct... | | 1,611.00 | | | 541.75 |
| 12/08/2003 | 129 | Best Buy | Office Supplies | telephone | 136.47 | | | 405.28 |
| 12/08/2003 | 130 | Ed Cohen | Photography | | 246.75 | | | 158.53 |
| 12/12/2003 | 131 | Beaulieu & Son | Repairs:Building Repairs | electricity | 100.00 | | | 58.53 |
| 12/17/2003 | | deposit | Fee Income | Deposit | | | 560.00 | 618.53 |

## Diálogo bilingue

5/31/2004

Register: Peoples Bank
From 06/01/2003 through 05/31/2004
Sorted by: Date, Type, Number/Ref

| Date | Number | Payee | Account | Memo | Payment | C | Deposit | Balance |
|------|--------|-------|---------|------|--------:|---|--------:|--------:|
| 12/19/2003 | 132 | Verizon | Telephone | | 283.42 | | | 335.11 |
| 12/19/2003 | 133 | Hector Bauza | newspaper distribution | | 500.00 | | | -164.89 |
| 12/23/2003 | 134 | Gayla | Articles for newspaper | | 200.00 | | | -364.89 |
| 12/29/2003 | | deposit | Fee Income | Deposit | | | 455.00 | 90.11 |
| 12/31/2003 | | service charge | Bank Service Charges | | 10.00 | | | 80.11 |
| 01/03/2004 | | deposit | Fee Income | Deposit | | | 326.00 | 406.11 |
| 01/05/2004 | 135 | Aubin Property | Rent | | 500.00 | | | -93.89 |
| 01/05/2004 | 136 | Hector Bauza | newspaper distribution | | 500.00 | | | -593.89 |
| 01/06/2004 | 137 | Hector Bauza | newspaper distribution | | 150.00 | | | -743.89 |
| 01/09/2004 | 138 | Verizon | Telephone | | 142.74 | | | -886.63 |
| 01/16/2004 | | deposit | Fee Income | Deposit | | | 560.00 | -326.63 |
| 01/20/2004 | | deposit | Fee Income | Deposit | | | 330.00 | 3.37 |
| 01/22/2004 | | deposit | Fee Income | Deposit | | | 740.00 | 743.37 |
| 01/23/2004 | 139 | Gayla | Articles for newspaper | | 200.00 | | | 543.37 |
| 01/23/2004 | 140 | Hector Bauza | newspaper distribution | | 100.00 | | | 443.37 |
| 01/23/2004 | 181 | Star Press | Printing and Reproduct... | | 1,611.00 | | | -1,167.63 |
| 01/27/2004 | | deposit | Fee Income | Deposit | | | 855.00 | -312.63 |
| 01/30/2004 | | deposit | Fee Income | Deposit | | | 805.00 | 492.37 |
| 01/30/2004 | | insufficient funds cha... | Bank Service Charges | | 100.00 | | | 392.37 |
| 01/30/2004 | 182 | Hector Bauza | newspaper distribution | | 75.00 | | | 317.37 |
| 01/31/2004 | | service charge | Bank Service Charges | | 10.00 | | | 307.37 |
| 02/10/2004 | 148 | Marie Sedelow | newspaper distribution | | 50.00 | | | 257.37 |
| 02/17/2004 | | deposit | Fee Income | Deposit | | | 586.00 | 843.37 |
| 02/18/2004 | | insufficient funds cha... | Bank Service Charges | | 20.00 | | | 823.37 |
| 02/18/2004 | 149 | Aubin Property | Rent | | 500.00 | | | 323.37 |
| 02/18/2004 | 183 | Hector Bauza | newspaper distribution | | 270.00 | | | 53.37 |
| 02/25/2004 | | deposit | Fee Income | Deposit | | | 245.00 | 298.37 |
| 02/27/2004 | | deposit | Fee Income | Deposit | | | 1,120.00 | 1,418.37 |
| 02/27/2004 | 150 | Jose Jr. | Commissions | | 500.00 | | | 918.37 |
| 02/29/2004 | | service charge | Bank Service Charges | | 10.00 | | | 908.37 |
| 03/02/2004 | | deposit | Fee Income | Deposit | | | 550.00 | 1,458.37 |
| 03/02/2004 | | deposit | Fee Income | Deposit | | | 80.00 | 1,538.37 |
| 03/02/2004 | | deposit | Fee Income | Deposit | | | 2,160.00 | 3,698.37 |
| 03/02/2004 | 151 | Marie Sedelow | newspaper distribution | | 50.00 | | | 3,648.37 |
| 03/02/2004 | 152 | Gayla | Articles for newspaper | | 400.00 | | | 3,248.37 |
| 03/04/2004 | 155 | Latin Chamber of Co... | Dues and Subscriptions | | 250.00 | | | 2,998.37 |
| 03/04/2004 | 156 | Jose Jr. | Commissions | | 100.00 | | | 2,898.37 |
| 03/04/2004 | 157 | Hector Bauza | newspaper distribution | | 100.00 | | | 2,798.37 |
| 03/04/2004 | 158 | Office Max | Office Supplies | file cabinet | 100.34 | | | 2,698.03 |
| 03/04/2004 | 159 | Verizon | Telephone | | 296.62 | | | 2,401.41 |

Page 3

Diálogo bilingue

5/31/2004

Register: Peoples Bank

From 06/01/2003 through 05/31/2004

Sorted by: Date, Type, Number/Ref

| Date | Number | Payee | Account | Memo | Payment | C | Deposit | Balance |
|------|--------|-------|---------|------|---------|---|---------|---------|
| 03/07/2004 | 160 | Postal | Postage and Delivery | | 40.00 | | | 2,361.41 |
| 03/07/2004 | 161 | Holyoke Gas & Elect... | Telephone | internet set up | 36.67 | | | 2,324.74 |
| 03/07/2004 | 162 | Star Press | Printing and Reproduct... | | 1,094.85 | | | 1,229.89 |
| 03/07/2004 | 163 | Holyoke Gas & Elect... | Utilities:Gas and Electric | deposit | 100.00 | | | 1,129.89 |
| 03/07/2004 | 164 | Hector Bauza | newspaper distribution | | 100.00 | | | 1,029.89 |
| 03/07/2004 | 165 | Marie Sedelow | newspaper distribution | | 50.00 | | | 979.89 |
| 03/08/2004 | | deposit | Fee Income | Deposit | | | 3,440.00 | 4,419.89 |
| 03/08/2004 | | deposit | Fee Income | Deposit | | | 326.00 | 4,745.89 |
| 03/08/2004 | 153 | Aubin Property | Rent | | 500.00 | | | 4,245.89 |
| 03/08/2004 | 154 | Void | Miscellaneous | VOID: | | X | | 4,245.89 |
| 03/11/2004 | 166 | Fernandez Family Re... | Travel & Ent:Meals | St. Patrick's Da... | 100.00 | | | 4,145.89 |
| 03/11/2004 | 167 | Hispanic Chamber of... | Dues and Subscriptions | | 250.00 | | | 3,895.89 |
| 03/12/2004 | 168 | Comp USA | Office Supplies | fax machine | 104.99 | | | 3,790.90 |
| 03/12/2004 | 169 | Hector Bauza | newspaper distribution | | 400.00 | | | 3,390.90 |
| 03/12/2004 | 170 | Comp USA | Office Supplies | modem | 125.95 | | | 3,264.95 |
| 03/15/2004 | 171 | Commonwealth of MA | Licenses and Permits | annual corp fili... | 125.00 | | | 3,139.95 |
| 03/15/2004 | 172 | Hector Bauza | Commissions | | 200.00 | | | 2,939.95 |
| 03/18/2004 | 173 | Marie Sedelow | Articles for newspaper | | 34.00 | | | 2,905.95 |
| 03/18/2004 | 174 | Jose Jr. | Commissions | "Gladys Cruz" | 300.00 | | | 2,605.95 |
| 03/19/2004 | 175 | Gayla | Articles for newspaper | | 200.00 | | | 2,405.95 |
| 03/25/2004 | | FirstFed | Accounts Receivable | | | | 120.00 | 2,525.95 |
| 03/25/2004 | 176 | Star Press | Printing and Reproduct... | | 1,498.00 | | | 1,027.95 |
| 03/25/2004 | 177 | Hector Bauza | newspaper distribution | | 300.00 | | | 727.95 |
| 03/25/2004 | 178 | Manuel Frau | newspaper distribution | van rental | 63.00 | | | 664.95 |
| 03/25/2004 | 179 | Gayla | Articles for newspaper | | 200.00 | | | 464.95 |
| 03/26/2004 | | service charge | Bank Service Charges | | 15.00 | | | 449.95 |
| 03/27/2004 | 180 | AC Moore | Office Supplies | frames for new... | 51.37 | | | 398.58 |
| 03/29/2004 | | deposit | Fee Income | Deposit | | | 1,190.00 | 1,588.58 |
| 03/31/2004 | | service charge | Bank Service Charges | | 10.00 | | | 1,578.58 |
| 04/01/2004 | | WestMass ElderCare ... | Accounts Receivable | | | | 196.00 | 1,774.58 |
| 05/04/2004 | | Citizens Bank | Accounts Receivable | | | | 490.00 | 2,264.58 |
| 05/04/2004 | | Balise Auto Sales | Accounts Receivable | | | | 560.00 | 2,824.58 |
| 05/04/2004 | | Open Square Cafe | Accounts Receivable | | | | 240.00 | 3,064.58 |
| 05/04/2004 | | Bueno y Sano | Accounts Receivable | | | | 160.00 | 3,224.58 |
| 05/04/2004 | | Maria Acuña Real Es... | Accounts Receivable | | | | 275.00 | 3,499.58 |
| 05/04/2004 | | Career Point | Accounts Receivable | | | | 199.00 | 3,698.58 |
| 05/04/2004 | | Balise Auto Sales | Accounts Receivable | | | | 560.00 | 4,258.58 |
| 05/10/2004 | | New England Center ... | Accounts Receivable | | | | 199.00 | 4,457.58 |

Page 4

4:20 PM
05/31/04

# Diálogo bilingue
## A/R Aging Detail
### All Transactions

Page 1

| Type | Date | Num | P. O. # | Name | Terms | Due Date | Class | Aging | Open Balance |
|---|---|---|---|---|---|---|---|---|---|
| **Current** | | | | | | | | | |
| **Total Current** | | | | | | | | | |
| **1 - 30** | | | | | | | | | |
| Invoice | 5/4/2004 | DB-57 | | Blitz Media, Inc. | Due on r... | 5/4/2004 | | 27 | 460.00 |
| Invoice | 5/4/2004 | DB-58 | | Balise Auto Sales | Due on r... | 5/4/2004 | | 27 | 560.00 |
| Invoice | 5/4/2004 | DB-59 | | Chaffee-Helliwell | Due on r... | 5/4/2004 | | 27 | 560.00 |
| Invoice | 5/4/2004 | DB-60 | | FirstFed | Due on r... | 5/4/2004 | | 27 | 234.00 |
| Invoice | 5/4/2004 | DB-61 | | Maria Acuña Real E... | Due on r... | 5/4/2004 | | 27 | 120.00 |
| Invoice | 5/4/2004 | DB-62 | | Manuel Flooring | Due on r... | 5/4/2004 | | 27 | 275.00 |
| Invoice | 5/4/2004 | DB-63 | | Open Square Cafe | | 5/4/2004 | | 27 | 80.00 |
| Invoice | 5/4/2004 | DB-64 | | Citizens Bank | | 5/4/2004 | | 27 | 80.00 |
| Invoice | 5/4/2004 | DB-65 | | Country Jeep | Due on r... | 5/4/2004 | | 27 | 490.00 |
| Invoice | 5/4/2004 | DB-66 | | Museum Park Apart... | | 5/4/2004 | | 27 | 560.00 |
| Invoice | 5/4/2004 | DB-68 | | Holyoke Health Cen... | | 5/4/2004 | | 27 | 236.00 |
| Invoice | 5/11/2004 | DB-70 | | Country Jeep | Due on r... | 5/11/2004 | | 20 | 280.00 |
| **Total 1 - 30** | | | | | | | | | **3,935.00** |
| **31 - 60** | | | | | | | | | |
| Invoice | 4/5/2004 | DB-55 | | Eventos HispanAm... | | 4/5/2004 | | 56 | 280.00 |
| Invoice | 4/6/2004 | DB-26 | | Blitz Media, Inc. | Due on r... | 4/6/2004 | | 55 | 460.00 |
| Invoice | 4/6/2004 | DB-27 | | Chaffee-Helliwell | Due on r... | 4/6/2004 | | 55 | 234.00 |
| Invoice | 4/6/2004 | DB-30 | | Citizens Bank | | 4/6/2004 | | 55 | 490.00 |
| Invoice | 4/6/2004 | DB-31 | | Manuel Flooring | Due on r... | 4/6/2004 | | 55 | 80.00 |
| Invoice | 4/6/2004 | DB-33 | | New World Travel | Due on r... | 4/6/2004 | | 55 | 80.00 |
| Invoice | 4/6/2004 | DB-35 | | Holyoke Health Cen... | Due on r... | 4/6/2004 | | 55 | 250.00 |
| Invoice | 4/21/2004 | DB-39 | | Blitz Media, Inc. | Due on r... | 4/21/2004 | | 40 | 560.00 |
| Invoice | 4/21/2004 | DB-42 | | FirstFed | Due on r... | 4/21/2004 | | 40 | 460.00 |
| Invoice | 4/21/2004 | DB-43 | | Manuel Flooring | Due on r... | 4/21/2004 | | 40 | 120.00 |
| Invoice | 4/21/2004 | DB-45 | | Country Jeep | | 4/21/2004 | | 40 | 80.00 |
| Invoice | 4/21/2004 | DB-46 | | Citizens Bank | Due on r... | 4/21/2004 | | 40 | 490.00 |
| Invoice | 4/21/2004 | DB-47 | | Holyoke Health Cen... | Due on r... | 4/21/2004 | | 40 | 280.00 |
| Invoice | 4/21/2004 | DB-49 | | University of Massa... | | 4/21/2004 | | 40 | 560.00 |
| Invoice | 4/21/2004 | DB-54 | | Museum Park Apart... | | 4/21/2004 | | 40 | 265.00 |
| Invoice | 4/21/2004 | DB-56 | | Eventos HispanAm... | | 4/21/2004 | | 40 | 236.00 |
| | | | | | | | | | 280.00 |
| **Total 31 - 60** | | | | | | | | | **5,125.00** |
| **61 - 90** | | | | | | | | | |
| Invoice | 3/13/2004 | DB-2 | | Manuel Flooring | Due on r... | 3/13/2004 | | 79 | 80.00 |
| Invoice | 3/13/2004 | DB-3 | | New World Travel | Due on r... | 3/13/2004 | | 79 | 250.00 |
| Invoice | 3/13/2004 | DB-6 | | Bertera Suzuki | Due on r... | 3/13/2004 | | 79 | 130.00 |
| Invoice | 3/13/2004 | DB-7 | | Holyoke Health Cen... | Due on r... | 3/13/2004 | | 79 | 560.00 |
| Invoice | 3/13/2004 | DB-8 | | Blitz Media, Inc. | | 3/13/2004 | | 79 | 560.00 |
| Invoice | 3/13/2004 | DB-11 | | Chaffee-Helliwell | | 3/13/2004 | | 79 | 326.00 |
| Invoice | 3/13/2004 | DB-13 | | Fitzgerald & Robbins | Due on r... | 3/13/2004 | | 79 | 234.00 |
| Invoice | 3/15/2004 | DB-14 | | New World Travel | Due on r... | 3/15/2004 | | 77 | 600.00 |
| Invoice | 3/19/2004 | DB-53 | | Blitz Media, Inc. | Due on r... | 3/19/2004 | | 73 | 500.00 |
| Invoice | 3/24/2004 | DB-16 | | Balise Auto Sales | Due on r... | 3/24/2004 | | 68 | 326.00 |
| | | | | | | | | | 560.00 |

Page 2

4:20 PM
05/31/04

## Diálogo bilingue
## A/R Aging Detail
### All Transactions

| Type | Date | Num | P. O. # | Name | Terms | Due Date | Class | Aging | Open Balance |
|------|------|-----|---------|------|-------|----------|-------|-------|--------------|
| Invoice | 3/24/2004 | DB-18 | | Chaffee-Helliwell | Due on r... | 3/24/2004 | | 68 | 234.00 |
| Invoice | 3/24/2004 | DB-22 | | Manuel Flooring | Due on r... | 3/24/2004 | | 68 | 80.00 |
| Invoice | 3/24/2004 | DB-23 | | New World Travel | Due on r... | 3/24/2004 | | 68 | 250.00 |
| Invoice | 3/24/2004 | DB-25 | | Holyoke Health Cen... | Due on r... | 3/24/2004 | | 68 | 560.00 |
| Total 61 - 90 | | | | | | | | | 4,690.00 |
| > 90 | | | | | | | | | |
| Invoice | 1/5/2004 | DB-52 | | Manuel Flooring | Due on r... | 1/5/2004 | | 147 | 80.00 |
| Invoice | 1/30/2004 | | | Realty Executives | | 1/30/2004 | | 122 | 200.00 |
| Invoice | 2/5/2004 | DB-50 | | Manuel Flooring | Due on r... | 2/5/2004 | | 116 | 80.00 |
| Invoice | 2/19/2004 | DB-51 | | Manuel Flooring | Due on r... | 2/19/2004 | | 102 | 80.00 |
| Invoice | 2/28/2004 | DB-69 | | Realty Executives | | 2/28/2004 | | 93 | 200.00 |
| Total > 90 | | | | | | | | | 640.00 |
| TOTAL | | | | | | | | | 14,390.00 |

4:24 PM

05/31/04

# Diálogo bilingue
# Statement of Cash Flows
### January through May 2004

|                                                                    | Jan - May 04 |
|--------------------------------------------------------------------|--------------|
| **OPERATING ACTIVITIES**                                           |              |
| Net Income                                                         | 14,142.72    |
| Adjustments to reconcile Net Income to net cash provided by operations: |         |
| Accounts Receivable                                                | -14,390.00   |
| Accounts Payable                                                   | 5,824.75     |
| **Net cash provided by Operating Activities**                      | 5,577.47     |
| **Net cash increase for period**                                   | 5,577.47     |
| **Cash at beginning of period**                                    | 80.11        |
| **Cash at end of period**                                          | 5,657.58     |

4:23 PM

05/31/04

Accrual Basis

**Diálogo bilingue**
# Profit & Loss
**May 2004**

|  | May 04 |
|---|---|
| **Ordinary Income/Expense** | |
| **Income** | |
| **Fee Income** | |
| Events | 3,935.00 |
| **Total Fee Income** | 3,935.00 |
| **Total Income** | 3,935.00 |
| **Net Ordinary Income** | 3,935.00 |
| **Net Income** | 3,935.00 |

4:22 PM

05/31/04

Accrual Basis

# Diálogo bilingue
# Balance Sheet
### As of May 31, 2004

|  | May 31, 04 |
|---|---|
| **ASSETS** | |
| **Current Assets** | |
| **Checking/Savings** | |
| Peoples Bank | 4,457.58 |
| **Total Checking/Savings** | 4,457.58 |
| **Accounts Receivable** | |
| Accounts Receivable | 14,390.00 |
| **Total Accounts Receivable** | 14,390.00 |
| **Other Current Assets** | |
| Undeposited Funds | 1,200.00 |
| **Total Other Current Assets** | 1,200.00 |
| **Total Current Assets** | 20,047.58 |
| **TOTAL ASSETS** | 20,047.58 |
| **LIABILITIES & EQUITY** | |
| **Liabilities** | |
| **Current Liabilities** | |
| **Accounts Payable** | |
| Accounts Payable | 5,824.75 |
| **Total Accounts Payable** | 5,824.75 |
| **Total Current Liabilities** | 5,824.75 |
| **Total Liabilities** | 5,824.75 |
| **Equity** | |
| Retained Earnings | 80.11 |
| Net Income | 14,142.72 |
| **Total Equity** | 14,222.83 |
| **TOTAL LIABILITIES & EQUITY** | 20,047.58 |

