# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF MASSACHUSETTS

_____
)
DIALOGO, LLC and                                    )
DIRECT MERCHANTS S.A., INC.,              )          CIVIL ACTION NO. 05-CV-30076-MAP
                                                                    )
        Plaintiffs,                                      )
                                                                    )
v.                                                                  )
                                                                    )
LILLIAN SANTIAGO BAUZÁ,                      )
EL DIALOGO, LLC, and                               )
FRANCISCO JAVIER SOLÉ,                        )
                                                                    )
        Defendants.                                 )
_____)
                                                                    )
LILLIAN SANTIAGO BAUZÁ,                      )
EL DIALOGO, LLC, and                               )
FRANCISCO JAVIER SOLÉ,                        )
                                                                    )
        Counterclaim-Plaintiffs,              )
                                                                    )
v.                                                                  )
                                                                    )
DIALOGO, LLC  and                                   )
DIRECT MERCHANTS S.A., INC.,              )
                                                                    )
        Counterclaim-Defendants.          )
_____)

## SECOND AFFIDAVIT OF GERRY PIKE

I, Gerry Pike, do hereby on oath depose and state as follows:

1.        My name is Gerry Pike, and I am the Managing Director of Direct Merchants

S.A., Inc. ("DMSA"), which is a New Jersey corporation with a principal place of business in

Newfoundland, Pennsylvania.  I am over 18 years old and competent to testify in this action.

2.      The information set forth in this affidavit is based upon my personal knowledge, upon the books and records of DMSA, which is a regularly-conducted business and which maintains its records as a regular practice of its business, or the public records of the Commonwealth of Massachusetts.

3.      In May of 2004, Lillian Santiago Bauzá and I discussed the possibility of engaging in a venture between DMSA and her.

4.      The purpose of the venture was to develop a Spanish language and bilingual print and media business.  At the time,  Ms. Santiago Bauzá explained that she was negotiating to buy out the other owner of her existing Massachusetts corporation,  Dialogo Bilingue, Inc. which published a newspaper entitled "Dialogo Bilingue," so that she could replace them with DMSA.

5.      Ms. Santiago Bauzá later explained that she was not able to work out an arrangement with the other owner of Dialogo Bilingue, Inc., and on or about June 1, 2004, Dialogo Bilingue, Inc. published its last edition of the publication "Dialogo Bilingue."

6.      In early June 2004, Ms. Santiago Bauzá wanted a contract to set forth the obligations of the parties in a new venture with DMSA.  In an e-mail sent to me in early June, Ms. Santiago Bauzá stated:

> I need to come to some understanding with you before we enter this new adventure in both our professional and business lives.  I really need a tangible contract that we can start building from.

I have attached a copy of this e-mail as Exhibit 1 to this affidavit.

7.      Ms. Santiago Bauzá continued, "I am moving on with the plan I presented to you. I am working very hard to have a <u>new</u> Dialogo by July 1st."  Ex. 1 (emphasis added).

8.      In response to Ms. Santiago Bauzá's e-mail, on June 9, 2004, I sent her a reply, stating:

It has been but 7 business days since our 05/27/04 CT meeting and your e-mail of 06/08.  Let's review where we are re: DMSA's commitment and what we have done to date:

\*          We have committed to partner with you without reservation.

\*          We outlined to you an exit strategy for your situation with Manuel [her business partner in a business called Dialogo Bilingue, Inc.].

I have attached a copy of my e-mail dated June 9, 2004 as Exhibit 2.

9.        In that June 9 e-mail, I also stated:

However, per our 06/02 conversation, you need to resolve the partnership situation with Manuel in order for us to execute it.

Ex. 2.

10.       In our initial discussions about this new venture, I talked with Ms. Santiago Bauzá about DMSA's prospective contributions to the venture, which included two distinct types of contributions.  First, these contributions would include a proprietary DMSA strategic marketing initiative specific to the Spanish language print media business and extensive and detailed research studies conducted by DMSA in companion to the strategic marketing initiative that DMSA had already completed and financed relating to the Spanish language markets throughout the United States, which the parties later stipulated in the Operating Agreement as having a value of $50,000.  Second, these contributions would also include the payment of certain of the Company's start-up expenses to get the venture going.  I never told Ms. Santiago Bauzá that DMSA would contribute $50,000 cash into Dialogo, LLC as its capital contribution nor do the Venture Agreement or the Operating Agreement include any such obligation.

11.       Moreover, I never told Ms. Santiago Bauzá that she would be required to quit her position as Director of the Employee Assistance Program at River Valley Counseling Center, Inc. for her to engage in this new venture.

3

12.    Later, on June 9, 2004, I e-mailed to Ms. Santiago Bauzá a copy of the corporate documents for the formation of the new company, Dialogo, LLC ("Dialogo, LLC" or "the Company") between DMSA and Ms. Santiago Bauzá.  Ex. 3.  These documents were executed by DMSA and included a Venture Agreement, an Operating Agreement and Members Agreement (Dialogo, LLC) for the new company, as well as two consents in lieu of meetings, one to be signed by the Members of the new company and one by the Directors.  Id.

13.    On June 9, Ms. Santiago Bauzá executed these documents on her own behalf and returned them to me by facsimile.

14.    As contemplated in the Venture Agreement, and as set forth in the Operating Agreement and Members Agreement (Dialogo, LLC) ("the Operating Agreement"), DMSA and Ms. Santiago Bauzá entered into the Operating Agreement to form a limited liability company called Dialogo, LLC.  The membership interests of the Company are as follows:  DMSA - 51%, Ms. Santiago Bauzá - 49%.  Id.

15.    Under the Venture Agreement, Ms. Santiago Bauzá and DMSA formed a joint venture and that agreed that, among other things:

- They would create a limited liability company called Dialogo LLC for the joint venture in which Ms. Santiago Bauzá had a 49% membership interest and DMSA had a 51% membership interest;
- The Company will be managed by a board of directors, consisting of two representatives from DMSA and one designated by Ms. Santiago Bauzá;
- DMSA and LSB [Lillian Santiago Bauzá] shall through the Company jointly pursue the Spanish language and bilingual print and media business;
- Ms. Santiago Bauzá shall devote her efforts exclusively to the Company, and she shall not provide "such services, directly or indirectly for itself [sic] or any other entity or person to the extent it relates to the Business."
- They will keep confidential the proprietary information of the Company.

Ex. 5, at 1-2.

16.    The Venture Agreement provided that "DMSA shall contribute the initial capital to launch the LLC <u>in an amount that DMSA deems appropriate</u> (including through travel, promotional costs, legal fees, accounting fees, billing fees and the labor of management and staff of DMSA)." Ex. 5, at 1 (emphasis added).  There is no term in the Venture Agreement providing that DMSA shall provide initial capital in the amount of $50,000 cash to launch the LLC.  <u>See</u> <u>id.</u>

17.    Under the Operating Agreement, the Company was "formed for the object and purpose of developing Spanish language newspaper(s) and media." Ex. 4, at 6.

18.    Under Section 12.7 of the Operating Agreement, Ms. Santiago Bauzá agreed to act exclusively on behalf of the Company.  She agreed that:

> LSB shall employ its [sic] diligent efforts for the Company and LSB shall not provide such services, directly or indirectly for itself [sic] or any other entity or person to extent that it relates to the business.

Ex. 4, at 22. Ms. Santiago Bauzá also agreed that she "may not resign from the Company prior to the dissolution and winding up of the Company." Ex. 4, at 10.

19.    Unlike Ms. Santiago Bauzá , the parties agreed that DMSA was expressly allowed to pursue opportunities outside the Company, as expressly set forth in the same Section 12.7 of the Operating Agreement:

> DMSA or an Affiliate thereof may engage in or possess an interest in other business ventures of any nature or description, independently or with others, similar or dissimilar to the business of the Company . . .

Ex. 4, at 22.  This section of the Operating Agreement made it clear that  DMSA was not obligated or expected to act exclusively for the Company.

20.    Ms. Santiago Bauzá also agreed that the proprietary information of the Company was to be kept confidential.  Section 12.8 of the Operating Agreement provides, in relevant part:

> DMSA and LSB acknowledge and agree that all efforts and
> actions undertaken by them for the Company in connection with
> the business of the Company are to be kept confidential.  Neither
> DMSA nor LSB will disclose to any person or entity, directly or
> indirectly, any Proprietary Information (as hereinafter defined)
> relating to the Company's business without the prior written
> consent of the LLC.  For the purposes of this Agreement,
> "Proprietary Information" means all advertiser and subscription
> lists, advertiser and subscription prospects, marketing information
> and data, product information, strategic or technical information,
> financial information, supplier information, billing rates and
> advertiser provided information, documents and data.

Ex. 4, at 22.

21.    Under Section 15.2(i) of the Operating Agreement, the dissolution and winding

up of the Company's affairs requires "the written consent of all Members."  Ex. 4, at 24.

22.     Section 4.1 of the Operating Agreement explains the members' initial capital

contributions to the Company.  Section 4.1(a) provides:

> Each Member <u>has contributed</u> or <u>is deemed to have contributed</u> to the
> capital of the Company the amount set forth opposite the Member's name
> on Schedule A attached hereto.  The <u>agreed value</u> of the Capital
> Contributions <u>made or deemed to have been made</u> by each Member shall
> be set forth on Schedule A.

Ex. 4, at 8 (emphasis added).  Schedule A provides that the agreed value of DMSA's capital

contribution was $50,000 and of Ms. Santiago Bauzá's capital contribution was $1.00.  Ex. 4, at

30.

23.    DMSA's initial capital contribution, which the parties agreed had a value of

$50,000,  was comprised of its proprietary strategic marketing initiative specific to the Spanish

language print media business and the companion research studies cited previously above.

24.    Shortly after Ms. Santiago Bauzá agreed to the terms of the Operating Agreement

and the Venture Agreement, she wrote me an e-mail to provide an update of the Company.  She

stated:

> Just an update of what I've been doing in the last two weeks. I informed Manuel that I was going to close the Dialogo [B]ilingual Corporation. Open a bank account under Dialogo LLC, I need the ID # of the venture for the bank and clients. Attached please find copy of the new media kit, new name logo and other form just for your information and [advice] if you wish.
>
> All new business are [sic] under Dialogo LLC contract.

Pike Aff. (Dkt. No. 4), Ex. 6.

    25.    Ms. Santiago Bauzá also reported the sales growth and new advertisers with the Company. She stated: "The sales are better than ever, Gabriela and I developed new sales strategies and we got two year contracts and we are doing a lot of presentations with potential clients." Pike Aff. (Dkt. No. 4), Ex. 6.

    26.    In June, 2004, the Company established an office at Suite 405, 250 Open Square in Holyoke, where another DMSA joint venture was located.

    27.    On or about July 1, 2004, the Company published and distributed the first edition of its bilingual newspaper entitled "El Diálogo". It published a number of issues after that, on a bi-weekly basis, from July 1, 2004 to February 15, 2005. From July, 2004 through February, 2005, the Company developed the trademark and trade name "El Diálogo". Through its development and use of the mark/name of "El Diálogo", the Company created substantial goodwill in this asset.

    28.    In August, 2004, the Company engaged the services of Ana Morales, a free lancer, for, among other things, the creation of a website for the newspaper, El Diálogo. The website, www.eldialogo.com, became operational on or about October 15, 2004.

    29.    The Company operated as set forth in the Venture Agreement and Operating Agreement. DMSA provided the capital for the Company, to the extent that DMSA deemed it appropriate, having directly paid salaries, rent and other expenses of the Company, and having

provided goods and services for the benefit of the Company, including accounts payable services, consulting services, computer hardware and software. Through March, 2005, DMSA had made over $40,000 in such out-of-pocket payments and also contributed over $5,000 in management services. I have attached a true and correct summary of DMSA's expenditures as Exhibit 6. Ms. Santiago Bauzá handled the day-to-day operation of the Company (but was required to get DMSA's approval for expenditures). During this period, I had a number of conversations and e-mails with Ms. Santiago Bauzá as one would expect between owners of a business.

30.    In December 2004, Ms. Santiago Bauzá presented me with financial statements (prepared by the accountant Tracy Learned) relating to the financial performance of the Company from July 1, 2004 to December 13, 2004. These documents showed that during this period, the Company had a total net income of over $21,000 and the Company had a profit for every complete month in this period. I have attached a true and correct copy of these financial statements as Exhibit 7.

31.    Specifically, these financial statements showed the monthly net income as follows:

|  | Net Income |
|---|---|
| July 2004 | $ 777.38 |
| August 2004 | 9,147.92 |
| September 2004 | 2,748.71 |
| October 2004 | 5,542.98 |
| November 2004 | 4,924.34 |

Ex. 7, at 1924.

32.    In early February, Ms. Santiago Bauzá sent me an e-mail indicating the continuing positive momentum of the business and stated:

> Gerry, the newspaper is on an incredible movement to grow, since
> Francisco arrived we had implemented many systems that are going
> to help us get the accounts we need . . . .

Ex. 8.

33.     From June 2004 through February 2005, Ms. Santiago Bauzá never informed me
that she thought DMSA was failing to abide by any of its obligations under the Venture
Agreement or Operating Agreement.  During this period, Ms. Santiago Bauzá never asserted to
me, as she now apparently claims, that DMSA was obligated to make a $50,000 cash investment
in the Company.

34.     I was treated for fever and pneumonia on or about February 13, 2005, which
required hospital care and total bed rest.  For the weeks of February 13 and 20, I was nearly
completely incapacitated.  Most of the week of February 27, I had limited capability.

35.     On February 20, I received a February 18 telephone message from Mr. Solé, an
employee of Dialogo, LLC, asking me to call him.  In response, I wrote him and Ms. Santiago
Bauzá an e-mail in which I stated:

> Beatriz [Mallory] and myself have been on our backs for a week,
> hospitalized on Wednesday and now under an intensive and
> accelerated program of antibiotics to prevent a spreading pneumonia
> and check a body temperature that at times hovered close to 103
> degrees.

Ex. 9.

36.     At some point, Ms. Santiago Bauzá drafted a letter dated February 17, 2004 (that
she did not mail to me until more than a week later) to inform me that she was unilaterally
closing down the business of the Company (which she had no authority to do).  The entire text of
this letter, including several false accusations, is reproduced below:

> Since our last meeting and telephone conversation I have
> reconsidered my position in Diálogo LLC.  Since the beginning I

9

have had to endure your lack of commitment to this organization and your promised financial contributions to the business.  Your inconsistent communication on the decision making process and lack of financial support to the venture has caused a material deteriorations [sic], to the point where we do not have staff support, nor are we able to continue without the business going into debt.  Therefore, as operating manager, I have no other alternative but to close the business effective immediately.

The landlord has been made aware of the situation; he is allowing you to leave the computer, software and other office furniture at that space until the end of the month.  You should take whatever steps are necessary to remove those items at your earliest.  All business paperwork, e.g. bank statements, check book and list of account payables will be sent to you shortly.

If you have questions and or concerns you can address those to my attorney, Arnold Greenhut at 413-785-1504.

Ex. 10.

37.     This letter, however, was not mailed until February 25, 2005.  I have attached a copy of the February 25, 2005 postmarked envelope as Exhibit 11.

38.     I did not receive this letter, which was sent by certified mail, until March 5.

39.     Until I received this letter on March 5, Ms. Santiago Bauzá never notified me of her unauthorized decision to unilaterally close the business of the Company by telephone, e-mail, fax, or regular U.S. mail.

40.     As of May 13, 2005, almost three months after the letter dated February 17, Ms. Santiago Bauzá still has not sent the business paperwork of the Company to DMSA as she promised to do "shortly" in her letter dated February 17, 2005.  Upon information and belief, Ms. Santiago Bauzá continues to use the Company's bank accounts.

41.     In February 2005, without my knowledge, and without the consent of DMSA, Ms. Santiago Bauzá physically moved the business, assets, and equipment of the Company out of its location at  Suite 405, 250 Open Square Way in Holyoke to a new location in the same building

at Suite 120, 4 Open Square in Holyoke.  This is directly contradictory of the statement in her letter of February 17, 2005 that she was leaving those items where they were so that I could come and pick them up.  The Company's assets at that time included the following valuable, confidential "Proprietary Information" which Ms. Santiago Bauzá had agreed to maintain confidential, and not disclose to others without prior written consent: advertiser and subscription lists, advertiser and subscription prospects, marketing information and data, product information, strategic or technical information, financial information, supplier information, billing rates and advertiser provided information, documents and data.  No consent was ever given to the disclosure or use of this property of the Company.

42.     On March 15, 2005, Ms. Santiago Bauzá established a new Massachusetts limited liability company called El Dialogo, LLC (hereinafter "Newco" for clarity).  The principal office of this new company is listed as  Suite 120, 4 Open Square in Holyoke.

43.     On each of March 1, 2005 and March 15, 2005, April 1, 2005, and April 15, 2005, Ms. Santiago Bauzá published an edition of El Diálogo, apparently with the assets of the Company.  Newco's and Ms. Santiago Bauzá's use of "El Diálogo" is likely to cause confusion to the readers and damage the goodwill of the Company.

44.     On or about April 21, 2005, the Commonwealth of Massachusetts approved Dialogo, LLC's application for registration of the trademark ("El Diálogo") and issued a certification of registration to Plaintiff Dialogo, LLC for that trademark.  A copy of that document is attached as Exhibit 12.

45.     Dialogo, LLC is registered as a foreign limited liability company doing business in the Commonwealth of Massachusetts.  A copy of that document is attached as Exhibit 13.

46.     As reflected in the March 15, 2005 edition of El Diálogo, Exhibit 14, the newspaper is virtually unchanged from the previous editions of El Diálogo.  <u>See</u> Exhibit 15.

47.     Ms. Santiago Bauzá's misappropriation of Diálogo, LLC's assets and publication of a new unauthorized version of El Diálogo are causing irreparable harm to Diálogo, LLC, threatening the Company's very existence.  The longer that Ms. Santiago Bauzá continues to use the misappropriated assets, the harder it will be for Diálogo, LLC to resume its operations.  Ms. Santiago Bauzá is currently establishing relationships on behalf of Newco between customers, vendors, and employees that had previously worked with Diálogo, LLC.  It will be impossible to re-establish those relationships with Diálogo, LLC if Ms. Santiago Bauzá continues to interfere with them.

48.     DMSA's reasonable financial expectations for Diálogo, LLC were that it would be self-sufficient by now and would have greatly increased in value.


Dated:  May 13, 2005                                    /s/ Gerry Pike_____
                                                       Gerry Pike



COMMONWEALTH OF PENNSYLVANIA
Wayne, ss.                                                     May 13, 2005

      Personally appeared the above-named Gerry Pike and made oath that the foregoing statements are true and based upon his own personal knowledge.

                              Before me,



                              /s/ Bridget A. Cavage_____
                              Notary Public/Attorney at Law
                              Print Name:  Bridget A. Cavage
                              My Commission Expires:  10/3/05


                         **CERTIFICATE OF SERVICE**

      I hereby certify that on May 13, 2005, I electronically filed the Second Affidavit of Gerry Pike with the Clerk of Court using the CM/ECF system which will send notification of such filing to the following:  Keith A. Minoff, Esq. and Arnold Greenhut, Esq., and I hereby certify that there are no non-registered participants.

                              /s/ Seth W. Brewster_____



P:\sbrewster\Dialogo\Second Affidavit of Gerry Pike.doc

# EXHIBIT 1

PreAgmtAccus.txt

lilliansantiago@comcast.net wrote:

>Hi Gerry:
>
>How are you doing?  Gerry,  I am sorry if I come across too assertive, however, I need to come to some understanding with
you before we enter this new adventure in both of our professional and business lives.
>
>I really need a tangible contract that we can start building from.  All of the items discribed in the business plan are not
to be done now.  Some are short and other long term goal.  I need to have clear how the financial aspect of the business is
going to work. such as; Gabriela's salary, equipment, and other areas the newspaper need.  Carmen is great, however, we must
decentralized some of the decision making process in order for me to run with the business, and made decisions that impact
the daily functions of the newspaper.  Therefore, I need to know how you see this happening.
>
>Dialogo is running and cannot be hold back,  I need Ana on board by the end of this month.  If you feel that her money
request is too much, we can perhaps discuss some other options,  however, I cannot wait until Bea has time out of her
extremelly busy schedule to deal with Dialogo's needs of staff.  I understand that for you this is an investment and as so,
you must pre-qualify candidates.  However, from my point of view this woman is what this newspaper needs.  Ana impressed me
overall, as an editor, as a goal getter and also her increadible commitment to the work I am trying to accomplish.  The
hiring of the personnel needs to be my decision, as I am the person that is here day in and day out and understand the needs
of the paper.  I am wailling to discuss with you the pros and cons of the desicion making process.
>
>I am moving on with the plan I presented to you,  I am working very hard to have a new Dialogo by July 1st.  I need
expedite action from you and to let me know clear what are you wailling to contemplate or not.  This will give me the
opportunity to make an inform desicion with regards to merging.
>
>Respectfully,
>
>Lillian Santiago
>
>
>
>
>

# EXHIBIT 2

PreAgmtAccus.txt

Subject: Re: Dialogo Bilingue
From: GPike <gpike@DMSAinc.com>
Date: Wed, 09 Jun 2004 13:26:49 -0400
To: lilliansantiago@comcast.net

Hi Lillian.

I appreciate your being "assertive" and your eagerness to keep things moving
forward.  It has been but 7 business days since our 05/27/04 CT meeting and your
e-mail of 06/08.  Let's review where we are re. DMSA's commitment and what we have
done to date:

      * We have committed to partner with you without reservation.
      * We outlined to you an exit strategy for your situation with Manuel
      * We immediately executed your software request to get Gabriela working.
      * We have leased a Dell desktop for Ana's use, per your request.  It is shipped
to NY to be configured by the IT department and then shipped to MA.
      * We proposed and agreed to your salary offer to Gabriela.
      * We put forward the proposition that you, too, must be salaried and accepted
your remuneration figure.
      * We agreed to continue with your accountant for Dialogo.
      * We have reviewed and discussed with you your business plan document as soon as
we received it.
      * We have had our attorneys create comprehensive LLC agreements.


Per your 3rd paragraph's 1st sentenced we have spent money and committed resources
without any  signed agreement with you
precisely because we do not want Dialogo to be held back.
Re. Contract:  Our attorneys have completed all the drafted documents to create the
new Dialogo LLD.  However, per our 06/02
conversation, you need to resolve the partnership situation with Manuel in order for
us to execute it.  When we last spoke
you expected it done in a week's time.  However, I will be happy to fax the drafts
to you immediately.  I will ring you for
your fax number.
Re. Ana and Beatriz meeting:  In fairness to Beatriz she was informed on Friday
(06/04) that Ana would be in NJ over the
weekend.  We live a hundred miles from the Metro area so weekend travel for her is
not a snap and her Monday schedule was
already set with a new Comcast pitch and strategy session.
Re. Ana's hiring:  No one wishes to interfere with your hiring prerogative.  In
fact, you will see that the LLC documents
specifically stipulates that responsibility to you. Meeting with Beatriz is not an
exercise to "pre qualify" her.  You have
qualified her, no one challenges that.  However,  you have suggested that if  "her
money request is too much, we can perhaps
discuss some other options".  That is precisely why she is meeting with Beatriz.
Unquestionably, we will have to bring the
salary number down but I want to determine if some of her skill set can be shared
with HispanAmerica so that we can distribute
her salary over two payrolls.  I suggest you have Ana travel to NYC next Monday when
you and Hector are here and things can
be laced up at that time.  If you need to get her working immediately in order to
insure a timely next issue of Dialogo, hire
her on at a $100 per diem.
Re. Carmen:  Carmen is not just "great", she is essential.  More than two thirds of
all new businesses fail.  We must
carefully manage money to be successful.  It is just that simple.  Carmen makes no
Dialogo decisions, she is merely the
conduit to payment, as with your decision to purchase the software for Gabriela.  As
Dialogo grows it will generate self
sufficient cash flow - and profitability! - and things will more direct.

Page 1

# EXHIBIT 3

SignLLC Docs.txt

Subject: LLC Agreement Documents
From: GPike <gpike@DMSAinc.com>
Date: Wed, 09 Jun 2004 15:10:46 -0400
To: lillian santiago bauza <lilliansantiago@comcast.net>

Hi Lillian.

Per our conversation, please find attached the following documents re. the formation
of Dialogo, LLC:

1.) Venture Agreement - 2 pgs.
2.) Operating Agreement & Member Agreement - 30 pgs.
3.) Consent Of Directors In Lieu Of Meeting Resolution - 1 pg.
4.) Consent Of Members In Lieu Of Meeting - 1 pg.

I have signed and sent via fax the signature page for each of the above listed
documents.  You should sign them and send the
back to me directly via return fax (570-676-9180).   Best.GP.

# EXHIBIT 4

# OPERATING AGREEMENT
# AND MEMBERS AGREEMENT
## DIALOGO, LLC

This Operating Agreement and Members Agreement ("Agreement") of Dialogo, LLC (the "Company") is made as of June __, 2004, among Lillian Santiago Bauzá, a resident of Massachusetts ("LSB"), and Direct Merchants S.A., Inc., a New Jersey Corporation ("DMSA"), as members of the Company, and the persons or entities who become members of the Company in accordance with the provisions hereof and whose names are set forth as Members on Schedule A hereto.

WHEREAS, LSB and DMSA desire to form a limited liability company pursuant to the Maine Limited Liability Company, as amended from time to time (the "Maine Act"), by filing Articles of Organization with the office of the Secretary of State of the State of Maine and entering into this Agreement.

NOW, THEREFORE, in consideration of the agreements and obligations set forth herein and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged and intending to be legally bound, the Members hereby agree as follows:

## ARTICLE I

## DEFINED TERMS

Section 1.1     Definitions.  Unless the context otherwise requires, the terms defined in this Article I shall, for the purposes of this Agreement, have the meanings herein specified.

"Additional Members" has the meaning set forth in Section 13.1 hereof.

"Affiliate" means with respect to a specified Person, any Person that directly or indirectly controls, is controlled by, or is under common control with, the specified Person.  As used in this definition, the term "control" means the possession, directly or indirectly, of the power to direct or cause the direction of the management and policies of a Person, whether through ownership of voting securities, by contract or otherwise.

"Agreement" means this Operating Agreement and Members Agreement of the Company, as amended, modified, supplemented or restated from time to time.

"Articles" means the Articles of Organization of the Company and any and all amendments thereto and restatements thereof filed on behalf of the Company with the office of the Secretary of State of the State of Maine pursuant to the Maine Act.

"Board" means the Board of Directors of the Company.

"Capital Account" means, with respect to any Member, the account maintained for such Member in accordance with the provisions of Section 4.4 hereof.

"Capital Contribution" means, with respect to any Member, the aggregate amount of money and the fair market value of any property (other than money) contributed to the Company pursuant to Section 4.1 hereof with respect to such Member's Interest.

"Code" means the Internal Revenue Code of 1986, as amended from time to time, or any corresponding federal tax statute enacted after the date of this Agreement. A reference to a specific section of the Code refers not only to such specific section but also to any corresponding provision of any federal tax statute enacted after the date of this Agreement, as such specific section or corresponding provision is in effect on the date of application of the provisions of this Agreement containing such reference.

"Company" means Dialogo, LLC, the limited liability company formed and continued under and pursuant to the Maine Act and this Agreement.

"Covered Person" means a Member, a Director, an Officer, a Manager, any Affiliate of a Member, a Director, an Officer or a Manager, any officers, directors, Members, partners, employees, representatives or agents of a Member, a Director, an Officer or a Manager, or their respective Affiliates, or any employee or agent of the Company or its Affiliates.

"Director" means a director of the Company.

"Fiscal Year" means (i) the period commencing upon the formation of the Company and ending on December 31, 2004, (ii) any subsequent twelve (12) month period commencing on January 1 and ending on December 31, or (iii) any portion of the period described in Clause (ii) of this sentence for which the Company is required to allocate Profits, Losses and other items of Company income, gain, loss or deduction pursuant to Article VIII hereof.

"Interest" means a Member's limited liability company interest in the Company which represents any Member Votes held by a member and such Member's interest of the profits and losses of the Company and a Member's right to receive distributions of the Company's assets in accordance with the provisions of this Agreement and the Maine Act.

"Laws" means:

(i)    all constitutions, treaties, laws, statutes, codes, ordinances, orders, decrees, rules, regulations and municipal by-laws, whether domestic, foreign or international;

(ii)    all judgments, orders, writs, injunctions, decisions, rulings, decrees and awards of any governmental body;

-2-

(iii)     all policies, practices and guidelines of any governmental body; and

(iv)     any amendment, modification, re-enactment, restatement or extension of the foregoing, in each case binding on or affecting the party or Person referred to in the context in which such word is used; and "Law" shall mean any one of them.

"Maine Act" means the Maine Limited Liability Company Act, 31 M.R.S.A. Chapter 13, as amended from time to time.

"Majority Vote" means the written approval of, or the affirmative vote by, Members holding a majority of the Member Votes.

"Majority" means a majority of the Member Votes.

"Manager" means any Person designated by the Members as a manager of the Company within the meaning of the Maine Act and shall include the Directors of the Company.

"Member" means each of LSB and DMSA and includes any Person admitted as an Additional Member or a substitute Member pursuant to the provisions of this Agreement, in such Person's capacity as a member of the Company, and "Members" means two (2) or more of such Persons when acting in their capacities as members of the Company.  For purposes of the Maine Act, the Members shall constitute one (1) class or group of members.

"Member Votes" means the votes allocated to each Person as reflected in Schedule A as may be amended.

"Net Cash Flow" means, for each Fiscal Year or other period of the Company, the gross cash receipts of the Company from all sources, but excluding any amounts, such as gross receipts taxes, that are held by the Company as a collection agent or in trust for others or that are otherwise not unconditionally available to the Company, less all amounts paid by or for the account of the Company during the same Fiscal Year or other period (including, without limitation, payments of principal and interest on any Company indebtedness and expenses reimbursed to the Members under Section 5.2 hereof), and less any amounts determined by the Members to be necessary to provide a reasonable reserve for working-capital needs or any other contingencies of the Company.  Net Cash Flow shall be determined in accordance with the cash receipts and disbursements method of accounting and otherwise in accordance with generally accepted accounting principles, consistently applied. Net Cash Flow shall

not be reduced by depreciation, amortization, cost recovery deductions, depletion, similar allowances or other non-cash items, but shall be increased by any reduction of reserves previously established.

"Officer" means an officer of the Company.

"Percentage Interest" means the interest of a Member, expressed as a portion of one hundred percent, as shown on Schedule A hereto, which reflects the Member's ownership interest in the Company, as determined by the unanimous written consent of the Members as adjusted from time to time.

"Person" includes any individual, Company, association, partnership (general or limited), joint venture, trust, estate, limited liability company, or other legal entity or organization.

"Profits" and "Losses" means, for each Fiscal Year, an amount equal to the Company's taxable income or loss for such Fiscal Year, determined in accordance with § 703(a) of the Code.

"Secretary" means the Person appointed by the Board as the secretary of the Company, who shall perform the duties described in Section 7.4 of this Agreement.

"Tax Matters Partner" has the meaning set forth in Section 11.1 hereof.

"Treasury Regulations" means the income tax regulations, including temporary regulations, promulgated under the Code, as such regulations may be amended from time to time (including corresponding provisions of succeeding regulations).

Section 1.2     Headings.  The headings and subheadings in this Agreement are included for convenience and identification only and are in no way intended to describe, interpret, define or limit the scope, extent or intent of this Agreement or any provision hereof.

## ARTICLE II

## FORMATION AND TERM

Section 2.1     Formation.

(i)     The Members hereby form the Company as a limited liability company under and pursuant to the provisions of the Maine Act and agree that the rights, duties, and liabilities of the Members shall be as provided in the Maine Act, except as otherwise provided herein.

-4-

(ii)    Upon the execution of this Agreement or a counterpart of this Agreement, LSB and DMSA shall be admitted as Members.

(iii)    The name and mailing address of each Member, the agreed value of the amount contributed to the capital of the Company and the Percentage Interest of each Member shall be listed on Schedule A attached hereto.  The Secretary shall be required to update Schedule A from time to time as necessary to accurately reflect the information therein.  Any amendment or revision to Schedule A made in accordance with this Agreement shall not be deemed an amendment to this Agreement.  Any reference in this Agreement to Schedule A shall be deemed to be a reference to Schedule A as amended and in effect from time to time.

(iv)    Gerry Pike, as an authorized person within the meaning of the Maine Act, shall execute, deliver, and file the Articles.

Section 2.2    <u>Name</u>.  The name of the Company formed hereby is Dialogo, LLC.  The business of the Company may be conducted upon compliance with all applicable Laws under any other name designated by the Board.

Section 2.3    <u>Term</u>.  The term of the Company shall commence on the date the Articles are filed in the office of the Secretary of State of the State of Maine and shall continue in perpetuity, unless the Company is dissolved in accordance with the provisions of this Agreement.  The existence of the Company as a separate legal entity shall continue until cancellation of the Articles in the manner required by the Maine Act.

Section 2.4    <u>Registered Agent and Office</u>.  The Company's registered agent and office in the State of Maine shall be Mark Googins, Verrill & Dana, One Portland Square, Portland, Maine 04112.  At any time, the Members may designate another registered agent and/or registered office.

Section 2.5    <u>Principal Place of Business</u>.  The principal place of business of the Company shall be at 252 Open Square Way, Suite 405, Holyoke, MA. 01040.  At any time, the Board may change the location of the Company's principal place of business to another location.

Section 2.6    <u>Qualification in Other Jurisdictions</u>.  The Board shall cause the Company to be qualified, formed, or registered under assumed or fictitious name statutes or similar Laws in any jurisdiction in which the Company transacts business.  The Secretary, as an authorized person within the meaning of the Maine Act, shall execute, deliver and file any certificates (and any amendments and/or restatements thereof) necessary for the Company to qualify to do business in a jurisdiction in which the Company may wish to conduct business.

# ARTICLE III

# PURPOSE AND POWERS OF THE COMPANY

Section 3.1    Purpose.  The Company is formed for the object and purpose of developing Spanish language newspaper(s) and media, and to engage in any lawful act or activity for which limited liability companies may be formed under the Maine Act and engaging in any and all activities necessary, convenient, desirable or incidental to the foregoing, including, without limitation, (i) to acquire, hold and dispose of the investments, including investments in Affiliates, (ii) to lend money to, borrow money from, act as surety, guarantor or endorser for, provide collateral for, and transact other business with third parties including, Members and Affiliates of the Company, and (iii) acquiring, holding, managing, operating and disposing of interests in real and personal property.

Section 3.2    Powers of the Company.

