UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

CIVIL ACTION NO. 05-30076-MAP

DIÁLOGO, LLC and      )
DIRECT MERCHANTS S.A., INC.,  )
   Plaintiffs       )
            )
v.             )
            )
LILLIAN SANTIAGO BAUZÁ,   )
EL DIÁLOGO, LLC, and     )
FRANCISCO JAVIER SOLÉ,    )
   Defendants      )
            )
LILLIAN SANTIAGO BAUZÁ,   )
EL DIÁLOGO, LLC, and     )
FRANCISCO JAVIER SOLÉ,    )
   Plaintiffs in Counterclaim  )
            )
v.             )
            )
DIÁLOGO, LLC and      )
DIRECT MERCHANTS S.A., INC.,  )
   Defendants in Counterclaim  )

## MEMORANDUM OF LAW OF DEFENDANTS, LILLIAN SANTIAGO BAUZA AND EL DIALOGO, LLC, IN OPPOSITION TO PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION

## I. INTRODUCTION

"He who seeks equity must do equity". Here, the plaintiffs, who seek equitable relief from this court in the form of a preliminary injunction, have violated this well-known maxim. They come to this Court with unclean hands. On this basis alone, their motion for a preliminary injunction must be denied in all respects.

As discussed in greater detail below, the plaintiff, DMSA, made material representations of fact which induced defendant, Lillian Santiago Bauza ("Ms. Santiago"), to enter into the Operating Agreement of Dialogo, LLC. DMSA then materially breached the Agreement by failing to make its promised $50,000 initial capital contribution to the new company and by failing to pay operating expenses. DMSA now seeks the Court's assistance to enjoin the defendant's from publishing "El Dialogo" by claiming exclusive trademark rights to that name, which DMSA does not own and was, in fact, previously established by Dialogo Bilingue, Inc., a predecessor company. The plaintiffs are not reasonably likely to succeed on their trademark claims in any event based on the doctrine of unclean hands under which this Court has broad authority to bar the plaintiffs from any recovery.

Moreover, there is no basis whatsoever for the plaintiffs' claims that Ms. Santiago breached the Operating Agreement, breached her fiduciary duties or wrongfully misappropriated trade secrets. DMSA's own misrepresentations and material breaches of the Operating Agreement excused Ms. Santiago from any further performance under the Agreement. In addition, the property which was allegedly misappropriated does not qualify as "confidential" or as "trade secrets" under Massachusetts law and, in any event, are comprised of advertiser and vendor relationships which were previously established by Dialogo Bilingue.

The balance of harms clearly weighs in favor of the defendants. In addition, a preliminary injunction which would effectively shut down "El Dialogo" in its present form and thus deprive the local Latino community of a valued and necessary service which would not be in the public interest.

Each of these arguments is discussed in further detail below.

## II. ARGUMENT

**A.    The Plaintiffs Have No Reasonable Likelihood Of Success On The Merits Of Their Claims.**

**1.    Dialogo LLC Does Not Own the Trademark Rights to "El Dialogo."**

The plaintiffs contend that Dialogo, LLC was the undisputed first user of the designation "El Dialogo" and, therefore, owns the trademark rights to that name. The plaintiffs' entire argument on its trademark claims is premised on this claim which, in fact, is completely untrue. In fact, the "Dialogo" mark was established used by another corporation, Dialogo Bilingue, Inc., as early as June 2003, more than one year before Dialogo, LLC was formed.

> The right to trademark and service mark rights is based on prior use, or the one who first uses the marks in connection with a peculiar line of business. *Blanchard Importing & Distrib. Co. v. Charles Gilman & Son, Inc.,* 353 F.2d 400, 401 (1st Cir. 1965), *cert. denied,* 383 U.S. 968, 86 S. Ct. 1273 , 16 L.Ed.2d 308 (1966). Trademark rights do not generally arise from registration. "[R]egistration does not create the underlying right in a trademark. That right which accrues from the use of a particular name or symbol, is essentially a common law property right. *Keebler Co. v. Rovira Bisquit Corp.,* 624 F.2d 366, 372 (1st Cir. 1980), *citing Campbell Soup Co. v. Armour & Co.,* 175 F.2d 795, 796-97 (3rd Cir.), *cert. denied,* 388 U.S. 847, 70 S. Ct. 88, 94 L.Ed. 518 (1949). An essential element of a claim of trademark infringement is a likelihood of confusion among prospective purchasers of plaintiff's products and services caused by defendants' use of plaintiff's marks. See *Baker v. Simmons Co.,* 307 F.2d 458, 461 (1st Cir. 1962).

*Volkswagenwerk AG v. Wheeler,* 814 F.2d 812, 815-816 (1st Cir. 1987).

Dialogo Bilingue, Inc. first began publishing the newspaper "Dialogo Bilingue" in June, 2003. It began as a monthly publication and became a bi-monthly in February, 2004. (Exhibit A, Affidavit of Lillian Santiago Bauza at ¶ 4). The newspaper that was produced by Dialogo

Bilingue in 2003 was the same in all respects, i.e., bilingual format, layout, content and advertisements, as the "El Dialogo" newspaper first published by Dialogo, LLC in June, 2004 and currently being published by defendant El Dialogo, LLC. (Ex. A, Santiago Affidavit at ¶ 5). Although the newspaper was called "Dialogo Bilingue," the word "Dialogo" was featured prominently in the banner, the masthead and at the bottom of each page, appearing in bolder, larger type than the word "bilingue". (See Exhibit B)[1]

In April, 2003, two months prior to the first publication of Dialogo Bilingue, Ms. Santiago and her partners in Dialogo Bilingue purchased the domain name "Dialogo." (Ex. A, Santiago Affidavit, ¶ 9 and Exhibit A to the Affidavit). Well before June 9, 2004, when Dialogo LLC was first formed, the "Dialogo Bilingue" newspaper was commonly known in the community simply as "Dialogo" or "El Dialogo". (See Letters of Andrew Morehouse, Director, Solutions Community Development Corporation; Xenia Rosado-Merced, Community Outreach Manager, Holyoke Medical Center, attached as Exhibit C). In addition, "El Dialogo" is commonly known simply as the new name and/or the continuation of the newspaper formerly known as "Dialogo Bilingue." (See Letters of John Aubin, Managing Member, Open Square Properties LLC; Hope Jinishian, M.S.W., Women's Fund of Western Massachusetts; Becky Michaels, Marketing Director, Holyoke Health Center, attached as Exhibit C)

Therefore, by July 1, 2004, when Dialogo, LLC published its first issue of "El Dialogo," Dialogo Bilingue, Inc. had already established a property right in the marks "Dialogo" and "El Dialogo" under the so-called "secondary meaning doctrine." The "secondary meaning doctrine" has been explained by the U.S. Court of Appeals for the First Circuit as follows:

> [W]ords which have a primary meaning of their own, such as bug, may, by long use in connection with a particular product, come to be known by the public as

---

[1] Mr. Pike admitted in his deposition that Dialago, LLC is not claiming to own any trademark rights to "Dialago Bilingue." (Exhibit F, Deposition of Gerry Pike, at p. 134)

specifically designating that product. *Volkswagenwerk AG v. Rickard*, 492 F.2d 474, 477 (5th Cir. 1974) (citations omitted). Secondary meaning is generally the test for determining whether the plaintiff has created a property right in the mark. It can be developed as a result of extensive advertising of a product with the mark. *Volkswagenwerk AG v. Hoffman*, 489 F. Supp. 678, 681 (D.S.C. 1980); *Time, Inc. v. Life Television Corp.*, 123 F. Supp. 470, 474-75 (D. Minn. 1954).

The establishment of secondary meaning in a word is an issue of fact. *Rickard*, 492 F.2d at 477-78. Accordingly, we must determine whether a genuine issue of fact lies regarding the establishment of a secondary meaning in the word Beetle.

"[I]t is appropriate to consider (1) the length and manner of its use, (2) the nature and extent of advertising and promotion of the mark and (3) the efforts made in the direction of promoting a conscious connection, in the public's mind, between that name or mark and a particular product or venture."

*Rickard*, 492 F.2d at 478, quoting 3 Callman, Unfair Competition, Trademarks, and Monopolies, § 19.27 (4th ed. 1983).

*Volkswagenwerk AG v. Wheeler, supra*, 814 F.2d at 816.

Applying these factors, Dialogo Bilingue, Inc. had already established its own right to the marks "Dialogo"and "El Dialogo" before Dialogo LLC first published its own version of the newspaper, now called "El Dialogo" on July 1, 2004. Indeed, Dialogo Bilingue, Inc. would most probably have had a viable claim of trademark infringement against Dialogo, LLC when El Dialogo began publishing based on the likelihood of confusion among readers who might reasonably assume that "El Dialogo" was the same newspaper that they had been reading for a year with a slightly altered name. At the very least, whether "Dialogo" or "El Dialogo" had established a secondary meaning in the eyes of the public as a shorthand reference to the newspaper "Dialogo Bilingue" prior to July 1, 2004 is "an issue of fact" which cannot be resolved by the Court at this early stage. *Volkswagenwerk AG v. Wheeler, supra*, 814 F.2d at 816.

2.    **The Plaintiffs' are Barred from any Equitable Relief on their Trademark Claims by their "Unclean Hands."**

In any event, the plaintiffs are barred from any equitable relief on their trademark claims based on the doctrine of "unclean hands." The doctrine of "unclean hands" in trademark cases is designed "to protect the Court from granting relief to a plaintiff no better than the defendant he is suing." *Worthington v. Anderson,* 386 F.3d 1314, 1319 (10th Cir. 2004), quoting, *McCarthy on Trademarks & Unfair Competition* §31:45. at 31-92.3 (4th ed. 2004). This Court has wide discretion in deciding whether to bar recovery due to a plaintiff's supposed "unclean hands." *K-Mart Corp. v. Oriental Plaza, Inc.,* 875 F.2d 907, 912 (1st Cir. 1989).

The wrongful conduct of the plaintiffs, particularly DMSA, in this case requires that they be barred from obtaining any equitable relief against these defendants, including the preliminary injunction which they now seek. This conduct began in May 2004, when Gerry Pike, Managing Director of DMSA, promised Ms. Santiago that DMSA would invest $50,000 in starting capital for their new venture, Dialogo, LLC. He also insisted that she resign from job at Holyoke Medical Center to devote her full time and energies to the new venture. Relying on these representations, Ms. Santiago executed the Venture Agreement and the Operating Agreement. (Ex. A, Santiago Aff. at ¶¶ 13, 14, 15) Ms. Santiago then began publishing "El Dialogo" for Dialogo LLC, which was, in all respects, a continuation of "Dialogo Bilingue," a newspaper which she had been publishing along with her partners since June, 2003. (Ex. A, Santiago Aff. at ¶¶ 4, 5) DMSA then breached its promise to furnish $50,000 in starting capital even though that requirement was expressly set forth in the Operating Agreement. In addition, by the end of 2004, DMSA had ceased paying salaries to Ms. Santiago and her staff, ceased paying rent, and ceased providing adequate funds to pay vendors. (Ex. A, Santiago Aff. at ¶¶ 20, 21, 24, 25, 26).

As a result of DMSA's material breaches under the Operating Agreement, the newspaper continually ran at a loss. Throughout this time, Ms. Santiago had numerous conversations with

Mr. Pike in which she informed him that the newspaper was losing money, that vendors and employees were not getting paid and that she could not continue to operate the newspaper under these conditions. (Ex. A, Santiago Aff. at ¶¶ 24, 27, 28, 29).

Ms. Santiago met with Mr. Pike in January, 2005 and told him that she felt that their business relationship needed to come to an end and that one of them needed to buy the other out. Mr. Pike responded, cynically, "What do I want with a newspaper?" (Ex. A, Santiago Aff. at ¶ 38). Finally, frustrated by DMSA's utter failure to live up to its contractual obligations and Mr. Pike's unwillingness to provide financial support to the newspaper, Ms. Santiago was compelled to disassociate herself from Dialogo, LLC in mid-February 2005 and begin publishing El Dialogo on her own.

Mr. Pike compounds DMSA's wrongful conduct by disputing nearly every one of these facts under oath in his Second Affidavit, just as he did in his deposition taken on May 10, 2005. Mr. Pike contends, for instance, that he never promised Ms. Santiago $50,000 in starting capital. Instead, he claims DMSA's contribution was to be "a strategic marketing initiative to the Spanish language print media business" and "extensive and detailed research studies" which DMSA had already completed relating to Spanish language markets throughout the United States. As Ms. Santiago states in her Supplemental Affidavit (Exhibit D), Mr. Pike never told her that this information was to comprise DMSA's initial contribution, nor would she have been interested, given that the only business of the LLC was to publish a bimonthly, bilingual newspaper in Holyoke, Massachusetts as she had been doing. In addition, Ms. Santiago states that at no time did DMSA or Mr. Pike ever provide her with any written materials setting forth a DMSA "strategic marketing initiative" or any of the "research studies" he refers to. (Exhibit D, Supplemental Affidavit of Lillian Santiago at ¶ 2) Mr. Pike also states that the parties agreed that

the marketing information provided by DMSA would have a value of $50,000. As Ms. Santiago states, she never agreed that this was to be DMSA's initial capital contribution, nor did she agree or would she have ever agreed that it had a value approaching $50,000. In fact, as Ms. Santiago states in her Supplemental Affidavit, Mr. Pike never stated to her that DMSA's initial capital contribution would be anything other than $50,000 in cash. (Exhibit D, Supplemental Affidavit of Lillian Santiago at ¶ 3)

Mr. Pike also claims in his Affidavit that DMSA had over $40,000 in out of pocket payments for the benefit of the LLC and contributed over $5,000 in management services. As Ms. Santiago points out in her Supplemental Affidavit, this is also untrue. The actual out-of-pocket expenses paid by DMSA relating to "El Dialogo" total only $18,618.73 and are set forth in Exhibit B to Ms. Santiago's original Affidavit. (Exhibit D, Supplemental Santiago Aff. at ¶ 5) This list of expenses was provided to Ms. Santiago by DMSA in January 2005 in response to her request for a complete accounting of all payments DMSA had made up to that point. That list stands in sharp contrast to Exhibit 6 to Mr. Pike's Second Affidavit which he claims sets forth "the true and correct summary of DMSA's expenditures". In fact, Exhibit 6 lists numerous payments which obviously have nothing whatsoever to do with El Dialogo. (Exhibit D, Supplemental Santiago Aff. at ¶ 6) These include four payments totaling in excess of $4,000 which were paid between February 27, 2004 and May 27, 2004, before the Operating Agreement was even signed, which occurred on June 9, 2004. Exhibit 6 also lists two payments to a George D. Scribner totaling $10,500, including a payment in the amount of $7,500 made on June 11, 2004, only two days after the Operating Agreement was signed and four months before the Articles of Organization of Dialogo, LLC were even filed with the State of Maine, which

occurred on October 12, 2004. (Exhibit D, Supplemental Affidavit of Lillian Santiago Bauza at ¶ 6, and Exhibit A to the Affidavit).

Interestingly, this is not the only time that Mr. Pike and DMSA have misled business partners with false promises to contribute starting capital for a new venture. In December, 2004, DMSA, along with partners Patricio Montalbetti, Nancy Perez and Eduardo Perez of Atlanta Georgia, formed a new company known as Perez Montalbetti Perez, LLC. The company was formed for the purposes of developing Spanish language and bilingual advertising, marketing and media. (Exhibit E, Affidavit of Eduardo Perez at ¶ 3) DMSA and the other partners signed an Operating Agreement which was nearly identical in form to the Operating Agreement for Dialogo, LLC. Like that Agreement, the Operating Agreement for Perez Montalbetti Perez, LLC provided that DMSA would make a capital contribution to the LLC in the amount of $50,000 ($49,997.00, to be exact) in exchange for an ownership interest in the LLC. (Exhibit E, Affidavit of Eduardo Perez at ¶¶ 4 and 5). DMSA only made partial capital contributions to the LLC while claiming, just as it does in this case, that it fulfilled its capital contribution commitment via other claimed expenses, primarily undocumented "management time and expertise." (Exhibit E, Affidavit of Eduardo Perez at ¶ 6). On April 13, 2005, Mr. Perez wrote to Mr. Pike and Beatriz Mallory, Mr. Pike's wife and business partner in DMSA, and informed them that he and his partners wished to terminate their relationship with DMSA, due in part to DMSA's failure to capitalize Perez Montalbetti Perez, LLC, as required under the Operating Agreement. (Exhibit E, Perez Affidavit, ¶¶ 7 and 8). Incredibly, when Mr. Pike was shown Mr. Perez's letter at his recent deposition, he denied ever having received it. (Exhibit F, Deposition of Gerry Pike at pp. 153-154) Mr. Perez states that he knows that this is not true because Mr. Pike contacted him after he received the letter and specifically referred to it. (Exhibit E, Perez Affidavit at ¶ 9).

Plaintiffs' claims in this case are premised largely on Mr. Pike's misstatements and distortions of fact. Nevertheless, Mr. Pike's company, DMSA, seeks extraordinary relief from this Court in the form of a preliminary injunction to obtain ownership and control of a trademark through Dialogo, LLC, a new venture concocted by Mr. Pike and DMSA, which Ms. Santiago was induced to join based on Mr. Pike's material misrepresentations and was compelled to leave when DMSA failed to deliver on its promises of financial support . (Ms. Santiago has filed a Counterclaim against DMSA for breach of contract, misrepresentation and violations of M.G.L. c. 93A, seeking damages, attorney's fees and costs and other relief.)

Based on the above, this Court should use the wide discretion it has in these matters to bar the plaintiffs from any recovery based on DMSA's unclean hands. *K-Mart Corp. v. Oriental Plaza*, 875 F.2d 907, 912 (1st Cir. 1989); *Donoghue v. IBC/USA (Publications), Inc.*, 886 F. Supp. 947, 954 (D. Mass. 1995).

### 3.    <u>The Plaintiffs' Are Not Likely to Prevail on their Other Claims.</u>

The plaintiffs are also not likely to prevail on their claims that Ms. Santiago breached the Operating Agreement. As discussed in the previous section, DMSA itself materially breached the Operating Agreement by failing to make its promised $50,000 initial capital contribution and by otherwise failing to provide needed financial support to the LLC. Under Massachusetts law, DMSA's material breach excused Ms. Santiago from any further performance under the Agreement. *Ward v. American Mut. Liab. Ins. Co.*, 15 Mass. App. Ct. 98, 100-102, 443 N.E. 2d 1342 (1983). Ms. Santiago was therefore entitled to withdraw from the LLC, as she did by her letter of February 17, 2005, and was no longer bound by any restrictions on her employment that may have been contained in the Operating Agreement. Similarly, DMSA cannot claim that Ms.

Santiago breached any fiduciary duties she may have had to DMSA or to the LLC based on DMSA's conduct, as described in detail above.

There is also no basis for the plaintiffs' claims that Ms. Santiago misappropriated trade secrets and other assets allegedly belonging to the LLC in violation of the Operating Agreement and Massachusetts law. Although trade secrets are defined broadly in M.G.L. c. 266, § 30 to include such items as "management information" and "merchandising information," the definition of a trade secret has been further refined by the Massachusetts courts. In the case of *Jet Spray Cooler, Inc. v. Crampton,* 361 Mass. 835, 840, 282 N.E.2d 921 (1972), the Supreme Judicial Court of Massachusetts set out six factors of relevant factual inquiry used to determine whether information sought to be protected is in fact and in law "confidential." These factors are (1) the extent to which the information is known outside of the business; (2) the extent to which it is known by employees and others involved in the business; (3) the extent of measures taken by the employer to guard the secrecy of the information; (4) the value of the information to the employer and its competitors; (5) the amount of effort or money expended by the employer in developing the information; and (6) the ease or difficulty with which the information could be properly acquired or duplicated by others. *Jet Spray Cooler, Inc. v. Crampton,* 361 Mass. at 840, *citing,* Restatement of Torts, § 757, Comment b (1939), *quoted in Warner-Lambert Co. v. Execuquest Corp.,* 427 Mass. 46, 49 (1998).

