UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

|  |  |  |
|---|---|---|
| DIÁLOGO, LLC and <br> DIRECT MERCHANTS S.A., INC., <br><br> Plaintiffs, <br><br> v. <br><br> LILLIAN SANTIAGO BAUZÁ, <br> EL DIÁLOGO, LLC, and <br> FRANCISCO JAVIER SOLÉ, <br><br> Defendants. | ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) | CIVIL ACTION NO. 05-cv-30076-MAP |

**PLAINTIFFS' MEMORANDUM IN SUPPORT OF MOTION
FOR SUMMARY JUDGMENT**

Pursuant to Rule 56 of the Federal Rules of Civil Procedure, Plaintiffs Diálogo, LLC ("the Company" or "Diálogo, LLC") and Direct Merchants S.A., Inc. ("DMSA") (collectively, "Plaintiffs") move for summary judgment against Defendants Lillian Santiago Bauzá and El Diálogo, LLC (collectively, "Defendants") on all claims in the Second Amended Complaint and Defendants' Counterclaims or, in the alternative, any claims thereof.

**PROCEDURAL BACKGROUND**

On March 31, 2005, Plaintiffs filed their complaint and moved for a temporary restraining order and a preliminary injunction against Defendants Lillian Santiago Bauzá and El Diálogo, LLC. At a hearing on April 6, 2005, the Court denied the motion for a temporary restraining order and, subsequently, on April 8, ordered an expedited discovery schedule. At the hearing on May 23, 2005, the Court denied Plaintiffs' motion for a preliminary injunction and ruled that Plaintiffs failed to show a likelihood of success on the merits. Plaintiffs appealed the

Court's Order.

On September 16, 2005, the First Circuit ruled that, at the preliminary injunction stage, there was no irreparable harm because it is alleged "Santiago is conducting the Diálogo, LLC business under her new company's name and DMSA is publishing no similar newspaper." Opinion at 8. The First Circuit also ruled that "[b]oth parties agree that the newspaper Santiago is currently publishing is the same as the newspaper the parties published together beginning in July 2004." Opinion at 3. In concluding, the First Circuit stated (without deciding) that "DMSA may well have viable claims against Santiago." Opinion at 10.

## FACTUAL BACKGROUND

In 2003, Santiago Bauzá, her husband Hector Bauzá, and two other partners, Manuel Frau-Ramos and Ingrid Estrany-Frau, started a Massachusetts corporation called Diálogo Bilingue, Inc. Plaintiffs' Statement of Material Facts ("PSMF") ¶ 7. The corporation Diálogo Bilingue published a newspaper known as "Diálogo Bilingue." (PSMF ¶ 14). The first edition of "Diálogo Bilingue" was on June 1, 2003 and the last edition of "Diálogo Bilingue" was on June 1, 2004. (PSMF ¶ 14). In the community, the corporation of Diálogo Bilingue, Inc. was known as "Diálogo Bilingue." (PSMF ¶ 12).

In May 2004, Lillian Santiago Bauzá discussed with Gerry Pike, Managing Director of DMSA, the business of Diálogo Bilingue, Inc. She told him that she was breaking her involvement with her other partners and she was deciding whether to continue the newspaper herself or whether to close it down. (PSMF ¶ 15). In discussions about DMSA's investment, Santiago Bauzá and Gerry Pike "vaguely discussed" money, and he would start by investing in "software which is $1,000. He said that he will pay me [Santiago Bauzá] $2,000 salary and he would pay Gabriela's salary. So that was the extent at that moment." (PSMF ¶ 17).

2

Santiago Bauzá offered her partners $3,000 for their Diálogo Bilingue stock, but they rejected her offer. (PSMF ¶¶ 21-22). Accordingly, in June 2004, she "started something new," and the corporation of Diálogo Bilingue, Inc. and the publication "Diálogo Bilingue" were being discontinued. (PSMF ¶¶ 30, 32). Through a new corporation (Diálogo, LLC), Santiago Bauzá launched a new newspaper, with a "new look, new way of doing that newspaper." (PSMF ¶ 33). In June 2004, Santiago Bauzá "was in the process of changing . . . of getting into another venture [Diálogo, LLC]." (PSMF ¶ 34).

