UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

DIÁLOGO, LLC, ET AL.,           )
          PLAINTIFFS            )
                                )
          v.                    )   C.A. No. 05-30076-MAP
                                )
LILLIAN SANTIAGO BAUZÁ,         )
ET AL.,                         )
          DEFENDANTS            )


MEMORANDUM AND ORDER REGARDING PLAINTIFFS'
SUBSTITUTE MOTION FOR SUMMARY JUDGMENT
(Dkt. No. 72)

December 18, 2006

PONSOR, D.J.


I. INTRODUCTION

    This is a suit brought by Plaintiffs Diálogo, LLC and

Direct Merchants S.A., Inc. ("DMSA") against Lillian

Santiago Bauzá ("Santiago"),[1] El Diálogo, LLC, and Francisco

Javier Solé ("Solé").  Plaintiffs have asserted claims for

violation of the Lanham Act, 15 U.S.C. § 1125(a), breach of

contract, and other business torts.  Defendants Santiago and

El Diálogo, LLC (collectively "Defendants") deny Plaintiffs'

allegations and have brought a four-count counterclaim.

Pending before the court is Plaintiffs' substitute motion

for summary judgment on its claims and on Defendants'

---

    [1] This Defendant has indicated that she generally goes by
the name Santiago (see Dkt. No. 26, Attach. A, Santiago Dep.
273:13-21) and has used this name in her briefs (see, e.g.,
Dkt. No. 57, Defs.' Opp'n Pls.' Mot. Summ. J.).  The court will
follow this preference.

counterclaim (Dkt. No. 72).  For the reasons stated below, this motion will be denied with respect to Plaintiffs' claims and Counts I, II, and IV of Defendants' counterclaim. The motion will be allowed with respect to Count III of Defendants' counterclaim.

## II. FACTS

The following facts appear in the light most favorable to Defendants, the non-moving parties.  See Kiman v. N.H. Dept. of Corr., 451 F.3d 274, 276 (1st Cir. 2006) (citation omitted).[2]

A.  Background.

In 2003, Santiago, her husband, and two other partners, Dr. Manuel J. Frau-Ramos ("Frau-Ramos") and Ingrid Estrany-Frau ("Estrany-Frau"), formed Diálogo Bilingue, Inc. for the purpose of publishing a bilingual newspaper based in Holyoke, Massachusetts.  (Dkt. No. 59, Ex. C., Santiago Aff. ¶ 3.)  In April 2003, Frau-Ramos secured the domain name "dialogobilingue.com" on behalf of the corporation (Dkt. No.

---

[2] On September 29, 2006, the court allowed co-defendant Solé's motion for summary judgment on his breach of contract counterclaim against Plaintiffs.  ( See Dkt. No. 71, Mem. & Order Re: Solé's Mot. Summ. J. 16.)  Plaintiffs have asserted a cross-claim against Santiago for indemnification, but have not moved for summary judgment on this theory of liability.

For the sake of clarity (and brevity), the court will not refer to facts pertinent to Plaintiffs' cross-claim unless they are also pertinent to the claims and counterclaims presently at issue.

26, Attach. B., Ex. 5, E-mail from RegisterSite.com Support
to Manuel Frau-Ramos (Apr. 17, 2003, 16:47:41 EST)), and on
June 1, 2003, Diálogo Bilingue, Inc. began publishing
"Diálogo Bilingue" on a monthly basis (Dkt. No. 26, Attach.
A, Santiago Dep. 48:19-22; <u>see also</u> Santiago Aff. ¶ 4
(noting that the newspaper became a bi-monthly publication
in February, 2004)).

Although the company was known by its business customers
as "Diálogo Bilingue" (Santiago Dep. 33:1-6), the newspaper
soon became known within the Hispanic community as "Diálogo"
or "El Diálogo" (Dkt. No. 59, Ex. A, Letter from Andrew
Morehouse, Dir., Solutions Cmty. Dev. Corp., to Keith A.
Minoff, Esq. (May 17, 2005); Letter from Xenia Rosado-
Merced, Cmty. Outreach Manager, Holyoke Med. Ctr., to Keith
A. Minoff, Esq. (May 18, 2005); <u>see also</u> Dkt. No. 58, Defs.'
Response to Pls.' Statement of Facts ¶ 66 (noting that "the
word 'Diálogo' was featured prominently in the banner, the
masthead and at the bottom of each page," and "appear[ed] in
bolder, larger type than the word 'bilingue'")).

In December 2003, Santiago met Gerry Pike ("Pike"), the
Managing Director of DMSA,[3] and he expressed some interest in
becoming involved with the publication.  (Santiago Dep.

---

[3] At the time, Santiago's husband and DMSA were partners
in an unrelated venture.  (Santiago Dep. 48:10-49:3.)

3

49:10-20.)  A few days later, after discussing Pike's
proposition, the partners of Diálogo Bilingue, Inc. elected
to continue running the newspaper without Pike's
participation.  (Id. 51:16-52:4).

Soon, however, Santiago's professional relationship with
Frau-Ramos and Estrany-Frau began to sour.  According to
Santiago, "the newspaper was not running in the black"
(Santiago Aff. ¶ 7), and the partners disagreed about
whether to invest more of their personal funds in the
enterprise.

In May 2004, Santiago met with Pike in North Haven,
Connecticut, and the two revisited the idea of working
together.  By this point, Frau-Ramos and Estrany-Frau were
no longer interested in publishing the newspaper, and
Santiago was contemplating whether to attempt to do so on
her own.  (Santiago Dep. 55:13-22.)  During the meeting,
Pike offered to "establish a capital account with 'starting
capital' of $50,000.00" in exchange for Santiago's
commitment to devote all of her professional energy to
running the newspaper.  (Santiago Aff. ¶¶ 13, 14 (stating
that she resigned her position as "Director of Employee
Assistance Programs at Holyoke Medical Center . . . in
reliance on [Pike's promise] to provide financial support

4

for the venture").)[4]

On May 31, 2004, Frau-Ramos sent Santiago an e-mail stating that he and Estrany-Frau had concluded that it would be in everyone's best interest to "retire all of the corporation that created Diálogo Bilingue." (Santiago Dep., Ex. 15, E-mail from Manuel Frau-Ramos to Lillian Santiago-Bauzá (May 31, 2004, 13:27 EST).) With that aim in mind, Frau-Ramos indicated that he and Estrany-Frau would be willing to sell Santiago their share of the corporation for $10,000.

In light of the fact that the newspaper was not operating at a profit, Santiago rejected the offer. In an e-mail to Frau-Ramos dated June 15, 2004, Santiago stated that she had decided to close Diálogo Bilingue, Inc. and that she would settle the company's affairs by personally

---

[4] Plaintiffs contend that Pike never promised to invest a specific sum of money and the figure $50,000 never came up. They cite Santiago's initial testimony during her deposition that the parties "vaguely discussed the amount of money." (Santiago Dep. 59:2-4; see also id. at 59:13-17 ("[Pike] said he would start by investing $1,000 in software. He said that he [would] pay me a $2,000 [per month] salary, and he said that he would pay Gabriela [Romero, a graphic designer Santiago wanted to hire, a $1,000 per month] salary.").)

While Plaintiffs acknowledge Santiago's subsequent claim that Pike promised to "set a capital account for the business [in] the amount of $50,000" (id. at 69:20-70:2), they seek to discredit her purported clarification by noting that it came after Santiago had a chance to consult with counsel. Under Rule 56, of course,, the court must resolve this factual dispute in favor of the non-moving parties.

paying all of its outstanding debts.

Two days later, counsel for Frau-Ramos and Estrany-Frau sent Santiago a letter informing her that she was obligated to purchase his clients' shares or proceed by the corporate form. (Santiago Dep. 126:1-4).  Santiago did not respond.

In the meantime, Santiago and Pike went about forming a new company, Diálogo, LLC.  On June 9, 2004, Pike sent Santiago two documents drafted by DMSA attorneys: a Venture Agreement (the "Venture Agreement") and an Operating Agreement and Members Agreement (the "Operating Agreement"). Santiago signed these documents without obtaining the advice of counsel and faxed them back to Pike for his signature that same day.

