UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS


DIÁLOGO, LLC, ET AL.,        )
    Plaintiffs              )
                              )
                    v.        ) 05-cv-30076-MAP
                              )
LILLIAN SANTIAGO BAUZÁ, ET AL., )
    Defendants


MEMORANDUM AND ORDER RE: ENTRY OF FINAL JUDGMENT

April 30, 2008

PONSOR, D.J.

## I. INTRODUCTION

As initially filed, the complaint and counterclaim in this case presented dueling claims to control of a small Spanish-language bi-weekly newspaper called "El Diálogo," now defunct but distributed during 2004-2006 in Holyoke, Massachusetts (pop. 39,000). After a somewhat tortuous pre-trial phase, Defendants, citing illness and lack of resources, withdrew from the litigation and agreed to turn over entire control of the paper to Plaintiffs. Unsatisfied, Plaintiffs insisted on proceeding to a jury trial on their claim for monetary damages. At this trial, Plaintiffs took advantage of Defendants' absence to offer evidence in a manner that was in several instances misleading; this overreaching at times required intervention by the court to preserve the integrity of the trial. Ultimately, the jury returned a verdict of

$300,000 for Plaintiffs, plus fees and expenses of $320,000.

Although they take shape in various forms due to the many counts in the complaint, the issues remaining before the court are essentially two: the proper damage entitlement of Plaintiffs on the counts reserved for the court, and the potential entitlement of Plaintiffs to multiple damages. For the reasons set forth below, the court will follow the jury's direction with regard to basic damages. Due to the unusual circumstances of this case, however, the court will decline to multiply the damages on any count. Plaintiffs' counsel will receive the full award of his attorneys' fees and costs.

## II. PROCEDURAL AND FACTUAL BACKGROUND

The following facts are distilled either from uncontested pre-trial submissions or from trial testimony.

Beginning in June 2003, Lilian Santiago Bauzá ("Santiago") began publishing a newspaper called "Diálogo Bilingue" through the corporation Diálogo Bilingue, Inc. In the summer of 2004, facing financial difficulties, Santiago entered into an agreement with Plaintiff Direct Merchants, SA, Inc. ("DMSA") through its principal Gerry Pike to form a new company, Plaintiff Diálogo, LLC, of which DMSA would own a fifty-one percent share and which would take over publication of a new newspaper, "El Diálogo," using a format nearly identical to Diálogo Bilingue. A formal Venture Agreement and

2

Operating Agreement embodied the terms of the parties'
understanding, whereby DMSA would provide certain capital
support and Santiago would contribute her expertise to the
venture.  Significantly, though the documents were very
detailed, no provision stated that Santiago was surrendering
her ownership  right in the name "Diálogo" or related usages
as part of the deal.

By November of 2004 the relationship between Pike and
Santiago began to break down, based largely on disagreements
about whether DMSA had made good on its promises of financial
support for the paper.  In early 2005 Santiago withdrew from
the agreement, started a new, third company, Defendant "El
Diálogo, LLC," and on March 1, 2005, began publishing El
Diálogo on her own.

On March 31, 2005 Plaintiffs Diálogo, LLC and DMSA filed
a complaint against El Diálogo, LLC, and Santiago. [1]  The
complaint, which offered thirteen counts, asserted claims
under the Lanham Act (15 U.S.C. § 1125(a)), the Massachusetts
consumer protection statute (Mass. Gen. Laws ch. 93A, § 11),
and various common law theories including breach of contract
and tort.

_____

[1] There was also a claim against another individual,
Francisco Javier Solé, but this party was eliminated from the
case at an early stage.

3

Along with the complaint, Plaintiffs filed an emergency motion for a temporary restraining order ("TRO"), seeking (among other things) an injunction prohibiting Defendants from using the phrase "El Diálogo," or any variant, in connection with any publication.  In opposition to Plaintiff's motion, Defendant Santiago submitted an affidavit confirming the indisputable fact that she had been using a version of the term "Diálogo" in connection with her own, separate publication (Diálogo Bilingue) at least one year before she became involved with Plaintiffs.  Santiago also averred that Gerry Pike, the principal of DMSA, had failed to honor his financial commitments to their joint enterprise. Although it was not clear at this time who had the better argument, it was manifest that DMSA and Diálogo, LLC had failed to show a likelihood of success on the merits, and the court therefore denied Plaintiffs' motion for a TRO on April 6, 2005.