**Diálogo bilingue**
**General Ledger**
All Transactions

4:27 PM
05/31/04
Accrual Basis

| Type | Date | Num | Name | Memo | Split | Amount | Balance |
|---|---|---|---|---|---|---|---|
| **Peoples Bank** | | | | | | | |
| Deposit | 6/13/2003 | | deposit | Deposit | Fee Income | 100.00 | 100.00 |
| Deposit | 6/17/2003 | | deposit | Deposit | Fee Income | 560.00 | 660.00 |
| Deposit | 6/20/2003 | | deposit | Deposit | Fee Income | 80.00 | 740.00 |
| Deposit | 6/26/2003 | | deposit | Deposit | Fee Income | 560.00 | 1,300.00 |
| Deposit | 7/7/2003 | | deposit | Deposit | Fee Income | 125.00 | 1,425.00 |
| Deposit | 7/9/2003 | | deposit | Deposit | Fee Income | 450.00 | 1,875.00 |
| Check | 7/17/2003 | 102 | Saltus Press | | Printing and R... | -1,681.00 | 194.00 |
| Deposit | 7/17/2003 | | deposit | Deposit | Fee Income | 205.00 | 399.00 |
| Deposit | 7/24/2003 | | deposit | Deposit | Fee Income | 120.00 | 519.00 |
| Check | 7/28/2003 | | Armstrong Photogr... | | Photography | -195.00 | 324.00 |
| Check | 7/31/2003 | | service charge | | Bank Service | -10.00 | 314.00 |
| Deposit | 8/7/2003 | | deposit | Deposit | Fee Income | 248.00 | 562.00 |
| Check | 8/7/2003 | | insufficient funds ch... | | Bank Service | -20.00 | 542.00 |
| Deposit | 8/11/2003 | | deposit | Deposit | Fee Income | 560.00 | 1,102.00 |
| Deposit | 8/12/2003 | | deposit | Deposit | Fee Income | 660.00 | 1,762.00 |
| Check | 8/18/2003 | 141 | Saltus Press | | Printing and R... | -1,720.40 | 41.60 |
| Deposit | 8/19/2003 | | deposit | Deposit | Fee Income | 125.00 | 166.60 |
| Deposit | 8/21/2003 | | deposit | Deposit | Fee Income | 599.00 | 765.60 |
| Check | 8/30/2003 | | service charge | | Bank Service ... | -10.00 | 755.60 |
| Check | 9/5/2003 | 104 | Arnold Greenhut | | Legal Fees | -600.00 | 155.60 |
| Check | 9/11/2003 | 105 | Saltus Press | | Printing and R... | -2,012.85 | -1,857.25 |
| Check | 9/11/2003 | | insufficient funds ch... | | Bank Service ... | -20.00 | -1,877.25 |
| Deposit | 9/15/2003 | | deposit | Deposit | Fee Income | 560.00 | -1,317.25 |
| Deposit | 9/17/2003 | | deposit | Deposit | Fee Income | 801.00 | -516.25 |
| Deposit | 9/18/2003 | | deposit | Deposit | Fee Income | 640.00 | 123.75 |
| Check | 9/18/2003 | 143 | ? | | Miscellaneous | -100.00 | 23.75 |
| Deposit | 9/19/2003 | | deposit | Deposit | Fee Income | 812.00 | 835.75 |
| Deposit | 9/23/2003 | | deposit | Deposit | Fee Income | 175.00 | 1,010.75 |
| Deposit | 9/26/2003 | | deposit | Deposit | Fee Income | 830.00 | 1,840.75 |
| Check | 9/26/2003 | 106 | Ed Cohen | | Photography | -150.00 | 1,690.75 |
| Check | 9/30/2003 | 108 | Jose Jr. | | Miscellaneous | -100.00 | 1,590.75 |
| Check | 9/30/2003 | | service charge | | Bank Service ... | -10.00 | 1,580.75 |
| Check | 10/1/2003 | 107 | Gladys Cruz | | newspaper dis... | -100.00 | 1,480.75 |
| Deposit | 10/1/2003 | | deposit | Deposit | Fee Income | 1,000.00 | 2,480.75 |
| Check | 10/2/2003 | 221 | City of Holyoke | | Licenses and ... | -100.00 | 2,380.75 |
| Deposit | 10/2/2003 | | deposit | Deposit | Fee Income | 755.00 | 3,135.75 |
| Check | 10/2/2003 | 110 | Star Press | | Printing and R... | -1,963.00 | 1,172.75 |
| Deposit | 10/3/2003 | | deposit | Deposit | Fee Income | 205.00 | 1,377.75 |
| Check | 10/3/2003 | 111 | Jacqueline Yos | | newspaper dis... | -100.00 | 1,277.75 |
| Check | 10/3/2003 | 112 | Hector Bauza | | newspaper dis... | -300.00 | 977.75 |
| Deposit | 10/14/2003 | | deposit | Deposit | Fee Income | 185.00 | 1,162.75 |
| Check | 10/16/2003 | 113 | Fernandez Family ... | catering for c... | Meals | -595.00 | 567.75 |
| Check | 10/18/2003 | 114 | Hector Bauza | | newspaper dis... | -400.00 | 167.75 |
| Check | 10/18/2003 | 115 | Star Press | | Printing and R... | -1,611.00 | -1,443.25 |
| Deposit | 10/20/2003 | | deposit | Deposit | Fee Income | 401.00 | -1,042.25 |
| Deposit | 10/23/2003 | | deposit | Deposit | Fee Income | 1,175.00 | 132.75 |
| Deposit | 10/24/2003 | | deposit | Deposit | Fee Income | 586.00 | 718.75 |
| Check | 10/25/2003 | 116 | Hector Bauza | | newspaper dis... | -300.00 | 418.75 |

4:27 PM
05/31/04
Accrual Basis

## Diálogo bilingue
## General Ledger
### All Transactions

| Type | Date | Num | Name | Memo | Split | Amount | Balance |
|---|---|---|---|---|---|---|---|
| Deposit | 10/29/2003 | | deposit | Deposit | Fee Income | 80.00 | 498.75 |
| Check | 10/29/2003 | 109 | J Rios | moving | Miscellaneous | -50.00 | 448.75 |
| Check | 10/31/2003 | | service charge | | Bank Service … | -10.00 | 438.75 |
| Check | 10/31/2003 | 144 | Jose Jr. | "Luigue Store" | Commissions | -150.00 | 288.75 |
| Deposit | 11/3/2003 | | deposit | Deposit | Fee Income | 1,120.00 | 1,408.75 |
| Check | 11/5/2003 | 117 | Hector Bauza | | Fee Income | -500.00 | 908.75 |
| Check | 11/5/2003 | 118 | Jose Jr. | | Commissions | -250.00 | 658.75 |
| Check | 11/5/2003 | 145 | Gayla | | Articles for ne… | -200.00 | 458.75 |
| Deposit | 11/17/2003 | | deposit | Deposit | Fee Income | 1,200.00 | 1,658.75 |
| Check | 11/19/2003 | 146 | Aubin Property | | Rent | -500.00 | 1,158.75 |
| Check | 11/19/2003 | 147 | Star Press | | Printing and R… | -1,611.00 | -452.25 |
| Check | 11/19/2003 | 119 | FAME | | Miscellaneous | -110.00 | -562.25 |
| Deposit | 11/19/2003 | | deposit | Deposit | Fee Income | 640.00 | 77.75 |
| Check | 11/21/2003 | | deposit | Deposit | Fee Income | 640.00 | 717.75 |
| Check | 11/24/2003 | | | | Commissions | -200.00 | 517.75 |
| Check | 11/26/2003 | 120 | Jose Jr. | "Office Supply" | Commissions | -250.00 | 267.75 |
| Deposit | 11/26/2003 | 121 | Jose Jr. | Deposit | Fee Income | 275.00 | 542.75 |
| Check | 11/28/2003 | | deposit | | Bank Service … | -10.00 | 532.75 |
| Check | 12/1/2003 | | service charge | | Donation | -50.00 | 482.75 |
| Check | 12/1/2003 | 122 | Isis Rivera | | newspaper dis… | -400.00 | 82.75 |
| Check | 12/3/2003 | 123 | Hector Bauza | | Consulting | -100.00 | -17.25 |
| Check | 12/3/2003 | 124 | Peter Quirk | Web page | newspaper dis… | -50.00 | -67.25 |
| Check | 12/3/2003 | 125 | Marie | Chicopee | Miscellaneous | -50.00 | -117.25 |
| Check | 12/3/2003 | 126 | Alex Maldonado | moving | Commissions | -500.00 | -617.25 |
| Check | 12/5/2003 | 127 | Jose Jr. | | Fee Income | 610.00 | -7.25 |
| Deposit | 12/5/2003 | | deposit | Deposit | Fee Income | 1,250.00 | 1,242.75 |
| Deposit | 12/5/2003 | | deposit | Deposit | Fee Income | 910.00 | 2,152.75 |
| Deposit | 12/8/2003 | 128 | Star Press | Deposit | Printing and R… | -1,611.00 | 541.75 |
| Check | 12/8/2003 | 129 | Best Buy | | Office Supplies | -136.47 | 405.28 |
| Check | 12/8/2003 | 130 | Ed Cohen | telephone | Photography | -246.75 | 158.53 |
| Check | 12/12/2003 | 131 | Beaulieu & Son | electricity | Building Repairs | -100.00 | 58.53 |
| Deposit | 12/17/2003 | | deposit | Deposit | Fee Income | 560.00 | 618.53 |
| Check | 12/19/2003 | 132 | Verizon | | Telephone | -283.42 | 335.11 |
| Deposit | 12/19/2003 | 133 | Hector Bauza | | newspaper dis… | -500.00 | -164.89 |
| Check | 12/23/2003 | 134 | Gayla | | Articles for ne… | -200.00 | -364.89 |
| Deposit | 12/29/2003 | | deposit | Deposit | Fee Income | 455.00 | 90.11 |
| Check | 12/31/2003 | | service charge | | Bank Service … | -10.00 | 80.11 |
| Deposit | 1/3/2004 | | deposit | Deposit | Fee Income | 326.00 | 406.11 |
| Check | 1/5/2004 | 135 | Aubin Property | | Rent | -500.00 | -93.89 |
| Check | 1/5/2004 | 136 | Hector Bauza | | newspaper dis… | -500.00 | -593.89 |
| Check | 1/6/2004 | 137 | Hector Bauza | | newspaper dis… | -150.00 | -743.89 |
| Check | 1/9/2004 | 138 | Verizon | | Telephone | -142.74 | -886.63 |
| Deposit | 1/16/2004 | | deposit | Deposit | Fee Income | 560.00 | -326.63 |
| Check | 1/20/2004 | | deposit | Deposit | Fee Income | 330.00 | 3.37 |
| Deposit | 1/22/2004 | | deposit | Deposit | Fee Income | 740.00 | 743.37 |
| Check | 1/23/2004 | 139 | Gayla | | Articles for ne… | -200.00 | 543.37 |
| Check | 1/23/2004 | 140 | Hector Bauza | | newspaper dis… | -100.00 | 443.37 |
| Check | 1/23/2004 | 181 | Star Press | | Printing and R… | -1,611.00 | -1,167.63 |
| Deposit | 1/27/2004 | | deposit | Deposit | Fee Income | 855.00 | -312.63 |

4:27 PM
05/31/04
Accrual Basis

## Diálogo bilingue
## General Ledger
### All Transactions

| Type | Date | Num | Name | Memo | Split | Amount | Balance |
|---|---|---|---|---|---|---|---|
| Deposit | 1/30/2004 | | deposit | Deposit | Fee Income | 805.00 | 492.37 |
| Check | 1/30/2004 | 182 | Hector Bauza | | newspaper dis ... | -75.00 | 417.37 |
| Check | 1/30/2004 | | insufficient funds ch ... | | Bank Service ... | -100.00 | 317.37 |
| Check | 1/31/2004 | 148 | service charge | | Bank Service ... | -10.00 | 307.37 |
| Check | 2/10/2004 | | Marie Sedelow | | newspaper dis ... | -50.00 | 257.37 |
| Deposit | 2/17/2004 | | deposit | Deposit | Fee Income | 586.00 | 843.37 |
| Check | 2/18/2004 | 149 | Aubin Property | | Rent | -500.00 | 343.37 |
| Check | 2/18/2004 | 183 | Hector Bauza | | newspaper dis ... | -270.00 | 73.37 |
| Check | 2/18/2004 | | insufficient funds ch ... | | Bank Service ... | -20.00 | 53.37 |
| Deposit | 2/25/2004 | | deposit | Deposit | Fee Income | 245.00 | 298.37 |
| Deposit | 2/27/2004 | | deposit | Deposit | Fee Income | 1,120.00 | 1,418.37 |
| Check | 2/27/2004 | 150 | Jose Jr. | | Commissions | -500.00 | 918.37 |
| Check | 2/29/2004 | | service charge | | Bank Service ... | -10.00 | 908.37 |
| Check | 3/2/2004 | 151 | Marie Sedelow | | newspaper dis ... | -50.00 | 858.37 |
| Check | 3/2/2004 | 152 | Gayla | | Articles for ne ... | -400.00 | 458.37 |
| Deposit | 3/2/2004 | | deposit | Deposit | Fee Income | 550.00 | 1,008.37 |
| Deposit | 3/2/2004 | | deposit | Deposit | Fee Income | 80.00 | 1,088.37 |
| Deposit | 3/4/2004 | | deposit | Deposit | Fee Income | 2,160.00 | 3,248.37 |
| Check | 3/4/2004 | 155 | Latin Chamber of C ... | | Dues and Sub ... | -250.00 | 2,998.37 |
| Check | 3/4/2004 | 156 | Jose Jr. | | Commissions | -100.00 | 2,898.37 |
| Check | 3/4/2004 | 157 | Hector Bauza | | newspaper dis ... | -100.00 | 2,798.37 |
| Check | 3/4/2004 | 158 | Office Max | file cabinet | Office Supplies | -100.34 | 2,698.03 |
| Check | 3/4/2004 | 159 | Verizon | | Telephone | -296.62 | 2,401.41 |
| Check | 3/7/2004 | 160 | Postal | | Postage and ... | -40.00 | 2,361.41 |
| Check | 3/7/2004 | 161 | Holyoke Gas & Elec ... | internet set up | Telephone | -36.67 | 2,324.74 |
| Check | 3/7/2004 | 162 | Star Press | | Printing and R ... | -1,094.85 | 1,229.89 |
| Check | 3/7/2004 | 163 | Holyoke Gas & Elec ... | deposit | Gas and Electric | -100.00 | 1,129.89 |
| Check | 3/7/2004 | 164 | Hector Bauza | | newspaper dis ... | -100.00 | 1,029.89 |
| Check | 3/8/2004 | 165 | Marie Sedelow | | newspaper dis ... | -50.00 | 979.89 |
| Check | 3/8/2004 | 153 | Aubin Property | | Rent | -500.00 | 479.89 |
| Deposit | 3/8/2004 | 154 | Void | VOID: | Miscellaneous | 0.00 | 479.89 |
| Deposit | 3/8/2004 | | deposit | Deposit | Fee Income | 3,440.00 | 3,919.89 |
| Deposit | 3/11/2004 | | deposit | Deposit | Fee Income | 326.00 | 4,245.89 |
| Check | 3/11/2004 | 166 | Fernandez Family ... | St. Patrick's | Meals | -100.00 | 4,145.89 |
| Check | 3/12/2004 | 167 | Hispanic Chamber ... | | Dues and Sub ... | -250.00 | 3,895.89 |
| Check | 3/12/2004 | 168 | Comp USA | fax machine | Office Supplies | -104.99 | 3,790.90 |
| Check | 3/12/2004 | 169 | Hector Bauza | | newspaper dis ... | -400.00 | 3,390.90 |
| Check | 3/15/2004 | 170 | Comp USA | modem | Office Supplies | -125.95 | 3,264.95 |
| Check | 3/15/2004 | 171 | Commonwealth of ... | annual corp fi ... | Licenses and ... | -125.00 | 3,139.95 |
| Check | 3/18/2004 | 172 | Hector Bauza | | Commissions | -200.00 | 2,939.95 |
| Check | 3/18/2004 | 173 | Marie Sedelow | | Articles for ne ... | -34.00 | 2,905.95 |
| Check | 3/19/2004 | 174 | Jose Jr. | "Gladys Cruz" | Commissions | -300.00 | 2,605.95 |
| Check | 3/25/2004 | 175 | Gayla | | Articles for ne ... | -200.00 | 2,405.95 |
| Check | 3/25/2004 | 176 | Star Press | | Printing and R ... | -1,498.00 | 907.95 |
| Check | 3/25/2004 | 177 | Hector Bauza | van rental | newspaper dis ... | -300.00 | 607.95 |
| Check | 3/25/2004 | 178 | Manuel Frau | | Articles for ne ... | -63.00 | 544.95 |
| Payment | 3/25/2004 | 179 | Gayla | | Articles for ne ... | -200.00 | 344.95 |
| | 3/25/2004 | | FirstFed | | Accounts Rec ... | 120.00 | 464.95 |
| Check | 3/26/2004 | | service charge | | Bank Service ... | -15.00 | 449.95 |

4:27 PM
05/31/04
Accrual Basis

**Diálogo bilingue**
**General Ledger**
**All Transactions**

| Type | Date | Num | Name | Memo | Split | Amount | Balance |
|---|---|---|---|---|---|---|---|
| Check | 3/27/2004 | 180 | AC Moore | frames for ne… | Office Supplies | -51.37 | 398.58 |
| Deposit | 3/29/2004 | | deposit | Deposit | Fee Income | 1,190.00 | 1,588.58 |
| Check | 3/31/2004 | | service charge | | Bank Service … | -10.00 | 1,578.58 |
| Payment | 4/1/2004 | | WestMass ElderCar… | | Accounts Rec… | 196.00 | 1,774.58 |
| Payment | 5/4/2004 | | Citizens Bank | | Accounts Rec… | 490.00 | 2,264.58 |
| Payment | 5/4/2004 | | Balise Auto Sales | | Accounts Rec… | 560.00 | 2,824.58 |
| Payment | 5/4/2004 | | Open Square Cafe | | Accounts Rec… | 240.00 | 3,064.58 |
| Payment | 5/4/2004 | | Bueno y Sano | | Accounts Rec… | 160.00 | 3,224.58 |
| Payment | 5/4/2004 | | Maria Acuña Real E… | | Accounts Rec… | 275.00 | 3,499.58 |
| Payment | 5/4/2004 | 6904 | Career Point | | Accounts Rec… | 199.00 | 3,698.58 |
| Payment | 5/4/2004 | 029366 | Balise Auto Sales | | Accounts Rec… | 560.00 | 4,258.58 |
| Payment | 5/10/2004 | | New England Cente… | | Accounts Rec… | 199.00 | 4,457.58 |

**Total Peoples Bank** | | | | | | 4,457.58 | 4,457.58 |

**Accounts Receivable**

| Type | Date | Num | Name | Memo | Split | Amount | Balance |
|---|---|---|---|---|---|---|---|
| Invoice | 1/5/2004 | | Manuel Flooring | | Events | 80.00 | 80.00 |
| Invoice | 1/30/2004 | DB-52 | Realty Executives | Opening bala… | Uncategorized… | 200.00 | 280.00 |
| Invoice | 2/5/2004 | DB-50 | Manuel Flooring | | Fee Income | 80.00 | 360.00 |
| Invoice | 2/19/2004 | DB-51 | Manuel Flooring | | Events | 80.00 | 440.00 |
| Invoice | 2/28/2004 | DB-69 | Realty Executives | | Events | 200.00 | 640.00 |
| Invoice | 3/13/2004 | DB-0… | Balise Auto Sales | | Events | 560.00 | 1,200.00 |
| Invoice | 3/13/2004 | DB-2 | Manuel Flooring | | Events | 80.00 | 1,280.00 |
| Invoice | 3/13/2004 | DB-3 | New World Travel | | Events | 250.00 | 1,530.00 |
| Invoice | 3/13/2004 | DB-4 | Bueno y Sano | | Events | 80.00 | 1,610.00 |
| Invoice | 3/13/2004 | DB-5 | Maria Acuña Real E… | | Events | 275.00 | 1,885.00 |
| Invoice | 3/13/2004 | DB-6 | Bertera Suzuki | | Events | 130.00 | 2,015.00 |
| Invoice | 3/13/2004 | DB-7 | Holyoke Health Cen… | | Events | 560.00 | 2,575.00 |
| Invoice | 3/13/2004 | DB-8 | Blitz Media, Inc. | | Events | 326.00 | 2,901.00 |
| Invoice | 3/13/2004 | DB-9 | FirstFed | | Events | 120.00 | 3,021.00 |
| Invoice | 3/13/2004 | DB-10 | Career Point | | Events | 199.00 | 3,220.00 |
| Invoice | 3/13/2004 | DB-11 | Chaffee-Helliwell | | Events | 234.00 | 3,454.00 |
| Invoice | 3/13/2004 | DB-12 | Holyoke Communit… | | -SPLIT- | 1,200.00 | 4,654.00 |
| Invoice | 3/13/2004 | DB-13 | Fitzgerald & Robbins | Please Send… | Events | 600.00 | 5,254.00 |
| Invoice | 3/15/2004 | DB-14 | New World Travel | | -SPLIT- | 500.00 | 5,754.00 |
| Invoice | 3/17/2004 | DB-15 | New England Cente… | | Events | 199.00 | 5,953.00 |
| Payment | 3/18/2004 | 1111 | Holyoke Communit… | | Undeposited F… | -1,200.00 | 4,753.00 |
| Invoice | 3/19/2004 | DB-53 | Blitz Media, Inc. | | Fee Income | 326.00 | 5,079.00 |
| Invoice | 3/24/2004 | DB-16 | Balise Auto Sales | | Events | 560.00 | 5,639.00 |
| Invoice | 3/24/2004 | DB-18 | Chaffee-Helliwell | | Events | 234.00 | 5,873.00 |
| Invoice | 3/24/2004 | DB-21 | Open Square Cafe | | Events | 80.00 | 5,953.00 |
| Invoice | 3/24/2004 | DB-22 | Manuel Flooring | | Events | 80.00 | 6,033.00 |
| Invoice | 3/24/2004 | DB-23 | New World Travel | | Events | 250.00 | 6,283.00 |
| Invoice | 3/24/2004 | DB-24 | Citizens Bank | | Events | 490.00 | 6,773.00 |
| Invoice | 3/25/2004 | DB-25 | Holyoke Health Cen… | | Events | 560.00 | 7,333.00 |
| Payment | 4/1/2004 | | FirstFed | | Peoples Bank | -120.00 | 7,213.00 |
| Payment | 4/5/2004 | DB-55 | WestMass ElderCar… | | Peoples Bank | -196.00 | 7,017.00 |
| Invoice | 4/5/2004 | | Eventos HispanAm… | | Events | 280.00 | 7,297.00 |
| Invoice | 4/6/2004 | DB-26 | Blitz Media, Inc. | | Events | 460.00 | 7,757.00 |