(i)    The Company shall have the power and authority to take any and all actions necessary, appropriate, proper, advisable, incidental or convenient to or for the furtherance of the purpose set forth in Section 3.1, including, but not limited to, the power:

(a)    to conduct its business, carry on its operations and have and exercise the powers granted to a limited liability company by the Maine Act in any state, territory, district or possession of the United States, or in any foreign country, that may be necessary, convenient, or incidental to the accomplishment of the purpose of the Company;

(b)    to enter into, perform and carry out contracts of any kind, including, without limitation, contracts with the Directors, the Officers, any Manager, any Member, any Affiliate thereof, or any agent or Affiliate of the Company necessary to, in connection with, convenient to, or incidental to the accomplishment of the purpose of the Company;

(c)    to lend money to, borrow money from, act as surety, guarantor or endorser for, provide collateral for, and transact other business with third parties including Members and Affiliates of the Company;

(d)    to purchase, take, receive, subscribe for, or otherwise acquire, own, hold, vote, use, employ, sell, mortgage, lend, pledge, or otherwise dispose of, and otherwise use and deal in and with, Interests or other interests in or obligations of

-6-

domestic or foreign Company's, associations, general or limited partnerships (including, without limitation, the power to be admitted as a partner thereof and to exercise the rights and perform the duties created thereby), trusts, limited liability companies (including, without limitation, the power to be admitted as a member or appointed as a manager thereof and to exercise the rights and perform the duties created thereof), or individuals or direct or indirect obligations of the United States or of any government, state, territory, governmental district, or municipality or of any instrumentality of any of them;

(e)     to lend money for its proper purpose, to invest and reinvest its funds, to take and hold real and personal property for the payment of funds so loaned or invested;

(f)     to sue and be sued, complain and defend, and participate in administrative or other proceedings, in its name;

(g)     to appoint employees and agents of the Company, and define their duties and fix their compensation;

(h)     to indemnify any Person in accordance with the Maine Act and to obtain any and all types of insurance;

(i)     to cease its activities and cancel its Articles;

(j)     to negotiate, enter into, renegotiate, extend, renew, terminate, modify, amend, waive, execute, acknowledge, or take any other action with respect to any lease, contract or security agreement in respect of any assets of the Company;

(k)     to borrow money and issue evidences of indebtedness, and to secure the same by a mortgage, pledge, or other lien on the assets of the Company;

(l)     to pay, collect, compromise, litigate, arbitrate, or otherwise adjust or settle any and all other claims or demands of or against the Company or to hold such proceeds against the payment of contingent liabilities; and

(m)     to make, execute, acknowledge, and file any and all documents or instruments necessary, convenient, or incidental to the accomplishment of the purpose of the Company.

(ii)    The Company may merge with, or consolidate into, another limited liability company or other business entity upon the approval of all of the Members.

## ARTICLE IV

## CAPITAL CONTRIBUTIONS, INTERESTS, CAPITAL ACCOUNTS AND ADVANCES

Section 4.1    Capital Contributions.

(i)    Each Member has contributed or is deemed to have contributed to the capital of the Company the amount set forth opposite the Member's name on Schedule A attached hereto.  The agreed value of the Capital Contributions made or deemed to have been made by each Member shall be set forth on Schedule A.

(ii)    No Member shall be required to make any additional capital contribution to the Company.  However, a Member may make additional capital contributions to the Company with the written consent of all of the Members.

Section 4.2    Member's Interest.  A Member's Interest shall for all purposes be personal property.  A Member has no interest in specific Company property.

Section 4.3    Status of Capital Contributions.

(i)    Except as otherwise provided in this Agreement, the amount of a Member's Capital Contributions may be returned to it, in whole or in part, at any time, but only with the consent of all of the Members.  Any such returns of Capital Contributions shall be made to all Members in proportion to their Percentage Interests.  Notwithstanding the foregoing, no return of a Member's Capital Contributions shall be made hereunder if such distribution would violate applicable law.  Under circumstances requiring a return of any Capital Contribution, no Member shall have the right to demand or receive property other than cash, except as may be specifically provided in this Agreement or as may be specifically agreed to by all of the Members.

(ii)    No Member shall receive any interest, salary, or drawing with respect to its Capital Contributions or its Capital Account or for services rendered on behalf of the Company or otherwise in its capacity as a Member, except:

        (a) the respective invoices of each of DMSA, in connection with services rendered or goods provided through or on behalf of the Company for a client of the Company, shall be paid by the Company as it receives payment form such customer;

-8-

(b) the Members shall be paid profits in accordance with their respective Membership Interests; and

(c) as expressly provided by a unanimous resolution of the Board.

(iii)    Except as otherwise provided herein and by applicable law, the Members shall be liable only to make their capital contributions pursuant to Section 4.1 hereof, and no Member shall be required to lend any funds to the Company or, after a Member's Capital Contributions have been fully paid pursuant to Section 4.1 hereof, to make any additional capital contributions to the Company.  No Member shall have any personal liability for the repayment of any Capital Contribution of any other Member.

Section 4.4    Capital Accounts.

(i)    An individual Capital Account shall be established and maintained for each Member.

(ii)    The Capital Account of each Member shall be maintained in accordance with the provisions of Regulation section 1.704-1 (b) (2) (iv)

Section 4.5    Advances.  If any Member shall advance any funds to the Company in excess of its Capital Contributions, the amount of such advance shall neither increase its Capital Account nor entitle it to any increase in its Interest of the distributions of the Company.  The amount of any such advance shall be a debt obligation of the Company to such Member and shall be subject to such terms and conditions acceptable to the Company and each Member.  Any such advance shall be payable and collectible only out of Company assets, and the other Members shall not be personally obligated to repay any part thereof.  No Person who makes any nonrecourse loan to the Company shall have or acquire, as a result of making such loan, any direct or indirect interest in the profits, capital, or property of the Company, other than as a creditor.

# ARTICLE V

## MEMBERS

Section 5.1    Powers of Members. The Members shall have the power to exercise any and all rights or powers granted to the Members pursuant to the express terms of this Agreement. The Members shall also have the power to authorize the Board, by Majority Vote, to possess and exercise any right or power not already vested in the Board pursuant to Article VI or any other provision of this Agreement. In addition to the foregoing, the Members have the power to exercise any and all other rights or powers of the Company and to do all lawful acts and things as are not by the Maine Act or this Agreement directed or required to be exercised or done by the Board. Except as provided herein, individually, the Members shall have no power to bind the Company.

Section 5.2    Reimbursements. The Company shall reimburse the Members, for all ordinary and necessary out-of-pocket expenses incurred by the Members on behalf of the Company. Such reimbursement shall be treated as an expense of the Company that shall be deducted in computing the Net Cash Flow and shall not be deemed to constitute a distributive Interest of Profits or a distribution or return of capital to any Member.

Section 5.3    Partition. Each Member waives any and all rights that it may have to maintain an action for partition of the Company's property.

Section 5.4    Resignation. A Member may not resign from the Company prior to the dissolution and winding up of the Company.

Section 5.5    Meetings of Members.

(i)    The annual meeting of the Members for the election of Directors and the transaction of other business shall be held, in each year, at such place as shall be designated by the Board and stated in the notice of the meeting. Special meetings of Members for any purpose or purposes may be held at such time and place, and shall be stated in the notice of the meeting or in a duly executed waiver of notice thereof.

(ii)    At the annual meeting of the Members, LSB shall elect one of the Directors and DMSA shall elect two of the Directors on the Company's Board of Directors.

(iii)    Written notice of the annual meeting stating the place, date and hour of the meeting shall be given to each Member entitled to vote at such meeting not less than 10 nor more than 60 days before the date of the meeting.

(iv)     Special meetings of the Members, for any purpose or purposes, may be called by the President and shall be called by the President or Secretary at the request in writing of a majority of the Board.  Such request shall state the purpose or purposes of the proposed meeting.

(v)     Written notice of a special meeting stating the place, date, and hour of the meeting and the purpose or purposes for which the meeting is called, shall be given not less than 10 nor more than 60 days before the date of the meeting, to each Member entitled to vote at such meeting.

(vi)     Business transacted at any special meeting of Members shall be limited to the purposes stated in the notice, unless otherwise agreed to by all of the Members.

(vii)     A Majority present in person or by proxy, shall constitute a quorum at all meetings of the Members for the transaction of business except as otherwise provided by this Agreement.  If, however, such quorum shall not be present or represented at any meeting of the Members, the Members entitled to vote thereat, present in person or represented by proxy, shall have power to adjourn the meeting from time to time, without notice other than announcement at the meeting, until a quorum shall be present or represented.  At such adjourned meeting at which a quorum shall be present or represented any business may be transacted which might have been transacted at the meeting as originally notified.  If the adjournment is for more than 30 days, or if after the adjournment a new record date is fixed for the adjourned meeting, a notice of the adjourned meeting shall be given to each Member of record entitled to vote at the meeting.

(viii)     When a quorum is present at any meeting, a Majority Vote shall decide any question brought before such meeting, unless the question is one upon which by express provision of this Agreement, a different vote is required in which case such express provision shall govern and control the decision of such question.

(ix)     Unless otherwise provided in this Agreement, each Member shall at every meeting of the Members be entitled to vote in person or by proxy, but no proxy shall be voted on after three years from its date, unless the proxy provides for a longer period.

(x)     Members may participate in a meeting of the Members by means of conference telephone or similar communications equipment, provided all persons participating in the meeting can hear each other, and such participation in a meeting shall constitute presence in person at the meeting.  If all the participants are participating by conference telephone or similar

-11-

communications equipment, the meeting shall be deemed to be held at the principal place of business of the Company.

(xi)    Unless otherwise provided in this Agreement, any action required to be taken at any annual or special meeting of the Members of the Company or any action which may be taken at any annual or special meeting of such Members, may be taken without a meeting, without prior notice and without a vote, if a consent in writing, setting forth the action so taken, shall be signed by a Majority.  Prompt notice of taking of the action without a meeting by less than unanimous consent shall be given to those Members who have not consented in writing.

## ARTICLE VI

## MANAGEMENT

Section 6.1    Board of Directors.  Subject to Section 5.1 of this Agreement, the business and affairs of the Company shall be managed by or under the direction of a Board of three Directors.  A person elected as a Director is by such election designated a Manager by the Members for purposes of the Act.  The Directors shall be elected at the annual meeting of the Members, except as provided in this Article, and each Director elected shall hold office until a successor is elected and qualified or until such Director's earlier death, resignation, or removal. Directors need not be Members.  Vacancies shall be filled by the vote of LSB, if the vacancy is the LSB-elected Director, and by DMSA if the vacancy is a DMSA-elected director, and the Directors so chosen shall hold office until the next annual election and until their successors are duly elected and shall qualify, unless sooner displaced.

Section 6.2    Meetings of the Board of Directors.  The Board of Directors of the Company may hold meetings, both regular and special, within or outside the State of Maine.  The first meeting of each newly elected Board of Directors shall be held immediately after the annual meeting of Members and at the same place, and no notice of such meeting shall be necessary to the newly elected Directors in order legally to constitute the meeting, provided a quorum shall be present.  In the event such meeting is not held at that time and place, the meeting may be held at such time and place as shall be specified in a notice given as hereinafter provided for special meetings of the Board of Directors, or as shall be specified in a written waiver signed by all of the Directors.  Regular meetings of the Board may be held without notice at such time and at such place as shall from time to time be determined by the Board.  Special meetings of the Board may be called by the President on three (3) days' notice to each Director, either personally, by telephone, by mail, by telegram or by any other means of communication; special meetings shall be called by the President in like manner and on like notice on the written request of one or more of the Directors.

Section 6.3    <u>Quorum and Acts of the Board</u>. At all meetings of the Board a majority of the Directors shall constitute a quorum for the transaction of business and, except as otherwise provided in Section 6.9 of this Agreement or any other provision of this Agreement, the act of a majority of the Directors present at any meeting at which there is a quorum shall be the act of the Board. If any Directors' vote shall result in a tie-vote, then the matter voted on by the Board shall be presented to the Members for vote, and the resulting vote by the Members shall decide such matters. If a quorum shall not be present at any meeting of the Board, the Directors present thereat may adjourn the meeting from time to time, without notice other than announcement at the meeting, until a quorum shall be present. Any action required or permitted to be taken at any meeting of the Board or of any committee thereof may be taken without a meeting, if all members of the Board or committee, as the case may be, consent thereto in writing, and the writing or writings are filed with the minutes of proceedings of the Board or committee.

Section 6.4    <u>Electronic Communications</u>. Members of the Board, or any committee designated by the Board, may participate in a meeting of the Board, or any committee, by means of conference telephone or similar communications equipment by means of which all persons participating in the meeting can hear each other, and such participation in a meeting shall constitute presence in person at the meeting. If all the participants are participating by conference telephone or similar communications equipment, the meeting shall be deemed to be held at the principal place of business of the Company.

Section 6.5    <u>Committees of Directors</u>. The Board may, by resolution passed by a majority of the whole Board, designate one or more committees, each committee to consist of one or more of the Directors of the Company. The Board may designate one or more Directors as alternate members of any committee, who may replace any absent or disqualified member at any meeting of the committee.

In the absence or disqualification of a member of a committee, the member or members thereof present at any meeting and not disqualified from voting, whether or not such members constitute a quorum, may unanimously appoint another member of the Board to act at the meeting in the place of any such absent or disqualified member.

Any such committee, to the extent provided in the resolution of the Board, shall have and may exercise all the powers and authority of the Board in the management of the business and affairs of the Company, but no such committee shall have the power or authority to take any of the actions described in Section 6.9 of this Agreement unless authorized in writing by each Director. Such committee or committees shall have such name or names as may be determined from time to time by resolution adopted by the Board. Each committee shall keep regular minutes of its meetings and report the same to the Board when required. Section 6.6 Compensation of Directors. The Board shall have the authority to fix the compensation of Directors. The Directors may be paid their expenses, if any, of attendance at

-13-

such meeting of the Board and may be paid a fixed sum for attendance at each meeting of the Board or a stated salary as Director. No such payment shall preclude any Director from serving the Company in any other capacity and receiving compensation therefor. Members of special or standing committees may be allowed like compensation for attending committee meetings.

Section 6.6    Removal of Directors. Unless otherwise restricted by Law, any Director may be removed, with or without cause, by the Member that was entitled to elect such director. Any vacancy caused by any such removal may be filled by action of the Member entitled to elect such director.

Section 6.7    Directors as Agents. The Directors, to the extent of their powers set forth in this Agreement, are agents of the Company for the purpose of the Company's business, and the actions of the Directors taken in accordance with such powers shall bind the Company.

Section 6.8    Actions Requiring Unanimous Approval of the Board. Notwithstanding any other provision of this Agreement to the contrary, none of the Board, any Director, or any Officer shall take any of the following actions on behalf of the Company unless authorized to do so unanimously by the Board:

    (i)    the sale, exchange, or other disposition of any of the assets of the Company except for sales in the ordinary course of business;

    (ii)    the commencement of a voluntary proceeding seeking reorganization or other relief with respect to the Company under any bankruptcy or other similar law or seeking the appointment of a trustee, receiver, custodian, or other similar official of the Company or any substantial part of its property, or the making by the Company of a general assignment for the benefit of creditors;

    (iii)    the declaration or making of any distributions to Members other than to reimburse DMSA for initial capital contributions.

    (iv)    the entering into by the Company of any joint venture, partnership, subcontracting, license, sub-license, manufacturing, marketing, distribution, or other similar arrangement with any Person;

    (v)    the entering into by the Company of any agreement, facility, commitment, guaranty, instrument, or other undertaking providing for, or relating to, the incurrence of any indebtedness by the Company;

(vi)    the formation or organization of any subsidiary of the Company and the appointment of directors of (or persons with comparable authority with respect to) any such subsidiary;

(vii)    the issuance, sale, acquisition, or repurchase by the Company of any Interest or other equity interest (or option, warrant, conversion or similar right with respect to any equity interest) in or of the Company;

(viii)    the commitment to any material capital expenditure by the Company in any Fiscal Year of the Company;

(ix)    the adoption of a business plan and annual operating budget for the Company (or any updates to each thereof).

(x)    the entering into, amendment or termination of employment contracts with Officers of the Company or other contracts with Directors, Officers, Managers, or Members or their respective Affiliates;

(xi)    the appointment or change of the independent auditors or deposit banks of the Company;

(xii)    the acquisition or lease by the Company of any real property, or any sale, lease, or sublease of, or similar arrangement affecting, any real property owned or leased by the Company;

(xiii)    the entering into, amendment, modification, renewal (or election not to renew), waiver, or termination by the Company of any financing document; and

(xiv)    the incurrence or assumption of any material liability or obligation, whether contractually or otherwise, by the Company.

# ARTICLE VII

## OFFICERS

Section 7.1    Officers. The Officers of the Company shall be elected by the Board and shall consist of at least a President, a Secretary, and a Treasurer. The Board of Directors may also choose one or more Vice Presidents, and one or more Assistant Secretaries and Assistant Treasurers. Any number of offices may be held by the same person. The Board at its first meeting after each annual meeting of Members shall choose a President, a Secretary, and a Treasurer. The Board at its first meeting may appoint such other Officers and agents as it shall deem necessary who shall hold their offices for such terms and shall exercise such powers and perform such duties as shall be determined from time to time by the Board. The salaries of all Officers and agents of the Company shall be fixed by or in the manner prescribed by the Board. The Officers of the Company shall hold office until their successors are chosen and qualify. Any Officer elected or appointed by the Board of Directors may be removed at any time by the affirmative vote of a majority of the Board. Any vacancy occurring in any office of the Company shall be filled by the Board.

Section 7.2    The President. The President shall be the chief executive officer of the Company, shall preside at all meetings of the Members and the Board, shall have general and active management of the business of the Company and shall see that all orders and resolutions of the Board are carried into effect. The President shall execute bonds, mortgages, and other contracts, except where required or permitted by Law to be otherwise signed and executed and except where signing and execution thereof shall be expressly delegated by the Board to some other Officer or agent of the Company or except as otherwise permitted in Section 7.3 hereof.

Section 7.3    The Vice President. In the absence of the President or in the event of the President's inability to act, the Vice President, if any, (or in the event there be more than one Vice President, the Vice Presidents in the order designated by the Directors, or in the absence of any designation, then in the order of their election) shall perform the duties of the President, and when so acting, shall have all the powers of and be subject to all the restrictions upon the President. The Vice Presidents, if any, shall perform such other duties and have such other powers as the Board may from time to time prescribe.

Section 7.4    The Secretary and Assistant Secretary. The Secretary shall be responsible for filing legal documents and maintaining records for the Company. The Secretary shall attend all meetings of the Board and all meetings of the Members and record all the proceedings of the meetings of the Company and of the Board in a book to be kept for that purpose and shall perform like duties for the standing committees when required. The Secretary shall give, or cause to be given, notice of all meetings of the Members and special meetings of the Board, and shall perform such other duties as may

be prescribed by the Board or President, under whose supervision the Secretary shall be. The Assistant Secretary, or if there be more than one, the Assistant Secretaries in the order determined by the Board (or if there be no such determination, then in order of their election) shall, in the absence of the Secretary or in the event of the Secretary's inability to act, perform the duties and exercise the powers of the Secretary and shall perform such other duties and have such other powers as the Board may from time to time prescribe.

Section 7.5    The Treasurer and Assistant Treasurer.  The Treasurer shall have the custody of the Company funds and securities and shall keep full and accurate accounts of receipts and disbursements in books belonging to the Company and shall deposit all moneys and other valuable effects in the name and to the credit of the Company in such depositories as may be designated by the Board.  The Treasurer shall disburse the funds of the Company as may be ordered by the Board, taking proper vouchers for such disbursements, and shall render to the President and the Board, at its regular meetings, or when the Board so requires, an account of all of the Treasurer's transactions and of the financial condition of the Company.  The Assistant Treasurer, or if there shall be more than one, the Assistant Treasurers in the order determined by the Board (or if there be no such determination, then in the order of their election), shall, in the absence of the Treasurer or in the event of the Treasurer's inability to act, perform the duties and exercise the powers of the Treasurer and shall perform such other duties and have such other powers as the Board may from time to time prescribe.

Section 7.6    Officers as Agents.  The Officers, to the extent of their powers set forth in this Agreement or otherwise vested in them by action of the Board, are agents of the Company for the purpose of the Company's business, and the actions of the Officers taken in accordance with such powers shall bind the Company.

Section 7.7    Duties of Board and Officers.  Except to the extent provided herein, each Director and Officer shall have the fiduciary duty of loyalty and care similar to those of directors and officers of business corporations organized under the Maine Business Corporation Act.

## ARTICLE VIII

## ALLOCATIONS

Section 8.1    Profits and Losses.

(i)    Subject to the allocation rules of Section 8.2 hereof, Profits for any Fiscal Year shall be allocated among the Members in proportion to the Percentage Interests.

(ii)    Subject to the allocation rules of Section 8.2 hereof, Losses for any Fiscal Year shall be allocated among the Members in proportion to the Percentage Interests.

Section 8.2     Allocation Rules.

(i)     For purposes of determining the Profits, Losses or any other items allocable to any period, Profits, Losses and any such other items shall be determined on a daily, monthly or other basis, as determined by the Members using any method that is permissible under § 706 of the Code and the Treasury Regulations thereunder.

(ii)    Except as otherwise provided in this Agreement, all items of Company income, gain, loss, deduction and any other allocations not otherwise provided for shall be shared among the Members in the same proportions as they shared Interest Profits and Losses for the Fiscal Year in question.

(iii)   The Members are aware of the income tax consequences of the allocations made by this Article VIII and hereby agree to be bound by the provisions of this Article VIII in reporting their Interests of Company income and loss for income tax purposes.

(iv)    The Members intend that the allocation provisions set forth in this Agreement are intended to comply with Section 704(b) of the Code and the Treasury Regulations issued thereunder and the provisions are to be interpreted in a manner consistent with those Treasury Regulations.

Section 8.3     Tax Allocations; Section 704(c) of the Code.  In accordance with Section 704(c) of the Code and the Treasury Regulations thereunder, income, gain, loss and deduction with respect to any property contributed to the capital of the Company shall, solely for income tax purposes, be allocated among the Members so as to take account of any variation between the adjusted basis of such property to the Company for federal income tax purposes and its initial fair market value.

## ARTICLE IX

## DISTRIBUTIONS

Section 9.1     Net Cash Flow.  Except as otherwise provided in Article XV hereof (relating to the dissolution of the Company), any distribution of the Net Cash Flow during any Fiscal Year shall be made to the Members in proportion to the Percentage Interests.

Section 9.2     Distribution Rules.  All distributions pursuant to Section 9.1 hereof shall be at such times and in such amounts as shall be determined by the Board.

Section 9.3    <u>Limitations on Distribution</u>.  Notwithstanding any provision to the contrary contained in this Agreement, the Company, and the Board on behalf of the Company, shall not make a distribution to any Member on account of its interest in the Company if such distribution would violate applicable Law.

Section 9.4    <u>Amounts Withheld</u>. All amounts withheld pursuant to the Code or any provision of any state, local or foreign tax law as to any payment, distribution or allocation to the Company or the Members shall be treated, for all purposes under this Agreement, as amounts paid or distributed, as the case may be, to the Members as to which such amount was withheld pursuant to this 9.4.  The Company is authorized to withhold from payments and distributions, or with respect to allocations to the Members, and to pay over to any federal, state and local government or any foreign government, any amounts required to be so withheld pursuant to the Code or any provisions of any other federal, state or local law or any foreign law, and shall allocate any such amounts to the Members with respect to which such amount was withheld.

## ARTICLE X

## BOOKS AND RECORDS

Section 10.1    <u>Books, Records and Financial Statements</u>.

(i)    At all times during the continuance of the Company, the Company shall maintain, at its principal place of business, separate books of account for the Company that shall show a true and accurate record of all costs and expenses incurred, all charges made, all credits made and received and all income derived in connection with the operation of the Company business in accordance with generally accepted accounting principles consistently applied, and, to the extent inconsistent therewith, in accordance with this Agreement.  Such books of account, together with a copy of this Agreement and of the Certificate, shall at all times be maintained at the principal place of business of the Company and shall be open to inspection and examination at reasonable times by each Member and its duly authorized representative for any purpose reasonably related to such Member's interest in the Company.

(ii)    The Company, and the Board on behalf of the Company, shall prepare and maintain, or cause to be prepared and maintained, the books of account of the Company.  The Company, and the Board on behalf of the Company, shall prepare and file, or cause to be prepared and filed, all applicable federal and state tax returns.

Section 10.2    <u>Accounting Method</u>.  For both financial and tax reporting purposes and for purposes of determining Profits and Losses, the books and records of the Company shall be kept on the accrual method of accounting applied in a consistent manner in accordance with generally accepted

accounting principles and shall reflect all Company transactions and be appropriate and adequate for the Company's business.

## ARTICLE XI

## <u>TAX MATTERS</u>

Section 11.1    <u>Tax Matters Partner</u>.

(i)    DMSA is hereby designated as "Tax Matters Partner" of the Company for purposes of § 6231(a)(7) of the Code.

(ii)    The Tax Matters Partner shall, within ten (10) days of the receipt of any notice from the Internal Revenue Service in any administrative proceeding at the Company level relating to the determination of any Company item of income, gain, loss, deduction or credit, mail or otherwise deliver a copy of such notice to each Member.

Section 11.2    <u>Taxation as Partnership</u>.  The Company shall be treated as a partnership for U.S. federal income tax purposes.

## ARTICLE XII

## <u>LIABILITY, EXCULPATION, INDEMNIFICATION</u>

Section 12.1    <u>Liability</u>.  Except as otherwise provided by the Maine Act, the debts, obligations, and liabilities of the Company, whether arising in contract, tort or otherwise, shall be solely the debts, obligations, and liabilities of the Company, and no Member or Manager shall be obligated personally for any such debt, obligation, or liability of the Company solely by reason of being a Member or Manager.

Section 12.2    <u>Exculpation</u>.

(i)    No Covered Person shall be liable to the Company or any other Covered Person for any loss, damage, or claim incurred by reason of any act or omission performed or omitted by such Covered Person in good faith on behalf of the Company and in a manner reasonably believed to be within the scope of authority conferred on such Covered Person by this Agreement, except that a Covered Person shall be liable for any such loss, damage or claim incurred by reason of such Covered Person's gross negligence or willful misconduct.

-20-

(ii)     A Covered Person shall be fully protected in relying in good faith upon the records of the Company and upon such information, opinions, reports or statements presented to the Company by any Person as to matters the Covered Person reasonably believes are within such other Person's professional or expert competence and who has been selected with reasonable care by or on behalf of the Company, including information, opinions, reports or statements as to the value and amount of the assets, liabilities, Profits, Losses, or Net Cash Flow or any other facts pertinent to the existence and amount of assets from which distributions to Members might properly be paid.

Section 12.3    Fiduciary Duty.  To the extent that, at law or in equity, a Covered Person has duties (including fiduciary duties) and liabilities relating thereto to the Company or to any other Covered Person, a Covered Person acting under this Agreement shall not be liable to the Company or to any Member for its good faith reliance on the provisions of this Agreement.  The provisions of this Agreement, to the extent that they restrict the duties and liabilities of a Covered Person otherwise existing at law or in equity, are agreed by the parties hereto to replace such other duties and liabilities of such Covered Person.

Section 12.4    Indemnification.  To the fullest extent permitted by applicable law, a Covered Person shall be entitled to indemnification from the Company for any loss, damage or claim incurred by such Covered Person by reason of any act or omission performed or omitted by such Covered Person in good faith on behalf of the Company and in a manner reasonably believed to be within the scope of authority conferred on such Covered Person by this Agreement, except that no Covered Person shall be entitled to be indemnified in respect of any loss, damage or claim incurred by such Covered Person by reason of gross negligence or willful misconduct with respect to such acts or omissions; provided, however, that any indemnity under this Section 12.4 shall be provided out of and to the extent of Company assets only, and no Covered Person shall have any personal liability with respect to such indemnity.

Section 12.5    Expenses.  To the fullest extent permitted by applicable law, expenses (including legal fees) incurred by a Covered Person in defending any claim, demand, action, suit, or proceeding shall, from time to time, be advanced by the Company prior to the final disposition of such claim, demand, action, suit or proceeding upon receipt by the Company of an undertaking by or on behalf of the Covered Person to repay such amount if it shall be determined that the Covered Person is not entitled to be indemnified as authorized in Section 12.4 hereof.

Section 12.6    Insurance.  The Company may purchase and maintain insurance, to the extent and in such amounts as the Board shall, in its sole discretion, deem reasonable, on behalf of Covered Persons and such other Persons as the Board shall determine, against any liability that may be asserted against or expenses that may be incurred by any such Person in connection with the activities of the Company or such indemnities, regardless of whether the Company would have the power to indemnify such Person against such liability under the provisions of this Agreement.  The Company may enter into

indemnity contracts with Covered Persons and such other Persons as the Board shall determine and adopt written procedures pursuant to which arrangements are made for the advancement of expenses and the funding of obligations under Section 12.5 hereof and containing such other procedures regarding indemnification as are appropriate.

      Section 12.7    <u>DMSA's Outside Businesses; LSB's Exclusivity</u>. DMSA or an Affiliate thereof may engage in or possess an interest in other business ventures of any nature or description, independently or with others, similar or dissimilar to the business of the Company, and the Company and the Members shall have no rights by virtue of this Agreement in and to such independent ventures or the income or profits derived therefrom, and the pursuit of any such venture, even if competitive with the business of the Company, shall not be deemed wrongful or improper. Neither DMSA, nor an Affiliate thereof shall be obligated to present any particular investment opportunity to the Company even if such opportunity is of a character that, if presented to the Company, could be taken by the Company, and DMSA or its Affiliate thereof shall have the right to take for its own account (individually or as a partner or fiduciary) or to recommend to others any such particular investment opportunity. Without diminishing DMSA's rights under the foregoing language, DMSA does agree that it intends to use diligent efforts to direct appropriate business to the Company in furtherance of the Company's goals. However, LSB shall employ its diligent efforts for the Company and LSB shall not provide such services, directly or indirectly for itself or any other entity or person to the extent it relates to the business. DMSA is hereby expressly relieved of its fiduciary duties as a Director to the extent such duties would prevent or impede DMSA from undertaking, soliciting or profiting from any business venture or investment opportunity, whether or not such venture or opportunity is similar or dissimilar to the business of the Company.

      Section 12.8    DMSA and LSB acknowledge and agree that all efforts and actions undertaken by them for the Company in connection with the business of the company are to be kept confidential. Neither DMSA nor LSB will disclose to any person or entity, directly or indirectly, any Proprietary Information (as hereinafter defined) relating to the Company's business without the prior written consent of the LLC. For purposes of this Agreement, "Proprietary Information" means all advertiser and subscription lists, advertiser and subscription prospects, marketing information and data, product information, strategic or technical information, financial information, supplier information, billing rates and advertiser provided information, documents and data.

# ARTICLE XIII

## ADDITIONAL MEMBERS

Section 13.1    Admission.  By approval of all of the Members, the Company is authorized to admit any Person as an additional member of the Company (each, an "Additional Member" and collectively, the "Additional Members").  Each such Person shall be admitted as an Additional Member at the time such Person (i) executes this Agreement or a counterpart of this Agreement and (ii) is named as a Member on Schedule A hereto.  The legal fees and expenses associated with such admission shall be borne by the Company.

Section 13.2    Allocations.  Additional Members shall not be entitled to any retroactive allocation of the Company's income, gains, losses, deductions, credits, or other items; provided that, subject to the restrictions of § 706(d) of the Code, Additional Members shall be entitled to their respective Interest of the Company's income, gains, losses, deductions, credits, and other items arising under contracts entered into before the effective date of the admission of any Additional Members to the extent that such income, gains, losses, deductions, credits, and other items arise after such effective date.  To the extent consistent with § 706(d) of the Code and Treasury Regulations promulgated thereunder, the Company's books may be closed at the time Additional Members are admitted (as though the Company's tax year had ended) or the Company may credit to the Additional Members pro rata allocations of the Company's income, gains, losses, deductions, credits and items for that portion of the Company's Fiscal Year after the effective date of the admission of the Additional Members.

# ARTICLE XIV

## ASSIGNMENT AND PLEDGE OF INTERESTS

Section 14.1    Assignability of Interests.  No Member may assign the whole or any part of its Interests, without complying with the terms of this Agreement.

Section 14.2    Recognition of Assignment by Company.  No assignment or pledge of any Interest, or any part thereof, that is in violation of this Article XIV shall be valid or effective, and neither the Company nor the Members shall recognize the same for the purpose of making distributions pursuant to this Agreement.  Neither the Company nor the Members shall incur any liability as a result of refusing to make any such distributions to the assignee of any such invalid assignment.

Section 14.3    Pledge.  No Member may pledge or otherwise encumber the whole or any part of its Interests, without prior written consent of all Members.

# ARTICLE XV

## DISSOLUTION, LIQUIDATION AND TERMINATION

Section 15.1    No Dissolution.  The Company shall not be dissolved by the admission of Additional Members or substitute Members in accordance with the terms of this Agreement.

Section 15.2    Events Causing Dissolution.  The Company shall be dissolved and its affairs shall be wound up upon the occurrence of any of the following events:

      (i)      the written consent of all Members;

      (ii)      the death, retirement, resignation, expulsion, bankruptcy, or dissolution of a Member or the occurrence of any other event under the Maine Act that terminates the continued membership of a Member in the Company unless, within ninety (90) days after the occurrence of such an event, all of the remaining Members agree in writing to continue the business of the Company; or

      (iii)      the entry of a decree of judicial dissolution of the Company.

Section 15.3    Liquidation.  Upon dissolution of the Company, the Board shall carry out the winding up of the Company and shall immediately commence to wind up the Company's affairs; provided, however, that a reasonable time shall be allowed for the orderly liquidation of the assets of the Company and the satisfaction of liabilities to creditors so as to enable the Members to minimize the normal losses attendant upon a liquidation.  The Members shall continue to distribute Interest Profits and Losses during liquidation in the same proportions, as specified in Article VIII hereof, as before liquidation.  The proceeds of liquidation shall be distributed in the following order and priority:

      (i)      to creditors of the Company, including Members who are creditors, to the extent otherwise permitted by law, in satisfaction of the liabilities of the Company (whether by payment or the making of reasonable provision for payment thereof); and

      (ii)      to the Members in accordance with their Capital Account balances, after giving effect to all contributions, distributions and allocations for all periods.

Section 15.4    Termination.  The Company shall terminate when all of the assets of the Company, after payment of or due provision for all debts, liabilities, and obligations of the Company, shall have been distributed to the Members in the manner provided for in this Article XV and the Articles shall have been canceled in the manner required by the Maine Act.

Section 15.5    <u>Claims of the Members</u>.  The Members and former Members shall look solely to the Company's assets for the return of their Capital Contributions, and if the assets of the Company remaining after payment of or due provision for all debts, liabilities, and obligations of the Company are insufficient to return such Capital Contributions, the Members and former Members shall have no recourse against the Company or any other Member.

**ARTICLE XVI**

**<u>TRANSFER RESTRICTIONS</u>**

Section 16.1    <u>Transfer Procedures</u>.  Each transfer of Interests of the Company shall be made on Schedule A of this Agreement.  The person in whose name Interests stand on Schedule A of this Agreement shall be deemed the owner thereof for all purposes as regards the Company, and the Company shall not be bound to recognize any equitable or other claim to or interest in such Interests on the part of any other person, whether or not it shall have express or other notice thereof, except as otherwise provided by law.