Here, the plaintiffs have not even attempted to apply these six factors to the advertiser-related and other information which they claim Ms. Santiago wrongfully misappropriated. If these factors were applied, the information in question could not be held to be "confidential" or a "trade secret." The companies that advertised in El Dialogo beginning in June, 2004 were the same companies that had advertised in Dialogo Bilingue between June, 2003 and May, 2004

400443

.(Exhibit A, Affidavit of Ms. Santiago, ¶¶ 5 and 6).  The identity of these advertisers appears in each issue of El Dialogo and is hardly a secret.  The plaintiffs have also failed to point to any measures taken by Dialogo, LLC to guard the secrecy of this information or establish that Dialogo, LLC invested any significant effort or money in developing this information.  In fact, it is clear from Ms. Santiago's testimony that the information in question was developed not by Dialogo, LLC but by Dialogo Bilingue, Inc. which had previously established relationships with advertisers and vendors (Exhibit A, Affidavit of Ms. Santiago, ¶ 19).  Also, before Ms. Santiago became involved with DMSA, she already had in place rental space, office equipment and supplies which she was using to publish Dialogo Bilingue (Exhibit A, Affidavit of Ms. Santiago, ¶ 16).

**B.  Ms. Santiago And El Dialogo, LLC Will Be Immediately And Irreparably Harmed If A Preliminary Injunction Is Granted**

If the preliminary injunction sought by the plaintiffs is allowed, Ms. Santiago and her new company El Dialogo, LLC will be enjoined not only from using the mark "El Dialogo" but also from operating and/or working for *any* Spanish language newspapers or media except for Dialogo, LLC.  Ms. Santiago will have to abandon the newspaper which she founded two years ago and which, to her credit, she has continued to dutifully publish twice a month as a service to the Latino community, despite financial hardship and DMSA's broken promises.  The newspaper is obviously very important to her both personally and as a leader in the local Latino community.  On the other hand, if the plaintiffs' request for preliminary injunction is denied, nothing will change for the plaintiffs.  DMSA was never involved in any meaningful way with the publication of El Dialogo and apparently never wished to be involved.  Indeed, as Mr. Pike told Ms.

Santiago in January, 2005 when she suggested that one of them buy the other out, "What would I do with a newspaper?"

### C.  A Preliminary Injunction Is Not In The Public Interest

Both El Dialogo and its predecessor, Dialogo Bilingue fulfill an important role in the local Latino community by providing local news coverage in Spanish and in English, supporting local businesses, community agencies and other local resources and responding to the needs of the Latino community in a way that the other local media has not been able to do.  (See Letters of James Lescault of Holyoke Even Start Family Literacy Program; Daniel Ross, Executive Director of Nuestra Raices; Andrew Morehouse, Director, Solutions Community Development Corporation; Xenia Rosado-Merced, Community Outreach Manager, Holyoke Medical Center; John Aubin, Managing Member, Open Square Properties LLC; Hope Jinishian, M.S.W., Women's Fund of Western Massachusetts; and, Becky Michaels, Marketing Director, Holyoke Health Center, attached hereto as Exhibit G).  If Ms. Santiago and her new company are enjoined from publishing a Spanish or bilingual newspaper, whether it is called "El Dialogo" or something else, it would be a great loss to the Latino community and all the residents of Hampden and Hampshire Counties who have come to rely upon and value this vital resource.

### III.  CONCLUSION

For all the reasons stated above, and based on the Affidavits and other supporting materials attached hereto, the defendants, Lillian Santiago Bauza and El Dialogo, LLC, respectfully urge that plaintiffs' Preliminary Injunction Motion be denied in all respects.


THE DEFENDANTS
LILLIAN SANTIAGO BAUZÁ and
EL DIÁLOGO, LLC


By
Keith A. Minoff, Esq., and


By
Nancy Frankel Pelletier, Esq., both of
Robinson Donovan, P.C.
1500 Main Street, Suite 1600
Springfield, Massachusetts 01115
Phone (413) 732-2301  Fax (413) 785-4658
KAM BBO No.:  551536
NFP BBO No.:  544402

400443

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS



```
                                    )
DIALOGO LLC, and                    )
DIRECT MERCHANTS, S.A., INC.        )
              Plaintiffs            )
                                    )        CIVIL ACTION NO. 05-30076MAP
v                                   )
                                    )
LILLIAN SANTIAGO BAUZA,             )
EL DIALOGO, LLC, and                )
FRANCISCO JAVIER SOLE               )
                                    )
              Defendants            )
                                    )
                                    )
```

**AFFIDAVIT OF LILLIAN SANTIAGO BAUZA IN OPPOSITION TO PLAINTIFFS'
EMERGENCY MOTION FOR TEMPORARY RESTRAINING ORDER**

I, Lillian Santiago Bauza, under oath do hereby depose and say:

1. I am a Defendant in this action.

2. I have reviewed the complaint, and the affidavits of Mr. Pike and Ms.Romero that were filed in this action.

3. In September of 2003, my husband and I, along with another couple formed a corporation known as Dialogo Bilingue, Inc., a Massachusetts corporation. The purpose of the corporation was to produce a bilingual newspaper to serve the Latino communities needs in the greater Holyoke area

4. The newspaper was produced under the name of 'Dialogo Bilingue'. The first issue was published in June 2003. It began as a monthly publication. In February 2004, it became a bimonthly.

5. The paper that was produced in 2003 is the same in all respects, i.e., bilingual format, layout, content, and advertisements, as the newspaper produced today, except for the name on the masthead.

6. The content, structure and format of the newspaper, as well as all advertisers, were established by me shortly after I began running the newspaper in June 2003. This was about one year before I became involved with plaintiff DMSA or Gerry Pike.

7. Dialogo Bilingue published this newspaper until approximately the middle of June, 2004. At that time, the other 50% shareholders decided to withdraw from the corporation. In May of 2004, the newspaper was not running in the black, and I was forced to use my own personal funds to pay creditors to keep the paper running.

8. I continued to publish the newspaper at that time, prior to any involvement with Mr. Pike or DMSA.

9. In April of 2003, I, with my former partners, purchased the domain name "Dialogo". Then, with my own funds, on June 10, 2004, I purchased the domain name 'El Dialogo'. It was my intent at that time to use that name for future publications of the newspaper. (See Network Solutions and Register Site e-mail confirmations and invoices attached as Exhibit A).

10. In June of 2004, I attempted to obtain Bank financing in the form of a line of credit in the amount of $25,000-$50,000, that would allow the newspaper to continue being published.

11. At this same time, in June of 2004, I was approached by Mr. Pike of DMSA, who was known to me, as he and my husband had other business dealings, not related to the newspaper.

12. Mr. Pike proposed that rather than using a bank, he/DMSA would provide the financing that I was seeking.

13. I told him that I wanted to start El Dialogo as soon as possible, and he proposed the following; (a) he would establish a capital account with "starting capital" of $50,000.00, from which to draw from as needed, (b) I would have exclusive control over the operation of the business, editorial issues, and employment issues, and (c) because of his financial investment, DMSA would have a 51% interest in the business and I would have a 49% interest in the business.

14. Mr. Pike also insisted that I devote my full time and energies to the newspaper and convinced me that I should resign my position as Director of Employee Assistance Programs at Holyoke Medical Center, which I did in reliance on his promises to provide financial support for the venture.

15. I agreed to this proposal in June of 2004 by signing the Venture Agreement and Operating Agreement attached to the Complaint. My only contribution to the venture was a capital contribution of one dollar. I did not transfer or assign to the LLC any assets of my existing newspaper business including the "El Dialogo" name, advertiser lists or any other personal property or proprietary information which I owned when I was first approached by Mr. Pike.

16. When I started this relationship with DMSA and Mr. Pike, I already had in place rental space, office equipment, and supplies which I was using to put out the newspaper.

17. Mr. Pike did purchase a computer with software to run the newspaper. Unfortunately, the software was inadequate. I had to expend $1,000 to solve the problem. Mr. Pike/DMSA never contributed or purchased any other equipment or supplies for the newspaper.

18. Mr. Pike urged me to move into space in the same complex which was already occupied by a venture he was involved in with my husband. I agreed to do so on order to save costs.

19. When this relationship started with Mr. Pike, I already had established regular advertisers including Balise Auto, Acuna Real Estate and Holyoke Health Center. I also had ongoing contracts with a printer and a distributor. I also had a graphic artist and salesperson as employees. After the relationship with DMSA began, I continued to publishe the newspaper with the same advertisers, vendors and employees.

20. Although DMSA had promised to provide starting capital of $50,000 and the Operating Agreement so provided, neither Mr. Pike nor DMSA ever provided any starting capital for the business or established any capital account to draw upon.

21. From the very beginning of the joint venture, I had problems with DMSA paying the bills. I had to use my own money ($500.00) to set up an operating account and expend some additional costs because neither Pike nor DMSA would pay them. I had a conversation with Mr. Pike at that time and inquired when he would be setting up the account with the $50,000, so that we could pay our bills in a timely fashion. He was non-committal. He informed me that he would only pay rent for the newspaper through the end of September. I told him that to do so was contrary to our Agreement. He argued that by October of 2004, the business should be self-sufficient and not require his further financial support. This was contrary to what he had promised and what was written in the agreements which I had entered into with DMSA.

22. On or about October of 2004, I directed one of my employees to construct a web site, using the domain name I had purchased the previous year.

23. The format and content of the newspaper during this time, other than its name,

had not changed.

24. Between July and the end of September 2004, Mr. Pike and I exchanged numerous e-mails and had many telephone conversations. Though the substance of these communications were varied, they all inevitably also included my queries as to where was his promised financial contribution, and the fact that the newspaper was constantly running between $5,000-$7,000 in debt.

25. Because the newspaper was unable to pay its debts, I was constantly shuffling payments to various vendors to keep everyone happy. I was able to prevail upon my banker to offer the newspaper overdraft protection. Mr. Pike's response to my complaints was always that he felt the newspaper should be self-sufficient by October of 2004. At this point in time, DMSA/Mr. Pike had contributed approximately $18,618.00 toward rent, payroll and accounting services. (See DMSA attached as Exhibit B) Neither Mr. Pike nor DMSA has paid any expenses since December 21, 2004.

26. By October 2004, no capital account with funds had been set up as promised. Despite my assertions, Mr. Pike refused to establish the funds he said he would to financially support the newspaper. However, true to his previous promise, in October of 2004, Mr. Pike ceased paying salaries or rent, despite the fact that the newspaper had absolutely no funds to do so.

27. Mr. Pike was always aware of the financial condition of the newspaper, as I would forward to him, on a monthly basis, all financials related to the newspaper, including revenue and accounts payable.

28. In October of 2004, I spoke with and wrote to Mr. Pike about the cessation of funds to pay employees. He repeated what he had said before, and claimed now that he was not obligated to contribute those funds. I explained to him that the newspaper could not exist much longer under these circumstances and therefore the deficits would need to be taken care of if the newspaper were to survive. He agreed to do so, yet with the exception of a check for $900, the required funds

never arrived.

29. At the beginning of November 2004, I wrote a letter to Mr. Pike in which I indicated that the Joint Venture was not working because he/DMSA was not living up to its terms, and as a result, the newspaper was not able to pay its creditors or its employees despite the increase in circulation. I told him that the newspaper could not continue to operate unless he immediately made the necessary contributions. I also suggested to him that the relationship should cease.

30. From August through February of 2004, I either spoke or met with Mr. Pike 8-10 times to discuss the need for his living up to his part of the venture by supplying his promised $50,000 contribution. Each and every time, Mr. Pike either ignored my requests or refused to respond.

31. I again wrote to Mr. Pike about arrearages on December 15, 2004. I heard no response, and no monies were forthcoming.  (See e-mail attached as Exhibit C.)

32. In the beginning of February, I recommended that a Mr. Sole be hired to improve the advertising sales of the newspaper. Mr. Pike met with Mr. Sole and agreed to hire him. He was to be paid in part as an employee with a salary, and partly on commissions. When he was hired, I explained to Mr. Pike that the newspaper did not have the funds to pay Mr. Sole. Mr. Pike agreed to pay him $2,000 per month.

33. Mr. Sole was never paid, and on February 28, 2005 he resigned. (See letter of resignation attached as Exhibit D)

34. During the month of February, we also lost the services of Gabriela Romero. Her work product had seriously deteriorated to the point where it was potentially causing a loss of several of our advertisers.

35. With the loss of Romero and the resignation of Sole, it became clear to me that the newspaper and its relationship with DMSA was not going to survive.

36. I could not risk incurring further financial obligations for the newspaper knowing that DMSA and Mr. Pike were clearly not interested in contributing further funds, despite the fact that they had never put up the amount they had agreed to in the first place, or were even making an effort to reduce the deficits the newspaper was experiencing.

37. Furthermore, the unavailability of cash flow required that I use the bank overdraft available to get the printer paid for the February edition. (The bank is still owed $700.00.) I was also required to cease the newspaper's relationship with The Valley Advocate, which was our sole means of distribution.

38. I told this to Mr. Pike when I met with him in mid January of 2005. Once again there was no willingness on his part to comply with his contractual obligations of the joint venture. I told him the relationship needed to come to an end. I told him that one or the other needed to buy the other out. His response was "what do I want with a newspaper"?

39. Therefore, in early March 2005, I informed Mr. Pike that it was impossible to continue the joint venture and that I was ceasing operations of the newspaper to avoid further debt. (see my letter attached as Exhibit E.)

40. I returned or made available all assets, which DMSA had purchased. I have not taken any salary since December 1, 2004. I have not taken any dividends or profits form the joint venture. Given that the newspaper was always running at a loss, this would have been impossible.

41. On or about March 10, 2005, I took out a loan in my own name, in the amount of $5,000 to pay some of the financial obligations that the newspaper had and which DMSA refused to pay. (a) I paid Francisco Sole $2,000 in wages for the work he did for the newspaper in January and February 2005; (b) I paid Ana

Morales (an employee) $1,450 for wages due; (c) I paid One Stop Technology $750 for web site work it was owed; and (d) I paid $625 in wages to our graphic artist Javier.

42. The current accounts payable stands at approximately $7219.  (See accounts payable report attached as Exhibit F).

43. I still remain committed to serving the Latino community, and with that in mind I did form a new company, under Massachusetts law, using the name El Dialogo LLC. The same name that was the domain name I had established almost two years earlier. The newspaper that I now publish is the same as the one I published before my involvement with Mr. Pike or DMSA.

44. I have a registered trademark for El Dialogo recorded here in Massachusetts which was certified by the Commonwealth on March 21, 2005. (See Exhibit G). It is my understanding that having registered the trademark in my name, I am presumed to be the owner.  I am not aware of any trademarks registered by Dialogo LLC in the Commonwealth.

45. To my knowledge, Dialogo LLC is not registered to do business in the Commonwealth of Massachusetts.

46. Upon information and belief, Ms. Romero has been offered a position by Mr. Pike or DMSA in the possible continuation of Dialogo LLC. Her assertions that I am using Dialogo assets in my new business are false.

47. Neither my company nor I employ Francisco Sole.

48. I was unaware of any illness on the part of Mr. Pike. Since our meeting in mid January produced no different result than what had been the history of our relationship since September, my decision to close the business would not have changed. Secondly, Mr. Pike was aware of the tenuous nature of the continued existence of the newspaper from our ongoing communications right through mid

February.

49. All advertisers now, are the ones we had with Dialogo Bilingue, Inc., there are no new ones.


Signed under the pains and penalties of perjury this    day of April, 2005.



LILLIAN SANTIAGO BAUZA


## COMMONWEALTH OF MASSACHUSETTS

HAMPDEN, ss.

On this 6th day of April, before me, the undersigned notary public, personally appeared Lillian Santiago Bauza and, proved to me through satisfactory evidence of identification, which was a Massachusetts driver's license, to be the person whose name is signed on the preceding or attached document, and acknowledged to me that she signed it voluntarily for its stated purpose.


Tarena N. Hines, Notary Public

My Commission Expires:  December 24, 2010


### CERTIFICATE OF SERVICE

I hereby certify that on this day a true copy of the above document was served upon the attorney of record for each party by mail/by hand.

Date: 4/6/05



**EUDORA** Web Mail

EXHIBIT

A

mfrau@eudoramail.com    LOG OUT    (Not you? click here)

powered by: **LYCOS**

· Mail Home

**MailBox Folders**

Compose

Address Book

Options

System Status

**MailBox: Read Mail**

REPLY   REPLY ALL   FORWARD   DELETE   –Move to Folder–   ♦

[                    ] [                    ]

**Date:** Thu, 17 Apr 2003 16:47:41 -0400
**From:** "RegisterSite.com Support" <support@registersite.com>
[                    ] [                    ]
**Subject:** Account for dialogo successfully created!
**To:** "Manuel Frau-Ramos" <mfrau@eudoramail.com>

Text Size:



Dear Manuel,

Thank you for creating an account at RegisterSite.com.
We look forward to meeting your domain name services needs.

Your username is: dialogo

You can manage your account and begin registering domain names by logging
in to your control panel at                              . If
you have any problems or questions, feel free to contact our support
team
at                           . We're available 24 hours a day to answer all
your questions.

Sincerely,
RegisterSite.com Support

"High on Service, High on Quality"
--------------------------------
*A service of Nitin Networks*

REPLY   REPLY ALL   FORWARD   DELETE   –Move to Folder–   ♦

AT&T Wireless

» Lycos Worldwide ►



**RegisterSite.com**
Nitin Networks
2 Tamarack Circle
Fishkill, NY 12524
**Email:** support@registersite.com

**Billed To:**
Manuel Frau-Ramos
Manuel Frau-Ramos
PO Box 572
Amherst, MA 01004-0572

**Date:** 2003-04-17 04:53:02 PM
**Ref. No.:** VEMA25977927
**Username:** dialogo

| Item Description | # Yrs. | Total |
|---|---|---|
| dialogobilingue.com<br>  - Premium Plan ($35/yr) | 2 | $70 |
| Subtotal: | | $70 |
| Total: | | $70 |

*Thank you for choosing*
*RegisterSite.com!*

DIALOGO
HOLYOKE 03

**NetworkSolutions**

  

ACCOUNT
INFORMATION

PAYMENT
INFORMATION

**4**
ORDER
COMPLETE

# THANK YOU FOR YOUR ORDER

**PLEASE PRINT THIS PAGE AS A COPY OF YOUR RECEIPT**

### YOUR LOGIN INFORMATION

**This is your only record of your password**

You will receive an e-mail confirmation that your order is complete in approximately 24 hours.

**User ID: eldialogonews**          **Password: opensquare**

Start managing your account now by logging in to Account Manager.

**LOG IN**

### YOUR ORDER SUMMARY

**Order Number:** 173043927  **Date:** 06/10/2004                              **Your Price ($US)**

**Account Number:**  28939808

**Credit Card:** MASTERCARD  xxxxxxxxxxxx0912

| | | |
|---|---|---|
| **Domain Name: eldialogi.com** | 3 Years - Save 28% | $74.97 |
| +Private Registration | 3 Years | $27.00 |
| **Domain Name: eldialogo.com** | 3 Years - Save 28% | $74.97 |
| +Private Registration | 3 Years | $27.00 |

For your protection, the domain name you have registered has Domain Protect turned on. You may change the Domain Protect status at anytime through the Account Manager.

**Total   $203.94**

## Name you want already taken?

**LEARN MORE**

Back to top | About Us | Partnerships | Contact Us | Site Map

Home    Register    Create a    Buy    Purchase    Promote    Grow Your    Free    Renew    Account
        a Domain   Web Site   E-mail   Hosting   Your Site   Business   Offers   Services   Manager

Review our Privacy Policy, Service Agreement, and Legal Notice

© Copyright 2004 Network Solutions. All rights reserved.



Network

FREE OFFERS    WHOIS    VIEW ORDER    CUSTOMER SERVICE    ACC

HOME    REGISTER    HOST YOUR    CREATE A    BUY    PROMOTE    GROW YOUR
A DOMAIN    WEB SITE    WEB SITE    E-MAIL    YOUR SITE    BUSINESS    Y

## ACCOUNT MANAGER

- Account Manager Home
- View Domain Name List
- View Account List

- Merge User IDs/Accounts

- Edit User Info
- Edit User ID/Password
- **Edit Account Contacts**

- Register Domain Names
- Renew Services

- Transfer Domain Names
- View Transfer Status

**Thousands of names expire every day.**

### ABOUT ACCOUNT MANAGER

Tour Account Manager

Account Manager User Guide

### FREQUENTLY ASKED QUESTIONS

How do I edit my Web site?