On June 8, 2004, Santiago Bauzá wanted a contract to set forth the obligations of the parties. (PSMF ¶ 35). She explained that she needed the Venture Agreement and the Operating Agreement. (PSMF ¶ 35). Santiago Bauzá wanted to launch "El Diálogo." (PSMF ¶ 35). And she wanted "the legal documents upon which the new venture could be built."

On June 9, 2004, Gerry Pike of DMSA sent to Santiago Bauzá a joint venture agreement and the organizational documents for the formation of the new company, Diálogo, LLC, and these documents included a Venture Agreement and an Operating Agreement (Diálogo, LLC) for the new company. Am. Compl. II ¶ 13; Answer ¶ 13 (PSMF ¶ 38). Santiago Bauzá executed these documents and returned them to DMSA by facsimile. Am. Compl. II ¶ 14; Answer ¶ 14; (PSMF ¶ 39).

Under the Venture Agreement, Santiago Bauzá and DMSA formed a joint venture. Am. Compl. II ¶ 16 and Ex. 2; Answer ¶ 16 (PSMF ¶ 43). The Venture Agreement provided that "DMSA shall contribute the initial capital to launch the LLC <u>in an amount that DMSA deems appropriate</u> (including through travel, promotional costs, legal fees, accounting fees, billing fees and the labor of management and staff of DMSA)." Am. Compl. II ¶ 16 and Ex. 2; Answer ¶ 16 (PSMF ¶ 44). The Venture Agreement "accurately reflect[ed] [Santiago Bauzá's]

understanding and discussions with Mr. Pike about what this venture was all about," (PSMF ¶ 46), and "accurately reflected what [her] obligations were and what DMSA obligations [were]." (PSMF ¶ 46).

Under the Operating Agreement, Santiago Bauzá agreed to act exclusively on behalf of the Company. Am. Compl. II ¶ 18 and Ex. 1; Answer ¶ 18 (PSMF ¶ 48). She agreed that "[her] conduct would be dedicated exclusively to the venture," (PSMF ¶ 55), and she would not work on any other venture, including Diálogo Bilingue, Inc. (PSMF ¶ 55). All her efforts were "to be dedicated to Diálogo, LLC, the Maine corporation." (PSMF ¶ 56). Santiago Bauzá also agreed that she "may not resign from the Company prior to the dissolution and winding up of the Company." Am. Compl. II ¶ 18 and Ex. 1; Answer ¶ 18 (PSMF ¶ 48). Santiago Bauzá also agreed that the proprietary information, including advertising and marketing information, subscription lists and supplier lists, of the Company was to be kept confidential. Am. Compl. II ¶ 19 and Ex. 1, at 22; Answer ¶ 19 (PSMF ¶ 50).

Section 4.1 of the Operating Agreement explains the members' initial capital contributions to the Company. Section 4.1(a) provides:

> Each Member <u>has contributed</u> or <u>is deemed to have contributed</u> to the capital of the Company the amount set forth opposite the Member's name on Schedule A attached hereto. The <u>agreed value</u> of the Capital Contributions <u>made or deemed to have been made</u> by each Member shall be set forth on Schedule A.

Am Compl. II ¶ 15 and Ex. 1 (emphasis added); Answer ¶ 15 (PSMF ¶ 52). Schedule A provides that the agreed value of DMSA's capital contribution was $50,000. Id. (PSMF ¶ 52). Santiago Bauzá understood that as of June 9, 2004, the capital contributions of DMSA were already made or were deemed to have been made. (PSMF ¶ 54).

Santiago Bauzá "brought a business to the venture." (PSMF ¶ 57). Since she had to

4

dedicate her work life to Diálogo, LLC, (PSMF ¶ 57), her contribution to the Company was "all of the contacts, advertising list[s], customer list[s] that she had with respect to Diálogo Bilingue was part of [her] contribution." (PSMF ¶ 57).

As of June 15, 2004, Santiago Bauzá announced: "I have decided to close Diálogo Bilingue corporation." (PSMF ¶ 61). This corporation was not going to conduct business any longer. (PSMF ¶ 61).

Shortly after Santiago Bauzá agreed to the terms of the Operating Agreement and the Venture Agreement, she announced that "[a]ll new business are [sic] under Diálogo LLC contract". Am. Compl. II ¶ 21; Answer ¶ 21 (PSMF ¶ 63). On June 10, 2004, Santiago Bauzá secured the domain name registration "eldialogo.com". (PSMF ¶ 62). At the time, she was operating exclusively on behalf of Diálogo, LLC. (PSMF ¶ 62). The Massachusetts company El Diálogo, LLC "wasn't even in [her] consciousness at that time." (PSMF ¶ 6).