B.   The Organizational Documents of Diálogo, LLC.

The Venture Agreement is a two-page document that sets out Santiago and DMSA's intent to form a Maine limited liability company in which Santiago would have a 49% membership interest and DMSA would have a 51% membership interest.  (Dkt. No. 15, Ex. 2, Venture Agreement ¶ 1 (noting the joint venture's purpose to "develop[] Spanish language and bilingual print and media business").)  In executing this document, Santiago agreed to "carry the title of Publisher" and "be responsible for editorial content and for managing the day-to-day operations of the venture,

including recruiting and hiring employees and contractors."
(Id.)  For its part, DMSA agreed to "contribute the initial
capital to launch the LLC in an amount that DMSA deems
appropriate (including through travel, promotional costs,
legal fees, accounting fees, billing fees and labor of
management and staff of DMSA)."  (Id.)   Both parties agreed
to execute the Operating Agreement "[i]n furtherance of this
Agreement."  (Id. ¶ 6.)

     The Operating Agreement is a thirty-page document that
provides a more detailed description of Diálogo LLC's
organization and the manner in which it was intended to
function.  Section 4.1 provides:

> Each Member has contributed or is deemed to have
> contributed to the Capital of the Company in the
> amount set forth opposite the Member's name on
> Schedule A.  The agreed value of the Capital
> Contributions made or deemed to have been made by
> each Member shall be set forth on Schedule A.

(Dkt. No. 15, Ex. 1, Operating Agreement § 4.1(I).)[5]
Schedule A, in turn, sets forth the sum of $50,000.00
opposite DMSA and the sum of $1.00 opposite Santiago.  This

---

[5] The Operating Agreement defines "Capital Contribution"
as "the aggregate amount of money and the fair market value of
any property (other than money) contributed to [Diálogo, LLC]
pursuant to Section 4.1 hereof with respect to such [party's]
Interest."  (Operating Agreement § 1.1.)  "'Member' means each
of [Santiago] and DMSA and includes any Person admitted as an
Additional Member or substitute Member . . . ."  (Id.)  There
is no indication that Diálogo, LLC ever admitted an Additional
Member or substitute member.

wording is odd, since it is undisputed that as of the
signing of the Operating Agreement DMSA had certainly not
contributed $50,000 to the project.  Section 4.1 further
states that "[n]o member shall be required to make any
additional capital contribution to the Company."  (Id. §
4.1(ii).)

According to the Operating Agreement, neither party
could resign from Diálogo, LLC prior to its dissolution, and
no dissolution of the enterprise could occur absent the
written consent of each party.  (Id. §§ 5.4, 15.2.)

Section 12.8 concerns confidentiality.  Under this
clause, DMSA and Santiago agreed not to "disclose to any
person or entity, directly or indirectly, any Proprietary
Information . . . relating to [Diálogo, LLC's] business
without the prior written consent of the LLC."  (Id. §
12.8.)[6]  While § 12.7 requires Santiago to act exclusively on
Diálogo, LLC's behalf, this provision permits DMSA to engage
in independent ventures similar to, or in direct competition
with, the business of Diálogo, LLC.  (Id. § 12.7.)

---

[6] Under the Operating Agreement, "Proprietary Information"
is defined as

   all advertiser and subscription lists, strategic or
   technical    information,    financial    information,
   supplier information, billing rates and advertiser
   provided information, documents and data.

(Operating Agreement § 12.8.)

Finally, the Operating Agreement purports to "constitute[] the entire agreement among the parties hereto pertaining to the subject matter hereof and supercedes all prior agreements and understandings pertaining hereto." (Id. § 17.8.)

Notably, neither the Venture Agreement nor the Operating Agreement required Santiago to transfer any right, title, or interest in the trademark "Diálogo" to Diálogo, LLC.  A reasonable factfinder could conclude that this mark remained the property either of Santiago personally or of the prior corporation Diálogo Bilingue, Inc.

C. The Operation of Diálogo, LLC.

On June 10, 2004, the day after she signed the Venture Agreement and Operating Agreement, Santiago obtained the domain name "eldialogo.com" on behalf of Diálogo, LLC. (Defs.' Response to Pls.' Statement of Material Facts ¶ 62 (acknowledging that the registration form listed Diálogo, LLC as the account holder).)  Shortly thereafter, Santiago sent Pike an e-mail indicating that all future business would be done under the Diálogo, LLC contract.

On July 1, 2004, Diálogo, LLC published the first edition of the newspaper entitled "El Diálogo." (Santiago Dep. 132:4-133:2 (acknowledging that she discontinued the numbering of "Diálogo Bilingue" and started a new numbering

system for "El Diálogo"); <u>see also</u> <u>id.</u> 61:12-16 (stating
that she changed the paper's name to "El Diálogo" because
she "never liked the Diálogo Bilingue name"); Santiago Aff.
¶¶ 5, 6 (noting that "El Diálogo" utilized the same
bilingual format, layout, content and advertisements as had
been featured in "Diálogo Bilingue").)  This first issue of
"El Diálogo" contained an editorial explaining that the
newspaper "ha[d] been created for all of our appreciated
readers."  (Dkt. No. 34, Ex. 13, <u>El Diálogo, the bilingual</u>
<u>newspaper for our community</u>, El Diálogo, July 1, 2004, at
2.)

On August 2, 2004, Santiago sent an e-mail to Pike in
which she cited the venture's "tremendous potential," but
noted the "need to come to a better understanding of the
financial situation."  (Santiago Dep., Ex. 29, E-mail from
Lillian Santiago to Gerry Pike (Aug. 2, 2004, 17:00:10
EST).)  This e-mail came in response to prior phone
conversations in which Santiago informed Pike that the
company's expenses were exceeding its revenues and was sent
in an attempt to encourage Pike to adhere to what Santiago
felt was his obligation to support the venture financially.
(Santiago Dep. 136:7-12.)  The e-mail concluded with
Santiago's assessment that the newspaper needed to sell
$11,000 in advertisements each month to "break even."  "As

you know," Santiago wrote, "this is not possible without a good sale[s] team."  (E-mail from Lillian Santiago to Gerry Pike (Aug. 2, 2004, 17:00:10 EST).)

During the next two months, Santiago and Pike continued to exchange business-related e-mails (see Santiago Dep. 141:9-143:12, 147:19-148:9), and DMSA paid a number of Diálogo, LLC's expenses (see, e.g., id. 151:2-5 (acknowledging that DMSA paid to get "El Diálogo" on the web), including Santiago's $2,000/month salary (id. 225:4-14).

However, on November 1, 2004, one of Pike's subordinates informed Santiago that DMSA would no longer pay her salary or the salary of anyone else connected with the publication. In response, Santiago sent Pike an e-mail stating:

> I am appalled at this decision without notifying me about it.  I feel that you have not been outfront with me.  If you want out of the business I can understand and I will honor that.

(Santiago Dep., Ex. 35, E-mail from Lillian Santiago to Gerry Pike (Nov. 1, 2004).)

The following day, Pike wrote, "You have concluded -- wrongly -- that a 'decision' has been made. [I gave instructions] to hold payment until I spoke with you, based on our conversation of last month in which we had a reminder that the plan as presented by you back in July showed Diálogo on its feet in October."  (Santiago Dep., Ex. 35, E-

mail from Gerry Pike to Lillian Santiago (Nov. 1, 2004, 16:05 EST).)  According to Santiago, the forecast of fiscal stability to which Pike referred was contingent upon financial support Pike had not provided.  See Santiago Dep. 155:9-14 ("I said if we . . . hire a sales person and if we take care of the things that we need to take care [of], I don't see . . . why the newspaper would not be in the black by October or November.").)

In December, Santiago decided that Diálogo, LLC should hire Solé as its Director of Advertising Sales.  After forwarding a copy of Solé's resume to Pike, Santiago followed up with an e-mail asking Pike if he would contribute to Solé's remuneration based on Pike's knowledge that Santiago did "not have the money to cover all payables."  (Santiago Dep., Ex. 41, E-mail from Lillian Santiago to Gerry Pike (Dec. 15, 2004).)