Honoring Plaintiffs' request for a compressed preliminary discovery schedule, the court issued an order on April 8, 2005, contemplating completion of preliminary discovery by May 6, 2005, and setting a hearing on Plaintiffs' Motion for Preliminary Injunction for May 23, 2005.  On April 22, 2005, Plaintiffs filed an amended complaint, increasing the number of counts to fifteen, and on May 3, 2005, Defendants filed an answer and four-count counterclaim for breach of contract,

misrepresentation, violation of Mass. Gen. Laws ch. 93A and declaratory judgment.

Following argument on May 23, 2005, the court denied the Motion for Preliminary Injunction, again for failure to show a likelihood of success on the merits.  Two days later, a further scheduling order issued, establishing a timetable for completion of all discovery and setting a final pretrial conference date for November 2, 2005.

On May 26, 2005, Plaintiffs took the somewhat unusual step of filing an interlocutory appeal of the court's order denying their Motion for Preliminary Injunction.  On October 12, 2005, the First Circuit issued its Mandate affirming the judgment of the district court.  Judge Boudin's opinion precisely summarized the opposing views of the parties on the merits, recounting Plaintiff DMSA's claim that it made all the contributions required of it "through services and assets, even if not in cash."  Dialogo, LLC v. Santiago-Bauza, 425 F.3d 1, 3 (1st Cir. 2005).

The court then noted:

> The documents and background events are less easy to interpret than DMSA suggests; but even if we assumed de novo review (in the absence of any discussion of the state claims by the district court) and further assumed dubitante that DMSA might well prevail, the misappropriation claims look like ones for which remedies at law would be sufficient.

Id. at 3-4.

When the parties appeared on November 3, 2005 for a final pretrial conference, Plaintiffs' counsel announced that, despite the court's previous finding of no likelihood of success on the merits and the First Circuit's affirmance, they wished to file a Motion for Summary Judgment. After briefing on the motion was extended several times at the request of the parties, the court heard argument and on September 15, 2006 provisionally denied Plaintiffs' motion, on the ground that their memorandum cited Massachusetts law with regard to the state law claims, when the contract between the parties specified that Maine law would control.

On October 16, 2006, Plaintiffs filed a substitute Motion for Summary Judgment, this time citing the pertinent law. On December 18, 2006, in a 48-page memorandum, this court denied the motion on all counts, with the exception of Count II of Defendants' counterclaim, which offered the common law misrepresentation theory, as to which the motion was allowed. On February 12, 2007, the court denied Plaintiffs' motion for partial reconsideration and allowed Plaintiffs' motion for leave to file a second amended complaint, increasing the number of counts to sixteen.

On February 22, 2007, the court convened a status conference and issued a Further Scheduling Order, setting a date for trial on June 18, 2007.

On May 14, 2007, Santiago filed a status report, indicating that she had ceased publishing El Diálogo in December of 2006 due to grave health problems. The report indicated that Santiago was still recovering from surgery and continued to receive treatment for her condition, and further that she had "no intention of resuming publication of El Diálogo or any similar newspaper." (Dkt. No. 86 at 1.) The status report further indicated that Defendants were prepared to transfer <u>all</u> of the assets of El Diálogo, LLC, including all intellectual property, to Plaintiffs and to transfer all other assets, including computers, accounts receivable, bank statements, and financial records as well. Santiago also indicated that she would not be appearing at trial to defend herself or her company. Finally, she stated that in her opinion any judgment against her would be "uncollectible as neither Santiago nor El Diálogo, LLC has any assets or insurance available to satisfy any such judgment." (<u>Id.</u>) The status report concluded that "[u]nder these circumstances, the defendants believe that a trial is wholly unnecessary and would be a waste of judicial resources." (<u>Id.</u> at 2.)

This effective victory on all issues related to the control of the newspaper and its mark was not enough to satisfy Plaintiffs. Despite the representation that Santiago was ill and that neither she nor the defendant company had any

assets to satisfy a monetary award, counsel for Plaintiffs indicated at the May 30, 2007 status conference that his clients still wished to proceed to trial on damages. Given that Defendants had thrown in the towel on any liability issue, the court on May 31, 2007 established a schedule for Plaintiffs to submit a proposed judgment on liability, with the understanding that a jury trial on damages would follow.