Page 5

4:27 PM
05/31/04
Accrual Basis

## Diálogo bilingue
## General Ledger
### All Transactions

| Type | Date | Num | Name | Memo | Split | Amount | Balance |
|---|---|---|---|---|---|---|---|
| Invoice | 4/6/2004 | DB-27 | Chaffee-Helliwell | | Events | 234.00 | 7,991.00 |
| Invoice | 4/6/2004 | DB-28 | WestMass ElderCar... | | Events | 196.00 | 8,187.00 |
| Invoice | 4/6/2004 | DB-30 | Citizens Bank | | Events | 490.00 | 8,677.00 |
| Invoice | 4/6/2004 | DB-31 | Manuel Flooring | | Events | 80.00 | 8,757.00 |
| Invoice | 4/6/2004 | DB-32 | Open Square Cafe | | Events | 80.00 | 8,837.00 |
| Invoice | 4/6/2004 | DB-33 | New World Travel | | Events | 250.00 | 9,087.00 |
| Invoice | 4/6/2004 | DB-34 | Bueno y Sano | | Events | 80.00 | 9,167.00 |
| Invoice | 4/6/2004 | DB-35 | Holyoke Health Cen... | | Events | 560.00 | 9,727.00 |
| Invoice | 4/21/2004 | DB-39 | Blitz Media, Inc. | | Fee Income | 460.00 | 10,187.00 |
| Invoice | 4/21/2004 | DB-42 | FirstFed | | Fee Income | 120.00 | 10,307.00 |
| Invoice | 4/21/2004 | DB-43 | Manuel Flooring | | Fee Income | 80.00 | 10,387.00 |
| Invoice | 4/21/2004 | DB-44 | Open Square Cafe | | Fee Income | 80.00 | 10,467.00 |
| Invoice | 4/21/2004 | DB-45 | Citizens Bank | | Fee Income | 490.00 | 10,957.00 |
| Invoice | 4/21/2004 | DB-46 | Country Jeep | | Events | 280.00 | 11,237.00 |
| Invoice | 4/21/2004 | DB-47 | Holyoke Health Cen... | | Fee Income | 560.00 | 11,797.00 |
| Invoice | 4/21/2004 | DB-48 | Balise Auto Sales | | Fee Income | 560.00 | 12,357.00 |
| Invoice | 4/21/2004 | DB-49 | University of Massa... | | Fee Income | 265.00 | 12,622.00 |
| Invoice | 4/21/2004 | DB-54 | Museum Park Apart... | | Fee Income | 236.00 | 12,858.00 |
| Invoice | 4/21/2004 | DB-56 | Eventos HispanAm... | | Fee Income | 280.00 | 13,138.00 |
| Payment | 5/4/2004 | | Citizens Bank | | Peoples Bank | -490.00 | 12,648.00 |
| Payment | 5/4/2004 | | Balise Auto Sales | | Peoples Bank | -560.00 | 12,088.00 |
| Payment | 5/4/2004 | | Open Square Cafe | | Peoples Bank | -240.00 | 11,848.00 |
| Payment | 5/4/2004 | | Bueno y Sano | | Peoples Bank | -160.00 | 11,688.00 |
| Payment | 5/4/2004 | | Maria Acuña Real E... | | Peoples Bank | -275.00 | 11,413.00 |
| Payment | 5/4/2004 | | Career Point | | Peoples Bank | -199.00 | 11,214.00 |
| Invoice | 5/4/2004 | DB-57 | Blitz Media, Inc. | | Events | 460.00 | 11,674.00 |
| Invoice | 5/4/2004 | DB-58 | Balise Auto Sales | | Events | 560.00 | 12,234.00 |
| Invoice | 5/4/2004 | DB-59 | Chaffee-Helliwell | | Events | 234.00 | 12,468.00 |
| Invoice | 5/4/2004 | DB-60 | FirstFed | | Events | 120.00 | 12,588.00 |
| Invoice | 5/4/2004 | DB-61 | Maria Acuña Real E... | | Events | 275.00 | 12,863.00 |
| Invoice | 5/4/2004 | DB-62 | Manuel Flooring | | Events | 80.00 | 12,943.00 |
| Invoice | 5/4/2004 | DB-63 | Open Square Cafe | | Events | 80.00 | 13,023.00 |
| Invoice | 5/4/2004 | DB-64 | Citizens Bank | | Events | 490.00 | 13,513.00 |
| Invoice | 5/4/2004 | DB-65 | Country Jeep | | Events | 560.00 | 14,073.00 |
| Invoice | 5/4/2004 | DB-66 | Museum Park Apart... | | Events | 236.00 | 14,309.00 |
| Invoice | 5/4/2004 | DB-67 | University of Massa... | | Events | 0.00 | 14,309.00 |
| Invoice | 5/4/2004 | DB-68 | Holyoke Health Cen... | | Events | 560.00 | 14,869.00 |
| Payment | 5/4/2004 | 6904 | Balise Auto Sales | | Peoples Bank | -560.00 | 14,309.00 |
| Payment | 5/10/2004 | 029366 | New England Cente... | | Peoples Bank | -199.00 | 14,110.00 |
| Invoice | 5/11/2004 | DB-70 | Country Jeep | | Events | 280.00 | 14,390.00 |
| **Total Accounts Receivable** | | | | | | 14,390.00 | 14,390.00 |
| **Unbilled Client Costs** | | | | | | | |
| **Total Unbilled Client Costs** | | | | | | 0.00 | 0.00 |

4:27 PM
05/31/04
Accrual Basis

## Diálogo bilingue
## General Ledger
### All Transactions

| Type | Date | Num | Name | Memo | Split | Amount | Balance |
|---|---|---|---|---|---|---|---|
| **Undeposited Funds** | | | | | | | |
| Payment | 3/18/2004 | 1111 | Holyoke Communit... | | Accounts Rec... | 1,200.00 | 1,200.00 |
| **Total Undeposited Funds** | | | | | | 1,200.00 | 1,200.00 |
| | | | | | | | |
| **Accounts Payable** | | | | | | | |
| Bill | 1/6/2004 | 13 | Star Press | 10,000 copie... | Other Expenses | -1,611.00 | -1,611.00 |
| Bill | 2/18/2004 | 2272... | Office Mas | | Printing and R... | -12.00 | -1,623.00 |
| Bill | 3/15/2004 | 222 | Star Press | 6,500 copies... | Other Expenses | -1,498.00 | -3,121.00 |
| Bill | 3/15/2004 | 288 | Star Press | 6,500 copies... | Other Expenses | -1,323.00 | -4,444.00 |
| Bill | 3/15/2004 | 99742 | Saltus Press | | Other Expenses | -203.35 | -4,647.35 |
| Bill | 3/15/2004 | 00062 | Gladys Cruz | | Consulting | -1,177.40 | -5,824.75 |
| **Total Accounts Payable** | | | | | | -5,824.75 | -5,824.75 |
| | | | | | | | |
| **Client Advance Payments** | | | | | | | |
| **Total Client Advance Payments** | | | | | | | 0.00 |
| | | | | | | | |
| **Capital Stock** | | | | | | | |
| **Total Capital Stock** | | | | | | | 0.00 |
| | | | | | | | |
| **Opening Bal Equity** | | | | | | | |
| **Total Opening Bal Equity** | | | | | | | 0.00 |
| | | | | | | | |
| **Retained Earnings** | | | | | | | |
| **Total Retained Earnings** | | | | | | | 0.00 |
| | | | | | | | |
| **Fee Income** | | | | | | | |
| **Events** | | | | | | | |
| Invoice | 1/5/2004 | DB-52 | Manuel Flooring | Jan 04 Ad | Accounts Rec... | -80.00 | -80.00 |
| Invoice | 2/19/2004 | DB-51 | Manuel Flooring | Feb 15 Ad | Accounts Rec... | -80.00 | -160.00 |
| Invoice | 2/28/2004 | DB-69 | Realty Executives | January 1, an... | Accounts Rec... | -200.00 | -360.00 |
| Invoice | 3/13/2004 | DB-0... | Balise Auto Sales | March 1st to ... | Accounts Rec... | -560.00 | -920.00 |
| Invoice | 3/13/2004 | DB-2 | Manuel Flooring | March 1st to ... | Accounts Rec... | -80.00 | -1,000.00 |
| Invoice | 3/13/2004 | DB-3 | New World Travel | March 1st to ... | Accounts Rec... | -250.00 | -1,250.00 |
| Invoice | 3/13/2004 | DB-4 | Bueno y Sano | March 1st to ... | Accounts Rec... | -80.00 | -1,330.00 |
| Invoice | 3/13/2004 | DB-5 | Maria Acuña Real E... | March 1st to ... | Accounts Rec... | -275.00 | -1,605.00 |
| Invoice | 3/13/2004 | DB-6 | Bertera Suzuki | March 1st to ... | Accounts Rec... | -130.00 | -1,735.00 |
| Invoice | 3/13/2004 | DB-7 | Holyoke Health Cen... | March 1st to ... | Accounts Rec... | -560.00 | -2,295.00 |
| Invoice | 3/13/2004 | DB-8 | Blitz Media, Inc. | March 1st to ... | Accounts Rec... | -326.00 | -2,621.00 |
| Invoice | 3/13/2004 | DB-9 | FirstFed | March 1st to ... | Accounts Rec... | -120.00 | -2,741.00 |
| Invoice | 3/13/2004 | DB-10 | Career Point | March 1st to ... | Accounts Rec... | -199.00 | -2,940.00 |
| Invoice | 3/13/2004 | DB-11 | Chaffee-Helliwell | March 1st to ... | Accounts Rec... | -234.00 | -3,174.00 |
| Invoice | 3/13/2004 | DB-12 | Holyoke Communit... | March 1st to ... | Accounts Rec... | -600.00 | -3,774.00 |
| Invoice | 3/3/2004 | DB-12 | Holyoke Communit... | March 1st to ... | Accounts Rec... | -600.00 | -4,374.00 |
| Invoice | 3/13/2004 | DB-13 | Fitzgerald & Robbins | March 1st to ... | Accounts Rec... | -600.00 | -4,974.00 |
| Invoice | 3/15/2004 | DB-14 | New World Travel | Feb 04 Ad | Accounts Rec... | -250.00 | -5,224.00 |
| Invoice | 3/15/2004 | DB-14 | New World Travel | Feb 15 Ad | Accounts Rec... | -250.00 | -5,474.00 |

Page 7

4:27 PM
05/31/04
Accrual Basis

# Diálogo bilingue
## General Ledger
### All Transactions

| Type | Date | Num | Name | Memo | Split | Amount | Balance |
|---|---|---|---|---|---|---|---|
| Invoice | 3/17/2004 | DB-15 | New England Cente... | Feb 04 Ad | Accounts Rec... | -199.00 | -5,673.00 |
| Invoice | 3/24/2004 | DB-16 | Balise Auto Sales | March 15 to... | Accounts Rec... | -560.00 | -6,233.00 |
| Invoice | 3/24/2004 | DB-18 | Chaffee-Helliwell | March 15 - 3... | Accounts Rec... | -234.00 | -6,467.00 |
| Invoice | 3/24/2004 | DB-21 | Open Square Cafe | | Accounts Rec... | -80.00 | -6,547.00 |
| Invoice | 3/24/2004 | DB-22 | Manuel Flooring | | Accounts Rec... | -80.00 | -6,627.00 |
| Invoice | 3/24/2004 | DB-23 | New World Travel | | Accounts Rec... | -250.00 | -6,877.00 |
| Invoice | 3/24/2004 | DB-24 | Citizens Bank | | Accounts Rec... | -490.00 | -7,367.00 |
| Invoice | 3/24/2004 | DB-25 | Holyoke Health Cen... | | Accounts Rec... | -560.00 | -7,927.00 |
| Invoice | 4/5/2004 | DB-55 | Eventos HispanAm... | | Accounts Rec... | -280.00 | -8,207.00 |
| Invoice | 4/6/2004 | DB-26 | Blitz Media, Inc. | April 1 Ad | Accounts Rec... | -460.00 | -8,667.00 |
| Invoice | 4/6/2004 | DB-27 | Chaffee-Helliwell | April 1 Ad for ... | Accounts Rec... | -234.00 | -8,901.00 |
| Invoice | 4/6/2004 | DB-28 | WestMass ElderCar... | | Accounts Rec... | -196.00 | -9,097.00 |
| Invoice | 4/6/2004 | DB-30 | Citizens Bank | April 1 Ad | Accounts Rec... | -490.00 | -9,587.00 |
| Invoice | 4/6/2004 | DB-31 | Manuel Flooring | April 1 Ad | Accounts Rec... | -80.00 | -9,667.00 |
| Invoice | 4/6/2004 | DB-32 | Open Square Cafe | April 1 Ad | Accounts Rec... | -80.00 | -9,747.00 |
| Invoice | 4/6/2004 | DB-33 | New World Travel | April 1 Ad | Accounts Rec... | -250.00 | -9,997.00 |
| Invoice | 4/6/2004 | DB-34 | Bueno y Sano | April 1 Ad | Accounts Rec... | -80.00 | -10,077.00 |
| Invoice | 4/6/2004 | DB-35 | Holyoke Health Cen... | April 1 Ad | Accounts Rec... | -560.00 | -10,637.00 |
| Invoice | 4/21/2004 | DB-46 | Country Jeep | April 15 to 30... | Accounts Rec... | -280.00 | -10,917.00 |
| Invoice | 5/4/2004 | DB-57 | Blitz Media, Inc. | Edition of Ma... | Accounts Rec... | -460.00 | -11,377.00 |
| Invoice | 5/4/2004 | DB-58 | Balise Auto Sales | Edition of Ma... | Accounts Rec... | -560.00 | -11,937.00 |
| Invoice | 5/4/2004 | DB-59 | Chaffee-Helliwell | Edition May 1 | Accounts Rec... | -234.00 | -12,171.00 |
| Invoice | 5/4/2004 | DB-60 | FirstFed | | Accounts Rec... | -120.00 | -12,291.00 |
| Invoice | 5/4/2004 | DB-61 | Maria Acuña Real E... | May 1st, 200... | Accounts Rec... | -275.00 | -12,566.00 |
| Invoice | 5/4/2004 | DB-62 | Manuel Flooring | May 1st, 200... | Accounts Rec... | -80.00 | -12,646.00 |
| Invoice | 5/4/2004 | DB-63 | Open Square Cafe | May 1st, 200... | Accounts Rec... | -80.00 | -12,726.00 |
| Invoice | 5/4/2004 | DB-64 | Citizens Bank | May 1st, 200... | Accounts Rec... | -490.00 | -13,216.00 |
| Invoice | 5/4/2004 | DB-65 | Country Jeep | May 1st to 15... | Accounts Rec... | -560.00 | -13,776.00 |
| Invoice | 5/4/2004 | DB-66 | Museum Park Apart... | | Accounts Rec... | -236.00 | -14,012.00 |
| Invoice | 5/4/2004 | DB-67 | University of Massa... | | Accounts Rec... | 0.00 | -14,012.00 |
| Invoice | 5/4/2004 | DB-68 | Holyoke Health Cen... | May 1st, 200... | Accounts Rec... | -560.00 | -14,572.00 |
| Invoice | 5/11/2004 | DB-70 | Country Jeep | March 16 - 31... | Accounts Rec... | -280.00 | -14,852.00 |

**Total Events**

-14,852.00    -14,852.00

**Press Release**

**Total Press Release**

0.00

4:27 PM
05/31/04
Accrual Basis

**Diálogo bilingue**
**General Ledger**
All Transactions

| Type | Date | Num | Name | Memo | Split | Amount | Balance |
|---|---|---|---|---|---|---|---|
| Fee Income - Other | | | | | | | |
| Deposit | 6/13/2003 | | | Deposit | Peoples Bank | -100.00 | -100.00 |
| Deposit | 6/17/2003 | | | Deposit | Peoples Bank | -560.00 | -660.00 |
| Deposit | 6/20/2003 | | | Deposit | Peoples Bank | -80.00 | -740.00 |
| Deposit | 6/26/2003 | | | Deposit | Peoples Bank | -560.00 | -1,300.00 |
| Deposit | 6/26/2003 | | | Deposit | Peoples Bank | -125.00 | -1,425.00 |
| Deposit | 7/7/2003 | | | Deposit | Peoples Bank | -450.00 | -1,875.00 |
| Deposit | 7/17/2003 | | | Deposit | Peoples Bank | -205.00 | -2,080.00 |
| Deposit | 7/24/2003 | | | Deposit | Peoples Bank | -120.00 | -2,200.00 |
| Deposit | 8/7/2003 | | | Deposit | Peoples Bank | -248.00 | -2,448.00 |
| Deposit | 8/11/2003 | | | Deposit | Peoples Bank | -560.00 | -3,008.00 |
| Deposit | 8/12/2003 | | | Deposit | Peoples Bank | -660.00 | -3,668.00 |
| Deposit | 8/19/2003 | | | Deposit | Peoples Bank | -125.00 | -3,793.00 |
| Deposit | 8/21/2003 | | | Deposit | Peoples Bank | -599.00 | -4,392.00 |
| Deposit | 9/15/2003 | | | Deposit | Peoples Bank | -560.00 | -4,952.00 |
| Deposit | 9/17/2003 | | | Deposit | Peoples Bank | -801.00 | -5,753.00 |
| Deposit | 9/18/2003 | | | Deposit | Peoples Bank | -640.00 | -6,393.00 |
| Deposit | 9/19/2003 | | | Deposit | Peoples Bank | -812.00 | -7,205.00 |
| Deposit | 9/23/2003 | | | Deposit | Peoples Bank | -175.00 | -7,380.00 |
| Deposit | 9/26/2003 | | | Deposit | Peoples Bank | -830.00 | -8,210.00 |
| Deposit | 10/1/2003 | | | Deposit | Peoples Bank | -1,000.00 | -9,210.00 |
| Deposit | 10/2/2003 | | | Deposit | Peoples Bank | -755.00 | -9,965.00 |
| Deposit | 10/3/2003 | | | Deposit | Peoples Bank | -205.00 | -10,170.00 |
| Deposit | 10/14/2003 | | | Deposit | Peoples Bank | -185.00 | -10,355.00 |
| Deposit | 10/20/2003 | | | Deposit | Peoples Bank | -401.00 | -10,766.00 |
| Deposit | 10/23/2003 | | | Deposit | Peoples Bank | -1,175.00 | -11,931.00 |
| Deposit | 10/24/2003 | | | Deposit | Peoples Bank | -586.00 | -12,517.00 |
| Deposit | 10/29/2003 | | | Deposit | Peoples Bank | -80.00 | -12,597.00 |
| Deposit | 11/3/2003 | | | Deposit | Peoples Bank | -1,120.00 | -13,717.00 |
| Deposit | 11/17/2003 | | | Deposit | Peoples Bank | -1,200.00 | -14,917.00 |
| Deposit | 11/19/2003 | | | Deposit | Peoples Bank | -640.00 | -15,557.00 |
| Deposit | 11/21/2003 | | | Deposit | Peoples Bank | -640.00 | -16,197.00 |
| Deposit | 11/26/2003 | | | Deposit | Peoples Bank | -275.00 | -16,472.00 |
| Deposit | 12/5/2003 | | | Deposit | Peoples Bank | -610.00 | -17,082.00 |
| Deposit | 12/5/2003 | | | Deposit | Peoples Bank | -1,250.00 | -18,332.00 |
| Deposit | 12/17/2003 | | | Deposit | Peoples Bank | -910.00 | -19,242.00 |
| Deposit | 12/29/2003 | | | Deposit | Peoples Bank | -560.00 | -19,802.00 |
| Deposit | 1/3/2004 | | | Deposit | Peoples Bank | -455.00 | -20,257.00 |
| Deposit | 1/16/2004 | | | Deposit | Peoples Bank | -326.00 | -20,583.00 |
| Deposit | 1/20/2004 | | | Deposit | Peoples Bank | -560.00 | -21,143.00 |
| Deposit | 1/22/2004 | | | Deposit | Peoples Bank | -330.00 | -21,473.00 |
| Deposit | 1/27/2004 | | | Deposit | Peoples Bank | -740.00 | -22,213.00 |
| Deposit | 1/30/2004 | | | Deposit | Peoples Bank | -855.00 | -23,068.00 |
| Invoice | 2/5/2004 | DB-50 | Manuel Flooring | | Accounts Rec... | -805.00 | -23,873.00 |
| Deposit | 2/17/2004 | | | Deposit | Peoples Bank | -80.00 | -23,953.00 |
| Deposit | 2/25/2004 | | | Deposit | Peoples Bank | -586.00 | -24,539.00 |
| Deposit | 2/27/2004 | | | Deposit | Peoples Bank | -245.00 | -24,784.00 |
| Deposit | 2/27/2004 | | | Deposit | Peoples Bank | -1,120.00 | -25,904.00 |
| Deposit | 3/2/2004 | | | Deposit | Peoples Bank | -550.00 | -26,454.00 |