Section 16.2    <u>Restrictions on Transfer</u>.  No Member shall have the right to transfer Interests of the Company except in compliance with the restrictions on transfer set forth below.  For purposes of this section, the term "transfer" means any transfer, whether outright or as security, <u>inter</u> <u>vivos</u> or testamentary, with or without consideration, voluntary or involuntary, by division of marital property or otherwise, of all or any part of any right, title, or interest (including without limitation voting rights and rights to dividends or liquidation proceeds) in or to any Interests, other than a transfer of voting rights by delivery of a revocable proxy.  The provisions of this Article shall be applicable to any transfer of Interests of the Company notwithstanding any prior transfer made in compliance with this Article or any prior transfer made pursuant to any waiver of the Company's rights hereunder.  Such Interests or any beneficial interest therein held by any person subsequent to such transfers shall be subject in every respect to these restrictions.  If a transferring Member fails to comply with the transfer procedures and restrictions contained in this Agreement, then so long as such failure continues (i) the Interests in question will be deemed not to be voted and (ii) no dividend or distribution declared on such Interests shall be paid by the Company.

Section 16.3    <u>Party to this Agreement</u>.  No sale, assignment, pledge, or gift, or other transfer of Interests shall be valid or enforceable unless the proposed transferee (i) is already a party to this Agreement, as then in effect, or (ii) has delivered to the Company a written undertaking to become a party to this Agreement, as may be amended from time to time.

Section 16.4    <u>Waiver</u>.  Upon any proposed transfer of Interests pursuant to Sections 16.9, 16.10, and 16.11 of this Agreement, the parties agree that the Company and the other Members shall

be deemed to have waived the applicability of any other right of first refusal it may otherwise have.

Section 16.5    Securities Opinion.  No Member may transfer, and no person may acquire, beneficial or record ownership of any Interests of the Company unless the transferee or transferor provides the Company an opinion of counsel, in form and substance satisfactory to the Board or the President, that such transfer will not violate the securities registration requirements of any applicable securities laws and will not cause the loss of any securities exemption on which the Company is relying with respect to prior sales or transfers of securities.  The Company shall not be required to bear the expense of any such opinion of counsel.  The Board or the President may waive this requirement for good cause.

Section 16.6    Right of First Refusal.  Except as otherwise provided in this subsection, any sale or other transfer of Interests of the Company for value shall be made only pursuant to a bona fide written agreement with the proposed transferee and shall be subject to the right of first refusal set forth below.  As a condition to any such sale or other transfer, the transferring Member shall deliver to the Company and all other Members of the Company written notice of the proposed transfer, which notice shall (i) contain a true and complete copy of the agreement by which the transferee proposes to acquire the Interests and (ii) set forth with particularity (to the extent not specified in such agreement) the identity and address of the proposed transferee, the Percentage Interests and number of LLC Votes to be transferred, the price, the terms of payment, all conditions to the transferee's obligation to acquire the Interests, and the date on which such proposed transfer is to be consummated.  Such notice shall be deemed to constitute an offer by the transferring Member to sell all (but not less than all) of the specified Interests to the Company, its designees, and the other Members on terms equivalent to those offered by the proposed transferee.  The Company, its designees (as determined by the Board), and the other Members may accept such offer by delivering written notice of acceptance to the transferring Member within sixty (60) days after the date on which a valid notice of transfer was received by the Company.  If the aggregate Interests offered to be purchased exceeds the number to be transferred, the available Interests shall be allocated first to the Company to the full extent of its offer to purchase, then to the Members (allocated among them on a pro rata basis as determined by the Board), and finally (to the extent that the aggregate Interests offered to be purchased by the Company and the other Members is less than the total number to be transferred) to designees of the Company.  During the pendency of such offer, the transferring Member shall promptly provide such further information concerning the proposed transfer as the Company may reasonably request in writing.  Closing of the purchase of the Interests by the Company, its designees, or other Members shall take place within ninety (90) days after the date on which a valid notice of transfer was received by the Company.  If acceptance and closing by the Company, its designees, and other Members have not occurred within the periods set forth above, the transferring Member shall have the right for sixty (60) days thereafter to transfer all (but not less than all) of the Interests to the original proposed transferee for the consideration specified in the original notice of transfer, subject to other terms and conditions of this Agreement.  The right of first refusal provided in this subsection shall not be applicable to any transfer of Interests directly to the Company.

-26-

Section 16.7    Other Rules Regarding Transfer, Etc.  The Board may, from time to time, adopt by resolution such additional rules and regulations as it deems expedient, not inconsistent with this Agreement concerning the issue and transfer of Interests of the Company.

Section 16.8    Waivers of Restrictions on Transfer.  Notwithstanding anything to the contrary, the Board may waive the applicability of any transfer restrictions contained in this Agreement or any resolution of the Board, if and to the extent that the Board deems a waiver for the particular transaction to be in the best interests of the Company.  No such waiver shall be effective unless duly adopted by resolution of the Board.

## ARTICLE XVII

## MISCELLANEOUS

Section 17.1    Notices.  All notices provided for in this Agreement shall be in writing, duly signed by the party giving such notice, and shall be delivered, mailed via an overnight courier service, telecopied or mailed by registered or certified mail, as follows:

    (i)     if given to the Company at the address specified in Section 2.5 of this Agreement;

    (ii)    if given to a Director, at such Director's mailing address as provided to the Company; or

    (iii)   if given to any Member at the address set forth opposite its name on Schedule A attached hereto, or at such other address as such Member may hereafter designate by written notice to the Company.

All such notices shall be deemed to have been given when received.

Section 17.2    Failure to Pursue Remedies.  The failure of any party to seek redress for violation of, or to insist upon the strict performance of, any provision of this Agreement shall not prevent a subsequent act, which would have originally constituted a violation, from having the effect of an original violation.

Section 17.3    Cumulative Remedies.  The rights and remedies provided by this Agreement are cumulative and the use of any one right or remedy by any party shall not preclude or waive its right to

use any or all other remedies.  Said rights and remedies are given in addition to any other rights the parties may have by Law or otherwise.

Section 17.4    Binding Effect.  This Agreement shall be binding upon and inure to the benefit of all of the parties and, to the extent permitted by this Agreement, their successors, legal representatives and assigns.

Section 17.5    Interpretation.  Throughout this Agreement, nouns, pronouns and verbs shall be construed as masculine, feminine, neuter, singular or plural, whichever shall be applicable.  All references herein to "Articles," "Sections" and "Paragraphs" shall refer to corresponding provisions of this Agreement.

Section 17.6    Severability.  The invalidity or unenforceability of any particular provision of this Agreement shall not affect the other provisions hereof, and this Agreement shall be construed in all respects as if such invalid or unenforceable provision were omitted.

Section 17.7    Counterparts.  This Agreement may be executed in any number of counterparts with the same effect as if all parties hereto had signed the same document.  All counterparts shall be construed together and shall constitute one instrument.

Section 17.8    Integration.  This Agreement constitutes the entire agreement among the parties hereto pertaining to the subject matter hereof and supersedes all prior agreements and understandings pertaining thereto.

Section 17.9    Governing Law.  This Agreement and the rights of the parties hereunder shall be interpreted in accordance with the laws of the State of Maine, and all rights and remedies shall be governed by such laws without regard to principles of conflict of laws.

Section 17.10    Amendments.  Any amendment to this Agreement shall be adopted and be effective as an amendment hereto if it received the affirmative vote of all of the Members, provided that such amendment be in writing and executed by all of the Members.

Section 17.11    No Implied Rights or Remedies.  Nothing expressed or implied shall be construed to confer upon any Person, except the Members and Managers, any rights or remedies under or by reason of this Agreement.

-28-

IN WITNESS WHEREOF, the parties hereto have executed this Agreement as of the date first above stated.

**Dialogo, LLC**

By: _____
Name: _____
Title: _____

By: _____ LSB
Name: Lillian Santiago Bauza
Title: Principal


**DIRECT MERCHANTS S.A., INC.**

By: _____
Name: Gerry Pike
Title: Managing Director

F:\SC\DMSA\oper.agr.doc

-29-

**SCHEDULE A**


**MEMBERS**


| Name | Mailing Address | Capital Contributions | Percentage Interest | Member Votes |
|------|-----------------|----------------------|---------------------|--------------|
| **LSB** | 101 Cabot Street<br>Holyoke, MA 01040 | $00,001.00 | 49.0% | 49 |
| **DMSA** | One Enterprise Drive<br>Newfoundland, PA  18445-0089 | $50,000.00 | 51.0% | 51 |
| | | | 100% | 100 |

P:\SCA\DMSA\oper.agr.doc

-30-

IN WITNESS WHEREOF, the parties hereto have executed this Agreement as of the date first above stated.

**Dialogo, LLC**

By:_____

Name:_____

Title:_____


**LSB**

By:_____

Name: Lillian Santiago Bauzá

Title:  Principal


**DIRECT MERCHANTS S.A., INC.**

By:_____

Name:  Gerry Pike

Title:  Managing Director

P:\SC\DMSA\oper.agr.doc

# EXHIBIT 5

# VENTURE AGREEMENT

1. The undersigned parties agree to form a Maine limited liability company ("LLC"), to be called Dialogo, with membership interests owned initially as follows: 49% by Lillian Santiago Bauzá ("LSB"), a Massachusetts resident, and 51% by Direct Merchants S.A., Inc ("DMSA"), a New Jersey Corporation, for the purpose of jointly developing Spanish language and bilingual print and media business ("the Business"). The LLC will be managed by a board of directors, consisting of two representatives from DMSA and one from LSB. Lillian Santiago Bauzá will carry the title of Publisher. She will be responsible for editorial content and for managing the day-to-day operations of the venture, including recruiting and hiring employees and contractors and, along with DMSA management, developing the long-term strategy of the joint venture. DMSA acknowledges that LSB will not contribute any cash to initiate the LLC. LSB acknowledges all expenditures must be done with the concurrence of DMSA. DMSA shall contribute the initial capital to launch the LLC in an amount that DMSA deems appropriate (including through travel, promotional costs, legal fees, accounting fees, billing fees and the labor of management and staff of DMSA). The owners will sign an agreement giving each other a right of first refusal on any proposed transfer of membership interests in the LLC and requiring approval by the Board of Directors issuing any additional membership interests. All profits that the board decides to distribute, both ordinary and capital, will be distributed to the members in proportion to their membership interest. The board shall distribute each year at least enough cash to owners to cover the owners' U.S. tax liability for LLC profits in such year if any.

2. DMSA and LSB agree that they shall through the LLC jointly pursue the Business. LSB acknowledges and agrees, however, that DMSA is an on-going enterprise, and its principals individually and through other enterprises, have a variety of business interests that are not and will not be part of the LLC's business, whether similar to the LLC's Business or not. LSB further acknowledges and agrees that neither DMSA nor its principals shall have any obligation to assign existing, or originate new business, advertising contracts, marketing contracts, or any other contracts for the benefit of the LLC, or to assign existing or originate new advertising opportunities or clients for the benefit of the LLC, and that DMSA and its principals may retain existing and originate new media opportunities, advertising contracts and clients for its own benefit, whether directly or indirectly. Without diminishing DMSA's rights under the foregoing language, DMSA does agree that it intends to use diligent efforts to direct appropriate business to the Company in furtherance of the Company's goals. However, LSB shall employ diligent efforts to originate new media and advertising contracts and clients for the LLC and neither LSB nor its principals shall provide such services, directly or indirectly for itself or any other entity or person to the extent it relates to the Business.

3. The LLC will initially rely on the staffs of DMSA and Dialogo .

4.  Amounts paid to the LLC by clients shall be distributed as follows: first to reimburse any out of pocket costs; second to DMSA to repay the initial capital to launch the LLC; third to owners to cover the owners' U. S. tax liability for LLC profits in such year, if any; finally any remaining amounts to be distributed by the Board at its discretion to the members in proportion to their respective membership interests. No member shall incur costs or expenses on behalf of the LLC, or commit the LLC to any costs or expenses, except in accordance with the approved budget. It is not currently expected that the LLC will borrow, but that may occur in the future if approved by the Board of Directors.

5.  DMSA and LSB acknowledge and agree that all efforts and actions undertaken by them for the LLC in connection with the Business are to be kept confidential.  Neither DMSA nor LSB will disclose to any person or entity, directly or indirectly, any Proprietary Information (as hereinafter defined) relating to the LLC's Business without the prior written consent of the LLC. For purposes of this Agreement, "Proprietary Information" means all advertising and subscription client lists, advertising and subscription client prospects, marketing information and data, product information, strategic or technical information, financial information, supplier information, billing rates and client provided information, documents and data.

6.  In furtherance of this Agreement, DMSA and LSB shall execute and deliver the following documents, all of which shall be consistent with this Agreement and otherwise shall contain standard terms and conditions. articles of organization of LLC:

- operating agreement of LLC;


IN WITNESS WHEREOF, the parties to this Agreement have executed this Agreement in one or more counterpart(s) as of the date first written below.

LSB                                      DMSA

By:_____              By:_____
Name:  Lillian Santiago Baüza            Name:  Gary Pike
Title:  Principal                        Title:  Managing Director
Date    June ___, 2004                   Date: June ___ 2004

**4.** Amounts paid to the LLC by clients shall be distributed as follows: first to reimburse any out of pocket costs; second to DMSA to repay the initial capital to launch the LLC; third to owners to cover the owners' U. S. tax liability for LLC profits in such year, if any; finally any remaining amounts to be distributed by the Board at its discretion to the members in proportion to their respective membership interests. No member shall incur costs or expenses on behalf of the LLC, or commit the LLC to any costs or expenses, except in accordance with the approved budget. It is not currently expected that the LLC will borrow, but that may occur in the future if approved by the Board of Directors.

**5.** DMSA and LSB acknowledge and agree that all efforts and actions undertaken by them for the LLC in connection with the Business are to be kept confidential. Neither DMSA nor LSB will disclose to any person or entity, directly or indirectly, any Proprietary Information (as hereinafter defined) relating to the LLC's Business without the prior written consent of the LLC. For purposes of this Agreement, "Proprietary Information" means all advertising and subscription client lists, advertising and subscription client prospects, marketing information and data, product information, strategic or technical information, financial information, supplier information, billing rates and client provided information, documents and data.

**6.** In furtherance of this Agreement, DMSA and LSB shall execute and deliver the following documents, all of which shall be consistent with this Agreement and otherwise shall contain standard terms and conditions. articles of organization of LLC;

- operating agreement of LLC;

IN WITNESS WHEREOF, the parties to this Agreement have executed this Agreement in one or more counterpart(s) as of the date first written below.

LSB                                          DMSA

By:_____          By:_____
Name:  Lillian Santiago Bauzá              Name:  Gerry Pike
Title:    Principal                        Title: Managing Director
Date    June __, 2004                       Date: June __, 2004

# EXHIBIT 6

DIRECT MERCHANTS S.A., INC.
Expenditures Paid for Dialogo LLC
From February 27, 2004 through April 6, 2005

Page 1 of 2

| Payee | Date Paid | Description | Reference # | Amount Paid | Balance |
|---|---|---|---|---|---|
| Open Square | 02/27/2004 | Allocated share of rent deposit | | $ 500.00 | $ 500.00 |
| Conklin Office Service | 03/10/2004 | Wall Panels | 20933 | 562.50 | 1,062.50 |
| Aura G. Romero | 04/06/2004 | Design & Production | 3380 | 2,000.00 | 3,062.50 |
| Quark Distribution Inc. | 05/27/2004 | Software | | 953.95 | 4,016.45 |
| George B Scribner | 06/11/2004 | Contractor | | 7,500.00 | 11,516.45 |
| Aura G. Romero | 06/25/2004 | Contractor | 3193 | 1,000.00 | 12,516.45 |
| Open Square | 06/30/2004 | Rent | 3896 | 500.00 | 13,016.45 |
| OneStop Technology.Com | 07/27/2004 | Server | 1943 | 1,411.33 | 14,427.78 |
| Ana G. Morales | 07/27/2004 | Contractor | | 308.00 | 14,735.78 |
| Aura G. Romero | 07/30/2004 | Contractor | ED-39 | 1,000.00 | 15,735.78 |
| George B Scribner | 07/30/2004 | Contractor | | 3,000.00 | 18,735.78 |
| J & J Accounting | 07/30/2004 | Payables Mgmt Fees | | 600.00 | 19,335.78 |
| Lilian Santiago-Bauza | 07/30/2004 | Contractor | 1 | 2,000.00 | 21,335.78 |
| Open Square | 07/30/2004 | Rent | 3938 | 500.00 | 21,835.78 |
| Tracy Learned | 08/05/2004 | Contractor | ED-40 | 507.20 | 22,342.98 |
| DMSA | 08/27/2004 | Mac Computer | | 1,000.00 | 23,342.98 |
| DMSA | 08/27/2004 | IT Work | | 500.00 | 23,842.98 |
| Aura G. Romero | 08/30/2004 | Contractor | | 1,000.00 | 24,842.98 |
| Lilian Santiago-Bauza | 08/30/2004 | | | 2,000.00 | 26,842.98 |
| Open Square | 08/30/2004 | Rent | 3984 | 615.00 | 27,457.98 |
| J & J Accounting | 09/10/2004 | Payables Mgmt Fees | | 300.00 | 27,757.98 |
| J & J Accounting | 09/29/2004 | Payables Mgmt Fees | | 300.00 | 28,057.98 |
| Open Square | 09/29/2004 | Rent | 4029 | 615.00 | 28,672.98 |
| Aura G. Romero | 09/30/2004 | Contractor | 3190 | 1,000.00 | 29,672.98 |
| Lilian Santiago-Bauza | 09/30/2004 | | 3189 | 2,000.00 | 31,672.98 |
| Secretary of State of Maine | 10/05/2004 | LLC Filing Fees | 3199 | 175.00 | 31,847.98 |
| J & J Accounting | 11/01/2004 | Payables Mgmt Fees | | 300.00 | 32,147.98 |
| Lilian Santiago-Bauza | 11/03/2004 | | EDS-16 | 975.00 | 33,122.98 |
| Open Square | 11/03/2004 | Rent | 4076 | 615.00 | 33,737.98 |
| Ana Morales | 11/29/2004 | Contractor | 1 | 1,072.10 | 34,810.08 |
| J & J Accounting | 11/29/2004 | Postage | | 4.22 | 34,814.30 |
| J & J Accounting | 11/29/2004 | Payables Mgmt Fees | | 300.00 | 35,114.30 |

EXHIBIT
53

PENGAD 800-631-6989

DIRECT MERCHANTS S.A., INC.
Expenditures Paid for Dialogo LLC
From February 27, 2004 through April 6, 2005

| Payee | Date Paid | Description | Reference # | Amount Paid | Balance |
|---|---|---|---|---|---|
| Tracy Learned | 11/29/2004 | Contractor | EDS-14 | 244.00 | 35,358.30 |
| Aura G. Romero | 12/21/2004 | Contractor | 3294 | 250.00 | 35,608.30 |
| Lilian Santiago-Bauza | 12/21/2004 | | 3287 | 1,000.00 | 36,608.30 |
| Verrill & Dana LLP | 12/21/2004 | Legal Fees | | 85.34 | 36,693.64 |
| J & J Accounting | 12/28/2004 | Payables Mgmt Fees | | 300.00 | 36,993.64 |
| DDB Worldwide | 01/31/2005 | Software | | 200.00 | 37,193.64 |
| DMSA | 01/31/2005 | Staff Labor | | 5,000.00 | 42,193.64 |
| Gerry Pike | 01/31/2005 | Travel Expense | | 900.00 | 43,093.64 |
| J & J Accounting | 02/01/2005 | Payables Mgmt Fees | | 300.00 | 43,393.64 |
| Verrill & Dana LLP | 02/01/2005 | Legal Fees | 340099 | 198.92 | 43,592.56 |
| J & J Accounting | 02/28/2005 | Payables Mgmt Fees | | 300.00 | 43,892.56 |
| Verrill & Dana LLP | 02/28/2005 | Legal Fees | | 166.00 | 44,058.56 |
| Aura G. Romero | 03/10/2005 | Contractor | 3444 | 2,000.00 | 46,058.56 |
| Verrill & Dana LLP | 03/28/2005 | Legal Fees | | 84.00 | 46,142.56 |
| Federal Express | 04/05/2005 | Postage0 | | 21.88 | 46,164.44 |

Page 2 of 2

00002061

**EXHIBIT 7**

10:00 AM
12/13/04
Cash Basis

**El Diálogo**
**Profit & Loss**
July 1 through December 13, 2004

|  | Jul 1 - Dec 13, 04 |
|---|---|
| **Ordinary Income/Expense** | |
| **Income** | |
| ad revenue | 26,909.50 |
| Ad/Graphic Design Income | 23,342.00 |
| **Total Income** | 50,251.50 |
| **Gross Profit** | 50,251.50 |
| **Expense** | |
| articles | 450.00 |
| bad debt | 25.00 |
| Bank Service Charges | 50.00 |
| Barter | 730.00 |
| Car/Truck Expense | |
| Auto Repairs & Maintenance | 175.00 |
| **Total Car/Truck Expense** | 175.00 |
| commission | 1,593.00 |
| Computer maint/troubleshoot | 200.00 |
| Computer software | 261.30 |
| contract copies | 155.93 |
| distribution | 2,455.00 |
| Donation | 2,190.00 |
| Dues and Subscriptions | 970.50 |
| Electric | 1,168.01 |
| Event | 1,700.00 |
| Marketing & Promotional Expense | 306.50 |
| Miscellaneous | 1,335.00 |
| Office Equipment | 49.20 |
| Office Supplies | 413.18 |
| petty cash | 50.00 |
| photographs | 328.50 |
| Postage and Delivery | 132.89 |
| Printing and Reproduction | 7,494.63 |
| Professional Fees | |
| Accounting Fees | 136.00 |
| **Total Professional Fees** | 136.00 |
| Rent | 500.00 |
| Repairs | |
| Equipment Repairs | 150.00 |
| **Total Repairs** | 150.00 |
| salary | 5,180.00 |
| Telephone & Fax | 1,019.81 |
| void | 0.00 |
| Web site | 75.00 |
| **Total Expense** | 29,292.45 |
| **Net Ordinary Income** | 20,959.05 |
| **Other Income/Expense** | |
| **Other Income** | |
| Other Income | 245.18 |
| **Total Other Income** | 245.18 |
| **Other Expense** | |
| Other Expense | 0.00 |
| **Total Other Expense** | 0.00 |
| **Net Other Income** | 245.18 |
| **Net Income** | 21,204.23 |



EXHIBIT

36

Page 1

00001904

| based on paid ads    20% | | CR | GV | | HB | LS |
|---|---|---|---|---|---|---|
| **August 15** | | | | | $   90.00 | |
| Blitz/Comcast (insert) | 450.00 | | | | | |
| Open Square/Echo Hill | 185.50 | 37.10 | | | | |
| Lyman Properties/Echo Hill | 185.50 | 37.10 | | | | |
| Nancy's Transportation | 50.00 | | | | | $   10.00 |
| Mi Casa Restaurant | 35.00 | | 35.00 | | | |
| Auto Express | 245.00 | | | | $   49.00 | |
| Solutions CDC classified | 25.00 | | 5.00 | | | |
| Holyoke Public Library classified | 25.00 | 5.00 | | | | |
| Salsarengue (see Aug 1) | 0.00 | | | | | |
| Holyoke Public Library classified | 25.00 | 5.00 | | | | $   120.00 |
| Family Literacy Program | 1120.00 | | | | | |
| Holyoke Health Center | 560.00 | | | | $ 112.00 | |
| Balise | 560.00 | | | | $ 112.00 | |
| **Total** | 3,016.00 | 84.20 | 40.00 | - | $ 363.00 | $   130.00 |
| | | | | | | |
| **September 1** | | GR | GV | DG | HB | LS |
| Open Square/Echo Hill | 185.50 | 37.10 | | | | |
| Lyman Properties/Echo Hill | 185.50 | 37.10 | | | | |
| Auto Express | 245.00 | | | | $   49.00 | |
| Blitz/Comcast | 460.00 | | | | $   92.00 | |
| Food For Thoughts Books | 120.00 | | 24.00 | | | |
| Nancy's Transportation | 50.00 | | | | | $   10.00 |
| CareerPoint classified | 50.00 | | | | | $   10.00 |
| Western Mass Training Consortium | 108.00 | | 21.60 | | | |
| Peter Vickery | 392.00 | | | | | $   78.40 |
| Maria Acuña Real Estate | 275.00 | | | | $   55.00 | |
| Salsarengue (for whole month) | 282.00 | | 56.40 | | | |
| Holyoke Health Center | 560.00 | | | | $ 112.00 | |
| Balise | 560.00 | | | | $ 112.00 | |
| **Total** | 3,473.00 | 74.20 | 102.00 | - | $ 420.00 | $   98.40 |
| | | | | | | |
| **September 15** | | GR | GV | DG | HB | LS |
| Open Square/Echo Hill | 185.50 | 37.10 | | | | |
| Lyman Properties/Echo Hill | 185.50 | 37.10 | | | | |
| Blitz/Comcast | 460.00 | | | | $   92.00 | |
| Nancy's Transportation | 50.00 | | | | | $   10.00 |
| Holyoke Health Center | 560.00 | | | | $ 112.00 | |
| Balise | 560.00 | | | | $ 112.00 | |
| Sonia | 90.00 | | $ 18.00 | | | |
| Bueno y Sano | 80.00 | | $ 16.00 | | | |
| Reliable Computer | 36.00 | | $   7.20 | | | |
| Valdir Costa | 36.00 | | $   7.20 | | | |
| Food For Thoughts Books | 20.40 | | $   4.80 | | | |
| Salsarengue | 270.00 | | $ 54.00 | | | |
| **Total** | 2533.40 | 74.20 | $ 107.20 | | $ 316.00 | $   10.00 |

| October 1st | | | | | | | |
|---|---|---|---|---|---|---|---|
| Open Square/Echo Hill | 185.50 | ¼pg | 37.10 | | | | |
| Lyman Properties/Echo Hill | 185.50 | ¼pg | 37.10 | | | | |
| Blitz/Comcast | 460.00 | ½pg | | | | $ 92.00 | $ 10.00 |
| Nancy's Transportation | 50.00 | 1x5 | | | | | |
| Holyoke Health Center | 585.00 | 1pg | | | | $ 112.00 | |
| Balise | 560.00 | 1pg | | | | $ 112.00 | |
| Sonia | 90.00 | 3x5 | | $ 18.00 | | | |
| International Language Inst. | 135.00 | 3x5 | | $ 27.00 | | | |
| Maria Acuña | 275.00 | ½pg | | | | $ 55.00 | |
| Girls Scouts of Pioneer Valley | 50.00 | 1x5 | | $ 10.00 | | | |
| Red Café | 36.00 | 2x2 | | $ 7.20 | | | |
| Total | 2612.00 | | | $ 62.20 | | $ 371.00 | $ 10.00 |

| October 15th | | | | | | | |
|---|---|---|---|---|---|---|---|
| Open Square/Echo Hill | 185.50 | ¼pg | 37.10 | | | | |
| Lyman Properties/Echo Hill | 185.50 | ¼pg | 37.10 | | | | |
| Blitz/Comcast | 460.00 | ½pg | | | | $ 92.00 | $ 10.00 |
| Nancy's Transportation | 50.00 | 1x5 | | | | | |
| Holyoke Health Center | 585.00 | 1pg | | | | $ 112.00 | |
| Balise | 560.00 | 1pg | | | | $ 112.00 | |
| Sonia | 90.00 | 3x5 | | $ 18.00 | | | |
| Island Inkjet | 135.00 | 3x5 | | $ 27.00 | | | |
| Bueno y Sano | 80.00 | 3x5 | | $ 16.00 | | | |
| Community Interprises | 32.40 | 2x2 | | $ 6.48 | | | |
| PRAFA | 500.00 | 1pg | | | | $ 100.00 | |
| WAPAAMERICA | 270.00 | ½pg | | $ 54.00 | | | |
| Pioneer Valley Motor | 36.00 | 2x2 | | $ 7.20 | | | |
| Total | 3169.40 | | | $ 128.68 | | $ 416.00 | $ 10.00 |

| November 1st | | | | | | | |
|---|---|---|---|---|---|---|---|
| Lyman Properties/Echo Hill | 185.50 | ¼pg | 37.10 | | | | |
| Blitz/Comcast | 460.00 | ½pg | | | | $ 92.00 | $ 10.00 |
| Nancy's Transportation | 50.00 | 2x2 | | | | | |
| Holyoke Health Center | 585.00 | 1pg | | | | $ 112.00 | |
| Balise | 560.00 | 1pg | | | | $ 112.00 | |
| Sonia | 90.00 | 3x5 | | $ 18.00 | | | |
| Island Inkjet | 135.00 | 3x5 | | $ 27.00 | | | |
| Community Interprises | 32.40 | 2x2 | | $ 6.48 | | | |
| WAPAAMERICA | 270.00 | ½pg | | $ 54.00 | | | |
| Maria Acuña | 275.00 | ½pg | | | | $ 55.00 | |
| First American Mortgages | 585.00 | 1pg | | $ 117.00 | | | |
| Sunden Associates | Pending | | | | | | |
| Total | 3227.90 | | 37.10 | 222.48 | | $ 371.00 | $ 10.00 |

| November 15 | | | | | | | |
|---|---|---|---|---|---|---|---|
| Open Square/Echo Hill | 185.50 | ¼pg | 37.10 | | | | |

| November 15 | | | | | | | | |
|---|---|---|---|---|---|---|---|---|
| Open Square/Echo Hill | 185.50 | ¼pg | 37.10 | | | | | |
| New World Theater | 135.00 | | | | | | | |
| Blitz/Comcast | 460.00 | ¼pg | | | | $ 92.00 | | |
| Nancy's Transportation | 50.00 | 2x2 | | | | | $ | 10.00 |
| Holyoke Health Center | 585.00 | 1pg | | | | $ 112.00 | | |
| Balise | 560.00 | 1pg | | | | $ 112.00 | | |
| Northeast Laser | 170.00 | | | | | | | |
| Auto Express | 189.00 | | | | | | | |
| Sonia | 90.00 | | | | | | | |
| | | | | | | | | |
| Total | 2424.50 | | | | | | | |

| December 1st. | | | | | | |
|---|---|---|---|---|---|---|
| Blitz/Comcast | 460.00 | | | | | |
| Nancy's Transportation | 50.00 | | | | | |
| Holyoke Health Center | 585.00 | | | | | |
| Balise | 560.00 | | | | | |
| Northeast Laser | 170.00 | | | | | |
| Auto Express | 189.00 | | | | | |
| Hampden Bank | 585.00 | | | | | |
| Fitzgerald (BayState Gas) | 585.00 | | | | | |
| Acuña | 275.00 | | | | | |
| Open Square | 185.00 | | | | | |
| Reliable Computer | 36.00 | | | | | |
| Bueno y Sano | 80.00 | | | | | |
| Travel Agency | 36.00 | | | | | |
| | 3796.00 | | | | | |

| December 15 | | | | | | |
|---|---|---|---|---|---|---|
| Blitz/Comcast | 460.00 | | | | | |
| Nancy's Transportation | 50.00 | | | | | |
| Holyoke Health Center | 585.00 | | | | | |
| Balise | 560.00 | | | | | |
| Northeast Laser | 170.00 | | | | | |
| Auto Express | 189.00 | | | | | |
| Hampden Bank | 585.00 | | | | | |
| Open Square | 185.00 | | | | | |
| Pioneer Valley | 36.00 | | | | | |
| Food Bank | 135.00 | | | | | |
| | | | | | | |
| TOTAL | 2955.00 | | | | | |

| January 1st. 2005 | | | | | |
|---|---|---|---|---|---|
| Blitz/Comcast | 460.00 | | | | |
| Nancy's Transportation | 50.00 | | | | |
| Holyoke Health Center | 585.00 | | | | |
| Balise | 560.00 | | | | |
| Northeast Laser | 170.00 | | | | |
| Acuña | 175.00 | | | | |
| Hampden Bank | 1170.00 | | | | |
| Echo Hill | 185.00 | | | | |
| Pioneer Valley | 36.00 | | | | |
| Reliable Computer | 36.00 | | | | |
| Bueno y Sano | 80.00 | | | | |
| | | | | | |
| TOTAL | 3507.00 | | | | |