How do I check my E-mail?

How do I change my domain name server (DNS)?

What is a NIC handle?

How do I edit billing information?

What are the roles of the different Account Contacts?

What is Auto Renew?

What is Domain Protect?

See What Our Customers

# ACCOUNT MANAGER HOME

Lillian Santiago
4 Open Square Way
Studio 120
Holyoke, MA 01040
US
413-536-5560
lsantiago@eldialogo.com
NIC Handle: 37998989P
Edit user information

**Now Available! Country-Specific Domains:**
.uk .de .be .at .mx .nz    From $6.99 per year!

## ACCOUNT DETAILS

### ACCOUNT INFORMATION

**Account:**              28939808
**Account Holder:**       ⊞ El Dialogo LLC
**Primary Contact:**      ⊞ Lillian Santiago (you)
**Billing Information:**  ⊞ Lillian Santiago
**Credit Card:**          ⊞ MASTERCARD xxxxxxxxxxxx0912

Edit Account/Billing Information

### SERVICES ASSIGNED TO THIS ACCOUNT

Select view: [ Services ▾ ]                    RENEW    EDIT DN

Services ▾ 1 - 4 of 4    Type    E-mail    Web site    Expiratic

| | | Type | E-mail | Web site | Expiratic |
|---|---|---|---|---|---|
| ⊟ ☐ | eldialogi.com | Domain | Add | | June 10, 20 |
| | ☐ Private Registration | Private Registration | | | June 10, 20 |
| ⊟ ☐ | eldialogo.com | Domain | Add | | June 10, 20 |
| | ☐ Private Registration | Private Registration | | | June 10, 20 |

☐ Select all on this page    Showing 1 - 4 of 4

RENEW    EDIT DN

### PEOPLE WHO CAN ACCESS THIS ACCOUNT

**Lillian Santiago's access:**        Primary Contact
**Account Administrative Contact:**   None
**Account Technical Contact:**        ana morales anaivette_morales@yahoo.com

Edit Account Contacts

DIRECT MERCHANTS S.A., INC.

1/27/2005



**EXHIBIT**

B

Register: Loan & Exchange:Dialogo Bilingue
From 01/01/2004 through 01/27/2005
Sorted by: Date, Type, Number/Ref

| Date | Ref. | Payee | Account | Memo | Decrease | C | Increase | Balance |
|---|---|---|---|---|---|---|---|---|
| 05/27/2004 | | Quark Distribution Inc. | Credit Cards:Citibank | | | software | 953.95 | 953.95 |
| 06/24/2004 | 3896 | Open Square | Accounts Payable [split] | | | Rent | 500.00 | 1,453.95 |
| 06/25/2004 | 3193 | Aura G. Romero | Wayne Check-Bee-59-2 | | | | 1,000.00 | 2,453.95 |
| 07/20/2004 | | Ana Morales | Accounts Payable | | | | 308.00 | 2,761.95 |
| 07/30/2004 | 3938 | Open Square | Accounts Payable [split] | | | Rent | 500.00 | 3,261.95 |
| 07/31/2004 | 1 | Lilian Santiago-Bauza | Accounts Payable | | | | 2,000.00 | 5,261.95 |
| 07/31/2004 | ED-39 | Aura G. Romero | Accounts Payable | | | | 1,000.00 | 6,261.95 |
| 08/05/2004 | ED-40 | Tracy Learned | Accounts Payable | | | | 507.20 | 6,769.15 |
| 08/30/2004 | 3984 | Open Square | Accounts Payable [split] | | | Rent | 615.00 | 7,384.15 |
| 08/30/2004 | | Aura G. Romero | Accounts Payable | | | | 1,000.00 | 8,384.15 |
| 08/30/2004 | | Lilian Santiago-Bauza | Accounts Payable | | | | 2,000.00 | 10,384.15 |
| 09/26/2004 | 4029 | Open Square | Accounts Payable [split] | | | Rent | 615.00 | 10,999.15 |
| 09/30/2004 | 3189 | Lilian Santiago-Bauza | PNC Bank:Checking | | | | 2,000.00 | 12,999.15 |
| 09/30/2004 | 3190 | Aura G. Romero | PNC Bank:Checking | | | | 1,000.00 | 13,999.15 |
| 10/01/2004 | | J & J Accounting | Accounts Payable [split] | | | | 272.10 | 14,003.17 |
| 10/03/2004 | | Ana Morales | Accounts Payable | | | | 4.22 | 14,275.47 |
| 10/05/2004 | 3199 | Secretary of State o... | PNC Bank:Checking | | | | 175.00 | 14,450.47 |
| 10/05/2004 | EDS-14 | Tracy Learned | Accounts Payable | | | | 244.00 | 14,694.47 |
| 10/19/2004 | 340099 | Verrill & Dana LLP | Accounts Payable [split] | | | | 198.92 | 14,893.39 |
| 10/21/2004 | EDS-16 | Lilian Santiago-Bauza | Accounts Payable | | | | 975.00 | 15,868.39 |
| 11/01/2004 | 4076 | Open Square | Accounts Payable [split] | | | Rent | 615.00 | 16,483.39 |
| 11/08/2004 | 1 | Ana Morales | Accounts Payable | | | | 800.00 | 17,283.39 |
| 12/21/2004 | 3287 | Lilian Santiago-Bauza | PNC Bank:Checking | | | | 1,000.00 | 18,283.39 |
| 12/21/2004 | 3294 | Aura G. Romero | PNC Bank:Checking | | | | 250.00 | 18,533.39 |
| 12/21/2004 | | Verrill & Dana LLP | Accounts Payable [split] | Research | | | 85.34 | 18,618.73 |

J&J ACCOUNTING CORP          201-947-2944          01/27/2005 12:53

EXHIBIT

## Lillian Santiago-Bauza

| | |
|---|---|
| **From:** | "Lillian Santiago-Bauza" <lsantiago@eldialogo.com> |
| **To:** | <GPike@DMSAinc.com> |
| **Sent:** | Miércoles, 15 de Diciembre de 2004 09:13 a.m. |
| **Attach:** | Sales Manager Contract.doc |
| **Subject:** | Francisco Contract |

Gerry:

Attached please find a Draft of the manager's contract for Francisco. I would appreciate if you review it and feedback at your earliest. Also, if you can let me know how you plan to contribute to this, knowing that I do not have the money to cover all payables. Payables are approximately $10,000 including this arrangement, and we have sales of $7,000 for the next two months.

I would like you to contribute at least $3,000 per month for next three months and then reevaluate.

Thank you

Lillian Santiago

15/12/2004



EXHIBIT

February 28, 2005

Ms. Lillian Santiago – Bauza
El Dialogo Newspaper
2 Open Square Way, Studio 405
Holyoke, MA 01040

Dear Lillian,

It is with great regret that I must inform you that I will no longer be able to continue working as an independent contractor for el Dialogo.

As you are aware I have been working for el Dialogo since January 17, 2005 and to date I have not been paid for my services. The company owes me $ 3000.00 and after repeated attempts to collect my fees from Mr. Gerry Pike, he seems unwilling to pay me.

I wish you the best and I hope el Dialogo will continue to grow.

Sincerely,

Francisco J Sole



February 17, 2005


Gerry Pike
DMSA, Inc.
P.O. Box H
New Foundland, PA 18445

Dear Gerry:

Since our last meeting and telephone conversation I have reconsidered my position in Diálogo LLC. Since the beginning I have had to endure your lack of commitment to this organization and your promised financial contributions to the business. Your inconsistent communication on the decision making process and lack of financial support to the venture has caused a material deteriorations, to the point where we do not have staff support, nor are we able to continue without the business going into debt. Therefore, as operating manager, I have no other alternative but to close the business effective immediately.

The landlord has been made aware of the situation; he is allowing you to leave the computer, software and other office furniture at that space until the end of the month. You should take whatever steps are necessary to remove those items at your earliest. All business paperwork, e.g. bank statements, check book and list of account payables will be sent to you shortly.

If you have questions and or concerns you can address those to my attorney, Arnold Greenhut at 413-785-1504.


Cordially,

Lillian Santiago



| Service Type | Account Number | Amount Owed |
|---|---|---|
| Poland Spring Water | 430047951 | $ 186.32 |
| Valley Advocate (Distribution) | 4026472 | $ 2,943.00 |
| Beaulieu&Sons Elec. Contractors | 1733 | $ 149.18 |
| AP News Finder Services | FG02689 | $ 642.00 |
| Open Square Properties, LLC | 367 | $ 1,230.00 |
| Verizon Telephone | 413-536-5560-800-009-3 | $ 520.64 |
| Holyoke Gas & Electric | 67412 | $ 435.55 |
| Pitney Bowes | 19675038863 | $ 112.38 |
| February Pay Roll (Gabriela) | | $ 1,000.00 |
| | **TOTAL:** | **$ 7,219.07** |

*+ 5,000*  *personal loon*



EXHIBIT
6



# The Commonwealth of Massachusetts
William Francis Galvin, Secretary of the Commonwealth
Corporations Division

\#: _65509_

Mark: _EL Dialogo_

Dear Registrant:

TM

   Enclosed please find an approved copy of your Trademark or Servicemark application. This certificate of registration will be effective for a period of ten (10) years from the date stamped on the back. The registration number, which appears in the top right corner of the front of the form, should be used when requesting information, copies, or notifying this office of an address change.

   Within six (6) months of the expiration of your term of registration a notification will be sent to the last address of record. Notices will not be sent to the law firm which may have filed the original application.

   The appropriate symbol to indicate state registration is *"TM"* or *"SM"*. The symbol used for a federal registration is an *"R"* within a circle. This symbol may not be used unless you mark is registered with the Patent and Trademark Office in Washington, DC. For federal information and forms, call (703) 308-4357.

   This office is not permitted to give legal advice regarding infringement of your Trademark or Servicemark. If you need information on name disputes or Trademark or Servicemark infringement, please consult an attorney.

                    Office of the Secretary of the Commonwealth
                              One Ashburton Place
                              Trademark Division
                              Boston, MA  02108

EXHIBIT

B

Free/Gratis

Nuestra Apertura

# Diálogo bilingüe

July 2003

Volume 1 Number 2

# RECORTES DE PRESUPUESTO: ¿CÓMO NOS AFECTAN?

**Recortes Presupuestarios a to'jender**

**Casualties of the War on Poverty**

**Tales of Two Realities: Springfield and Holyoke**

**El PAC Bilingüe de Holyoke Informa**

## Recortes Presupuestarios y la Ley de Inmersión al Inglés:
## Dos Trancazos para la Comunidad Latina

Dentro de pocos meses entrará en efecto la nueva Ley de Inmersión al Inglés. También comenzaremos un nuevo año fiscal con un presupuesto "acomodado" a reducir el déficit presupuestario del estado. Aunque por sí solas estas decisiones representan un reto para nuestras comunidades, la combinación de éstas se convierten en un serio problema que afecta nuestro bienestar, identidad cultural y calidad de vida .

Es de todos conocido que nuestras escuelas se encuentran en una situación precaria. La magnitud de estos recortes le echa "leña al fuego" a esta crisis educativa. La primera ola de despidos de maestros bilingües en las escuelas del área ha comenzado. Con el paso de la nueva Ley de Inmersión al Inglés, los servicios de profesionales bilingües en nuestras escuelas se consideran irrelevantes e innecesarios. Nuestros estudiantes puertorriqueños/latinos regresarán a salones de clase donde su cultura y su lenguaje no se verán reflejados ni en sus maestros ni en el personal de apoyo.

Ante esta situación, me vienen a la mente las palabras que compartí con la audiencia durante la fiesta de inauguración de nuestro periódico. Como dijo Marian Wright Edelman y cito, "Democracy is not a spectator sport. " (La democracia no es un deporte para espectadores.) Ante esta crisis no podemos quedarnos con los brazos cruzados. Nuestro futuro depende de lo que hagamos ante esta situación. Participemos en el proceso político para articular nuestra propia agenda. *El bilingüismo no puede ser un privilegio de pocos si no un derecho de todos.*

• • • • • • • • • • • • • • • • • • • • • • • • • • • • • •

## Tax Cuts and the Law of English Immersion:
## Two Strikes for the Latino Community

Within a few months the new law of English Immersion will come into effect. We will also be entering a new fiscal year with a "fixed" budget to reduce the state's deficit. These decisions taken singly represent a goal for our communities, when examined together they represent a serious problem that affects our well being, our culture and our quality of life.

It is well known that our schools find themselves in a precarious situation. The magnitude of these cuts fuel the fire in this educational crisis. The first wave of bilingual teachers in the schools being laid off has begun. With the enactment of the new Law of English Immersion, the professional bilingual services in our schools are considered irrelevant and unnecessary. Our Puerto Rican/ Latino students will return to classrooms where their language and culture will not be reflected neither in their teachers nor in the staff.

Facing this situation, words that I shared with the audience during the inauguration party of our newspaper come to mind. As Marian Wright Edelman said, "Democracy is not a spectator sport." Facing this crisis we cannot remain with our arms crossed. Our future depends on what we faced with this situation. Let us participate in the political process to articulate our own agenda. *Bilingualism cannot be a privilege of the few but must be a right of all.*

**Diálogo bilingüe**

101 Cabot Street
Holyoke, Massachusetts 01040
Volumen 1 No. 2

Editor in Chief • Manuel Frau-Ramos
(413) 250-0243
editor@dialogobilingue.com
Managing Director • Héctor Batiza
Marketing Director • Héctor Batiza
(413) 836-5560
marketing@dialogobilingue.com
Sales Manager • Mabel Baéz
advertise@dialogobilingue.com
Language Editors • Jord Esrany Frau
Raúl Errey
Nastia Betancourt
Photographers • Javier Feliciano
Jim Amstrong
Contributing Writers • Raúl Errey
Doris Thomas
Nastia de Murphy
Jim el Nieto
Jillian Santiago
Veronica J. Santos
D. K. Thomas
Evelyn Marrero
Fernando Zapata
Cartoonist • Carlos V. McFall
Art Director • Wallis Rivera
artdirector@dialogobilingue.com

Online edition • www.dialogobilingue.com

---HAY UNA DIFERENCIA!---

## LICENCIADO RYAN E. ALEKMAN

### EL ABOGADO QUE HABLA ESPAÑOL

SPRINGFIELD • 781-4566

HOLYOKE • 532-9135

HERIDAS PERSONALES/DEFENSA CRIMINAL

VISTO EN TELEMUNDO

---

**square cafe**

at open square
in the heart of
Holyoke's
canal district
413.538.6214

www.opensquare.com

---

## !square cafe
## está abierto!

| | |
|---|---|
| cappuccino | fresh baked goods |
| espresso | bagels |
| gourmet coffee | muffins |
| mocha | turnovers |

### try our iced cappuccino!

open monday thru friday 8am - 1 pm
square cafe is off lyman street across from the
Wherehouse



May 17, 2005

Robinson and Donovan PC
Attn: Keith A. Minoff., Esq.
1500 Main Street, Suite 1600
Springfield, Massachusetts 01115

**EXHIBIT**

_C_

Dear Mr. Minoff,

I am the Executive Director of Solutions Community Development Corporation – a non-profit organization dedicated to strengthening the economic potential of low- and moderate-income residents in Holyoke, Massachusetts. Having served in this capacity for the last ten years, I can attest to the fact that there have been very few media sources that facilitate a constructive dialogue of critical issues facing working families in the community. The mainstream media – corporate television, radio and newspapers – do not address these issues even in English, much less Spanish, which is the primary language of a large segment of this population.

The problem with community newspapers is that either they don't address controversial issues at all or they come and go within a few years for lack of professional, financial management and resources... until now.

Lillian Santiago Báuza, Publisher of El Diálogo, has brought a breath of fresh air and professionalism to the exchange of ideas, information and opinions of different segments of the community. When she started the paper, it was called El Diálogo Bilingue. Gradually, it became know simply as El Diálogo. Under her direction, El Diálogo has become a fundamental community asset not only for households, but also for the non-profit sector. El Diálogo offers affordable rates for advertising. It has covered several of our services to assist low-income families, providing essential information to the public. It has also sponsored special events like the Two Islands – Puerto Rican and Irish music event, which brought these two ethnic communities closer together for a fun evening of shared values and interests as well as raising $1,400 for Solutions CDC.

For all of the exemplary and committed service of El Diálogo to the City of Holyoke and its environs, we are sincerely grateful.

Signed under the pains and penalties of perjury,

Andrew Morehouse
Director



**HARRY MONTALVO**
Notary Public
Commonwealth of Massachusetts
My Commission Expires
August 11, 2011

254 Maple Street • Holyoke, MA 01040 • Tel: (413) 315-6017 • Fax: (413) 315-6258

May 18, 2005

Robinson Donovan PC
Keith A. Minoff
1500 Main Street, Suite 1600
Springfield, MA 01115

Dear Atty. Minoff,

This letter is written on behalf and at the request of Ms. Lillian Santiago-Bauzá. My name is Xenia Rosado-Merced, and I am the Manager of the Community Outreach Department at Holyoke Medical Center. One of the many responsibilities in my position is to provide community health education, primarily to the Holyoke's Hispanic/Latino population. A way in which I attempt to accomplish such task is through an active involvement with community groups. I seek to identify existing and surfacing community needs and urge my organization to respond to such identified needs. Subsequently, I am very familiar with, and respectful of the Hispanic/Latino community that Holyoke Medical Center serves.

I was fortunate to have met Ms.Lillian Santiago in the mid 1970's as a result of our mutual active involvement with the Holyoke's Hispanic/Latino community. Ms. Santiago was a leader in the community then, and continues to be a leader in the Hispanic/Latino community today. Ms. Santiago has earned the respect and the vote not only of the Hispanic community, but also of the Holyoke community at large. I, most recently, also had the opportunity to work closer with Ms. Santiago while she held the position of Director of Concern EAP, here at Holyoke Medical Center. As colleagues, we work closer together, and I was able to see first hand, the quality of her clinical skills and her profound commitment to this community.

Early in 2003, Ms. Santiago began discussing with me the lack of a professional Spanish newspaper in this area and her interest in creating one. She spoke of a high quality newsletter which will really represent the issues and sentiments of our people. Within few months, she was already developing a new newspaper in the city of Holyoke, El Diálogo Bilingüe. With Lillian's knowledge, enthusiasm, and hard work, soon this publication became better know within the community as "El Diálogo". I believe Lillian's role was, and still is crucial for El Diálogo's success and its continuation, simply because of Lillian's strong commitment to her community.

Our Hispanic/Latino community has greatly benefitted by Ms. Santiago's creation of a professional publication because it speaks about the important issues affecting the community. "El Diálogo" has opened a dialogue, like the name suggest, for the process of achieving a greater understanding and a respectful connection between our Hispanic/Latino people and the Holyoke's Anglo population.

I support Ms. Santiago's fight to preserve a newspaper that has become a community symbol because of her dedication and commitment to the Holyoke's Hispanic/Latino community. Please preserve "El Diálogo" and Ms. Santiago as its editor. If you have any further questions please without hesitation call me at 534-2610.

Signed under the pains and penalties of perjudy this 18th of May, 2005.

Xenia Rosado-Merced, M.Ed., L.S.W.
Community Outreach Manager

## MASSACHUSETTS ALL-PURPOSE ACKNOWLEDGMENT

Gov. Exec. Ord. #455 (03-13), §5(d)

Commonwealth of Massachusetts

County of _____ *Hampden* _____ } ss.

On this the __18__ day of _____ *May* _____ , *2005* , before me,
Day                                Month              Year

_____ *Amy Smith* _____ , the undersigned Notary Public,
Name of Notary Public

personally appeared _____ *Xenia Rosado-Merced* _____ ,
Name(s) of Signer(s)

proved to me through satisfactory evidence of identity, which was/were

_____ *Personal Knowledge* _____ ,
Description of Evidence of Identity

to be the person(s) whose name(s) is/are signed on the preceding or attached document, and
acknowledged to me that he/she/they signed it voluntarily for its stated purpose(.)