On or about July 1, 2004, the Company published and distributed the first issue of its bilingual newspaper, "El Diálogo." Am. Compl. II ¶ 24; Answer ¶ 24 (PSMF ¶ 65). It published numerous issues after that, on a bi-weekly basis, from July, 2004 until February, 2005. Id. Before July 1, 2004, neither Santiago Bauzá nor Diálogo Bilingue, Inc. had published a newspaper entitled "El Diálogo." Id. at ¶ 25 (PSMF ¶ 66).

In December 2004, Santiago Bauzá presented DMSA with financial statements reflecting the financial performance of the Company from July 1, 2004 to December 13, 2004. (PSMF ¶ 72). These documents demonstrated that, during this period, the Company had a total net income of over $21,000 and that the Company had a profit for every complete month in this period. Id. (PSMF ¶¶ 72, 88 ). Santiago Bauzá had exclusive control over the finances of the Company and the financial reporting of the business. (PSMF ¶ 71).

5

In early February, Santiago Bauzá noted the continuing positive momentum of the business and stated:

> Gerry, the newspaper is on an incredible moment to grow, since Francisco arrived we had implemented many systems that are going to help us get the accounts we need . . . .

Pike Aff. II ¶ 32 and Ex. 8 (PSMF ¶ 100). Through March, 2005, however, DMSA had made over $40,000 in such out-of-pocket payments and also contributed over $5,000 in management services. Pike Aff. II ¶ 29 (PSMF ¶ 104).

In mid-February, the Managing Director of DMSA (Gerry Pike) was nearly completely incapacitated and could not monitor the developments at the Company. Pike Aff. II ¶ 34 (PSMF ¶ 105). Without authority, Santiago Bauzá drafted a letter dated February 17, 2004 to inform Mr. Pike that she was unilaterally closing down the business of the Company. Am. Compl. II ¶ 34 and Ex. 4; Answer ¶ 34 (PSMF ¶ 106); Pike Aff. II ¶ 36 and Ex. 10 (PSMF ¶ 106). This letter, however, was not mailed until February 25, 2005, Pike Aff. II ¶ 37 (PSMF ¶ 108), and Mr. Pike did not receive the letter until March 5. Id. at ¶ 38 (PSMF ¶ 108).

In February 2005, without the knowledge and consent of DMSA, Santiago Bauzá physically moved the business, assets, and equipment of the Company out of its location at Suite 405, 250 Open Square Way in Holyoke to a new location. Pike Aff. II ¶ 41 (PSMF ¶ 112).

On March 15, 2005, Santiago Bauzá established a new Massachusetts limited liability company called El Diálogo, LLC (hereinafter "Newco" for clarity). Pike Aff. II ¶ 42 (PSMF ¶ 113). On each of March 1, 2005 and March 15, 2005, April 1, 2005, and April 15, 2005, Santiago Bauzá published an edition of "El Diálogo," apparently with the assets of the Company. Pike Aff. II ¶ 43 (PSMF ¶ 114). The newspaper is virtually unchanged from the previous

editions of El Diálogo.  Am. Compl. II ¶ 41; Answer ¶ 41 (PSMF ¶¶ 114, 115).

## **ARGUMENT**

Summary judgment is appropriate if the record shows "that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law."  Fed. R. Civ. P. 56(c).  An issue is "genuine" if, based on the record evidence, a reasonable jury could return a verdict for the nonmoving party.  Anderson v. Liberty Lobby, 477 U.S. 242, 248 (1986). "'Material' means that a contested fact has the potential to change the outcome of the suit under the governing law if the dispute over it is resolved favorably to the nonmovant."  McCarthy v. Northwest Airlines, Inc., 56 F.3d 313, 315 (1st Cir. 1995) (citations omitted).  The party moving for summary judgment must demonstrate an absence of evidence to support the nonmoving party's case.  Celotex Corp. v. Catrett, 477 U.S. 317, 325 (1986).  In determining whether this burden is met, the court must view the record in the light most favorable to the nonmoving party and give that party the benefit of all reasonable inferences in its favor.  Nicolo v. Philip Morris, Inc., 201 F.3d 29, 33 (1st Cir. 2000).