On or about December 18, 2004, Santiago met Pike at a Holyoke restaurant and gave him a copy of Diálogo, LLC's financial statements, which had been prepared by the company's bookkeeper.  (Santiago Dep. 164:9-166:6.)  Prior to providing these statements to Pike, Santiago reviewed them briefly and was under the impression that they were accurate.  (Id. 166:12-17.)

The statements indicated that Diálogo, LLC's net income

over the previous five and a half months was over twenty
thousand dollars.  (Santiago Dep., Ex. 36, El Diálogo Profit
& Loss, July 1 through Dec. 13, 2004.)  When Pike pointed to
the company's profits and told Santiago she could now go to
the bank to get a loan, Santiago realized that much of the
revenue reported on the statements had been double counted,
and she assured Pike that Diálogo, LLC was operating at a
loss.  (Santiago Dep. 172:1-13; <u>see also</u> Dkt. No. 59, Ex. F,
Supplemental Santiago Aff. ¶¶ 7, 9.)

On December 23, 2004, Pike sent Santiago an e-mail
instructing her to "to forward the [confidentiality
agreement] you wanted to present to Sr. Solé so that our
attorneys could review it along with the draft contract."
(Santiago Dep., Ex. 42, E-mail from Gerry Pike to Lillian
Santiago (Dec. 23, 2004, 13:13 EST).)  In response, Santiago
told Pike he could use whatever confidentiality agreement
and contract he wanted.  (Santiago Dep. Ex. 42, E-mail from
Lillian Santiago to Gerry Pike (Dec. 23, 2004).)

On January 5, 2005, Santiago sent Pike an e-mail stating
in part:

> You know the value on recruiting Solé and the need
> this newspaper has to contract someone that knows
> about sales.  I need the contract today, I am going
> to contract this man and I am going to bill you for
> $3,000[.]  I need to do so.
>
> I cannot continue holding El Diálogo the way I had.
> I entered into this partnership with the hope of

13

bringing this newspaper further . . . .

I acknowledge your investment, and I will pay back
if [it] comes to that, but I cannot have a partner
that I cannot talk [to].

(Santiago Dep., Ex. 43, E-mail from Lillian Santiago to

Gerry Pike (Jan. 5, 2005).)

In response, Pike stated, "You are in a partnership and

we are growing a business, which is by definition a

frustrating experience."  (Santiago Dep., Ex. 43, E-mail

from Gerry Pike to Lillian Santiago (Jan. 5, 2005, 13:15:32

EST).)

Over the next six weeks, Santiago and Pike exchanged a

series of e-mails concerning Solé's status with the company.

See supra note 2.  At some point in the middle of January,

Pike and Santiago had a long conversation at Santiago's home

in which she informed him that their business relationship

had to end and that one of them should buy the other out.

In response to this suggestion, Pike stated: "What do I want

with a newspaper?"  (Santiago Aff. ¶ 38; see also Santiago

Dep. 238:17-239:8 (indicating that this conversation took

place in the beginning of February).)  At about this time,

Santiago also requested, and Pike provided, a complete

accounting of payments made by DMSA, which indicated DMSA

had contributed $18,618.73 to the venture.  (Santiago

Supplemental Aff. ¶ 5.)

In mid-February, Pike came down with a case of pneumonia that rendered him incapable of monitoring developments at Diálogo, LLC.  In a letter to Pike dated February 17, 2005, Santiago stated:

> Since our last meeting and telephone conversation I have reconsidered my position in Diálogo LLC. Since the beginning I have had to endure your lack of commitment to this organization and your promised financial contributions to the business. Your inconsistent communication on the decision making process and lack of financial support to the venture has caused a material deteriorations, to the point where we do not have staff support, nor are we able to continue without the business going into debt.  Therefore, as operating manager, I have no other alternative but to close the business effective immediately.
>
> The landlord has been made aware of the situation; he is allowing you to leave the computer, software and other office furniture at that space until the end of the month.  You should take whatever steps are necessary to remove those items at your earliest.  All business paperwork, e.g. bank statements, check book and list of account payables will be sent to you shortly.
>
> If you have questions and or concerns you can address those to my attorney . . . .

(Dkt. No. 27, Ex. 10, Letter from Lillian Santiago to Gerry Pike (Feb. 17, 2005).)

Santiago sent this letter to Pike by certified mail on February 25, 2005.  (See Dkt. No. 27, Second Pike Aff. ¶¶ 37, 38 (stating he did not receive the letter until March 5, 2005).)  Prior to doing so, Santiago made arrangements to lease a new space for the newspaper.  (Santiago Dep., Ex.

59, Lease Agreement between Open Square Properties, LLC & El Diálogo).)

On March 1, 2005, Santiago began publishing "El Diálogo" through a new Massachusetts limited liability company called El Diálogo, LLC, which was formally established on March 13, 2005. Each version of "El Diálogo" published by Defendants has been virtually identical to versions of the newspaper previously published by Diálogo, LLC. (Santiago Dep. 231:14-20.)

On March 11, 2005, Defendants applied to register the trademark "El Diálogo" in Massachusetts. In the application, Santiago stated that the trademark "El Diálogo" was first used on July 1, 2004, but did not state that it was used by Diálogo, LLC. Santiago also failed to identify Diálogo, LLC as a predecessor entity even though the registration form requested this information. (Santiago Dep. Ex. 70, Santiago Application for Registration of "El Diálogo" Trademark.)

D. <u>Travel of the Case</u>.

On March 31, 2005, Plaintiffs filed their original complaint and moved for a temporary restraining order enjoining Defendants from: (a) using the title "El Diálogo" in connection with any publication; (b) disclosing any proprietary information relating to Diálogo, LLC; (c)

16

operating and/or working for any Spanish language media in
Western Massachusetts; and (d) employing the property,
assets, equipment, and goodwill of Diálogo, LLC.

After a hearing on April 6, 2005, the court denied
Plaintiffs' motion based on their failure to demonstrate a
substantial likelihood of success on the merits.  Two days
later, the court issued a scheduling order, which provided
for expedited discovery, including the depositions of Pike
and Santiago.

On April 22, 2005, Plaintiffs filed a fifteen-count
amended complaint.  Four days later, having learned that
their own application for the trademark "El Diálogo" had
been approved, Plaintiffs filed a second amended complaint,
asserting claims for: violation of the Lanham Act, 15 U.S.C.
§ 1125(a) (Count I); violation of Mass. Gen. Laws ch. 93A, §
11 (Count II); common law trademark infringement and unfair
competition (Count III); breach of contract by Santiago
(Count IV); breach of contract by Solé (Count V);
misappropriation of trade secrets resulting in damages
(Count VI); misappropriation of trade secrets necessitating
injunctive relief (Count VII); conversion (Count VIII);
breach of fiduciary duties by Santiago (Count IX); tortious
interference with contractual relations by Santiago (Count
X); tortious interference with contractual relations by Solé

17

(Count XI); unjust enrichment (Count XII); constructive trust (Count XIII); a declaratory judgment concerning the trademark "El Diálogo" (Count XIV); violation of Mass. Gen. Laws ch. 110B, § 10 by Santiago and El Diálogo, LLC (Count XV); and violation of Mass. Gen. Laws ch. 110B, § 11 by Santiago and El Diálogo, LLC (Count XVI).[7]

On May 3, 2005, Defendants tendered an answer and set forth a counterclaim alleging: breach of contract (Count I); misrepresentation (Count II); and violation of Mass. Gen. Laws ch. 93A, § 11 (Count III). Defendants also requested a judgment declaring that "El Diálogo, LLC is the exclusive, rightful owner of the mark 'El Diálogo' as used in connection with newspapers in the Commonwealth of Massachusetts" (Count IV).