After submissions from Plaintiffs, and no opposition from Defendants, the court on June 12, 2007, ordered entry of judgment on liability in favor of Plaintiffs on various counts. (Dkt. No. 92.) This judgment essentially granted all of Plaintiffs' equitable claims, leaving only monetary damages for further proceedings.[2] The damages trial was thereafter postponed to September 17, 2007, and finally to January 22, 2008, due to the press of the court's criminal docket.

Following the June 12, 2007 order and judgment, the sixteen counts in the Second Amended Complaint broke into three groups: (a) counts as to which no further action was

---

[2] On August 8, 2007, Defendants confirmed that the equitable orders of the court (requiring surrender of all available records, financial documents, physical assets, etc. of the defendant company) had been satisfied. (Dkt. 95.) DMSA's principal Pike, during his testimony at trial, appeared to contest this confirmation to some extent, but no formal objection to Defendants' August 8, 2007 response has ever been filed.

required by the jury or by the court, either because they were dismissed (i.e., related to Defendant Solé) or because the court's June 12 order afforded Plaintiffs the equitable relief they requested (counts 5, 7, 11, 12, 13 and 14); (b) counts as to which a jury trial would be needed to ascertain monetary damages (counts 3, 4, 6, 8, 9, 10, and 15); and (c) counts as to which the amount of damages was reserved for the court to determine following the trial (counts 1, 2, and 16).

During the jury trial on damages commencing on January 22, 2008, Plaintiffs took advantage of the absence of Defendants to offer incomplete, distorted, and at times flatly misleading evidence. Given its obligation to ensure the fundamental integrity of the trial, this overreaching placed the court in an awkward dilemma.

For example, Plaintiffs' counsel led off his opening with the representation to the jury that El Diálogo as of the summer of 2004 had a "bright future" and in fact earned profits of $29,000 during the period from July to December 2004. The testimony of the sole witness at the trial, Gerry Pike, embroidered on this theme by offering into evidence profit and loss statements from January 2005 (Trial Exhibits 10 and 11), which he said were used by Santiago to administer the operation of the paper and which appeared to support the $29,000 profit calculation. This figure became the benchmark

9

for damages.  Based on the $29,000 figure, Pike estimated
annual profits of El Diálogo at $60,000 per year.  Then,
applying (obviously without cross examination or contest) his
own multiplier of eight or nine times profit to assess the
value of the paper, Pike testified that El Diálogo was worth
$550,000.

What Plaintiffs and the court well knew, but what the
jury was never told, was that during her deposition Plaintiff
Santiago had testified that <u>at the time she gave Pike the
financial statements</u> she had told him they were inaccurate.
She never used them, as Pike said, to administer the operation
of the paper. ( <u>See</u> Dkt. No. 59 (documents submitted by
Defendants in response to Plaintiffs' statement of facts in
support of their motion for summary judgment), Ex. B, Santiago
Dep., 71-72.)   In her sworn affidavit in opposition to
Plaintiffs' motion for summary judgment, Santiago had stated
that the newspaper's accountant, Tracy Learned, had
erroneously double-counted much of the paper's revenue.  (<u>Id.</u>,
Ex. F, ¶ 7.)  Her testimony would have been that the profit
and loss statements were based on erroneous revenue figures
and that El Diálogo, in fact, never made a cent of profit.
(<u>Id.</u>, ¶ 9.)

It would have been one thing for Pike to testify that he
had started with his own figures to make his estimate of the

10

paper's profits and through them its value, but he did not do this. His testimony suggested that the baseline figures came from Defendants, which in one sense they did, though with the distorting omission that they had been declared inaccurate (at least according to Ms. Santiago) at the time they were supplied.

The upshot of all this was that the court ended up sitting on the bench in the position of Ulysses, lashed to the mast while the witness sang his siren song. Intervention or clarification by the court might have compounded confusion. Even had Defendants been present, the jury might have disbelieved Santiago's testimony that the profit and loss figures were inaccurate or that she conveyed their inaccuracy to Pike. Wedged into this uncomfortable position, the court, for better or worse, was forced to remain silent. As a result the jury based its damage calculation on figures that were misleadingly represented as coming from Defendants without the key proviso, which would have borne strongly on the issue of credibility, that Santiago claimed to have denied their accuracy virtually from the moment they were produced.

Several other problematic moments in the trial did require the court's intervention to avoid outright subversion of the process.