4:27 PM
05/31/04
Accrual Basis

# Diálogo bilingue
## General Ledger
### All Transactions

| Type | Date | Num | Name | Memo | Split | Amount | Balance |
|---|---|---|---|---|---|---|---|
| Deposit | 3/2/2004 | | deposit | Deposit | Peoples Bank | -80.00 | -26,534.00 |
| Deposit | 3/2/2004 | | deposit | Deposit | Peoples Bank | -2,160.00 | -28,694.00 |
| Deposit | 3/8/2004 | | deposit | Deposit | Peoples Bank | -3,440.00 | -32,134.00 |
| Deposit | 3/8/2004 | | deposit | Deposit | Peoples Bank | -326.00 | -32,460.00 |
| Invoice | 3/19/2004 | DB-53 | Blitz Media, Inc. | March 15 Ad | Accounts Rec... | -326.00 | -32,786.00 |
| Deposit | 3/29/2004 | | deposit | Deposit | Peoples Bank | -1,190.00 | -33,976.00 |
| Invoice | 4/21/2004 | DB-39 | Blitz Media, Inc. | April 15 Ad | Accounts Rec... | -460.00 | -34,436.00 |
| Invoice | 4/21/2004 | DB-42 | FirstFed | April 15 Ad | Accounts Rec... | -120.00 | -34,556.00 |
| Invoice | 4/21/2004 | DB-43 | Manuel Flooring | April 15 Ad | Accounts Rec... | -80.00 | -34,636.00 |
| Invoice | 4/21/2004 | DB-44 | Open Square Cafe | April 15 Ad | Accounts Rec... | -80.00 | -34,716.00 |
| Invoice | 4/21/2004 | DB-45 | Citizens Bank | April 15 Ad | Accounts Rec... | -490.00 | -35,206.00 |
| Invoice | 4/21/2004 | DB-47 | Holyoke Health Cen... | April 15 Ad | Accounts Rec... | -560.00 | -35,766.00 |
| Invoice | 4/21/2004 | DB-48 | Ba!ise Auto Sales | April 15 Ad | Accounts Rec... | -560.00 | -36,326.00 |
| Invoice | 4/21/2004 | DB-49 | University of Massa... | April 15 Ad | Accounts Rec... | -265.00 | -36,591.00 |
| Invoice | 4/21/2004 | DB-54 | Museum Park Apart... | April 15 Ad | Accounts Rec... | -236.00 | -36,827.00 |
| Invoice | 4/21/2004 | DB-56 | Eventos HispanAm... | April 15 Ad | Accounts Rec... | -280.00 | -37,107.00 |
| **Total Fee Income - Other** | | | | | | **-37,107.00** | **-37,107.00** |
| **Total Fee Income** | | | | | | **-51,959.00** | **-51,959.00** |
| **Reimbursed Expenses** | | | | | | | |
| **Total Reimbursed Expenses** | | | | | | | |
| **Uncategorized Income** | | | | | | | **0.00** |
| Invoice | 1/30/2004 | | Realty Executives | Opening bala... | Accounts Rec... | -200.00 | -200.00 |
| **Total Uncategorized Income** | | | | | | **-200.00** | **-200.00** |
| **Articles for newspaper** | | | | | | | |
| Check | 11/5/2003 | 145 | Gayla | | Peoples Bank | 200.00 | 200.00 |
| Check | 12/29/2003 | 134 | Gayla | | Peoples Bank | 200.00 | 400.00 |
| Check | 1/23/2004 | 139 | Gayla | | Peoples Bank | 200.00 | 600.00 |
| Check | 3/2/2004 | 152 | Gayla | | Peoples Bank | 400.00 | 1,000.00 |
| Check | 3/18/2004 | 173 | Marie Sedelow | | Peoples Bank | 34.00 | 1,034.00 |
| Check | 3/19/2004 | 175 | Gayla | | Peoples Bank | 200.00 | 1,234.00 |
| Check | 3/25/2004 | 179 | Gayla | | Peoples Bank | 200.00 | 1,434.00 |
| **Total Articles for newspaper** | | | | | | **1,434.00** | **1,434.00** |
| **Automobile Expense** | | | | | | | |
| **Total Automobile Expense** | | | | | | | **0.00** |

4:27 PM
05/31/04
Accrual Basis

# Diálogo bilingue
## General Ledger
### All Transactions

| Type | Date | Num | Name | Memo | Split | Amount | Balance |
|---|---|---|---|---|---|---|---|
| **Bank Service Charges** | | | | | | | |
| Check | 7/31/2003 | | service charge | | Peoples Bank | 10.00 | 10.00 |
| Check | 8/7/2003 | | insufficient funds ch... | | Peoples Bank | 20.00 | 30.00 |
| Check | 8/30/2003 | | service charge | | Peoples Bank | 10.00 | 40.00 |
| Check | 9/11/2003 | | insufficient funds ch... | | Peoples Bank | 20.00 | 60.00 |
| Check | 9/30/2003 | | service charge | | Peoples Bank | 10.00 | 70.00 |
| Check | 10/31/2003 | | service charge | | Peoples Bank | 10.00 | 80.00 |
| Check | 11/28/2003 | | service charge | | Peoples Bank | 10.00 | 90.00 |
| Check | 12/31/2003 | | service charge | | Peoples Bank | 10.00 | 100.00 |
| Check | 1/30/2004 | | insufficient funds ch... | | Peoples Bank | 100.00 | 200.00 |
| Check | 1/31/2004 | | service charge | | Peoples Bank | 10.00 | 210.00 |
| Check | 2/18/2004 | | insufficient funds ch... | | Peoples Bank | 20.00 | 230.00 |
| Check | 2/29/2004 | | service charge | | Peoples Bank | 10.00 | 240.00 |
| Check | 3/26/2004 | | service charge | | Peoples Bank | 15.00 | 255.00 |
| Check | 3/31/2004 | | service charge | | Peoples Bank | 10.00 | 265.00 |
| **Total Bank Service Charges** | | | | | | 265.00 | 265.00 |
| **Cash Discounts** | | | | | | | |
| **Total Cash Discounts** | | | | | | | 0.00 |
| **Commissions** | | | | | | | |
| Check | 10/31/2003 | 144 | Jose Jr. | | Peoples Bank | 150.00 | 150.00 |
| Check | 11/5/2003 | 118 | Jose Jr. | | Peoples Bank | 250.00 | 400.00 |
| Check | 11/24/2003 | 120 | Jose Jr. | "Luigue Store" | Peoples Bank | 200.00 | 600.00 |
| Check | 11/26/2003 | 121 | Jose Jr. | "Office Supply" | Peoples Bank | 250.00 | 850.00 |
| Check | 12/3/2003 | 127 | Jose Jr. | | Peoples Bank | 500.00 | 1,350.00 |
| Check | 2/27/2004 | 150 | Jose Jr. | | Peoples Bank | 500.00 | 1,850.00 |
| Check | 3/4/2004 | 156 | Jose Jr. | | Peoples Bank | 100.00 | 1,950.00 |
| Check | 3/15/2004 | 172 | Hector Bauza | | Peoples Bank | 200.00 | 2,150.00 |
| Check | 3/18/2004 | 174 | Jose Jr. | "Gladys Cruz" | Peoples Bank | 300.00 | 2,450.00 |
| **Total Commissions** | | | | | | 2,450.00 | 2,450.00 |
| **Contract Labor** | | | | | | | |
| **Total Contract Labor** | | | | | | | 0.00 |
| **Contributions** | | | | | | | |
| **Total Contributions** | | | | | | | 0.00 |
| **Depreciation Expense** | | | | | | | |
| **Total Depreciation Expense** | | | | | | | 0.00 |
| **Donation** | | | | | | | |
| Check | 12/1/2003 | 122 | Isis Rivera | | Peoples Bank | 50.00 | 50.00 |
| **Total Donation** | | | | | | 50.00 | 50.00 |

4:27 PM
05/31/04
Accrual Basis

# Diálogo bilingue
## General Ledger
### All Transactions

| Type | Date | Num | Name | Memo | Split | Amount | Balance |
|---|---|---|---|---|---|---|---|
| **Dues and Subscriptions** | | | | | | | |
| Check | 3/4/2004 | 155 | Latin Chamber of C... | | Peoples Bank | 250.00 | 250.00 |
| Check | 3/11/2004 | 167 | Hispanic Chamber ... | | Peoples Bank | 250.00 | 500.00 |
| **Total Dues and Subscriptions** | | | | | | 500.00 | 500.00 |
| **Equipment Rental** | | | | | | | |
| Total Equipment Rental | | | | | | | 0.00 |
| **Insurance** | | | | | | | |
| **Disability Insurance** | | | | | | | |
| Total Disability Insurance | | | | | | | 0.00 |
| **Liability Insurance** | | | | | | | |
| Total Liability Insurance | | | | | | | 0.00 |
| **Work Comp** | | | | | | | |
| Total Work Comp | | | | | | | 0.00 |
| **Insurance - Other** | | | | | | | |
| Total Insurance - Other | | | | | | | 0.00 |
| **Total Insurance** | | | | | | | 0.00 |
| **Interest Expense** | | | | | | | |
| **Finance Charge** | | | | | | | |
| Total Finance Charge | | | | | | | 0.00 |
| **Loan Interest** | | | | | | | |
| Total Loan Interest | | | | | | | 0.00 |
| **Mortgage** | | | | | | | |
| Total Mortgage | | | | | | | 0.00 |
| **Interest Expense - Other** | | | | | | | |
| Total Interest Expense - Other | | | | | | | 0.00 |
| **Total Interest Expense** | | | | | | | 0.00 |
| **Licenses and Permits** | | | | | | | |
| Check | 10/1/2003 | 221 | City of Holyoke | | Peoples Bank | 100.00 | 100.00 |
| Check | 3/15/2004 | 171 | Commonwealth of ... | annual corp fi... | Peoples Bank | 125.00 | 225.00 |
| **Total Licenses and Permits** | | | | | | 225.00 | 225.00 |

Page 12

4:27 PM
05/31/04
Accrual Basis

# Diálogo bilingue
## General Ledger
### All Transactions

| Type | Date | Num | Name | Memo | Split | Amount | Balance |
|------|------|-----|------|------|-------|--------|---------|
| **Mechanical Prep** | | | | | | | |
| Total Mechanical Prep | | | | | | | 0.00 |
| **Miscellaneous** | | | | | | | |
| Check | 9/18/2003 | 143 | ? | | Peoples Bank | 100.00 | 100.00 |
| Check | 9/30/2003 | 108 | Jose Jr. | | Peoples Bank | 100.00 | 200.00 |
| Check | 10/29/2003 | 109 | J Rios | | Peoples Bank | 50.00 | 250.00 |
| Check | 11/19/2003 | 119 | FAME | moving | Peoples Bank | 110.00 | 360.00 |
| Check | 12/3/2003 | 126 | Alex Maldonado | moving | Peoples Bank | 50.00 | 410.00 |
| Check | 3/8/2004 | 154 | Void | VOID: | Peoples Bank | | 410.00 |
| Total Miscellaneous | | | | | | 410.00 | 410.00 |
| **newspaper distribution** | | | | | | | |
| Check | 10/1/2003 | 107 | Gladys Cruz | | Peoples Bank | 100.00 | 100.00 |
| Check | 10/3/2003 | 111 | Jacqueline Yos | | Peoples Bank | 100.00 | 200.00 |
| Check | 10/3/2003 | 112 | Hector Bauza | | Peoples Bank | 300.00 | 500.00 |
| Check | 10/18/2003 | 114 | Hector Bauza | | Peoples Bank | 400.00 | 900.00 |
| Check | 10/25/2003 | 116 | Hector Bauza | | Peoples Bank | 300.00 | 1,200.00 |
| Check | 11/5/2003 | 117 | Hector Bauza | | Peoples Bank | 500.00 | 1,700.00 |
| Check | 12/1/2003 | 123 | Hector Bauza | | Peoples Bank | 400.00 | 2,100.00 |
| Check | 12/3/2003 | 125 | Marie | Chicopee | Peoples Bank | 50.00 | 2,150.00 |
| Check | 12/19/2003 | 133 | Hector Bauza | | Peoples Bank | 500.00 | 2,650.00 |
| Check | 1/5/2004 | 136 | Hector Bauza | | Peoples Bank | 500.00 | 3,150.00 |
| Check | 1/6/2004 | 137 | Hector Bauza | | Peoples Bank | 150.00 | 3,300.00 |
| Check | 1/23/2004 | 140 | Hector Bauza | | Peoples Bank | 100.00 | 3,400.00 |
| Check | 1/30/2004 | 182 | Hector Bauza | | Peoples Bank | 75.00 | 3,475.00 |
| Check | 2/10/2004 | 148 | Marie Sedelow | | Peoples Bank | 50.00 | 3,525.00 |
| Check | 2/18/2004 | 183 | Hector Bauza | | Peoples Bank | 270.00 | 3,795.00 |
| Check | 3/2/2004 | 151 | Marie Sedelow | | Peoples Bank | 50.00 | 3,845.00 |
| Check | 3/4/2004 | 157 | Hector Bauza | | Peoples Bank | 100.00 | 3,945.00 |
| Check | 3/7/2004 | 164 | Hector Bauza | | Peoples Bank | 100.00 | 4,045.00 |
| Check | 3/7/2004 | 165 | Marie Sedelow | | Peoples Bank | 50.00 | 4,095.00 |
| Check | 3/12/2004 | 169 | Hector Bauza | | Peoples Bank | 400.00 | 4,495.00 |
| Check | 3/25/2004 | 177 | Hector Bauza | | Peoples Bank | 300.00 | 4,795.00 |
| Check | 3/25/2004 | 178 | Manuel Frau | van rental | Peoples Bank | 63.00 | 4,858.00 |
| Total newspaper distribution | | | | | | 4,858.00 | 4,858.00 |
| **Office Supplies** | | | | | | | |
| Check | 12/8/2003 | 129 | Best Buy | telephone | Peoples Bank | 136.47 | 136.47 |
| Check | 3/4/2004 | 158 | Office Max | file cabinet | Peoples Bank | 100.34 | 236.81 |
| Check | 3/12/2004 | 166 | Comp USA | fax machine | Peoples Bank | 104.99 | 341.80 |
| Check | 3/12/2004 | 170 | Comp USA | modem | Peoples Bank | 125.95 | 467.75 |
| Check | 3/27/2004 | 180 | AC Moore | frames for ne... | Peoples Bank | 51.37 | 519.12 |
| Total Office Supplies | | | | | | 519.12 | 519.12 |

4:27 PM
05/31/04
Accrual Basis

# Diálogo bilingue
## General Ledger
### All Transactions

| Type | Date | Num | Name | Memo | Split | Amount | Balance |
|---|---|---|---|---|---|---|---|
| **Photography** | | | | | | | |
| Check | 7/28/2003 | 106 | Armstrong Photogr... | | Peoples Bank | 195.00 | 195.00 |
| Check | 9/26/2003 | 106 | Ed Cohen | | Peoples Bank | 150.00 | 345.00 |
| Check | 12/8/2003 | 130 | Ed Cohen | | Peoples Bank | 246.75 | 591.75 |
| **Total Photography** | | | | | | 591.75 | 591.75 |
| **Postage and Delivery** | | | | | | | |
| Check | 3/7/2004 | 160 | Postal | | Peoples Bank | 40.00 | 40.00 |
| **Total Postage and Delivery** | | | | | | 40.00 | 40.00 |
| **Printing and Reproduction** | | | | | | | |
| Check | 7/9/2003 | 102 | Saltus Press | | Peoples Bank | 1,681.00 | 1,681.00 |
| Check | 8/18/2003 | 141 | Saltus Press | | Peoples Bank | 1,720.40 | 3,401.40 |
| Check | 9/11/2003 | 105 | Saltus Press | | Peoples Bank | 2,012.85 | 5,414.25 |
| Check | 10/2/2003 | 110 | Star Press | | Peoples Bank | 1,963.00 | 7,377.25 |
| Check | 10/18/2003 | 115 | Star Press | | Peoples Bank | 1,611.00 | 8,988.25 |
| Check | 11/19/2003 | 147 | Star Press | | Peoples Bank | 1,611.00 | 10,599.25 |
| Check | 12/8/2003 | 128 | Star Press | | Peoples Bank | 1,611.00 | 12,210.25 |
| Check | 1/23/2004 | 181 | Star Press | | Peoples Bank | 1,611.00 | 13,821.25 |
| Bill | 2/18/2004 | 2272... | Office Mas | | Accounts Pay... | 12.00 | 13,833.25 |
| Check | 3/7/2004 | 162 | Star Press | | Peoples Bank | 1,094.85 | 14,928.10 |
| Check | 3/25/2004 | 176 | Star Press | | Peoples Bank | 1,498.00 | 16,426.10 |
| **Total Printing and Reproduction** | | | | | | 16,426.10 | 16,426.10 |
| **Professional Development** | | | | | | | |
| **Total Professional Development** | | | | | | | 0.00 |
| **Professional Fees** | | | | | | | |
| **Accounting** | | | | | | | |
| **Total Accounting** | | | | | | | 0.00 |
| **Consulting** | | | | | | | |
| Check | 12/3/2003 | 124 | Peter Quirk | Web page | Peoples Bank | 100.00 | 100.00 |
| Bill | 3/15/2004 | 00062 | Gladys Cruz | | Accounts Pay... | 1,177.40 | 1,277.40 |
| **Total Consulting** | | | | | | 1,277.40 | 1,277.40 |
| **Legal Fees** | | | | | | | |
| Check | 9/5/2003 | 104 | Arnold Greenhut | | Peoples Bank | 600.00 | 600.00 |
| **Total Legal Fees** | | | | | | 600.00 | 600.00 |
| **Professional Fees - Other** | | | | | | | |
| **Total Professional Fees - Other** | | | | | | | 0.00 |
| **Total Professional Fees** | | | | | | 1,877.40 | 1,877.40 |

# ATTACHMENT B

# Santiago Bauzá Deposition Exhibits

# Exhibits 12, 17, 37 and 70



**Dialogue**

Volume 2 Number 1 — June 1–15, 2004 — Free/Gratis

Encuentro Agricola 02

# Congratulations! You Made It!
# ¡Felicidades! ¡Lo Lograron!

**3** Nuestra Cámara de Comercio

**4** Boricuas 'Invisible' Within the Broader Latino World

**4** Battling Domestic Violence: Will You Help?

**5** Las Diferentes Batallas de Isaac Ben Ezra

**6** Carlos Colón: From Holyoke to UMass

2  Editorial
5  Ask the Sarge
7  Bienes Raíces
8  Poesía
9  Cocinando Criollo en U.S.A.
10 Horóscopo
10 The Host Commentarios
12 [illegible]
12 [illegible]
11 [illegible]
13 Entrevista
14 Salud



BCP Graduation 2004

Photo by Carol[...]

EXHIBIT

## Celebraciones y Cambios

En esta época del año hay mucho que celebrar. Hace cerca de un año atrás, el 2 de junio de 2003, sale a la calle el primer número de Diálogo bilingüe. Desde ese momento, Diálogo bilingüe se convirtió en una alternativa confiable de noticias de y para la comunidad puertorriqueña y latina.

Durante este pasado año, hemos sido testigos del surgimiento de organizaciones que agrupan la clase empresarial latina en nuestra área de cobertura. El establecimiento del Hispanic Chamber of Commerce of Western Massachusetts y el Latino Chamber of Comerse son ejemplos de esto.

No menos importante es ser testigo de la ya tradicional graduación estudiantil del Bilingual Collegiate Program (BCP) de la Universidad de Massachussets – Amherst, este año celebrando su 30 aniversario. Este programa, al cual le dedicamos nuestra portada, ha servido, aún con recursos limitados y poco apoyo institucional, a la comunidad puertorriqueña y latina desde su creación, siempre "haciendo de tripas, corazones." A la clase graduanda del 2004, ¡Felicidades!

Comenzando con los próximos números, el periódico entrará a una nueva etapa de desarrollo que incluirá cambios notables en el montaje y contenido del mismo. Agradecemos de todo corazón las muestras de apoyo que recibimos durante el pasado año, tanto al periódico como a cada uno de nosotros individualmente. Reiteramos nuestro compromiso con la comunidad puertorriqueña. Fue un placer y un honor servirles.

Sinceramente,
Manuel

## Celebrations and Changes

At this time of year, there is much to celebrate. It was almost a year ago, June 2, 2003, when the first number of Diálogo bilingüe made its appearance. Since that moment, Diálogo bilingüe became a trustworthy news alternative for and about the Puerto Rican and Latino community.

During this past year we witnessed the launching of organizations that support the Latino business sector in our area. The establishment of the Hispanic Chamber of Commerce of Western Massachusetts, and of the Latino Chamber of Commerce are examples of this.

No less important is being witness to the traditional student graduation of the Bilingual Collegiate Program (BCP) of the University of Massachusetts – Amherst, celebrating its 30th anniversary this year. This program, to which we dedicate our cover page, has served, even with limited resources and little institutional support, the Puerto Rican and Latino community since its creation, always "haciendo de tripas, corazones." To the graduating class of 2004, Congratulations!

Beginning with the next numbers, the newspaper will enter a new phase of development that will include notable changes in its form and content. We are deeply grateful for the many demonstrations of support we received during this past year, both to the newspaper and to each one of us individually. We reiterate our commitment to the Puerto Rican community. It was a pleasure and an honor to serve you.