00001908

10:55 AM

12/13/04

Cash Basis

El Diálogo

# Custom Transaction Detail Report

### July 1 through December 13, 2004

| Date | Num | Name | Original Amount | Paid Amount |
|------|-----|------|----------------:|------------:|
| **Angelides & South LLP** | | | | |
| 15/11/2004 | ED-113 | Angelides & South ... | -135.00 | -135.00 |
| 15/11/2004 | | Angelides & South ... | 135.00 | 135.00 |
| 15/11/2004 | | Angelides & South ... | -135.00 | 135.00 |
| 15/11/2004 | | Angelides & South ... | -135.00 | -135.00 |
| 20/11/2004 | ED-134 | Angelides & South ... | -135.00 | -135.00 |
| 20/11/2004 | | Angelides & South ... | 135.00 | 135.00 |
| 20/11/2004 | | Angelides & South ... | -135.00 | 135.00 |
| 20/11/2004 | | Angelides & South ... | -135.00 | -135.00 |
| **Total Angelides & South LLP** | | | | 0.00 |
| **Auto Express** | | | | |
| 17/08/2004 | ED-41 | Auto Express | -245.00 | -245.00 |
| 17/08/2004 | | Auto Express | 265.00 | 265.00 |
| 17/08/2004 | | Auto Express | -265.00 | -265.00 |
| 17/08/2004 | | Auto Express | -265.00 | 245.00 |
| 21/08/2004 | ED-53 | Auto Express | -245.00 | -20.00 |
| 21/08/2004 | | Auto Express | 20.00 | 20.00 |
| 26/08/2004 | ED-9 | Auto Express | -245.00 | -245.00 |
| 26/08/2004 | ED-23 | Auto Express | -245.00 | -245.00 |
| 26/08/2004 | ED-53 | Auto Express | -245.00 | -40.00 |
| 26/08/2004 | | Auto Express | 530.00 | 530.00 |
| 26/08/2004 | | Auto Express | -530.00 | 40.00 |
| 26/08/2004 | | Auto Express | -530.00 | 245.00 |
| 26/08/2004 | | Auto Express | -530.00 | 245.00 |
| 26/08/2004 | | Auto Express | -530.00 | -530.00 |
| 31/08/2004 | ED-53 | Auto Express | -245.00 | -185.00 |
| 31/08/2004 | | Auto Express | 185.00 | 185.00 |
| 31/08/2004 | | Auto Express | -185.00 | 185.00 |
| 31/08/2004 | | Auto Express | -185.00 | -185.00 |
| 07/09/2004 | ED-64 | Auto Express | -245.00 | -245.00 |
| 07/09/2004 | | Auto Express | 245.00 | 245.00 |
| 07/09/2004 | | Auto Express | -245.00 | 245.00 |
| 07/09/2004 | | Auto Express | -245.00 | -245.00 |
| 01/10/2004 | ED-78 | Auto Express | -245.00 | -245.00 |
| 01/10/2004 | | Auto Express | 245.00 | 245.00 |
| 01/10/2004 | | Auto Express | -245.00 | -245.00 |
| 01/10/2004 | | Auto Express | -245.00 | -245.00 |
| **Total Auto Express** | | | | 0.00 |
| **Balise Auto Sales** | | | | |
| 10/08/2004 | ED-7 | Balise Auto Sales | -560.00 | -560.00 |
| 10/08/2004 | ED-38 | Balise Auto Sales | -560.00 | -560.00 |
| 10/08/2004 | | Balise Auto Sales | 1,120.00 | 1,120.00 |
| 10/08/2004 | | Balise Auto Sales | -1,120.00 | 560.00 |
| 10/08/2004 | | Balise Auto Sales | -1,120.00 | -1,120.00 |
| 10/08/2004 | | Balise Auto Sales | -1,120.00 | 560.00 |
| 31/08/2004 | ED-45 | Balise Auto Sales | -560.00 | -560.00 |
| 31/08/2004 | ED-55 | Balise Auto Sales | -560.00 | -560.00 |
| 31/08/2004 | | Balise Auto Sales | 1,120.00 | 1,120.00 |
| 31/08/2004 | | Balise Auto Sales | -1,120.00 | 560.00 |
| 31/08/2004 | | Balise Auto Sales | -1,120.00 | -1,120.00 |
| 31/08/2004 | | Balise Auto Sales | -1,120.00 | 560.00 |
| 01/10/2004 | ED-65 | Balise Auto Sales | -560.00 | -560.00 |
| 01/10/2004 | ED-79 | Balise Auto Sales | -560.00 | -560.00 |
| 01/10/2004 | | Balise Auto Sales | 1,120.00 | 1,120.00 |
| 01/10/2004 | | Balise Auto Sales | -1,120.00 | -1,120.00 |
| 01/10/2004 | | Balise Auto Sales | -1,120.00 | 560.00 |
| 01/10/2004 | | Balise Auto Sales | -1,120.00 | 560.00 |
| 31/10/2004 | ED-91 | Balise Auto Sales | -560.00 | -560.00 |
| 31/10/2004 | ED-106 | Balise Auto Sales | -560.00 | -560.00 |
| 31/10/2004 | | Balise Auto Sales | 1,120.00 | 1,120.00 |
| 31/10/2004 | | Balise Auto Sales | -1,120.00 | 560.00 |
| 31/10/2004 | | Balise Auto Sales | -1,120.00 | 560.00 |
| 31/10/2004 | | Balise Auto Sales | -1,120.00 | -1,120.00 |
| **Total Balise Auto Sales** | | | | 0.00 |

00001909

10:55 AM

12/13/04

Cash Basis

El Diálogo
## Custom Transaction Detail Report
### July 1 through December 13, 2004

| Date | Num | Name | Original Amount | Paid Amount |
|------|-----|------|-----------------|-------------|
| **Blitz Media, Inc.** | | | | |
| 22/09/2004 | ED-2 | Blitz Media, Inc. | -460.00 | -460.00 |
| 22/09/2004 | | Blitz Media, Inc. | 460.00 | 460.00 |
| 22/09/2004 | | Blitz Media, Inc. | -460.00 | 460.00 |
| 22/09/2004 | | Blitz Media, Inc. | -460.00 | -460.00 |
| 30/09/2004 | ED-22 | Blitz Media, Inc. | -460.00 | -460.00 |
| 30/09/2004 | ED-22 | Blitz Media, Inc. | -450.00 | -450.00 |
| 30/09/2004 | | Blitz Media, Inc. | 910.00 | 910.00 |
| 30/09/2004 | | Blitz Media, Inc. | -910.00 | 450.00 |
| 30/09/2004 | | Blitz Media, Inc. | -910.00 | -910.00 |
| 30/09/2004 | | Blitz Media, Inc. | -910.00 | 460.00 |
| 25/10/2004 | ED-40 | Blitz Media, Inc. | -460.00 | -460.00 |
| 25/10/2004 | ED-60 | Blitz Media, Inc. | -450.00 | -450.00 |
| 25/10/2004 | | Blitz Media, Inc. | 910.00 | 910.00 |
| 25/10/2004 | | Blitz Media, Inc. | -910.00 | 450.00 |
| 25/10/2004 | | Blitz Media, Inc. | -910.00 | -910.00 |
| 25/10/2004 | | Blitz Media, Inc. | -910.00 | 460.00 |
| 25/11/2004 | ED-66 | Blitz Media, Inc. | -460.00 | -460.00 |
| 25/11/2004 | ED-80 | Blitz Media, Inc. | -460.00 | -460.00 |
| 25/11/2004 | | Blitz Media, Inc. | 920.00 | 920.00 |
| 25/11/2004 | | Blitz Media, Inc. | -920.00 | 460.00 |
| 25/11/2004 | | Blitz Media, Inc. | -920.00 | 460.00 |
| 25/11/2004 | | Blitz Media, Inc. | -920.00 | -920.00 |
| **Total Blitz Media, Inc.** | | | | 0.00 |
| | | | | |
| **Borinquen Grocery** | | | | |
| 01/07/2004 | | Borinquen Grocery | 25.00 | 25.00 |
| 01/07/2004 | | Borinquen Grocery | -25.00 | -25.00 |
| 14/07/2004 | ED-11 | Borinquen Grocery | -25.00 | -25.00 |
| 14/07/2004 | | Borinquen Grocery | -25.00 | 25.00 |
| **Total Borinquen Grocery** | | | | 0.00 |
| | | | | |
| **Bueno y Sano** | | | | |
| 20/07/2004 | ED-4 | Bueno y Sano | -80.00 | -80.00 |
| 20/07/2004 | | Bueno y Sano | 80.00 | 80.00 |
| 20/07/2004 | | Bueno y Sano | -80.00 | -80.00 |
| 20/07/2004 | | Bueno y Sano | -80.00 | 80.00 |
| 31/08/2004 | ED-42 | Bueno y Sano | -80.00 | -80.00 |
| 31/08/2004 | | Bueno y Sano | 80.00 | 80.00 |
| 31/08/2004 | | Bueno y Sano | -80.00 | -80.00 |
| 31/08/2004 | | Bueno y Sano | -80.00 | 80.00 |
| 15/10/2004 | ED-81 | Bueno y Sano | -80.00 | -80.00 |
| 15/10/2004 | | Bueno y Sano | 80.00 | 80.00 |
| 15/10/2004 | | Bueno y Sano | -80.00 | 80.00 |
| 15/10/2004 | | Bueno y Sano | -80.00 | -80.00 |
| 10/11/2004 | ED-93 | Bueno y Sano | -80.00 | -80.00 |
| 10/11/2004 | | Bueno y Sano | 80.00 | 80.00 |
| 10/11/2004 | | Bueno y Sano | -80.00 | -80.00 |
| 10/11/2004 | | Bueno y Sano | -80.00 | 80.00 |
| 25/11/2004 | ED-122 | Bueno y Sano | -80.00 | -80.00 |
| 25/11/2004 | | Bueno y Sano | 80.00 | 80.00 |
| 25/11/2004 | | Bueno y Sano | -80.00 | 80.00 |
| 25/11/2004 | | Bueno y Sano | -80.00 | -80.00 |
| **Total Bueno y Sano** | | | | 0.00 |
| | | | | |
| **Career Point** | | | | |
| 14/09/2004 | ED-73 | Career Point | -50.00 | -50.00 |
| 14/09/2004 | | Career Point | 50.00 | 50.00 |
| 14/09/2004 | | Career Point | -50.00 | -50.00 |
| 14/09/2004 | | Career Point | -50.00 | 50.00 |
| 25/11/2004 | ED-120 | Career Point | -50.00 | -50.00 |
| 25/11/2004 | | Career Point | 50.00 | 50.00 |
| 25/11/2004 | | Career Point | -50.00 | -50.00 |
| 25/11/2004 | | Career Point | -50.00 | 50.00 |
| **Total Career Point** | | | | 0.00 |

**Page 2**

00001910

# El Diálogo
## Custom Transaction Detail Report
### July 1 through December 13, 2004

10:55 AM

12/13/04

Cash Basis

| Date | Num | Name | Original Amount | Paid Amount |
|---|---|---|---|---|
| **Citizens Bank** | | | | |
| 06/10/2004 | 156 | Citizens Bank | -87.10 | -87.10 |
| 06/10/2004 | 156 | Citizens Bank | 87.10 | 87.10 |
| 07/11/2004 | 120 | Citizens Bank | -87.10 | -87.10 |
| 07/11/2004 | 120 | Citizens Bank | 87.10 | 87.10 |
| 07/12/2004 | 124 | Citizens Bank | -87.10 | -87.10 |
| 07/12/2004 | 124 | Citizens Bank | 87.10 | 87.10 |
| **Total Citizens Bank** | | | | 0.00 |
| | | | | |
| **City of Holyoke Public Health Dept.** | | | | |
| 18/07/2004 | ED-16 | City of Holyoke Pub... | -320.00 | -320.00 |
| 18/07/2004 | | City of Holyoke Pub... | 320.00 | 320.00 |
| 31/07/2004 | ED-36 | City of Holyoke Pub... | -320.00 | -320.00 |
| 31/07/2004 | | City of Holyoke Pub... | 320.00 | 320.00 |
| **Total City of Holyoke Public Health Dept.** | | | | 0.00 |
| | | | | |
| **Community Enterprise** | | | | |
| 10/11/2004 | ED-103 | Community Enterpri... | -36.00 | -36.00 |
| 10/11/2004 | | Community Enterpri... | 36.00 | 36.00 |
| 10/11/2004 | | Community Enterpri... | -36.00 | -36.00 |
| 10/11/2004 | | Community Enterpri... | -36.00 | -36.00 |
| **Total Community Enterprise** | | | | 0.00 |
| | | | | |
| **deposit** | | | | |
| 01/07/2004 | | deposit | 500.00 | 500.00 |
| 01/07/2004 | | deposit | -500.00 | -500.00 |
| 02/07/2004 | | deposit | 1,138.00 | 1,138.00 |
| 02/07/2004 | | deposit | -1,138.00 | -1,138.00 |
| 15/07/2004 | | deposit | 75.00 | 75.00 |
| 15/07/2004 | | deposit | -75.00 | -75.00 |
| 20/07/2004 | | deposit | 280.00 | 280.00 |
| 20/07/2004 | | deposit | -280.00 | -280.00 |
| 21/07/2004 | | deposit | 125.00 | 125.00 |
| 21/07/2004 | | deposit | -125.00 | -125.00 |
| 03/08/2004 | | deposit | 465.50 | 465.50 |
| 03/08/2004 | | deposit | -465.50 | -465.50 |
| 03/08/2004 | | deposit | 1,305.50 | 1,305.50 |
| 03/08/2004 | | deposit | -1,305.50 | -1,305.50 |
| 10/08/2004 | | deposit | 150.00 | 150.00 |
| 10/08/2004 | | deposit | -150.00 | -150.00 |
| 10/08/2004 | | deposit | 275.00 | 275.00 |
| 10/08/2004 | | deposit | -275.00 | -275.00 |
| 18/08/2004 | | deposit | 230.00 | 230.00 |
| 18/08/2004 | | deposit | -230.00 | -230.00 |
| 18/08/2004 | | deposit | 530.00 | 530.00 |
| 18/08/2004 | | deposit | -530.00 | -530.00 |
| 19/08/2004 | | deposit | 120.00 | 120.00 |
| 19/08/2004 | | deposit | -120.00 | -120.00 |
| 19/08/2004 | | deposit | 265.00 | 265.00 |
| 19/08/2004 | | deposit | -265.00 | -265.00 |
| 27/08/2004 | | deposit | 2,020.50 | 2,020.50 |
| 27/08/2004 | | deposit | -2,020.50 | -2,020.50 |
| 27/08/2004 | | deposit | 715.50 | 715.50 |
| 27/08/2004 | | deposit | -715.50 | -715.50 |
| 01/09/2004 | | deposit | 675.00 | 675.00 |
| 01/09/2004 | | deposit | -675.00 | -675.00 |
| 01/09/2004 | | deposit | 1,120.00 | 1,120.00 |
| 01/09/2004 | | deposit | -1,120.00 | -1,120.00 |
| 14/09/2004 | | deposit | 36.00 | 36.00 |
| 14/09/2004 | | deposit | -36.00 | -36.00 |
| 14/09/2004 | | deposit | 831.00 | 831.00 |
| 14/09/2004 | | deposit | -831.00 | -831.00 |
| 14/09/2004 | | deposit | 560.00 | 560.00 |
| 14/09/2004 | | deposit | -560.00 | -560.00 |
| 17/09/2004 | | deposit | 183.00 | 183.00 |
| 17/09/2004 | | deposit | -183.00 | -183.00 |
| 20/09/2004 | | deposit | 1,072.00 | 1,072.00 |

00001911

El Diálogo
## Custom Transaction Detail Report
### July 1 through December 13, 2004

10:55 AM
12/13/04
Cash Basis

| Date | Num | Name | Original Amount | Paid Amount |
|------|-----|------|-----------------|-------------|
| 20/09/2004 | | deposit | -1,072.00 | -1,072.00 |
| 24/09/2004 | | deposit | 245.00 | 245.00 |
| 24/09/2004 | | deposit | -245.00 | -245.00 |
| 28/09/2004 | | deposit | 245.18 | 245.18 |
| 28/09/2004 | | deposit | -245.18 | -245.18 |
| 30/09/2004 | | deposit | 275.00 | 275.00 |
| 30/09/2004 | | deposit | -275.00 | -275.00 |
| 30/09/2004 | | deposit | 121.50 | 121.50 |
| 30/09/2004 | | deposit | -121.50 | -121.50 |
| 30/09/2004 | | deposit | 831.00 | 831.00 |
| 30/09/2004 | | deposit | -831.00 | -831.00 |
| 05/10/2004 | | deposit | 1,281.00 | 1,281.00 |
| 05/10/2004 | | deposit | -1,281.00 | -1,281.00 |
| 07/10/2004 | | deposit | 1,120.00 | 1,120.00 |
| 07/10/2004 | | deposit | -1,120.00 | -1,120.00 |
| 14/10/2004 | | deposit | 937.00 | 937.00 |
| 14/10/2004 | | deposit | -937.00 | -937.00 |
| 15/10/2004 | | deposit | 100.00 | 100.00 |
| 15/10/2004 | | deposit | -100.00 | -100.00 |
| 24/10/2004 | | deposit | 1,120.00 | 1,120.00 |
| 24/10/2004 | | deposit | -1,120.00 | -1,120.00 |
| 25/10/2004 | | deposit | 1,470.00 | 1,470.00 |
| 25/10/2004 | | deposit | -1,470.00 | -1,470.00 |
| 26/10/2004 | | deposit | 275.00 | 275.00 |
| 26/10/2004 | | deposit | -275.00 | -275.00 |
| 29/10/2004 | | deposit | 85.00 | 85.00 |
| 29/10/2004 | | deposit | -85.00 | -85.00 |
| 02/11/2004 | | deposit | 1,170.00 | 1,170.00 |
| 02/11/2004 | | deposit | -1,170.00 | -1,170.00 |
| 03/11/2004 | | deposit | 3,536.00 | 3,536.00 |
| 03/11/2004 | | deposit | -3,536.00 | -3,536.00 |
| 17/11/2004 | | deposit | 270.00 | 270.00 |
| 17/11/2004 | | deposit | -270.00 | -270.00 |
| 17/11/2004 | | deposit | 36.00 | 36.00 |
| 17/11/2004 | | deposit | -36.00 | -36.00 |
| 24/11/2004 | | deposit | 270.00 | 270.00 |
| 24/11/2004 | | deposit | -270.00 | -270.00 |
| 24/11/2004 | | deposit | 1,195.00 | 1,195.00 |
| 24/11/2004 | | deposit | -1,195.00 | -1,195.00 |
| 24/11/2004 | | deposit | 130.00 | 130.00 |
| 24/11/2004 | | deposit | -130.00 | -130.00 |
| 30/11/2004 | | deposit | 270.00 | 270.00 |
| 30/11/2004 | | deposit | -270.00 | -270.00 |
| **Total deposit** | | | | 0.00 |
| | | | | |
| **Family Literacy Program** | | | | |
| 25/08/2004 | ED-10 | Family Literacy Pro... | -1,240.00 | -1,240.00 |
| 25/08/2004 | | Family Literacy Pro... | 1,240.00 | 1,240.00 |
| 25/08/2004 | | Family Literacy Pro... | -1,240.00 | -1,240.00 |
| 25/08/2004 | | Family Literacy Pro... | 1,240.00 | 1,240.00 |
| **Total Family Literacy Program** | | | | 0.00 |
| | | | | |
| **Food For Thought Books** | | | | |
| 15/08/2004 | | Food For Thought B... | 120.00 | 120.00 |
| 15/08/2004 | | Food For Thought B... | -120.00 | -120.00 |
| 06/09/2004 | ED-75 | Food For Thought B... | -108.00 | -108.00 |
| 06/09/2004 | | Food For Thought B... | -120.00 | 108.00 |
| 19/09/2004 | | Food For Thought B... | -120.00 | 12.00 |
| 19/09/2004 | ED-86 | Food For Thought B... | -32.00 | -12.00 |
| 30/09/2004 | ED-86 | Food For Thought B... | -32.00 | -20.00 |
| 30/09/2004 | | Food For Thought B... | 20.00 | 20.00 |
| 30/09/2004 | | Food For Thought B... | -20.00 | 20.00 |
| 30/09/2004 | | Food For Thought B... | -20.00 | -20.00 |
| **Total Food For Thought Books** | | | | 0.00 |

00001912

El Diálogo

# Custom Transaction Detail Report

### July 1 through December 13, 2004

| Date | Num | Name | Original Amount | Paid Amount |
|------|-----|------|-----------------|-------------|
| **Generation X** | | | | |
| 01/09/2004 | | Generation X | 135.00 | 135.00 |
| 01/09/2004 | | Generation X | -135.00 | -135.00 |
| 20/09/2004 | ED-89 | Generation X | -135.00 | -135.00 |
| 20/09/2004 | | Generation X | -135.00 | 135.00 |
| **Total Generation X** | | | | 0.00 |
| **Girl Scouts of Pioneer Valley** | | | | |
| 31/10/2004 | ED-101 | Girl Scouts of Pione... | -50.00 | -50.00 |
| 31/10/2004 | | Girl Scouts of Pione... | 50.00 | 50.00 |
| 31/10/2004 | | Girl Scouts of Pione... | -50.00 | -50.00 |
| 31/10/2004 | | Girl Scouts of Pione... | -50.00 | 50.00 |
| **Total Girl Scouts of Pioneer Valley** | | | | 0.00 |
| **Herrell's Mill Cafe** | | | | |
| 22/07/2004 | ED-31 | Herrell's Mill Cafe | -50.00 | -50.00 |
| 22/07/2004 | | Herrell's Mill Cafe | 50.00 | 50.00 |
| **Total Herrell's Mill Cafe** | | | | 0.00 |
| **Holyoke Health Center** | | | | |
| 26/08/2004 | ED-6 | Holyoke Health Cen... | -560.00 | -560.00 |
| 26/08/2004 | | Holyoke Health Cen... | 560.00 | 560.00 |
| 26/08/2004 | | Holyoke Health Cen... | -560.00 | -560.00 |
| 26/08/2004 | | Holyoke Health Cen... | -560.00 | 560.00 |
| 07/09/2004 | ED-37 | Holyoke Health Cen... | -560.00 | -560.00 |
| 07/09/2004 | | Holyoke Health Cen... | 560.00 | 560.00 |
| 07/09/2004 | | Holyoke Health Cen... | -560.00 | -560.00 |
| 07/09/2004 | | Holyoke Health Cen... | -560.00 | 560.00 |
| 30/09/2004 | ED-43 | Holyoke Health Cen... | -560.00 | -560.00 |
| 30/09/2004 | ED-54 | Holyoke Health Cen... | -560.00 | -560.00 |
| 30/09/2004 | | Holyoke Health Cen... | 1,120.00 | 1,120.00 |
| 30/09/2004 | | Holyoke Health Cen... | -1,120.00 | 560.00 |
| 30/09/2004 | | Holyoke Health Cen... | -1,120.00 | 560.00 |
| 30/09/2004 | | Holyoke Health Cen... | -1,120.00 | -1,120.00 |
| 25/10/2004 | ED-67 | Holyoke Health Cen... | -560.00 | -560.00 |
| 25/10/2004 | | Holyoke Health Cen... | 560.00 | 560.00 |
| 25/10/2004 | | Holyoke Health Cen... | -560.00 | 560.00 |
| 25/10/2004 | | Holyoke Health Cen... | -560.00 | -560.00 |
| 10/11/2004 | ED-82 | Holyoke Health Cen... | -560.00 | -560.00 |
| 10/11/2004 | ED-94 | Holyoke Health Cen... | -585.00 | -585.00 |
| 10/11/2004 | | Holyoke Health Cen... | 1,145.00 | 1,145.00 |
| 10/11/2004 | | Holyoke Health Cen... | -1,145.00 | -1,145.00 |
| 10/11/2004 | | Holyoke Health Cen... | -1,145.00 | 585.00 |
| 10/11/2004 | | Holyoke Health Cen... | -1,145.00 | 560.00 |
| **Total Holyoke Health Center** | | | | 0.00 |
| **Holyoke Public Library** | | | | |
| 10/07/2004 | ED-19 | Holyoke Public Libr... | -500.00 | -500.00 |
| 10/07/2004 | | Holyoke Public Libr... | 500.00 | 500.00 |
| 30/09/2004 | ED-61 | Holyoke Public Libr... | -25.00 | -25.00 |
| 30/09/2004 | ED-62 | Holyoke Public Libr... | -25.00 | -25.00 |
| 30/09/2004 | | Holyoke Public Libr... | 50.00 | 50.00 |
| 30/09/2004 | | Holyoke Public Libr... | -50.00 | 25.00 |
| 30/09/2004 | | Holyoke Public Libr... | -50.00 | -50.00 |
| 30/09/2004 | | Holyoke Public Libr... | -50.00 | 25.00 |
| **Total Holyoke Public Library** | | | | 0.00 |
| **Imperial Hall** | | | | |
| 01/07/2004 | | Imperial Hall | 25.00 | 25.00 |
| 01/07/2004 | | Imperial Hall | -25.00 | -25.00 |
| 14/07/2004 | ED-13 | Imperial Hall | -25.00 | -25.00 |
| 14/07/2004 | | Imperial Hall | -25.00 | 25.00 |
| **Total Imperial Hall** | | | | 0.00 |

00001913

# El Diálogo
## Custom Transaction Detail Report
### July 1 through December 13, 2004

| Date | Num | Name | Original Amount | Paid Amount |
|------|-----|------|-----------------|-------------|
| **Jasmine Creations** | | | | |
| 15/07/2004 | ED-8 | Jasmine Creations | -25.00 | -25.00 |
| 15/07/2004 | | Jasmine Creations | 25.00 | 25.00 |
| Total Jasmine Creations | | | | 0.00 |
| | | | | |
| **La Familia Hispana** | | | | |
| 31/07/2004 | ED-26 | La Familia Hispana | -500.00 | -500.00 |
| 31/07/2004 | | La Familia Hispana | 500.00 | 500.00 |
| Total La Familia Hispana | | | | 0.00 |
| | | | | |
| **Lyman Associates LTD** | | | | |
| 10/08/2004 | ED-20 | Lyman Associates ... | -92.75 | -92.75 |
| 10/08/2004 | | Lyman Associates ... | 185.50 | 185.50 |
| 10/08/2004 | | Lyman Associates ... | -185.50 | -185.50 |
| 10/08/2004 | | Lyman Associates ... | -185.50 | 92.75 |
| 26/08/2004 | ED-49 | Lyman Associates ... | -92.75 | -92.75 |
| 26/08/2004 | | Lyman Associates ... | 185.50 | 185.50 |
| 26/08/2004 | | Lyman Associates ... | -185.50 | 92.75 |
| 26/08/2004 | | Lyman Associates ... | -185.50 | -185.50 |
| 07/09/2004 | ED-52 | Lyman Associates ... | -92.75 | -92.75 |
| 07/09/2004 | | Lyman Associates ... | 185.50 | 185.50 |
| 07/09/2004 | | Lyman Associates ... | -185.50 | 92.75 |
| 07/09/2004 | | Lyman Associates ... | -185.50 | -185.50 |
| 23/09/2004 | ED-68 | Lyman Associates ... | -92.75 | -92.75 |
| 23/09/2004 | | Lyman Associates ... | 185.50 | 185.50 |
| 23/09/2004 | | Lyman Associates ... | -185.50 | -185.50 |
| 23/09/2004 | | Lyman Associates ... | -185.50 | 92.75 |
| 30/09/2004 | ED-83 | Lyman Associates ... | -92.75 | -92.75 |
| 30/09/2004 | | Lyman Associates ... | 185.50 | 185.50 |
| 30/09/2004 | | Lyman Associates ... | -185.50 | 92.75 |
| 30/09/2004 | | Lyman Associates ... | -185.50 | -185.50 |
| 05/10/2004 | ED-104 | Lyman Associates ... | -92.75 | -92.75 |
| 05/10/2004 | | Lyman Associates ... | -185.50 | 92.75 |
| Total Lyman Associates LTD | | | | 0.00 |
| | | | | |
| **Maria Acuña Real Estate** | | | | |
| 02/08/2004 | ED-1 | Maria Acuña Real E... | -275.00 | -275.00 |
| 02/08/2004 | | Maria Acuña Real E... | 275.00 | 275.00 |
| 02/08/2004 | | Maria Acuña Real E... | -275.00 | -275.00 |
| 02/08/2004 | | Maria Acuña Real E... | -275.00 | 275.00 |
| 26/08/2004 | ED-44 | Maria Acuña Real E... | -275.00 | -275.00 |
| 26/08/2004 | | Maria Acuña Real E... | 275.00 | 275.00 |
| 26/08/2004 | | Maria Acuña Real E... | -275.00 | -275.00 |
| 26/08/2004 | | Maria Acuña Real E... | -275.00 | 275.00 |
| 20/09/2004 | ED-69 | Maria Acuña Real E... | -275.00 | -275.00 |
| 20/09/2004 | | Maria Acuña Real E... | 275.00 | 275.00 |
| 20/09/2004 | | Maria Acuña Real E... | -275.00 | 275.00 |
| 20/09/2004 | | Maria Acuña Real E... | -275.00 | -275.00 |
| 25/10/2004 | ED-96 | Maria Acuña Real E... | -275.00 | -275.00 |
| 25/10/2004 | | Maria Acuña Real E... | 275.00 | 275.00 |
| 25/10/2004 | | Maria Acuña Real E... | -275.00 | 275.00 |
| 25/10/2004 | | Maria Acuña Real E... | -275.00 | -275.00 |
| 25/11/2004 | ED-126 | Maria Acuña Real E... | -275.00 | -275.00 |
| 25/11/2004 | | Maria Acuña Real E... | 275.00 | 275.00 |
| 25/11/2004 | | Maria Acuña Real E... | -275.00 | 275.00 |
| 25/11/2004 | | Maria Acuña Real E... | -275.00 | -275.00 |
| Total Maria Acuña Real Estate | | | | 0.00 |
| | | | | |
| **MD Beauty Salon** | | | | |
| 01/07/2004 | | MD Beauty Salon | 25.00 | 25.00 |
| 01/07/2004 | | MD Beauty Salon | -25.00 | -25.00 |
| 14/07/2004 | ED-14 | MD Beauty Salon | -25.00 | -25.00 |
| 14/07/2004 | | MD Beauty Salon | -25.00 | 25.00 |
| Total MD Beauty Salon | | | | 0.00 |

00001914

## El Diálogo
## Custom Transaction Detail Report
### July 1 through December 13, 2004

| Date | Num | Name | Original Amount | Paid Amount |
|------|-----|------|-----------------|-------------|
| **Mi Casa Restaurant** | | | | |
| 10/08/2004 | | Mi Casa Restaurant | 25.00 | 25.00 |
| 10/08/2004 | | Mi Casa Restaurant | -25.00 | -25.00 |
| 15/08/2004 | | Mi Casa Restaurant | 10.00 | 10.00 |
| 15/08/2004 | | Mi Casa Restaurant | -10.00 | -10.00 |
| 24/08/2004 | ED-58 | Mi Casa Restaurant | -35.00 | -10.00 |
| 24/08/2004 | ED-58 | Mi Casa Restaurant | -35.00 | -25.00 |
| 24/08/2004 | | Mi Casa Restaurant | -25.00 | 25.00 |
| 24/08/2004 | | Mi Casa Restaurant | -10.00 | 10.00 |
| **Total Mi Casa Restaurant** | | | | 0.00 |
| | | | | |
| **Nancy's Transportation** | | | | |
| 10/08/2004 | | Nancy's Transportat... | 150.00 | 150.00 |
| 10/08/2004 | | Nancy's Transportat... | -150.00 | -150.00 |
| 24/08/2004 | ED-59 | Nancy's Transportat... | -50.00 | -50.00 |
| 24/08/2004 | | Nancy's Transportat... | -150.00 | 50.00 |
| 31/10/2004 | ED-111 | Nancy's Transportat... | -50.00 | -50.00 |
| 31/10/2004 | | Nancy's Transportat... | 50.00 | 50.00 |
| 31/10/2004 | | Nancy's Transportat... | -50.00 | -50.00 |
| 31/10/2004 | | Nancy's Transportat... | -50.00 | 50.00 |
| **Total Nancy's Transportation** | | | | 0.00 |
| | | | | |
| **Open Square Properties LLC** | | | | |
| 10/08/2004 | ED-21 | Open Square Prope... | -92.75 | -92.75 |
| 10/08/2004 | | Open Square Prope... | 185.50 | 185.50 |
| 10/08/2004 | | Open Square Prope... | -185.50 | -185.50 |
| 10/08/2004 | | Open Square Prope... | -185.50 | 92.75 |
| 26/08/2004 | ED-48 | Open Square Prope... | -92.75 | -92.75 |
| 26/08/2004 | | Open Square Prope... | 185.50 | 185.50 |
| 26/08/2004 | | Open Square Prope... | -185.50 | -185.50 |
| 26/08/2004 | | Open Square Prope... | -185.50 | 92.75 |
| 07/09/2004 | ED-51 | Open Square Prope... | -92.75 | -92.75 |
| 07/09/2004 | | Open Square Prope... | 185.50 | 185.50 |
| 07/09/2004 | | Open Square Prope... | -185.50 | 92.75 |
| 07/09/2004 | | Open Square Prope... | -185.50 | -185.50 |
| 23/09/2004 | ED-70 | Open Square Prope... | -92.75 | -92.75 |
| 23/09/2004 | | Open Square Prope... | 185.50 | 185.60 |
| 23/09/2004 | | Open Square Prope... | -185.50 | -185.60 |
| 23/09/2004 | | Open Square Prope... | -185.50 | 92.75 |
| 30/09/2004 | ED-84 | Open Square Prope... | -92.75 | -92.75 |
| 30/09/2004 | | Open Square Prope... | 185.50 | 185.50 |
| 30/09/2004 | | Open Square Prope... | -185.50 | 92.75 |
| 30/09/2004 | | Open Square Prope... | -185.50 | -185.50 |
| 05/10/2004 | ED-105 | Open Square Prope... | -92.75 | -92.75 |
| 05/10/2004 | | Open Square Prope... | -185.50 | 92.75 |
| **Total Open Square Properties LLC** | | | | 0.00 |
| | | | | |
| **Pioneer Valley Oil** | | | | |
| 20/09/2004 | | Pioneer Valley Oil | 72.00 | 72.00 |
| 20/09/2004 | | Pioneer Valley Oil | -72.00 | -72.00 |
| 05/10/2004 | ED-100 | Pioneer Valley Oil | -36.00 | -36.00 |
| 05/10/2004 | | Pioneer Valley Oil | -72.00 | 36.00 |
| **Total Pioneer Valley Oil** | | | | 0.00 |
| | | | | |
| **Reliable Computer** | | | | |
| 15/08/2004 | | Reliable Computer | 35.00 | 35.00 |
| 15/08/2004 | | Reliable Computer | -35.00 | -35.00 |
| 19/09/2004 | ED-88 | Reliable Computer | -35.00 | -35.00 |
| 19/09/2004 | | Reliable Computer | -35.00 | 35.00 |
| 31/10/2004 | ED-98 | Reliable Computer | -36.00 | -35.00 |
| 31/10/2004 | | Reliable Computer | 35.00 | 35.00 |
| 31/10/2004 | | Reliable Computer | -35.00 | 35.00 |
| 31/10/2004 | | Reliable Computer | -35.00 | -35.00 |
| **Total Reliable Computer** | | | | 0.00 |