☐ as partner(s) for _____
                    Name of Partnership

_____ , a partnership.

☐ as _____ for
      Title of Office

_____ , a corporation.
      Name of Corporation

☐ as attorney in fact for _____
                         Name of Principal Signer

_____ , the principal.

☐ as _____ for _____
      Type of Capacity

_____ , a/the _____
Name of Person/Entity        Type of Entity

*Amy Smith*
Signature of Notary Public

*Amy Smith*
Printed Name of Notary

**AMY B. MACKENZIE**
Notary Public
Commonwealth of Massachusetts
My Commission Expires Sep 4, 2009

Place Notary Seal and/or Any Stamp Above

My Commission Expires __9/4/09__

━━━━━━━━━━ OPTIONAL ━━━━━━━━━━

*Although the information in this section is not required by law, it may prove valuable to persons
relying on the document and could prevent fraudulent removal and reattachment of this form to
another document.*

**Description of Attached Document**

Title or Type of Document: _____ *Letter of Support* _____

Document Date: __5/17/05__  Number of Pages: _____ *two* _____

Signer(s) Other Than Named Above: _____ *N/A* _____

| Right Thumbprint of Signer |
|---|
| Top of thumb here |

© 2004 National Notary Association • 9350 De Soto Ave., P.O. Box 2402 • Chatsworth, CA 91313-2402 • www.NationalNotary.org
Item No. 5951                                    Reorder: Call Toll-Free 1-800-US NOTARY (1-800-876-6827)



# Holyoke Health Center, Inc.

May 18, 2005

Keith A. Minoff
Robinson, Donovan, PC
1500 Main St., Ste. 1600
Springfield, MA 01115

**HOLYOKE HEALTH CENTER**

ADMINISTRATIVE OFFICE
217 High Street
Mailing Address:
P. O. Box 6260
Holyoke, MA 01041-6260

Phone (413) 420-2111
Fax (413) 534-5416

..............

CLINIC
230 Maple Street
Mailing Address:
P. O. Box 6260
Holyoke, MA 01041-6260

Phone (413) 420-2200
Fax (413) 420-2260

..............

SUPPORT SERVICES
255 High Street
Mailing Address:
P. O. Box 6260
Holyoke, MA 01041-6260

Phone (413) 420-2130
Fax (413) 540-0957

..............

**CHICOPEE HEALTH CENTER**

CLINIC
203 Exchange Street
Chicopee, MA 01013
Mailing Address:
P. O. Box 6260
Holyoke, MA 01041-6260

Phone (413) 420-2222
Fax (413) 592-2324

..............

Dear Mr. Minoff:

I am writing regarding the newspaper *El Dialogo*, formerly *Dialogo Bilingue*. Holyoke Health Center, Inc. has advertised its services in the newspaper since the paper was founded in June 2003.

Holyoke Health Center, Inc. was an early and enthusiastic supporter of *El Dialogo* because Lillian Santiago, like the health center, has worked hard for the community of Holyoke. She has shown a long-term commitment to the health of this city. As a community health center, we consider it our mission to support local endeavors, like *El Dialogo*, that bring positive changes to the community.

Hector Bauza was our initial contact with the newspaper, and Lillian Santiago became our contact when she took over as publisher. With the exception of conversations about the design and content of our ad with graphic designers and email exchanges with editor Ana Morales, Lillian has been our only contact at the newspaper. *El Dialogo* has printed articles about the work of the health center and has included our events in its calendar.

Hector Bauza joined the Holyoke Health Center's Board of Directors last December.

Please contact me if you have further questions.

Sincerely,

Becky Michaels
Marketing Director
413-420-2114

On the 8th Day of May, 2005, before me, The undersigned notary public, personally appeared Becky Michaels, proved to me through satisfactory evidence of identification which was a MA Drivers Lic., to be the person whose name is signed on the preceding or attached document, and ...

Patrick B. Lavelle, Jr.
NOTARY PUBLIC
My commission expires July 14, 2006



10 Open Square Way
Holyoke, MA 01040
tel 413.532.5057
fax 413.532.5178
info@opensquare.com
www.opensquare.com

I met Lillian Santiago-Bauza in the late summer of 2003 through her son, Raul Lorenzo and husband Hector Bauza. One sunny Sunday afternoon I found Raul and Hector wandering around Open Square, the large mill property in the center of Holyoke's urban core which I am developing. They had heard about the project and were curious. We immediately struck up a conversation and they told me that they would like to return with Lillian, who had started a bilingual newspaper called Dialogo Bilingue, and was looking to move the business from their residence to an office location in the near future. From there they introduced me to Lillian and we met several times. I was thrilled to learn that they lived downtown in another mill that had been converted to condominiums some ten to fifteen years ago as part of a failed resurgence of the Holyoke. I had been living in Holyoke for three years by then and could count on one hand the number of educated professionals that I knew living in the area. As the poorest city in the Commonwealth of Massachusetts with a large, undereducated Hispanic population, Holyoke is not the first choice of most professionals and certainly not the location of choice to start such a risky venture as a newspaper. By December of 2003 Dialogo Bilingue had signed a lease and was operating out of Open Square.

Lillian's concept for Dialogo Bilingue was both innovative and ambitious. She wanted a newspaper that spoke to the underserved and under represented Hispanic population as well as the broader population, while at the same time bridging the cultural divide between different ethnic groups. There are very few people with the skills, local community ties, and commitment to pull off such a project. Lillian has all three in abundance and has worked tirelessly to achieve her goals. Lillian's work has extended far beyond just publishing a newspaper to include events like "Island's Together", an unprecedented and successful series of ongoing gatherings that bring different ethnic groups together to mingle, socialize and share their music. The level of quality and outreach is helping to spark the dormant economy of Holyoke and the region by creating economic opportunity for many people and businesses. The community, and more the region, looks towards the newspaper, now named El Dialogo, as not only a resource for all people regardless of income and ethnicity, but as a sign of hope for the future. The newspaper, later renamed El Dialogo would not exist, nor would it have reached its current level of success without Lillian Santiago. It would be a travesty for the community to lose El Dialogo under Lillian's direction, and a blow to the Holyoke's economic turnaround.

John Aubin
Managing Member, Open Square LLC
Managing Member, Open Square Properties LLC
General Partner, Lyman Associates (Echo Hill of Holyoke Apartments)



On this 19th day of May, 2005, before me, the undersigned notary public, personally appeared John Aubin, proved to me through satisfactory evidence of identification, which were a Massachusetts Driver's License, to be the person whose name is signed on the attached document in my presence.



Commission exp: 6/23/2011

HOPE JINISHIAN, M.S.W.
121 WILLOW STREET
FLORENCE, MASSACHUSSETTS 01062
(413) 586-0440

May 18, 2005

Robinson & Donovan, PC
1500 Main Street, Suite 1600
Springfield, MA 01115

To Whom It May Concern,

I am writing on behalf of Lillian Santiago-Bauza and the bilingual newspaper, El Dialogo, which she has published since 2003. I serve on a planning committee with Ms. Santiago-Bauza at the Women's Fund of Western Massachussetts (WFWM) where she has initiated a Latino chapter of the Women's Fund and serves on the Board of Directors. At the WFWM like at El Dialogo she works diligently to inspire civic responsibility in the local Latino community.

Lillian Santiago-Bauza works tirelessly on behalf of her community publishing the only bilingual newspaper in Hampshire and Hampden Counties Through the publication of the paper, not only does she provide education and information on a variety of topics, but she offers a forum for promotion of local business's products and services as well. I am impressed by her dedication and commitment to service and believe that it would be a great loss to the residents of Hampshire and Hamden counties to lose this unique contribution to our society.

Sincerely,                    Signed under the pains and penalties of perjury this 18 day of May, 2005

Hope Jinishian, M.S.W.

Joanne M. Stall
notarized for Hope Jinishian

My Commission Expires
December 4, 2009

EXHIBIT

D

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

CIVIL ACTION NO. 05-30076-MAP

DIÁLOGO, LLC and )
DIRECT MERCHANTS S.A., INC., )
    Plaintiffs )
     )
     )
v. )
     )
LILLIAN SANTIAGO BAUZÁ, )
EL DIÁLOGO, LLC, and )
FRANCISCO JAVIER SOLÉ, )
    Defendants )
     )
LILLIAN SANTIAGO BAUZÁ, )
EL DIÁLOGO, LLC, and )
FRANCISCO JAVIER SOLÉ, )
    Plaintiffs in Counterclaim )
     )
v. )
     )
DIÁLOGO, LLC and )
DIRECT MERCHANTS S.A., INC., )
    Defendants in Counterclaim )

## SUPPLEMENTAL AFFIDAVIT OF LILLIAN SANTIAGO BAUZA

I, Lillian Santiago Bauza, first being duly sworn, do hereby depose and say:

1.    I have read the Second Affidavit of Gerry Pike which was filed along with plaintiff's Preliminary Injunction Motion. Like his original Affidavit which was filed with Plaintiffs' Application for Temporary Restraining Order, Mr. Pike's Second Affidavit is filled with inaccuracies and misstatements. I will address these below.

2.    In paragraph 10, Mr. Pike states that he never told me that DMSA would contribute $50,000 cash into Dialogo, LLC as its capital contribution. This is simply not true. As stated in my earlier Affidavit, Mr. Pike stated to me at our meeting at a hotel in North Haven,

400360

Connecticut on May 24, 2004, that DMSA would contribute $50,000 cash in starting capital to the new company.  Schedule A to the Operating Agreement states that DMSA will make a capital contribution of $50,000 to the LLC.  Mr. Pike also states that DMSA was to contribute "a strategic marketing initiative specific to the Spanish language print media business" and "extensive and detailed research studies" which DMSA had already completed relating to Spanish language markets throughout the United States.  Mr. Pike never told me that this was to be DMSA's contribution to the LLC.  Had Mr. Pike discussed this with me, which he did not, I would not have been interested.  Based on our discussions, the only business of the LLC was to publish a bimonthly, bilingual newspaper in Holyoke, Massachusetts. I had no use for the marketing plans and research studies which Mr. Pike now says made up DMSA's capital contribution.  In addition, at no time did DMSA or Mr. Pike ever provide me with any written material setting forth a DMSA "strategic marketing initiative" or any of the research studies he refers to in Paragraphs 10 and 23.

3.     Similarly, in paragraph 23, Mr. Pike falsely states that DMSA's initial capital contribution, which the parties agreed had a value of $50,000, was comprised of its proprietary strategic marketing initiative specific to the Spanish language print media business and the companion research studies cited previously.  On the contrary, I never agreed that this was to be DMSA's initial capital contribution to the LLC nor did I agree or would I have ever agreed that it had a value of $50,000.  Mr. Pike never stated to me that DMSA's initial capital contribution would be anything other than $50,000 cash.

4.     In paragraph 27, Mr. Pike claims that Dialogo, LLC developed the trademark and trade name "El Dialogo".  This is also untrue.  Between June, 2003 and May, 2004, I, along with my partners in Dialogo Bilingue, Inc., published Dialogo Bilingue, which was also a bimonthly,

400360

bilingual newspaper serving the Holyoke/Springfield area and was known throughout the Latino community simply as "Dialogo" or "El Dialogo."

5.      In paragraph 29, Mr. Pike claims that through March, 2005, DMSA had made over $40,000 in out of pocket payments for the benefit of the LLC and also contributed over $5,000 in management services. This is also untrue. The actual out-of-pocket expenses paid by DMSA relating to "El Dialogo" total $18,618.73 and are set forth in Exhibit B to my original Affidavit. This exhibit was provided to me by DMSA in January, 2005 in response to my request for a complete accounting of payments of DMSA had made up to that point.

6.      I have reviewed Exhibit 6 to Mr. Pike's Second Affidavit, which Mr. Pike claims is a true and correct summary of DMSA's expenditures. This is also untrue. I had never seen Exhibit 6 until it was produced by DMSA as part of its response to the defendant's request for production of documents in this case. Exhibit 6 consists of numerous payments which, if they were made at all, have nothing whatsoever to do with El Dialogo. For example, Exhibit 6 lists four payments totalling in excess of $4,000 which were paid between February 27 and May 27, 2004. I did not even sign the Operating Agreement for the LLC until June 9, 2004. Exhibit 6 also lists two payments to a George D. Scribner totaling $10,500. The first of these payments, in the amount of $7,500, was allegedly paid on June 11, 2004, only two days after the Operating Agreement was signed and four months before the Articles of Organization of Dialogo, LLC were filed with the State of Maine which occured on October 12, 2004. (A true and correct copy of the Articles is attached as Exhibit A) Exhibit 6 also includes unspecified payments made to DMSA and Gerry Pike totaling $7,400 which are not described or itemized in any way, were never previously disclosed to me and to my knowledge, do not relate in any way to El Dialogo.

7.      In paragraphs 30 and 31, Mr. Pike refers to financial statements relating to the financial performance of the LLC between July 1, 2004 and December 13, 2004. Mr. Pike states that these documents showed a total net income of over $21,000 and that the company had a profit for every complete month in this period. While the financial statements Mr. Pike refers to do in fact include those figures, Mr. Pike was well aware when those financial statements were first presented to him in December, 2004 that they were in error. I explained to Mr. Pike at that time that the accountant who prepared the financial statements, Tracy Learned, had made a mistake and that much of the revenue reported on the statements had been double counted. I assured Mr. Pike as I already had on several occasions that the company was not making a profit and in fact was running at a loss every month.

8.      In paragraph 33, Mr. Pike charges that I never informed him that DMSA failed to abide by its obligation to make a $50,000 cash investment in the LLC. On the contrary, I reminded Mr. Pike on many occasions both in person and on the telephone between June, 2004 and February, 2005 that DMSA had promised to make a capital contribution of $50,000 and had failed to do so.

9.      Dialogo, LLC never made any profits. It continually operated at a loss.

10.     Mr. Pike's Second Affidavit contains many other misstatements of fact which I previously addressed in my earlier Affidavit filed in opposition to the plaintiff's Application for a Temporary Restraining Order. I hereby incorporate that earlier Affidavit by reference.


I solemnly affirm under the pains and penalties of perjury that the statements set forth in the foregoing Affidavit are true and correct and based upon personal knowledge.

Signed under the pains and penalties of perjury this _19th_ day of _MAY_ , 2005.

Lillian Santiago Bauza

COMMONWEALTH OF MASSACHUSETTS

HAMPDEN, SS.

On this 19th day of May, 2005, before me, the undersigned notary public, personally appeared Lillian Santiago-Bauza, proved to me through satisfactory evidence of identification, which was a ~~Massachusetts~~ Puerto Rico driver's license, to be the person whose name is signed on the preceding or attached document, and acknowledged to me that she signed it voluntarily for its stated purpose.

Tarena N. Hines, Notary Public

My Commission Expires: 12/24/2010

**DOMESTIC
LIMITED LIABILITY COMPANY**

**STATE OF MAINE**

**ARTICLES OF ORGANIZATION OF
LIMITED LIABILITY COMPANY**

(Mark box only if applicable)

☐ This is a professional limited liability company** formed pursuant to 13 MRSA Chapter 22-A to provide the following professional services:

_____

_____

(type of professional services)

Filing Fee $175.00

File No. 20051057DC  Pages 2
Fee Paid $ 175
DCN    2042931300019   LTLC
----FILED----
10/13/2004

*Julie L Flynn*
Deputy Secretary of State

**A True Copy When Attested By Signature**

*Julie L Flynn*
Deputy Secretary of State

Pursuant to 31 MRSA §622, the undersigned executes and delivers the following Articles of Organization of Limited Liability Company:

**FIRST:**     The name of the limited liability company is

**Dialogo LLC**
_____
(The name must contain one of the following: "Limited Liability Company", "L.L.C." or "LLC"; 31 MRSA §605-A.1)

**SECOND:**     The name of its Registered Agent, an individual Maine resident or a corporation, foreign or domestic, authorized to do business or carry on activities in Maine, and the address of the registered office shall be:

**Mark K. Googins, Esq.**
_____
(name)

**1 Portland Square, Portland, Maine  04112-0586**
_____
(physical location - street (not P.O. Box), city, state and zip code)

_____
(mailing address if different from above)

**THIRD:**     ("X" one box only).

☐     A.     The management of the company is vested in a member or members.

☒     B.     1.     The management of the company is vested in a manager or managers.  The minimum number shall be **1**____ managers and the maximum number shall be **10**____ managers.

2.     If the initial managers have been selected, the name and business, residence or mailing address of each manager is:

| Name | Address |
|------|---------|
| | |
| | |
| | |

☐     Names and addresses of additional managers are attached hereto as Exhibit ____, and made a part hereof.

**FOURTH:**     Other provisions of these articles, if any, that the members determine to include are set forth in Exhibit ____ attached hereto and made a part hereof.

FORM NO. MLLC-6 (1 of 2)

00002063

Organizer(s)*

DATED October 12, 2004

_____
(signature)

Mark K. Googins, Esq.
_____
(type or print name)

_____
(signature)

_____
(type or print name)

_____
(signature)

_____
(type or print name)

**For Organizer(s) which are Entities**

Name of Entity _____

By _____
(authorized signature)

_____
(type or print name and capacity)

Name of Entity _____

By _____
(authorized signature)

_____
(type or print name and capacity)

Name of Entity _____

By _____
(authorized signature)

_____
(type or print name and capacity)

### Acceptance of Appointment of Registered Agent

The undersigned hereby accepts the appointment as registered agent for the above-named limited liability company.

Registered Agent

DATED October 12, 2004

_____
(signature)

Mark K. Googins, Esq.
_____
(type or print name)

**For Registered Agent which is a Corporation**

Name of Corporation _____

By _____
(authorized signature)

_____
(type or print name and capacity)

Note: If the registered agent does not sign, Form MLLC-18 (31 MRSA §607.2) must accompany this document.

_____

**Examples of professional service corporations are accountants, attorneys, chiropractors, dentists, registered nurses and veterinarians. (This is not an inclusive list – see 13 MRSA §723.7)

*Articles MUST be signed by:
   (1)  all organizers OR
   (2)  any duly authorized person.
The execution of this certificate constitutes an oath or affirmation under the penalties of false swearing under 17-A MRSA §453.

Please remit your payment made payable to the Maine Secretary of State.

**SUBMIT COMPLETED FORMS TO:  CORPORATE EXAMINING SECTION, SECRETARY OF STATE,
101 STATE HOUSE STATION, AUGUSTA, ME  04333-0101
TEL. (207) 624-7740**

FORM NO. MLLC-6 (2 of 2)   Rev. 8/1/2004

00002064



UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

CIVIL ACTION NO. 05-30076-MAP

DIÁLOGO, LLC and )
DIRECT MERCHANTS S.A., INC., )
    Plaintiffs )
     )
     )
v. )
     )
LILLIAN SANTIAGO BAUZÁ, )
EL DIÁLOGO, LLC, and )
FRANCISCO JAVIER SOLÉ, )
    Defendants )

## AFFIDAVIT OF EDUARDO PEREZ

I, Eduardo Perez, hereby depose and say:

1.    I am an individual who resides at 960 Taft Avenue, Northeast Number 8, Atlanta, GA. My business address is 1440 Dutch Valley Place, Suite 130, Atlanta, GA.

2.    I am President of PM Publicidad, an advertising and public relations firm focusing on the Hispanic market.

3.    On or about November 22, 2004, I, along with my partners Patricio Montalbetti and Nancy Perez, formed a new company with Direct Merchants S.A ("DMSA") known as Perez Montalbetti Perez, LLC. The company was formed for the purposes of developing Spanish language and bilingual advertising marketing and media.

4.    I, along with my partners and DMSA, executed a Venture Agreement and an Operating Agreement, both of which are attached hereto as Exhibit "A". It is my understanding and belief that these documents were signed

400339

by Gerry Pike for DMSA and that Articles of Organization for the LLC were filed in the State of Maine by the law firm Verrill Dana.

5.  The Operating Agreement provided that DMSA would make a capital contribution to the LLC in the amount of $49,997.00 in exchange for a 35% interest in the LLC.  (see Schedule A to the Operating Agreement)

6.  DMSA made only partial cash capital contributions to Perez, Montalbetti, Perez, LLC while claiming DMSA had fulfilled their capital contribution commitment via other claimed "expenses", primarily undocumented "management time and expertise"..

7.  On or about April 13, 2005 I wrote to Gerry Pike and Beatrice Mallory of DMSA, Inc. and informed him that my partners and I wish to terminate our relationship with DMSA and Perez, Montalbetti, Perez, LLC.  A true and correct copy of this letter is attached hereto as Exhibit "B".