I.   THERE IS NO GENUINE ISSUE OF MATERIAL FACT THAT DEFENDANT SANTIAGO BAUZÁ BREACHED HER AGREEMENTS WITH DMSA AND HER FIDUCIARY DUTIES TO DIÁLOGO, LLC

It is undisputed that:

- Defendant Santiago Bauzá entered into the Venture and Operating Agreements to form the Company.  Am. Compl. II ¶ 14; Answer ¶ 14.  (PSMF ¶ 39).

- Under these agreements, Defendant Santiago Bauzá was required to devote her efforts <u>exclusively</u> to the Company and was prohibited from providing services to any other entity relating to the Business.  Am. Compl. II ¶¶ 16, 18 and Exs. 1 and 2; Answer ¶¶ 16, 18.  (PSMF ¶ 43).  Santiago Bauzá agreed and understood that she would not work on any venture [other than the Company], including Diálogo Bilingue, Inc.  (PSMF ¶ 55).

·   Under the agreements Santiago Bauzá was required to keep all Company information confidential. Am. Compl. II ¶ 19 and Ex. 1 at 22; Answer ¶ 19. (PSMF ¶ 50).

·   In her deposition, Santiago Bauzá testified that the Venture Agreement "accurately reflect[ed] [her] understanding and discussions with Mr. Pike about what this venture was 'all about,'" and "accurately reflected what [her] obligations were and what DMSA's obligations [were]." (PSMF ¶ 46).

·   Santiago Bauzá testified that she "brought a business to the venture." Her contribution to the Company was "all of the contacts, advertising, list[s], customer list[s] that she had with respect to Diálogo Bilingue was part of her contribution." (PSMF ¶ 57).

·   With respect to her old business, Diálogo Bilingue, Santiago Bauzá announced: "I have decided to close Diálogo Bilingue corporation." Santiago Bauzá conceded that this corporation was not going to conduct business any longer. (PSMF ¶ 61).

·   On or about July 1, 2004, the Company published the first issue of the bilingual newspaper, "El Diálogo." Am. Compl. II ¶ 24; Answer ¶ 24 (PSMF ¶ 65). Before that date, neither Santiago Bauzá nor Diálogo Bilingue, Inc. had published a newspaper entitled "El Diálogo." Am. Compl. II ¶ 25; Answer ¶ 25 (PSMF ¶ 66).

·   It is undisputed that Defendants continued to publish the exact same newspaper that Diálogo, LLC published previously. (PSMF ¶¶ 114, 115).

As plainly set forth above, *supra* at 4-5, these agreements plainly set forth Santiago's obligations to not compete with the Company . . . and take its assets.[1]

There also can be little dispute that Santiago Bauzá's conduct constituted a breach of her fiduciary duty to the Company and her partner, DMSA. "Stockholders in close corporations

---

[1] This taking also was a theft of Diálogo, LLC's trade secrets. A trade secret is defined broadly under Mass. G.L. c. 266, Sec. 30. The information taken by Santiago Bauzá is at least "management information" and "merchandising information" as defined by the statute. Pike Aff. II ¶ 41 (PSMF ¶ 112). "Further, confidential information, even if not truly a trade secret, and even if there is no ascertainable damage, is entitled to protection by injunction." Transkaryotic Therapies, Inc. v. Bain & Co., Inc., 14 Mass. L. Rptr. 397, 2002 WL 799694 *3 (Mass. Super. 2002);

must discharge their management and stockholder responsibilities in conformity with this strict good faith standard. They may not act out of avarice, expediency or self-interest in derogation of their duty of loyalty to the other stockholders and to the corporation." Donahue v. Rodd Electrotype Co. of New England, Inc., 367 Mass. 578, 593 (1975).

Defendants do not dispute that Santiago Bauzá had these legal obligations. Instead, Defendants have asserted that DMSA breached the Operating Agreement by failing to make "its promised $50,000 initial capital contribution" and that Santiago Bauzá "was therefore entitled to withdraw from the LLC." This argument fails for a number of reasons. First, neither the Venture Agreement nor the Operating Agreement provided that DMSA would make an initial capital contribution of $50,000 cash. Under the Operating Agreement, the expertise and strategic planning and research that DMSA brought to the company was deemed to constitute a capital investment of $50,000. (PSMF ¶¶ 52, 53). The Operating Agreement provides:

> Each Member *has contributed* or is *deemed to have contributed* to the Capital of the Company in the amount set forth opposite the Member's name on Schedule A. The *agreed value* of the Capital Contributions made or *deemed to have been made* by each Member shall be set forth on Schedule A.