On May 13, 2005, Plaintiffs moved a second time for a preliminary injunction in order to prevent Santiago from, among other things, using the title "El Diálogo," disclosing any proprietary information, employing the physical assets of Diálogo, LLC, or working for any Spanish language media. After hearing argument on Plaintiffs' motion, the court once

---

[7] On December 1, 2006, Plaintiffs filed a motion to amend their complaint a third time in order to include a claim for infringement of a federally registered trademark. This proposed amendment does not affect the analysis of the issues presented here. Defendants have not offered any opposition to the motion to amend.

again determined that injunctive relief was improper due to
Plaintiffs' failure to show a likelihood of success on the
merits.

On September 16, 2005, the First Circuit affirmed this
court's decision.  <u>See</u> <u>Dialogo, LLC v. Santiago-Bauza</u>, 425
F.3d 1 (1st Cir. 2005).  Plaintiffs subsequently moved for
summary judgment on all their claims and/or Defendants'
counterclaims.  On September 15, 2006, the court denied this
motion without prejudice.  (<u>See</u> Dkt. No. 70.)

On October 16, 2006, Plaintiffs filed the pending
substitute motion, which seeks summary judgment on all their
claims and Defendants' counterclaims, or, in the
alternative, on any claims or counterclaims in which there
is no genuine issue of fact and Plaintiffs are entitled to
judgment as a matter of law.

### III. <u>DISCUSSION</u>

Summary judgment is proper when "the pleadings,
depositions, answers to interrogatories, and admissions on
file, together with affidavits, if any, show that there is
no genuine issue as to any material fact and that the moving
party is entitled to judgment as a matter of law."  Fed. R.
Civ. P. 56(c).  Summary judgment is improper when "there is
a factual controversy pertaining to an issue that may affect
the outcome of the litigation . . . , and the evidence is

'sufficiently open-ended to permit a rational factfinder to resolve the issue in favor of either side.'" <u>Rojas-Ithier v. Sociedad Espanola de Auxilio Mutuo y Beneficiencia de P.R.</u>, 394 F.3d 40, 42-43 (1st Cir. 2005) (citations omitted).

In this case, it should be noted that a party seeking summary judgment bears a significantly greater burden than it bears when it attempts to obtain a preliminary injunction. <u>See</u> <u>Atl. Coast Airlines Holdings, Inc. v. Mesa Air Group, Inc.</u>, 295 F. Supp. 2d 75, 91 (D.D.C. 2003) ("For purposes of a preliminary injunction, a plaintiff need not supply the full evidence that would be required by the end of discovery to win summary judgment . . . ."). Whereas a movant for injunctive relief may establish the likelihood of its eventual success by relying on its version of the facts, a party aspiring for judgment as a matter of law must demonstrate complete absence of dispute regarding the pertinent facts.

While a district court's findings with respect to a motion for injunctive relief "do not bind the court in subsequent proceedings," <u>TEC Eng'g Corp. v. Budget Molders Supply, Inc.</u>, 82 F.3d 542, 545 (1st Cir. 1996) (citation omitted), parties who seek (or seek to avoid) summary judgment after losing the battle on likelihood of success

typically point to a new factual landscape, see, e.g., Eli
Lilly & Co. v. Am. Cynamid Co., 66 F. Supp. 2d 924, 927
(S.D. Ind. 1999) (noting plaintiff's post-preliminary
injunction assertion "that further discovery and factual
development have brought to light new facts which preclude
the entry of summary judgment"); see also Council of
Alternative Political Parties v. Hooks, 179 F.3d 64, 67 (3d
Cir. 1999) (Alito, J.) (citing intervening change in the
law).

Here, though the procedural posture has changed, the
facts have not, as the parties have engaged in no additional
discovery since this court denied Plaintiffs' motion for a
preliminary injunction.  In light of this previous ruling,
Plaintiffs have a steep hill to climb in convincing the
court that a record that the court found incapable of
establishing Plaintiffs' probability of success now entitles
Plaintiffs to judgment as a matter of law.[8]

That being said, the court begins its analysis of the

--------

[8] Confronted with similar circumstances, one district court
in this circuit recently held that its prior ruling allowing
a motion for a preliminary injunction constituted the law of
the case.  Mank v. Green, 323 F. Supp. 2d 115, 122 n.10 (D. Me.
2004) (noting the defendants' failure to offer "any arguments
directly in response to the Court's conclusions at the
preliminary injunction stage" or any "'substantially different
evidence that might undermine the validity' of this Court's
prior ruling" (citing Cohen v. Brown Univ., 101 F.3d 155, 169
(1st Cir. 1996))).

claims at issue mindful of the deference afforded its
preliminary injunction ruling.  See A.M. Capen's Co., Inc.
v. Am. Trading & Prod. Corp., 202 F.3d 469, 473 (1st Cir.
2000) ("[T]he scope of review given a case . . . in the
posture of a preliminary injunction is more deferential than
that given to one . . . on appeal from final judgment.").
The court also acknowledges the First Circuit's decision to
affirm the denial of Plaintiffs' motion for preliminary
injunction due to their inability to demonstrate irreparable
harm; the Diálogo court expressly declined to address
whether Plaintiffs had managed to establish a substantial
likelihood of success on the merits.  See 425 F.3d at 3-5.

A.   Plaintiffs' Claims.

     1.   Trademark Infringement (Counts I and III).[9]

     The term "trademark" includes "any word or name used by
a person 'to identify and distinguish his or her goods . . .
from those manufactured or sold by others . . . .'"  Flynn
v. AK Peters, Ltd., 377 F.3d 13, 19 (1st Cir. 2004) (citing
15 U.S.C. § 1127).  The purpose of trademark law is "to

_____

[9] The parties appear to agree that the elements of common
law trademark infringement are indistinguishable from the
elements of a Lanham Act claim.  See Pignons S.A. de Mecanique
de Precision v. Polaroid Corp., 657 F.2d 482, 486-87 (1st Cir.
1981).
     To the extent that any differences do exist, Plaintiffs
have not pressed their case for summary judgment on Count III,
and their motion for summary judgment on their common law
trademark infringement claim will be denied for that reason.

22

prevent one seller from using the same 'mark' as -- or one similar to -- that used by another in such a way that he confuses the public about who really produced the goods." DeCosta v. Viacom Int'l., Inc., 981 F.2d 602, 605 (1st Cir. 1992) (noting that such confusion may "jeopardize the commercial reputation of the senior (first) user, which might be tarnished by association with the junior (subsequent) user.").

To prevail in a claim for trademark infringement, a plaintiff must establish (1) his ownership of a mark; (2) use by the defendant of that mark or a similar one; and (3) the likelihood such use will confuse the public, causing the plaintiff harm. Star Fin. Servs., Inc. v. AASTAR Mort. Corp., 89 F.3d 5, 9 (1st Cir. 1996) (citation omitted).

In this case, Plaintiffs' claim turns on whether Diálogo, LLC can demonstrate ownership of the "El Diálogo" mark. Rights to a trademark arise with its use in commerce; it is "'not enough to have invented the mark first or even to have registered it first.'" Grupo Gigante SA De CV v. Dallo & Co., Inc., 391 F.3d 1088, 1093 (9th Cir. 2004) (citation omitted); see also Volkswagenwerk Aktiengesellschaft v. Wheeler, 814 F.2d 812, 815 (1st Cir. 1987).

Since the onset of this litigation, Defendants have

23

taken the position that the mark in question was first used
by Diálogo Bilingue, Inc. more than one year before Diálogo,
LLC's formation.  In response, Plaintiffs argue that
Defendants' prior use claim is barred by: (1) the doctrine
of judicial estoppel; (2) the so-called "anti-dissection
rule"; (3) Santiago's abandonment of Diálogo Bilingue, Inc.;
(4) the principles of equitable estoppel; and (5) what the
First Circuit found to be Plaintiffs' "strongest argument,"
i.e., "whatever the relationship between the ['Diálogo
Bilingue' and 'El Diálogo' marks], Santiago implicitly
brought to the new venture whatever interest she had in the
Diálogo name."  425 F.3d at 4.

<u>Judicial Estoppel</u>.