The first was Pike's repeated testimony during his direct

11

testimony that he made a "$50,000 capital contribution" to El
Diálogo.  Pike admitted only after prodding from the court
that this contribution was not in cash, but was his own
valuation of certain "marketing and strategy studies" he made
during the time DMSA had an ownership interest in the paper.
Pike and his counsel must in fact have realized that a
reasonable juror might well interpret the phrase "$50,000
capital contribution" to mean a cash contribution in that
amount.  It was misleading of the witness initially to attempt
to omit the real story and put the court in the position of
having to insist on a clarification regarding the real nature
of the contribution.

Second, Pike testified that Defendants failed to "show
up" for trial, using this spin to create the impression that
Defendants' absence reflected a cavalier attitude towards the
case.  Again, the court was placed in the position of
insisting on a clarification to inform the jury of what
Plaintiffs well knew: that Defendants had notified the court
and counsel many months earlier of their decision not to
appear.  Even this limited disclosure left out the facts that
Defendant Santiago had been ill and that Defendants had no
assets.

Third, Pike testified, in essence, that El Diálogo had
been taken from him by Santiago's "renegade corporation" and

12

that he was entitled to damages equal to its value. This testimony omitted the undisputable fact that Defendants had offered to make available, voluntarily, all property of El Diálogo, LLC to Plaintiffs nine months before the trial began. Again, the court was required to intervene to ensure that the jury received something approaching a description of reality.[3]

Following final argument and deliberations on the second day of trial, the jury returned a verdict for less than one-tenth of Plaintiffs' claimed damages, awarding $300,000 plus fees and expenses in the amount of $320,000.

### III. DISCUSSION

As noted above, the court on June 11, 2007 entered, with some significant modifications, Plaintiffs' proposed Order and Judgment on liability. (Dkt. 92.) This portion of the memorandum will address each count in the Second Amended Complaint and the monetary award or equitable remedy appropriate for each.

A. Count I: Violation of the Lanham Act, 15 U.S.C. § 1125(a).

Based upon the jury's verdict, the court will order entry

---

[3] It might also be noted that the absence of any risk of cross examination allowed the witness Pike to offer doubtful testimony that his plan to "roll out" similar publications in other towns was somehow thwarted by Defendant's treatment of El Diálogo. However, the jury's rejection of the witness's inflated damage estimate, $3,800,000, probably reflects its skepticism about the credibility of this testimony.

of judgment for Plaintiffs on this count in the amount of $300,000, which constitutes a generous but sensible estimate of the extent of Plaintiffs' injury, based on a fair and reasonable assessment of the evidence offered at the trial. No multiple of this monetary award will be ordered by the court, for several reasons.[4]  First, § 1117(a) gives the court broad discretion "according to the circumstances of the case" in determining whether damages should be enhanced in a successful claim under § 1125(a).  Exercising this discretion, the court for the reasons set forth below will decline to award any enhancement.  Second, the Federal Circuit has made clear that, even if enhancement were appropriate, the amount to be trebled under this section of the Lanham Act cannot include lost profits.  Thompson v. Haynes, 305 F.3d 1369, 1380 (Fed. Cir. 2002).  The tangled testimony offered by Pike makes it impossible to distinguish between claims for alleged lost profits and more general damages.  Third, in determining

---

[4] Plaintiffs make the curious suggestion that the court's judgment of liability "provides that the Defendants' conduct has been fraudulent, intentional, and willful," citing Dkt. 92, at 8, implying that the trebled award should be virtually automatic.  Since Dkt. 92 has only six pages, the reference must be to paragraph 8, which nowhere uses the words "intentional" or "willful" and uses the word "fraudulent" only in the disjunctive.  Moreover, the court's modification to Plaintiffs' proposed judgment, replacing the words "is to be trebled" in paragraphs 1, 2, 5, and 11 with the phrase "may be trebled" made clear that the issue of enhanced damages was open.  (See Dkt. 92.)