Sincerely,
Manuel



**This summer, change** your **life: change** your **mind.**

We will change your mind this summer with new course selections, expanded degree programs and accredited online learning.

**Use this coupon to waive the registration fee for 6 or more credits!***

*Only at UMass Amherst. Only this summer.*

Call 413-545-2414 for a free course catalog, or visit us online at www.umass.edu/summer

*Savings Code: E8TI1S. May be applied when registering for six or more credits at one time during Summer Session I or II, 2004. Coupon has a singular value of $35.00; multiple coupons may not be applied to one registration. Must be presented at the time of registration and may not be applied retroactively. Not redeemable in cash or credit. Not valid if credit load falls below six. Other limitations apply.



**UMassAmherst**
Continuing Education
*Where summer is a state of mind.*

## JOB OPPORTUNITY
## TV AD ACCOUNT EXECUTIVE

**TV Ad Sales WUVN-TV 18,** Hartford's Univision Network Affiliate, is looking for a results-oriented, organized, professional self-starter who can help us bring our message of a fast growing market and our quality product to the Hartford & New Haven business community.

Degree and bi-lingual a plus but not mandatory. Salary commensurate with experience.
WUVN is an Equal Opportunity Employer (EOE). Woman and minorities encouraged to respond. Interested candidates should send resume, references and salary history to: Hiring Manager, One Constitution Plaza 7th Floor, Hartford, CT 06103 or fax to (781) 433-2702. You can also e-mail your resume as part of the email body to uar-rig@entravision.com.

 **TELEFUTURA** 

## Noticias

# Nuestra Cámara de Comercio

Por Héctor Bauzá de Diálogo bilingüe

El pasado miércoles, 19 de mayo en el Imperial Hall frente a una audiencia de sobre 100 personas incluyendo políticos, hombres y mujeres de negocios y líderes comunitarios, inauguramos la Cámara de Comercio Hispana del Oeste de Massachussets. La experiencia fue increíble, ver el entusiasmo de todos los presentes reforzó nuestras metas e ideales. El Oeste de Massachussets está listo y Holyoke está listo para empezar a trabajar con los comerciantes hispanos. Estamos listos y deseosos de empezar el trato igual de parte de la banca comercial. Estamos unidos para enfrentar los retos que podamos encontrar al tratar de conseguir un permiso para abrir nuestros negocios. Estamos deseosos de trabajar con los políticos del área para mejorar nuestra calidad de vida.

El evento fue un éxito, no solamente por la gran concurrencia, sino también por la organización y la buena comida. Demostramos que juntos podemos. Quiero agradecerle al equipo de trabajo todo su esfuerzo y dedicación. Todo el mundo trabajó duro pero quiero hacer especial reconocimiento a María Ferrer, dueña del Imperial may, a Sandra Santiago, Vicepresidenta de la Cámara, a Eddie Rivera, popularmente conocido como Luigi, dueño de "Luigi Christian Books and Music Store", a Harry Montalvo de Solutions CDC, a Bernard Ramírez de Chaffee-Helliwell Insurance Agency y a Manuel García de Manuel García Flooring Covering. Su compromiso y dedicación hicieron la diferencia. Este gran evento trae otros retos. Los próximos eventos que realicemos van a medirse con la misma vara y la vara está alta.

El 1 de julio de 2004 tendremos el primer evento de las Noches Caribeñas. Durante cinco jueves consecutivos cerraremos partes de la calle High de 6:00PM a 10:00PM y presentaremos un espectáculo con música. Los comerciantes tendrán la oportunidad de vender sus productos. Este evento está diseñado para atraer las familias al Downtown de Holyoke a visitar y a entretenerse de forma sana.

El Paseo Caribeño es nuestra meta más grande y también estamos trabajando hacia el desarrollo de este importante proyecto. Sabemos que tenemos grandes retos por delante pero también sabemos que estamos unidos trabajando para una gran causa: un mejor futuro para todos.



252 Open Square Way • Suite 405 • Holyoke, Massachusetts 01040
Phone 413-536-5550 • Fax 413-533-9467

Volumen 2 • No. 1
Established in June, 2003

**Publishers**          Héctor Bauzá
                        Ingrid Estrany-Frau
                        Manuel Frau Ramos
                        Lillian Santiago-Bauzá
**Editor in Chief**     Manuel Frau Ramos
                        editor@dialogobilingue.com
**Managing Director**   Héctor Bauzá
**Sales Director**      Héctor Bauzá
**Sales Manager**       Miguel Paz
                        advertising@dialogobilingue.com
                        sales@dialogobilingue.com
**Language Editor**     Ingrid Estrany-Frau
**Cartoonist**          Carolyn M. Frau
**Contributing Writers** Rigo Serrano
                        Sonia Correa-Pope

**Política Editorial/ Editorial Policy**
Diálogo bilingüe acepta colaboraciones tanto en inglés como en español. Nos comprometemos a examinarlas, pero no necesariamente a publicarlas. Nos reservamos el derecho de editar los textos y hacer correcciones por razones de espacio y/o de estilo.

Diálogo bilingüe welcomes submissions in either English or Spanish. We consider and review all submissions but reserve the right to not publish them. We reserve the right to edit texts and make corrections for reasons of space and/or style.

# hoy gozamos
## más canales que hablan nuestro idioma

## Canales Selecto
### instalación GRATIS

Compre cable básico, añada canales Selecto y reciba la instalación ¡GRATIS!

**Hoy tenemos más**

- Todos los canales de cable más populares en español y en inglés
- Canales de Pay-Per-View con películas y boxeo
- 53 canales de música, incluyendo 8 canales nuevos con salsa, merengue y rock en español
- Acceso a Internet de alta velocidad

Los canales más populares en español con Canales Selecto:



Todos los canales locales con Cable Básico:









# ahora llamamos 1-866-3-PARA-Tí



Comcast
La conexión que nos une

# Boricuas 'Invisible' Within the Broader Latino World

Por Manuel Frau Ramos de Diálogo bilingüe

Almost three hundred Puerto Ricans activists, political leaders, and organizations from all over the United States, mostly from the Northeast region, converged in New York Hostos Community College in the Bronx on May 21-22 to hold an extraordinary and historic meeting, **Encuentro Boricua 2004.**

The uniqueness and magnitude of this gathering, unseen for the last three decades, have been the result of a year-long nationwide dialogue and planning process by its organizers, **The Boricua Initiative** coalition.



*Diosdado López of Holyoke City Council and Natalia Muñoz of The Republican.*

The majority of **The Boricua Initiative** members were part of an informal network of activists and organizations that contributed to the successful campaigns to get the U. S. Navy out of Vieques and the final liberation of the Puerto Rican political prisoners.

The goal of **Encuentro Boricua 2004** was to develop a progressive political agenda to advance the social progress of the 4 million Puerto Ricans living in the United States. It was seen by most participants as a mechanism to set up a move designed "to refocus, reinvigorate and bind the Puerto Rican movement nationally. " As well stated by Juan Carlos Vilar, National Coordinator of **The Boricua Initiative,** "For the first time in history, there will be more Puerto Ricans living in the US than on the Island this year. More than ever, the potential for economic, cultural and social change of our people hinges on our ability to come together."

Angelo Falcón, senior policy executive for the National Puerto Rican Legal Defense and Educational Fund (PRLDEF) pointed out that **The Boricua Initiative** came about because, due to the nationwide dispersion of the Puerto Rican community, we have become almost 'invisible' within the broader Latino world. He added that although Puerto Ricans have made some economic advances, Boricuas are still struggling with the highest poverty rate - more than 26% - of any Latino group.



*Vladimir Morales of the Amherst School Committee*

Falcón pointed out that "the major problem we identified was that anti-Puerto Rican forces had begun to appropriate our language of social justice and self determination in ways that worked against the social progress of Boricuas. We feel the time is right to correct this, assess our progressive values in ways to develop new strategies for social and political changes."

One of the most exciting announcements made at this conference was the launching in the near future of *eBoricua Magazine,* which is scheduled to make its public debut just before the coming general elections.



*Panel featuring journalist Juan González and Puerto Rican Members of U.S. Congress: Luis Gutiérrez of Chicago, José Serrano and Nydia Velázquez of New York City.*

# Battling Domestic Violence: Will You Help?

Lillian Santiago-Bauzá de Diálogo bilingüe

Last Thursday May 19 I attended a fundraiser organized by Hampden Sheriff and District Attorney William Bennett. Present at the speaker table was Mary Johnson, Executive Director of the YWCA, who explained her vision to build a shelter that would accommodate 48 women and their children. Each room would have a bathroom, she said. The first time she saw such a facility was in Jacksonville, Florida. She was so impressed by the facility and the services, that she called State Representative Linda Malconian to help her build the same facility in Springfield. Also present was Thomas Moriarty, Magistrate of Probate. The keynote speaker was Dr. Stephen Jefferson. He spoke about his own personal experience with the cycle of violence, and the abuse he experienced by his alcoholic father. He also talked about how his relationships were impacted by his traumatic childhood. Dr. Jefferson encouraged people to seek help, and to be committed to it.

Everyone spoke about how domestic violence is a community issue, not a private one. A victim and her/his children don't need criticism, judgment or indifference. They need community support at all levels: a family member to listen, a neighbor to the call police, a victim advocate from the courts or social services to help obtain a restraining order, a lawyer to help retain custody of the children, a doctor to provide medical care, a landlord to help prevent homelessness, and a professional to help the victim obtain public benefits to survive. I admired Dr. Stephen Jefferson because it takes courage to acknowledge the scope of domestic violence and to make the commitment to understanding and doing something about it. Do you have the courage to make a difference? The YWCA needs more than ever your support and commitment. They must fundraise two million dollars to build a place that will provide safety with dignity to women and their children.

Domestic violence is a major criminal-justice issue, a public health crisis and a costly drain on economic productivity. The victims and survivors suffer not once but, in fact, repeatedly, in large part because of what appears to be a massive unwillingness in our society to confront this problem openly. A recent report from the American Bar Association Commission on Domestic Violence makes this point well with regards to those who practice law:

"Whether or not lawyers realize it, domestic violence permeates the practice of law in almost every field. Corporate lawyers, bankruptcy lawyers, tort lawyers, real estate property lawyers, criminal lawyers, and family lawyers regularly represent victims or perpetrators of domestic violence. Criminal and civil judges preside over a range of cases involving domestic violence as an underlying or a hotly contested issue. Failure to fully understand domestic violence legal issues threatens the competency of individual lawyers and judges, as well as the legal professional as a whole."

"Uninformed individuals about domestic violence issues may endanger the safety of victims or contribute to a society that has historically condoned the abuser intimate partner."

Let us all stop, listen, think and begin to make changes...

You can send your contributions to:
YWCA of Western Massachusetts
First Ever Capital Campaign
120 Maple Street
Springfield, MA 01103-2203

## Solutions, CDC

354 Maple Street • Holyoke, MA • (413) 315-6017 ext. 18

Is proud to invite you to its
**Annual Membership Meeting**

Come and celebrate with us another year of accomplishments, renew your membership, elect the new Board of Directors, eat and reconnect with friends. Your contribution is only **$5.00 !!!!**

**Imperial Hall**
**296 High Street, Holyoke**
**June 23, 2004 from 5:30 to 8 PM**

Please RSVP or call Sandra Rivera with your questions at 315-6017 ext.11

**Nuestra Gente**

## ASK THE SARGE
By James Sparrow

★★★★★★★★★★★★★★★★★★★★★★★★★★★★★★

# Flag Days

June 14th is Flag Day and the flag is back in style these days and I think that is a good thing. Every other car seems to have one and every other lapel sports a flag pin. Flags mean many things to many people. Not only the national colors but state flags and service flags also. I see many homes flying the Marine Corps flag proudly. I feel sorry for those of us who don't really appreciate the meaning of flags. They have no sense of history and they are denying themselves the wonderful and fulfilling feeling of loyalty and safety that flags give to us that do understand the meaning. Flags are the visible soul of a nation, state or unit.

During the Civil War the term "rally around the flag boys" really could mean the difference between life and death giving inspiration and direction to the troops. The Medal of Honor was awarded to 132 men during the Civil War for actions involving the national colors or a state or unit colors. One was William Carney of the newly formed 54th Massachusetts Colored Infantry. Many of these men where recent immigrants from Ireland and Germany and many of them where either killed or wounded in their endeavor. Most of them picked up the colors after one or two colors bearers already got killed. Cecil Clay of the 58th Pennsylvania infantry led his regiment in a charge carrying the colors and when severely wounded in the right arm, incurring loss of same, he shifted the colors to the left hand, which also became disabled by a gunshot wound. Martin Schubert of the 26th New York infantry relinquished a furlough granted for wounds and reentered the battle of Fredericksburg where he picked up the colors after several bearers had been killed or wounded, and carried them until himself again wounded. Charles Tanner of the 1st Delaware infantry carried off the colors which had fallen within 20 yards of the enemy's lines, the color guard of 9 men having all been killed or wounded; was himself 3 times wounded. Benjamin Levy, a 14 year old drummer boy with the 1st New York infantry, took the gun of a wounded comrade, went into the battle, and when the color bearers were shot down, carried the colors and saved them from capture. Thomas Plunkett of the 21st Massachusetts infantry seized the colors of his regiment, the color bearer having been shot down, and bore them to the front where both his arms were carried off by a shell.

The spirits of these men lie in cemeteries across this nation from sea to shining sea and they would be happy with the popularity of the flag today knowing that their sacrifices were not in vain. But they would be aghast at the debate on whether the flag should be protected by law or not. They would believe that it is the solemn duty of every citizen to protect the flag. Our courts say it's okay to burn the flag. They say it's an expression of free speech but don't try and burn one in front of me unless you want a real good dose of my expression of free speech.

# Las Diferentes Batallas de Isaac BenEzra

Por Manuel Frau Ramos de Diálogo bilingüe

Isaac BenEzra, residente y miembro del Amherst Town Meeting recientemente anunció su candidatura para la única posición abierta existente en el *Governor's Council of Massachussets* por el Octavo Distrito en las próximas primarias del Partido Demócrata, programadas para el mes de septiembre de este año.

BenEzra, presidente del *Massachussets Senior Action Council*, una organización de 22 años de fundada con cerca de 2.500 miembros a través del estado, quiere darle mayor visibilidad al Concilio. Según BenEzra, el Concilio, organismo que le hace recomendaciones al gobernador sobre candidatos a jueces en el estado, ha sido una "de las sociedades más secretas del Commonwealth". Sólo aquellas personas interesadas en esta comisión en particular la conocen.

Como Presidente del Concilio, formó una coalición para traer medicinas de Canadá a precios razonables. BenEzra recibió un premio de la Asociación de Enfermeras/os de Massachussets por su ayuda para preservar empleos en el Hospital Cooley Dickinson. Entre otros, ha trabajado como trabajador social y entiende las necesidades reales de la clase trabajadora, de las familias y de los envejecientes. Entiende cómo el ambiente, la transportación, los servicios de salud y otros issues afectan la vida de los ciudadanos.

En estos momentos, la comisión tiene un una gran debilidad, apunta BenEzra: la tendencia a favorecer a aquellos con amigos en altas posiciones políticas. Para BenEzra lo importante es asegurarse de que las selecciones que se hagan sobre los que van a servir en el sistema judicial no se basen nepotismo o padrinazgo político.

Finalmente BenEzra añade que, "Nosotros necesitamos que todo candidato haga pública su carrera política y de activismo social y que en los mismos haya demostrado respetar a los ciudadanos del estado de Massachusetts. Es necesario asegurarse de que a las familias trabajadoras se les trate con justicia."

# ADVERTISE!!



**MANUEL GARCIA**

**FLOORING COVERING**
Surtido variado, comercial y residencial, en
Alfombras • Linóleos
Losetas en cerámica
Remanentes • Tiles
Pisos laminados en madera
(Hardwood floor)

¡Servicio garantizado,
completamente asegurado!
Expertos profesionales le orientarán en su selección y brindarán el mejor servicio. ¡Estimados gratis!

**VISITE NUESTRO SALÓN DE EXHIBICIONES EN**
775 High Street, Holyoke, MA 01040 • Tel. (413) 214-6765 • Fax (413) 214-6765

**square café**

at open square
in the heart of
Holyoke's
canal district
413.538.6214

www.opensquare.com

# nuevos almuerzos en square café

**now offering a selection of sandwiches from our new panini grill**

every morning offering
fresh baked goods
coffee & espresso drinks

open monday thru friday 8 am - 1 pm
square café is at 110 Lyman St.
(across from the Wherehouse?)

**Diálogo** bilingüe ● June 1-15, 2004

# Carlos Colón: From Holyoke to UMass / Carlos Colón: De Holyoke a UMass

Courtesy of Sonia Correa-Pope

*Carlos Colon is going to be one the few Puertoricans "Holyokianos" that has the opportunity to enter the University of Massachusetts- Amherst. A city so close to college out out of reach for most Puerto Ricans who make up the majority of the student body at the Holyoke School Public system.*

Carlos Colón va a ser uno de los pocos puertorriqueños "Holyokianos" que tienen la oportunidad de entrar a la Universidad de Massachusetts – Amherst. Una ciudad tan cerca de las universidades pero tan fuera del alcance de la mayoría de los puertorriqueños que componen el estudiantado del Sistema de Escuelas Públicas de Holyoke.

*Carlos, who is a product of the Holyoke Public Schools, enrolled in the Holyoke Community College Upward Bound Program as a high school sophomore. Carlos attended Holyoke High School and on June 5, 2000 graduated not only with a high school diploma but also with an award for Excellent Attendance. He has always been responsible, mature and respectful of others. Before choosing the University of Massachusetts in Amherst, Carlos was accepted at Western New England College and Holyoke Community College, but he wanted UMass as his Alma Mater.*

Carlos, quien es producto de las Escuelas Públicas de Holyoke, se matriculó en el Programa Upward Bound del Holyoke Commnity College cuando era estudiante de segundo año de escuela superior. Carlos fué a la Escuela Superior de Holyoke y el 5 de junio de 2002 se graduó y no solamente recibió un diploma, sino un premio por su Excelente Asistencia. Siempre ha sido responsable, maduro y respetuoso. Antes de escoger la Universidad de Massachusetts en Amherst, Carlos había sido aceptado en el Western New England College y en Holyoke Community College, pero el quería que UMass fuera su Alma Mater.

*Carlos was an active participant in the Upward Bound Program from 1998-2000. He participated in various activities such as weekly tutoring sessions, the after-school mini-courses for five weeks at Holyoke Community College, and multiple college visits. He also attended the Upward Bound Academic six-week summer program for three years. Carlos had the opportunity to explore what it was like to commute to college every day with our first three-week commuting program and then he learned about residing in college in our second three-week residential component.*

Carlos participó activamente en el Programa Upward Bound durante 1998-2000. Participó en varias actividades tales como tutorías semanales, los mini-cursos después de la escuela en Holyoke Community College y múltiples visitas a colegios. También, durante tres años, fue parte del Programa de Upward Bound de seis semanas en el verano. Carlos tuvo la oportunidad de explorar lo que significa ir a la universidad todos los días con nuestro primer programa de tres semanas y más adelante aprendió lo que era residir en la universidad con nuestro segundo componente residencial de tres semanas.

*His peers recognize Carlos as the class poet and singer. After his first year of college, he came back to the program and served as a peer tutor to the younger students. After completing his second year at the university, he again came back to the program and worked as a residential assistant for the summer. He has served as a tutor, mentor and role model to many of our younger students in the Upward Bound Program.*

Sus compañeros reconocen en Carlos el poeta y cantante de la clase. Luego de su primer año universitario, volvió al programa y sirvió de tutor a los estudiantes más jóvenes. Luego de completar su segundo año en la universidad, regresó nuevamente al



Aurelio Colon, Sonia Correa-Pope and Carlos Colon

programa y trabajó como asistente de residencia durante el verano. Ha servido como tutor, mentor y ha sido ejemplo para muchos de nuestros estudiantes jóvenes del Programa Upward Bound.

*This Spring, Carlos graduated from UMass with an English mayor. Dr. Sonia Correa-Pope, Director of the Upward Bound Program at Holyoke Community College, conferred him an award during the graduation ceremonies of the Bilingual Collegiate Program (BCP) at UMass. Carlos became the second student from the Upward Bound Program to have finished a university program in 4 years.*

Carlos se graduó esta primavera de UMass con una concentración en inglés. En la ceremonia de graduación del Bilingual Collegiate Program (BCP) de UMass recibió un premio de parte de la Dra. Sonia Correa-Pope, Directora del Programa Upward Bound del Holyoke Community College. Carlos se convirtió en el segundo estudiante del Upward Bound Program en graduarse de la universidad en 4 años.

# FIRSTFED

## Las Ventajas de las Hipotecas de Firstfed

Pre-aprobacion gratis
Sin costos
Sin obligación
Programas sin pronto pago
Todo tipo de credito
Financiamiento de 100% para primeros compradores

Para más información, favor de llamar a Oneida Morales al
1-800-331-8181 ext 2688



# SONIA
## PALM AND CARD READINGS

Will help you with all your personal problems:
Love, Marriage, Business and Health
If you are sick, suffering, have bad luck,
call Sonia today
Te puedo resolver todos tus problemas.
Llama hoy mismo.