00001915

El Diálogo

# Custom Transaction Detail Report

### July 1 through December 13, 2004

| Date | Num | Name | Original Amount | Paid Amount |
|------|-----|------|-----------------|-------------|
| **Remax** | | | | |
| 31/07/2004 | ED-15 | Remax | -25.00 | -25.00 |
| 31/07/2004 | ED-30 | Remax | -50.00 | -50.00 |
| 31/07/2004 | | Remax | 75.00 | 75.00 |
| 31/07/2004 | | Remax | -75.00 | 50.00 |
| 31/07/2004 | | Remax | -75.00 | 25.00 |
| 31/07/2004 | | Remax | -75.00 | -75.00 |
| **Total Remax** | | | | 0.00 |
| | | | | |
| **Rock the Vote** | | | | |
| 31/07/2004 | ED-27 | Rock the Vote | -500.00 | -500.00 |
| 31/07/2004 | | Rock the Vote | 500.00 | 500.00 |
| **Total Rock the Vote** | | | | 0.00 |
| | | | | |
| **Salsarengue Restaurant** | | | | |
| 01/07/2004 | | Salsarengue Resta... | 50.00 | 50.00 |
| 01/07/2004 | | Salsarengue Resta... | -50.00 | -50.00 |
| 22/07/2004 | ED-28 | Salsarengue Resta... | -50.00 | -50.00 |
| 22/07/2004 | | Salsarengue Resta... | -50.00 | 50.00 |
| 01/08/2004 | | Salsarengue Resta... | 300.00 | 300.00 |
| 01/08/2004 | | Salsarengue Resta... | -300.00 | -300.00 |
| 10/08/2004 | ED-57 | Salsarengue Resta... | -120.00 | -120.00 |
| 10/08/2004 | | Salsarengue Resta... | -300.00 | 120.00 |
| 21/08/2004 | ED-56 | Salsarengue Resta... | -245.00 | -180.00 |
| 21/08/2004 | | Salsarengue Resta... | -300.00 | 180.00 |
| **Total Salsarengue Restaurant** | | | | 0.00 |
| | | | | |
| **Six Flags New England** | | | | |
| 31/07/2004 | ED-39 | Six Flags New Engl... | -680.00 | -680.00 |
| 31/07/2004 | | Six Flags New Engl... | 680.00 | 680.00 |
| **Total Six Flags New England** | | | | 0.00 |
| | | | | |
| **Solutions CDC** | | | | |
| 31/08/2004 | ED-63 | Solutions CDC | -25.00 | -25.00 |
| 31/08/2004 | | Solutions CDC | 25.00 | 25.00 |
| 31/08/2004 | | Solutions CDC | -25.00 | 25.00 |
| 31/08/2004 | | Solutions CDC | -25.00 | -25.00 |
| **Total Solutions CDC** | | | | 0.00 |
| | | | | |
| **Sonia Palm and Card Readings** | | | | |
| 15/07/2004 | ED-17 | Sonia Palm and Ca... | -90.00 | -90.00 |
| 15/07/2004 | | Sonia Palm and Ca... | 90.00 | 90.00 |
| 15/07/2004 | | Sonia Palm and Ca... | -90.00 | -90.00 |
| 15/07/2004 | | Sonia Palm and Ca... | -90.00 | 90.00 |
| 30/09/2004 | ED-85 | Sonia Palm and Ca... | -90.00 | -90.00 |
| 30/09/2004 | | Sonia Palm and Ca... | 90.00 | 90.00 |
| **Total Sonia Palm and Card Readings** | | | | 0.00 |
| | | | | |
| **The Desired Image** | | | | |
| 01/07/2004 | | The Desired Image | 25.00 | 25.00 |
| 01/07/2004 | | The Desired Image | -25.00 | -25.00 |
| 14/07/2004 | ED-12 | The Desired Image | -25.00 | -25.00 |
| 14/07/2004 | | The Desired Image | -25.00 | 25.00 |
| **Total The Desired Image** | | | | 0.00 |
| | | | | |
| **University of Massachusetts** | | | | |
| 09/08/2004 | ED-3 | University of Massa... | -265.00 | -265.00 |
| 09/08/2004 | ED-24 | University of Massa... | -265.00 | -265.00 |
| 09/08/2004 | | University of Massa... | 530.00 | 530.00 |
| 09/08/2004 | | University of Massa... | -530.00 | -530.00 |
| 09/08/2004 | | University of Massa... | -530.00 | 265.00 |
| 09/08/2004 | | University of Massa... | -530.00 | 265.00 |
| **Total University of Massachusetts** | | | | 0.00 |

00001916

El Diálogo

# Custom Transaction Detail Report

July 1 through December 13, 2004

10:55 AM

12/13/04

Cash Basis

| Date | Num | Name | Original Amount | Paid Amount |
|------|-----|------|-----------------|-------------|
| **Valdir Costa** | | | | |
| 15/09/2004 | | Valdir Costa | 36.00 | 36.00 |
| 15/09/2004 | | Valdir Costa | -36.00 | -36.00 |
| 19/09/2004 | ED-87 | Valdir Costa | -36.00 | -36.00 |
| 19/09/2004 | | Valdir Costa | -36.00 | 36.00 |
| **Total Valdir Costa** | | | | 0.00 |
| **Valley Motorsports** | | | | |
| 15/11/2004 | ED-102 | Valley Motorsports | -36.00 | -36.00 |
| 15/11/2004 | | Valley Motorsports | 36.00 | 36.00 |
| 15/11/2004 | | Valley Motorsports | -36.00 | -36.00 |
| 15/11/2004 | | Valley Motorsports | -36.00 | 36.00 |
| **Total Valley Motorsports** | | | | 0.00 |
| **Vote Vickery Committee** | | | | |
| 06/10/2004 | ED-72 | Vote Vickery Comm... | -392.00 | -392.00 |
| 06/10/2004 | | Vote Vickery Comm... | 392.00 | 392.00 |
| 06/10/2004 | | Vote Vickery Comm... | -392.00 | -392.00 |
| 06/10/2004 | | Vote Vickery Comm... | -392.00 | 392.00 |
| **Total Vote Vickery Committee** | | | | 0.00 |
| **Western Massachusetts Training Consortium** | | | | |
| 14/09/2004 | ED-71 | Western Massachu... | -108.00 | -108.00 |
| 14/09/2004 | | Western Massachu... | 108.00 | 108.00 |
| 14/09/2004 | | Western Massachu... | -108.00 | -108.00 |
| 14/09/2004 | | Western Massachu... | -108.00 | 108.00 |
| **Total Western Massachusetts Training Consortium** | | | | 0.00 |
| **Westover Animal Clinic** | | | | |
| 01/07/2004 | ED-18 | Westover Animal Cl... | -280.00 | -280.00 |
| 01/07/2004 | | Westover Animal Cl... | 280.00 | 280.00 |
| 01/07/2004 | | Westover Animal Cl... | -280.00 | 280.00 |
| 01/07/2004 | | Westover Animal Cl... | -280.00 | -280.00 |
| **Total Westover Animal Clinic** | | | | 0.00 |
| **WWLP Channel 22 TV** | | | | |
| 15/11/2004 | ED-116 | WWLP Channel 22 ... | -270.00 | -270.00 |
| 15/11/2004 | | WWLP Channel 22 ... | 270.00 | 270.00 |
| 15/11/2004 | | WWLP Channel 22 ... | -270.00 | -270.00 |
| 15/11/2004 | | WWLP Channel 22 ... | -270.00 | 270.00 |
| 25/11/2004 | ED-133 | WWLP Channel 22 ... | -270.00 | -270.00 |
| 25/11/2004 | | WWLP Channel 22 ... | 270.00 | 270.00 |
| 25/11/2004 | | WWLP Channel 22 ... | 270.00 | 270.00 |
| 25/11/2004 | | WWLP Channel 22 ... | -270.00 | -270.00 |
| **Total WWLP Channel 22 TV** | | | | 0.00 |
| **Beaulieu & Sons** | | | | |
| 26/07/2004 | 102 | Beaulieu & Sons | -75.00 | -75.00 |
| 26/07/2004 | 102 | Beaulieu & Sons | 75.00 | 75.00 |
| **Total Beaulieu & Sons** | | | | 0.00 |
| **Eagle Printing** | | | | |
| 13/08/2004 | 272 | Eagle Printing | -1,070.00 | -1,070.00 |
| 13/08/2004 | 272 | Eagle Printing | 1,070.00 | 1,070.00 |
| 01/09/2004 | 282 | Eagle Printing | -1,070.00 | -1,070.00 |
| 01/09/2004 | 282 | Eagle Printing | 1,070.00 | 1,070.00 |
| 14/09/2004 | 290 | Eagle Printing | -1,110.00 | -1,110.00 |
| 14/09/2004 | 290 | Eagle Printing | 1,110.00 | 1,110.00 |
| 16/09/2004 | 295 | Eagle Printing | -110.00 | -110.00 |
| 16/09/2004 | 295 | Eagle Printing | 110.00 | 110.00 |
| 29/09/2004 | 142 | Eagle Printing | -1,110.00 | -1,110.00 |
| 29/09/2004 | 142 | Eagle Printing | 1,110.00 | 1,110.00 |
| 13/10/2004 | 151 | Eagle Printing | -913.50 | -913.50 |
| 13/10/2004 | 151 | Eagle Printing | 913.50 | 913.50 |

Payables
To
Pg 14

00001917

10:55 AM

12/13/04

Cash Basis

# El Diálogo
## Custom Transaction Detail Report
### July 1 through December 13, 2004

| Date | Num | Name | Original Amount | Paid Amount |
|---|---|---|---|---|
| 09/11/2004 | 172 | Eagle Printing | -1,169.70 | -1,169.70 |
| 09/11/2004 | 172 | Eagle Printing | 1,169.70 | 1,169.70 |
| **Total Eagle Printing** | | | | 0.00 |
| **Edward Cohen** | | | | |
| 20/10/2004 | 157 | Edward Cohen | -105.00 | -105.00 |
| 20/10/2004 | 157 | Edward Cohen | 105.00 | 105.00 |
| 07/11/2004 | 170 | Edward Cohen | -150.00 | -150.00 |
| 07/11/2004 | 170 | Edward Cohen | 150.00 | 150.00 |
| 09/11/2004 | 171 | Edward Cohen | -73.50 | -73.50 |
| 09/11/2004 | 171 | Edward Cohen | 73.50 | 73.50 |
| **Total Edward Cohen** | | | | 0.00 |
| **ERC** | | | | |
| 06/10/2004 | 149 | ERC | -75.00 | -75.00 |
| 06/10/2004 | 149 | ERC | 75.00 | 75.00 |
| **Total ERC** | | | | 0.00 |
| **Holyoke Gas & Electric** | | | | |
| 26/07/2004 | 104 | Holyoke Gas & Elec... | -188.62 | -188.62 |
| 26/07/2004 | 104 | Holyoke Gas & Elec... | 188.62 | 188.62 |
| 06/09/2004 | 111 | Holyoke Gas & Elec... | -245.18 | -245.18 |
| 06/09/2004 | 111 | Holyoke Gas & Elec... | 245.18 | 245.18 |
| 28/09/2004 | 161 | Holyoke Gas & Elec... | -222.53 | -222.53 |
| 28/09/2004 | 161 | Holyoke Gas & Elec... | 222.53 | 222.53 |
| 29/09/2004 | 113 | Holyoke Gas & Elec... | -509.68 | -509.68 |
| 29/09/2004 | 113 | Holyoke Gas & Elec... | 509.68 | 509.68 |
| **Total Holyoke Gas & Electric** | | | | 0.00 |
| **Newsfinder** | | | | |
| 10/08/2004 | 105 | Newsfinder | -148.00 | -148.00 |
| 10/08/2004 | 105 | Newsfinder | 148.00 | 148.00 |
| 28/09/2004 | 160 | Newsfinder | -148.00 | -148.00 |
| 28/09/2004 | 160 | Newsfinder | 148.00 | 148.00 |
| 29/09/2004 | 114 | Newsfinder | -148.00 | -148.00 |
| 29/09/2004 | 114 | Newsfinder | 148.00 | 148.00 |
| 29/11/2004 | 122 | Newsfinder | -296.00 | -296.00 |
| 29/11/2004 | 122 | Newsfinder | 296.00 | 296.00 |
| **Total Newsfinder** | | | | 0.00 |
| **Office Max** | | | | |
| 27/08/2004 | 278 | Office Max | -49.20 | -49.20 |
| 27/08/2004 | 278 | Office Max | 49.20 | 49.20 |
| **Total Office Max** | | | | 0.00 |
| **OneStopTechnology** | | | | |
| 26/07/2004 | 103 | OneStopTechnology | -75.00 | -75.00 |
| 26/07/2004 | 103 | OneStopTechnology | 75.00 | 75.00 |
| 31/08/2004 | 108 | OneStopTechnology | -200.00 | -200.00 |
| 31/08/2004 | 108 | OneStopTechnology | 200.00 | 200.00 |
| **Total OneStopTechnology** | | | | 0.00 |
| **Paradise Copies** | | | | |
| 30/08/2004 | 281 | Paradise Copies | -40.43 | -40.43 |
| 30/08/2004 | 281 | Paradise Copies | 40.43 | 40.43 |
| 01/09/2004 | 286 | Paradise Copies | -155.93 | -155.93 |
| 01/09/2004 | 286 | Paradise Copies | 155.93 | 155.93 |
| **Total Paradise Copies** | | | | 0.00 |

00001918

El Diálogo
## Custom Transaction Detail Report
### July 1 through December 13, 2004

10:55 AM
12/13/04
Cash Basis

| Date | Num | Name | Original Amount | Paid Amount |
|------|-----|------|----------------|-------------|
| **Pitney Bowes** | | | | |
| 20/09/2004 | 159 | Pitney Bowes | -100.00 | -100.00 |
| 20/09/2004 | 159 | Pitney Bowes | 100.00 | 100.00 |
| 07/11/2004 | 118 | Pitney Bowes | -31.89 | -31.89 |
| 07/11/2004 | 118 | Pitney Bowes | 31.89 | 31.89 |
| Total Pitney Bowes | | | | 0.00 |
| **Poland Spring** | | | | |
| 15/08/2004 | 109 | Poland Spring | -98.83 | -98.83 |
| 15/08/2004 | 109 | Poland Spring | 98.83 | 98.83 |
| 29/09/2004 | 115 | Poland Spring | -34.46 | -34.46 |
| 29/09/2004 | 115 | Poland Spring | 34.46 | 34.46 |
| 07/11/2004 | 119 | Poland Spring | -34.46 | -34.46 |
| 07/11/2004 | 119 | Poland Spring | 34.46 | 34.46 |
| Total Poland Spring | | | | 0.00 |
| **Postal Privilege (Pitney Bowes)** | | | | |
| 10/08/2004 | 106 | Postal Privilege (Pit... | -1.00 | -1.00 |
| 10/08/2004 | 106 | Postal Privilege (Pit... | 1.00 | 1.00 |
| Total Postal Privilege (Pitney Bowes) | | | | 0.00 |
| **Signs Plus** | | | | |
| 27/07/2004 | 266 | Signs Plus | -162.00 | -162.00 |
| 27/07/2004 | 266 | Signs Plus | 162.00 | 162.00 |
| 12/08/2004 | 271 | Signs Plus | -94.50 | -94.50 |
| 12/08/2004 | 271 | Signs Plus | 94.50 | 94.50 |
| Total Signs Plus | | | | 0.00 |
| **Staples** | | | | |
| 13/10/2004 | 152 | Staples | -179.92 | -179.92 |
| 13/10/2004 | 152 | Staples | 179.92 | 179.92 |
| Total Staples | | | | 0.00 |
| **Star Press** | | | | |
| 27/09/2004 | 300 | Star Press | -500.00 | -500.00 |
| 27/09/2004 | 300 | Star Press | 500.00 | 500.00 |
| Total Star Press | | | | 0.00 |
| **Verizon** | | | | |
| 18/08/2004 | 107 | Verizon | -459.63 | -459.63 |
| 18/08/2004 | 107 | Verizon | 459.63 | 459.63 |
| 15/09/2004 | 116 | Verizon | -177.87 | -177.87 |
| 15/09/2004 | 116 | Verizon | 177.87 | 177.87 |
| 16/09/2004 | 112 | Verizon | -180.30 | -180.30 |
| 16/09/2004 | 112 | Verizon | 180.30 | 180.30 |
| 07/11/2004 | 121 | Verizon | -202.01 | -202.01 |
| 07/11/2004 | 121 | Verizon | 202.01 | 202.01 |
| Total Verizon | | | | 0.00 |
| **Ana Morales** | | | | |
| 06/10/2004 | 154 | Ana Morales | -730.00 | -730.00 |
| 06/10/2004 | 154 | Ana Morales | 730.00 | 730.00 |
| 17/11/2004 | 173 | Ana Morales | -600.00 | -600.00 |
| 17/11/2004 | 173 | Ana Morales | 600.00 | 600.00 |
| 01/12/2004 | 175 | Ana Morales | -850.00 | -850.00 |
| 01/12/2004 | 175 | Ana Morales | 850.00 | 850.00 |
| Total Ana Morales | | | | 0.00 |

00001919

10:55 AM

12/13/04

Cash Basis

El Diálogo
## Custom Transaction Detail Report
### July 1 through December 13, 2004

| Date | Num | Name | Original Amount | Paid Amount |
|------|-----|------|-----------------|-------------|
| **Cathleen Robinson** | | | | |
| 01/09/2004 | 267 | Cathleen Robinson | -75.00 | -75.00 |
| 01/09/2004 | 267 | Cathleen Robinson | 75.00 | 75.00 |
| 06/10/2004 | 150 | Cathleen Robinson | -50.00 | -50.00 |
| 06/10/2004 | 150 | Cathleen Robinson | 50.00 | 50.00 |
| 04/11/2004 | 166 | Cathleen Robinson | -25.00 | -25.00 |
| 04/11/2004 | 156 | Cathleen Robinson | 25.00 | 25.00 |
| 04/11/2004 | 167 | Cathleen Robinson | -25.00 | -25.00 |
| 04/11/2004 | 167 | Cathleen Robinson | 25.00 | 25.00 |
| **Total Cathleen Robinson** | | | | 0.00 |
| **Denise Salgado** | | | | |
| 03/08/2004 | 267 | Denise Salgado | -150.00 | -150.00 |
| 03/08/2004 | 267 | Denise Salgado | 150.00 | 150.00 |
| 13/08/2004 | 274 | Denise Salgado | -150.00 | -150.00 |
| 13/08/2004 | 274 | Denise Salgado | 150.00 | 150.00 |
| 01/09/2004 | 284 | Denise Salgado | -150.00 | -150.00 |
| 01/09/2004 | 284 | Denise Salgado | 150.00 | 150.00 |
| 14/09/2004 | 293 | Denise Salgado | -150.00 | -150.00 |
| 14/09/2004 | 293 | Denise Salgado | 150.00 | 150.00 |
| **Total Denise Salgado** | | | | 0.00 |
| **Gabriela Romero** | | | | |
| 13/07/2004 | 101 | Gabriela Romero | -180.00 | -180.00 |
| 13/07/2004 | 101 | Gabriela Romero | 180.00 | 180.00 |
| 01/10/2004 | 297 | Gabriela Romero | -1,000.00 | -1,000.00 |
| 01/10/2004 | 297 | Gabriela Romero | 1,000.00 | 1,000.00 |
| 02/11/2004 | 164 | Gabriela Romero | -1,000.00 | -1,000.00 |
| 02/11/2004 | 164 | Gabriela Romero | 1,000.00 | 1,000.00 |
| 01/12/2004 | 174 | Gabriela Romero | -1,000.00 | -1,000.00 |
| 01/12/2004 | 174 | Gabriela Romero | 1,000.00 | 1,000.00 |
| **Total Gabriela Romero** | | | | 0.00 |
| **Hector Bauza** | | | | |
| 02/10/2004 | 147 | Hector Bauza | -300.00 | -300.00 |
| 02/10/2004 | 147 | Hector Bauza | 300.00 | 300.00 |
| **Total Hector Bauza** | | | | 0.00 |
| **Luis Rivera** | | | | |
| 03/07/2004 | 261 | Luis Rivera | -250.00 | -250.00 |
| 03/07/2004 | 261 | Luis Rivera | 250.00 | 250.00 |
| 03/07/2004 | 262 | Luis Rivera | -175.00 | -175.00 |
| 03/07/2004 | 262 | Luis Rivera | 175.00 | 175.00 |
| 18/07/2004 | 265 | Luis Rivera | -150.00 | -150.00 |
| 18/07/2004 | 265 | Luis Rivera | 150.00 | 150.00 |
| **Total Luis Rivera** | | | | 0.00 |
| **Maria Berrios** | | | | |
| 01/10/2004 | 146 | Maria Berrios | -170.00 | -170.00 |
| 01/10/2004 | 146 | Maria Berrios | 170.00 | 170.00 |
| **Total Maria Berrios** | | | | 0.00 |
| **Tracy Learned** | | | | |
| 31/08/2004 | 110 | Tracy Learned | -52.49 | -52.49 |
| 31/08/2004 | 110 | Tracy Learned | 52.49 | 52.49 |
| 15/09/2004 | 294 | Tracy Learned | -136.00 | -136.00 |
| 15/09/2004 | 294 | Tracy Learned | 136.00 | 136.00 |
| **Total Tracy Learned** | | | | 0.00 |
| **?** | | | | |
| 03/11/2004 | 180 | ? | -1,000.00 | -1,000.00 |
| 03/11/2004 | 180 | ? | 1,000.00 | 1,000.00 |
| **Total ?** | | | | 0.00 |

**Page 12**

00001920

# El Diálogo
## Custom Transaction Detail Report
### July 1 through December 13, 2004

10:55 AM
12/13/04
Cash Basis

| Date | Num | Name | Original Amount | Paid Amount |
|------|-----|------|----------------|-------------|
| **Athena Stylos** | | | | |
| 18/07/2004 | 264 | Athena Stylos | -125.00 | -125.00 |
| 18/07/2004 | 264 | Athena Stylos | 125.00 | 125.00 |
| 09/08/2004 | 268 | Athena Stylos | -125.00 | -125.00 |
| 09/08/2004 | 268 | Athena Stylos | 125.00 | 125.00 |
| 13/08/2004 | 273 | Athena Stylos | -150.00 | -150.00 |
| 13/08/2004 | 273 | Athena Stylos | 150.00 | 150.00 |
| 01/09/2004 | 283 | Athena Stylos | -125.00 | -125.00 |
| 01/09/2004 | 283 | Athena Stylos | 125.00 | 125.00 |
| 14/09/2004 | 292 | Athena Stylos | -150.00 | -150.00 |
| 14/09/2004 | 292 | Athena Stylos | 150.00 | 150.00 |
| 30/09/2004 | 143 | Athena Stylos | -170.00 | -170.00 |
| 30/09/2004 | 143 | Athena Stylos | 170.00 | 170.00 |
| 06/10/2004 | 153 | Athena Stylos | -170.00 | -170.00 |
| 06/10/2004 | 153 | Athena Stylos | 170.00 | 170.00 |
| 06/10/2004 | 155 | Athena Stylos | -170.00 | -170.00 |
| 06/10/2004 | 155 | Athena Stylos | 170.00 | 170.00 |
| **Total Athena Stylos** | | | | 0.00 |
| **cash** | | | | |
| 16/08/2004 | 276 | cash | -250.00 | -250.00 |
| 16/08/2004 | 276 | cash | 250.00 | 250.00 |
| 14/09/2004 | 291 | cash | -50.00 | -50.00 |
| 14/09/2004 | 291 | cash | 50.00 | 50.00 |
| 22/10/2004 | 158 | cash | -1,200.00 | -1,200.00 |
| 22/10/2004 | 158 | cash | 1,200.00 | 1,200.00 |
| 22/10/2004 | 162 | cash | -400.00 | -400.00 |
| 22/10/2004 | 162 | cash | 400.00 | 400.00 |
| **Total cash** | | | | 0.00 |
| **Friends of Holyoke High Football Team** | | | | |
| 16/08/2004 | 277 | Friends of Holyoke ... | -50.00 | -50.00 |
| 16/08/2004 | 277 | Friends of Holyoke ... | 50.00 | 50.00 |
| **Total Friends of Holyoke High Football Team** | | | | 0.00 |
| **Fun Time Lanes** | | | | |
| 08/11/2004 | 169 | Fun Time Lanes | -180.00 | -180.00 |
| 08/11/2004 | 169 | Fun Time Lanes | 180.00 | 180.00 |
| **Total Fun Time Lanes** | | | | 0.00 |
| **Gabriela Vidali** | | | | |
| 10/07/2004 | 263 | Gabriela Vidali | -125.00 | -125.00 |
| 10/07/2004 | 263 | Gabriela Vidali | 125.00 | 125.00 |
| 27/08/2004 | 280 | Gabriela Vidali | -21.00 | -21.00 |
| 27/08/2004 | 280 | Gabriela Vidali | 21.00 | 21.00 |
| 27/08/2004 | 279 | Gabriela Vidali | -150.00 | -150.00 |
| 27/08/2004 | 279 | Gabriela Vidali | 150.00 | 150.00 |
| 01/09/2004 | 285 | Gabriela Vidali | -150.00 | -150.00 |
| 01/09/2004 | 285 | Gabriela Vidali | 150.00 | 150.00 |
| 16/09/2004 | 296 | Gabriela Vidali | -220.00 | -220.00 |
| 16/09/2004 | 296 | Gabriela Vidali | 220.00 | 220.00 |
| 22/09/2004 | 299 | Gabriela Vidali | -13.02 | -13.02 |
| 22/09/2004 | 299 | Gabriela Vidali | 13.02 | 13.02 |
| 30/09/2004 | 144 | Gabriela Vidali | -50.00 | -50.00 |
| 30/09/2004 | 144 | Gabriela Vidali | 50.00 | 50.00 |
| 04/10/2004 | 148 | Gabriela Vidali | -193.00 | -193.00 |
| 04/10/2004 | 148 | Gabriela Vidali | 193.00 | 193.00 |
| **Total Gabriela Vidali** | | | | 0.00 |
| **Gladys Cruz** | | | | |
| 11/09/2004 | 289 | Gladys Cruz | -250.00 | -250.00 |
| 11/09/2004 | 289 | Gladys Cruz | 250.00 | 250.00 |
| **Total Gladys Cruz** | | | | 0.00 |

00001921

10:55 AM
12/13/04
Cash Basis

# El Diálogo
## Custom Transaction Detail Report
### July 1 through December 13, 2004

| Date | Num | Name | Original Amount | Paid Amount |
|------|-----|------|----------------|-------------|
| **Greater Holyoke Chamber of Commerce** | | | | |
| 09/09/2004 | 288 | Greater Holyoke Ch... | -470.50 | -470.50 |
| 09/09/2004 | 288 | Greater Holyoke Ch... | 470.50 | 470.50 |
| Total Greater Holyoke Chamber of Commerce | | | | 0.00 |
| **Gregg Stroman** | | | | |
| 28/09/2004 | 141 | Gregg Stroman | -135.00 | -135.00 |
| 28/09/2004 | 141 | Gregg Stroman | 135.00 | 135.00 |
| Total Gregg Stroman | | | | 0.00 |
| **Hispanic Chamber of Commerce** | | | | |
| 04/08/2004 | 270 | Hispanic Chamber ... | -500.00 | -500.00 |
| 04/08/2004 | 270 | Hispanic Chamber ... | 500.00 | 500.00 |
| Total Hispanic Chamber of Commerce | | | | 0.00 |
| **Holyoke Merry Go Round** | | | | |
| 02/10/2004 | 145 | Holyoke Merry Go ... | -50.00 | -50.00 |
| 02/10/2004 | 145 | Holyoke Merry Go ... | 50.00 | 50.00 |
| Total Holyoke Merry Go Round | | | | 0.00 |
| **John Aubin** | | | | |
| 04/11/2004 | 168 | John Aubin | -500.00 | -500.00 |
| 04/11/2004 | 168 | John Aubin | 500.00 | 500.00 |
| Total John Aubin | | | | 0.00 |
| **Puerto Rican Cultural Center** | | | | |
| 25/10/2004 | 163 | Puerto Rican Cultur... | -100.00 | -100.00 |
| 25/10/2004 | 163 | Puerto Rican Cultur... | 100.00 | 100.00 |
| Total Puerto Rican Cultural Center | | | | 0.00 |
| **service charge** | | | | |
| 31/07/2004 | | service charge | -10.00 | -10.00 |
| 31/07/2004 | | service charge | 10.00 | 10.00 |
| 31/08/2004 | | service charge | -10.00 | -10.00 |
| 31/08/2004 | | service charge | 10.00 | 10.00 |
| 30/09/2004 | | service charge | -10.00 | -10.00 |
| 30/09/2004 | | service charge | 10.00 | 10.00 |
| 31/10/2004 | | service charge | -10.00 | -10.00 |
| 31/10/2004 | | service charge | 10.00 | 10.00 |
| 30/11/2004 | | service charge | -10.00 | -10.00 |
| 30/11/2004 | | service charge | 10.00 | 10.00 |
| Total service charge | | | | 0.00 |
| **Simon Ben Nathan** | | | | |
| 03/08/2004 | 269 | Simon Ben Nathan | -50.00 | -50.00 |
| 03/08/2004 | 269 | Simon Ben Nathan | 50.00 | 50.00 |
| 13/08/2004 | 275 | Simon Ben Nathan | -50.00 | -50.00 |
| 13/08/2004 | 275 | Simon Ben Nathan | 50.00 | 50.00 |
| Total Simon Ben Nathan | | | | 0.00 |
| **void** | | | | |
| 15/09/2004 | 117 | void | 0.00 | 0.00 |
| 15/09/2004 | 117 | void | | |
| 29/09/2004 | 298 | void | 0.00 | 0.00 |
| 29/09/2004 | 298 | void | | |
| Total void | | | | 0.00 |
| **TOTAL** | | | | 0.00 |

Page 14

00001922

10:51 AM
12/13/04
Cash Basis

# El Diálogo
## Profit & Loss
### July 1 through December 13, 2004

| | Jul 04 | Aug 04 | Sep 04 | Oct 04 | Nov 04 | Dec 1 - 13, 04 |
|---|---|---|---|---|---|---|
| **Ordinary Income/Expense** | | | | | | |
| **Income** | | | | | | |
| ad revenue | 1,618.00 | 6,077.00 | 5,949.50 | 6,388.00 | 6,877.00 | 0.00 |
| Ad/Graphic Design Income | 3,570.00 | 6,961.00 | 4,320.50 | 5,058.50 | 3,432.00 | 0.00 |
| **Total Income** | 5,188.00 | 13,038.00 | 10,270.00 | 11,446.50 | 10,309.00 | 0.00 |
| **Gross Profit** | 5,188.00 | 13,038.00 | 10,270.00 | 11,446.50 | 10,309.00 | 0.00 |
| **Expense** | | | | | | |
| articles | 125.00 | 150.00 | 75.00 | 50.00 | 50.00 | 0.00 |
| bad debt | 25.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 |
| Bank Service Charges | 10.00 | 10.00 | 10.00 | 10.00 | 10.00 | 0.00 |
| Barber | 730.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 |
| **Car/Truck Expense** | | | | | | |
| Auto Repairs & Maintenance | 175.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 |
| **Total Car/Truck Expense** | 175.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 |
| commission | 180.00 | 250.00 | 670.00 | 483.00 | 0.00 | 0.00 |
| Computer maint/troubleshoot | 0.00 | 200.00 | 0.00 | 0.00 | 0.00 | 0.00 |
| Computer software | 0.00 | 0.00 | 135.00 | 87.10 | 87.10 | 87.10 |
| contract copies | 525.00 | 675.00 | 155.93 | 0.00 | 0.00 | 0.00 |
| distribution | 0.00 | 875.00 | 745.00 | 510.00 | 0.00 | 0.00 |
| Donation | 2,140.00 | 500.00 | 0.00 | 0.00 | 0.00 | 0.00 |
| Dues and Subscriptions | 0.00 | 0.00 | 470.50 | 50.00 | 0.00 | 0.00 |
| Electric | 0.00 | 0.00 | 977.39 | 0.00 | 0.00 | 0.00 |
| Event | 188.62 | 0.00 | 0.00 | 1,700.00 | 0.00 | 0.00 |
| Marketing & Promotional Expense | 0.00 | 144.50 | 0.00 | 0.00 | 1,180.00 | 0.00 |
| Miscellaneous | 162.00 | 20.00 | 135.00 | 0.00 | 0.00 | 0.00 |
| Office Equipment | 0.00 | 49.20 | 0.00 | 0.00 | 34.46 | 0.00 |
| Office Supplies | 0.00 | 151.32 | 47.48 | 179.92 | 0.00 | 0.00 |
| petty cash | 0.00 | 0.00 | 50.00 | 50.00 | 0.00 | 0.00 |
| photographs | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 |
| Postage and Delivery | 0.00 | 1.00 | 100.00 | 105.00 | 223.50 | 0.00 |
| Printing and Reproduction | 0.00 | 1,279.43 | 3,836.00 | 913.50 | 31.89 | 0.00 |
| **Professional Fees** | | | | | | |
| Accounting Fees | 0.00 | 0.00 | 136.00 | 0.00 | 1,465.70 | 0.00 |
| **Total Professional Fees** | 0.00 | 0.00 | 136.00 | 0.00 | 1,465.70 | 0.00 |
| Rent | 0.00 | 0.00 | 0.00 | 0.00 | 500.00 | 0.00 |
| **Repairs** | | | | | | |
| Equipment Repairs | 75.00 | 0.00 | 0.00 | 75.00 | 0.00 | 0.00 |
| **Total Repairs** | 75.00 | 0.00 | 0.00 | 75.00 | 0.00 | 0.00 |

00001923

10:51 AM
12/13/04
Cash Basis

# El Diálogo
## Profit & Loss
### July 1 through December 13, 2004

| | Jul 04 | Aug 04 | Sep 04 | Oct 04 | Nov 04 | Dec 1 - 13, 04 |
|---|---|---|---|---|---|---|
| salary | 0.00 | 0.00 | 0.00 | 1,730.00 | 1,600.00 | 1,850.00 |
| Telephone & Fax | 0.00 | 459.63 | 358.17 | 0.00 | 202.01 | 0.00 |
| void | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 |
| Web site | 75.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 |
| **Total Expense** | 4,410.62 | 3,890.08 | 7,766.47 | 5,903.52 | 5,384.66 | 1,937.10 |
| **Net Ordinary Income** | 777.38 | 9,147.92 | 2,503.53 | 5,542.98 | 4,924.34 | -1,937.10 |
| Other Income/Expense | | | | | | |
| Other Income | | | | | | |
| Other Income | 0.00 | 0.00 | 245.18 | 0.00 | 0.00 | 0.00 |
| **Total Other Income** | 0.00 | 0.00 | 245.18 | 0.00 | 0.00 | 0.00 |
| Other Expense | | | | | | |
| Other Expense | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 |
| **Total Other Expense** | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 |
| **Net Other Income** | 0.00 | 0.00 | 245.18 | 0.00 | 0.00 | 0.00 |
| **Net Income** | 777.38 | 9,147.92 | 2,748.71 | 5,542.98 | 4,924.34 | -1,937.10 |

00001924

10:47 AM
12/13/04
Cash Basis

# El Diálogo
## Transaction Detail By Account
### July 1 through December 13, 2004

| Type | Date | Num | Name | Memo | Clr | Split | Original Amount | Paid Amount | Balance |
|---|---|---|---|---|---|---|---|---|---|
| salary | | | | | | | | | |
| Check | 01/10/2004 | 297 | Gabriela Romero | | | Peoples Bank ... | 1,000.00 | | 1,000.00 |
| Check | 06/10/2004 | 154 | Ana Morales | | | Peoples Bank ... | 730.00 | | 1,730.00 |
| Check | 02/11/2004 | 164 | Gabriela Romero | | | Peoples Bank ... | 1,000.00 | | 2,730.00 |
| Check | 17/11/2004 | 173 | Ana Morales | 11/15 edition | | Peoples Bank ... | 600.00 | | 3,330.00 |
| Check | 01/12/2004 | 174 | Gabriela Romero | | | Peoples Bank ... | 1,000.00 | | 4,330.00 |
| Check | 01/12/2004 | 175 | Ana Morales | | | Peoples Bank ... | 850.00 | | 5,180.00 |
| Total salary | | | | | | | | 5,180.00 | 5,180.00 |
| TOTAL | | | | | | | | 5,180.00 | 5,180.00 |

00001925



Income and Expense by Month
January 1 through December 13, 2004



Expense Summary
January 1 through December 13, 2004



| | | |
|---|---|---|
| ■ Printing and Reproduction | %25.59 |
| ■ salary | 17.68 |
| distribution | 8.38 |
| ■ Donation | 7.48 |
| ■ Event | 5.80 |
| ■ commission | 5.44 |
| ■ Miscellaneous | 4.56 |
| ■ Electric | 3.98 |
| ■ Telephone & Fax | 3.48 |
| ■ Dues and Subscriptions | 3.31 |
| ■ Other | 14.30 |
| Total | $29,292.45 |

By Account

# EXHIBIT 8

FJS SignedEC&NC.txt

Subject: Re: (no subject)
From: GPike <gpike@DMSAinc.com>
Date: Thu, 03 Feb 2005 15:06:30 -0500
To: Lsholyoke@aol.com

Hi Lillian.