8.  As stated in the letter, there were various reasons for our decision, including deep and fundamental differences with DMSA in values and business philosophies in addition to DMSA's failure to capitalize Perez, Montalbetti, Perez, LLC with $49,997.00, as required under the operating agreement.

9.  It is my understanding that Mr. Pike testified in a deposition in this case on May 10th that he did not receive the letter which I have attached as Exhibit "A".  I know that this is not true because Mr. Pike contacted me after he received the letter and referred to it.

I solemnly affirm under the pains and penalties of perjury that the contents of the foregoing

affidavit are true and correct and based upon my personal knowledge.

Eduardo Perez

_____, SS.

On this _19_ day of _May_, 2005, before me, the undersigned notary public, personally appeared Eduardo Perez, proved to me through satisfactory evidence of identification, which was _GA DL 04933038-1_____, to be the person whose name is signed on the preceding or attached document, and acknowledged to me that Eduardo Perez signed it voluntarily for its stated purpose.

Notary Public

My Commission Expires: _5/14/07_



400339



EXHIBIT

_A_

**VENTURE AGREEMENT**

**1.** The undersigned parties agree to form a Maine limited liability company ("LLC"), to be called Perez, Montalbetti, Perez, with membership interests owned initially as follows: 15 % by Patricio Montalbetti , 15 % by Eduardo Perez, 15 % by Nancy Perez (Collectively, "PMP"), Georgia residents, and 35% by Direct Merchants S.A., Inc ("DMSA"), a New Jersey Corporation, for the purpose of jointly developing a Spanish language and bilingual advertising, marketing and media business ("the Business"). The LLC will be managed by a board of directors, consisting of two representatives from DMSA and 3 from PMP. PMP will be responsible for managing the day-to-day operations of the venture, including recruiting and hiring employees and contractors and, along with DMSA management, developing the long-term strategy of the joint venture. DMSA acknowledges that PMP will not contribute any cash to initiate the LLC. PMP acknowledges all expenditures must be done with the concurrence of DMSA. DMSA shall contribute the initial capital to launch the LLC in an amount that DMSA deems appropriate (including through travel, promotional costs, legal fees, accounting fees, billing fees and the labor of management and staff of DMSA). The owners will sign an agreement giving each other a right of first refusal on any proposed transfer of membership interests in the LLC and requiring approval by the Board of Directors issuing any additional membership interests. All profits that the board decides to distribute, both ordinary and capital, will be distributed to the members in proportion to their membership interest. The board shall distribute each year at least enough cash to owners to cover the owners' U.S. tax liability for LLC profits in such year if any.

**2.** DMSA and PMP agree that they shall through the LLC jointly pursue the Business. PMP acknowledges and agrees, however, that DMSA is an on-going enterprise, and its principals individually and through other enterprises, have a variety of business interests that are not and will not be part of the LLC's business, whether similar to the LLC's Business or not. PMP further acknowledges and agrees that neither DMSA nor its principals shall have any obligation to assign existing, or originate new business, advertising contracts, marketing contracts, or any other contracts for the benefit of the LLC, or to assign existing or originate new advertising opportunities or clients for the benefit of the LLC, and that DMSA and its principals may retain existing and originate new media opportunities, advertising contracts and clients for its own benefit, whether directly or indirectly. Without diminishing DMSA's rights under the foregoing language, DMSA does agree that it intends to use diligent efforts to direct appropriate business to the Company in furtherance of the Company's goals. However, PMP shall employ diligent efforts to originate new media and advertising contracts and clients for the LLC and neither PMP nor its principals shall provide such services, directly or indirectly for itself or any other entity or person to the extent it relates to the Business.

**3.** The LLC will initially rely on the staffs of DMSA and efforts of Perez, Montalbetti and Perez .



**4.** Amounts paid to the LLC by clients shall be distributed as follows: first to reimburse any out of pocket costs; second to DMSA to repay the initial capital to launch the LLC; third to owners to cover the owners' U. S. tax liability for LLC profits in such year, if any; finally any remaining amounts to be distributed by the Board at its discretion to the members in proportion to their respective membership interests. No member shall incur costs or expenses on behalf of the LLC, or commit the LLC to any costs or expenses, except in accordance with the approved budget. It is not currently expected that the LLC will borrow, but that may occur in the future if approved by the Board of Directors.

**5.** DMSA and PMP acknowledge and agree that all efforts and actions undertaken by them for the LLC in connection with the Business are to be kept confidential. Neither DMSA nor PMP will disclose to any person or entity, directly or indirectly, any Proprietary Information (as hereinafter defined) relating to the LLC's Business without the prior written consent of the LLC. For purposes of this Agreement, "Proprietary Information" means all advertising and subscription client lists, advertising and subscription client prospects, marketing information and data, product information, strategic or technical information, financial information, supplier information, billing rates and client provided information, documents and data.

**6.** In furtherance of this Agreement, DMSA and PMP shall execute and deliver the following documents, all of which shall be consistent with this Agreement and otherwise shall contain standard terms and conditions. articles of organization of LLC;

  ▪ operating agreement of LLC;

IN WITNESS WHEREOF, the parties to this Agreement have executed this Agreement in one or more counterpart(s) as of the date first written below.

| **Patricio Montalbetti** | **DMSA** |
|---|---|
| By:_____ | By:_____ |
| Name: Patricio Montalbetti | Name: Gerry Pike |
| Title:   Principal | Title: Managing Director |
| Date    September ___, 2004 | Date: September ___, 2004 |

| **Eduardo Perez** | **Nancy Perez** |
|---|---|
| By:_____ | By:_____ |
| Name: Eduardo Perez | Name: Nancy Perez |
| Title:   Principal | Title: Managing Director |
| Date    September ___, 2004 | Date: September ___, 2004 |

## OPERATING AGREEMENT
## PEREZ, MONTALBETTI, PEREZ, LLC

This Operating Agreement (the "Agreement") of Perez, Montalbetti, Perez, LLC (the "Company") is made as of the Effective Date by and among Patricio Montalbetti, Eduardo Perez, Nancy Perez, resident of Georgia ("PMP"), and Direct Merchants S.A., Inc., a New Jersey Corporation ("DMSA"), as members of the Company, and the persons or entities who become members of the Company in accordance with the provisions hereof and whose names are set forth as Members on Schedule A hereto.

## ARTICLE I

## DEFINED TERMS

Section 1.1    Definitions.  Unless the context otherwise requires, the terms defined in this Article I shall, for the purposes of this Agreement, have the meanings herein specified.

"Additional Members" has the meaning set forth in Section 13.1 hereof.

"Affiliate" means with respect to a specified Person, any Person that directly or indirectly controls, is controlled by, or is under common control with, the specified Person.  As used in this definition, the term "control" means the possession, directly or indirectly, of the power to direct or cause the direction of the management and policies of a Person, whether through ownership of voting securities, by contract or otherwise.

"Agreement" means this Operating Agreement of the Company, as amended, modified, supplemented or restated from time to time.

"Articles" means the Articles of Organization of the Company and any and all amendments thereto and restatements thereof filed on behalf of the Company with the office of the Secretary of State of the State of Maine pursuant to the Maine Act.

"Board" means the Board of Directors of the Company.

"Capital Account" means, with respect to any Member, the account maintained for such Member in accordance with the provisions of Section 4.4 hereof.

"Capital Contribution" means, with respect to any Member, the aggregate amount of money and the fair market value of any property (other than money) contributed to the Company pursuant to Section 4.1 hereof with respect to such Member's Interest.

"Code" means the Internal Revenue Code of 1986, as amended from time to time, or any corresponding federal tax statute enacted after the date of this Agreement.  A reference to a specific section of the Code refers not only to such specific section but also to any corresponding provision of

any federal tax statute enacted after the date of this Agreement, as such specific section or corresponding provision is in effect on the date of application of the provisions of this Agreement containing such reference.

"Company" means Perez, Montalbetti, Perez, LLC, the limited liability company formed and continued under and pursuant to the Maine Act and this Agreement.

"Covered Person" means a Member, a Director, an Officer, a Manager, any Affiliate of a Member, a Director, an Officer or a Manager, any officers, directors, Members, partners, employees, representatives or agents of a Member, a Director, an Officer or a Manager, or their respective Affiliates, or any employee or agent of the Company or its Affiliates.

"DMSA Account Balance" means $49,997 minus the aggregate of distributions made to DMSA pursuant to Section 9.1(i).

"Director" means a director of the Company.

"Effective Date" means the date the Articles are filed with the Secretary of State of the State of Maine.

"Fiscal Year" means (i) the period commencing upon the formation of the Company and ending on December 31, 2004, (ii) any subsequent twelve (12) month period commencing on January 1 and ending on December 31, or (iii) any portion of the period described in Clause (ii) of this sentence for which the Company is required to allocate Profits, Losses and other items of Company income, gain, loss or deduction pursuant to Article VIII hereof.

"Interest" means a Member's limited liability company interest in the Company which represents any Member Votes held by a member and such Member's interest of the profits and losses of the Company and a Member's right to receive distributions of the Company's assets in accordance with the provisions of this Agreement and the Maine Act.

"Laws" means:

        (i)      all constitutions, treaties, laws, statutes, codes, ordinances, orders, decrees, rules, regulations and municipal by-laws, whether domestic, foreign or international;

        (ii)      all judgments, orders, writs, injunctions, decisions, rulings, decrees and awards of any governmental body;

        (iii)      all policies, practices and guidelines of any governmental body; and

(iv)    any amendment, modification, re-enactment, restatement or extension of the foregoing, in each case binding on or affecting the party or Person referred to in the context in which such word is used; and "Law" shall mean any one of them.

"Maine Act" means the Maine Limited Liability Company Act, 31 M.R.S.A. Chapter 13, as amended from time to time.

"Majority Vote" means the written approval of, or the affirmative vote by, Members holding a majority of the Member Votes.

"Majority" means a majority of the Member Votes.

"Manager" means any Person designated by the Members as a manager of the Company within the meaning of the Maine Act and shall include the Directors of the Company.

"Member" means each of PMP and DMSA and includes any Person admitted as an Additional Member or a substitute Member pursuant to the provisions of this Agreement, in such Person's capacity as a member of the Company, and "Members" means two (2) or more of such Persons when acting in their capacities as members of the Company.  For purposes of the Maine Act, the Members shall constitute one (1) class or group of members.

"Member Votes" means the votes allocated to each Person as reflected in Schedule A as may be amended.

"Net Cash Flow" means, for each Fiscal Year or other period of the Company, the gross cash receipts of the Company from all sources, but excluding any amounts, such as gross receipts taxes, that are held by the Company as a collection agent or in trust for others or that are otherwise not unconditionally available to the Company, less all amounts paid by or for the account of the Company during the same Fiscal Year or other period (including, without limitation, payments of principal and interest on any Company indebtedness and expenses reimbursed to the Members under Section 5.2 hereof), and less any amounts determined by the Members to be necessary to provide a reasonable reserve for working-capital needs or any other contingencies of the Company.  Net Cash Flow shall be determined in accordance with the cash receipts and disbursements method of accounting and otherwise in accordance with generally accepted accounting principles, consistently applied. Net Cash Flow shall not be reduced by depreciation, amortization, cost recovery deductions, depletion, similar allowances or other non-cash items, but shall be increased by any reduction of reserves previously established.

-3-

"Officer" means an officer of the Company.

"Percentage Interest" means the interest of a Member, expressed as a portion of one hundred percent, as shown on Schedule A hereto, which reflects the Member's ownership interest in the Company, as determined by the unanimous written consent of the Members as adjusted from time to time.

"Person" includes any individual, Company, association, partnership (general or limited), joint venture, trust, estate, limited liability company, or other legal entity or organization.

"Profits" and "Losses" means, for each Fiscal Year, an amount equal to the Company's taxable income or loss for such Fiscal Year, determined in accordance with § 703(a) of the Code.

"Secretary" means the Person appointed by the Board as the secretary of the Company, who shall perform the duties described in Section 7.4 of this Agreement.

"Tax Matters Partner" has the meaning set forth in Section 11.1 hereof.

"Treasury Regulations" means the income tax regulations, including temporary regulations, promulgated under the Code, as such regulations may be amended from time to time (including corresponding provisions of succeeding regulations).

"Venture Agreement" means the Venture Agreement by and between PMP and DMSA of or about even date herewith, the text of which is attached hereto as Exhibit A.

Section 1.2    Headings.  The headings and subheadings in this Agreement are included for convenience and identification only and are in no way intended to describe, interpret, define or limit the scope, extent or intent of this Agreement or any provision hereof.

## ARTICLE II

## FORMATION AND TERM

Section 2.1    Formation.

(i)    On the Effective Date, Company was formed pursuant to the Maine Act by executing and delivering the Articles to the Secretary of State of the State of Maine in accordance with and pursuant to the Maine Act.  The Company and the Members hereby forever discharge the organizer, and the organizer shall be indemnified by the Company and the

-4-

Member from and against, any expense or liability actually incurred by the organizer by reason of having been the organizer of the Company.

(ii)    Upon the execution of this Agreement or a counterpart of this Agreement, PMP and DMSA shall be admitted as Members.

(iii)    The name and mailing address of each Member, the agreed value of the amount contributed to the capital of the Company and the Percentage Interest of each Member shall be listed on Schedule A attached hereto. The Secretary is hereby directed and authorized (without any further vote or action by the Board or the Members) to promptly update Schedule A from time to time as necessary to accurately reflect the information therein. Any reference in this Agreement to Schedule A shall be deemed to be a reference to Schedule A as amended and in effect from time to time.

Section 2.2    Name.  The name of the Company formed hereby is Perez, Montalbetti, Perez, LLC. The business of the Company may be conducted upon compliance with all applicable Laws under any other name designated by the Board.

Section 2.3    Term.  The term of the Company shall commence on the Effective Date and shall continue in perpetuity, unless the Company is dissolved in accordance with the provisions of this Agreement. The existence of the Company as a separate legal entity shall continue until cancellation of the Articles in the manner provided under the Maine Act.

Section 2.4    Registered Agent and Office.  The Company's registered agent and office in the State of Maine shall be Mark Googins, Verrill Dana, LLP, One Portland Square, Portland, Maine 04112. At any time, the Members may designate another registered agent and/or registered office.

Section 2.5    Principal Place of Business.  The principal place of business of the Company shall be at Atlanta, Georgia. At any time, the Board may change the location of the Company's principal place of business to another location.

Section 2.6    Qualification in Other Jurisdictions.  The Board shall cause the Company to be qualified, formed, or registered under assumed or fictitious name statutes or similar Laws in any jurisdiction in which the Company transacts business. The Secretary, as an authorized person within the meaning of the Maine Act, shall execute, deliver and file any certificates (and any amendments and/or restatements thereof) necessary for the Company to qualify to do business in a jurisdiction in which the Company may wish to conduct business.

-5-

## ARTICLE III

## PURPOSE AND POWERS OF THE COMPANY

Section 3.1    Purpose.  The Company is formed for the object and purpose of developing Spanish language and bilingual advertising, marketing and media, and to engage in any lawful act or activity for which limited liability companies may be formed under the Maine Act including, without limitation, (i) to acquire, hold and dispose of the investments, including investments in Affiliates, (ii) to lend money to, borrow money from, act as surety, guarantor or endorser for, provide collateral for, and transact other business with third parties including, Members and Affiliates of the Company, and (iii) acquiring, holding, managing, operating and disposing of interests in real and personal property.

Section 3.2    Powers of the Company.

(i)    The Company shall have the power and authority to take any and all actions necessary, appropriate, proper, advisable, incidental or convenient to or for the furtherance of the purpose set forth in Section 3.1.

(ii)    The Company may merge with, or consolidate into, another limited liability company or other business entity upon the approval of all of the Members.

## ARTICLE IV

## CAPITAL CONTRIBUTIONS, INTERESTS,
## CAPITAL ACCOUNTS AND ADVANCES

Section 4.1    Capital Contributions.

(i)    Each Member has contributed to the capital of the Company the amount set forth opposite the Member's name on Schedule A attached hereto.  The agreed value of the Capital Contributions made by each Member shall be set forth on Schedule A.

(ii)    No Member shall be required to make any additional capital contribution to the Company.  A Member may make additional capital contributions to the Company only with the written consent of all of the Members.

Section 4.2    <u>Member's Interest</u>.  A Member's Interest shall for all purposes be personal property.  A Member has no interest in specific Company property.

Section 4.3    <u>Capital</u>

    (i)    Except as provided in Sections 9.1 and 15.3, no Member shall receive any interest, salary, or drawing with respect to its Capital Contributions or its Capital Account or for services rendered on behalf of the Company or otherwise in its capacity as a Member, except:

        (a) the invoices of DMSA, in connection with services rendered or goods provided through or on behalf of the Company for a client of the Company, shall be paid by the Company as it receives payment from such client; and

        (b) as expressly provided by a unanimous resolution of the Board.

    (ii)    No Member shall have any personal liability for the repayment of any Capital Contribution of any other Member.

Section 4.4    <u>Capital Accounts</u>.

    (i)    An individual Capital Account shall be established and maintained for each Member.

    (ii)    The Capital Account of each Member shall be maintained in accordance with the provisions of Regulation section 1.704-1(b)(2)(iv)

Section 4.5    <u>Advances</u>.  If any Member shall advance any funds to the Company in excess of its Capital Contributions, the amount of such advance shall neither increase its Capital Account nor entitle it to any increase in its Interest in the distributions of the Company.  The amount of any such advance shall be a debt obligation of the Company to such Member and shall be subject to such terms and conditions acceptable to the Company and such Member.  Any such advance shall be payable and collectible only out of Company assets, and the other Members shall not be personally obligated to repay any part thereof.  No Person who makes any nonrecourse loan to the Company shall have or acquire, as a result of making such loan, any direct or indirect interest in the profits, capital, or property of the Company, other than as a creditor.

**ARTICLE V**

**MEMBERS**

Section 5.1    <u>Powers of Members</u>.  The Members shall have the power to exercise any and all rights or powers granted to the Members pursuant to the express terms of this Agreement.  The Members shall also have the power to authorize the Board, by Majority Vote, to possess and exercise any right or power not already vested in the Board pursuant to Article VI or any other provision of this Agreement.  In addition to the foregoing, the Members have the power to exercise any and all rights or powers of the Company and to do all lawful acts and things as are not by the Maine Act or this Agreement directed or required to be exercised or done by the Board.  Except as provided herein, individually, the Members shall have no power to bind the Company.

Section 5.2    <u>Reimbursements</u>.  The Company shall reimburse the Members, for all ordinary and necessary out-of-pocket expenses incurred by the Members on behalf of the Company in accordance with the Company's policy for such reimbursements.  Such reimbursement shall be treated as an expense of the Company that shall be deducted in computing the Net Cash Flow and shall not be deemed to constitute a distribution of Net Cash Flow or a distribution or return of capital to any Member.

Section 5.3    <u>Partition</u>.  Each Member waives any and all rights that it may have to maintain an action for partition of the Company's property.

Section 5.4    <u>Withdrawal</u>.  No Member may withdraw from the Company prior to the dissolution and winding up of the Company without the prior unanimous written consent of the Directors.  Unless otherwise agreed by the withdrawing Member and the Board, any Member withdrawing from the Company under this Section 5.4 shall be entitled to receive distributions in connection with such withdrawal in 10 equal annual installments, the first such installment falling due and payable on the first anniversary of such withdrawal takes effect.

Section 5.5    <u>Meetings of Members</u>.

(i)    Any Member may call a meeting of the Members for any purpose related to the business of the Company.

(ii)    Written notice of any such meeting shall state the place, date, and hour of the meeting and the purpose or purposes for which the meeting is called, shall be given not less than 10 nor more than 60 days before the date of the meeting, to each Member entitled to vote at such meeting.

(iii)    Business transacted at any meeting of Members shall be limited to the purposes stated in the notice, unless otherwise agreed to by all of the Members.

(iv)    A Majority present in person or by proxy, shall constitute a quorum at all meetings of the Members for the transaction of business except as otherwise provided by this Agreement.  If, however, such quorum shall not be present or represented at any meeting of the Members, the Members entitled to vote thereat, present in person or represented by proxy, shall have power to adjourn the meeting from time to time, without notice other than announcement at the meeting, until a quorum shall be present or represented.  At such adjourned meeting at which a quorum shall be present or represented any business may be transacted which might have been transacted at the meeting as originally notified.  If the adjournment is for more than 30 days, or if after the adjournment a new record date is fixed for the adjourned meeting, a notice of the adjourned meeting shall be given to each Member of record entitled to vote at the meeting.