Id. (emphasis added). In her deposition, Santiago Bauzá plainly admitted that she understood that as of June 9, 2004, "either those capital contributions were already made or were deemed to be made." (PSMF ¶ 54). The Operating Agreement plainly provides, "No Member shall be required to make any <u>additional</u> capital contribution to the Company." (PSMF ¶ 54) (emphasis added). Indeed, the Venture Agreement provides that "DMSA shall contribute the initial capital to launch the LLC <u>in an amount DMSA deems appropriate</u>." (PSMF ¶ 44). And Santiago Bauzá testified that the Venture Agreement "accurately reflected . . . what [DMSA's] obligations

---

see also Warner-Lambert Company v. Execuquest Corporation, 427 Mass. 46, 50 (1998).

[were]."  (PSMF ¶ 46).  Therefore, it is important that Santiago Bauza did not write any document to DMSA plainly stating that DMSA was in default of any alleged obligation to invest $50,000.  (PSMF ¶¶ 83, 93, 97).

Second, even assuming *arguendo* that DMSA breached the Operating Agreement, Santiago Bauzá's remedy does not include the misappropriation of the Company's assets. Indeed, the Operating Agreement plainly provides that:  the Company's Board of Directors must approve all transfers of Company assets not in the ordinary course of business, a Member may not take back his or her Capital Contribution without written consent of all Members, a Member may not resign from the Company until the Company has been dissolved by the consent of all Members or by court order; upon dissolution, all creditors of the Company must be paid before Members may seek to take Company assets for themselves.  Am. Comp. II ¶ 15 and Ex. 1; Answer ¶ 15 (PSMF ¶ 51).  In short, the Operating Agreement does not allow a Member to engage in a self-help remedy of unilaterally taking all the Company's assets.

"Not all breaches of contract by one party will excuse performance by the other.  In evaluating a breach of contract, the Court must determine 'whether the defendant's breach entitled the plaintiff merely to recovery for that breach while continuing to abide by the contract, or was so material in all circumstances as to justify the plaintiff in throwing the contract over and suing for the total breach.'"  Dunkin Donuts Inc. v. Gav-Stra Donuts, Inc., 139 F. Supp.2d 147, 155 (D. Mass. 2001), quoting Center Garment Co. v. United Refrigerator Co., 369 Mass. 633, 638, 341 N.E.2d 669 (1976).  In this case, the Operating Agreement plainly provides for the appropriate remedy . . . which includes a claim for breach of the agreement, action of the Board of Directors, or dissolution of the Company (PSMF ¶ 51).  In fact, Santiago Bauzá conceded that

10

the Operating and Venture Agreements did not allow her to unilaterally shut down the business. (PSMF ¶ 107).

II.     THERE IS NO GENUINE ISSUE OF MATERIAL FACT THAT DEFENDANTS ARE INFRINGING DIÁLOGO, LLC'S TRADEMARKS.

A trademark is any designation used "by a manufacturer or merchant to identify his goods and distinguish them for those manufactured or sold by others." 15 U.S.C. § 1127. Ownership of trademark rights arises upon use, not upon registration. 2 J. Thomas McCarthy, McCarthy on Trademarks § 16:4 (4th ed. 2003). A "use" in the trademark sense means a sale of goods or services in commerce under the mark. Id. § 16:11. "No rights accrue to one who merely selects a trademark without actual use of it in the advertising or sale of goods." Id. Therefore, the first person to *sell* products and services under a designation owns the trademark rights, even if someone else thinks of using the designation first or even registers the designation.