"The doctrine of judicial estoppel 'generally prevents a
party from prevailing in one phase of a case on an argument
and then relying on a contradictory argument to prevail in
another phase.'"  <u>Beaudette v. Louisville Ladder, Inc.</u>, 462
F.3d 22, 26 (1st Cir. 2006) (quoting <u>New Hampshire v. Maine</u>,
532 U.S. 742, 749 (2001)).[10]

Citing Defendants' assertion, in their Massachusetts

---

[10] "Because this case invokes federal subject matter
jurisdiction on federal question grounds[,] . . . the federal
law of judicial estoppel applies."  <u>Lydon v. Boston Sand &
Gravel Co.</u>, 175 F.3d 6, 12 n.3 (1st Cir. 1999) (citations
omitted); <u>see also id.</u> ("Massachusetts judicial estoppel
principles do not vary significantly from those that [the First
Circuit] appl[ies]." (citations omitted)).

trademark application, that the publication and distribution of "El Diálogo" on July 1, 2004 constituted the "Diálogo" mark's first use, Plaintiffs contend that Defendants should not be entitled to assert a contrary position in this legal proceeding.

This argument overlooks the First Circuit's recognition that judicial estoppel should be confined to instances "when a litigant is playing fast and loose with the courts, and when intentional self-contradiction is being used as a means of obtaining unfair advantage." S.E.C. v. Happ, 392 F.3d 12, 20 (1st Cir. 2004) (internal quotation marks and citation omitted). Here, it is difficult to see what advantage Defendants could have obtained by asserting that the "Diálogo" mark was not used until July 1, 2004.[11] Cf. Lydon v. Boston Sand & Gravel Co., 175 F.3d 6, 13 (1st Cir. 1999) (describing defendant's arguments in "each of two potential forums that [plaintiff's] claims should be heard in the other, thereby depriving [plaintiff] of any tribunal in which to bring his action."). The most that can be said is that Santiago has taken inconsistent positions; not all inconsistencies result in judicial estoppel.

In short, because this is not an occasion where a

---

[11] Significantly, Plaintiffs have not suggested that the date of first use cited by Defendants in their trademark application afforded them any advantage.

"litigant . . . took one position, used that position to its
advantage . . . , and later attempted to switch horses
midstream to revive a previously abandoned (and flatly
inconsistent) claim," Alternative Sys. Concepts, Inc. v.
Synopsys, Inc., 374 F.3d 23, 35 (1st Cir. 2004) (affirming
district court's finding that plaintiff had engaged in "a
game of bait and switch"), the doctrine of judicial estoppel
does not foreclose a prior use defense.

### The "Anti-Dissection Rule".

The "anti-dissection rule" is a tool used in some
circuits to determine the similarity between conflicting
marks. See, e.g., Little Caesar Enters., Inc. v. Pizza
Caesar, Inc., 834 F.2d 568, 570-72 (6th Cir. 1987); see also
Borinquen Biscuit Corp. v. M.V. Trading Corp., 443 F.3d 112,
120 (1st Cir. 2006) (noting that "similarity of the marks"
is one of the eight factors the First Circuit considers in
analyzing likelihood of confusion (citations omitted)).

In Little Caesar, a national franchise with the
trademark "Little Caesar" alleged infringement on the part
of a local pizza chain employing the name "Pizza Caesar
USA."  While both marks utilized the word "Caesar," the
Sixth Circuit found that the anti-dissection rule required
the court to focus on "the impression which the mark as a

26

whole creates on the average reasonably prudent buyer and not the parts thereof." 834 F.2d at 571 (citation omitted). After noting the "obvious" differences "in sound and appearance between 'Little Caesar' and 'Pizza Caesar,'" the court concluded that the marks were not confusingly similar. Id. at 571-72.

In light of this authority, Plaintiffs assert that prior use of the term "Diálogo" in the composite mark "Diálogo Bilingue" provides neither Santiago nor Diálogo Bilingue, Inc. with rights to the composite mark "El Diálogo." Like "Little Caesar" and "Pizza Caesar," the terms "Diálogo Bilingue" and "El Diálogo" are sufficiently different, Plaintiffs argue, that use of one does not generate a right to ownership of the other. Based on subsequent Sixth Circuit case law, the court cannot agree.

In Daddy's Junky Music Stores, Inc. v. Big Daddy's Family Ctr., 913 F. Supp. 1065 (S.D. Ohio 1996), the district court held that the defendant was entitled to summary judgment on the plaintiff's trademark infringement claim based on the plaintiff's inability to establish any similarity between the parties' respective marks. The Sixth Circuit reversed, finding that while the district court

> properly refrained from concentrating exclusively on the "Daddy's" component when comparing "Daddy's Junky Music Store" with "Big Daddy's Family Music Center," the phrase "Daddy's" is not merely a

27

component of the "Daddy's" marks: it _is_ the marks. Daddy's Junky Music Stores, Inc. v. Big Daddy's Family Music Ctr., 109 F.3d 275, 283 (6th Cir. 1997) (emphasis in original).

In this case, Defendants have presented evidence that the newspaper "Diálogo Bilingue" was known within the Hispanic community as "Diálogo" and that this word was featured more prominently than "Bilingue" in the banner, the masthead, and at the bottom of each page. Cf. id. at 284 (evidence that parties were not known in the community by their full names warranted comparison of "every mark of plaintiff with each name used by defendant"). As with the word "Daddy's," "Diálogo" is not merely a component of the trademark, it _is_ the mark. At a minimum, the question of which party is entitled to use the "Diálogo" mark remains a disputed fact that prohibits a favorable ruling on Plaintiffs' motion for summary judgment.

### Abandonment.

Plaintiffs argue that any rights to the "Diálogo" mark Diálogo Bilingue, Inc. might have enjoyed were legally abandoned when Santiago decided to close that company and devote all her efforts to Diálogo, LLC.

Abandonment of a trademark occurs when "its use has been discontinued with [an] intent not to resume such use." 15

28

U.S.C. § 1127.  The Lanham Act provides that "[i]ntent not
to resume may be inferred from circumstances," and it
creates a rebuttable presumption of such an intent in cases
where three consecutive years of nonuse can be shown.  Id.
Ultimately, because abandonment entails the forfeiture of a
property interest, courts in this district have determined
that it must be "proved by clear and convincing evidence."
Micromuse, Inc. v. Micromuse, PLC, 304 F. Supp. 2d 202, 216
(D. Mass. 2004) (citations omitted); see also Gen.
Healthcare Ltd. v. Qashat, 254 F. Supp. 2d 193, 198 (D.
Mass. 2003) (citation omitted).[12]

     In this case, evidence of abandonment is neither clear
nor convincing.  Since Diálogo Bilingue, Inc. last used the
"Diálogo" mark less than three years ago, there is no prima
facie evidence of its intent not to resume its use.
Consequently, to establish the requisite intent, Plaintiffs
must rely on inferences that are not undisputed in the
record.

     For example, the fact that Santiago and her former
partners have very different positions regarding Diálogo

---

[12] But see Cerveceria Centroamericana, S.A. v. Cerveceria
India, Inc., 892 F.2d 1021, 1024 (Fed. Cir. 1989) ("[W]e are
unable to discern from the legislative history of the Lanham
Act any intention by Congress to raise the burden of proof for
. . . abandonment above the normal civil burden of a
preponderance of the evidence.").

Bilingue, Inc.'s status makes it all but impossible to infer
the company's intent.  While Santiago seems to believe that
she closed Diálogo Bilingue, Inc. (and acquired the rights
to the "Diálogo" mark) by personally paying all of the
company's outstanding debts, Frau-Ramos and Estrany-Frau
appear under the impression that retiring Diálogo Bilingue,
Inc. required Santiago to purchase their shares.  Obviously,
if Santiago is correct, Plaintiffs' abandonment claim
becomes moot.  If, on the other hand, Diálogo Bilingue, Inc.
remains in existence, then its intentions regarding the
"Diálogo" mark are anything but clear.  In short, because
the record is too confusing to permit Plaintiffs to satisfy
their burden of proof, they are not entitled to summary
judgment based a claim of abandonment.

<u>Equitable Estoppel</u>.