whether enhanced damages are appropriate the court has the
obligation to apply equitable principles.    Id.    These
principles strongly militate against any enhanced award in
this case.  Fourth, the basic award itself already lies at the
outer fringe of the credible supporting evidence.  Fifth, the
absence of any defense distorted the presentation to the jury,
and this difficulty was exacerbated by the opportunistic
omission by Plaintiffs of certain undisputed facts and the
distortion of others, which the court was only partially able
to correct.  Sixth, it is undisputed that Defendant Santiago
used a title, Diálogo Bilingue, many months before she met
Pike, and that none of the parties' documents confirmed that
she was surrendering the right to use this phrase or variants
of it on her own.  Her assumption that she could continue to
use the phrase El Diálogo in a successor publication after she
broke from Plaintiffs may have been incorrect but had a
colorable basis and did not reflect a willful or intentional
violation of the statute.    In light of all these
circumstances, the fair and appropriate award of damages is
$300,000.[5]  The court will not award attorneys' fees under
this count (although it will do so under the following count),

_____

[5] The criteria set forth in § 1117(b) governing an award
of enhanced damages are somewhat different from § 1117(a).
They will be addressed in the court's discussion of Count XVI.

15

since "exceptional circumstances" are required as a prerequisite to such an award under § 1117(a), and no such circumstances have been shown here. See Tamko Roofing Prods., Inc. v. Ideal Roofing Co., 282 F.3d 23, 32-33 (1st Cir. 2002) (noting that a case does not satisfy the "exceptional circumstances" standard where the defendant might reasonably have believed it was not violating the statute, or where the violation presented a close legal question).

   B. Count II: Mass. Gen. Laws ch. 93A § 11.

   As before, based on the jury's award of $300,000 in actual damages, the court will make an identical award on this count. The court will not, however, award double or treble damages, since there has been no showing that Defendants' conduct was knowing or willful. As noted above, supra note 3, the court's entry of judgment of liability for Plaintiffs on this count in no way constituted an automatic finding of knowledge or willfulness. Moreover, the earlier use by Defendant Santiago of a variant of Plaintiffs' mark, and the absence of any reference to a transfer of the mark in the detailed documents embodying the parties' agreement, undercuts any claim that Defendants' conduct constituted a knowing or willful violation of the statute. On this count, however, the court will award Plaintiffs' the full amount of their fees and costs, in the amount of $320,000.

C. <u>Count III: Common Law Trademark Infringement and Unfair Competition</u>.

Based on the jury's verdict, the court will award $300,000 in actual damages. No claim for enhanced damages or fees is made regarding this count.

D. <u>Count IV: Breach of Contract</u>.

Based on the jury's verdict, the court will award $300,000 in actual damages on this count, which includes no claim for enhanced damages or fees.

E. <u>Count V: Breach of Contract Against Solé</u>.

This count is dismissed.

F. <u>Count VI: Misappropriation of Trade Secrets</u>.

Based on the jury's verdict, the court will award $300,000 in actual damages. The state statute gives the court discretion to award enhanced damages. <u>See</u> Mass. Gen. Laws ch. 93, § 42. For the reasons already stated the court will decline to award any enhanced damages.

G. <u>Count VII: Misappropriation of Trade Secrets – Injunctive Relief</u>.

Plaintiffs have received all the equitable relief requested, through the judgment on liability. (Dkt. No. 92.) No further action by the court has been sought.

H. <u>Count VIII: Conversion</u>.

Based on the jury's verdict, the court will award

17

$300,000 in actual damages.  No further action by the court has been sought.

    I. <u>Count IX: Breach of Fiduciary Duties</u>.

    Based on the jury's verdict, the court will award $300,000 in damages, plus $320,000 in attorneys' fees.  No further action by the court has been sought.

    J. <u>Count X: Tortious Interference with Contractual Relations</u>.

    Based on the jury's verdict, the court will award $300,000 in damages, plus $320,000 in attorneys' fees.  No further action by the court has been sought.

    K. <u>Count XI: Tortious Interference with Contractual Relations (Solé)</u>.

    This count is dismissed.

    L. <u>Counts XII, XIII, and XIV: Unjust Enrichment, Constructive Trust, and Declaratory Judgment</u>.

    Plaintiffs have received all equitable relief they requested, through the court's judgment on liability.  (Dkt. No. 92.)  No further action by the court has been sought.

    M. <u>Count XV: Violation of Mass. Gen. Laws ch. 110B, § 10</u>.

    Based on the jury's verdict, the court will award $300,000 in actual damages, plus $320,000 in attorneys' fees and costs.  No further action by the court has been sought.

    N. <u>Count XVI: Infringement of a Federally Registered</u>

<u>Trademark, 15 U.S.C. § 1114</u>.