# 413.783.6779
PALM READING FOR PARTIES AND GROUPS
762 Boston Road, Springfield, MA

## Bienes Raíces

# ¡Hola! Por María Acuña de María Acuña Real Estate, LLC

Ha decidido poner su casa en venta. Ha pintado la casa y las reparaciones se han completado. La casa se ha puesto a la venta con un corredor de bienes raíces y hay un anuncio de venta en su patio. ¿Y ahora, qué?

**¡Las primeras impresiones son importantes!** Una casa desordenada es poco atractiva y puede prevenir que un posible comprador vea la propiedad de una manera positiva. El patio debe estar arreglado, los arbustos recortados y la basura recogida. Los compradores deberán poder moverse *libremente y con seguridad* dentro de la casa. Las escaleras y los pasillos deberán estar limpios. Remueva la basura que se haya acumulado en el garaje, en el ático y en el sótano. Esto permitirá que los compradores vean bien estas áreas y que no crean que "hay algo escondido". Los cuartos oscuros no son atractivos. Abra las ventanas y provea iluminación adecuada para que los posibles compradores puedan ver cuán clara y acogedora es su residencia.

Llega el fin de semana y varios posibles compradores vendrán a ver su propiedad. Limpie bien la cocina y el baño. No esté presente cuando vengan los posibles compradores para que no se sientan que están molestando. Déles una oportunidad de sentirse cómodos con ellos. Si tiene que estar presente, sea cortés y amistoso. No entable conversación con los posibles compradores. ¿Por qué? Los comentarios que usted haga pueden debilitar su posición a la hora de negociar. Apague los televisores y los equipos estereofónicos para que los compradores no se distraigan y puedan hablar con calma. Como esto no es una venta de artículos usados, no trate de vender los muebles que usted ya no quiera.

No trate de negociar en estos momentos. Todas las preguntas, ofertas y negociaciones deben ser atendidas por su corredor de bienes raíces. Usted está en una posición vulnerable y posiblemente pueda poner en peligro el trato.

# ¡Hola! By María Acuña of María Acuña Real Estate, LLC

You've decided to put your house up for sale. All repairs have been made and a fresh coat of paint where needed. The house is listed with a real estate agent and the sign is up in front of the yard. Now what?

**First impressions are important!** A cluttered house is unattractive and can prevent a prospective buyer from seeing the house at its best. The outside should be mowed with the bushes trimmed and trash picked up. Buyers should be able to move *freely and safely* throughout the house. Stairways and hallways should be kept cleared. Junk that had piled up in the garage, attic or basement should be removed. This allows buyers to see the full value of these areas and remove any doubt that "something is being hidden." Dark, dreary rooms are not appealing to homebuyers. Open curtains and provide lighting so prospects can see how bright and cheerful the house is.

The weekend is here and several showings are scheduled. Make your kitchen and bathroom sparkle. Leave the house during the showings so that buyers won't feel as if they are intruding. Give them a chance to be comfortable and not hurry through the house. Arrangements should be made for pets since all people are not comfortable with them. If you are present, be courteous and friendly. Do not engage in conversation with potential buyers. Why? Comments you make now could weaken your position in negotiating later on. Turning odd television and stereos keeps buyers from being distracted and lets them talk calmly without having to yell over any noise. Since this isn't a garage sale, don't try to sell furnishings that you don't want to take with you.

Do not attempt to negotiate at this time. All questions, offers and negotiations should be handled by your real estate agent. You are in a vulnerable position and could possibly jeopardize the deal.

Your Realtor,
Maria Acuna


Elias Acuña
(413) 783-7025


Maria Acuña


Anna Santana
(413) 747-6092


Ramona Helton
(413)750-0701




Maritza Martinez
(413) 748-6148

Norma Cartagena
(413) 695-3930

Junior Garcia
(978) 390-2727

**Your Real Estate Company**

**Su Compañia de Bienes Raices**


Maria Ortiz
(413) 210-3130


Stephanie Ouellette
(413) 734-4327

## Arturo Pellerano Castro

(dominicana, 1853 –1916)

### Atí...(Criolla)

Yo quisiera, mi vida, ser burro,
ser burro de carga,
y llevarte, en mi lomo, a la fuente,
en busca del agua,
con que riega tu madre el conuco,
con que tú, mi triguita, te bañas.
Yo quisiera, mi vida, ser burro,
ser burro de carga,
y llevar al mercado tus frutos,
y traer, para ti, dentro del argana,
el vestido que ciña tu cuerpo,
el pañuelo que cubra tu espalda,
el rosario de cuentas de vidrio
con Cristo de plata,
que cual rojo collar de cerezas
rodee tu garganta...
Yo quisiera, mi vida, ser burro,
ser burro de carga...
Desde el día que en el cierro del monte,
cogida la falda
el arroyo al cruzar, me dijiste
sonriendo: ¿me pasas?...
y tus brazos ciñeron mi cuello,
y al pasarte sentí muchas ganas,
de que fuera muy ancho el arroyo,
de que fueran muy hondas sus aguas...
desde el día que te cuento, triguena,
¡yo quisiera ser burro de carga!...
Y llevarte en mi lomo a la fuente,
y contigo cruzar la cañada,
y sentirme arrear por ti misma,
cuando, a vuelta del pueblo, te traiga,
el vestido que ciña tu cuerpo,
el pañuelo que cubra tu espalda,
el rosario de cuentas de vidrio
con Cristo de plata,
que cual rojo collar de cerezas
rodee tu garganta...
¡Yo quisiera, mi vida, ser burro,
ser burro de carga!

## Fabio Fiallo

(dominicano, 1866-1942)

### Quienfueratuespejo

¡Cuán feliz es el sol! En las mañanas
por verte su carrera precipita,
a tus balcones llega, y en cada alcoba
penetra por la abierta celosía.

Al blanco lecho en que reposas, sube,
a tu hermosura de calor y vida,
tornase ritmo en tus azules venas,
y epigrama de luz en tus pupilas.

Mas, yo, no envidio al sol, sino al espejo
en donde ufana tu beldad se mira,
que te ama, alegre, cuando estás delante,
y al punto que te vas de ti se olvida.

## Fabio Fiallo

(dominicano, 1866-1942)

### Elsilenciodeunosojos

Qué me dicen tus dulces ojos negros,
tan cargados de sombras, ¡oh, adorada!
que en la noche me basta su recuerdo
para llenar mi corazón de lágrimas.

Qué me dicen tus dulces ojos negros,
en su silencio lleno de palabras
tan leves, que el oído nunca advierte
cuando se adentran en mi oscura entraña...

Tal dos aves que buscan su refugio
en un agrio peñón de oculta playa,
y en su áspero nidal, en vez de cánticos
alzan al cielo súplicas calladas.

### Astromuerto

La luna, anoche, como en otro tiempo,
como una nueva amada me encontró;
también anoche, como en otro tiempo,
cantaba el ruiseñor.
Si como en otro tiempo, hasta la luna
hablábame de amor,
¿por qué la luna, anoche, no alumbraba
dentro mi corazón?

## Salomé Ureña de Henríquez

(dominicana, 1850-1897)

### El Ave y el Nido

¿Por qué te asustas, ave sencilla?
¿Por qué tus ojos fijas en mí?
Yo no pretendo, pobre avecilla,
llevar tu nido lejos de aquí.

Aquí, en el hueco de piedra dura,
tranquila y sola te vi al pasar,
y traigo flores de la llanura
para que adornes tu libre hogar.

Pero me miras y te estremeces,
y el ala bates con inquietud,
y te adelantas, resuelta, a veces,
con amorosa solicitud.

Porque no sabes hasta qué grado
yo la inocencia sé respetar,
que es, para el alma tierna, sagrado
de tus amores el libre hogar.

¡Pobre avecilla! Vuelve a tu nido
mientras del prado me alejo yo;
en él mi mano lecho mullido
de hojas y flores te preparó.

Mas si tu tierna prole futura
en duro lecho mirar al pasar,
con flores y hojas de la llanura
deja que adorne tu libre hoga

## Domingo Moreno Jiménez

(dominicano, 1894-1986)

### Melancolía

Dejaré mis niños.
Partiré del pueblo.
Me roerá la angustia que a los peregrinos
acoge en silencio.

El día que parta,
todos a sus puertas saldrán a verme;
encontraré en mi senda alguna anciana
de las que socorría algunas veces...

Cuando unos pinos cruce
fustigaré mi potro,
y aunque el norte no empañe ni una nube,
mi pañuelo de hilo me llevaré a los ojos.

Al verme las perdices
levantarán el vuelo;
llorará en una palma una tórtola triste,
y tal vez si un can sucio me seguirá a lo lejos...

Por unas semanas y aun meses
me instigará una sombra;
luego... mis cantos en la mañana alegre.
¿Y después?... el olvido y algunas muertas rosas.

## Manuel del Cabral

(dominicano, 1907-1999)

### TrópicoPicapedrero

Hombres negros pican sobre piedras blancas,
tienen en sus picos enredado el sol.
Y como si a ratos se exprimieran algo...
lloran sus espaldas gotas de charol.
Hombres de voz blanca, su piel negra lavan,
la lavan con perlas de terco sudor.
Rompen la alcancía salvaje del monte,
y cavan la tierra, pero al hombre no.
De las piedras salta, cuando pica el pico,
picadillo fatuo de menudo sol,
que se apaga y vuelve cuando vuelve el pico
como si en las piedras reventara Dios.
Dentro de una gota de sudor se mete
la mañana enorme —perro grande no—
Saltan de los cráneos de las piedras chispas
que los pensamientos de las piedras son.
Y los hombres negros cantan cuando pican
como si ablandaran las piedras su voz.
Mas los hombres cavan, y no acaban nunca...
cavan la cantera: la de su dolor.
Contra la inocencia de las piedras blancas
los haitianos pican, bajo un sol de ron.
Los negros que erzan de chispas las piedras
son noches que rompen pedazos de sol.
Hoy buscando el oro de la tierra encuentran
el oro más alto, porque su filón
es aquel del día que pone en los picos
astillas de estrellas, como si estuvieran
sobre la montaña picoteando a Dios.

### Calendario histórico

2 de junio de 2003 – Se publica el primer número de Diálogo bilingüe.

5 de junio de 1878 – Nace el legendario revolucionario mexicano Francisco "Pancho" Villa en San Juan de Río. Bautizado con el nombre de Doroteo Arango Quiñones.

6 de junio de 1823 – Se funda Quebradillas.

9 de junio de 1521 – El conquistador español Hernán Cortés llega finalmente al Gran Templo en Tenochtitlán, corazón del imperio Azteca.

10 de junio de 1942 – Nace Anthony J. Alvarado. Primer puertorriqueño que ocupa la posición de "Chancellor" del sistema de escuelas públicas de la ciudad de New York en el 1983.

11 de junio de 2004 – Día de la Bandera de Puerto Rico.

12 de junio de 1927 – Nace Angelo (Ángel) Cabrera, líder y político de la ciudad de New York.

13 de junio de 2004 – Puerto Rican National Day Parade en NY. La primera vez que se llevó a cabo en el 1958, cuando la primera organización formó el Puerto Rican Day Parade in New York City.

15 de junio de 1928 – Nace en San Juan el educador y escritor Antonio Pedreira. Autor de libro "Insularismo", estudió las características, los valores, y la identidad del puertorriqueño y su lucha por definirse como pueblo.

16 de junio de 1961 – Se funda la Cruzada del Rosario.

17 de junio de 1833 – Nace los fundadores el pintor puertorriqueño Francisco Oller Cestero. El famoso cuadro "El Velorio", que se encuentra en el Museo de la Universidad de Puerto Rico, es un ejemplo de su maestría en el arte de combinar las paletas. El cuadro es un estudio de diferentes tipos puertorriqueños y representa un velorio de niño o baquiné, que se acostumbraba celebrar, especialmente en el campo. En el baquiné se cantaba, se reía y se repartían golosinas mientras que sus padres se morían de dolor.

17 de junio de 1520 – En Tenochtitlán, capital Azteca, el emperador Moctezuma se enfrenta a una muchedumbre frente a su palacio. Los indios Aztecas estaban molestos por la presencia de los españoles en su ciudad. El emperador fue apedreado y murió el 29 de junio.

17 de junio de 2004 – Día de los Padres.

21 de junio de 1955 – Se establece el Instituto de Cultura Puertorriqueña de Puerto Rico. Su primer Director Ejecutivo fue el Dr. Ricardo E. Alegría, quien guió la agencia hacia dos objetivos fundamentales: estudiar y conservar nuestro patrimonio histórico-cultural; y estimular, fomentar, promover y divulgar las diversas manifestaciones de la cultura puertorriqueña.

21 de junio de 1939 – Nace el líder independentista Rubén Berríos Martínez, Presidente de El Partido Independentista Puertorriqueño desde el 1979.

23 de junio de 1935 – Nace Mauro Ferrer, primer alcalde de la ciudad de Miami (1973-1985) de descendencia puertorriqueña. Durante su administración ocurrieron hechos muy significativos como el éxodo masivo de Mariel, Cuba y los disturbios raciales en Liberty City.

24 de junio de 2004 – Se celebra la "Noche de San Juan", caminando hacia la playa, de espaldas, a la medianoche, para la buena suerte.

24 de junio de 1820 – Se funda el pueblo de Ciales.

25 de junio de 1881 – Nace Miriam M. de Pérez Almiroty, primera mujer electa a la legislatura de Puerto Rico.

27 de junio de 1982 – Se establece el Institute for Puerto Rican Policy en la ciudad de New York por Angelo Falcón. En el 1999 pasa a ser parte del Puerto Rican Legal Defense and Education Fund.

29 de junio de 1912 – Se funda la Universidad Interamericana de Puerto Rico en la ciudad de San Germán.

30 de junio de 1939 – Nace Izzy "Mr. Salsa" Sanabria. Se conoce porque, casi sin ayuda de nadie, popularizó este término para la música latina de Nueva York durante la década de los 70s.

30 de junio de 1939 – Nace José Figueroa, violinista puertorriqueño, quien tocó como primer violinista en el Radio City Music Hall en 1945.

30 de junio de 1823 – Se funda el pueblo de Hatillo.

## Cocinando Criollo en U.S.A.

  

Por Lillian Santiago-Bauzá

Aunque reconozco que el mangó es una fruta que se cosecha en muchos países, no dejo de identificarme con la fruta como si fuera de nosotros los puertorriqueños. En Puerto Rico la temporada del mangó es abundante y siempre buscamos nuevas formas de prepararlo. Ahora, cuando mezclamos flan de queso con mangó entonces sí que estamos haciendo un "statement", porque nosotros los puertorriqueños sí nos identificamos con el flan. Así que la receta que les traigo es Flan de Queso y Mangó. ¡Que la disfruten!

### Flan de Queso y Mangó

**Ingredientes:**
1 lata de leche condensada
1 taza de leche fresca
4 huevos
8 ozs. de queso crema
1 taza de pulpa de mango molida
2 rebanadas de pan sin corteza
1cdta. de jengibre rallado
4 cdtas. de mantequilla derretida

**Procedimiento:**
Mezcle en la licuadora todos los ingredientes hasta que unan bien. Vierta en un molde redondo de 8" ó 10" ó en moldes individuales con caramelo en el fondo. Hornee a 350 grados en baño de María por una hora o hasta que cuaje.



Even though I recognize that mango is a fruit that grows in many countries, I identify it as truly Puerto Rican. In Puerto Rico the mango harvest is abundant and we are always looking for new recipes that include it. When we combine flan de queso with mango we certainly are making a statement, as all Puerto Ricans identify themselves with flan. So, today's recipe is cheese and Mango Flan. Enjoy!

### Cheese and Mango Flan

**Ingredients:**
1 can condensed milk
1 cup milk
4 eggs
8 ozs. cream cheese
1 cup mango pulp
2 slices white bread
1 teaspoon grated ginger
4 teaspoons melted butter

**Procedure:**
Combine all ingredients in a blender until well blended. Pour mixture into an 8" or 10" round baking pan or in individual molds that have been caramelized. Bake at 350 degrees in a water bath (double boiler) until firm.

Si tienes alguna receta que quieras compartir con nuestros lectores, la puedes enviar a: Diálogo bilingüe, 252 Open Square Way, Suite 405, Holyoke MA 01040.



# OPORTUNIDAD DE EMPLEO

*Si tiene iniciativa propia, está constantemente motivado y comprometido a ofrecer servicios de excelente calidad, esta es su oportunidad de ingresar a una carrera próspera y rentable.*

*Diálogo Bilingüe solicita ejecutivos de venta para formar parte de su equipo de mercadeo. Los solicitantes deben ser bilingües (Inglés- Español) y tener su medio de transporte propio. Interesados enviar su "resume" a:*
*DIÁLOGO BILINGÜE,*
*252 Open Square Way - Studio 405, Holyoke, MA 01040Si tiene iniciativa*

# Horóscopo bilingüe

# Horóscopo del 1 al 15 de junio de 2004

## ARIES (21 de marzo - 19 de abril)

Actuarás con certeza en una situación que nadie se anima a enfrentar. Tu valentía hará que ganes rivales que no podrán disimular su envidia. Gozarás de unos placenteros fines de semana.

*You will act with assurance in a situation that nobody wants to face. Your boldness will win you rivals that will have a hard time disguising their envy. You will enjoy very pleasant week-ends.*

## TAURO (20 de abril - 20 de mayo)

Tus sentimientos estarán a flor de piel. No te obsesiones con aquello que tú sabes no puede ser. Permite que en tu vida todo fluya con naturalidad. Quien te quiera, que venga a ti por voluntad propia. Busca nuevas formas de entretenerte para que te relajes y te distraigas.

*Your feelings will be evident. Don't obsess about something that you know can't be. Allow things to flow naturally. Whoever loves you must come to you freely. Look for new forms of entertainment.*

## GEMINIS (21 de mayo - 20 de junio)

Una persona a la que habías ignorado despierta en ti nuevas emociones. Cuídate de no asfixiar a tu pareja demandando o exigiendo atenciones. Supera tus inseguridades. No exijas aquello que tú no das.

*A person that you had ignored awakens new emotions. Be careful not to suffocate your partner demanding attention. Overcome your insecurities. Don't demand what you don't give.*

## CANCER (21 de junio - 22 de julio)

Problemas familiares afectándote como nunca antes. Toma las cosas con calma ya que por el momento nada puedes hacer para resolverlos.

En el amor las cosas se ponen al rojo vivo y tendrás que hacer cambios para que esa relación no naufrague. Es momento de madurar y ver las cosas desde otra perspectiva.

*Family problems will affect you like never before. Take it easy because there's nothing you can do right now to solve them. In love, things get complicated and you will have to make changes to save the relationship. It is time to mature and to see things from a different perspective.*

## LEO (23 de julio - 22 de agosto)

Es tiempo de cambiar costumbres tradicionales y de adaptarte a lo nuevo. El dinero te llegará más fácilmente. Un viaje corto te llevará a conocer gente influyente que de una manera indirecta te afectarán favorablemente en tu trabajo o en tu profesión. Continúa venciendo obstáculos.

*It is time to change your traditional ways and to adapt to new things. Money will come easily. A short trip will have you meet influential people that will prove to be favorable for you job and your profession. Continue overcoming obstacles.*

## VIRGO (23 de agosto - 22 de septiembre)

La suerte te sonríe en el dinero y en el amor. Lo íntimo, lo personal, se exalta. La confianza que depositas en esa persona que tanto te interesa sentará las bases para una relación más estable.

*You will be lucky in money and love. Your personal life becomes important. The trust that you show that person that you are interested in will be the basis for a stable relationship.*

## LIBRA (23 de septiembre - 22 de octubre)

Te enfrentarás y vencerás la duda o la incertidumbre. Algo que te propongan quedará en la nada si no tomas una decisión definitiva. Ponte en acción,

despierta tu sexto sentido. Déjate guiar por tu intuición y obtendrás la respuesta que tanto deseas. Sé sincero contigo mismo.

*You will conquer your fears and doubts. A proposal will result in nothing if you don't make a quick decision. Take action; awaken your sixth sense. Let yourself be guided by your intuition and you will find the answer you are looking for. Be sincere with yourself.*

## ESCORPION (23 de octubre - 21 de noviembre)

Abre todos tus sentidos a nuevos comienzos. Tómate todo el tiempo que necesites al momento de tomar decisiones importantes. No te precipites a compromisos de los cuales podrías arrepentirte luego. Ordena, organiza tu vida en todos los aspectos

*Open all your senses to new beginnings. Take all the time you need to make important decisions. Don't make commitments that you might regret later. Organize all areas of your life.*

## SAGITARIO (22 de noviembre - 21 de diciembre)

No es momento de formalizar relaciones pero si puedes comenzar a darle forma a esa idea que tienes en mente realizar. Es tiempo de desarrollar más confianza, entendimiento o comunicación en tus relaciones.

*This is not the time to formalize relationships but you might start to give shape to an idea that you want to carry out. It is time to develop more trust and understanding in your personal relationships.*

## CAPRICORNIO (22 de diciembre - 19 de enero)

Revisa tu estado financiero y ajústate a tu presupuesto real. Tratando de impresionar a otros podrías caer en la ruina económica. Controla tus impulsos y toma en consideración la opinión de alguien que te quiere ver progresar en la vida.