Thank you for your summary of the situation.  Javier's status is not an all or
nothing situation, however.  If his concern is how much money he is going to lose to
taxes we can easily address that issue in a way favorable to him within this 3 month
time frame prior to the 1st performance review.  In my e-mail reply to him of
yesterday I encouraged him to call me to discuss his issues.  I would appreciate it
if you would reiterate that encouragement to him.  We have the mechanisms to protect
his pocketbook without diluting our defenses.  Best.GP.

Lsholyoke@aol.com wrote:

> Hi Gerry:
>
> I believe the confusion come from the fact that none of the Dialogo LLC personnel
is an employee, and when Francisco asked me about that I said to him that all
dialogo's personnel were consultants.  Hi signed the agreement even when it said
employee thinking he was a consultant.  Especially, because we are not offering
health benefits and so.
>
> I do not believe that Dialogo LLC is in the financial position to pay employee
insurance nor taxes to MA.  I also feel that if we are given this to Francisco we
must offer it also to Ana and Gabriela.  There is more potential for Gabriela to
open a newspaper next to ours that Francisco.
>
> Gerry,  the newspaper is on an incredible moment to grow, since Francisco arrived
we had implemented many systems that are going to help us get the accounts that we
need.  I do not want to jeopardize this with semantics.  He is very clear in the
confidentiality and noncompete agreement he signed, and he is committed to help me
get this newspaper in the financial position that it should be.
>
> I do not feel this man is here to make us lose money or to go to another newspaper
and take the accounts, especially when this place is so small and people do not
forgive nor forget.  Most of the accounts he is bringing are accounts that
understand the importance of a bilingual newspaper, and they are signing with us
because of that.  They already are advertising with The Republican and some with the
Pueblo Latino, in fact many accounts are not renewing contract with Pueblo Latino
because they feel we are a better newspaper.
>
> I do not want this to become and issue and want to continue in this positive
trend.
>
> Lillian

Page 1

# EXHIBIT 9

GP Sick.txt

Subject: re. Your Phone Call Of 02/18
From: GPike <gpike@DMSAinc.com>
Date: Sun, 20 Feb 2005 17:56:05 -0500
To: "Francisco Sole" <fsole@eldialogo.com>, Lillian Santiago
<lsantiago@eldialogo.com>

Hi Javier.

I today pulled down your phone message of Friday (02/18).  Please excuse this
delayed response but this is my situation -
Beatriz and myself have been on our backs for a week, hospitalized on Wednesday and
now under an intensive and accelerated
program of antibiotics to prevent a spreading pneumonia and check a body temperature
that has at times hovered close to 103
degrees.  If I am capable of a conversation tomorrow I will ring you.  Certainly I
will make an effort to engage you by
midweek.  I am grateful for your patience.  Best.GP.

# EXHIBIT 10

February 17, 2005

Gerry Pike
DMSA, Inc.
P.O. Box H
New Foundland, PA 18445

Dear Gerry:

Since our last meeting and telephone conversation I have reconsidered my position in
Diálogo LLC. Since the beginning I have had to endure your lack of commitment to this
organization and your promised financial contributions to the business. Your inconsistent
communication on the decision making process and lack of financial support to the
venture has caused a material deteriorations, to the point where we do not have staff
support, nor are we able to continue without the business going into debt. Therefore, as
operating manager, I have no other alternative but to close the business effective
immediately.

The landlord has been made aware of the situation; he is allowing you to leave the
computer, software and other office furniture at that space until the end of the month.
You should take whatever steps are necessary to remove those items at your earliest. All
business paperwork, e.g. bank statements, check book and list of account payables will be
sent to you shortly.

If you have questions and or concerns you can address those to my attorney, Arnold
Greenhut at 413-785-1504.

Cordially,

Lillian Santiago

# EXHIBIT 11





# EXHIBIT 12



# The Commonwealth of Massachusetts
William Francis Galvin, Secretary of the Commonwealth
Corporations Division

\#: _____ 65669 _____

Mark: _____ EL DIALOGO _____

Dear Registrant:

Tm

Enclosed please find an approved copy of your Trademark or Servicemark application. This certificate of registration will be effective for a period of ten (10) years from the date stamped on the back. The registration number, which appears in the top right corner of the front of the form, should be used when requesting information, copies, or notifying this office of an address change.

Within six (6) months of the expiration of your term of registration a notification will be sent to the last address of record. Notices will not be sent to the law firm which may have filed the original application.

The appropriate symbol to indicate state registration is *"TM"* or *"SM"*. The symbol used for a federal registration is an *"R"* within a circle. This symbol **may not be used** unless you mark is registered with the Patent and Trademark Office in Washington, DC. For federal information and forms, call (703) 308-4357.

This office is not permitted to give legal advice regarding infringement of your Trademark or Servicemark. If you need information on name disputes or Trademark or Servicemark infringement, please consult an attorney.

Office of the Secretary of the Commonwealth
One Ashburton Place
Trademark Division
Boston, MA 02108

Fee: $50.00

# The Commonwealth of Massachusetts

**William Francis Galvin**
Secretary of the Commonwealth
One Ashburton Place, Boston, Massachusetts 02108-1512

## APPLICATION FOR REGISTRATION OF A TRADEMARK
### (General Laws, Chapter 110B, Section 2)

1. Name of applicant:  **Dialogo, LLC**

2. (a) Principal business address: **252 Open Square Way, Suite 54**
   **Holyoke, MA 01040**
   (b) *Business address in Massachusetts, if any: **Same**

3. State whether applicant is an individual, partnership, corporation, union or association:
   **Limited liability company**

4. If a corporation, the state of incorporation is:
   **Maine**

5. Describe mark:
   **the words "El Diálogo"**

6. Describe the specific goods in connection with which the mark is used:
   **Newspapers**

7. Class No.: **016**

8. The mark is used by displaying it:

   **X** directly to the goods                              to tags or labels affixed to the containers for the goods
   directly to the containers for the goods                to tags or labels affixed directly to the goods
   by displaying it in physical association with the goods in the sale or distribution thereof
   in other fashions (explain):

9. Date of first use of mark by applicant or predecessor. If first use of mark was in Massachusetts, use the same date in both
   (a) and (b). **July 1, 2004**

   (a) Anywhere: **July 1, 2004**

   (b) In Massachusetts:

10. If either of the above first uses was by a predecessor of the applicant, state which use or uses were by a predecessor and
    identify that predecessor:

Name of applicant:  **Gerry Pike**

Signature of applicant: _Pike_

State of: _Maine_

County of: _Cumberland_

Title:  **Managing Director**

*Note: This document must be notarized – see reverse side.*
*Fill in only if principal business address is not in Massachusetts.*

1108 cmn 12/10/03

*Gerry Pike* _____, being duly sworn, deposes and says that he is the *Managing Director* of the above named applicant, that the statements contained in the foregoing statement are true and that he verily believes that said applicant is the owner of the mark sought to be registered and that no other person has the right in the Commonwealth of Massachusetts to use such mark either in the identical form thereof, or in such near resemblance thereto, as to be likely, when applied to the goods or services of such person, to cause confusion or to cause mistake or to deceive.

SUBSCRIBED and sworn to before me this *18th* day of *April* _____, 20 *05* .

Notary Public: *Ellen R. Guptill* My commission expires: _____

ELLEN R. GUPTILL
Notary Public, Maine
My Commission Expires April 23, 2007

*Please print the name and address in the space provided below of the person to whom you wish this application to be sent.*

**CERTIFICATE OF REGISTRATION OF A TRADEMARK**

General Laws, Chapter 110B, Section 4

Filed with
William Francis Galvin,
Secretary of the Commonwealth
and Secretary's Certificate of Record issued on:

APR 21 2005

_____ , 20 ___

William Francis Galvin
Secretary of the Commonwealth
Trademark Section
One Ashburton Place, Rm. 1717
Boston, MA 02108

* Mr. Gerry Pike _____

c/o Verrill Dana, LLP    Attn: CPB _____

One Portland Square, P.O. Box 586 _____

Portland, ME 04112-0586 _____

**Complaints and Other Initiating Documents**

3:05-cv-30076-MAP Dialogo, LLC et al v. Bauza et al

---

## United States District Court

### District of Massachusetts

Notice of Electronic Filing

The following transaction was received from Brewster, Seth entered on 4/26/2005 at 10:17 AM EDT and filed on 4/26/2005

**Case Name:**         Dialogo, LLC et al v. Bauza et al
**Case Number:**      3:05-cv-30076
**Filer:**                  Dialogo, LLC
                              Direct Merchants S.A., Inc.

**Document Number:** 15

**Docket Text:**
AMENDED COMPLAINT *Second Amended Complaint and Request for Injunctive Relief* against all defendants, filed by Dialogo, LLC, Direct Merchants S.A., Inc.. (Attachments: # (1) Exhibit 1# (2) Exhibit 2# (3) Exhibit 3# (4) Exhibit 4# (5) Exhibit 5)(Brewster, Seth)

The following document(s) are associated with this transaction:

**Document description:**Main Document
**Original filename:**yes
**Electronic document Stamp:**
[STAMP dcecfStamp_ID=1029851931 [Date=4/26/2005] [FileNumber=947730-0]
[76278fa308390264854ade22c5a9d7f1f7dbbb4b5da54d0e01610a9db295b3ab3b3d
f62c833815ac78e617a3e173a1b35e9c3ecebc675e06ff4b5bf12bd39cc8]]
**Document description:**Exhibit 1
**Original filename:**yes
**Electronic document Stamp:**
[STAMP dcecfStamp_ID=1029851931 [Date=4/26/2005] [FileNumber=947730-1]
[b151f3b7c4e57b3d8a00f2ce865493ac123ecf08c69bcc6c6f81ef7241d82c8dd24f
56708109fa49a553321fc722dca90172e21f0646e87a44e631684985dda3]]
**Document description:**Exhibit 2
**Original filename:**yes
**Electronic document Stamp:**
[STAMP dcecfStamp_ID=1029851931 [Date=4/26/2005] [FileNumber=947730-2]
[222fdcf0727441f480f321d29e610101932f42777f3457f38ab0039b2b2e5eb4bd5c
6d000d60566a0e47a0e16a97288f8380697fd5a18f6efe074031a15e3396]]
**Document description:**Exhibit 3
**Original filename:**yes
**Electronic document Stamp:**
[STAMP dcecfStamp_ID=1029851931 [Date=4/26/2005] [FileNumber=947730-3]
[9371e84c66d7ac83da9207722e0571a0931ad5b0741677a90cd20ce4ff99c8c5e5fb
b0b9b50663eb9e8c6bb5f5996f72c5ee2d68550f6ec37ce3d726c2fd104]]
**Document description:**Exhibit 4
**Original filename:**yes
**Electronic document Stamp:**

[STAMP dcecfStamp_ID=1029851931 [Date=4/26/2005] [FileNumber=947730-4]
[c6218df42e06da86f38663c2b59b6aa4a2ddfc5ea6bd74e2cefc09317f65d6540cbe
5ea21b68a328bdcd1528dd0a7e1435f78fa2c3337febdf23256734c14913]]
**Document description:**Exhibit 5
**Original filename:**yes
**Electronic document Stamp:**
[STAMP dcecfStamp_ID=1029851931 [Date=4/26/2005] [FileNumber=947730-5]
[45ecaef7129bf57752c2d7b0a7b66a180a48561bf56f8fbfef539aeeeb2f9b4081e8
16af42f0be83358b0e386492727d9301313bef0aad1a11cbb103d1596662]]

**3:05-cv-30076 Notice will be electronically mailed to:**

Seth W. Brewster     sbrewster@verrilldana.com

George P. Field     gfield@verrilldana.com

Keith A. Minoff     kminoff@robinson-donovan.com, swatling@robinson-donovan.com;thines@robinson-donovan.com

Nancy Frankel Pelletier     npelletier@robinson-donovan.com, skenniston@robinson-donovan.com;wbeliveau@robinson-donovan.com

**3:05-cv-30076 Notice will not be electronically mailed to:**

# EXHIBIT 13

APPLICATION FOR REGISTRATION
OF A
FOREIGN LIMITED LIABILITY COMPANY

**FILED**

MAY 9 2005

SECRETARY OF THE COMMONWEALTH
CORPORATIONS DIVISION

FEDERAL EMPLOYER IDENTIFICATION
NO. 13-4288253

1.  Name of the foreign limited liability company

(a) In jurisdiction of organization: Dialogo LLC

(b) If different from (a) above, name under which the foreign
    limited liability company proposes to do business in
    Massachusetts:

2a. The jurisdiction under which such foreign limited liability
    company was organized in: Maine

2b. The date of organization of the foreign limited liability
    company is: October 13, 2004

3a. The general character of the business the foreign limited
    liability company proposed to do in Massachusetts:
    Advertising, marketing, public relations, promotions,
    publishing and other media and direct sales

3b. If the foreign limited liability company is to render
    professional service(s) in Massachusetts, each service to be
    rendered, the name and address of each member or manager who
    will render a service in Massachusetts are as follows:

    The foreign limited liability company will abide by and be
    subject to any conditions or limitations established by any
    regulating board, including the provisions of liability
    insurance.

    This Application for Registration is accompanied by a
    certificate from the applicable regulating board certifying
    that each member or manager who will render a professional
    service in Massachusetts is duly licensed.

4.  The business address of the foreign limited liability company is: c/o Verrill Dana, One Portland Square, P. O. Box 586, Portland, ME 04112-0586

5.  The name and business address, if different from the principal office location, of each manager, if any, is as follows:

| NAME | BUSINESS ADDRESS |
|------|------------------|
| Gerry Pike | One Enterprise Drive, Bldg. H |
|  | Newfoundland, PA 18445-0080 |
| Beatriz Mallory | One Enterprise Drive, Bldg. H |
|  | Newfoundland, PA 18445-0080 |
|  |  |
|  |  |

6.  The business address of the foreign limited liability company in Massachusetts, if any: c/o Verrill Dana, One Boston Place, Suite 2330, Boston, MA 02108

7.  The name and business address of the resident agent required to comply with 950 CMR is: C T Corporation System, 101 Federal Street, Boston, Massachusetts 02110 .

8.  If the foreign limited liability company has a specific date of dissolution, the latest date on which the limited liability company is to dissolve: _____

9.  The name of one or more persons, if desired, authorized to execute, acknowledge, deliver and record any recordable instrument purporting to affect an interest in real property, whether to be recorded in the registry of deeds or a district office of the land court: _____

This Application for Registration is accompanied by a Certificate of Legal Existence or a Certificate of Good Standing of the foreign limited liability company, issued by an officer or agency properly authorized in the jurisdiction where the foreign limited liability company is organized.

DATED _____May 6_____, _2005_

                            _Dialogo LLC_____
                               (Name of Foreign Limited
                                 Liability Company)

                            By: _____

                            _Mark K. Googins, Duly Authorized_
                                    (Print Name)


STATE OF _MAINE_____)
                               )
COUNTY OF _CUMBERLAND_____)

The foregoing instrument was acknowledged before me this_ 6th__
_____ day of _May_____, _2005_ .


                            _William W. Richardson_____
                                Notary Public

# State of Maine



# Department of the Secretary of State

*I, the Secretary of State of Maine, certify* that according to the provisions of the Constitution and Laws of the State of Maine, the Department of the Secretary of State is the legal custodian of the Great Seal of the State of Maine which is hereunto affixed and of the records of formation, amendment and cancellation of articles of organization of limited liability companies and annual reports filed by the same.

*I further certify* that DIALOGO LLC is a duly formed limited liability company under the laws of the State of Maine and that the date of formation is October 13, 2004.

*I further certify* that said limited liability company has filed annual records due to this Department, and that no action is now pending by or on behalf of the State of Maine to forfeit the articles of organization and that according to the records in the Department of the Secretary of State, said limited liability company is a legally existing limited liability company in good standing under the laws of the State of Maine at the present time.

*In testimony whereof,* I have caused the Great Seal of the State of Maine to be hereunto affixed. Given under my hand at Augusta, Maine, this sixth day of May 2005.



**MATTHEW DUNLAP**
**Secretary of State**

# EXHIBIT 14



**El Diálogo**
CLASSIFIEDS
Offering the following sections
**Real Estate**
**Job Search**
**General Sales**
www.eldialogo.com



Volume 2
Number 4

**2 EDITORIAL**
EDITORIAL

**3 NOTICIAS**
NEWS

**5 PORTADA**
COVER

**7 ORGULLO NUESTRO**
OUR PRIDE

**8 DIALOGANDO
Y COCINANDO**
COOKING AND
DIALOGUING

**9 ARTE Y
ENTRETENIMIENTO**
ARTS &
ENTERTAINMENT

**10 DIALOGO DEL
CONSUMIDOR**
CONSUMER'S
DIALOGUE

**12 SALUD**
HEALTH

**13 DEPORTES**
SPORTS

**15 CLASIFICADOS**
CLASSIFIEDS



Blanca Reyes, Ph.D.
*Holyoke Charter School Principal*



Ada Iris Rodriguez Fernández & Jacqueline Fernández
*Fernandez Restaurant*

MÉS DE LA MUJER • WOMEN'S MONTH



Reina Lorenzi,
*Administrative Assistant*
*Holyoke Charter School*





Denise Salgado,
*Director of the Teen Resource Project*







2 • El Diálogo • March 15, 2005

EDITORIAL

# Jn dia no es suficiente

El martes 8 de marzo celebramos el Dia Internacional de la Mujer. Esa tarde en el supermercado, escuché a una mujer decirle a su amiga: "Esto del dia de la mujer no tiene sentido. ¿Por qué no celebramos el dia del hombre?"

Ella me sacó de órbita, debo confesar. Claro, los compadres educados que nos respetan merecen su dia. Mi lanza va hacia la primera parte de su comentario.

Parece que no sabe que gracias a otras mujeres es que ella puede usar pantalones, obtener una licencia de conducir, y escoger a sus mandatarios mediante el voto.

Definitivamente no sabe que según informes de las Naciones Unidas, casi 25,000 novias son calcinadas cada año en India porque no presentaron suficientes ofrendas en la boda. familia del novio las inde en fuego" y después dicen que fue un accidente o se suicidaron para que el novio pueda buscar una novia con más dinero.

En Jordania, Pakistán, Líbano, Siria, Irak y otros países del Golfo Pérsico, las mujeres que han sido violadas son a veces asesinadas por sus propias familias para así mantener el honor.

La Organización Mundial de la Salud dice que alrededor de 100 millones de mujeres y niñas han sido sometidas a mutilación genital para que no puedan disfrutar placer sexual.

La violación se usa como arma de guerra en Chiapas, Méjico: Rwanda, Kuwait, Haiti, Colombia, y Yugoslavia.

Y aquí en nuestra comunidad muchas mujeres son sometidas a dificultades innecesarias gracias a algunos hombres de poca educación que las usan como sirvientas, objetos sexuales y máquinas hace-bebés. En nuestra sociedad, el 90% del tiempo la mujer hace lo que cree que tiene que hacer y sólo un 10% del tiempo, con suerte, hace lo que quiere hacer. En Puerto Rico, 1 de cada 15 mujeres es víctima de violencia doméstica.

Esta edición de El Diálogo la dedicamos a la mujer, especialmente a 6 campeonas que se han destacado por su valor a hacer lo que desean. Mujeres: seamos solidarias unas con otras. Podríamos lograr más si nos uniéramos. Y para la mujer del supermercado que piensa que el Dia de la Mujer no tiene sentido, yo le digo que tiene razón: Un dia no es suficiente para celebrar y conmemorar un ser tan especial.

Ana Morales
*Jefa de redacción*

EDITORIAL

# One day is not enough

On Tuesday, March 8, we celebrated International Women's Day. That day at the supermarket, I heard a woman say to her friend: "This women's day thing is pure nonsense. Why don't we celebrate men's day?"

She confused me, I must confess. Sure, educated *compadres* that respect us deserve their day. My lance aims to the first part of her comment.

It seems that she doesn't know that thanks to other women she can wear trousers, get a license to drive, and choose her country chief executives through her vote.

She definitively doesn't know that according to the United Nations, almost 25,000 brides are burn to death every year in India because they did not present sufficient offerings for the wedding. The groom's family sets them on fire and later they say that it was an accident or a suicide so that the fiancé can look for another bride with more money.

In Jordan, Pakistan, Lebanon, Syria, Iraq and other countries of the Persian Gulf, women who have been raped sometimes are assassinated by their own families to maintain their family's honor.

The World Health Organization says that around 100 million women and girls have been submitted to genital mutilation so they cannot enjoy sex.

Rape is used as a war weapon in Chiapas, Mexico: Rwanda, Kuwait, Haiti, Colombia, and Yugoslavia.

In Puerto Rico, 1 of every 15 women are victims of domestic violence.

And right here in our community many women are put under unnecessary difficulties thanks to some undereducated men who use them as maids, sexual objects and baby-making machines. In our society, 90% of the time women do what they think they must do and only 10% of the time, with luck, they do what they want to do.

This edition of El Diálogo is dedicated to our women, specially to 6 champions who stand out for doing what they wish.

Women: let's solidarize with each other. We could get much farther if we unite. And for the supermarket woman who thinks that Women's Day is nonsense, I say she's right: A day is not enough to celebrate and commemorate such special being.

Ana Morales
*Editor in chief*

---

# El Diálogo

**Lillian Santiago-Bauzá**
*Publisher*

**Francisco J. Sole**
*Sales Director*

**Ana Morales**
*Editor in Chief*

**Javier Arango Fdez**
*Graphic Designer*

**Contributors**
Cathleen Robinson

252 Open Square Way
Studio 404
Holyoke, MA 01040

(413) 536-5560
fax (413) 533-9467

editor@eldialogo.com
sales@eldialogo.com
art@eldialogo.com

www.ElDialogo.com



go to www.opensquare.com

# ECHO HILL
## OF HOLYOKE

- Huge 2 and 3 bedroom townhouse
- Available in canal district.
- Hardwood floors, basement, carport, and patio.
- Starting at $730.00 for 2 bedrooms

**PLEASE CALL    413-532-5057 X 204**
*Saint kolbe Drive,  Holyoke, Ma 01040*

NEWS • NOTICIAS

# Business:
# Springfield's got flava

On February 14th, Puerto Rico born Isabelle Pellot opened Latin Flava, an alcohol-free, kid friendly cafe restaurant in Springfield. There, you can find coffee, desserts, and typical Puerto Rican food. A beautiful interior mural by Springfield's own award-winning artist Awilda Oxios makes the space a cozy and welcoming place where anything from poetry to music and performance arts can happen.

Pellot made this happen on a shoe string, while also raising her children. She took a run down, abandoned shell of a space and turned it into a place where you'll want to be a regular.

**Latin Flava Cafe**
**1677 Main Street, Springfield**
**Corner of Lyman, across the**
**street from the Hippodrome.**



**En Latin Flava Cafe puedes encontrar café, postres, y comidas típicas de Puerto Rico.**
(foto: Lillian Santiago)

**At Latin Flave Cafe you will find coffee, desserts and typical Puerto Rican food.**
(Photo: Lillian Santiago)

# Negocios:
# Springfield tiene "flava"

El 14 de febrero, la puertorriqueña Isabelle Pellot abrió Latin Flava, un café-restaurante localizado en Springfield. El ambiente es libre de alcohol, donde niños son bienvenidos. Allí, puedes encontrar café, postres, y comidas típicas de Puerto Rico. Un hermoso mural ganador de premios por la artista Awilda Oxios de Springfield hace del espacio un lugar acogedor donde cualquier cosa desde poesía a música y hasta espectácu-los pueden suceder. Pellot logró su meta con un pequeño presupuesto, a la vez que criaba a sus hijos. Ella tomó un lugar abandonado y lo convirtió en un lugar donde desearás ser "de la casa".

**Latin Flava Cafe**
**1677 Main Street, Springfield**
**Esquina con Lyman, alfrente del Hippodrome.**



JOHN P. FRANGIE, M.D.

NO FLAP LASIK

1-866-SEE-NELC
www.northeastlaser.net

**NorthEast Laser Center**

LADARVision Custom Cornea with INTRALASE

ADVOCATE BEST of SPRINGFIELD READERS POLL 2003

THE ESSENTIAL COMPONENT OF BETTER VISION

ADVOCATE BEST of SPRINGFIELD 2004

**For Details Call 413-781-6352**



**Comcast**

¿A VECES NO TIENES LA SENSACION DE QUE NO HAY NADA PARA VER EN ESPAÑOL?

**Canales Selecto con HBO** sólo **$19.95**
más por mes, al suscribirte a cable básico.
**¡La instalación es GRATIS!**
Llama hoy al
**1-888-702-7012**

Comienza a disfrutar hoy de un paquete muy, pero muy bueno para los que hablamos español.
• CineLatino • CNN en Español • Discovery en Español • Fox Sports en Español • TVE Internacional • MTV en Español • Toon Disney (SAP) • The History Channel en Español
• Cine Mexicano • Casa Club TV • Supercanal Caribe • Y muchos más

● HBO ON DEMAND
Programación original, películas, series y espectáculos de la más alta calidad en la historia de la TV por cable.
Hasta 12 canales HBO con lo mejor de lo mejor y la magnífica programación de HBO Latino
• El exclusivo contenido de HBO ON DEMAND sin costo adicional. Con más de 100 horas de series como: The Sopranos, Sex & the City y mucho más.

● TV de Alta Definición disponible
Todo el realismo de la más avanzada tecnología para disfrutar del mejor entretenimiento con una imagen pura y perfecta hasta en el mínimo detalle.

● Caja digital
Con varias funciones, como guía de programación en pantalla y Bloqueo de programación para controlar lo que ven los niños.

● ON DEMAND en español gratis
Te permite empezar a ver programas del archivo de Comcast en el momento que quieras: películas, shows, deportes y lo más variado del entretenimiento. Pudiendo parar, avanzar y retroceder a voluntad. Un servicio no disponible en el sistema satelital. ¡Comcast lo tiene!

4 • El Diálogo • March 15, 2005

# Events: Citizens fight Social Security privatization

If you want to find out the latest about Social Security privatization, and how to join the fight to defeat it, on Friday, March 18, a group of citizens will celebrate a **Social Security Summit** at Great Hall, State House, Boston. The rally will feature Peter Diamond, MIT Economics Prof.; Congressman John Tierney; Activist Panel

from AARP-Massachusetts, Mass Senior Action Council, OWL-The Voice of Midlife and Older Women, and others. Event runs 9:30-11:30 am, with registration and coffee at 9 am. WMass bus - $5 for bus and lunch - leaves Springfield/Chicopee (Plantation Inn) 7 am; Palmer (Big Y Plaza) 7:20 am. For more information, contact

Linda Stone, 413-533-9235, lstone@wmeldercare.org.

**Social Security Summit
March 18, 9 -11 am, free
Great Hall, State House
Boston 413-533-9235**

**Against sweatshop labor abuse**

Folk singers and musical storytellers Charlie King and Karen Brandow team up with

storyteller Bob Ross, author of the recently published "Slaves to Fashion: poverty and abuse in the new sweatshops" to bring us "The story of the fight against sweatshop labor in history and song."

The event takes place on Saturday, March 19 at 8 pm at the new cabaret-style seating of the Pioneer Arts Center of Easthampton (P.A.C.E.: 41 Union St., Easthampton). Tickets are $12 at the door and there is a $2 discount for ordering ahead by phone or online through www.pioneer-

arts.org. Call Sonia Fried Oppenheim, 413-527-3700 or email pace@pionecrarts.org

**The story of the fight against sweatshop labor in history and song
March 19, 8 pm, $12
P.A.C.E.; 41 Union St.
Easthampton 413-527-3700**

**Sprintime egghunt!**

For those looking for lighter activities, the Holyoke Parks & Recreation treats Holyoke youngsters under the age of 12 to a Continued on page 6

# Eventos: Ciudadanos luchan contra privatización del Seguro Social

Si deseas descubrir lo último sobre la privatización del Seguro Social y cómo dar lucha para derrotarla, el viernes, 18 de marzo, un grupo de ciudadanos celebrará la **Cumbre del Seguro Social** en Great Hall, State House, Boston. La reunión tendrá como invitados a Peter Diamond, profesor de economía en MIT; Congresista John Tierney; el Panel de istas de AARP-Massachu- l el Mass Senior Action Council, OWL-The Voice of Midlife and Older Women, y otros. El evento tomará lugar de 9:30-11:30 am, con registración y café a las 9 am. Un autobús de WMass - $5 para

autobús y almuerzo - sale de Springfield / Chicopee (Plantation Inn) a las 7 am; Palmer (Big Y Plaza) a las 7:20 am. Para más información, llama a Linda Stone, 413-533-9235, o envía correo a lstone@wmeldercare.org

**Cumbre del Seguro Social
18 de marzo,
9:30-11:30 am, gratis
Great Hall, State House
Boston 413-533-9235**

**Contra el abuso en las fábricas**

Los cantantes de música folclórica americana y cuentistas Charlie King y Karen Brandow se unen con el cuentista Bob Ross, autor del recién publica-

do "Esclavos a la moda: pobreza y abuso en las nuevas fábricas" para traernos "el relato de la lucha en contra del abuso en las fábricas en historia y canción".

El evento ocurre el sábado, 19 de marzo a las 8 pm en el nuevo sitio del Pioneer Arts Center of Easthampton al estilo cabaret (41 Union St., Easthampton). Los boletos son $12 en la puerta y hay descuentos de $2 para ordenar por Internet o por teléfono. Llama a Sonia Fried Oppenheim, 413-527-3700 o envía correo a pace@pioneerarts.org

**El relato de la lucha en contra**

**del abuso en las fábricas en historia y canción
19 de marzo, 8 pm, $12
P.A.C.E.; 41 Union St.
Easthampton
413-527-3700**

**¡Cacería de huevos de pascua!**

Para aquellos que buscan actividades más livianas, el Holyoke Parks & Recreation invita a todos los niños menores de 12 años a una mañana de búsqueda de huevos, paseos en potros (si lo permite el clima), pinturas para la cara, juegos, y artes en el Holyoke Heritage State Park. Bolsitas con regalos serán distribuidas a todos los niños y premios especiales adi-

cionales serán concedidos a los cazadores de huevos de pascua que recojan los huevos especialmente marcados. El Conejito de Pascua compartirá con los niños y estará disponible para fotos. Además se ofrecerán vueltas en el carrusel por $1. Toda la diversión y festividades ocurrirán el sábado, 26 de marzo, de 9 a 11 am. Esta celebración de primavera está abierta a todos los residentes, y es gratis. ¡Llueva o nieve se prenderá la fiesta!

**Cacería de huevos de pascua
26 de marzo, 9 - 11 am, gratis
Holyoke Heritage State Park
413-322-5620**

# Education: Celebrating 25 years of women in transition programs

HOLYOKE, MA - While there has been progress over the past 25 years, women still face many barriers to higher education. Many continue to juggle work, school, and family responsibilities, often under very stressful conditions. Through New Directions (ND), HCC's program for adult women, HCC continues to assist adult women in making a successful transition to college.

On March 8th, International Women's Day, HCC commemorated 25 years of service to non-traditional students with a free open house reception and celebration.

he program included remarks by H.CC President Bill Messner and honored current and past students, including more than 20 HCC employees who began their careers at HCC through ND.

Non-traditional students at HCC have created a unique and inspiring legacy for women aspiring to higher education.

Launched in 1979 as Women in Business, the program provided support and special classes at HCC for what Anne Potter, professor of business at HCC, called, "a bunch of brave women." Renamed Women in Transition in 1984, the program expanded to allow students to choose any major at HCC.

With the addition of programs for displaced and unemployed workers (both male and female) in the 1990s, the name of the program was changed to New Directions/New Careers. Now known simply as New Directions, the program continues to support the many adult women who enroll at HCC each year.

# Educación: Celebrando 25 años de mujeres en transición

HOLYOKE, MA - Si bien es cierto que ha habido progreso durante los pasados 25 años, las mujeres todavía enfrentan muchas barreras para lograr una educación más avanzada. Muchas hacen juegos malabares para balancear trabajo, escuela, y responsabilidades de la familia, a menudo bajo condiciones muy agotadoras. Gracias a Nuevas Direcciones (ND, por sus siglas en inglés), el programa de HCC para mujeres adultas, HCC continúa asistiendo a mujeres adultas en lograr una transición acertada a la universidad.

El pasado 8 de marzo, el Día Internacional de la Mujer, HCC conmemoró 25 años de servicio a los estudiantes no tradicionales con una recepción de casa abierta y una celebración abierta al público.

El programa incluyó una intervención del Presidente Bill Messner y se rindió honor a ex-alumnos, incluyendo a más de 20 empleados de HCC que comen-

zaron sus carreras en HCC con ND.

Los estudiantes no tradicionales en HCC han creado una herencia única e inspirante para las mujeres que aspiraban a una educación avanzada. Lanzado en 1979 como Mujeres en Negocios, el programa proporcionó ayuda y clases especiales para quienes Anne Potter, profesora de negocios en HCC, llamó, "un grupo de mujeres valientes".

En 1984, el nombre del programa se cambió a Mujeres en Transición y se le permitió a las estudiantes elegir cualquier concentración académica en HCC. Con la adición de los programas para los trabajadores desplazados y desempleados (hombres y mujeres) en los años 90, el nombre del programa fue cambiado a Nuevas Direcciones/Nuevas Carreras. Ahora conocido simplemente como Nuevas Direcciones, el programa continúa apoyando a las muchas mujeres que se matriculan en HCC cada año.

COVER • PORTADA

# Champions

**Ana Morales and Lillian Santiago-Bauzá**

Thanks to the struggles of those women who fought for equality in the past, modern society is more fair today. What no one knew was that with the feminine liberation, women now have to work twice as hard.

They not only have the option of going out to work: they *have* to do it. Today more than ever, many women are both head of households and breadwinners. And when they arrive from work, another job awaits: cleaning the house and taking care of their husbands and children. The problem: men were never educated on how to deal with a "liberated woman."

Researchers of this subject theorize that the increase in domestic violence cases results from men who do not know what to do about the liberation. Something similar to what happened to the slaves who tried to free themselves their master.

Most women nowadays don't have enough control of their lives. Few can stand up and handle the consequences of their liberation.

A concerning fact is that,

little by little, the correlation between power, control and health becomes more evident. These studies suggest that, among women, the greater power and control, the greater their health.