(v)    When a quorum is present at any meeting, a Majority Vote shall decide any question brought before such meeting, unless the question is one upon which by express provision of this Agreement, a different vote is required in which case such express provision shall govern and control the decision of such question.

(vi)    Members may participate in a meeting of the Members by means of conference telephone or similar communications equipment, provided all persons participating in the meeting can hear each other, and such participation in a meeting shall constitute presence in person at the meeting.  If all the participants are participating by conference telephone or similar communications equipment, the meeting shall be deemed to be held at the principal place of business of the Company.

(vii)    Unless otherwise provided in this Agreement, any action which may be taken at any meeting of such Members, may be taken without a meeting, without prior notice and without a vote, if a consent in writing, setting forth the action so taken, shall be signed by a Majority.  Prompt notice of taking of the action without a meeting by less than unanimous consent shall be given to those Members who have not consented in writing.

**ARTICLE VI**

**MANAGEMENT**

Section 6.1    Board of Directors. Subject to Section 5.1 of this Agreement, the business and affairs of the Company shall be managed by or under the direction of a Board of Directors. The Board shall consist of 1 member appointed by PMP (the "PMP Director") and 2 members appointed by DMSA (the "DMSA Directors"). A person appointed as a Director is by such appointment designated a Manager by the Members for purposes of the Act. The initial PMP Director shall be _____; the initial DMSA Directors shall be Beatriz Mallory and Gerry Pike. Each Director elected shall hold office until such Director's earlier death, disability, resignation, bankruptcy, or removal. Directors need not be Members. The PMP Director may be removed only by PMP; a DMSA Director may be removed only by DMSA. A vacancy created by the death, disability, resignation, bankruptcy, or removal of the PMP Director shall be filled only by PMP; a vacancy created by the death, disability, resignation, bankruptcy, or removal of a DMSA Director shall be filled only by DMSA. The relative duties and responsibilities for the day to day operation of the Company shall be as provided in the Venture Agreement.

Section 6.2    Meetings of the Board of Directors. The Board of Directors of the Company may hold meetings within or outside the State of Maine. Meetings of the Board may be called by the President or Secretary on three (3) days' notice to each Director, either personally, by telephone, by mail, by telegram or by any other means of communication.

Section 6.3    Electronic Communications. Members of the Board, or any committee designated by the Board, may participate in a meeting of the Board, or any committee, by means of conference telephone or similar communications equipment by means of which all persons participating in the meeting can hear each other, and such participation in a meeting shall constitute presence in person at the meeting. If all the participants are participating by conference telephone or similar communications equipment, the meeting shall be deemed to be held at the principal place of business of the Company.

Section 6.4    Committees of Directors. The Board may, by resolution passed by a majority of the whole Board, designate one or more committees, each committee to consist of one or more of the Directors of the Company. The Board may designate one or more Directors as alternate members of any committee, who may replace any absent or disqualified member at any meeting of the committee.

In the absence or disqualification of a member of a committee, the member or members thereof present at any meeting and not disqualified from voting, whether or not such members constitute a quorum, may unanimously appoint another member of the Board to act at the meeting in the place of any such absent or disqualified member.

Any such committee, to the extent provided in the resolution of the Board, shall have and may exercise all the powers and authority of the Board in the management of the business and affairs of the Company, but no such committee shall have the power or authority to take any of the actions described in Section 6.7 of this Agreement unless authorized in writing by each Director. Such committee or committees shall have such name or names as may be determined from time to time by resolution adopted by the Board. Each committee shall keep regular minutes of its meetings and report the same to the Board when required.

Section 6.5 <u>Compensation of Directors</u>. The Board shall have the authority to fix the compensation of Directors. The Directors may be paid their expenses, if any, of attendance at such meeting of the Board and may be paid a fixed sum for attendance at each meeting of the Board or a stated salary as Director. No such payment shall preclude any Director from serving the Company in any other capacity and receiving compensation therefor. Members of special or standing committees may be allowed like compensation for attending committee meetings.

Section 6.6    <u>Directors as Agents</u>. The Directors, to the extent of their powers set forth in this Agreement, are agents of the Company for the purpose of the Company's business, and the actions of the Directors taken in accordance with such powers shall bind the Company.

Section 6.7    <u>Actions Requiring Unanimous Approval of the Board</u>. Notwithstanding any other provision of this Agreement to the contrary, none of the Board, any Director, or any Officer shall take any of the following actions on behalf of the Company unless authorized to do so by the unanimous vote or consent of the Directors:

      (i)      the sale, exchange, or other disposition of any of the assets of the Company except for sales in the ordinary course of business;

      (ii)      the commencement of a voluntary proceeding seeking reorganization or other relief with respect to the Company under any bankruptcy or other similar law or seeking the appointment of a trustee, receiver, custodian, or other similar official of the Company or any substantial part of its property, or the making by the Company of a general assignment for the benefit of creditors;

      (iii)      the declaration or making of any distributions to Members as provided in Article IX and Article XV.

-11-

(iv)    the entering into by the Company of any joint venture, partnership, subcontracting, license, sub-license, manufacturing, marketing, distribution, or other similar arrangement with any Person;

(v)    the entering into by the Company of any agreement, facility, commitment, guaranty, instrument, or other undertaking providing for, or relating to, the incurrence of any indebtedness by the Company;

(vi)    the formation or organization of any subsidiary of the Company and the appointment of directors of (or persons with comparable authority with respect to) any such subsidiary;

(vii)    the issuance, sale, acquisition, or repurchase by the Company of any Interest or other equity interest (or option, warrant, conversion or similar right with respect to any equity interest) in or of the Company;

(viii)    the commitment to any material capital expenditure by the Company in any Fiscal Year of the Company;

(ix)    the adoption of a business plan and annual operating budget for the Company (or any updates to each thereof).

(x)    the entering into, amendment or termination of employment contracts with Officers of the Company or other contracts with Directors, Officers, Managers, or Members or their respective Affiliates;

(xi)    the appointment or change of the independent auditors or deposit banks of the Company;

(xii)    the acquisition or lease by the Company of any real property, or any sale, lease, or sublease of, or similar arrangement affecting, any real property owned or leased by the Company;

(xiii)    the entering into, amendment, modification, renewal (or election not to renew), waiver, or termination by the Company of any financing document; and

(xiv)    the incurrence or assumption of any material liability or obligation, whether contractually or otherwise, by the Company.

-12-

# ARTICLE VII

# OFFICERS

Section 7.1    Officers.  The Officers of the Company shall be elected by the Board and shall consist of at least a Chairperson, President, a Secretary, and a Treasurer.  The Board of Directors may also choose one or more Vice Presidents, and one or more Assistant Secretaries and Assistant Treasurers.  Any number of offices may be held by the same person.  The Board at its first meeting shall choose a Chairperson, President, a Secretary, and a Treasurer.  The Board at its first meeting may also appoint such other Officers and agents as it shall deem necessary who shall hold their offices for such terms and shall exercise such powers and perform such duties as shall be determined from time to time by the Board.  The salaries of all Officers and agents of the Company shall be fixed by or in the manner prescribed by the Board.  The Officers of the Company shall hold office until their successors are chosen and qualify.  Any Officer elected or appointed by the Board of Directors may be removed at any time by the affirmative vote of a majority of the Board.  Any vacancy occurring in any office of the Company shall be filled by the Board.

Section 7.2    The Chairperson.  The Chairperson shall be the chief executive officer of the Company, shall preside at all meetings of the Members and the Board, shall have general and active management of the business of the Company and shall see that all orders and resolutions of the Board are carried into effect.  The Chairperson shall execute bonds, mortgages, and other contracts, except where required or permitted by Law to be otherwise signed and executed and except where signing and execution thereof shall be expressly delegated by the Board to some other Officer or agent of the Company or except as otherwise permitted in Section 7.3 hereof.  The initial Chairperson shall be Beatriz Mallory.

Section 7.3    The President.  The President shall supervise the day to day activities of the Company.  The President shall report to the Chairperson.  The President shall have no authority to bind the Company in any way for obligations in excess of $1,000 without the express consent of the Chairperson.

Section 7.3    The Vice President.  In the absence of the President or in the event of the President's inability to act, the Vice President, if any, (or in the event there be more than one Vice President, the Vice Presidents in the order designated by the Directors, or in the absence of any designation, then in the order of their election) shall perform the duties of the President, and when so acting, shall have all the powers of and be subject to all the restrictions upon the President.  The Vice Presidents, if any, shall perform such other duties and have such other powers as the Board may from time to time prescribe.

-13-

Section 7.4    <u>The Secretary and Assistant Secretary</u>.  The Secretary shall be responsible for filing legal documents and maintaining records for the Company.  The Secretary shall attend all meetings of the Board and all meetings of the Members and record all the proceedings of the meetings of the Company and of the Board in a book to be kept for that purpose and shall perform like duties for the standing committees when required.  The Secretary shall give, or cause to be given, notice of all meetings of the Members and special meetings of the Board, and shall perform such other duties as may be prescribed by the Board or President, under whose supervision the Secretary shall be.  The Assistant Secretary, or if there be more than one, the Assistant Secretaries in the order determined by the Board (or if there be no such determination, then in order of their election) shall, in the absence of the Secretary or in the event of the Secretary's inability to act, perform the duties and exercise the powers of the Secretary and shall perform such other duties and have such other powers as the Board may from time to time prescribe.

Section 7.5    <u>The Treasurer and Assistant Treasurer</u>.  The Treasurer shall have the custody of the Company funds and securities and shall keep full and accurate accounts of receipts and disbursements in books belonging to the Company and shall deposit all moneys and other valuable effects in the name and to the credit of the Company in such depositories as may be designated by the Board.  The Treasurer shall disburse the funds of the Company as may be ordered by the Board, taking proper vouchers for such disbursements, and shall render to the President and the Board, at its regular meetings, or when the Board so requires, an account of all of the Treasurer's transactions and of the financial condition of the Company.  The Assistant Treasurer, or if there shall be more than one, the Assistant Treasurers in the order determined by the Board (or if there be no such determination, then in the order of their election), shall, in the absence of the Treasurer or in the event of the Treasurer's inability to act, perform the duties and exercise the powers of the Treasurer and shall perform such other duties and have such other powers as the Board may from time to time prescribe.

Section 7.6    <u>Officers as Agents</u>.  The Officers, to the extent of their powers set forth in this Agreement or otherwise vested in them by action of the Board, are agents of the Company for the purpose of the Company's business, and the actions of the Officers taken in accordance with such powers shall bind the Company.

## ARTICLE VIII

## <u>ALLOCATIONS</u>

Section 8.1    <u>Profits and Losses</u>.

(i)    Subject to the allocation rules of Section 8.2 hereof, Profits for any Fiscal Year shall be allocated among the Members in proportion to the Percentage Interests.

-14-

(ii)     Subject to the allocation rules of Section 8.2 hereof, Losses for any Fiscal Year shall be allocated first among the Members in proportion to their Capital Account balances to the extent thereof, and then to the Members in proportion to their Percentage Interests.

Section 8.2     Allocation Rules.

(i)     For purposes of determining the Profits, Losses or any other items allocable to any period, Profits, Losses and any such other items shall be determined on a daily, monthly or other basis, as determined by the Members using any method that is permissible under Section 706 of the Code and the Treasury Regulations thereunder.

(ii)     Except as otherwise provided in this Agreement, all items of Company income, gain, loss, deduction and any other allocations not otherwise provided for shall be shared among the Members in the same proportions as they shared Profits for the Fiscal Year in question.

(iii)     The Members are aware of the income tax consequences of the allocations made by this Article VIII and hereby agree to be bound by the provisions of this Article VIII in reporting their Interests of Company income and loss for income tax purposes.

(iv)     The Members intend that the allocation provisions set forth in this Agreement are intended to comply with Section 704(b) of the Code and the Treasury Regulations issued thereunder and the provisions are to be interpreted in a manner consistent with those Treasury Regulations.

(v)     In the event any Member unexpectedly receives any adjustments, allocations, or distributions described in Regulations Section 1.704-1(b)(2)(ii)(d)(4), Section 1.704-1(b)(2)(ii)(d)(5), or Section 1.704-1(b)(2)(ii)(d)(6), items of Company income and gain shall be specially allocated to such Member in an amount and manner sufficient to eliminate, to the extent required by the Regulations, the adjusted capital account deficit of the Member as quickly as possible.

Section 8.3     Tax Allocations; Section 704(c) of the Code.  In accordance with Section 704(c) of the Code and the Treasury Regulations thereunder, income, gain, loss and deduction with respect to any property contributed to the capital of the Company shall, solely for income tax purposes, be allocated among the Members so as to take account of any variation between the adjusted basis of such property to the Company for federal income tax purposes and its initial fair market value.

-15-

# ARTICLE IX

# DISTRIBUTIONS

Section 9.1    Net Cash Flow.  Except as otherwise provided in Article XV hereof (relating to the dissolution of the Company), any distribution of the Net Cash Flow during any Fiscal Year shall be made to the Members as follows:

(i)  First, to DMSA an amount up to the DMSA Account Balance; and

(ii)  Second, to the Members in proportion to their Percentage Interests.

Section 9.2    Distribution Rules.  All distributions pursuant to Section 9.1 hereof shall be at such times and in such amounts as shall be determined by the Board.

Section 9.3    Limitations on Distribution.  Notwithstanding any provision to the contrary contained in this Agreement, the Company, and the Board on behalf of the Company, shall not make a distribution to any Member on account of its interest in the Company if such distribution would violate applicable Law.

Section 9.4    Amounts Withheld. All amounts withheld pursuant to the Code or any provision of any state, local or foreign tax law as to any payment, distribution or allocation to the Company or the Members shall be treated, for all purposes under this Agreement, as amounts paid or distributed, as the case may be, to the Members as to which such amount was withheld pursuant to this 9.4.  The Company is authorized to withhold from payments and distributions, or with respect to allocations to the Members, and to pay over to any federal, state and local government or any foreign government, any amounts required to be so withheld pursuant to the Code or any provisions of any other federal, state or local law or any foreign law, and shall allocate any such amounts to the Members with respect to which such amount was withheld.

Section 9.5    Business Activities of Members other than DMSA.

(a)  Except as provided in Section 9.5(b), for the period ending on the first anniversary following the withdrawal of a Member, neither such Member nor any related party of such Member shall engage, directly or indirectly (as an owner, employee, consultant, or otherwise), in the any geographic area in which the Company conducts business or plans to conduct business, in any business activity (i) in which the Company engages or plans to engage, or (ii) that is enhanced by the Company's business and activities or by such Member's association with the Company, unless such activity is

-16-

expressly authorized by DMSA. Each Member hereby agrees to disclose and make available to the Company each and every such business opportunity that such Member becomes aware of in his capacity as a Member, Director, Officer, or otherwise. Each Member further agrees that such Member shall be accountable to, and hold in trust for, the Company any income, compensation, or profit that such Member may hereafter derive from any such activity and that such Member will indemnify the Company for any profits that the Company may reasonably be viewed as having foregone or any loss that it may incur as a result of any failure by such Member to disclose business opportunities to the Company. Notwithstanding anything to the contrary herein, a Member shall not be treated as engaging in an activity solely by reason of owning an equity interest of less than five percent (5%) of the capital and profits of a corporation, partnership, or other entity.

(b)   The provisions of Section 9.5(a) shall not apply to DMSA.

## ARTICLE X

## BOOKS AND RECORDS

Section 10.1   <u>Books, Records and Financial Statements</u>.

(i)   At all times during the continuance of the Company, the Company shall maintain, at its principal place of business, separate books of account for the Company that shall show a true and accurate record of all costs and expenses incurred, all charges made, all credits made and received and all income derived in connection with the operation of the Company business in accordance with generally accepted accounting principles consistently applied, and, to the extent inconsistent therewith, in accordance with this Agreement. Such books of account, together with a copy of this Agreement and of the Certificate, shall at all times be maintained at the principal place of business of the Company and shall be open to inspection and examination at reasonable times by each Member and its duly authorized representative for any purpose reasonably related to such Member's interest in the Company.

(ii)   The Company, and the Board on behalf of the Company, shall prepare and maintain, or cause to be prepared and maintained, the books of account of the Company. The Company, and the Board on behalf of the Company, shall prepare and file, or cause to be prepared and filed, all applicable federal and state tax returns.

Section 10.2   <u>Accounting Method</u>. For both financial and tax reporting purposes and for purposes of determining Profits and Losses, the books and records of the Company shall be kept on the accrual method of accounting applied in a consistent manner in accordance with generally accepted

-17-

accounting principles and shall reflect all Company transactions and be appropriate and adequate for the Company's business.

## ARTICLE XI

## TAX MATTERS

Section 11.1    Tax Matters Partner.

(i)    DMSA is hereby designated as "Tax Matters Partner" of the Company for purposes of § 6231(a)(7) of the Code.

(ii)    The Tax Matters Partner shall, within ten (10) days of the receipt of any notice from the Internal Revenue Service in any administrative proceeding at the Company level relating to the determination of any Company item of income, gain, loss, deduction or credit, mail or otherwise deliver a copy of such notice to each Member.

Section 11.2    Taxation as Partnership.  The Company shall be treated as a partnership for U.S. federal income tax purposes.

## ARTICLE XII

## LIABILITY, EXCULPATION, INDEMNIFICATION

Section 12.1    Liability.  Except as otherwise provided by the Maine Act, the debts, obligations, and liabilities of the Company, whether arising in contract, tort or otherwise, shall be solely the debts, obligations, and liabilities of the Company, and no Member or Manager shall be obligated personally for any such debt, obligation, or liability of the Company solely by reason of being a Member or Manager.

Section 12.2    Exculpation.

(i)    No Covered Person shall be liable to the Company or any other Covered Person for any loss, damage, or claim incurred by reason of any act or omission performed or omitted by such Covered Person in good faith on behalf of the Company and in a manner reasonably believed to be within the scope of authority conferred on such Covered Person by this Agreement, except that a Covered Person shall be liable for any such loss, damage or claim incurred by reason of such Covered Person's gross negligence or willful misconduct.

-18-

(ii)      A Covered Person shall be fully protected in relying in good faith upon the records of the Company and upon such information, opinions, reports or statements presented to the Company by any Person as to matters the Covered Person reasonably believes are within such other Person's professional or expert competence and who has been selected with reasonable care by or on behalf of the Company, including information, opinions, reports or statements as to the value and amount of the assets, liabilities, Profits, Losses, or Net Cash Flow or any other facts pertinent to the existence and amount of assets from which distributions to Members might properly be paid.

Section 12.3     Fiduciary Duty.  To the extent that, at law or in equity, a Covered Person has duties (including fiduciary duties) and liabilities relating thereto to the Company or to any other Covered Person, a Covered Person acting under this Agreement shall not be liable to the Company or to any Member for its good faith reliance on the provisions of this Agreement.  The provisions of this Agreement, to the extent that they restrict the duties and liabilities of a Covered Person otherwise existing at law or in equity, are agreed by the parties hereto to replace such other duties and liabilities of such Covered Person.

Section 12.4     Indemnification.  To the fullest extent permitted by applicable law, a Covered Person shall be entitled to indemnification from the Company for any loss, damage or claim incurred by such Covered Person by reason of any act or omission performed or omitted by such Covered Person in good faith on behalf of the Company and in a manner reasonably believed to be within the scope of authority conferred on such Covered Person by this Agreement, except that no Covered Person shall be entitled to be indemnified in respect of any loss, damage or claim incurred by such Covered Person by reason of gross negligence or willful misconduct with respect to such acts or omissions; provided, however, that any indemnity under this Section 12.4 shall be provided out of and to the extent of Company assets only, and no Covered Person shall have any personal liability with respect to such indemnity.

Section 12.5     Expenses.  To the fullest extent permitted by applicable law, expenses (including legal fees) incurred by a Covered Person in defending any claim, demand, action, suit, or proceeding shall, from time to time, be advanced by the Company prior to the final disposition of such claim, demand, action, suit or proceeding upon receipt by the Company of an undertaking by or on behalf of the Covered Person to repay such amount if it shall be determined that the Covered Person is not entitled to be indemnified as authorized in Section 12.4 hereof.