The trademark "El Diálogo" clearly belongs to Diálogo, LLC. The organizational documents and the Venture and Operating Agreements, were executed on June 9, 2004. Am. Compl. II ¶ 14; Answer ¶ 14. (PSMF ¶ 39). On July 1, 2004, the Company published and distributed the first issue of its bilingual newspaper, "El Diálogo." Am. Comp. II ¶ 24; Answer ¶ 24 (PSMF ¶ 65). Defendants have admitted that the date of the first use of the mark, "El Diálogo," was July 1, 2004. Am. Compl. II ¶ 43; Answer ¶ 43 (PSMF ¶ 116). Santiago Bauzá conceded in her Massachusetts trademark application that the first use of the mark "El Diálogo" was on July 1, 2004. (PSMF ¶ 116). Therefore, under the principles of judicial estoppel, Santiago Bauzá is estopped from claiming that she or Diálogo Bilingue, Inc. ever used or owned the mark "El Diálogo" before July 1, 2004. Otis v. Arbella Mutual Ins. Co., 443 Mass. 634, 639-

640, 824 N.E.2d 23 (2005) (and cases cited therein).  Therefore, it is clear that Diálogo LLC, the undisputed first user of the designation, is the owner of the exclusive trademark rights to "El Diálogo".

Defendants have argued that they possess the rights to "El Diálogo" by virtue of Diálogo Bilingue, Inc.'s use of the mark "Diálogo Bilingue," which was discontinued.  Defendants are incorrect for two reasons.  First, Diálogo Bilingue never used "El Diálogo" and never owned it. Am. Comp. II ¶ 25; Answer ¶ 25 (PSMF ¶ 66).  Santiago Bauzá admitted that the previous corporation was known as "Diálogo Bilingue" in the community.  (PSMF ¶ 12).  The previous use of "Diálogo Bilingue" does not create rights in "Diálogo" alone or in "El Diálogo"; such previous use only establishes rights in the words "Diálogo Bilingue" used together.  Franklin Mint Corp. v. Master Manuf. Co., 667 F.2d 1005, 1007 (C.C.P.A. 1981)("It is axiomatic that a mark should not be dissected and considered piecemeal, rather, it must be considered as a whole in determining likelihood of confusion").

Under the so-called "anti-dissection rule," the court must consider composite marks (i.e., marks consisting of more than one word) as a whole and cannot dissect the mark or consider the individual components separately.  The Sixth Circuit applied this rule to hold that the use of "Little Caesar" for pizza restaurants created no rights to "Pizza Caesar".  Little Caesar Enterp., Inc. v. Pizza Caesar, 834 F.2d 568, 571-72 (6th Cir. 1987).  The Sixth Circuit explained that the Little Caesar Enterprises had no rights to other composite marks employing the common, dominant word "Caesar" as follows:

> Although both marks employ the word 'Caesar,' we are warned by Professor McCarthy that a trademark 'should not be split up into its component parts and each part then compared with parts of the conflicting mark to determine the likelihood of confusion. It is the impression which the mark as a whole creates on the average reasonably prudent buyer and not the parts thereof which is

> important.' MCCARTHY, *supra*, at § 23:15 (footnotes omitted). McCarthy observes that it is a violation of this 'anti-dissection' rule to focus upon the 'prominent' feature of a mark and not upon the mark in its totality.

Little Caesar, 834 F.2d at 571-72. Defendants' argument that the use of the dominant term "Diálogo" in a previous composite mark creates rights to different composite marks employing the same term violates this principle.

Second, Santiago Bauzá admittedly abandoned Diálogo Bilingue's operations to devote all her efforts to Diálogo, LLC. (PSMF ¶¶ 30, 55). Trademark abandonment occurs when "the owner of the mark both (1) discontinued use of the mark and (2) intended not to resume its use." Vais Arms, Inc. v. Vais, 383 F.3d 287, 293 (5th Cir. 2004). In Vais, the seller of a business was deemed to have abandoned his rights to the mark "Vais" by selling his business and moving to Greece, even though he testified under oath that he intended to return to the business. Similarly, by abandoning Diálogo Bilingue and starting a new company, Diálogo Bilingue's rights were abandoned. (PSMF ¶ 55).

Third, the principles of equitable estoppel also bar Santiago Bauzá plainly representing to DMSA that she was closing the business of Diálogo Bilingue, Inc. . . . and then subsequently stealing the business and the trademark "El Diálogo" from the Company. See Boylston Development Group, Inc. v. 22 Boylston Street Corp., 412 Mass. 531, 542, 591 N.E.2d 157, 163 (1992). Ms. Santiago Bauza plainly represented to DMSA that she was closing Diálogo Bilingue. (PSMF ¶¶ 27, 30). DMSA relied on that representation. (PSMF ¶ 36).