To invoke the doctrine of equitable estoppel, Plaintiffs
must show that Santiago made a material representation,
which Plaintiffs reasonably relied upon to their
disadvantage.  <u>See</u> <u>Plumley v. S. Container, Inc.</u>, 303 F.3d
364, 374 (1st Cir. 2002) (citation omitted); <u>Boylston Dev.</u>
<u>Group, Inc. v. 22 Boylston St. Corp.</u>, 591 N.E.2d 157, 163
(Mass. 1992); <u>Tarason v. Town of South Berwick</u>, 868 A.2d
230, 233 (Me. 2005) (citations omitted).

In an attempt to satisfy this burden, Plaintiffs assert

30

that Santiago knowingly misled them into thinking she was closing the business of Diálogo Bilingue, Inc.  In light of this misrepresentation, they argue, Santiago should now be estopped from now claiming that Diálogo Bilingue, Inc. remains in existence and has any interest in the "Diálogo" name.

The problem with this argument is that it does not appear to accurately reflect Santiago's position.  As noted above, Santiago maintains that she <u>did</u> close the business of Diálogo Bilingue, Inc. and personally retained its rights to the "Diálogo" mark in June, 2004.  Accordingly, the principles of equitable estoppel do not apply to the facts of this case.

<u>Santiago's Implicit Contribution to the New Venture</u>

During her deposition, Santiago admitted "bringing a business to the venture," which included "the contacts, advertising list, [and] customer list that [she] had with respect to Diálogo Bilingue."  (Santiago Dep. 105:2-3, 105:20-106:1.)  Citing this concession and Santiago's written agreement to employ her "diligent efforts" exclusively on behalf of Diálogo, LLC, Plaintiffs contend that Santiago transferred any interest she may have had in the "Diálogo" mark.

While this is certainly Plaintiffs' "strongest

argument," as the First Circuit noted, its strength is not sufficient to entitle them to summary judgment on their trademark infringement claims.  Despite Plaintiffs' protestations to the contrary, significant evidence supports Santiago's argument that she personally owned the "Diálogo" mark at the time she executed the Venture Agreement and Operating Agreement.  It would have required no special skill in drafting the corporate documents to confirm that Santiago was transferring this ownership right to the new corporation.  Despite the obvious simplicity required to express this commitment, neither of the key documents required Santiago to relinquish her right to any intellectual property.

It is well-settled that an integration clause, such as § 17.8 of the Operating Agreement, "precludes the implication of any extrinsic promises." Reliance Nat' Indem. v. Knowles Indus. Servs. Corp., 868 A.2d 220, 225 (Me. 2005). Consequently, the agreement's characterization of what Santiago brought (or did not bring) to the venture is dispositive.

Putting aside this canon of contract construction, Plaintiffs' contention that the Operating Agreement effectuated an implicit transfer of Santiago's right to the valuable asset at the heart of this litigation cannot be

32

squared with the fact that Santiago's capital contribution, i.e. the fair market value of the property she contributed to Diálogo, LLC, was deemed to be one dollar.

In sum, Plaintiffs' trademark infringement claims hinge upon disputed facts, making summary judgment inappropriate. The court will therefore deny Plaintiffs' substitute motion with respect to Counts I and III.

2. <u>Breach of Contract (Count IV)</u>.

Plaintiffs assert that Santiago breached the Operating Agreement by continuing to publish "El Diálogo" after terminating her relationship with Diálogo, LLC. Defendants do not contest the fact that neither Santiago nor DMSA had any right, under the Operating Agreement, to dissolve Diálogo, LLC unilaterally. Instead, they argue that Santiago's breach was preceded by DMSA's refusal to make its promised $50,000 initial capital contribution and by its failure to provide needed financial support to Diálogo, LLC. According to Defendants, this non-performance on DMSA's part itself constituted a material breach and permitted Santiago to act as she did.

A material breach "is a non-performance of duty that is so material and important as to justify the injured party in regarding the whole transaction as at an end." <u>Down E. Energy Corp. v. RMR, Inc.</u>, 697 A.2d 417, 421 (Me. 1997)

(citation omitted).  Under the laws of Maine, "[w]hether a
material breach has occurred is a question of fact,"
Jenkins, Inc. v. Walsh Bros., Inc., 776 A.2d 1229, 1234 (Me.
2001) (citation omitted), to be resolved through the
application of "traditional contract principles," Associated
Builders, Inc. v. Coggins, 722 A.2d 1278, 1280 (Me. 1999)
(citation omitted). "In cases of this sort, where the
question is whether the one party is set free by the action
of the other, the real matter for consideration is whether
the action or conduct of the one . . . amount[s] to an
intimation to abandon and altogether refuse performance of
the contract." Simpson v. Emmons, 99 A. 658, 660 (Me. 1917)
(citation omitted).[13]

---

[13] More recently, Associated Builders characterized the
following five factors "as significant in determining if a
failure to render performance is material":

(a) the extent to which the injured party will be
deprived of the benefit which he reasonably expected;

(b) the extent to which the injured party can be
adequately compensated for the part of that benefit
of which he will be deprived;

(c) the extent to which the party failing to perform
. . . will suffer forfeiture;

(d) the likelihood that the party failing to perform
. . . will cure his failure . . . ;

(e) the extent to which the behavior of the party
failing to perform or to offer to perform comports
with standards of good faith and fair dealing.

34

During the parties' initial discussions, Plaintiffs claim that DMSA promised to make "two distinct types of contributions." (Dkt. No. 27, 2nd Pike Aff. ¶ 10.)

> First, these contributions would include a proprietary DMSA strategic marketing initiative specific to the Spanish language print media business and extensive and detailed research studies conducted by DMSA in companion to the strategic marketing initiative that DMSA had already completed and financed relating to the Spanish language markets throughout the United States . . . .

(Id.)

> Second, these contributions would also include the payment of certain of the Company's start-up expenses to get the venture going.

(Id.)  According to Plaintiffs, DMSA made its first contribution prior to the execution of the Operating Agreement and fulfilled its second obligation by paying those start-up expenses that it deemed "appropriate."  (Id. ¶ 16 (citing the Venture Agreement ¶ 1)).

Defendants assert that Pike "never stated . . . that DMSA's initial capital contribution would be anything other than $50,000 cash."  (Supplemental Santiago Aff. ¶ 3.) Indeed, Santiago claims she "had no use for . . . marketing plans and research studies," and if Pike had proposed making such a contribution she "would not have been interested."

---

722 A.2d at 1280 n.1 (citing Restatement (Second) of Contracts § 241 (1981)).

(Id. ¶ 2 (stating that Pike never provided "any written material setting forth a DMSA 'strategic marketing initiative' or any . . . research studies").)

As noted above, the Operating Agreement provides that DMSA "has contributed or is deemed to have contributed" $50,000.  (Operating Agreement § 4.1(I), Sched. A.)  While Maine courts construe ambiguities in a contract against the drafter, Champagne v. Victory Homes, Inc., 897 A.2d 803, 806 (Me. 2006), a contractual provision cannot be ambiguous unless "it is reasonably possible to give that provision at least two different meanings," Villas by the Sea Owners Ass'n v. Garrity, 748 A.2d 457, 461 (Me. 2000) (citation omitted); see also Farrington's Owners' Ass'n v. Conway Lake Resorts, Inc., 878 A.2d 504, 507 (Me. 2005) (noting that while the interpretation of an ambiguous contract is a question of fact, the determination of whether a contract is ambiguous is a question of law).

Because § 4.1 is written in the past tense, there is no merit to the argument that this provision required DMSA to make a $50,000 contribution in the future. See City of Augusta v. Quirion, 436 A.2d 388, 394 (Me. 1981) (stating that the plain language of a contract should not "be stretched or tortured").  Instead, § 4.1 clearly constitutes an acknowledgment by Santiago that DMSA had already made the

36

capital contribution required by the Operating Agreement.

Whether DMSA made the capital contribution required by the Venture Agreement is significantly less certain. The Venture Agreement states that

> DMSA shall contribute the initial capital to launch
> the LLC in an amount that DMSA deems appropriate
> (including through travel, promotional costs, legal
> fees, accounting fees, billing fees and the labor
> of management and staff of DMSA).