Like Counts I and II, this count was tried solely to the court.  Based on the jury's verdict, the court will award Plaintiffs $300,000 in actual damages plus $320,000 in fees and costs.  For the reasons set forth below, the court will not award enhanced damages.

As noted above, the analysis of whether treble damages should be awarded involves slightly different criteria for the § 1114 claim (Count XVI) from those used in the Lanham Act claim under § 1125 (Count I).  The latter is governed by 15 U.S.C. § 1117(a), which grants the court broad discretion, while the former is governed by § 1117(b), which states that the court "shall" treble the damages "unless the court finds extenuating circumstances."

Despite the mandatory tone of § 1117(b), courts have found that, even with the finding of requisite intent an award of treble damages is "never automatic and may be limited by equitable considerations."  <u>Lindy Pen Co. v. Bic Pen Corp.</u>, 982 F.2d 1400, 1409 (9th Cir. 1993); <u>see also</u> <u>Intel Corp. v. Terabyte Int'l</u>, 6 F.3d 614, 620 (9th Cir. 1993); <u>Rolex Watch USA, Inc. v. Meece</u>, 158 F.3d 816, 826 (5th Cir. 1998).  <u>But see</u> <u>Louis Vuitton S.A. v. Lee</u>, 875 F.2d 584, 590 (7th Cir. 1989) (treating "extenuating circumstances" as an affirmative defense to be pleaded or "otherwise presented" to the trial

19

court).

Despite the strong language of § 1117(b) courts have carefully scrutinized the specific circumstances of the case before awarding enhanced damages.  In Microsoft Corp. v. CMOS Technologies, Inc., 872 F. Supp. 1329 (D.N.J. 1994), the court noted that "[w]hat constitutes an extenuating circumstance is determined on a case by case basis." Id. at 1339.  Where "the defendant is an 'unsophisticated individual, operating on a small scale, for whom the imposition of treble damages would mean that he or she would be unable to support his or her family' treble damages may be inappropriate."  Id. (citing Joint Explanatory Statement, 130 Cong. Rec. H. 12,076 at 12,083 (Oct. 10, 1984)).

Numerous district courts have found extenuating circumstances and declined to award treble damages in cases where the defendant's actions arguably had far less justification than the facts demonstrate here.  See Husbands for Rent, Inc. v. Handy Husbands for Rent, Inc., No. C04-1603 BZ, 2006 U.S. Dist. LEXIS 6843, at *13 (N.D. Cal. Feb. 23, 2006) (finding absence of deliberate intent to deceive, bad faith, or fraudulent behavior to be extenuating circumstances); Neles-Jamesbury, Inc. v. Bill's Valves, 974 F. Supp. 979, 985 (S.D. Tex. 1997) (no wrongful intention); Gucci Am., Inc. v. Rebecca Gold Enters., Inc., 798 F. Supp. 177

20

(S.D.N.Y. 1992) (considering totality of evidence and finding limited extent of infringement); <u>Gen. Elec. Co. v. Speicher</u>, 681 F. Supp 1337, 1344 (N.D. Ind. 1988) (conduct "simply not egregious enough" to warrant treble damages).

Here, all the factors enumerated in support of the court's decision not to award multiple damages on Count I apply with equal force. Moreover, the evidence in the case simply does not support a finding of willful intent to copy Plaintiffs' mark. Even accepting the uncontested finding that Defendants owned the mark, it is undisputed that Defendant Santiago, who was very unsophisticated and of limited means, used a very similar mark long before she ever entered into any contractual relationship with Plaintiffs. Moreover, Plaintiffs had an opportunity to make their ownership of the mark and its variants clear in the documents memorializing their understanding with Santiago and failed to do so. Santiago's resumption of the use of the mark after the relationship with Plaintiffs broke down may have been mistaken but it had a good faith basis. These factors plus the unusual nature of the trial, and the disturbing tactics of Plaintiffs at trial, all constitute extenuating circumstances making any trebling of damages inappropriate.

## IV. <u>CONCLUSION</u>

For the foregoing reasons, the court hereby orders the

clerk to enter judgment for Plaintiffs in the amount of $300,000, plus $320,000 in attorneys' fees and costs. No pre-judgment interest is required to make Plaintiff whole, and the court does not award any. Plaintiffs will be entitled to post-judgment interest at the applicable rate.

This case may now be closed.

It is So Ordered.

/s/ Michael A. Ponsor
MICHAEL A. PONSOR
United States District Judge