*Review your financial status and stick to a realistic budget. If you try to impress others you may face financial ruin. Control your impulses and take into consideration the opinion of somebody who wishes you well.*

## ACUARIO (20 de enero - 18 de febrero)

Laborarás hoy junto a personas conflictivas pero saldrás airoso. Recuperas la fe en ti mismo. Las adicciones emocionales, los engaños y las dependencias neuróticas serán superadas. Te enfrentarás a la verdad y ganarás como nunca antes en sabiduría.

*You will work alongside conflictive individuals but you will be successful. You regain you self-esteem. Emotional addictions, lies and neurotic tendencies will be overcome. You will face reality and become wiser.*

## PISCIS (19 de febrero - 20 de marzo)

Algo maravilloso te sacudirá y te llenará de felicidad. Ábrele las puertas al amor y de seguro recobrarás las esperanzas y las ilusiones que ya dabas por perdidas. Examínate por dentro y por fuera. Entiende que la mayoría de tus preocupaciones no son más que una gran distorsión de la realidad actual.

*Something wonderful will make you very happy. Open your heart to love and you will regain lost hope. Examine yourself. Understand that many of your worries are nothing else than distortions of reality.*

## HOLYOKE

**FREE CLASS to Get Ready to College**
The JUNTOS Adult Education Collaborative and Holyoke Community College invite you to: College-level writing course. Class starts July 5 and ends August 6, 2004.

This Program is for you if:
- You have a GED or graduated from high school a while back.
- You want to enter college to learn more about the world, expand your career opportunities, and contribute to your community.
- You want to strengthen your academic skills and prepare to be successful in college.

The Program Includes:
- Brush-up of math and college-level reading and writing.
- College study skills and computer skills.
- Help with admissions and financial aid.
- A supportive learning environment to prepare for success!

For More Information Contact:
o Betty Falcón (ABE Transition to College & Mentor Program) at Holyoke Community College. Phone: 413-552-2118; Fax: 413-552-2113; Email: bfalcon@hcc.mass.edu. o Luis Sáez at Community Education Project on 317 Main Street Holyoke. Phone: 413-538-5770; Fax: 413-538-5770.

**The Holyoke Creative Arts Center (HCAC)** is offering a summer program of Fine Arts and Home Crafts classes for Pioneer Valley youth and adults from June 22 - August 14, 2004. Classes for young people age 8 - 17 will be offered weekday mornings and afternoons in the Center's air-conditioned facility (each class has a posted age range). HCAC also offers a larger menu of day and evening classes for adults in over twenty different arts disciplines, from oil painting to furniture upholstery. Young people age 12 and up may also enroll in adult classes.

Scholarships are available to income-eligible youth and adults. Registrations are accepted first come, first served. Parents may register young people for some classes by the week, and others for two-week and three-week sessions during the Summer. Classes run when minimum enrollment is reached.

A complete listing of classes along with a printable registration form can be found at the HCAC web site at www.holyokecac.org. For more information on classes and materials lists or to register, call (413) 532-0465

## SPRINGFIELD

**Parada Puertorriqueña de NY.** La Asociación Nacional de Mujeres Puertorriqueñas de Massachusetts anuncia que la delegación que representará el estado en la Parada Nacional partirá desde el North Gate Plaza, frente al edificio del periódico *Union News/ Sunday Republican* La Parada se celebrará el domingo 13 de junio de 2004. La hora de partida será a las 7:00 AM (hora americana).

**Oficina del Proyecto de Discriminación en la Vivienda, Inc.** (Housing Discrimination Project, Inc.) les invita a una reunión comunitaria para hablar sobre el problema de discriminación en la vivienda y préstamos injustos.

Si usted está en peligro de perder su casa porque está pagando demasiado por los intereses del préstamo ¡aprenda maneras de retener su casa! **Nosotros le podemos ayudar.**

Tendremos un abogado disponible para contestar preguntas acerca de las prácticas discriminatorias de parte de los propietarios, agentes de bienes raíces, instituciones de préstamos, y compañías de seguros.

Para más información y preguntas pueden llamar a Julie en la Oficina del Proyecto de Discriminación en la Vivienda. **(Se habla español e inglés)** Housing Discrimination Project, Inc o 57 Suffolk Street o Holyoke, MA 01040

## NORTHAMPTON

**Latino Night.** Northampton High School will host the first "Cultural Night" on June 4th, 2004 when we celebrate Latino life. Cultural Night is a time dedicated every year to celebrate the diversity of our school and the different cultures represented in the various community. This "Cultural Night" is going to be a significant new community-building event in Northampton, MA. Hundreds of people, representing diverse segments of the community, political figures and special guests will be in attendance from all around the Pioneer Valley.

Come and enjoy a night of softball games, traditional foods, music performances (ARHS Bomba group)(Springfield's Salsa Kids), art exhibits, local and international celebrities, and much more.

In addition to all the festivities, we will be honoring and recognizing several local Latinos / Latinas for their positive contributions and achievements, not only in our community but also around the world.

For more information, volunteer opportunities, sponsorship donations, or to reserve a table at the event, please contact Edgar Cancel at N.H.S. at 413-587-1344 ext.1194 or e-mail him at ecancel@mps.northampton.ma.us.

# Mosaico Noticioso

## Más Soldados Boricuas p'Irak

San Juan, PR. (WWW.DIARIODEPUERTORICO.COM). 18 de mayo de 2004. La compañía 268 de transportación de la reserva del ejército en la isla será movilizada para su desempeño en la guerra contra el terrorismo en Irak, se informó.

El Comando de Movilización del Fuerte Buchanan indicó que unos 70 militares de esa unidad deberán reportarse hoy a esa base para el proceso administrativo inicial y el domingo al Campamento Santiago para comenzar su adiestramiento.

La misión de esta compañía consiste en proveer apoyo de transporte y transportación de suministros y equipo a unidades en el área de operaciones, se explicó en un comunicado emitido a los medios de prensa.

Se estima que el proceso de movilización y entrenamiento tome cerca de un mes. Tras su validación, serían desplegados a uno de los teatros de operaciones de guerra.

Esta es la décima unidad movilizada por Buchanan en la segunda fase del adiestramiento Operativo Libertad Iraki. En la primera fase se movilizó a otras 10 unidades, la mayoría de las cuales ya ha regresado a Puerto Rico.

Mientras, este fin de semana se espera el regreso a la isla de la Compañía 770 de Policía Militar, adscrita a la Guardia Nacional de Puerto Rico, se indicó.

## Nuevo Movimiento Independentista

San Juan, PR. (WWW.DIARIODEPUERTORICO.COM). 17 de mayo de 2004. Quedaron disueltos ayer dos organismos políticos y por voluntad de centenares congregantes en Caguas dieron paso a la fundación del nuevo Movimiento Independentista Nacional Hostosiano (MINH). Con ello el movimiento independentista pone fin al Congreso Nacional Hostosiano (CNH) y el Nuevo Movimiento Independentista (NMIP).

En una asamblea celebrada en el nuevo Centro de Bellas Artes en Caguas, el nuevo organismo resolvió no aspirará a convertirse en un partido político y no intervendrá en la manera en que sus miembros votarán en las elecciones. Asimismo, se determinó desarrollar un programa de educación sobre la "conveniencia de la independencia nacional frente los profundos problemas que genera la condición colonial existente". Se propone, además, como un organismo que busque la unidad de los grupos independentistas.

Luego de disueltos el NMIP y el CNH, la asamblea discutió los postulados que regirán la organización y eligió el nombre de la misma, entre otros asuntos. Además, se celebró una votación para elegir a 30 personas, de una lista de 42 candidatos, para integrar la Dirección Nacional, grupo que liderará el organismo. Ese grupo, junto con otros 10 delegados, deberá elegir un presidente. No se informó cuando.

En el grupo a elegirse ayer había profesores, arqueólogos, abogados y líderes políticos reconocidos. Entre estos, Julio Muriente, ex presidente del Nuevo Movimiento Independentista; Héctor L. Pesquera, ex presidente del Congreso Nacional Hostosiano; Eduardo Villanueva, ex presidente del Colegio de Abogados; José Rivera Santana, planificador, y José (Lole) Rodríguez Báez, líder sindical.

En la resolución, el abogado Noel Colón Martínez hizo una

relación de los eventos que culminaron con la creación de la nueva entidad y que comenzaron en noviembre del 2001 cuando los dos grupos, ahora desaparecidos, decidieron desarrollar una agenda de trabajo en conjunto.

"Nos encontramos en un Puerto Rico con un deterioro enorme y tenemos que intervenir en el proceso social con igual fuerza que intervenimos en el proceso político. Le vamos a meter mano a las luchas de este pueblo de la misma manera en que lo hacen otras organizaciones de la sociedad civil", afirmó el abogado, que se sentó junto al fundador del Partido Socialista Puertorriqueño, Juan Mari Bras.

## Hispanic Media Crucial for Hispanic Population

Washington, DC. (HISPANIC PR WIRE). April 28, 2004. Numerous Hispanic readership studies conducted by the National Association of Hispanic Publications, Inc. and the recent survey by Hispanic Pew Center confirm what Hispanic publishers have articulated for generations: Hispanic media provides the most accurate and positive image of the Hispanic community in the country.

According to the Pew Hispanic Center, 78 percent of Latinos, regardless of education, income or language preferences, believe that Spanish-language news media are very important to the economic and political development of the Hispanic population. "The Spanish-language media exercise a powerful draw through their coverage of Latin American and of Latino communities in the Unites States," said their report.

"These studies reconfirm decades of our industry's own readership studies that the Hispanic print media holds far greater influence over Latino consumers and will continue to do so for generations. For the most part, Hispanic media is the one that gives the most accurate reflection of Latino leaders and our community," said Tom Oliver, Interim Executive Director of NAHP, Inc.

Despite the rapid-growth of the Latino population, mainstream media still falls behind in Hispanic coverage. Over 50 percent of Latinos consider English-language news coverage poor, especially with news relevant to the Hispanic community, and 44 percent of Latinos believe English-language media damage their community image, said the Pew report.

Most Latinos often maintain Spanish-language or bilingual news resources through generations. According to the most recent survey, at least 68 percent of Latinos get their news in Spanish or both languages, while only 31 percent get all their news in English.

The Hispanic population is the largest minority in the country, making up 13.5 percent of the U.S. population. This rapid-growing community also counts with a large variety of Hispanic media outlets, which is not seen in any other immigrant population. "Some of our member publications date back to the early years of the 20th century such as La Opinion and El Diario/La Prensa. The Hispanic media continues to grow because of high demand, which has grown even more rapidly at the end of the last century and beginning on the 21st century," said Oliver.

This study confirms that Latinos who get their news in Spanish or bilingual outlets have a better knowledge of some public policies. For example, 70 percent of those who get their news in Spanish

and 68 percent of those who get their news in both languages knew about President Bush's recent proposal on immigration, compared to only 53 percent of those who get their news in English.

"Print has often been portrayed secondary to TV and radio in terms of influence. This most recent survey clearly shows that in crucial areas of health care, business, economy and sports, Hispanic print is the major source for the Hispanic community," said Oliver.

## CDF Decries U.S. Senate Corporate Tax Bill

Washington, D.C. (HISPANIC PR WIRE). May 14, 2004. The Children's Defense Fund (CDF) is outraged by the U.S. Senate's passage this week of the Jumpstart Our Business Strength Act (S. 1637). What started as the Congressional repeal of a $5 billion-a-year export subsidy prohibited under international trade agreements became another money-grab by wealthy corporate interests. The pork barrel laden bill was adopted at a budget-busting cost of $170 billion. Among others, the long list of corporate special interests that benefit include horse- and dog-track owners, cruise-ship operators, NASCAR track owners, Oldsmobile dealers, and multi-national corporations -- many of which send their jobs overseas. Oil and gas subsidies alone account for about $5 billion in tax breaks in the bill.

"This bill exemplifies again the misplaced priorities of our national leaders," said Marian Wright Edelman President and Founder of CDF. "For less than the cost of these tax breaks, Congress could have provided Head Start for every eligible child or provided every uninsured child in America with comprehensive health care for the next decade. They have chosen not to. President Franklin Delano Roosevelt famously cautioned 'The test of our progress is not whether we add more to the abundance of those who have much; it is whether we provide enough for those who have too little.' We find ourselves today clearly failing that test."

CDF applauds Senator John McCain (R-AZ) for offering a voice of reason against this legislation during the Senate floor debate. His words should be remembered when the House of Representatives takes up their version of the bill. Senator McCain said, "It is remarkable, with a half trillion [dollar] deficit, and we are enacting new tax credits for -- guess who -- the oil and gas industry in America which, the last time I checked, is doing pretty well. The majority of my colleagues on this side of the aisle just voted against an extension of the unemployment benefits for Americans who remain unemployed and haven't profited by this reemerging and strengthening economy. My God, we won't give them an extension of their unemployment benefits. But if the ethanol people of Archer Daniels Midland need it, by God, we will give it to them ... $170 billion in tax credits but no extension of unemployment benefits for people who have been out of work, it is a remarkable commentary."

CDF finds the actions of the Senate this week both remarkable and sad, and calls on President Bush to reject these irresponsible and immoral tax breaks.

Conéctese a WWW.DIARIODEPUERTORICO.COM para las últimas noticias de Puerto Rico. Este periódico digital actualiza las noticias diariamente, de lunes a viernes.

---

## Citas y Algo Más

**Cita Memorable** "El camino hacia la riqueza depende fundamentalmente de dos palabras: trabajo y ahorro." Bernard Henry Levy. Filósofo y novelista francés.

**Refranes Populares** "Donde hubo fuego, cenizas quedan."

**"Slang" Boricua** *tumbar* (robar). A Joel le *tumbaron* el carro de frente de la casa.

**Curiosidad** Uno de los más grandes oradores de todos los tiempos, Demóstenes (384-322 a. de C.), era un tartamudo que luchó tenazmente para vencer ese defecto, inclusive poniéndose a veces piedras pequeñas en la boca y practicando sus discursos en voz alta.

## Hechos y Realidades

La Constitución de Cuba establecía que sólo dos personas nacidas en el extranjero podían aspirar a ser presidente de la república: el dominicano Máximo Gómez y el boricua Juan Ríos Rivera.

*The Constitution of Cuba established that only two people born outside of Cuba could aspire to become President of the Republic: the dominican Máximo Gómez and the boricua Juan Ríos Rivera.*

Santurce, al igual que San Juan, es una isla o isleta. Para entrar a Santurce desde cualquier dirección, hay que cruzar uno de estos puentes: Martín Pena, Constitución, Puente Dos Hermanos, o Puente de Piñones.

*Santurce, like San Juan, is an island or islet. In order to*

*reach Santurce from any direction, you have to cross one of these bridges:* Martín Peña, Constitución, Puente Dos Hermanos, or Puente de Piñones.

En los Bailes de Bomba se usan dos clases de tambores. El tambor más grande y de sonido más profundo tiene un nombre muy curioso, "el burlador".

*Traditional Bomba Dances use two types of drums. The largest drum and the one with the deepest sound is called "el burlador".*

El grupo musical "Puya" fue la primera agrupación de rock en español en aparecer en MTV.

*The musical group "Puya" was the first Spanish rock group to appear on MTV.*

Fuente: ¡Qué le parece... boricua! por Papá Lino

---



# #1 DISCOUNT SHOPPING

Open Sundays 12-4 PM

Only In The Country
## 14 DAYS ONLY

## YOU PAY
# INVOICE

# 0% FINANCING

**Pick A Vehicle. Pay Invoice**
in the country where you have a choice

*"THAT'S THE REAL" DEAL*

## INVOICE SALE
"PLUS"
ALL FACTORY REBATES

GRANDs **35** IN STOCK

LIBERTYs **20** IN STOCK

## Discount Shopping At It's Best
# CLOSEOUT'S

RED TAG $19.98 Wkly.

YOUR CHOICE **$4,888**

$19.98 WEEKLY

- 99 SATURN SL
- 98 TOYOTA COROLLA
- 98 NISSAN ALTIMA
- 00 OLDS INTRIGUE98
- 98 DODGE CARAVAN
- 97 CHEVY BLAZER

YOUR CHOICE **$7,888**

$32.55 WEEKLY

- 03 DODGE NEON
- 02 FORD ESCORT
- 01 CHRYSLER 300M
- 01 CHRYSLER SEBRING LX
- 01 CHEVY CAVALIER
- 00 DODGE INTREPID

• SPECIAL • SPECIAL • SPECIAL •
- 03 CHRYSLER SEBRING LXI
- 02 JEEP WRANGLER
- 01 NISSAN MAXIMA

YOUR CHOICE **$12,888**

• SPECIAL •
02 SAAB 9.3 SE
**$13,888**

• SPECIAL •
03 Chrysler Sebring Conv.
**$14,888**

• SPECIAL •
01 SAAB 9.5 Wagon
**$15,888**

## 04s JEEP CLOSEOUT
- ★ ROCKY MT EDITION
- ★ COLUMBIA EDITION
- ★ SPECIAL EDITION
- ★ LIMITED EDITION

YOUR CHOICE
HARD TO GET **$23,888**

15 IN STOCK

Payment based on longest term, best interest rate. Credit score 780 or greater. NEW cars include $1,000 extra rebate from Chrysler.

WWW.COUNTRYJEEP.COM

OPEN
Mon.-Thurs. 9am-8pm
Fri. 9-6
Sat. 9-5

# COUNTRY JEEP
JEEP • (413) 786-6222
959 SPRINGFIELD ST. (RTE. 147) • AGAWAM, MA

Hablamos Español

June 1-15, 2004  ● **Diálogo** bilingü

-**Deportes**



# SPORTS DEPORTES

## Líder Comunitario es Recordado Como un Héroe Nacional

Por Rigo Serrano de Dialogo-Bilingue

"Cuando un amigo se va, queda un espacio vacío . . ." (canción)

Así recordaremos todos a Miguel A. Hernández, líder comunitario, amigo y miembro de la Reserva del Ejército de los Estados Unidos de América (U.S. Army Reserve).

El pasado 10 de mayo, Miguel pasó a "mejor vida" a los 36 años de edad luego de servir durante varios meses en Afganistán. Este joven puertorriqueño, original de Cayey y residente de Holyoke desde 1993, fue honrado y recordado en una corta ceremonia que se llevó a cabo el viernes, 21 de mayo del 2004 en las facilidades de la organización comunitaria Nuestras Raíces, Inc.

Para aquellos que conocieron a Miguel, alias "Gange", no podremos olvidar su especial sonrisa y la manera peculiar de saludar cuando te lo encontrabas por la calle. Aunque Miguel se enfrentó a momentos muy difíciles en su vida, nunca dejó de ser él mismo y nunca le negó su mano a nadie y en especial, a los jóvenes de nuestra comunidad hispana. Yo, personalmente, conocí a Miguel en el año 1997 en la emisora radial WFCR de Amherst, MA durante una presentación en vivo de uno de los programas para jóvenes de la organización Nueva Esperanza. En aquel tiempo, yo llevaba menos de un año de vivir en los Estados Unidos y servía como comentarista deportivo en un pequeño segmento del programa "Tertulia" del compañero Luis Meléndez. En el año 1998 decidí mudarme a la ciudad de Holyoke e inmediatamente comencé una gran amistad con "Miguelo" (como yo lo nombraba) y Daniel Ross, actual Director Ejecutivo de Nuestras Raíces.

Durante varios años, Miguel estuvo a cargo del programa de jóvenes "Protectores de la Tierra" que pertenece a Nuestras Raíces. Además, dió sus primeros pasos en la política pública de la ciudad de Holyoke, cuando estuvo muy activo en campañas para elegir líderes hispanos en posiciones de importancia en la ciudad. En el año 2002 y mientras trabajaba en las oficinas de New England Farm Workers' Council en Hartford, CT, Miguel decide renunciar y firma con la Reserva del Ejército de los Estados Unidos con la intención de poner en orden su vida y servir a esta nación en la guerra contra el terrorismo. Recuerdo que cuando me comentó que pensaba entrar al servicio me tomó por sorpresa. Sin embargo, pude ver en sus ojos que realmente quería hacerlo y que una de sus metas era regresar a su comunidad y continuar su labor con nuestros jóvenes.

Hoy, Miguel ha dejado a tres niños y a una esposa sin el apoyo emocional y el cariño de familia. Sin embargo, su legado va mucho más allá que las palabras de uno de sus amigos. Miguel quizás se quedó corto en su afán de regresar a trabajar por su comunidad, pero su labor como líder, amigo y patriota permanecerá en nuestros corazones y en las mentes de aquellos que reconocen que la patria se hace trabajando.

Como dijo en alguna ocasión uno de nuestros máximos líderes puertorriqueños, "La patria es valor y sacrificio." Adiós, Miguel. ¡Nunca te olvidaremos!

## CARIBBEAN NIGHTS
### In the City of Holyoke

The Hispanic Chamber of Commerce of Western Massachusetts invites you to enjoy with your family of five (5) Caribbean Nights in the city of Holyoke. We will have live music and other surprises for your delight.