Among risk factors, according to the Women's Health Center of Puerto Rico, are poverty, low hierarchy, psycho-physical demands, stress, lack of political power, lack of social support, and lack of resources.

But perhaps the most difficult barrier is the set of beliefs that have been drilled on women for centuries. Over 90% of the time women do what they think they must do and only 10% of the time they do what they want to do.

This edition of El Diálogo is dedicated to women, specially to 6 champions who stand out for doing what they wish. The motivation to pursue their dreams came from within. In addition, they are lucky of having pleasant experiences and networks of support; of feeling optimism and gratitude, all factors that empower and promote mental health.

**Learn more about them!**



**Blanca Reyes, Ph.D.**

**Blanca Reyes, Ph.D.**
**Age:** 51
**Enjoys:** Combining her education, experience and childhood upbringing to ensure that socially deprived students have an opportunity to discover their strengths and self-worth.

**Job:** Principal, Holyoke Community Charter School
**Skillset:** Educational leader and a behaviorist who designed a program to address behavior and life outlook issues. Developed the test LA TAZA (English and Spanish) to measure self-worth.

# Campeonas

**Ana Morales y Lillian Santiago-Bauzá**

Gracias a muchas que en el pasado lucharon, es que hoy las mujeres pueden disfrutar de equidad dentro de la sociedad. Lo que no sabíamos es que con la liberación femenina, ahora la mujer trabaja doble.

No sólo tiene la opción de salir a la calle y trabajar, sino que tiene que hacerlo. Hoy más que nunca, son muchas las mujeres que son jefas de hogar. Y cuando llega de su trabajo, le espera otro trabajo: el de limpiar la casa y atender al marido y a los hijos. Es que a los hombres nunca se les educó sobre cómo lidiar con una "mujer liberada".

Incluso, investigadores de

asuntos de la mujer teorizan que la violencia doméstica resulta de hombres que no saben qué hacer con la liberación. Algo así como lo que le pasaba a los esclavos que intentaban liberarse de su amo.

Muchas mujeres en nuestra sociedad moderna están fuera de control. Les falta poder para levantarse y manejar las consecuencias de su liberación. Lo preocupante del caso es que poco a poco la correlación entre poder, control y salud se hace más evidente. Estos estudios sugieren que en las mujeres, a mayor poder y control, mayor salud.

Entre los factores de riesgo, según el Centro Salud y Mujer de Puerto Rico, se encuentran

la pobreza, poca jerarquía, demandas sico-físicas, estrés, falta de poder político, falta de apoyo social, y falta de recursos.

La barrera más difícil es el conjunto de creencias que se le ha impuesto a la mujer. El 90% del tiempo la mujer hace lo que cree que tiene que hacer y sólo un 10% del tiempo hace lo que quiere hacer.

Esta edición de El Diálogo la dedicamos a la mujer, especialmente a 6 campeonas que se han destacado por su valor a hacer lo que desean. La motivación para lograr su sueño fue propia. Además cuentan con la suerte de tener experiencias agradables, optimismo, redes de apoyo y gratitud, factores que apoderan y promueven la salud mental.

**¡Conócelas!**

**Support network:** Family of 5 sisters, 4 brothers and a strong minded mother with a fourth grade education and great determination.
**Dreams:** Establishing a consulting business and seeing more Latinas and Latinos following their own paths to success.
**Says:** "Choose a career that motivates you to get up in the morning. If you are good at what you like, money will follow."

**Blanca Reyes, Ph.D.**
**Edad:** 51
**Disfruta:** Combinar su educación, experiencia y crianza para asegurar que los estudiantes con desventajas sociales tengan la oportunidad de descubrir sus fortalezas y autovalía.
**Trabajo:** Principal, Holyoke Community Charter School
**Destrezas:** Líder en la educación y analista de comportamiento que diseñó un programa para atender asuntos de comportamiento y proyecciones de vida.
**Red de apoyo:** Familia de 5 hermanas, 4 hermanos y una madre con fuerza mental, una educación de 4to grado y mucha determinación.
**Sueña con:** Establecer su negocio de consultoría y ver más latinas y latinos seguir su camino al éxito.
**Dice:** "Busca una carrera que te motive a levantarte en la mañana. Si eres bueno en lo que te gusta, el dinero vendrá".



**Reina Lorenzi**

**Reina Lorenzi**
**Age:** 24
**Enjoys:** Fast paced environments, dealing with different people everyday, learning about the educational system, sharing constructive criticism.
**Job:** Administrative Assistant, Holyoke Community Charter School
**Skillset:** Multi-tasker, computer literate, English and Spanish proficient, customer service and office savvy.
**Support network:** Sister stands out for setting up an interview with School Principal Dr. Reyes.
**Dreams:** Getting an executive position at current job or opening a financial services business.
**Says:** "Never give up on your dreams; they do come true. It takes time and hard work but it is possible to do everything your heart desires."

**Reina Lorenzi**
**Edad:** 24
**Disfruta:** Ambientes dinámicos de rápido cambio, lidiar con diferentes personas diariamente, aprender sobre el sistema de educación, compartir crítica constructiva.
**Trabajo:** Asistente Administrativa, Holyoke Community Charter School
**Destrezas:** Combinación y ejecución de tareas, literacia en computadoras, proficiencia en inglés y español, servicio al cliente y destrezas de oficina.
**Red de apoyo:** Se destaca su hermana por haber coordinado entrevista con la Principal Dra. Reyes para su trabajo actual.
**Sueña con:** Obtener una posición ejecutiva en el trabajo actual o abrir un negocio de servicios financieros.
**Dice:** "Nunca te rindas en

6 • **El Diálogo** • March 15, 2005

COVER • PORTADA

## Champions • Campeonas

seguir tus sueños; ellos se hacen realidad. Toma tiempo y trabajo pero es posible hacer lo que el corazón desea".



**Ada Iris Rodriguez Fdez** (Izquierda/Left)
**Jacqueline Fernández** (Derecha/Right)

**Ada Iris Rodriguez Fernández**
**Age:** 32
**Enjoys:** Working at Fernandez Restaurant in Holyoke, family's restaurant.
**Job:** Fernandez Restaurant
**Skillset:** Restaurant management experience, currently majoring in psychology at Holyoke Community College.
**Support network:** Family
**Dreams:** About finishing her degree and becoming a psychologist.
**Says:** "Concentrate on your future; get and education."

**Jacqueline Fernández**
**Age:** 28
**Enjoys:** Going to school and together with sister Ada Iris, working at Fernandez Restaurant in Holyoke, her family's restaurant.
**Job:** Fernandez Restaurant
**Skillset:** Restaurant management experience, currently working towards Medical Assistant degree at Holyoke Community College.
**Support network:** Family and son Kenny.
**Dreams:** About finishing her degree.
**Says:** "Don't fall into the stereotypes; never underestimate your potential to excel."

**Ada Iris Rodriguez Fernandez**
**Edad:** 32
**Disfruta:** Trabajar en Fernandez Restaurant, el restaurante de la familia.
**Trabajo:** Fernandez Restaurant
**Destrezas:** Experiencia en manejo de restaurantes, actualmente estudiando sicología en Holyoke Community College.
**Red de apoyo:** La familia.
**Sueña con:** Completar su bachillerato y convertirse en sicóloga.
**Dice:** "Concéntrate en tu futuro; edúcate".

**Jacqueline Fernandez**
**Edad:** 28
**Disfruta:** Trabajar en Fernandez Restaurant, el restaurante de la familia.
**Destrezas:** Experiencia en manejo de restaurantes, actualmente estudiando para convertirse en asistente clínica en Holyoke Community College.
**Red de apoyo:** La familia y su hijo Kenny.
**Sueña con:** Completar sus estudios.
**Dice:** "No seas como el estereotipo; no subestimes tu potencial para triunfar".



**Xenia Rosado-Merced**

**Xenia Margarita Rosado-Merced**
**Age:** 54
**Enjoys:** Being creative while helping others.
**Job:** Department Manager, Holyoke Medical Center
**Skillset:** Licensed Social Worker by profession with a Masters Degree in Education and Business Management from Cambridge College. Designed "Transcultural Health Care: Community IN-Out Reach Model," a community-based model for patient accessibility.
**Support network:** A number of people, including husband Sylvester Merced.
**Dreams:** About fishing in Florida, enjoying the warm weather and feeling sorry for all the people freezing in New England.
**Says:** "Failure is not an option."

**Xenia Margarita Rosado-Merced**
**Edad:** 54
**Disfruta:** Ser creativa mientras ayuda a los demás.
**Trabajo:** Gerente de Departamento, Holyoke Medical Center
**Destrezas:** Trabajadora social con licencia con Maestría de Cambridge College en Educación y Gerencia.
**Red de apoyo:** Mucha gente, incluyendo a su esposo Sylvester Merced.
**Sueña con:** Pescar en Florida, disfrutar el clima caliente y sentirse mal por toda la gente que se congela del frío en Nueva Inglaterra.
**Dice:** "El fracaso no es una opción".

**Says:** "Hold on to your dreams, work hard...eventually you would get there."

**Denise Salgado**
**Edad:** 29
**Disfruta:** Ayudar a desarrollar poder a la comunidad y hacer cambios en la vida de los jóvenes.
**Trabajo:** Directora, Teen Resource Project.
**Destrezas:** Organizadora comunitaria profesional y especialista en desarrollo de la juventud.
**Red de apoyo:** Su familia de 4. Su madre Maria Berrios es su fuente de orgullo.
**Sueña con:** Convertirse en directora ejecutiva de una organización sin fines de lucro.
**Dice:** "Mantén tus sueños, trabaja duro...eventualmente lo lograrás".

**Denise Salgado**

**Denise Salgado**
**Age:** 29
**Enjoys:** Empowering the community and making a change on youth lives.
**Job:** Director, Teen Resource Project.
**Skillset:** Professional community organizer and youth development specialist.
**Support network:** Family of 4. Mother Maria Berrios is her source of pride.
**Dreams:** Becoming executive director of a non-for-profit organization.

## Events: Citizens

*From page 4*
morning of egg hunts, live pony rides (weather permitting), face painting, games, and crafts at the Holyoke Heritage State Park. Gift bags will be distributed to all of the children and extra special prizes will be awarded to egg hunters who collect the specially marked eggs. The Easter Bunny will be mingling with children and will be available for photos. An added treat for the family will be a spin on the Merry-Go-Round for $1. All the fun and festivities will take place on Saturday, March 26th, from 9 am to 11 am. This Spring celebration is open to all residents, at no charge. Rain or snow the party is on!

**Sprintime Egghunt**
March 26, 9 - 11 am, free
Holyoke Heritage State Park Complex 413-322-5620



**El Diálogo**
CLASSIFIEDS

Offering the following new sections:
**Real Estate, Job Search and General Sales**
Call now to place your ad 413.536.5560

# Police officer inspires youth to excell

**Gustavo Acosta**

This may sound very familiar: Do good for someone and that person will do the same for someone else. That is the motivation for Edwin Sustache, a Wesfield-born and Holyoke-raised Puerto Rican who coaches the Trailblazers, a basketball team for at-risk youth from Holyoke and Springfield.

With his parents from Humacao, Puerto Rico, "Piraña," as his friends call him, grew up in the Churchill neighborhood, and as many other young men growing up poor with no job opportunities, he says he "got in the very same kinds of trouble our kids get in today." Edwin has been volunteering as a coach for 15 years and every time he makes a connection with a young man from the neighborhood he remembers that sports saved him from trouble.

His goal with coaching basketball teams is "to get kids off the street and steer them to college."

And that's exactly what Edwin did. He is a Holyoke Police Officer after graduating from Westfield State College in 1996. His path: Morgan Elementary, Peck Middle School, Holyoke High, Holyoke Community College, four years as a group-home counselor in mental health agencies, four years as Correction Officer in Connecticut, and then passing the test for police officer. His formula: pride about his heritage and "*mancha de plátano*" (plantain stain; an expression referring to all characteristics of native Puerto Ricans), as he puts it.

His philosophy: Inspire kids to do the same he does for them and his coach did for him.

Edwin reflects on his commitment to Holyoke by saying, "it's home; where my people live. I see myself in the Latino kids."



Latinos are growing fast in Holyoke, most of them are young, and for Edwin, we have to prepare ourselves with the attitude of always aiming higher. "It is a constant struggle," he says.

Support the Trailblazers (send donations to Springfield Trailblazers, 27 Hyde Street, Springfield, MA 01107. Call 413-250-5519); they are our kids. Do something good for someone else. That's Edwin's call!

# Policía motiva a jóvenes a tener éxito

**Gustavo Acosta**

Esto les parecerá conocido: Haz bien a alguien y otró hará lo mismo por alguien más. Así piensa y actúa Edwin Sustache, un puertorriqueño nacido en Wesfield de padres de Humacao, P.R. y criado en Holyoke. Ahora es el entrenador de los Traiblazers, un equipo de baloncesto para jóvenes de Holyoke y Springfield.

Piraña, como le conocen sus amigos, nos cuenta que creció en Churchill, Holyoke con las mismas limitaciones de pobreza y desempleo que enfrentan los jóvenes de hoy. Y como ellos, nos dice Edwin que se metió "en el mismo tipo de líos".

Edwin ha estado dirigiendo equipos de baloncesto como voluntario por 15

Edwin "Piraña" Sustache wants to get kids off the street and steer them to college. (Photo: Lillian Santiago)

**Edwin "Piraña" Sustache quiere mantener a los jóvenes alejados de los problemas callejeros y orientarlos hacia el colegio y la universidad. (Foto: Lillian Santiago)**

años, y cada vez que logra conectarse con un jóven del vecindario, Edwin recuerda que el deporte lo mantuvo alejado de problemas. Su meta es mantener a los jóvenes alejados de los problemas callejeros y orientarlos hacia el colegio y la universidad.

Edwin es un oficial de policía de Holyoke que se graduó de Wesfield State College en 1996. Su recorrido: la Escuela Morgan, La Peck Middle School, la Holyoke High, el Holyoke Community College, cuatro años como consejero residente en agencias de salud mental, cuatro años como guardia carcelario en Connecticut, y luego pasó la prueba para ingresar al cuerpo de policías.

Su fórmula para el éxito: orgullo de su herencia Latina y de su "mancha de plátano", nos dice. Su filosofía: Inspirar a los jóvenes a hacer por otros lo que él hace por ellos, y a la vez lo que su entrenador hizo por él. Edwin reconoce su compromiso con Holyoke cuando nos dice que "[Holyoke] es mi casa, donce vive mi gente. Yo me veo a mi mismo en los jóvenes latinos".

La comunidad latina está creciendo rápidamente en Holyoke, y la mayoría son jóvenes. Es por eso que Edwin dice que tenemos que prepararnos con la actitud de querer llegar cada vez más álto. "Es una lucha constante", dice.

Bríndale tu apoyo a los Trailblazers (envía donaciones a Springfield Trailblazers, 27 Hyde Street, Springfield, MA 01107 o llama al 413-250-5519). Ellos son nuestros muchachos. Siempre es bueno hacer algo bueno para alguien más - *right true*!

# Conference focuses on Viequense women

Celebrating International Women's Week, three woman speakers from community organizations in Vieques, Puerto Rico, spoke for the Western Massachusetts community on March 9th in the first series of the New England Demilitarization, Environmental and Economic Conference: The Case Study of Vieques, Puerto Rico. The first series were presented at El Mercado and at Mount Holyoke College.

This first conference series ("Why Viequense Women Keep on Fighting") addressed women's role in the massive social movement and civil disobedience campaign that forced the U.S. Navy to abandon on May 2003 its 60-year base in Vieques. It also addressed

women's participation in the current problems largely left behind by the U.S. Navy such as severe soil, air and water contamination which can cause a health crisis.

After having fought for their island, Viequenses are still in danger of losing their island but this time to displacement due to a boom in speculation and housing costs. Viequenses are still struggling for decontamination, return of lands and greater community control over sustainable economic development.

The Demilitarization, Environmental and Economic Conference: The Case Study of Vieques, Puerto Rico Conference consists of four
*Continued on page 8*

# Conferencia se enfoca en mujeres viequenses



**Viequense women have played an important role in the fight against the U.S. Navy in the island. In the photo, Anti-U.S. Navy protestors break through a fence and rush onto the U.S. Naval Station Camp García in Vieques.**

**Las mujeres viequenses han jugado un rol importante en la lucha contra la Marina de los E.U. en la isla. En la foto, ciudadanos en protesta rompen el cerco y entran a la Base Naval del Campamento García en Vieques, P.R. (Foto: AP) (Photo: AP)**

Celebrando la Semana Internacional de la Mujer, tres conferenciantes de organizaciones comunitarias en Vieques, Puerto Rico, hablaron a la comunidad Occidental de Massachusetts el 9 de marzo en la primera serie de la conferencia Ambiental, Económica y de Desmilitarización de Nueva Inglaterra: El Estudio del Caso de Vieques, Puerto Rico.

Esta primera serie de la conferencia "Por qué las Mujeres de Vieques Siguen Luchando" discutió el papel de las mujeres en el movimiento social masivo y la campaña de desobediencia civil que forzó a la Marina de guerra de E.U. a abandonar en mayo de 2003 su base en Vieques.

También discutió la participación de las mujeres en los problemas actuales dejados detrás por la Marina de guerra de E.U., tales como contaminación severa del suelo, del aire y del agua.

8 • El Diálogo • March 15, 2005

DIALOGANDO Y COCINANDO • COOKING AND DIALOGUING

# Sunrise Avocado Quiche

(HPRW) - Avocados offer the perfect ingredient to add extra flavor to your day. With this in mind, the Hass Avocado Board has developed the Sunrise Avocado Quiche, which can easily and conveniently be cooking in the oven while the kids are outside hunting for Easter eggs.

The Sunrise Avocado Quiche features the creamy texture of avocados melded with eggs, potatoes and onions, perfectly baked to create a dish of avocado-delight.

**Sunrise Avocado Quiche**
**6-8 servings**

**Ingredients**
2 tablespoon butter
1 large potato, peeled, cut in small chunks
1 large shallot, finely chopped
6 large eggs
1 teaspoon salt
1/2 teaspoon white pepper
1 teaspoon dried oregano

1 cup grated Cheddar-Jack cheese
2 ripe Hass avocados, peeled, seeded, cubed



**Preparation**
Preheat oven to 325 degrees, and generously coat a 9-inch round ceramic or glass baking dish with cooking spray.

Over medium heat, melt butter in medium skillet. Cook potato chunks, stirring frequently, for about 3 minutes. Add chopped shallot to pan and continue to cook mixture for another 2 min-

utes. Remove from heat. In large bowl, whisk eggs with seasonings and cheese. Gently stir in cooked potato mixture

The Sunrise Hass Avocado Quiche is a delicious way to start the day. (Photo: HPRW)

El Quiche Amanecero de Aguacate es perfecto para la Pascua y otras celebraciones de primavera. (foto: HPRW)

shallot, and avocado cubes. Transfer mixture to prepared baking dish.

Bake for 35 minutes, until firm and lightly browned on top and edges. Let cool for at least 5 minutes before slicing into wedges to serve.

**More avocado recipes:**
www.avocadocentral.com

# Quiche de aguacate

(HPRW) - Los aguacates ofrecen el ingrediente perfecto para darle sabor adicional a tu día. Teniendo esto en cuenta, el Consejo de Aguacates Hass (Hass Avocado Board) ha creado el Quiche Amanecero de Aguacate, que convenientemente se puede cocinar en el horno mientras los niños están afuera buscando huevos de Pascua.

El Quiche Amanecaro de Aguacate ofrece la textura cremosa de los aguacates, combinada con huevos, papas y cebollas, horneados perfectamente para crear un plato con aguacates que deleita.

**Quiche Amanecero de Aguacate**
**6 a 8 porciones**

**Ingredientes**
2 cucharadas de mantequilla
1 papa grande, pelada y cortada en trozos pequeños
1 cebolla finamente picada
6 huevos grandes
1 cucharadas de sal
1/2 cucharada de pimienta blanca
1 cucharada de orégano seco
1 taza de queso Cheddar-Jack

rallado
2 aguacates maduros, sin semilla y cortados en cubitos

**Preparación**
Calienta el horno a 325 grados y cubre con aerosol para cocinar una fuente redonda de cerámica o de vidrio para hornear de 9 pulgadas de diámetro.

A fuego medio, derrite la mantequilla en una sartén mediana. Coce los pedazos de papa, revolviéndolos frecuentemente, durante aproximadamente 3 minutos. Añade la cebolla cortada en pedazos a la sartén y continúa cocinando la mezcla 2 minutos adicionales. Retírala del fuego. En una vasija grande, bate los huevos con los condimentos y el queso. Mézclalos suavemente con la papa cocida con la cebolla y los cubos de aguacate. Pasa la mezcla a la fuente preparada.

Pónla al horno 35 minutos, hasta que esté firme y ligeramente dorado encima y en los bordes. Déjalo enfriar por lo menos 5 minutos antes de cortarlo en triángulos para servir.

**Más recetas con aguacate:**
www.avocadocentral.com

# Conference

From page 7

series that will take place in colleges and local communities mainly throughout Connecticut, Massachusetts and New York. Each series addresses the role of one

social group in the past and present struggle in Vieques.

The conference series is sponsored by the Voz Latina Media Project, the Committee for the Rescue and Development of Vieques and the Vieques Women's Alliance.



These Marine Corps amphibious vehicles rolled onto the beach on Vieques as part of training that moved to Eglin Air Force Base, Florida. (Photo: AP)

Estos vehículos anfibios de los Marine Corps entraron a las playas de Vieques como parte de un entrenamiento que ahora se hace en el Eglin Air Force Base, Florida. (Foto: AP)

## El Horóscopo de Doña Ana (Source: AP)

**ARIES**
Share some of your more creative ideas with someone who can take them one step further, in a practical way.

**ARIES**
Comparte tus ideas más creativas con alguien que pueda llevarlas un paso adelante, de manera práctica.

**TAURUS**
All you want this week is peace and quiet, but it seems like everyone needs to speak or be with you. Find time to sneak off on your own.

**TAURO**
Lo único que quieres esta semana es paz y silencio, pero parece que todos quieren estar contigo. Busca la oportunidad para escabullirte.

**GEMINI**
This time you may find it eas-

ier to sort out old misunderstandings. Don't take any risks with your money right now; you may regret it.

**GEMINIS**
Ahora será más fácil resolver malentendidos. No tomes riesgos con tu dinero ahora; te arrepentirás.

**CANCER**
With your delightful charm you may get just what you need.

**CANCER**
Con tu agradable carisma, obtendrás lo que necesitas.

**LEO**
Even though you try your best to please everyone, you won't he very successful. Maybe you should try to please yourself.

**LEO**
Aunque trates de complacer a todos, no tendrás éxito. Qui-

zás debas intentar complacerte a ti mismo.

**VIRGO**
The people you care about are very receptive to your ideas right now. That's the kind of support you really need.

**VIRGO**
La gente que te importa están receptivas a tus ideas ahora mismo. Ese es el tipo de apoyo que realmente necesitas.

**LIBRA**
Once harmony is restored, turn your attentions to making plans with a few good friends.

**LIBRA**
Cuando la armonía regrese, enfoca tus atenciones a hacer planes con unos cuantos amigos.

**SCORPIO**
Hopefully something that has been bothering you for the last

several months is now gone for good.

**ESCORPIO**
Con suerte eso que te ha estado molestando por los pasados meses desaparece para siempre.

**SAGITTARIUS**
A friend of yours has a serious problem and is relying on your help to come up with a solution, so think fast.

**SAGITARIO**
Un amigo tiene un problema serio y depende de tu ayuda para una solución, así que piensa rápido.

**CAPRICORN**
It's time to take a serious look at the romance in your life - and ask yourself if your expectations are realistic.

**CAPRICORNIO**
Es hora de que des un vistazo muy serio al romance en tu

vida - y que te preguntes si tus espectativas son reales.

**AQUARIUS**
Your strong ego may get you in hot water with a mate, and those old feelings of whether you've made the right choice or not are going to surface again.

**ACUARIO**
Tu fuerte ego te llevará a aguas calientes con tu pareja, y esos viejos sentimientos sobre si hiciste una buena elección saldrán otra vez.

**PISCES**
If you feel that your friends have been difficult to deal with lately, perhaps you should take a good look at yourself.

**PISCIS**
Si sientes que tus amigos son más difíciles de un tiempo para aca, quizás debas mirarte a ti mismo.

ARTE Y ENTRETENIMIENTO • ARTS & ENTERTAINMENT                    March 15, 2005 • **El Diálogo** • 9

# El Diálogo
## PICKS



**George Lopez.** The hit family comedy *con mucho pique* starring popular standup comedian George Lopez, Tuesdays (8:30-9:00 pm, ABC) presents a guy who has made lemonade from lemons at every turn.

**George Lopez.** Este éxito de comedia familiar con mucho pique protagonizado por el popular comediante George Lopez sigue dando de qué hablar. Todos los martes (8:30-9 pm, ABC) vemos como George hace limonada de los limones que le caen del cielo.

With www.casasnuevasaqui.com you will find new homes for sale, house blueprints and contractors throughout the U.S. You will also learn from how to protect your investment to how to choose the right color for your home.

En www.casasnuevasaqui.com encontrarás casas nuevas a la venta, planos de casas y constructores de viviendas a través de todos los E.U. Además aprenderás desde cómo proteger tu inversión hasta cómo elegir el color apropiado para tu hogar.



**Lola's Rebirth.** After fawning over former fiancé Ben Affleck on 2002's "This is Me...Then," Jennifer Lopez wisely keeps her love life out of the spotlight on her aptly titled fourth disc, "Rebirth."

**Renacimiento de Lola.** Después de mostrar su locura por su ex-prometido Ben Affleck en "This is Me...Then" (2002), Jennifer Lopez mantiene su vida amorosa fuera de las cámaras en el bien titulado 4to CD, "Rebirth" (Renacimiento).

**The Da Vinci Code.** A word-of-mouth sensation from the moment it came out, the controversial book remains high on best-seller lists even as it begins its third year since publication.

**El Código de Da Vinci.** Desde su publicación, este libro pasó de boca en boca hasta convertirse en una sensación. Hoy sigue en las listas de best seller y ya va para su tercer año desde su lanzamiento.



**Rum and Coke.** A romantic comedy that takes place in the Cuban community in New York, this film is a wry look at a businesswoman's struggle to avoid falling in love. It also examines her juggling act between Cuban and American cultures. Available on video.

**Rum and Coke.** Una comedia romántica que toma lugar en la comunidad cubana de Nueva York, este filme es una mirada cínica a la lucha de una mujer de negocios para evitar enamorarse. También examina su acto de malabarismo con su cultura cubana y americana. En video.



# New WORLD Theater
**Spring 2005 / UMass Amherst**



**A Song Cycle of Lives in Transit:**
**Vijay Iyer/Mike Ladd**
**March 24, 2005**
**8 pm , FAC Concert Hall**
**Co-presented with Magic Triangle Series**

A new age, spoken word, hip hop jazz fusion performance depicting the interior monologues of various travelers and laborers of color confronting the hyper-globalized setting of an international airport. *In What Language?* was created in response to an international incident involving Iranian filmmaker Jafar Panahi, who was shackled to a bench, detained for 10 hours during a routine layover at New York's JFK Airport and later deported to Hong Kong in handcuffs.

## Project 2050 Showcase & Fundraiser*
A dazzling showcase by our Project 2050 youth, addressing environmental injustice and global and personal survival.
**April 7, 2005 - 7 pm, Bowker Auditorium**
*Note new time. Call NWT for details about our special fundraiser event!

TICKETS ARE: $ 15-general public; $ 8-seniors/low income patrons; $5-students. Call the FAC Box Office 545-2511. For info about the shows, call NWT at 413.545.1972


www.newworldtheater.org



*THE FUSION OF TWO CULTURES*
*In a unique event...*
**El Diálogo & Advocate**
present
## ISLANDS TOGETHER
**IRISH & SALSA**
Live music & more...
March 17 • 6:30 PM
Open Square Cafe



Donation: $5

## Combo Sabroso is here to stay

Combo sabroso ("tasty combo"), the band that plays the salsa part of El Diálogo's Irish and Salsa event this Thursday, March 17, has played to packed houses and nearly at every festival, club, fundraiser and good friend's wedding.

Combo Sabroso is soul cleaning, Latin dance music. Their repertoire includes compositions that range in style from cha cha to danzon, from bolero to salsa, from Latin jazz to plena.

The band features 5 members: From Costa Rica, Manolo Miarena, from Venezuela, Omar Ledezema, and from Ecuador, bassist and singer Alex Alvear. On horns, Combo Sabroso presents trombonist Russell Jewell and saxophonist Matt Langley.



## Combo Sabroso llegó para quedarse

Este jueves, 17 de marzo, no se pierdan el sonido indiscutible de la banda más pegada de Nueva Inglaterra: Combo Sabroso. La agrupación ganadora de premios tendrá a su cargo la parte salsera del evento Irish and Salsa, auspiciado por El Diálogo y el Valley Advocate.

El líder del grupo, Matt Jenson, dice que Combo Sabroso goza de influencias de Eddie Palmieri. De hecho, Jenson estudió con Palmieri y es amigo del Maestro!

Su fórmula: sólidas descargas y mucha energía para que bailes hasta el amanecer. Su repertorio incluye cha cha, danzón, bolero, salsa, jazz latino, y plena. No te lo pierdas. Porque Combo Sabroso...¡llegó para quedarse!

**Combo Sabroso at / en**
**ISLANDS TOGETHER, Irish & Salsa**
**17 de marzo, 8 pm**
**March 17, 8 pm**
**252 Open Square, Holyoke**
**mj@acidreggae.com**
**781-316-2487**

10 • **El Diálogo** • March 15, 2005                    DIALOGO DEL CONSUMIDOR • CONSUMER'S DIALOGUE

# Cheap at-home genetic testing opens deep Pandora's box



La Dra. Katherine Rauen, director médico de DNA Direct; Elissa Levin, director clínico; y la directora de desarrollo de producto, Jennifer Graham, a la izquierda, hablan en la oficina de DNA Direct en San Francisco. DNA Direct, una compañía recién lanzada en San Francisco, comenzará a ofrecer directamente a los consumidores una prueba polémica que puede predecir la susceptibilidad de una mujer al cáncer del seno. (Foto: AP)

DNA Direct medical director Dr. Katherine Rauen; clinical director Elissa Levin; and director of product development Jennifer Graham, from left, speak at the office of DNA Direct in San Francisco. DNA Direct, a San Francisco startup, will begin offering direct to consumers a controversial test that can predict a woman's susceptibility to breast cancer. (Photo: AP)

SAN FRANCISCO, CA (AP) - Commercials hawking prescription drugs directly to consumers have driven doctors crazy for years. Now comes a new kind of medical marketing that is already troubling some medical professionals: at-home genetic testing.

An increasing number of online startups are marketing tests that can show predisposition to any number of maladies, from breast cancer to blood clotting. They are exploiting the blizzard of genetic discoveries reported almost daily since scientists published the complete map of all human genes five years ago.

The tests are cheap, easy to 'minister, often just a cotton lb inside the cheek, and the .esults are available online, cutting out the visit to the doctor's office.

Plus, the companies note, the test results aren't usually jotted down on official medical histories, which keeps sensitive information away from insurance companies.

"We are empowering patients with knowledge," said Ryan Phelan, who recently launched the San Francisco-based testing company DNA Direct.

The company currently offers genetic testing, a la carte with prices ranging from $199 to $380, for a predisposition to cystic fibrosis, blood clotting, iron overload and a heightened risk for lung and liver diseases. Testing positive

can help customers make lifestyle changes to prevent the onset of disease, the company says.

This week, in a small but dramatic move validating the popularity of the online approach, DNA Direct will begin offering two popular breast cancer tests created and conducted by Myriad Genetics, the most visible player in the field of "predictive medicine."

Still, as the popularity of at-home genetic tests soars, so do questions about whether they will be correctly interpreted. Skeptics fret that the online companies don't have the expertise to properly explain the often complicated results.

There are only about 2,000 genetic counselors in the United States, the majority of whom work with pregnant women.

And as the technology gets more powerful -the day when a patient's entire genetic blueprint can inexpensively fit onto a compact disk is within sight- the problem with interpreting results will only worsen.

"As often is the case, science is running ahead of public policy," said Dr. Francis Collins, the head of the National Human Genome Research Institute and leader of the government team that published the human genetic map.

# Pruebas genéticas abren la caja de Pandora

SAN FRANCISCO, CA (HPRW) – El mercadeo de medicinas directamente a los consumidores ha vuelto locos a los doctores por años. Ahora viene una nueva clase de comercialización médica que está preocupando a algunos profesionales de la salud: pruebas genéticas en casa.

Un creciente número de lanzamiento de negocios por Internet anuncian pruebas que pueden demostrar predisposición a un sinnúmero de males, desde cáncer del seno hasta desórdenes de coagulación de la sangre.

Están explotando la ola de tantos descubrimientos genéticos divulgados casi diariamente, desde que los científicos publicaron el mapa completo de todos los genes humanos hace cinco años.

Las pruebas son baratas, fáciles de administrar, a menudo apenas se necesita una esponja de algodón dentro de la mejilla, y los resultados son accesibles por Internet, atajando la visita al doctor.

Además, los resultados de las pruebas no se apuntan en historiales médicos oficiales, lo que mantiene esta información privada, fuera del alcance de las compañías de seguros.

"Estamos brindando apoderamiento a pacientes a través del conocimiento", dijo Ryan Phelan, que lanzó recientemente DNA Direct, compañía de pruebas directas basada en San Francisco.

La compañía ofrece actualmente pruebas genéticas "a la carta", con precios desde $199 hasta $380, para determinar predisposición a fibrosis quística, problemas de coagulación de la sangre, niveles elevados de hierro y a un riesgo aumentado para enfermedades del pulmón y el hígado. Un resultado positivo ayuda al cliente a realizar cambios en estilos de vida para prevenir el inicio de la enfermedad, la compañía dice.

Esta semana, en una movida pequeña pero dramática que

valida el renombre del enfoque por Internet, DNA Direct comienza a ofrecer dos pruebas para detectar cáncer del seno, las cuales han sido creadas y conducidas por Myriad Genetics, el jugador más visible del campo profético de de la medicina.

Los escépticos se preocupan porque las compañías de Internet no tienen la maestría para explicar correctamente los resultados a menudo complicados. Hay solo cerca de 2,000 consejeros genéticos en E.U., la mayoría de los cuales trabaja con mujeres embarazadas. Y como la tecnología consigue cada vez más alcance, el problema de interpretar resultados se empeorará.

"Como suele suceder, la ciencia está funcionando delante del orden público", dijo el Dr. Francis Collins, director del Instituto de Investigación del Genoma y líder del equipo del gobierno que publicó el mapa genético humano.