Section 12.6     Insurance.  The Company may purchase and maintain insurance, to the extent and in such amounts as the Board shall, in its sole discretion, deem reasonable, on behalf of Covered Persons and such other Persons as the Board shall determine, against any liability that may be asserted against or expenses that may be incurred by any such Person in connection with the activities of the Company or such indemnities, regardless of whether the Company would have the power to indemnify such Person against such liability under the provisions of this Agreement.  The Company may enter into

-19-

indemnity contracts with Covered Persons and such other Persons as the Board shall determine and adopt written procedures pursuant to which arrangements are made for the advancement of expenses and the funding of obligations under Section 12.5 hereof and containing such other procedures regarding indemnification as are appropriate.

Section 12.7    <u>DMSA's Outside Businesses; PMP's Exclusivity</u>.    Gerry Pike, DMSA or an Affiliate thereof may engage in or possess an interest in other business ventures of any nature or description, independently or with others, similar or dissimilar to the business of the Company, and the Company and the Members shall have no rights by virtue of this Agreement in and to such independent ventures or the income or profits derived therefrom, and the pursuit of any such venture, even if competitive with the business of the Company, shall not be deemed wrongful or improper.    Neither Gerry Pike nor DMSA nor an Affiliate thereof shall be obligated to present any particular investment opportunity to the Company even if such opportunity is of a character that, if presented to the Company, could be taken by the Company, and Gerry Pike, DMSA or its Affiliate thereof (as the case may be) shall have the right to take for its own account (individually or as a partner or fiduciary) or to recommend to others any such particular investment opportunity.    Without diminishing DMSA's rights under the foregoing language, DMSA does agree that it intends to use diligent efforts to direct appropriate business to the Company in furtherance of the Company's goals. However, PMP shall employ its diligent efforts for the Company and PMP shall not provide such services, directly or indirectly for itself or any other entity or person to the extent it relates to the business.    Gerry Pike and DMSA are hereby expressly relieved of fiduciary duties as a Director or Member to the extent such duties would prevent or impede Gerry Pike or DMSA from undertaking, soliciting or profiting from any business venture or investment opportunity, whether or not such venture or opportunity is similar or dissimilar to the business of the Company.

Section 12.8    DMSA and PMP acknowledge and agree that all efforts and actions undertaken by them for the Company in connection with the business of the company are to be kept confidential.    Neither DMSA nor PMP will disclose to any person or entity, directly or indirectly, any Proprietary Information (as hereinafter defined) relating to the Company's business without the prior written consent of the Company.    For purposes of this Agreement, "Proprietary Information" means all advertiser and subscription lists, advertiser and subscription prospects, marketing information and data, product information, strategic or technical information, financial information, supplier information, billing rates and advertiser provided information, documents and data.

## ARTICLE XIII

## ADDITIONAL MEMBERS

Section 13.1    Admission. By approval of all of the Members, the Company is authorized to admit any Person as an additional member of the Company (each, an "Additional Member" and collectively, the "Additional Members"). Each such Person shall be admitted as an Additional Member at the time such Person (i) executes this Agreement or a counterpart of this Agreement and (ii) is named as a Member on Schedule A hereto. The legal fees and expenses associated with such admission shall be borne by the Company.

Section 13.2    Allocations. Additional Members shall not be entitled to any retroactive allocation of the Company's income, gains, losses, deductions, credits, or other items; provided that, subject to the restrictions of Section 706(d) of the Code, Additional Members shall be entitled to their respective Interest of the Company's income, gains, losses, deductions, credits, and other items arising under contracts entered into before the effective date of the admission of any Additional Members to the extent that such income, gains, losses, deductions, credits, and other items arise after such effective date. To the extent consistent with § 706(d) of the Code and Treasury Regulations promulgated thereunder, the Company's books may be closed at the time Additional Members are admitted (as though the Company's tax year had ended) or the Company may credit to the Additional Members pro rata allocations of the Company's income, gains, losses, deductions, credits and items for that portion of the Company's Fiscal Year after the effective date of the admission of the Additional Members.

## ARTICLE XIV

## ASSIGNMENT AND PLEDGE OF INTERESTS

Section 14.1    Assignability of Interests. No Member may assign the whole or any part of its Interests, without complying with the terms of Article XVI and (if applicable) Section 14.3 of this Agreement.

Section 14.2    Recognition of Assignment by Company. No assignment or pledge of any Interest, or any part thereof, that is in violation of this Article XIV shall be valid or effective, and neither the Company nor the Members shall recognize the same for the purpose of making distributions pursuant to this Agreement. Neither the Company nor the Members shall incur any liability as a result of refusing to make any such distributions to the assignee of any such invalid assignment.

Section 14.3    Pledge. No Member may pledge or otherwise encumber the whole or any part of its Interests, without prior written consent of all Members.

-21-

## ARTICLE XV

### DISSOLUTION, LIQUIDATION AND TERMINATION

Section 15.1    No Dissolution. The Company shall not be dissolved by the admission of Additional Members or substitute Members in accordance with the terms of this Agreement.

Section 15.2    Events Causing Dissolution. The Company shall be dissolved and its affairs shall be wound up upon the occurrence of any of the following events:

        (i)      the written consent of DMSA; or

        (iii)     the entry of a decree of judicial dissolution of the Company.

Section 15.3    Liquidation. Upon dissolution of the Company, the Board shall carry out the winding up of the Company and shall immediately commence to wind up the Company's affairs; provided, however, that a reasonable time shall be allowed for the orderly liquidation of the assets of the Company and the satisfaction of liabilities to creditors so as to enable the Members to minimize the normal losses attendant upon a liquidation. The Members shall continue to distribute Interest Profits and Losses during liquidation in the same proportions, as specified in Article VIII hereof, as before liquidation. The proceeds of liquidation shall be distributed in the following order and priority:

        (i)      to creditors of the Company, including Members who are creditors, to the extent otherwise permitted by law, in satisfaction of the liabilities of the Company (whether by payment or the making of reasonable provision for payment thereof); and

        (ii)     to DMSA, an amount up to the DMSA Account Balance; and

        (iii)     to the Members in accordance with their Capital Account balances, after giving effect to all contributions, distributions and allocations for all periods.

Section 15.4    Termination. The Company shall terminate when all of the assets of the Company, after payment of or due provision for all debts, liabilities, and obligations of the Company, shall have been distributed to the Members in the manner provided for in this Article XV and the Articles shall have been canceled in the manner required by the Maine Act.

Section 15.5    Claims of the Members. The Members and former Members shall look solely to the Company's assets for the return of their Capital Contributions, and if the assets of the Company remaining after payment of or due provision for all debts, liabilities, and obligations of the Company are

insufficient to return such Capital Contributions, the Members and former Members shall have no recourse against the Company or any other Member.

## ARTICLE XVI

## TRANSFER RESTRICTIONS

Section 16.1    Transfer Procedures.  Each transfer of Interests of the Company shall be made on Schedule A of this Agreement.  The person in whose name Interests stand on Schedule A of this Agreement shall be deemed the owner thereof for all purposes as regards the Company, and the Company shall not be bound to recognize any equitable or other claim to or interest in such Interests on the part of any other person, whether or not it shall have express or other notice thereof, except as otherwise provided by law.

Section 16.2    Restrictions on Transfer.  No Member shall have the right to transfer Interests of the Company except in compliance with the restrictions on transfer set forth below.  For purposes of this section, the term "transfer" means any transfer, whether outright or as security, inter vivos or testamentary, with or without consideration, voluntary or involuntary, by division of marital property or otherwise, of all or any part of any right, title, or interest (including without limitation voting rights and rights to dividends or liquidation proceeds) in or to any Interests, other than a transfer of voting rights by delivery of a revocable proxy.  The provisions of this Article shall be applicable to any transfer of Interests of the Company notwithstanding any prior transfer made in compliance with this Article or any prior transfer made pursuant to any waiver of the Company's rights hereunder.  Such Interests or any beneficial interest therein held by any person subsequent to such transfers shall be subject in every respect to these restrictions.  If a transferring Member fails to comply with the transfer procedures and restrictions contained in this Agreement, then so long as such failure continues (i) the Interests in question will be deemed not to be voted and (ii) no dividend or distribution declared on such Interests shall be paid by the Company.

Section 16.3    Party to this Agreement.  No sale, assignment, pledge, or gift, or other transfer of Interests shall be valid or enforceable unless the proposed transferee (i) is already a party to this Agreement, as then in effect, or (ii) has delivered to the Company a written undertaking to become a party to this Agreement, as may be amended from time to time.

Section 16.4    Waiver.  Upon any proposed transfer of Interests pursuant to Sections 16.9, 16.10, and 16.11 of this Agreement, the parties agree that the Company and the other Members shall be deemed to have waived the applicability of any other right of first refusal it may otherwise have.

Section 16.5    Securities Opinion.  No Member may transfer, and no person may acquire, beneficial or record ownership of any Interests of the Company unless the transferee or transferor

-23-

provides the Company an opinion of counsel, in form and substance satisfactory to the Board or the President, that such transfer will not violate the securities registration requirements of any applicable securities laws and will not cause the loss of any securities exemption on which the Company is relying with respect to prior sales or transfers of securities. The Company shall not be required to bear the expense of any such opinion of counsel. The Board or the President may waive this requirement for good cause.

Section 16.6    Right of First Refusal. Except as otherwise provided in this subsection, any sale or other transfer of Interests of the Company for value shall be made only pursuant to a bona fide written agreement with the proposed transferee and shall be subject to the right of first refusal set forth below. As a condition to any such sale or other transfer, the transferring Member shall deliver to the Company and all other Members of the Company written notice of the proposed transfer, which notice shall (i) contain a true and complete copy of the agreement by which the transferee proposes to acquire the Interests and (ii) set forth with particularity (to the extent not specified in such agreement) the identity and address of the proposed transferee, the Percentage Interests and number of votes to be transferred, the price, the terms of payment, all conditions to the transferee's obligation to acquire the Interests, and the date on which such proposed transfer is to be consummated. Such notice shall be deemed to constitute an offer by the transferring Member to sell all (but not less than all) of the specified Interests to the Company, its designees, and the other Members on terms equivalent to those offered by the proposed transferee. The Company, its designees (as determined by the Board), and the other Members may accept such offer by delivering written notice of acceptance to the transferring Member within sixty (60) days after the date on which a valid notice of transfer was received by the Company. If the aggregate Interests offered to be purchased exceeds the number to be transferred, the available Interests shall be allocated first to the Company to the full extent of its offer to purchase, then to the Members (allocated among them on a pro rata basis as determined by the Board), and finally (to the extent that the aggregate Interests offered to be purchased by the Company and the other Members is less than the total number to be transferred) to designees of the Company. During the pendency of such offer, the transferring Member shall promptly provide such further information concerning the proposed transfer as the Company may reasonably request in writing. Closing of the purchase of the Interests by the Company, its designees, or other Members shall take place within ninety (90) days after the date on which a valid notice of transfer was received by the Company. If acceptance and closing by the Company, its designees, and other Members have not occurred within the periods set forth above, the transferring Member shall have the right for sixty (60) days thereafter to transfer all (but not less than all) of the Interests to the original proposed transferee for the consideration specified in the original notice of transfer, subject to other terms and conditions of this Agreement. The right of first refusal provided in this subsection shall not be applicable to any transfer of Interests directly to the Company.

Section 16.7    Other Rules Regarding Transfer, Etc. The Board may, from time to time, adopt by resolution such additional rules and regulations as it deems expedient, not inconsistent with this Agreement concerning the issue and transfer of Interests of the Company.

-24-

Section 16.8    <u>Waivers of Restrictions on Transfer</u>.  Notwithstanding anything to the contrary, the Board may waive the applicability of any transfer restrictions contained in this Agreement or any resolution of the Board, if and to the extent that the Board deems a waiver for the particular transaction to be in the best interests of the Company.  No such waiver shall be effective unless duly adopted by resolution of the Board.

**ARTICLE XVII**

**<u>MISCELLANEOUS</u>**

Section 17.1    <u>Notices</u>.  All notices provided for in this Agreement shall be in writing, duly signed by the party giving such notice, and shall be delivered, mailed via an overnight courier service, telecopied or mailed by registered or certified mail, as follows:

       (i)    if given to the Company at the address of its principal place of business;

       (ii)    if given to a Director, at such Director's mailing address as provided to the Company; or

       (iii)    if given to any Member at the address set forth opposite its name on Schedule A attached hereto, or at such other address as such Member may hereafter designate by written notice to the Company.

All such notices shall be deemed to have been given when received.

Section 17.2    <u>Failure to Pursue Remedies</u>.  The failure of any party to seek redress for violation of, or to insist upon the strict performance of, any provision of this Agreement shall not prevent a subsequent act, which would have originally constituted a violation, from having the effect of an original violation.

Section 17.3    <u>Cumulative Remedies</u>.  The rights and remedies provided by this Agreement are cumulative and the use of any one right or remedy by any party shall not preclude or waive its right to use any or all other remedies.  Said rights and remedies are given in addition to any other rights the parties may have by Law or otherwise.

Section 17.4    <u>Binding Effect</u>.  This Agreement shall be binding upon and inure to the benefit of all of the parties and, to the extent permitted by this Agreement, their successors, legal representatives and assigns.

-25-

Section 17.5    <u>Interpretation</u>. Throughout this Agreement, nouns, pronouns and verbs shall be construed as masculine, feminine, neuter, singular or plural, whichever shall be applicable. All references herein to "Articles," "Sections" and "Paragraphs" shall refer to corresponding provisions of this Agreement.

Section 17.6    <u>Severability</u>. The invalidity or unenforceability of any particular provision of this Agreement shall not affect the other provisions hereof, and this Agreement shall be construed in all respects as if such invalid or unenforceable provision were omitted.

Section 17.7    <u>Counterparts</u>. This Agreement may be executed in any number of counterparts with the same effect as if all parties hereto had signed the same document. All counterparts shall be construed together and shall constitute one instrument.

Section 17.8    <u>Integration</u>. This Agreement, including all Schedules and Exhibits attached hereto, and together with the Venture Agreement, constitutes the entire agreement among the parties hereto pertaining to the subject matter hereof and supersedes all prior agreements and understandings pertaining thereto.

Section 17.9    <u>Governing Law</u>. This Agreement and the rights of the parties hereunder shall be interpreted in accordance with the laws of the State of Maine, and all rights and remedies shall be governed by such laws without regard to principles of conflict of laws.

Section 17.10    <u>Amendments</u>. Any amendment to this Agreement shall be adopted and be effective as an amendment hereto if it received the affirmative vote of all of the Members, provided that such amendment be in writing and executed by all of the Members.

Section 17.11    <u>No Implied Rights or Remedies</u>. Nothing expressed or implied shall be construed to confer upon any Person, except the Members and Managers, any rights or remedies under or by reason of this Agreement.

-26-

IN WITNESS WHEREOF, the parties hereto have executed this Agreement as of the date first above stated.

**Perez, Montalbetti, Perez, LLC**

By:_____
Name:_____
Title:_____

By:_____
Name: Patricio Montalbetti
Title:  Principal

By:_____
Name: Eduardo Perez
Title:  Principal

By:_____
Name: Nancy Perez
Title:  Principal

**DIRECT MERCHANTS S.A., INC.**

By:_____
Name:  Gerry Pike
Title:  Managing Director

H:\DMSA\OpAgree-PMP_3.doc

-27-

**SCHEDULE A**

**<u>MEMBERS</u>**

| Name | Member Mailing Address | Capital Contributions | Percentage Interest | Votes/ Member Votes |
|------|------------------------|-----------------------|---------------------|---------------------|
| **P. Montalbetti** | 1170 Peachtree St. NE, Atlanta, GA, 30309 | $00,001.00 | 25% | 18.8461% |
| **Eduardo Perez** | 1170 Peachtree St. NE, Atlanta, GA, 30309 | $00,001.00 | 15% | 11.3075% |
| **Nancy Perez** | 1170 Peachtree St. NE, Atlanta, GA, 30309 | $00,001.00 | 25% | 18.8461% |
| **DMSA** | One Enterprise Drive Newfoundland, PA 18445-0089 | $49,997.00 | 35% | 51.0000% |
| | | $50,000.00 | 100% | 100% |

H:\DMSA\OpAgree-PMP_3.docH:\DMSA\OpAgree-PMP_3.doc

-28-

EXHIBIT

B

April 13, 2005


Gerry Pike
Beatriz Mallory
DMSA, Inc.


Gerry and Beatriz,

We have hoped to communicate with you via telephone however it seems you have been unable to make time to speak with us and we can wait no longer.

We wish to inform you that we, Eduardo Pérez, Nancy Pérez and Patricio Montalbetti wish to terminate our relationship with DMSA, Inc. in the company incorporated as Pérez Montalbetti Pérez, LLC.

There are various reasons for this but most importantly we have realized that there are deep and fundamental differences in values and business philosophies between ourselves and DMSA.  These differences make it impossible for us to continue this business relationship. Furthermore we believe DMSA, Inc. has failed to meet the requirements of our agreement, which was to capitalize Pérez Montalbetti Pérez, LLC with $49,997.  Per our operating agreement "Capital Contribution" was defined as "money and…property".

We would like to proceed immediately to discuss the details of this severance and wrap up the issue expeditiously.  Please advise when you would like to engage in this discussion.

Sincerely,


Eduardo Pérez

For: Nancy Pérez and Patricio Montalbetti

1    CONFIDENTIAL      CONFIDENTIAL      CONFIDENTIAL

2              UNITED STATES DISTRICT COURT
           District of Massachusetts

3                        No. 05-30076-MAP

4

5    DIALOGO, LLC
                 Plaintiff

6    and

7

8    DIRECT MERCHANTS S.A. INC.
                 Plaintiff/Defendant in Counterclaim
     vs.

9

10   LILLIAN SANTIAGO BAUZA and EL DIALOGO, LLC
                 Defendants/Plaintiffs in Counterclaim

11   And

12

13   FRANCISCO JAVIER SOLE,
                 Defendant

14

15              DEPOSITION OF:  GERALD PIKE, taken

16   before ROXANNE C. COSTIGAN, Notary Public

17   Stenographer, pursuant to Rule 30 of the

18   Massachusetts Rules of Civil Procedure, at the

19   offices of ROBINSON DONOVAN, 1500 Main Street,

20   Springfield, Massachusetts on May 10, 2005.

21

22   APPEARANCES:  (See Page 2)

23

24              Roxanne C. Costigan
             Registered Merit Reporter

**EXHIBIT F**

1    Bilingue, correct?

2        A.    Yes.

3        Q.    Are you claiming in this case that

4    Dialogo, LLC owns any trademark rights to, quote,

5    Dialogo Bilingue, unquote?

6        A.    No.

7        Q.    So, if Miss Santiago were to stop

8    publishing El Dialogo and start publishing the

9    newspaper under the name Dialogo Bilingue, would

10   Dialogo, LLC have a problem?

11               MR. BREWSTER:  Object to the form of

12          the question.  I'm --

13               MR. MINOFF:  You can answer.

14               MR. BREWSTER:  With respect to --

15          I'm just curious how it's relevant.

16               MR. MINOFF:  Just answer the

17          question.

18               MR. BREWSTER:  No. I understand, but

19          you know, we are -- we do have parameters of

20          relevance.

21               MR. MINOFF:  This is pretty

22          important, don't you think?  Aren't we talking

23          about trademark rights and names and Dialogo

24          and Dialogo Bilingue, you don't think that's

1    they paid that publication or not paid the

2    publication.

3              MR. MINOFF:  Let's take a break.

4              (A recess was taken)

5              MR. MINOFF:  Back on the record.

6    Mark this as Exhibit B.

7              (Exhibit B, marked)

8         Q.    (By Mr. Minoff)  Mr. Pike, I'm showing

9    you a letter which I've marked Exhibit B.  Can you

10   look at that and tell me if that's a letter that you

11   received from Eduardo Perez?  Have you had a chance

12   to look at that letter, Mr. Pike?

13        A.    I have not.

14             MR. BREWSTER:  Well, this is what we

15        talked about before with respect to relevance

16        and the relevance with respect to this case.

17             MR. MINOFF:  Is this confidential

18        too?