Finally, under the Venture and Operating Agreements, Santiago Bauzá agreed that "[her] conduct would be dedicated exclusively to the venture [the Company]," (PSMF ¶¶ 43, 55), and she would not work on any other venture, including Diálogo Bilingue, Inc. Id. at 100. In this vein, Santiago Bauzá stated that she "brought a business to the venture." (PSMF ¶57).

Specifically, Santiago Bauzá admitted that the business, including "all of the contacts, advertising lists, customer lists that you had with 'respect to Diálogo Bilingue'" was part of her contribution. (PSMF ¶ 57). The First Circuit recognized that this was Plaintiffs' strongest argument. Opinion at 7-8.

Section 43(a) of the Lanham Act creates a federal cause of action for infringement of an unregistered trademark. Two Pesos v. Taco Cabana, Inc., 505 U.S. 763, 780-81 (1992) (Stevens, J., concurring). The likelihood of confusion test for infringement is the same for registered and unregistered marks. New West Corp. v. NYM Co. of California, Inc., 595 F.2d 1194, 1199-1201 (9th Cir. 1979); 4 J. Thomas McCarthy, McCarthy on Trademarks § 27:18 (4th ed. 2003).

The Company, therefore, must prove only three elements to prevail on its trademark infringement claim: (1) that it "uses and thereby 'owns', a mark"; (2) that Defendants are "using the same or a similar mark"; and (3) that such "use is likely to confuse the public, thereby harming the plaintiff." Anheuser-Busch, Inc. v. Caught-On-Bleu, Inc., 288 F. Supp. 2d 105, 113-14 (D.N.H. 2003).

As previously discussed, Plaintiff Diálogo, LLC, as the undisputed first user, owns the trademark rights. Supra at 13. Defendants are using the identical name, "El Diálogo", and the identical format, layout, and appearance for their new newspaper. Am. Comp. II ¶ 41; Answer ¶ 41 (PSMF ¶¶ 114, 115). In fact, Defendants have conceded that it is the same newspaper. Am. Comp. II ¶ 41; Answer ¶ 41.

III. THERE IS NO GENUINE ISSUE OF MATERIAL FACT THAT DEFENDANTS HAVE VIOLATED MASS. GEN. L. C. 93A.

Santiago Bauzá's taking of the Company's assets to El Diálogo, LLC in knowing violation of her contractual obligations and fiduciary duty is the type of conduct prohibited by

14

Massachusetts G.L. c. 93A.  In <u>Anthony's Pier Four, Inc. v. HBC Associates</u>, 411 Mass. 451, 488 (1991), the Supreme Judicial Court reversed a Superior Court decision to deny Chapter 93A damages, holding that:  "conduct in disregard of known contractual arrangements and intended to secure benefits for the breaching party constitutes an unfair act or practice for c. 93A purposes." <u>Id.</u> at 474 (citing three previous decisions).  One court has applied this principle to virtually identical facts and found that an executive of a closely-held corporation violated Chapter 93A by taking corporate assets without proper permission and using those assets in a new competing company owned by him.  <u>Henderson v. Axiam, Inc.</u>, 1999 WL 33587312 at *57-58 (Mass. Super. June 22, 1999).  Therefore, Santiago Bauzá's disregard for her known contractual obligations and fiduciary duties to increase the value of her personal asset (her new company) violates chapter 93A.

IV    <u>THERE IS NO GENUINE ISSUE OF MATERIAL FACT THAT DEFENDANTS ARE LIABLE FOR CONVERSION/MISAPPROPRIATION.</u>

Under Massachusetts law, the "elements of conversion require that a defendant be proved to have intentionally or wrongfully exercise[d] acts of ownership, control or dominion over personal property to which he has no right of possession at the time." <u>Grand Pac. Fin. Corp. v. Bauer</u>, 57 Mass. App. Ct. 407, 412 (2003), citing <u>Abington Natl. Bank v. Ashwood Homes, Inc.</u>, 19 Mass. App. Ct. 803, 807 (1965).  In this case, there is no genuine issue of material fact that Defendants were not entitled to take control of Diálogo, LLC's assets.  (PSMF ¶¶ 107, 112).