(Venture Agreement ¶ 1.) While it is undisputed that DMSA paid some start-up expenses, the parties have very different views on how much DMSA paid and whether its payments satisfied the obligation set forth in the Venture Agreement. (Compare 2nd Pike Aff. ¶ 29 ("Through March, 2005, DMSA had made over $40,000 in such out-of-pocket payments and also contributed over $5,000 in management services."), with Supplemental Santiago Aff. ¶ 5 ("The actual out-of-pocket expenses paid by DMSA relating to "El Diálogo" total $18,618.73 . . . .").)

Notwithstanding this factual dispute, Plaintiffs contend that summary judgment is appropriate since DMSA could hardly have breached an agreement that only required it to contribute an amount that it deemed "appropriate." While the plain language of the Venture Agreement appears to favor Plaintiffs' position, the courts of Maine have long held that one party's "'reservation . . . of an unlimited right

37

to determine the nature and extent of [its] performance'
renders the obligation too indefinite to be enforceable."
Larson v. Johnson, 184 F. Supp. 2d 26, 32 (D. Me. 2002)
(citing Corthell v. Summit Thread Co., 167 A. 79, 81 (Me.
1933)).[14]

Of course, the fact that the Venture Agreement appears
to provide DMSA with unbridled discretion to determine the
nature of its contribution does not make the contract
unenforceable per se.  See Hodgkins v. New England Tel. Co.,
82 F.3d 1226, 1231 (1st Cir. 1996) (observing that, under
the laws of Maine, courts should be "reluctant to construe a
contract so as to render it unenforceable if that result can

---

[14] As will be discussed below, Plaintiffs take the position
that the choice-of-law provision found in § 17.9 of the
Operating Agreement applies only to the rights of the parties
under the Operating Agreement itself.
    While the Venture Agreement does not contain a choice-of-
law provision similar to § 17.9, its last paragraph provides
that the parties shall execute an operating agreement, "which
shall be consistent with this Agreement."  (Venture Agreement
¶ 6.)  In addition,

> The general rule is that in the absence of anything
> to indicate a contrary intention, instruments
> executed at the same time, by the same contracting
> parties, for the same purpose, and in the course of
> the same transaction will be considered and construed
> together, since they are, in the eyes of the law, one
> contract or instrument.

Crowe v. Bolduc, 334 F.3d 124, 137 (1st Cir. 2003) (citing
Hilltop Cmty. Sports Ctr., Inc. v. Hoffman, 755 A.2d 1058, 1062
(Me. 2000)).
    Based on the foregoing, the court finds that the Venture
Agreement must also be construed under the laws of Maine.

be avoided" (quoting <u>Towne v. Larson</u>, 51 A.2d 51, 53 (Me. 1947))).

In <u>Hodgkins</u>, the First Circuit addressed the enforceability of an employer's agreement to compensate its employees for useful ideas.  Despite the fact that the agreement gave the employer the "sole, exclusive, and complete discretion and right to determine . . . the amount of any award granted," <u>id.</u> at 1228, <u>Hodgkins</u> held that the employer's obligation was not illusory.

Given the employer's policy of "generally informing its employees when one of them received an award," the First Circuit found that, notwithstanding the plain language of the agreement, the employer could not refuse to compensate employees "arbitrarily at its discretion" since such conduct "would not provide incentives to employees to suggest improvements."  <u>Id.</u> at 1231.  Because evidence of an initial offer of $17,500 by the employer could have led a reasonable factfinder to "infer that [the defendant] did not live up to its obligations when it later claimed that [the plaintiff's] idea did not merit [any payment]," the <u>Hodgkins</u> court concluded that the employer was not entitled to summary judgment on the plaintiff's breach of contract claim.  <u>Id.</u> at 1232.

Applying the principles of <u>Hogkins</u>, this court concludes

39

that: (1) the Venture Agreement "was not rendered unenforceable by a grant of unfettered discretion" to DMSA; and (2) DMSA "cannot avoid factfinding as to whether its . . . refusal to pay" certain expenses constituted a material breach that justified Santiago in treating their business relationship as at an end.  <u>Id.</u> at 1231, 1232.

As Maine's highest court once observed, the fact that parties to a contract have exercised their "prerogative" to

> employ a phrase the meaning of which is not readily definable . . . does not preclude the existence of a contract; nor does it render the contract incapable of enforcement. . . . It does, however, necessitate a greater reliance on their own course of performance and practical construction in interpreting the agreement. . . . In such cases the existence of the terms of the contract becomes a question for the trier of fact.

<u>Blue Rock Indus. v. Raymond Int'l, Inc.</u>, 325 A.2d 66, 73 (Me. 1974) (citations omitted).

In sum, Defendants' claim that DMSA had an obligation to contribute $50,000 pursuant to § 4.1 of the Operating Agreement is inconsistent with the plain language of that provision.  The court therefore finds that Santiago's admitted breach of the Operating Agreement was not preceded by DMSA's breach of that agreement.  On the other hand, the question of whether Santiago's admitted breach was preceded by DMSA's material breach of the Venture Agreement is one that must be answered by a jury.  For this reason,

40

Plaintiffs' motion for summary judgment with respect to
Count IV will be denied.[15]

    3.  <u>Mass. Gen. Laws ch. 93A, § 11 (Count II)</u>.

    In Massachusetts, the victim of an "unfair method of
competition or an unfair or deceptive act or practice" may
receive increased damages when that act or practice has been
perpetrated by "another person who engages in any trade or
commerce." Mass. Gen. Laws ch. 93A, § 11. Because
Plaintiffs' claim pursuant to this provision hinges on
disputed facts the court will deny their motion for summary
judgment with respect to Count II.

    In denying Plaintiffs' original motion for summary
judgment without prejudice, the court observed that neither
party had addressed the apparently unsettled question of
whether a choice-of-law provision like § 17.9 of the
Operating Agreement bars a claim (or counterclaim) pursuant
to Mass. Gen. Laws ch. 93A. <u>Compare</u> <u>Computer Sales
Int'l., Inc. v. Lycos, Inc.</u>, No. 05-10017-RWZ, 2006 WL
1896192, at *2 (D. Mass. July 11, 2006) (unpublished) ("[I]f
an agreement 'purported to contract away any claims under

---

    [15] In their substitute brief, Plaintiffs make no effort to
distinguish their breach of contract claim from their breach
of fiduciary duties claim (Count IX). Having concluded that
Plaintiffs are not entitled to judgment as a matter of law with
respect to the former, the court concludes that summary
judgment is also inappropriate with respect to the latter.

G.L. c. 93A,' Massachusetts courts might 'decline to enforce the provision on public policy grounds.'" (citing <u>BNY Fin. Corp. v. Fitwel Dress Co.</u>, No. Civ. A 95-4785A, 1997 WL 42518, at *4 (Mass. Super. 1997); <u>Jacobson v. Mailboxes Etc. U.S.A., Inc.</u>, 646 N.E.2d 741, 746 n.9 (Mass. 1995))), <u>with Ne. Data Sys., Inc. v. McDonnell Douglas Computer Sys. Co.</u>, 986 F.2d 607, 610 (1st Cir. 1993) (Breyer, C.J.) ("[W]hen parties agree that 'contract related' claims will be tried under, say, the law of California, they do not mean that a claim of 'serious' or 'rascal-like' breach of contract will be tried under the law of Massachusetts.").

In their substitute memorandum in support of the pending motion, Plaintiffs assert that their cause of action under Chapter 93A is based on conduct that occurred outside the agreement.  If, at trial, Plaintiffs are able to persuade the jury that Santiago acted deceptively during the formation of the contract, then separate recovery under Chapter 93A may be permitted.  If, however, it becomes clear that Plaintiffs' Chapter 93A action "is essentially duplicative of a traditional contract claim," then Plaintiffs will not be entitled to collect "cumulative damages . . . for the same wrong." <u>Canal Elec. Co. v. Westinghouse Elec. Corp.</u>, 548 N.E.2d 182, 188 (Mass. 1990) (citations omitted).