**Caribbean Nights Schedule**

| Date | Theme | Most Locations are on High Street | Music |
|---|---|---|---|
| July 1st | Christian | In front of Luigi's Christain Book Store & Music. # 103 High Street | Zariz Band, Rafael Montañes Victor Puchy Colon and their bands |
| July 8th | Tropical | In fron t of MD Beauty Salon & Supply # 394 High Street | ZUM-ZUM Sombra Groups New Haven Band |
| July 22nd | Bohamian | Veteran's Park Maple Street | TRIOS Festival |
| July 29th | Tropical | In front of Manuel Garcia Floor Covering # 775 High Street | New Haven Band ZUM-ZUM Group La Perfecta Band |
| August 5th | Tropical | In front of City Hall | "Pachanga Latina" |

**SPONSORS**
The City of Holyoke
Hispanic Chamber of Commerce of Western Massachusetts
Solutions Community Development Corporation
Univision - Javier Designs - Chaffee-Helliwell
Tony's Grocery Store



**Regrese hoy a casa manejando su auto nuevo !!!!**

# 1-800-845-1371

## Salud

# HOLYOKE HEALTH CENTER IS THE MEDICAL HOME FOR A YOUNG UNINSURED COUPLE

Jenny Myers is 21 and uninsured. "I used to go to the ER for my healthcare," she said recently. "But that wasn't the right place for me to find out what was really wrong." What she needed was a medical home where a doctor could take time with her to figure out why she wasn't feeling well. She found her medical home at the Holyoke Health Center.

When Jenny's husband Scott was 18, he woke up one morning with a sore throat. "I didn't have health insurance, and a friend told me about the Holyoke Health Center. I came in and got a throat culture." Now 25, and still uninsured, he has been coming in ever since. He is the reason Jenny stopped going to the emergency room.

Scott and Jenny found a medical home at the Holyoke Health Center. Scott comes in on as-needed basis. "When I have a sore throat or something hurts," he explained. Jenny has a more complex health history and used to visit the emergency room frequently. "I had heard of the health center," she said, "but I was scared to go. I didn't think real doctors worked there." Jenny feels very differently today.

"I had a physical with Dr. Alers at the health center. He is the best doctor I have ever seen," she said. "I have never had a doctor talk to me for an hour before. He really listened. He is reviewing all my old records from past doctors and the ER. Even when I had insurance, no one spent time like he did. I was so glad to find him."

Scott and Jenny encourage their friends and family to visit the health center. "I think we get better treatment here than we would if we had insurance and went to a private doctor."

*Holyoke Health Center believes that everyone – rich or poor, insured or not – needs a medical home. For more information*

about enrollment and our services, please call Yamira Moreno-Escobar at 420-2129.

**The Holyoke Health Center is located at 230 Maple Street in downtown Holyoke. 413-420-2200. The Chicopee Health Center is located at 203 Exchange Street in downtown Chicopee. 413-420-2222. The health centers offer care in Adult Medicine, Gynecology, Pediatrics, and Dental Care. Same Day Care is available for urgent, non-emergency problems. Fees are based on patient income and insurance coverage. Nobody is denied care based on inability to pay.**



# EL HOLYOKE HEALTH CENTER ES EL CENTRO DE CUIDADO MEDICO PARA UNA PAREJA JOVEN SIN SEGURO MEDICO

Jenny Myers tiene 21 años y no tiene seguro médico. Aunque reconocía que no era lo mejor, ella usaba la Sala de Emergencias del Hospital para su cuidado médico rutinario. Lo que ella necesitaba era un centro de cuidado médico donde un médico pudiera diagnosticar su enfermedad. Ella encontró los servicios adecuados en el Holyoke Health Center.

Cuando Scott, el esposo de Jenny, tenía 18 años, se levantó una mañana con dolor de garganta. Como no tenía seguro médico, un amigo le habló del Holyoke Health Center. Fué allí y le tomaron un cultivo. Ahora tiene 25 años, todavía no tiene seguro médico y continúa yendo al Holyoke Health Center. El es la razón por la cual ya Jenny no va a la Sala de Emergencias.

Scott y Jenny encontraron su centro de cuidado médico en el Holyoke Health Center. Scott va cuando lo necesita. Jenny tiene más problemas médicos y visitaba la Sala de Emergencias con frecuencia. Dice que había oído del centro pero que tenía miedo de ir. Creía que no tenían médicos de verdad. Hoy en día Jenny tiene una opinión muy diferente.

Dice que tuvo un examen físico con el Dr. Alers y que él es el mejor médico que ella ha visto. Dice que nunca ningún doctor había dedicado una hora para hablar con ella. Dice que el Dr. Alers revisó todo su expediente. Aun cuando tenía seguro médico, ella dice que nadie nunca le dedicó tanto tiempo. Jenny está muy contenta de haber encontrado al Dr. Alers.

Scott y Jenny le han recomendado el Holyoke Health Center a sus amigos y familiares, ya que consideran que reciben mejor cuidado médico que el que recibirían si tuvieran seguro y fueran a un médico privado.

El Holyoke Health Center cree que toda persona- pobre o rico, con seguro médico o sin seguro- necesita un centro de cuidado médico. Para más información sobre los servicios, favor de llamar a Yamira Moreno-Escobar al 420-2129.

**El Holyoke Health Center está localizado en 230 Maple Street en Holyoke. 413-420-2200. El Chicopee Health Center está localizado en 203 Exchange Street en Chicopee. 413-420-2222. Los centros ofrecen Medicina para Adultos, Ginecología, Pediatría y Cuidado Dental. Se atienden casos el mismo día si es un problema urgente y no de emergencia. Los costos están basados en el ingreso del paciente y en la cubierta del seguro médico. No se le niega tratamiento a ninguna persona.**



Bueno Y Sano ℠

**$1⁰⁰ off**

Any Burrito

Bueno Y Sano ℠

Boltwood Walk • Amherst
413-253-4000

# CONSEJOS PARA UN VERANO SEGURO

Por la Oficina del Jefe de Bomberos de la Ciudad de Holyoke. Para más información en español sobre estos consejos y/o cualquier otro servicio ofrecido puede comunicarse con Margarita Reyes al 534-2250.

## ASADORES

**Seguridad en la Parrilla**
- Mantenga los asadores en la parte de atrás de la casa retirados de la misma.
- Mantenga los niños bajo supervisión cuando esté usando el asador.
- ¡Nunca use gasolina en el asador!

**Asadores de Gas**
- Mantenga todos los asadores que usan gas propano afuera, a tres pies de las entradas del edificio, tales como puertas, ventanas, respiraderos de secadoras y respiraderos de aire.
- Todos los cilindros de gas propano con capacidad de entre 4 y 40 libras deben ser equipados con un aparato para prevenir que se sobre llenen.
- Recomendamos que los cilindros de gas se coloquen a no menos de 10 pies retirados de la casa, especialmente cuando se están usando.
- Los asadores que usan gas propano no son permitidos dentro de la casa o en balcones más arriba del primer piso en un edificio donde viven otras personas.
- El gas propano es más pesado que el aire y tiende a bajar. Un tanque de gas con escape puede ser peligroso para las personas que viven debajo de usted. Posibles fuentes de fuego son productos de fumar, aires acondicionados, compresores, llamas pilotos y carros.
- Asegúrese que todas las conexiones estén ajustadas y seguras.

**Asadores de Carbón**
- Encienda el carbón con líquido de encender carbón.
- Cuando el carbón prenda, no le añada líquido encendedor al fuego – las llamas pueden subir hasta la lata y causar quemaduras muy serias.

# SUMMER SAFETY TIPS

## BARBECUES

**Barbecue Safety**
- Use all barbecue grills away from the house in the backyard.
- Supervise children whenever any grill is in use.
- Never use gasoline on any grill!

**Gas Grills**
- Keep all LP-gas outside, three feet away from building openings such as doors, windows, dryer vents and air intake vents.
- All LP gas cylinders with a capacity between 4-40 lbs. must be equipped with an overfill protection device.
- We recommend LP-gas canisters be ten feet away from the house, if possible, especially when in use.
- LP-gas grills are not permitted inside or on balconies above the first floor of any building where people live.
- LP-gas is heavier than air and sinks. A leaky grill could pose a hazard to people below. Possible ignition sources include smoking materials, air conditioners, compressors, pilot lights and cars.
- Make sure all connections are tight and secure.

**Charcoal Grills**
- Use only charcoal lighter fluid to start charcoal grills.
- Once the coals have been lighted, never add more lighter fluid to the fire – flames may travel up the stream of lighter fluid resulting in serious burns.

# Good Health Starts Here

We provide healthcare, regardless of insurance status or ability to pay. Contact Yamira Moreno for more information about low cost and free care options: 420-2129.

- Internal Medicine
- Family Practice
- Pediatrics
- Gynecological Care
- Same Day Care
- Dental Care
- Referrals to Specialists

Holyoke Health Center
230 Maple Street
Holyoke, MA  01040
Telephone: 420-2200 for appointments


**Holyoke and Chicopee Health Centers**

# La Buena Salud Empieza Aquí

Proveemos servicios médicos sin importar su habilidad para pagar ó si tiene seguro médico. Favor de ponerse en contacto con Yamira Moreno para más información sobre cómo obtener servicios gratis ó a bajo costo: 420-2129.

- Medicina Interna
- Medicina de Familia
- Pediatría
- Ginecología
- Atención Médica el Mismo Día
- Cuidado Dental
- Referidos a Especialistas

Holyoke Health Center
230 Maple Street
Holyoke, MA  01040
Teléfono: 420-2200 para citas



# baliseautoespanol.com



**Ahora puedes comprar
tu auto nuevo o usado
en español y desde el lugar
que más te convenga**



*baliseautoespanol.com*
es la mejor manera de
comprar tu auto en tu
idioma y desde el lugar que
más te convenga.

En *baliseautoespanol.com*
puedes obtener el valor
actual de tu vehículo.
También, si deseas hacer el
"trade in" de tu auto, lo
puedes hacer fácilmente y
sin complicaciones.

Más aún, en
*baliseautoespanol.com*
puedes lograr tu pre-
aprobación de crédito,
obtener financiamiento,
realizar pagos y completar
tu compra "on line". No
importa si tu crédito tiene
algún problema. En Balise
estamos para ayudarte y
facilitarte tu compra.

*Visítanos en baliseautoespanol.com,
la mejor manera de comprar tu auto
en tu propio idioma y desde el lugar
que más te convenga.*

## baliseautoespanol.com

# BALISE
*En Balise te tratamos como familia*

PreVntrAccuDmd.txt

Subject: Re: Dialogo Bilingue
From: GPike <gpike@DMSAinc.com>
Date: wed, 09 Jun 2004 13:26:49 -0400
To: lilliansantiago@comcast.net

Hi Lillian.

I appreciate your being "assertive" and your eagerness to keep things moving
forward.  It has been but 7 business days since our 05/27/04 CT meeting and your
e-mail of 06/08.  Let's review where we are re. DMSA's commitment and what we have
done to date:

    * We have committed to partner with you without reservation.
    * We outlined to you an exit strategy for your situation with Manuel
    * We immediately executed your software request to get Gabriela working.
    * We have leased a Dell desktop for Ana's use, per your request.  It is shipped
to NY to be configured by the IT department and then shipped to MA.
    * We proposed and agreed to your salary offer to Gabriela.
    * We put forward the proposition that you, too, must be salaried and accepted
your remuneration figure.
    * We agreed to continue with your accountant for Dialogo.
    * We have reviewed and discussed with you your business plan document as soon as
we received it.
    * We have had our attorneys create comprehensive LLC agreements.

Per your 3rd paragraph's 1st sentenced we have spent money and committed resources
without any  signed agreement with you
precisely because we do not want Dialogo to be held back.
Re. Contract:  Our attorneys have completed all the drafted documents to create the
new Dialogo LLD.  However, per our 06/02
conversation, you need to resolve the partnership situation with Manuel in order for
us to execute it.  When we last spoke
you expected it done in a week's time.  However, I will be happy to fax the drafts
to you immediately.  I will ring you for
your fax number.
Re. Ana and Beatriz meeting:  In fairness to Beatriz she was informed on Friday
(06/04) that Ana would be in NJ over the
weekend.  we live a hundred miles from the Metro area so weekend travel for her is
not a snap and her Monday schedule was
already set with a new Comcast pitch and strategy session.
Re. Ana's hiring:  No one wishes to interfere with your hiring prerogative.  In
fact, you will see that the LLC documents
specifically stipulates that responsibility to you. Meeting with Beatriz is not an
exercise to "pre qualify" her.  You have
qualified her, no one challenges that.  However,  you have suggested that if  "her
money request is too much, we can perhaps
discuss some other options".  That is precisely why she is meeting with Beatriz.
Unquestionably, we will have to bring the
salary number down but I want to determine if some of her skill set can be shared
with HispanAmerica so that we can distribute
her salary over two payrolls.  I suggest you have Ana travel to NYC next Monday when
you and Hector are here and things can
be laced up at that time.  If you need to get her working immediately in order to
insure a timely next issue of Dialogo, hire
her on at a $100 per diem.
Re. Carmen:  Carmen is not just "great", she is essential.  More than two thirds of
all new businesses fail.  We must
carefully manage money to be successful.  It is just that simple.  Carmen makes no
Dialogo decisions, she is merely the
conduit to payment, as with your decision to purchase the software for Gabriela.  As
Dialogo grows it will generate self
sufficient cash flow - and profitability! - and things will more direct.

Page 1


EXHIBIT
17

PreVntrAccuDmd.txt

lilliansantiago@comcast.net wrote:

>Hi Gerry:
>
>How are you doing?   Gerry,  I am sorry if I come across too assertive, however, I need to come to some understanding with
you before we enter this new adventure in both of our professional and business lives.
>
>I really need a tangible contract that we can start building from.  All of the items discribed in the business plan are not
to be done now.  Some are short and other long term goal.  I need to have clear how the financial aspect of the business is
going to work. such as; Gabriela's salary, equipment, and other areas the newspaper need.   Carmen is great, however, we must
decentralized some of the decision making process in order for me to run with the business, and made decisions that impact
the daily functions of the newspaper.  Therefore, I need to know how you see this happening.
>
>Dialogo is running and cannot be hold back,  I need Ana on board by the end of this month.  If you feel that her money
request is too much, we can perhaps discuss some other options,  however, I cannot wait until Bea has time out of her
extremelly busy schedule to deal with Dialogo's needs of staff.  I understand that for you this is an investment and as so,
you must pre-qualify candidates. However, from my point of view this woman is what this newspaper needs.  Ana impressed me
overall, as an editor, as a goal getter and also her increadible commitment to the work I am trying to accomplish.  The
hiring of the personnel needs to be my decision, as I am the person that is here day in and day out and understand the needs
of the paper.  I am wailling to discuss with you the pros and cons of the desicion making process.
>
>I am moving on with the plan I presented to you,  I am working very hard to have a new Dialogo by July 1st.  I need
expedite action from you and to let me know clear what are you wailling to contemplate or not.  This will give me the
opportunity to make an inform desicion with regards to merging.
>
>Respectfully,
>
>Lillian Santiago
>
>
>
>
>

Page 2

00002001

# EmDialogo
## Profit & Loss
### July through December 2004

|                                      | Jul - Dec 04 |
|--------------------------------------|-------------:|
| **Ordinary Income/Expense**          |              |
| **Income**                           |              |
| ad revenue                           | 26,909.50    |
| Ad/Graphic Design Income             | 33,718.50    |
| **Total Income**                     | 60,628.00    |
|                                      |              |
| **Gross Profit**                     | 60,628.00    |
|                                      |              |
| **Expense**                          |              |
| articles                             | 450.00       |
| bad debt                             | 25.00        |
| Bank Service Charges                 | 50.00        |
| Barter                               | 730.00       |
| Car/Truck Expense                    |              |
| Auto Repairs & Maintenance           | 175.00       |
| **Total Car/Truck Expense**          | 175.00       |
| commission                           | 1,593.00     |
| Computer maint/troubleshoot          | 200.00       |
| Computer software                    | 261.30       |
| contract copies                      | 155.93       |
| distribution                         | 2,455.00     |
| Donation                             | 2,190.00     |
| Dues and Subscriptions               | 970.50       |
| Electric                             | 1,166.01     |
| Event                                | 1,700.00     |
| Marketing & Promotional Expense      | 306.50       |
| Miscellaneous                        | 3,247.00     |
| non profit                           | 13.50        |
| Office Equipment                     | 49.20        |
| Office Supplies                      | 413.18       |
| petty cash                           | 50.00        |
| photographs                          | 328.50       |
| Postage and Delivery                 | 132.89       |
| Printing and Reproduction            | 7,494.63     |
| Professional Fees                    |              |
| Accounting Fees                      | 136.00       |
| **Total Professional Fees**          | 136.00       |
| Rent                                 | 500.00       |
| Repairs                              |              |
| Equipment Repairs                    | 150.00       |
| **Total Repairs**                    | 150.00       |
| salary                               | 5,180.00     |
| Telephone & Fax                      | 1,019.81     |
| void                                 | 0.00         |
| Web site                             | 75.00        |
| **Total Expense**                    | 31,217.95    |
|                                      |              |
| **Net Ordinary Income**              | 29,410.05    |
| **Other Income/Expense**             |              |
| **Other Income**                     |              |
| Other Income                         | 245.18       |
| **Total Other Income**               | 245.18       |
| **Other Expense**                    |              |
| Other Expense                        | 0.00         |
| **Total Other Expense**              | 0.00         |
| **Net Other Income**                 | 245.18       |
| **Net Income**                       | 29,655.23    |



PENGAD 800-631-6989

EXHIBIT

37



## The Commonwealth of Massachusetts
William Francis Galvin. Secretary of the Commonwealth
Corporations Division

\#: _65509_

Mark: _EL DIALOGO_

*TM*

Dear Registrant:

Enclosed please find an approved copy of your Trademark or Servicemark application. This certificate of registration will be effective for a period of ten (10) years from the date stamped on the back. The registration number, which appears in the top right corner of the front of the form, should be used when requesting information, copies, or notifying this office of an address change.

Within six (6) months of the expiration of your term of registration a notification will be sent to the last address of record. Notices will not be sent to the law firm which may have filed the original application.

The appropriate symbol to indicate state registration is *"TM"* or *"SM"*. The symbol used for a federal registration is an *"R"* within a circle. This symbol **may not be used** unless you mark is registered with the Patent and Trademark Office in Washington, DC. For federal information and forms. call (703) 308-4357.

This office is not permitted to give legal advice regarding infringement of your Trademark or Servicemark. If you need information on name disputes or Trademark or Servicemark infringement, please consult an attorney.

Office of the Secretary of the Commonwealth
One Ashburton Place
Trademark Division
Boston. MA 02108

**EXHIBIT**
70

65509

Fee: $50.00

# The Commonwealth of Massachusetts

**William Francis Galvin**
Secretary of the Commonwealth
One Ashburton Place, Boston, Massachusetts 02108-1512

## APPLICATION FOR REGISTRATION OF A TRADEMARK
(General Laws, Chapter 110B, Section 2)

1. Name of applicant: *El Diálogo*

2. (a) Principal business address: *4 Open Square Way Studio 120, Holyoke, MA 01040*

   (b) *Business address in Massachusetts, if any: *Same*

3. State whether applicant is an individual, partnership, corporation, union or association: ~~Corporation~~ *LLC*

4. If a corporation, the state of incorporation is: *MASSACHUSETTS*

5. Describe mark:

*Bold Lettering   El Diálogo*

Describe the specific goods in connection with which the mark is used:

*Newspaper*

7. Class No.: *16*

8. The mark is used by displaying it:

   ☐ directly to the goods
   ☐ directly to the containers for the goods
   ☒ by displaying it in physical association with the goods in the sale or distribution thereof
   ☐ in other fashions (explain):
   
   ☐ to tags or labels affixed to the containers for the goods
   ☐ to tags or labels affixed directly to the goods

9. Date of first use of mark by applicant or predecessor. If first use of mark was in Massachusetts, use the same date in both (a) and (b).

   (a) Anywhere:

   (b) In Massachusetts:
   *7-1-04*

10. If either of the above first uses was by a predecessor of the applicant, state which use or uses were by a predecessor and identify that predecessor:

State of: *Massachusetts*

County of: *Hampden*

Name of applicant: *Lillian Santiago*

Signature of applicant:

Title: *President*

*. .: This document must be notarized – see reverse side.*
*Fill in only if principal business address is not in Massachusetts*

110bcrlm 12/10/03

*Lillian Santiago* , being duly sworn, deposes and says that he is the *President* of the above named applicant, that the statements contained in the foregoing statement are true and that he verily believes that said applicant is the owner of the mark sought to be registered and that no other person has the right in the Commonwealth of Massachusetts to use such mark either in the identical form thereof, or in such near resemblance thereto, as to be likely, when applied to the goods or services of such person, to cause confusion or to cause mistake or to deceive.

SUBSCRIBED and sworn to before me this *11* day of *March* , 20 *05* .

Notary Public: *Anthony Soto*        My commission expires: *2-10-11*

*Please print the name and address in the space provided below of the person to whom you wish this application to be sent.*

CERTIFICATE OF REGISTRATION
OF A TRADEMARK

General Laws, Chapter 110B, Section 4

Filed with
William Francis Galvin,
Secretary of the Commonwealth
and Secretary's Certificate of Record issued on:

MAR 21 2005
, 20



William Francis Galvin
Secretary of the Commonwealth
Trademark Section
One Ashburton Place, Rm. 1717
Boston, MA 02108

# El Diálogo

**Lillian Santiago- Bauzá**
*Publisher*

250 Open Square        Ph: 413•536•5560
Studio 405             Fax: 413•533•9467
Holyoke, MA 01040      lsantiago@eldialogo.com