# Get your credit report...free!

**Q. My wife and I plan to a house in the future, we are a little worried that the credit problems that we had in the past may harm us. What we can do?**

A. Any negative informa-

tion in your credit report can hold you back from buying a house or automobile, rent an apartment, get a good job or credit card, or simply enjoying life. Therefore, you must take advantage from a

Massachusetts law that allows you to get a free credit report once a year. Verifying your problems today will protect you from unpleasant surprises at the moment when you need credit. In order to obtain your free report, contact TransUnion, Experian or Equifax. If you discover an error in the report, you have the right to dispute the information with the credit agency. As a rule, you must communicate with the agencies in writing, by certified mail.

If you have a complaint with a business that you have not been able to solve, contact M.O.C.I or Attorney General Tom Reilly to learn about your rights or to ask for mediation.

**Experian**
www.experian.com, 888-397-3742, P.O. Box 9530, Allen, TX 75013. Report fraud: 888-397-3742

**Trans Union**
www.transunion.com, 800-888-4213, P.O. Box 6790, Fullerton, CA 92634

Report fraud: 800-680-7289

**Equifax**
www.equifax.com, 800-685-1111, P.O. Box 740241, Atlanta, GA 30374
Report fraud: 800-525-6285

**Mayor's Office of Consumer Information**
413-787-6437

**Massachusetts Attorney General**, 413-784-1240
www.ago.state.ma.us

*Artículo en Español en la  pagina 12*



WE TREAT ADULTS AND CHILDREN. WE CAN TREAT YOU OR
YOUR CHILDREN TODAY FOR URGENT, NON-EMERGENCY CARE
OR YOU CAN MAKE AN APPOINTMENT.

ATENDEMOS NIÑOS Y ADULTOS. LE PODEMOS VER A USTED
O A SU HIJO/HIJA HOY POR CUIDADOS DE EMERGENCIA, DE
NO EMERGENCIA O USTED PUEDE LLAMAR Y HACER UNA CITA.



## Holyoke and Chicopee Health Centers

LE OFRECEMOS SERVICIOS MÉDICOS SIN IMPORTAR SU CAPACIDAD DE PAGO. LLAME AL 420-2129,
PARA PEDIR INFORMACIÓN SOBRE CUIDADOS MÉDICOS Y DENTALES A BAJO COSTO O GRATIS

HOLYOKE AND CHICOPEE HEALTH CENTERS CAN TREAT YOU EVEN IF YOU CANNOT PAY. CALL 420-2129
TO LEARN ABOUT LOW COST OR FREE MEDICAL AND DENTAL CARE

Holyoke Health Center        Chicopee Health Center
230 Maple Street             203 Exchange Street
Holyoke                      Chicopee
Tlf./Phone: 420-2200         Tlf./Phone: 420-2222



OUR DENTAL OFFICE IS COMPLETELY RENOVATED
AND OFFERS SERVICES FOR CHILDREN AND ADULTS

OFRECEMOS SERVICIOS DENTALES PARA NIÑOS Y
ADULTOS, EN NUESTRA OFICINA COMPLETAMENTE
RENOVADA.

12 • El Diálogo • March 15, 2005

SALUD • HEALTH

# Overweight basketball players?

NEW YORK (AP) - It's hard to think of "fat" and "basketball player" at the same time, but by the most widely used standard nearly half the players in the NBA qualify as overweight.

Four players are even obese -most notably, Miami Heat star Shaquille O'Neal.

The analysis of 426 players by The Associated Press actually says more about the widely used body-mass index than the National Basketball Association: Just because 200 players are "overweight" doesn't necessarily mean they're too fat.

Obesity experts say the BMI really is a useful guide for identifying people who are too fat for their own good, but it shouldn't be used by itself.

"The value of the BMI for the (general) population is it's a good first step, and I underline 'first step,'" says Dr. George Bray of the Pennington Biomedical Research Inter in Baton Rouge, La.

"No one has ever suggested it's the only criterion to use, because it clearly is not."

The body-mass index doesn't directly measure fat. It comes from a formula that considers only weight and height. At 7-foot-1 and 325 pounds, O'Neal had the NBA's highest BMI, 31.6, in the AP analysis. (He admits to gaining 2 pounds since those numbers were posted.)

That puts him in the "obese" range, which is 30 and above. A BMI indicates normal weight if it falls between 18.5 and 24.9, and overweight if it's between 25 and 29.9.

Studies show that as a group, people who score "overweight" on the BMI run an elevated risk of developing such problems as diabetes and heart disease, while those in the "obese" category have even higher risks.

The AP's basketball analysis points out a key drawback of the BMI: People who are lean but well-muscled, like most basketball players, can have the same elevated BMI as somebody who carries too much fat.



Fat or in shape? NBA player Shaquille O'Neal qualifies as overweight according to body mass index (BMI) standards. (Photo/Foto: AP)

¿Gordito o en forma? El jugador de la NBA Shaquille O'Neal califica como persona en sobrepeso de acuerdo a los estándares del famoso índice cuerpo-masa.

# ¿Baloncelistas en sobrepeso?

NEW YORK (AP) - Es duro pensar en "gordo" y "jugador de baloncesto" al mismo tiempo, pero por el estándar más usado, casi más de la mitad de los jugadores en la NBA califican como personas en sobrepeso.

El análisis de 426 jugadores por la Prensa Asociada dice más sobre el extensamente

Cuatro jugadores son incluso obesos - más notablemente, la estrella Shaquille O'Neal de los Heat de Miami.

usado índice de cuerpo-masa (BMI, por sus siglas en ingles) que de la Asociación Nacional del Baloncesto: Apenas porque 200 jugadores están en sobrepeso no significa necesariamente que están demasiado gordos.

Los expertos de la obesidad dicen que el BMI realmente es una guía útil para identificar a la gente que es demasiado gorda para su propio bien, pero no debe ser utilizado por sí mismo.

"El valor del BMI para la población general es un buen primer paso, y subrayo el 'primer paso,'" dice el Dr. George Bray del Centro de Investigación Biomédico de Pennington en Baton Rouge, La.

"Nadie ha sugerido que es el único criterio a utilizar, porque claramente no lo es".

El índice de cuerpo-masa no mide directamente la grasa. Viene de una fórmula que considera solamente el peso y la altura.

Con 7 pies y 325 libras. O'Neal tenía el BMI más alto de la NBA, 31.6, en el análisis del AP.

Eso lo pone en la "gama obesa", que es más de 30. Un BMI indica peso normal si cae entre 18.5 y 24.9, e indica exceso de peso si está entre 25 y 29.9.

Los estudios demuestran
Continúa en la página 13

---

DIALOGO DEL CONSUMIDOR

## Consigue tu historial de crédito... ¡gratis!

P. Mi esposa y yo planificamos comprar una casa en el futuro, pero estamos un poco preocupados que los problemas de crédito que hemos tenido en el pasado nos perjudiquen. ¿Qué podemos hacer?

R. Cualquier información negativa en tu historial de crédito puede prevenir que puedas comprar una casa o automóvil, rentar un apartamento, obtener un buen empleo o tarjeta de crédito, o simplemente disfrutar de la vida. Por eso, debes tomar ventaja de una ley de Massachusetts que te da derecho a una copia gratis de tu reporte de crédito una vez al año. Verificando tus problemas hoy te protegerte de sorpresas desagradables al momento que necesites crédito. Para obtener tu reporte gratis, comunícate con TransUnion, Experian o Equifax. Si descubres un error

en el reporte, tienes derecho a disputar la información que la compañía que suministró a la agencia de crédito con la agencia de crédito directamente. Por regla general, debes comunicarte con las agencias por escrito, por carta certificada.

Si tienes una querella con un negocio que no has podido resolver, comunícate con la oficina de M.O.C.I. o el Abogado Procurador Tom Reilly para aprender sobre tus derechos o para solicitar mediación.

EXPERIAN
www.experian.com, 888-397-3742, P.O. Box 9530, Allen, TX 75013. Reporta fraude: 888-397-3742

TRANS UNION
www.transunion.com
800-888-4213, P.O. Box 6790 Fullerton, CA 9263. Reporta fraude: 800-680-7289

# BMC HealthNet Plan.

HealthNet Plan
1-800-792-4355
www.bmchp.org

EQUIFAX
www.equifax.com, 800-685-1111, P.O. Box 740241, Atlanta, GA 30374. Reporta fraude: 800-525-6285

OFICINA DE INFORMACIÓN AL CONSUMIDOR
413-787-6437 (se habla español)

ABOGADO PROCURADOR DE MASSACHUSETTS
413-784-1240
www.ago.state.ma.us

**SPORTS • DEPORTES**

# Local baseball team seeks host families

# Equipo local busca anfitriones

The New England Collegiate Baseball League will be celebrating a 42 game schedule from June through early August of this year. Teams composed of premier college players from across the country, including the Holyoke Giants, will compete in this event.

The Holyoke Giants baseball organization is currently seeking host families for the summer of 2005. Host families will be responsible for housing one or more players from the beginning of June though the end of the season in the tradition of the Cape Cod summer baseball league.

The NECBL was founded in 1994 by George Foster & former MLB commissioner Fay Vincent, and has grown into a twelve member league with franchises located from Keene, NH to Newport, RI.

More information: www.holyokegiants.com



The Holyoke Giants baseball organization is currently seeking host families for the summer of 2005.

**La Organización de Béisbol de los Gigantes de Holyoke (arriba) está buscando familias anfitrionas para el verano de 2005.**

La Liga de Béisbol Colegial de Nueva Inglaterra celebrará un torneo de 42 juegos a partir de junio hasta agosto. Los equipos están integrados por jugadores universitarios de primera categoría de todo el país, incluyendo los Gigantes de Holyoke, que competirán en este acontecimiento.

La Organización de Béisbol de los Gigantes de Holyoke está buscando familias anfitrionas para el verano de 2005.

Las familias anfitrionas serán responsables de alojar a uno o más jugadores desde principios de junio hasta el final del verano, según la tradición de la Liga de Cape Cod.

La Liga de Béisbol Colegial de Nueva Inglaterra fue fundada en 1994 por George Foster y el comisionado de las grandes ligas Fay Vincent, y se ha convertido en una liga de 12 miembros con franquicias en Keene, NH y Newport, RI.

Más información: www.holyokegiants.com



**Laura Serrano**
Lawyer & Boxer • Boxeadora y Abogado

**Sofia Mulanovich**
ASP World Champion • Campeona del Mundo

**Nadia Comaneci**
Olympic Champion • Campeona Olímpica

# Breaking stereotypes • Rompiendo estereotipos

In this edition we commemorate women who stand out in sports.

Mexican born **Laura Serrano** put the spotlight on women's boxing in 1998 when Mexico City officials upheld a 52-year-old ban on female fights. A lawyer who set aside that career to box, Serrano is battling the city regulation. (Photo: AP)

**Sofia Mulanovich** made history in November 2004 when she became the first Peruvian surfer -woman or man- to ever win a World Title and an Association of Surfing Professionals (ASP) World Championship. (Photo: AP)

At age 14, Romanian gymnast **Nadia Comaneci** was the first to get a perfect 10 in the 1976 Olympic Games. (Photo: AP)

En esta edición conmemoramos a las mujeres que se han destacado en el deporte.

La mejicana **Laura Serrano** llamó toda la atención al boxeo femenino en 1998 cuando las autoridades de Ciudad Méjico mantuvieron la prohibición de 52 años de duración contra los combates de boxeo entre mujeres. Como abogada que dejó su carrera para boxear, Serrano lucha en contra de la ciudad para eliminar la regulación. (Foto: AP)

**Sofia Mulanovich** hizo historia en noviembre de 2004 cuando se convirtió en la primera "surfer" peruana –entre mujeres o hombres– que ganó un Título Mundial y el Campeonato de la Asociación de Profesionales del Surfing. (Foto: AP)

A los 14 años, **Nadia Comaneci**, de Rumania, fue la primera en obtener un perfecto 10 en los juegos olímpicos de 1976. (Foto: AP)

## ¿Sobrepeso?

From page 12
que como grupo, la gente que califica como "gorda" en el BMI n un riesgo elevado de rollar problemas tales como diabetes y enfermedades cardíacas, mientras que ésos en la categoría obesa tienen incluso riesgos más altos.

El análisis del AP precisa una desventaja dominante del BMI: La gente que es delgada pero bien musculosa, como la mayoría de los jugadores de baloncesto, puede tener el mismo BMI elevado que alguien que tiene demasiada grasa.

14 • **El Diálogo** • March 15, 2005

PUBLIC SERVICE ANNOUNCEMENT

## Help Thea Som

The following message has been submitted by Julie Lichtenberg on behalf of Thea Som, a Cambodian refugee whose parents crossed the Thai border after fleeing the Khmer Rouge killings in Cambodia. He was still inside his mother's womb when this family left and thus Thea Som has never set foot in Cambodia. Lichtenberg is the Artistic Director of Performance Project, an organization that combines the talents of professional artists, men and women in jail, and those who have been released from jail to create and perform original movement and theater works.

Greetings Friends,

Performance Project "outside" Company member, Thea Som, a 24-year-old Cambodian refugee whose family lives in Amherst, was taken by Immigration last Friday. He was placed in the INS facility in Hartford.

It is thought that, because of his incarceration, and because of 9/11, he is at high risk for deportation. During recent days, Thea Som worked on his application essay for Hampshire College.

Michael Boyle, the lawyer who has helped Thea with INS last time (203-239-2299), Mahsa Khanbabai, (civil rights and immigration Law) have been contacted for help.

The advice I have been getting is that Thea's best chance is if someone like Congressmen Olver, Kerry, or Kennedy get involved on his behalf.

Can anyone help with this?

**Julie Lichtenberg**
**Artistic Director**
**Performance Project**
**413-586-4960**
**Cell 413-374-4938**

SERVICIO PÚBLICO

## Ayudemos a Thea Som

El siguiente mensaje ha sido sometido por Julie Lichtenberg a nombre de Thea Som, un refugiado camboano cuyos padres cruzaron la frontera tailandesa después de huir las matanzas del Khmer Rouge en Camboya. El todavía estaba dentro del vientre de su madre cuando su familia huyó el régimen. Thea Som nunca ha pisado tierra en Camboya. Lichtenberg es la Directora Artística del Performance Project, una organización que combina los talentos de artistas, hombres y mujeres profesionales en cárcel, y los que han salido de la cárcel para crear y presentar obras de movimiento y teatro originales.

Saludos Amigos,

El viernes pasado Inmigración tomó al miembro "externo" de Performance Project, Thea Som, refugiado camboyano de 24 años de edad cuya familia vive en Amherst. Ha sido colocado en la facilidad del INS en Hartford.

Se piensa que, debido a su previo encarcelamiento, y debido a 9/11, él está en alto riesgo para deportación. Durante días recientes, Thea Som trabajó en su ensayo de admisión para la Universidad de Hampshire.

Me he comunicado con Michael Boyle, el abogado que ayudó a Thea con el INS la última vez (203-239-2299), y con Mahsa Khanbabai, (derechos civiles y ley de inmigración) para buscar ayuda. El consejo que he recibido es que lo que más puede ayudar a Thea es si alguno de los miembros del Congreso como Olver, Kerry, o Kennedy se involucran a su favor. ¿Puede alguien ayudar con esto?

**Julie Lichtenberg**
**Directora Artística**
**Performance Project**
**413-586-4960**
**Cell 413-374-4938**

## El Diálogo
### CLASSIFIEDS

El Diálogo is pleased to announce that as of March 2005 we will offer a

# CLASSIFIEDS PAGE
offering the following sections:
## Real Estate • Job Search • General Sales

Please call **413.536.5560** or email us at **classified@eldialogo.com** for information and rates

www.eldialogo.com

### *Where to find* **El Diálogo**
### *Donde encontrar* **El Diálogo**

**NORTHAMPTON**
Sylvester's 111 Pleasant St.- Northampton Chamber of Commerce 99 Pleasant St .- International Language Institute, 17 New South St. - Campus Center, Smith College 4100 Elm St. - Forbes Library West St

**SOUTH HADLEY**
South Hadley Library Bardwell St. - Thirsty Mind Village Commons Shops Tailgate PicnicVillage Commons Shops - Odyssey Books 29 College St.- Willits Hallowell Center - Mt. Holyoke Campus

**AMHERST**
Amherst College College St.- Black Sheep Deli 79 Main St.- Bueno y Sano 1 Boltwood Walk - Albion Book 8 Main St. - Jones Library 43 Amity St. - La Veracruzana 63 South Pleasant St. - Video To Go 6-10 University Dr. - UMASS Whitmore Center Umass Campus - UMASS Student Union - Hampshire College Admin. West St. (Route 116) - Hampshire College Library West St. (Route 116)

**EASTHAMPTON**
Riverside Industries 1 Cottage St. - Coffee Roasters 47 Union St. - Arts & Industry Bldg. 221 Pine St.

**FLORENCE**
Cooper's Corner 31 Main St. - Casa Latina 140 Pine St.

**GREENFIELD**
CVS 137 Federal St. - Foster's Supermarket Allen & Conway Sts. - Greenfield Community College Colrain Rd.

**SPRINGFIELD**
Dr. Aziz 3300 Main St. - Baystate Medical Center 780 Chestnut St. - Hallway of Louis & Clark 2 Medical Center Dr. - Chestnut Middle School 355 Plainfield St. - El Priscilla Grocery. 2960 Main St. - El Mercadito Main St. - Puerto Rico Bakery, 2917 Main St. - Mexico Money Express 2766 Main St. - Carmen's Gift & Jewelry Shop 2684 Main St. - Lillians Flowers 2670 Main St. - Luigi's Christian Bookstore 2595 Main St. - A Cut Above The Rest ll 2262 Main St. - Old San Juan Bakery 2460 Main St. - New Sunshine Laundry 2460 Main St. - New North Citizens Council 2345 Main St. - Northgate Liquors 1985 Main St. - Dough Show Restaurant 1985 Main St. - Insurance Company 1691 Main St. - Kennedy Fried Chicken 1675 Main St. - Springfield City Hall 36 Court St. - Mundo Musical 1104 Main St. - Red Rose Restaurant 1074 Main St. - El Criollo Restaurant 544 Main St. - Michael Lauro Insurance 468 Main St. - McDonalds 360 Main St. - Springfield Library 220 State St. - Puerto Rico Cultural Center 38 School St. - Drug Store121 Spring St. - Lucy's Corporate Services 937 Worthington St. - M.J.'s Pizza 955 Worthington St. - Chiropractic Healthcare Center 689 - Dave's Discount Soda 1330 Carew St. - El Pilon 622 Carew St - WNEC (St. Germain Campus) 1215 Wilbraham Rd.

**HOLYOKE:**
Barnes & Noble Ingleside Plaza - Twin Food Store 625 Homestaed Ave. - Db Mart 494 Westfield Rd. - Holyoke Community College 303 Homestead Ave. - HHA--Beaudoin Village 40 Leary Dr. - Career Point 136 Queen Ave. - Tony's Grocery 801 High St. - Sam's Foods 515 High St. - Cuba Supermarket 439 High St. - Old San Juan Bakery 408 High St. - MD Beauty 396 High St. - Providence Prenatal Center 384 High St. - Tutty Market 372 High St. - 99 Cents Plus 369 High St. - Chiropractic Healthcare Center 337 High St. - Victoria Beauty 301 High St. - Holyoke City Hall High St. - La Favorita 176 Higfh St. - Fernandez Family Restaurant 161 High St. - Bodega 24H 152 High St. - Bayamon Restaurant 107 High St. - Corner's Delight 95 High St. - HHA--Lyman Terrace 5 Hamden Court - The Café at Open Square(280) Lyman St. 250 Open Square

**CLASSIFIEDS • CLASICADOS**

March 15, 2005 • **El Diálogo** • 15



BIENES RAICES

This listing information has been provided by the office of **Maria Acuña Real Estate** (413) 739-5787

## SINGLE-FAMILY

**List Price: $139,000**
**195 ARNOLD, Springfield, MA:**
Pine Pt Hstn Rd
**Rooms: 5 Bedrooms: 3**
**Baths: 2 / 0**
**Style: Detached - Ranch**
**Acres: 0.13 (6032 sq.ft.)**
**Living Area: 988**
**Year Built: 1992**
**Remarks:** Hola! Very nice vinyl sided single family home large eat-in kitchen with sliding doors to deck and yard wood and ceramic floors thru-out finished basement with kitchen area and full bath great for in-law apartment central air plus garage call-llame
**Garage: 1**
**Parking: 2**
**Tax: $1792.66**

**List Price: $149,000**
**81 METHUEN, Springfield, MA:**
N End Brightwood
**Rooms: 6**
**Bedrooms: 3**
**Baths: 1 / 0**
**Style: Detached - Cape**
**Acres: 0.03 (1363 sq.ft.)**
**Living Area: 1363**
**Year Built: 1954**
**Remarks:** Hola! Nice vinyl sided single family home large living room with picture window for extra sunshine good size kitchen 2bedrooms on first floor and two tandem rooms on second floor with beautiful wood thru-out plus two skylights back three season porch garage all ready to move in
**Garage: 1**
**Parking: 2**
**Tax: $1938.88**

**List Price: $159,000**
**74 GLENHAM, Springfield, MA**
**Rooms: 7**
**Bedrooms: 4**
**Baths: 2 / 0**
**Style: Detached - Colonial**
**Acres: 0.14 (6300 sq.ft.)**
**Living Area: 2152**
**Year Built: 1958**
**Remarks:** Hola! Nice brick colonial 7rooms 4bedrooms extra large living room with fireplace ceramic

and wood floors thru-out plus 2car garage 24 hour notice for showings
**Garage: 2**
**Parking: 2**
**Tax: $2533.27**

**List Price: $159,000**
**174 MIDDLE, Springfield, MA:**
East Springfield
**Rooms: 6**
**Bedrooms: 4**
**Baths: 2 / 0**
**Style: Detached - Ranch**
**Acres: 0.11 (5000 sq.ft.)**
**Living Area: 1046**
**Year Built: 1956**
**Remarks:** Hola! Nicely maintained bien mantenida-vinyl sided single family home 6rooms 3-4bedrooms fourth bedroom with exit to deck and great size yard with shed could be the dinning room instead large living room with picture window for extra sunshine wooden floors thru-out partially finished basement wit...
**Garage: 0**
**Parking: 2**
**Tax: $1971.16**

**List Price: $189,999**
**240 NASH, Springfield, MA**
**Rooms: 6**

**Bedrooms: 3**
**Baths: 1 / 1**
**Style: Detached - Colonial**
**Acres: 0.11 (5000 sq.ft.)**
**Living Area: 1418**
**Year Built: 1998**
**Remarks:** Hola!built 1998 nice single family home with 6rooms 3bedrooms 1 1/2 baths anderson windows and slider ceramic and wooden floors thru-out full finised basement for extra living space yard with deck and shed all located on nice private lot call-llame
**Garage: 0**
**Parking: 2**
**Tax: $2411.73**

## MULTI-FAMILY

**List Price: $169,999**
**40-42 ACORN, Springfield, MA:**
Hill mcknight
**Rooms: 5 / 5 / 5 /**
**Bedrooms: 3 / 3 / 3 /**
**Baths: 1 / 1 / 1 /**
**Type: 3 Family Units: 3**
**Acres: 0.13 (5668 sq.ft.)**
**Living Area: 3506**
**Year Built: 1913**
**Remarks:** Hola! Nice three family

with 5rooms 3bedrooms each unit some newer windows and heating systems as per owner all fenced in call for appointment-llame para una cita
**Garage: 0**
**Parking: 3**
**Tax: $1775.57**

**List Price: $179,000**
**140-42 ORCHARD, Springfield, MA:** N End Brightwood
**Rooms: 5 / 5 / 3 /**
**Bedrooms: 3 / 3 / 1 /**
**Baths: 1 / 1 / 1 /**
**Type: 2 Family Units: 2**
**Acres: 0.16 (7081 sq.ft.)**
**Living Area: 2620**
**Year Built: 1901**
**Remarks:** Hola! Well maintained-bien matenida vinyl sided two family with 5rooms 3bedrooms each unit extra 3rooms 1bedroom and bath with sliding doors in living room to private porch on third floor front and side porches great aluminum sided roof coin-op laundry for extra income too! Plus possible buildabl...
**Garage: 1**
**Parking: 4**
**Tax: $1515.4**





**Maria Acuña REAL ESTATE, LLC**

**Your Real Estate Company**

**Su compañía de bienes raices**

*Now with a Connecticut license!!*
*Ahora con licencia en Connecticut!!*

Check out our web site • Visite nuestra página de internet
**www.MariaAcunaRealEstate.com**

27 Pratt Street, Springfield, MA 01107 • 413.739.5787

16 • **El Diálogo** • March 15, 2005



# baliseautoespanol.com

**Ahora puedes comprar tu auto nuevo o usado en español y desde el lugar que más te convenga**



*Visítanos en baliseautoespanol.com, la mejor manera de comprar tu auto en tu propio idioma y desde el lugar que más te convenga.*

*baliseautoespanol.com* es la mejor manera de comprar tu auto en tu idioma y desde el lugar que más te convenga.

En *baliseautoespanol.com* puedes obtener el valor actual de tu vehículo fácilmente y sin complicaciones.

Más aún, en *baliseautoespanol.com* puedes lograr tu pre-aprobación de crédito, obtener financiamiento desde la tranquilidad de tu hogar o desde el sitio donde te encuentres. No importa si tu cédito tiene algún problema, en *Balise* estamos para ayudarte y facilitarte tu compra.

Visítanos en baliseautoespanol.com, la mejor manera de comprar tu auto en tu propio idioma y desde el lugar que más te convenga. También tenemos el más extenso inventario de vehículos de la región. Entra en baliseautoespanol.com y conseguirás el vehículo que deseas.

# EXHIBIT 15




**Secciones/Sections**

Front Page

Editorial

**Noticias** / **News**

**Educación** / **Education**

**Análisis de los candidatos vicepresidenciales**

**Arts and Entertainment**

**Eventos** / **Events**

**Bush and Kerry on the issues**

**Politics**

**Conoce tus derechos / Learn about your rights**

**Dialogando desde PR / Dialoguing from PR**

**Deportes**

**Horóscopo**

**⁻⁻ealth**

*⁻ás/More*

**Ver Archivo** / See Archives

**Quiénes somos** / **About us**

**Envíenos noticias** / **Send news tips**

**Anúnciese** / **Advertise**

**Download Media Kit**

**Contáctenos** / Contact us

Holyoke, MA - Volume 1 Number 7-

# FALTAN 15 DIAS

## Edición Especial: Elecciones presidencia



# 15 MORE DAYS

## Especial Edition: Presidential Election

**Ver Archivo**/ See Archives | **Quiénes Somos**/About Us/ | **Envíenos Noticias**/Send News
Anúnciese/Advertise | **Download Media Kit**| **Contáctenos**/Contact Us

**El Diálogo**

Copyright 2004 ©





**Secciones/Sections**

Front Page

Editorial

**Negocios** / **Business**

**Noticia de portada** /
**Cover story**

**Noticias** / **News**

**Galería de Fotos Irish and**
**Salsa** / **Irish and Salsa**
**Photo Gallery**

**Arte y Entretenimiento** /
**Arts and Entertainment**

**Conoce tus derechos** /
**Learn about your rights**

**Diálogo del Hogar** / **Home**
**Dialogue**

**Educación** / **Education**

**Dialogando desde PR** /
**Dialoguing from PR**

**Vive los momentos más**
**emocionantes de la Serie**
**Mundial** / **Relive the Red**
**Sox Victory**

**Horóscopo** / **Horoscope**

**Salud** / **Health**

**Más/More**

**Ver Archivo** / See
Archives

**Quiénes somos** / About us

**Envíenos noticias** / **Send**
**news tips**

**Anúnciese** / **Advertise**

**Download Media Kit**

**Contáctenos** /
Contact us

Holyoke, MA - Volume 1 Number 8 -

# Sr. Presidente, los votante latinos exigimos...



# Mr. President, the Latino voters demand...

**Terror a Rosselló**
**viste a Puerto Rico de**
**violeta**

**Carmen Claudio**
**recibe honores**



**Shell extiende la mano a públicos latinos**

*Shell reaches out to Latino audiences*

**Terror to Rosselló turns Puerto Rico purple**



**Irish and Salsa, donde tréboles y congas son uno**

*Irish and Salsa, where clovers and congas become one*

**Honors to Carmen Claudio**





**Revive la vi los Red Sox de Fotos**

*Relive the victory - Ph Gallery*

**Ver Archivo**/ See Archives | **Quiénes Somos**/About Us/ | **Envíenos Noticias**/**Send News**
Anúnciese/Advertise | **Download Media Kit**| **Contáctenos**/Contact Us

**El Diálogo**

Copyright 2004 ©



Holyoke, MA - Volume 1 Number 9 -



**Secciones/Sections**

Front Page
Editorial
**Noticia de portada /**
**Cover story**
**Noticias / News**
**Conoce tus derechos /**
**Learn about your rights**
**Negocios / Business**
**Arte y Entretenimiento /**
**Arts and Entertainment**
**Dialogando y Cocinando /**
**Cooking and Dialoguing**
**Deportes / Sports**
**Horóscopo / Horoscope**
**Salud / Health**
*Más/More*
**Ver Archivo / See**
**Archives**
    **iénes somos / About us**
**Envíenos noticias / Send**
**news tips**
**Anúnciese / Advertise**
**Download Media Kit**
**Contáctenos /**
**Contact us**

# ¿Por qué los latinos votaro por Bush? ¿Asuntos morales?



# *Why Latinos voted for Bush Moral issues?*

| | |
|---|---|
| **Hispanos de Nuevo Méjico inclinados** | **Arafat encarnó anhelo de palestinos** |
| **Honran bandera puertorriqueña** *Tribute to Puerto Rican flag* | **De gala el Centro Cultural** |

**hacia Bush**    *Arafat embodied Palestinian hopes*                                          **Puertorriqueño**

*New Mexico Hispanics shift to Bush*                                                            *Extravaganza at Puerto Rican Cul Center*

**Ver Archivo**/ See Archives | **Quiénes Somos**/About Us/ | **Envíenos Noticias**/**Send New** Anúnciese/Advertise | **Download Media Kit**| **Contáctenos**/Contact Us

## El Diálogo

Copyright 2004 ©

# El Diálogo



*YOUR BILINGUAL NEWSPAPER ON LINE*

Holyoke, MA - Volume 1 Number 19

## Secciones/Sections

**Front Page**

**Editorial**

**Noticia de portada /
Cover story**

**Noticias / News**

**Conoce tus derechos /
Learn about your rights**

**Negocios / Business**

**Arte y Entretenimiento /
Arts and Entertainment**

**Dialogando y Cocinando /
Cooking and Dialoguing**

**Deportes** / Sports

**Horóscopo / Horoscope**

**Salud / Health**

*Más/More*

**Ver Archivo** / See
Archives

   *¿iénes somos* / About us

**Envíenos noticias / Send
news tips**

**Anúnciese / Advertise**

**Download Media Kit**

**Contáctenos /
Contact us**

**Encantadora y sabia es
Memoria de mis Putas
Tristes**

*Clever and enchanted
Memoria de mis Putas
Tristes*

*Gabriel
García
Márquez*



# Las fiestas del invierno: M razones para celebrar



# *Winter holidays revealed: More reasons to celebrate*

**¿Comprando a última
hora? ¡Cuidado!**





*Shopping in a rush? Get your feet on the ground!*







**Ciudad maltratada: La descarga de El Diálogo**

*Abandoned city: El Diálogo takes it out*

**Disminuye tus impuestos antes de que finalice el año**

*Lower your taxes before the year ends*

**Artest dice que sanción es exc**

*Artest: Punishn too harsh*

**Ver Archivo**/ See Archives | **Quiénes Somos**/About Us/ | **Envíenos Noticias**/**Send News**
Anúnciese/Advertise | **Download Media Kit**| **Contáctenos**/Contact Us

**El Diálogo**

Copyright 2004 ©





Holyoke, MA - Volume 1 Number 10

**Secciones/Sections**

Front Page

Editorial

**Noticia de portada /
Cover story**

**Noticias / News**

**Conoce tus derechos /
Learn about your rights**

**Negocios / Business**

**Arte y Entretenimiento /
Arts and Entertainment**

**Dialogando y Cocinando /
Cooking and Dialoguing**

**Deportes** / Sports

**Horóscopo / Horoscope**

**Salud / Health**

*Más/More*

**Ver Archivo /** See
Archives

___iénes somos / About us

**Envíenos noticias / Send
news tips**

**Anúnciese / Advertise**

**Download Media Kit**

**Contáctenos /**
Contact us

*Encantadora y sabia es
Memoria de mis Putas
Tristes*

*Clever and enchanted
Memoria de mis Putas
Tristes*

*Gabriel
García
Márquez*

# Las fiestas del invierno: M razones para celebrar



# *Winter holidays revealed: More reasons to celebrate*

**¿Comprando a última
hora? ¡Cuidado!**



*Shopping in a rush? Get your feet on the ground!*







**Ciudad maltratada: La descarga de El Diálogo**

*Abandoned city: El Diálogo takes it out*

**Disminuye tus impuestos antes de que finalice el año**

*Lower your taxes before the year ends*

**Artest dice que sanción es exc**

*Artest: Punish too harsh*

**Ver Archivo**/ See Archives | **Quiénes Somos**/About Us/ | **Envíenos Noticias**/**Send News**
Anúnciese/Advertise | **Download Media Kit**| **Contáctenos**/Contact Us

**El Diálogo**

Copyright 2004 ©

# EL Diálogo .COM

**¡OUR BILINGUAL NEWSPAPER ON LINE**



¡Pronto! La música y el folklore de dos islas...Pulsa a

**1 de febrero 2005**
*February 1, 2005*

Holyoke, MA - Volume 2 Number 1 - 4:07:40 PM

**Front Page**

**Editorial**

**Noticias**
*News*

**Noticia de portada**
*Cover story*

**Dialogando desde P.R.**
*Dialoguing from P.R.*

**Dialogando y Cocinando**
*Cooking and Dialoguing*

**Diálogo del Hogar**
*Home Dialogue*

**Eventos**
*Events*

**Arte y Entretenimiento**
*Arts and Entertainment*

**Diálogo del consumidor**
*Consumer's Dialogue*

**ɔportes**
 *lorts*

*Health*

**Más**
*More*

**Ver Archivo**
*See Archives*

**Quiénes somos**
*About us*

**Envíenos noticias**
*Send news tips*

**Anúnciese**
*Advertise*

**Download Media Kit**

**Contáctenos**
*Contact us*

## Amar, cosa seria

**Alarmantes estadísticas, 10 formas para hablarle a tus hijos de sexo**



# *Loving, a serious matter*

***Alarming statistics, 10 ways you can talk about sex with your kids***



Una nueva manera de hacer negocios en Holyoke

**EVENTOS . EVENTS**

## DEPORTES . SPORTS

La Serie Mundial
Caribeña 2005,
56 años celebrando la
tradición beisbolística
caribeña

*The 2005
Caribbean World
Series,
56 years celebrating
Latino baseball
tradition*

*Celebrating a new way of doing business in Holyoke*



## El Diálogo

Copyright 2004 ©