19             MR. BREWSTER:  I'm not saying that

20        it's confidential.  We're talking -- well, it

21        is with respect to the workings and DMSA's

22        other businesses have been designated highly

23        confidential in this case.  I understand that

24        you want to make Exhibit B part of the record

1       in this case and your question to Mr. Pike is

2       whether or not he has received this.

3              MR. MINOFF:  That's right.

4              MR. BREWSTER:  Do you have any other

5       questions other than that?

6              MR. MINOFF:  No.

7              MR. BREWSTER:  Well, for those

8       purposes, then, I'm not agreeing that it's

9       relevant in this case.  It can be made part of

10      the record and it will be part of the record in

11      this case but, again, with respect -- I don't

12      want to -- Mr. Pike and I am not going to

13      concede that this is by any way relevant, but I

14      don't want Mr. Pike talking about DMSA's other

15      business ventures for the competitive reasons

16      that we talked about.  Now, my question is, how

17      long -- I mean, this document is not -- was not

18      disclosed to us in discovery.

19             MR. MINOFF:  I'm not sure it was

20      within any of the categories that you asked

21      for.

22             MR. BREWSTER:  So that --

23             MR. MINOFF:  I just saw it today for

24      the first time.

1          MR. BREWSTER:  Okay.  So, the

2    question is if you want to make things like

3    this, again, if I had this -- if you're saying

4    that this is relevant and you want to talk

5    about this, this is not a document that I had

6    an opportunity to know why your client has the

7    internal workings of DMSA and what her

8    conversations have been with his business

9    associates in other jurisdictions, I'm

10    concerned about this, Keith, because I'm

11    concerned that she's interfering with his

12    businesses in other parts of the country.  That

13    is a concern that has now raised its head and

14    is reflected in Exhibit B.

15          MR. MINOFF:  Okay.  Are you going to

16    let him answer the question, did he receive the

17    letter?  You asked me if I had any questions

18    beyond that, and I said -- well, I assume if I

19    have any, you're going to instruct him not to

20    answer, but will you at least agree to let him

21    answer the question.

22          MR. BREWSTER:  I will allow him to

23    answer the question, the one question, did he

24    receive the letter, and this letter will be

1          designated highly confidential.

2                    THE WITNESS:  I did not receive this

3          letter.

4          Q.      (By Mr. Minoff)  Okay.  It's already

5     marked Exhibit B and Mr. Brewster has designated it

6     highly confidential.

7                    MR. BREWSTER:  Can I have a copy of

8          that for my records?

9                    MR. MINOFF:  Sure.

10                   MR. BREWSTER:  Thank you.

11         Q.      (By Mr. Minoff)  Sir, have you

12    participated in any effort to sell El Dialogo, the

13    newspaper?

14                   MR. BREWSTER:  I'm going to object

15         to the form of the question.  I'm also going to

16         object to, again, strategy, future strategy,

17         issues with having to do with the newspaper and

18         the future plans for the newspaper.

19                   MR. MINOFF:  This is actually a

20         question about the past.  Have you in the past,

21         that is, before right now, participated, sir,

22         in any effort to sell El Dialogo to some third

23         party.

24                   MR. BREWSTER:  The question I have



**Solutions**
COMMUNITY DEVELOPMENT CORPORATION

**EXHIBIT**

G

May 17, 2005

Robinson and Donovan PC
Attn: Keith A. Minoff., Esq.
1500 Main Street, Suite 1600
Springfield, Massachusetts 01115

Dear Mr. Minoff,

I am the Executive Director of Solutions Community Development Corporation – a non-profit organization dedicated to strengthening the economic potential of low- and moderate-income residents in Holyoke, Massachusetts. Having served in this capacity for the last ten years, I can attest to the fact that there have been very few media sources that facilitate a constructive dialogue of critical issues facing working families in the community. The mainstream media – corporate television, radio and newspapers -- do not address these issues even in English, much less Spanish, which is the primary language of a large segment of this population.

The problem with community newspapers is that either they don't address controversial issues at all or they come and go within a few years for lack of professional, financial management and resources... until now.

Lillian Santiago Báuza, Publisher of El Diálogo, has brought a breath of fresh air and professionalism to the exchange of ideas, information and opinions of different segments of the community. When she started the paper, it was called El Diálogo Bilingue. Gradually, it became know simply as El Diálogo. Under her direction, El Diálogo has become a fundamental community asset not only for households, but also for the non-profit sector. El Diálogo offers affordable rates for advertising. It has covered several of our services to assist low-income families, providing essential information to the public. It has also sponsored special events like the Two Islands – Puerto Rican and Irish music event, which brought these two ethnic communities closer together for a fun evening of shared values and interests as well as raising $1,400 for Solutions CDC.

For all of the exemplary and committed service of El Diálogo to the City of Holyoke and its environs, we are sincerely grateful.

Signed under the pains and penalties of perjury,

Andrew Morehouse
Director

HARRY MONTALVO
Notary Public
Commonwealth of Massachusetts
My Commission Expires
August 11, 2011

254 Maple Street • Holyoke, MA 01040 • Tel: (413) 315-6017 • Fax: (413) 315-6258

May 18, 2005

Robinson Donovan PC
Keith A. Minoff
1500 Main Street, Suite 1600
Springfield, MA 01115

Dear Atty. Minoff,

This letter is written on behalf and at the request of Ms. Lillian Santiago-Bauzá. My name is Xenia Rosado-Merced, and I am the Manager of the Community Outreach Department at Holyoke Medical Center. One of the many responsibilities in my position is to provide community health education, primarily to the Holyoke's Hispanic/Latino population. A way in which I attempt to accomplish such task is through an active involvement with community groups. I seek to identify existing and surfacing community needs and urge my organization to respond to such identified needs. Subsequently, I am very familiar with, and respectful of the Hispanic/Latino community that Holyoke Medical Center serves.

I was fortunate to have met Ms.Lillian Santiago in the mid 1970's as a result of our mutual active involvement with the Holyoke's Hispanic/Latino community. Ms. Santiago was a leader in the community then, and continues to be a leader in the Hispanic/Latino community today. Ms. Santiago has earned the respect and the vote not only of the Hispanic community, but also of the Holyoke community at large. I, most recently, also had the opportunity to work closer with Ms. Santiago while she held the position of Director of Concern EAP, here at Holyoke Medical Center. As colleagues, we work closer together, and I was able to see first hand, the quality of her clinical skills and her profound commitment to this community.

Early in 2003, Ms. Santiago began discussing with me the lack of a professional Spanish newspaper in this area and her interest in creating one. She spoke of a high quality newsletter which will really represent the issues and sentiments of our people. Within few months, she was already developing a new newspaper in the city of Holyoke, El Diálogo Bilingüe. With Lillian's knowledge, enthusiasm, and hard work, soon this publication became better know within the community as "El Diálogo". I believe Lillian's role was, and still is crucial for El Diálogo's success and its continuation, simply because of Lillian's strong commitment to her community.

Our Hispanic/Latino community has greatly benefitted by Ms. Santiago's creation of a professional publication because it speaks about the important issues affecting the community. "El Diálogo" has opened a dialogue, like the name suggest, for the process of achieving a greater understanding and a respectful connection between our Hispanic/Latino people and the Holyoke's Anglo population.

I support Ms. Santiago's fight to preserve a newspaper that has become a community symbol because of her dedication and commitment to the Holyoke's Hispanic/Latino community. Please preserve "El Diálogo" and Ms. Santiago as its editor. If you have any further questions please without hesitation call me at 534-2610.

Signed under the pains and penalties of perjudy this 18th of May, 2005.

*Xenia Rosado-Merced, M.Ed., L.S.W.*

Xenia Rosado-Merced, M.Ed., L.S.W.
Community Outreach Manager

## MASSACHUSETTS ALL-PURPOSE ACKNOWLEDGMENT

Gov. Exec. Ord. #455 (03-13), §5(d)

Commonwealth of Massachusetts

County of _Hampden_ } ss.

On this the _18_ day of _May_, _2005_, before me,
Day       Month       Year

_Amy Smith_, the undersigned Notary Public,
Name of Notary Public

personally appeared _Xenia Rosado-Merced_,
Name(s) of Signer(s)

proved to me through satisfactory evidence of identity, which was/were

_Personal Knowledge_,
Description of Evidence of Identity

to be the person(s) whose name(s) is/are signed on the preceding or attached document, and acknowledged to me that he/she/they signed it voluntarily for its stated purpose(.)

☐ as partner(s) for _____
                    Name of Partnership

_____, a partnership.

☐ as _____ for
        Title of Office

_____, a corporation.
    Name of Corporation

☐ as attorney in fact for _____
                          Name of Principal Signer

_____, the principal.

☐ as _____ for _____
        Type of Capacity

_____, a/the _____
Name of Person/Entity          Type of Entity

_Amy Smith_
Signature of Notary Public

_Amy Smith_
Printed Name of Notary

My Commission Expires _9/4/09_

**AMY B. MACKENZIE**
Notary Public
Commonwealth of Massachusetts
My Commission Expires Sep 4, 2009

Place Notary Seal and/or Any Stamp Above

──────── OPTIONAL ────────

*Although the information in this section is not required by law, it may prove valuable to persons relying on the document and could prevent fraudulent removal and reattachment of this form to another document.*

Right Thumbprint of Signer

Top of thumb here

**Description of Attached Document**

Title or Type of Document: _Letter of Support_

Document Date: _5/17/05_  Number of Pages: _two_

Signer(s) Other Than Named Above: _N/A_

© 2004 National Notary Association • 9350 De Soto Ave., P.O. Box 2402 • Chatsworth, CA 91313-2402 • www.NationalNotary.org
Item No. 5951    Reorder: Call Toll-Free 1-800-US NOTARY (1-800-876-6827)



# Holyoke Health Center, Inc.

May 18, 2005

Keith A. Minoff
Robinson, Donovan, PC
1500 Main St., Ste. 1600
Springfield, MA 01115

Dear Mr. Minoff:

I am writing regarding the newspaper *El Dialogo*, formerly *Dialogo Bilingue*. Holyoke Health Center, Inc. has advertised its services in the newspaper since the paper was founded in June 2003.

Holyoke Health Center, Inc. was an early and enthusiastic supporter of *El Dialogo* because Lillian Santiago, like the health center, has worked hard for the community of Holyoke. She has shown a long-term commitment to the health of this city. As a community health center, we consider it our mission to support local endeavors, like *El Dialogo*, that bring positive changes to the community.

Hector Bauza was our initial contact with the newspaper, and Lillian Santiago became our contact when she took over as publisher. With the exception of conversations about the design and content of our ad with graphic designers and email exchanges with editor Ana Morales, Lillian has been our only contact at the newspaper. *El Dialogo* has printed articles about the work of the health center and has included our events in its calendar.

Hector Bauza joined the Holyoke Health Center's Board of Directors last December.

Please contact me if you have further questions.

Sincerely,

Becky Michaels
Marketing Director
413-420-2114

HOLYOKE HEALTH CENTER

ADMINISTRATIVE OFFICE
217 High Street
Mailing Address:
P. O. Box 6260
Holyoke, MA 01041-6260

Phone (413) 420-2111
Fax (413) 534-5416

------------

CLINIC
230 Maple Street
Mailing Address:
P. O. Box 6260
Holyoke, MA 01041-6260

Phone (413) 420-2200
Fax (413) 420-2260

------------

SUPPORT SERVICES
255 High Street
Mailing Address:
P. O. Box 6260
Holyoke, MA 01041-6260

Phone (413) 420-2130
Fax (413) 540-0957

------------

CHICOPEE HEALTH CENTER

CLINIC
203 Exchange Street
Chicopee, MA 01013
Mailing Address:
P. O. Box 6260
Holyoke, MA 01041-6260

Phone (413) 420-2222
Fax (413) 592-2324

------------

On the 18th day of May, 2005, before me, the undersigned notary public, personally appeared Becky Michaels, provided to me through satisfactory evidence of identification which was a MA drivers lic, to be the person whose name is signed on the preceding or attached document and ...

Patrick B. Lavelle, Jr.
NOTARY PUBLIC
My commission expires July 14, 2006



10 Open Square Way
Holyoke, MA 01040
tel 413.532.5057
fax 413.532.5178
info@opensquare.com
www.opensquare.com

I met Lillian Santiago-Bauza in the late summer of 2003 through her son, Raul Lorenzo and husband Hector Bauza. One sunny Sunday afternoon I found Raul and Hector wandering around Open Square, the large mill property in the center of Holyoke's urban core which I am developing. They had heard about the project and were curious. We immediately struck up a conversation and they told me that they would like to return with Lillian, who had started a bilingual newspaper called Dialogo Bilingue, and was looking to move the business from their residence to an office location in the near future. From there they introduced me to Lillian and we met several times. I was thrilled to learn that they lived downtown in another mill that had been converted to condominiums some ten to fifteen years as part of a failed resurgence of the Holyoke. I had been living in Holyoke for three years by then and could count on one hand the number of educated professionals that I knew living in the area. As the poorest city in the Commonwealth of Massachusetts with a large, undereducated Hispanic population, Holyoke is not the first choice of most professionals and certainly not the location of choice to start such a risky venture as a newspaper. By December of 2003 Dialogo Bilingue had signed a lease and was operating out of Open Square.

Lillian's concept for Dialogo Bilingue was both innovative and ambitious. She wanted a newspaper that spoke to the underserved and under represented Hispanic population as well as the broader population, while at the same time bridging the cultural divide between different ethnic groups. There are very few people with the skills, local community ties, and commitment to pull off such a project. Lillian has all three in abundance and has worked tirelessly to achieve her goals. Lillian's work has extended far beyond just publishing a newspaper to include events like "Island's Together", an unprecedented and successful series of ongoing gatherings that bring different ethnic groups together to mingle, socialize and share their music. The level of quality and outreach is helping to spark the dormant economy of Holyoke and the region by creating economic opportunity for many people and businesses. The community, and more the region, looks towards the newspaper, now named El Dialogo, as not only a resource for all people regardless of income and ethnicity, but as a sign of hope for the future. The newspaper, later renamed El Dialogo would not exist, nor would it have reached its current level of success without Lillian Santiago. It would be a travesty for the community to lose El Dialogo under Lillian's direction, and a blow to the Holyoke's economic turnaround.

John Aubin
Managing Member, Open Square LLC
Managing Member, Open Square Properties LLC
General Partner, Lyman Associates (Echo Hill of Holyoke Apartments)



On this 19th day of May, 2005, before me, the undersigned notary public, personally appeared John Aubin, proved to me through satisfactory evidence of identification, which were a Massachusetts Driver's License, to be the person whose name is signed on the attached document in my presence.



Commission exp: 6/23/2011

HOPE JINISHIAN, M.S.W.
121 WILLOW STREET
FLORENCE, MASSACHUSSETTS 01062
(413) 586-0440

May 18, 2005

Robinson & Donovan, PC
1500 Main Street, Suite 1600
Springfield, MA 01115

To Whom It May Concern,

I am writing on behalf of Lillian Santiago-Bauza and the bilingual newspaper, El Dialogo, which she has published since 2003. I serve on a planning committee with Ms. Santiago-Bauza at the Women's Fund of Western Massachussetts (WFWM) where she has initiated a Latino chapter of the Women's Fund and serves on the Board of Directors. At the WFWM like at El Dialogo she works diligently to inspire civic responsibility in the local Latino community.

Lillian Santiago-Bauza works tirelessly on behalf of her community publishing the only bilingual newspaper in Hampshire and Hampden Counties Through the publication of the paper, not only does she provide education and information on a variety of topics, but she offers a forum for promotion of local business's products and services as well. I am impressed by her dedication and commitment to service and believe that it would be a great loss to the residents of Hampshire and Hamden counties to lose this unique contribution to our society.

Sincerely,

Signed under the pains and penalties of perjury this 18 day of May, 2005

Hope Jinishian, M.S.W.

notarized for Hope Ginishian

My Commission Expires
December 4, 2009



May 17, 2005

Robinson Donovan PC
Keith A. Minoff
1500 Main Street, Suite 1600
Springfield, Ma 01115

Dear Attorneys Donovan and Minoff:

I am writing in support of Lillian Santiago and the newspaper El Diálogo. This newspaper fulfills a vital role in the community of Greater Holyoke as a way for both Latinos and Anglos to get news about the community and the issues of importance to the community. True to its name, El Diálogo encourages dialogue across cultures, neighborhoods and languages.

Nuestras Raíces is a grassroots organization promoting sustainable development in Holyoke through projects relating to food, agriculture and the environment. We draw our membership and our leadership from the 125 families participating in our network of community gardens, shared-use commercial kitchen and farmer training program. Nuestras Raíces is deeply embedded in the community of inner-city Holyoke. According to the 2000 census, Holyoke is the mainland city with the highest percentage of Puerto Ricans (38%) in the United States. This large and growing population of Puerto Ricans is primarily Spanish-speaking and maintains strong cultural and political ties to Puerto Rico. It also faces barriers of discrimination and high levels of poverty, leading to low level of political representation and media coverage. El Diálogo performs the crucial service of providing in-depth, profound reporting on community issues and issues of importance to the Latino community in ways that other media outlets do not. The owner of the paper and principal reporters are Latinos living in the community, helping to ensure that the news is relevant and gathered and presented in the context and language of the community. This perspective is important for community members and non-community members alike to understand.

The impact of El Diálogo is extensive, not just because of its language and content. Ms. Santiago and El Diálogo invest in the local community as community leaders and as a business. Ms. Santiago is recognized for her civic service and representation of her Ward. El Diálogo as a business has hired young people from the community to write articles, take photos and deliver newspapers. Five young program participants of Nuestras Raíces worked on weekends for the newspaper, getting income for their families and learning important job skills. The offices of El Diálogo are in downtown Holyoke and host community meetings. El Diálogo sponsors community events such as the Islands United event joining Irish and Puerto Rican traditional music, another example of El Diálogo building cross-cultural relationships.

The name "El Diálogo" is a powerful statement as to the purpose of the newspaper and testimony to its role in this community. We encourage the court to defend El Diálogo to the fullest extent possible. Please contact me, (413) 535-1789, dross@nuestras-raices.org, with any questions.

Sincerely,

Daniel Ross
Executive Director



**Even Start Family Literacy Program**
**Joseph Metcalf School**
**2019 Northampton Street - Holyoke, Massachusetts 01040-3475**
Tel. (413) 493-1609      Fax. (413) 493-1639
ecarballo@hps.holyoke.ma.us

Dr. Eduardo Carballo, Superintendent Of Scho

Elizabeth Larivee, Principal
James Lescault, Even Start Family Literacy Supervisor

Robinson & Donovan PC
Atty. Keith A. Minoff
1500 Main Street, Suite 1600
Springfield, MA  01115

May 18, 2005

Dear Atty. Minoff,

I am submitting this letter as written testimony on behalf of El Dialogo newspaper currently situated in Holyoke Ma.

The Holyoke Even Start Family Literacy Program has been providing classes since May, 2003.  We currently have eighteen Holyoke families, comprised of 21 adults and 30 children receiving services three evenings a week.   All of the families we have served over the years have been Latino except for one.  The primary reason the parents enroll themselves and their children, is to learn or improve their English so they can help their children with their homework.

El Dialogo has been and continues to be a vital medium for these families and others throughout the greater Holyoke area.  El Dialogo is many things to the Latino and non-Latino community.  The paper covers not only important local news, enabling the residents to become more knowledgeable and active citizens but also highlights community agencies and local resources.   Many of those resources assist those same readers in rectifying and overcoming economical and personal barriers.  Our adult teachers have more than once used an article from El Dialogo for class lessons.

On another very real concern to us at Even Start is the bilingual nature of El Dialogo. This allows our students to read the same article both in English and Spanish.  This helps the student practice their reading, spelling, grammar and comprehension.

The letter attached is a list of signatures of Even Start students and staff who have read or had this letter read and translated for them.  Their signature indicates their belief in and support of El Dialogo.

Respectfully,

James Lescault, Supervisor
Holyoke Even Start Family Literacy Program

HARRY MONTALVO
Notary Public
Commonwealth of Massachusetts
My Commission Expires
August 11, 2011

**"A community working together to prepare our students for their future."**

We the undersigned are in agreement with the cover letter regarding El Dialogo and the newspaper's importance in our lives:

_[handwritten signatures]_

HARRY MONTALVO
Notary Public
Commonwealth of Massachusetts
My Commission Expires
August 11, 2011