V.    <u>INJUNCTIVE RELIEF IS APPROPRIATE AND NECESSARY.</u>

As set forth in <u>Henderson v. Axiam, Inc.</u>, 1999 WL 33587312 at * 57-58 (Mass. Super.

June 22, 1999),[2] Section 11 of Chapter 93A expressly authorizes injunctive relief to prevent future harm from occurring, which should eliminate the need to show irreparable harm. UV Industries, Inc. v. Posner, 466 F. Supp. 1251 1255-56 (D. Me. 1979) ("Where . . . a statute provides for injunctive relief upon the showing of a violation, the party seeking such relief need not make a showing of irreparable harm in the normal equity sense"). Similarly, Lanham Act violations warrant an injunction without the need for showing irreparable harm. See Keds Corp. v. Renee International Trading Corp., 888 F.2d 215, 220 (1st Cir. 1989) (primary significance of infringement finding in issuing injunctive relief); see also Trak, Inc. v. Benner Ski, K.G., 475 F. Supp. 1076, 1078 (D. Mass. 1979) (irreparable harm flows from infringement finding). Irreparable harm, therefore, is presumed upon a showing of likelihood of success on the merits. GoTo.Com, Inc. v. Walt Disney Co., 202 F.3d 1199, 1205 n. 4 (9th Cir. 2000) (citation omitted) ("In a trademark infringement claim, 'irreparable injury may be presumed from a showing of likelihood of success on the merits'"); American Bd. of Psych. and Neur., Inc. v. Johnson-Powell, 129 F.3d 1, 4 (1st Cir. 1997) (stating in dicta "trademark infringements may be presumed without more to cause irreparable harm").[3]

---

[2] The Henderson court also acknowledged that "[u]nder c. 93A, § 11, a plaintiff may obtain an injunction if he has not suffered any loss of property or money 'if it can be shown that the aforementioned unfair method of unfair competition, act or practice may have the effect of causing such loss of property.'" Id. at 58. Accordingly, the Chapter 93A violations alone justify granting the requested injunctive relief because, as clearly set forth in the record, Defendants' conduct will cause both irreparable harm and economic loss to Plaintiffs.

[3] Furthermore, the First Circuit has held that loss of "incalculable revenues" and "harm to [a plaintiff's] goodwill" qualify as irreparable harm. Ross-Simons of Warwick, Inc. v. Baccarat, Inc., 102 F.3d 12, 19 (1st Cir. 1996). The First Circuit also has "recognized that the loss of a unique or fleeting business opportunity can constitute irreparable injury." Starlight Sugar, Inc. v. Soto, 114 F.3d 330, 332 (1st Cir. 1997); see also Hyde Park Partners v. Connolly, 839 F.2d 837, 853 (1st Cir. 1988); see also Baccarat, 102 F.3d at 18-19 ("[A] plaintiff need not demonstrate that the denial of injunctive relief will be fatal to its business . . . . If [it] suffers a substantial injury that is not accurately measurable or adequately compensable by money damages, irreparable harm is a natural sequel") (citations omitted) (emphasis added). Defendants' conduct creates such harms by misappropriating existing revenues and incalculably hindering Dialogo, LLC's potential to generate new and growing revenues.

**CONCLUSION**

For the foregoing reasons, the Court should GRANT Plaintiffs Motion for Summary Judgment.

                              DIÁLOGO, LLC and
                              DIRECT MERCHANTS S.A., INC.

                              By its attorneys,

Dated:   November 30, 2005         /s/ Seth W. Brewster
                              George Field (BBO No. 164520)
                              Seth W. Brewster (BBO No. 551248)
                              Attorneys for Plaintiffs
                              Verrill Dana, LLP
                              One Portland Square
                              PO Box 586
                              Portland, ME 04112-0586
                              gfield@verrilldana.com
                              sbrewster@verrilldana.com

**CERTIFICATE OF SERVICE**

I hereby certify that on November 30, 2005, I electronically filed Plaintiffs' Memorandum in Support of Motion for Summary Judgment with the Clerk of Court using the CM/ECF system which will send notification of such filing to the following: Keith A. Minoff, Esq. and Arnold Greenhut, Esq., and I hereby certify that there are no non-registered participants.

                              /s/ Seth W. Brewster

P:\sbrewster\Dialogo\Memo Support MSJ 11-30-05.doc