42

4.   <u>Misappropriation of Trade Secrets (Counts VI and
     VII)</u>.

In their second amended complaint, Plaintiffs maintain
that Diálogo, LLC provided Santiago with certain proprietary
information, which she "embezzled, stole[], or unlawfully
carried away."  (Second Am. Compl. ¶ 79.)  Assuming, as
Plaintiffs do, that the law of Massachusetts applies to this
claim, a plaintiff seeking to demonstrate the
misappropriation of a trade secret must point to specific
information that it conveyed and explain

> (1) the extent to which the information is known
> outside of the business; (2) the extent to which it
> is known by employees and others involved in the
> business; (3) the extent of measures taken by the
> employer to guard the secrecy of the information;
> (4) the value of the information to the employer
> and to his competitors; (5) the amount of effort or
> money expended by the employer in developing the
> information; and (6) the ease or difficulty with
> which the information could be properly acquired or
> duplicated by others.

<u>Moore v. Marty Gilman, Inc.</u>, 965 F. Supp. 203, 217 (D. Mass.
1997) (citing <u>Jet Spray Cooler, Inc. v. Crampton</u>, 282 N.E.2d
921, 925 (Mass. 1972)).

Although Plaintiffs have generally identified the kinds
of information Diálogo, LLC allegedly conveyed,[16] they have

---

[16]   (<u>See</u> 2nd Pike Aff. ¶ 41 (citing "advertiser and
subscription lists, advertiser and subscription prospects,
marketing information and data, product information, strategic
or technical information, financial information, supplier
information, billing rates and advertiser provided information,
documents and data").)

not attempted to apply the six factors set forth above to establish that the "'information sought to be protected is, in fact and in law, confidential.'" <u>Warner-Lambert Co. v. Execuquest Corp.</u>, 691 N.E.2d 545, 547 (Mass. 1998) (citing <u>Jet Spray</u>, 282 N.E.2d at 925)). Absent such a demonstration on Plaintiffs' part, the court cannot infer that the information in question was not widely known, valuable, and/or not easily duplicated. Thus Plaintiffs' motion for summary judgment with respect to Counts VI and VII must be denied.[17]

    5.    <u>Conversion (Count VIII)</u>.

    Plaintiffs contend that Santiago took "the property, assets, equipment, employees, goodwill, and confidential information of Diálogo, LLC . . . [w]ithout authorization . . . and transferred such assets to El Diálogo, LLC." (Second Am. Compl. ¶ 87.)

    Under Massachusetts law, a plaintiff asserting a conversion claim must demonstrate that:

    (1) the defendant intentionally and wrongfully
    exercised control or dominion over the personal
    property; (2) the plaintiff had an ownership or
    possessory interest in the property at the time of

------

    [17] Summary judgment with respect to these counts is also inappropriate in light of Defendants' claim that any confidential information Santiago and El Diálogo, LLC now possess is information that Santiago brought to the venture and was entitled to re-possess when DMSA failed to fulfill its end of the bargain.

the alleged conversion; (3) the plaintiff was
damaged by the defendant's conduct; and (4) if the
defendant legitimately acquired possession of the
property under a good-faith claim of right, the
plaintiff's demand for its return was refused.

Evergreen Marine Corp. v. Six Consignments of Frozen

Scallops, 4 F.3d 90, 95 (1st Cir. 1993) (citations

omitted).

Given the parties' dispute over whether Santiago
misappropriated the assets of Diálogo, LLC or rightfully
reclaimed what she brought to the venture, Plaintiffs are
not entitled to judgment as a matter of law with respect to
Count VIII.[18]

B.   Defendants' Counterclaim.

1.   Breach of Contract (Count I).

In their counterclaim, Defendants argue that DMSA
breached its contract with Santiago by: (1) "failing to make
a capital contribution of $50,000"; (2) "failing to provide
financial support for the ongoing operations of Diálogo,
LLC"; and (3) "otherwise failing to perform its obligations
under the Agreement."  (Dkt. No. 16, Defs.' Counter-cl. ¶
17.)  For the reasons set forth in Section III.A.2, the
court finds that while Defendants' first theory is

_____

[18] Because Plaintiffs have not made even a perfunctory case
for summary judgment with respect to Counts 10, 12-16, the
court will deny Plaintiffs' substitute motion with respect to
these counts as well.

45

untenable, a reasonable jury could conclude that DMSA breached the Venture Agreement.  Consequently, Plaintiffs are not entitled to summary judgment with respect to Count I of Defendants' counterclaim.

    2.  <u>Misrepresentation (Count II)</u>.

    An action for fraudulent misrepresentation requires a plaintiff to prove that the defendant: "made a false representation of material fact; for the purpose of inducing reliance; and that [the] plaintiff relied upon the representation to his or her detriment." <u>Cummings v. HPG Int'l, Inc.</u>, 244 F.3d 16, 22 (1st Cir. 2001) (citing <u>Danca v. Taunton Sav. Bank</u>, 429 N.E.2d 1129, 1133 (Mass. 1982); <u>Snyder v. Sperry & Hutchinson Co.</u>, 333 N.E.2d 421, 428 (Mass. 1975)).

    According to Defendants, Santiago reasonably relied on Pike's misrepresentations that DMSA would (1) "establish a capital account and contribute $50,000 in 'starting capital' to the joint venture" (Defs.' Counter-cl. ¶20); or (2) "provide other necessary financial support to the joint venture" (<u>id.</u> ¶ 23).  For the reasons stated above, the court finds that while Defendants' first theory cannot support a cause of action for misrepresentation, their second theory is viable.  Therefore, Plaintiffs are not entitled to judgment as a matter of law with respect to

Count II of Defendants' counterclaim.

    3.  <u>Mass. Gen. Laws ch. 93A, § 11 (Count III)</u>.

    Like Plaintiffs, Defendants argue § 17.9 of the Operating Agreement should not preclude their invocation of Mass. Gen. Laws ch. 93A, § 11 since their cause of action pursuant to this provision is rooted in conduct that occurred outside the parties' contract. Specifically, they state that their

> 93A counterclaim is based on a misrepresentation made by . . . Pike to . . . Santiago that he would contribute $50,000 in starting capital towards their new venture which induced . . . Santiago to quit her job and enter into the Operating Agreement with . . . Pike's company, DMSA."

(Dkt. No. 74, Defs.' Opp'n Pls.' Substitute Mot. Summ. J. 2.)

    As noted above, § 4.1 of the Operating Agreement does not compel either party to do anything, but merely acknowledges their past capital contributions to establish their respective membership interests. Based on the plain language of this provision, Santiago's reliance on a prior misrepresentation by Pike concerning DMSA's willingness to contribute $50,000 in cash was unreasonable. Accordingly, the court will allow Plaintiffs' motion for summary judgment with respect to Count III of Defendants' counterclaim.

    4.  <u>Declaratory Judgment</u> (Count IV).

    In the final count of their counterclaim, Defendants

47

request a declaration from this court that

> El Diálogo, LLC is the exclusive, rightful owner of
> the mark "El Diálogo" as used in connection with
> newspapers in the Commonwealth of Massachusetts
> pursuant to MGL c. 110B, §4 and that the
> Certificate of Registration issued to defendant-in-
> counterclaim, Diálogo, LLC, be rendered null and
> void.

(Defs.' Counter-cl. ¶ 41.)

For the reasons set forth in Section III.A.1,
Plaintiffs' motion for summary judgment with respect to
Count IV of Defendants' counterclaim must be denied.

## IV. CONCLUSION

For the foregoing reasons, Plaintiffs' Substitute Motion
for Summary Judgment is hereby DENIED with respect to
Plaintiffs' claims, and with respect to Counts I, II, and IV
of Defendants' counterclaim.  The motion is ALLOWED with
respect to Count III of Defendants' counterclaim.

The clerk will set this case for a status conference to
determine further proceedings.

It is So Ordered.

/s/ Michael A. Ponsor
MICHAEL A. PONSOR
U. S. District Judge

48